BOIES, SCHILLER & FLEXNER, LLP
Stuart Singer (*pro hac vice*)
ssinger@bsfllp.com
David Nelson (*pro hac vice*)
dnelson@bsfllp.com
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACADEMY OF MOTION PICTURE ARTS AND SCIENCES, a California nonprofit corporation,<br><br>          Plaintiff,<br><br>      v.<br><br>GODADDY.COM, INC., a Delaware corporation; THE GODADDY GROUP INC., a Delaware corporation; DOMAINS BY PROXY, INC., a Delaware Corporation; GREENDOMAINMARKT.COM, an unknown entity; BDS, an unknown entity; and XPDREAMTEAM LLC, a California limited liability corporation,<br><br>          Defendants. | Case No. CV10 3738 ABC (CWx)<br><br>**PLAINTIFF'S OPPOSITION TO GODADDY.COM, INC.'S MOTION FOR PROTECTIVE ORDER TO PREVENT THE DEPOSITION OF BOB PARSONS, CEO OF GODADDY.COM** |

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ........................................................................ 2

II.   STATEMENT OF FACTS ............................................................................. 4

   A.  General Background re Bob Parsons, His Blogs, and His Radio Broadcasts
   Directed to the Public ................................................................................... 4

   B.  Parsons was Intimately Involved with and Has Personal Knowledge on
   Numerous Key Issues relating to Domain Name Monetization ......................... 5

     1.  Parsons personally made numerous decisions relating to the Page Parking
     Programs. ................................................................................................ 6
     2.  Parsons has personal knowledge regarding GoDaddy's policy of
     monetizing domain names using the Page Parking Programs. .......................... 7
     3.  Parsons also has personal knowledge regarding a key issue in this case—
     GoDaddy's ability to screen for trademarks in its Page Parking Programs. ...... 8
     4.  Parsons advertises his own www.bobparsons.me website on Free Parked
     Pages, and, contrary to GoDaddy's claims, tracks the results. ........................ 10
     5.  Parsons has personal knowledge regarding GoDaddy's own direct
     registration/monetization of trademarked domain names in a GoDaddy
     subsidiary called "Standard Tactics." ........................................................ 11

   C.  Given the Pending Discovery Cut-off, AMPAS Had to Set the Parsons
   Deposition for Mid-December ........................................................................ 13

III.  ARGUMENT ............................................................................................. 15

   A.  Recent Caselaw Favors Ordering the Parsons Deposition ............................ 15

   B.  Parsons Has Unique, First-Hand Knowledge of Key Issues in This Case .... 16

   C.  AMPAS Has Exhausted Other Avenues of Discovery, including Requests for
   Production (RFPs), Requests for Admission (RFAs), and Depositions of
   GoDaddy Witnesses ...................................................................................... 18

     1.  GoDaddy has stonewalled AMPAS's attempts to take written discovery. 19
     2.  GoDaddy has failed to provide knowledgeable witnesses for 30(b)(6)
     depositions. ............................................................................................ 21

IV.  CONCLUSION ........................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir.1975) ............................ 15

*Celerity, Inc. v. Ultra Clean Holding, Incl*, 2007 WL 205067 (N.D. Jan. 25, 2007) ........................................................................................................................ 16

*In re Chase Bank USA, N.A. Check Loan Contract Litig.*, MDL 2032, 2011 WL 5248158 (N.D. Cal. Nov. 3, 2011) ...................................................................... 16

*Minter v. Wells Fargo Bank, N.A.*, 258 F.R.D. 118, 124-25 (D. Md. 2009) (citation omitted). .......................................................................................................... 15

*WebSideStory, Inc. v. NetRatings, Inc.*, 06CV408 WQH(AJB), 2007 WL 1120567, at *2 (S.D. Cal. Apr. 6, 2007) ...................................................................... 15

Plaintiff's Opposition to GD's Motion for Protective Order

## I.   **PRELIMINARY STATEMENT**

Courts sometimes prevent the deposition of the CEO of a large company due to potential harassment on a high-ranking executive.  But, not where the CEO is directly involved and participates in the accused conduct.  Here, AMPAS seeks to depose Bob Parsons not for harassment or undue burden, but to question him as a ***direct beneficiary*** in the wrongful monetization of domain names incorporating AMPAS's trademarks.  For example, GoDaddy cannot deny that Parsons' own personal advertisements appear on hundreds of domain names in GoDaddy's Page Parking Programs, despite the fact that AMPAS sent over 60 cease and desist letters to GoDaddy regarding this very practice.  Even if Parsons does not receive this revenue directly as GoDaddy claims (without evidentiary support), thru July 2011, Parsons was the sole 78% shareholder (with the other 22% as stock options for employees).  Simply stated, this is not a case where a party simply seeks to depose a CEO with a mere supervisory role.

There is more.  Parsons was also ***directly and intimately involved*** with GoDaddy's domain name monetization, including in the Page Parking Programs. Parsons has authored several blogs on the topic (at www.bobparsons.me), co-hosted several radio shows discussing the topic (at www.radiogodaddy.com), and has even posted video blogs.[1]  Perhaps the best example (of many) is "Standard Tactics," a GoDaddy subsidiary who *actually registered* domain names and then parked them—*including at least 3 domain names incorporating AMPAS's trademarks*.  Parsons gave a radio broadcast interview regarding why he *personally*

---

[1]  For example in Parsons' June 2006 blog, he wrote that "several well known trademark holders have filed a large and rather nasty lawsuit against Dotster . . . for registering many misspellings of [well-known] trademarked names, and associating them with search engine pages."  He explained that the "whole idea being that Internet users will land on these pages, click on these links and then generate revenue for our friends at Dotster…. It's all about catching internet traffic. . . . Anytime an Internet user lands on one of their mini-Web sites and clicks on one of the links, money is made."  [Liang Decl., par. 4, Exh. 2].

This is *precisely* the conduct that AMPAS has complained about to GoDaddy, such as with the www.academyawardz.com domain parked by GoDaddy.

1  decided to discontinue Standard Tactics, claiming it was purportedly "just for
2  research [because GoDaddy] wanted to understand this whole monetization,
3  parked page deal, and so what we did is we created Standard Tactics."  GoDaddy
4  cannot benefit from Parsons' outspokenness to the public on numerous topics, yet
5  refuse to produce him for deposition on those topics relevant to this case.

6      Forgetting its refusal to produce any pre-2007 documents (even though the
7  Page Parking Programs began generating revenue in 2005), GoDaddy accuses
8  AMPAS of failing to point to emails showing Parsons' direct involvement.  *Even*
9  *without* pre-2007 emails, AMPAS can show the following:  (1) Parsons initiated
10 GoDaddy's efforts to monetize domain names bearing the new <.mobi> extension,
11 (2) Parsons was a micro-managing CEO who demanded minute changes to each
12 page of a GoDaddy website, including the CashParking website interface,  (3)
13 Parsons decided what GoDaddy would call monetized domain names in the Page
14 Parking Programs ("Active" vs. "Passive"), and (4) Parsons approved newsletter
15 updates and templates sent to GoDaddy customers about CashParking.

16     AMPAS has also exhausted all other avenues of discovery (including written
17 discovery which GoDaddy has consistently stonewalled).  As for depositions,
18 GoDaddy claims it has produced numerous witnesses for deposition—True.  But
19 the GoDaddy witnesses produced to date have routinely answered "I don't know"
20 in response to virtually *every* policy-related decision regarding the implementation
21 of the Page Parking Programs, as well as GoDaddy's patent application for a
22 method of filtering third party trademarks out of parked pages.  For example,
23 GoDaddy's Senior Director of Domain Registration Services and the sole listed
24 inventor on the patent application—Richard Merdinger—claims he held a
25 "strategic leadership role responsible for . . . the park[ing] system."  Yet, he could
26 not answer why GoDaddy has not developed and implemented the patent.  He did
27 not even know why GoDaddy created the Page Parking Programs.  Other GoDaddy
28 witnesses similarly lacked knowledge on crucial aspects of this case.

1   Accordingly, AMPAS is entitled to ask Parsons about the statements that *he*
2   *authored* and positions *he announced* to the public.   Regardless of whether
3   GoDaddy's General Counsel addresses these issues or not, a single 7-hour
4   deposition of Parsons is necessary and appropriate.   This is especially the case
5   since Parsons is no longer GoDaddy's CEO (following a $2 billion investment by
6   third parties in July 2011).

7   **II.   STATEMENT OF FACTS**

8       **A. General Background re Bob Parsons, His Blogs, and His Radio**
9           **Broadcasts Directed to the Public**

10      Bob Parsons is not your typical CEO, who relies upon his executives to
11  manage a publicly listed company.   Today, GoDaddy remains privately held.
12  [12/27/2011 Declaration of Enoch Liang ("Liang Decl.," ¶18, Exh. 16.]   And up
13  until July 2011, other than its employees, Parsons was the *sole* shareholder in
14  GoDaddy.   [*Id.*, Exh. 16].   Moreover, as even GoDaddy concedes in its motion,
15  Parsons was extremely hands-on and involved in every aspect of GoDaddy,
16  boasting to reporters that "the reason I'm the single largest investor is because this
17  is what I eat, sleep, and breathe", [*Id.*, Exh. 16].[2]   As shown below, Parsons slept,
18  ate, and breathed key issues relating to domain name monetization, including for
19  GoDaddy's Page Parking Programs.

20      Not only is Parsons intimately involved in setting GoDaddy's policies, but
21  he is very vocal to the public about the decisions he makes—from which new
22  GoDaddy Girl he has chosen, to which new Super Bowl® advertisement he plans
23  on airing, to disseminating his rules for success in business and life.   Parsons
24  communicates with the public through his (1) written blog at www.bobparsons.me
25  (which evolved into a video blog starring Parsons), and (2) his co-hosting a weekly
26  GoDaddy radio show (archived at www.radiogodaddy.com) from 2005 to 2009.   In

27
28  [2] Generally, Parsons' hands-on management style includes making even minute
    changes to GoDaddy.com websites on a page-by-page basis [Liang Decl., ¶16,
    Exh. 14].

1   total, Parsons has authored approximately 160 written/video blog entries archived

2   at www.bobparsons.me, which also sells posters of the "Bob Parsons® 16 Rules

3   for Success in Business and Life in General" on every page of the archives (for

4   between $6.99 and $119.99).   [Liang Decl., ¶3]. And he has co-hosted

5   approximately 60 radio broadcasts (each approximately 60-90' long) through Dec.

6   2009, all archived at www.radiogodaddy.com.  [Liang Decl., ¶2].

7         **B. Parsons was Intimately Involved with and Has Personal Knowledge**

8              **on Numerous Key Issues relating to Domain Name Monetization**

9         GoDaddy accuses AMPAS of failing to show that Parsons was personally

10  involved in the Page Parking Programs.   However, as this Court will recall,

11  GoDaddy adamantly refused (1) to run targeted searches for its Executive

12  Management Team against the Negotiated ESI search results (approximately

13  818,000 emails), and (2) to search for *any* ESI at all prior to January 2007, despite

14  not disclosing to AMPAS that the Page Parking Programs had started generating

15  revenue as early as 2005.  Hence, it is no surprise that AMPAS can only point to a

16  few internal emails written by Parsons regarding the Page Parking Programs.

17        Nevertheless, despite GoDaddy's obvious attempts to hamstring AMPAS's

18  discovery, AMPAS can *still show* that Parsons had *personal knowledge and*

19  *involvement* in domain name monetization at GoDaddy, including the Page Parking

20  Programs.  Given Parsons' micro-management and numerous contact points with

21  the Page Parking Programs, it is "no surprise" that GoDaddy witness Richard

22  Merdinger—GoDaddy's Senior Director of Domain Registration Services testified

23  at his deposition [Liang Decl., ¶28, Exh. 27, at 121-122 (emphasis added)]:

24              Q. And is Bob Parsons involved in the policy in those types of
            [WHOIS-related] policy decisions?

25
            MR. McKOWN: Objection, vague, also calls for speculation.
26
            ***A. Bob's influence as the owner of the company is felt in all aspects.***
27          So, yes, I believe that he would have had conversations regarding
            whois policy if people brought it to him as a question.
28
            Q. And when you refer to all aspects, that would obviously also
            include the parked page services, true?

1    MR. McKOWN: Objection, calls speculation.

2    A. The entire company.

3    *Q. I mean, it wouldn't surprise you if Bob Parsons had made a*
4    *policy decision about whether or not to start the parked page*
     *services to begin with, would it?*

5    *A. No.*

6    Parsons' involvement in domain name monetization included the following areas:

7    **1. Parsons personally made numerous decisions relating to the**
8    **Page Parking Programs.**

9    As a micro-managing CEO, Parsons was intimately involved with the Page

10   Parking Programs.  For example, Parsons:  **(a)** approved how GoDaddy would

11   refer to monetized domain names in Page Parking (as opposed to domain names

12   resolving to active websites), [Liang Decl., ¶11, Exh. 9 (approving use of "Active"

13   v. "Passive" terminology for parked domains], **(b)** initiated GoDaddy's efforts to

14   monetize domain names using the new <.mobi> extension, [*Id.*, ¶8, Exh. 6], **(c)**

15   approved newsletter updates to GoDaddy customers about CashParking, including

16   how GoDaddy "added hundreds of NEW templates to CashParking, all designed to

17   help users increase traffic"  [*Id.*, ¶10, Exh. 8 (Parsons also wrote that "[w]hen it

18   comes to domain monetization, more traffic means more revenue.")], **(d)**

19   demanded overhauls to the CashParking interface that GoDaddy customers would

20   interface with [*Id.*, ¶7, Exh. 5],[3] and **(e)** approved GoDaddy's template

21   CashParking Monthly Update, containing a monthly account summary sent to all

22   registrants in CashParking [*Id.*, ¶9, Exh. 7.]

23   Contrary to GoDaddy's statements, this is not just a few random emails, but

24   shows a pattern of Parson's continued involvement with domain name

25   monetization (including the Page Parking Programs)starting in January 2007.

26   _____
     [3] The post-2007 emails produced by GoDaddy show that Parsons not only micro-
27   managed the Page Parking Programs, but himself was an avid user of GoDaddy's
     CashParking program.  [Liang Decl., ¶7, Exh. 5 (capital letters in original) (I . . .
28   "[j]ust attempted to manage cash parking for the domains in my account. . . . The
     process is . . . screwed up . . . IT NEEDS TO GET FXIED IMMEDIATELY."

## 2. Parsons has personal knowledge regarding GoDaddy's policy of monetizing domain names using the Page Parking Programs.

Although GoDaddy has not produced pre-2007 emails, AMPAS's research again reveals Parsons' involvement in monetizing domain names. Parsons discussed this practice in his April and June 2006 blog entries. [Liang Decl., ¶4, Exhs. 1 and 2.] In these blog entries, Parsons was complaining about "domain kiting," a practice where "registrars put up mini-Web sites—loaded with search engine links—for domain names for which they never pay." [*Id.*] In this context, Parsons set forth his philosophy on domain name monetization:

> **Traffic monetization is a legitimate business.**
> Before moving further, I'll point out that there's nothing wrong with being in the traffic monetization industry. Go Daddy and its affiliates participate in this on our parked pages. We put links on the pages associated with the domain names our customers park with us and we use those funds to keep our rates low and our services high.
>
> **There are many legitimate traffic monetizers.**
> There are also companies who own domain names and put up websites for the sole purpose of monetizing traffic. Some of these companies are customers of Go Daddy, many are not. I also see nothing wrong with monetizing traffic in this respect as these companies actually step up and purchase the domain names. [Liang Decl., ¶4, Exh. 2 (bold in original).]

Ironically, the only issue Parsons saw with "kiting," was that the registrars were taking advantage of the 5-day grace period to profit off of domain names that were never actually paid-for and registered. In other words, so long as GoDaddy made money off of domain names that were actually registered by "domain kiters," then Parsons saw no issue with the monetization (and free-riding) of domain names that incorporated famous trademarks. AMPAS should be able to depose Parsons on this issue.

Parsons also knew (and told the public) that monetizing famous trademarks could lead to trademark infringement. Again, in June 2006, Parsons informed the public of the following lawsuit against a fellow registrar [Liang Decl., Exh. 2.]:

**Dotster gets singled out.**

In the meantime, several well known trademark holders have filed a large and rather nasty lawsuit against Dotster – a registrar who hasn't exactly been a stranger to domain kiting - for registering many misspellings of the trademarked names, and associating them with search engine pages.

The names that are alleged to have been unlawfully used by Dotster are not trivial. They include such well known brands as Cingular, Disney, Ikea, Google, Neiman Marcus, Playboy, Verizon and the list goes on.

The whole idea being that Internet users will land on these pages, click on these links and then generate revenue for our friends at Dotster. I don't know if Dotster's guilty here or not - but that's what the suit is all about.

This is *exactly* AMPAS's complaint in this case.  That its marks are famous and well-known; that GoDaddy monetizes domain names incorporating AMPAS's trademarks; and that GoDaddy knows this practice infringes AMPAS's trademarks—having received 60 cease/desist letters from AMPAS—yet continues to park domain names incorporating AMPAS's marks.

> **3.  Parsons also has personal knowledge regarding a key issue in this case—GoDaddy's ability to screen for trademarks in its Page Parking Programs.**

In April 2005—right around the time that GoDaddy first started generating revenue from the Page Parking Programs—Parsons discussed GoDaddy's ability to screen for trademarks in domain names on his radio show.[4]  In the context of discussing a 2005 Ninth Circuit decision permitting domain name registrants to add the word "sucks" after a trademark and register it as a domain name, Parsons stated the following (in the 25th to 27th minutes of Episode 2):

> . . . There's two things that all our listeners should do in dealing with this issue [of domain name hijacking].  . . . We all have to look out for our own rights.
>
> What I recommend is that we use both foresight . . . and what we do is we take the little bit of money that it takes to go ahead and buy the

---

[4]The full radio broadcast is available at the following URL: http://www.radiogodaddy.com/gdshop/live/default.asp (April 6, 2005 broadcast).

1   protection that we need and that is step up and buy "godaddysucks" or whatever else you think might be registered and both buy "sucks" and however else you think it might be spelled.

2

3   *And then also awareness.  And that is there are tools that you can get. We have one of them.  It's called Deep Monitor.  5 bucks a year.* **What you can do you can run this thing it will let you know anytime anybody uses a domain name that has your domain name encapsulated in it.**  And then you can go ahead and deal with it right when it first takes place.  [Liang Decl., ¶2(a)—Episode 2.]

4

5

6   Of course, Parson's statements about "Deep Monitor" appear contrary to testimony

7   from Richard Merdinger[5]—the GoDaddy inventor listed on its October 2007 patent

8   application for "Systems and Methods for Filtering Online Advertisements

9   Containing Third Party Trademarks."  Merdinger testified at his deposition:

10

11   Q.  Do you know of any systems and methods for filtering online advertisements containing third party trademarks as it relates to the CashParking or the free parking system?

12

13   [objections from GoDaddy's counsel]

14   A.  No.  [Liang Decl., ¶27, Exh. 26, at 78-79].

15   Indeed, in a later Radio GoDaddy episode broadcast in December 2008,

16   Parsons was asked specifically about this patent application.[6]  After describing the

17   patent application, the guest on the show asked Parsons:

18   **[Question by Guest on Radio Broadcast]:**  Is that [patent application] an actual technology that you guys have, or is that just an idea that you came up with?

19

20   **[Answer by Parsons]:**  That would be an idea. . . . But, that's certainly the type of thing that we spend a lot of time thinking about. . . . We're always trying to get it right.  [Liang Decl., ¶2(b)].

21

22

23   [5]  AMPAS's independent research shows that GoDaddy applied for (and later abandoned) two trademarks for monitoring specified "keywords" in domain names followed by "creation of form correspondence relating to the management of intellectual property":  (1) "BRAND CATCHER," abandoned in 2005; and then (2) "DEEP MONITOR," abandoned in 2006.  [Liang Decl., ¶24, Exhs. 22-23].

24

25

26   Unfortunately, GoDaddy has refused to respond to discovery regarding its trademark applications for brand protection programs, which may necessitate yet another round of discovery motions before this Court.

27

28   [6]  The full archive of the radio broadcast is available at the following URL: http://www.radiogodaddy.com/gdshop/live/default.asp (Dec. 17, 2008 broadcast, Andrew Alleman section).

1  Though Parsons claims it was "an idea," in his previous April 2005 radio show,
2  Parsons discussed how and why GoDaddy's trademark does not get hijacked.  At
3  minutes 49 to 50 of Episode 2, Parsons stated that "we [GoDaddy] *have very tight*
4  *controls* and also we are lucky."   [Liang Decl., ¶2(a).]   Parsons has personal
5  knowledge of GoDaddy's "tight controls" preventing its own GODADDY family
6  of marks from being registered as domain names.  Yet, he refuses to employ this
7  technology for famous trademark owners like AMPAS.  AMPAS should have a
8  chance to depose Parsons on this issue.

9     Parsons told the public as early as 2005 that GoDaddy could filter domain
10  names for trademarks, a contention that other GoDaddy witnesses have denied in
11  depositions.   In 2005, at around the time GoDaddy started monetizing domain
12  names *en masse* in the Parked Page Programs, GoDaddy decided it could make
13  more money engaging in—rather than preventing (via BRAND CATCHER and
14  DEEP MONITOR)—trademark infringement.  Today, to rationalize that decision,
15  GoDaddy wants to bury what its CEO had to say about what GoDaddy can and
16  cannot do—including for its own family of trademarks.

17     **4. Parsons advertises his own** www.bobparsons.me **website on**
18        **Free Parked Pages, and, contrary to GoDaddy's claims, tracks**
19        **the results.**

20     There is no dispute that Parsons displays bobparsons.me banner
21  advertisements—with his picture—on the majority of websites parked in the Free
22  Parking Program.  There is also no dispute that Parsons himself appears—live and
23  in color—on approximately 160 video blogs on the www.bobparsons.me site.
24  Though GoDaddy now conveniently claims that Parsons is not involved and does
25  not operate the www.bobparsons.me website [Motion, at 10:3-24], it denies belief
26  that the micro-managing Parsons would actually videotape personal blogs directed
27  to his fan base, and then exercise no control.  Tellingly, GoDaddy does not cite to
28  *any* sworn testimony in making these naked assertions about how the
www.bobparsons.me website and advertisements are operated and tracked.

Contrary to GoDaddy's unsupported assertions, Parsons is frequently able to cite *specific facts and numbers* in his blog postings [Liang Decl., ¶4, Exhs. 1, 2, and 3] and advises his fans to *never engage in advertising* that cannot be measured. [Liang Decl., ¶5(a) (Rule No. 5 – "everything we do at GoDaddy is measured. . . . advertising we can't measure, we don't do, period".]   Indeed, performance metrics—"Anything that is measured and watched improves"—is Rule No. 9 in his "Bob Parsons® 16 Rules for Success in Business and Life in General."[7]

Further belying GoDaddy's statements, GoDaddy also produced documents showing that GoDaddy actually *does track revenues* generated from its banner ads on Parked Pages [Liang Decl., ¶17, Exh. 15 ("Parked pages are a big revenue driver for us.   See monthly data below (*available in order cube under Parked Pages channel*.") (emphasis added).]   In just 5 months, GoDaddy made well over one million dollars in revenue from almost 40,000 orders "to GD from the GD banners we have on parked pages.   I don't think this includes the cut we get from Google AdSense."   [*Id*.]   In other words, GoDaddy tracks the orders placed through GoDaddy banner ads on parked pages *separately* from the money that Google pays to GoDaddy for clicks on sponsored links.   Since GoDaddy refuses to provide any written discovery on these metrics, the only option for AMPAS is to depose Parsons, who benefits the most from www.bobparsons.me.

### 5. Parsons has personal knowledge regarding GoDaddy's own direct registration/monetization of trademarked domain names in a GoDaddy subsidiary called "Standard Tactics."

Recently, GoDaddy's counsel confirmed that GoDaddy had directly registered at least three domain names that incorporated AMPAS's trademarks.[8]

---

[7]   The full text of Parsons' Rule No. 9 is:   **Measure Everything of Significance**.   I swear this is true.   Anything that is measured and watched, improves.   [See http://www.bobparsons.me/bp_16_rules.php?ci=21428 (bold in original).]

[8]   Despite promises to do so, GoDaddy has yet to produce the documents showing which three domain names incorporating AMPAS's trademarks it actually registered through Standard Tactics.

1  This fact is, of course, of great interest to AMPAS as it shows *direct*
2  *cybersquatting* by GoDaddy acting *as a registrant itself*—as opposed to acting as a
3  "licensee" of a registrant and/or as opposed to contributory cybersquatting when
4  acting as a registrar for domain name registrants.

5       In December 2008, Parsons gave another Radio GoDaddy interview
6  discussing why GoDaddy discontinued Standard Tactics, despite its generating
7  approximately $40,000 per month.  [Liang Decl., ¶2(b).]  AMPAS should be able
8  to explore these issues with Parsons at a deposition, including his statements from
9  this December 17, 2008 radio broadcast, at minutes 7-10 of the interview:

> Standard Tactics [was]. . . just for research.  We wanted to understand this whole monetization, parked page deal, and so what we did is we created Standard Tactics.
>
> Now, it got to the point . . . where it had 33,000 names in it total, alright?  Of those 33,000 names, 8,000 generated . . . any revenue, alright?  So what we have done since then, is we've said, . . . we know what we need to know, there is no reason to continue with Standard Tactics anymore because . . . it makes it look like we're involved in domain name warehousing . . . but that's not the case.
>
> We never did much.  I think we were making a total of about 40,000 dollars a month in the revenue, which is certainly nothing to sneeze at, but in the whole scheme of things . . . it's more of a distraction than it is a revenue maker.  [Liang Decl., ¶2(a).]

18  Though GoDaddy discontinued Standard Tactics, it later compounded the
19  infringement by then auctioning off the infringing domain names in its program
20  "The Domain Name AfterMarket."  [*Id*.]

21       In that same interview, Parsons discussed GoDaddy's position on preventing
22  the sale of domain names that incorporated trademarks, at minutes 9-12:

> **[Question by Guest on Radio Broadcast]:**  One of the difficulties is that a lot of the domains that expire and have a lot of traffic are also trademarks.  As I pointed out, you guys have been subject to [many UDRP arbitrations] . . . What is GoDaddy's stance on domains there being trademarks being sold? . . . What's GoDaddy's position on that?
>
> **[Answer by Parsons]:**  Well, first of all, it's almost impossible, particularly when you are talking about typos, for us to screen the number of transactions on our aftermarket for that and do it effectively. . . . We have 333,000 names on our aftermarket at the moment.

1
2
3

> *So what we've decided to do is we decided to take the position of education. And we are in the process of posting on the aftermarket a warning [about registered trademarks] . . . And that's already in our agreement. But if somebody points it out to us . . . and we look at it and we see that it is [a trademark], then we'll remove it.* [Liang Decl., ¶2(a)].

4   Again, AMPAS is entitled to explore these policy issues with Parsons at a

5   deposition, including why GoDaddy uses its patented technology to protect its own

6   domain names, but refuses to do so for other famous trademark holders, relying

7   instead on "education."

8   ## C. Given the Pending Discovery Cut-off, AMPAS Had to Set the

9   ## Parsons Deposition for Mid-December

10   The current fact discovery cut-off set is February 9, 2012. Due to the trial

11   schedule of GoDaddy's counsel and the intervening holidays, GoDaddy claimed

12   that its witnesses (like Christine Jones) could not sit for deposition until the week

13   of January 23, 2012. [Liang Decl., ¶19, Exh. 17.] Given the looming fact

14   discovery cut-off, there would have been insufficient time for AMPAS to first take

15   those depositions, then request and meet/confer on the Parsons deposition, and

16   finally bring a motion to compel the Parsons deposition. In other words, AMPAS

17   could not wait to use up 19 of the 20 allotted depositions before noticing the

18   Parsons deposition, especially given Judge Collins' standing order, Paragraph 2.[9]

19   After receiving GoDaddy's motion for a protective order, AMPAS took

20   steps to avoid the instant motion until after the second round of Phoenix

21   depositions. On December 22, AMPAS asked GoDaddy to stipulate to having this

22   motion heard on Feb. 7, 2012—*i.e.,* after the results of GoDaddy's computer

23   search and the second round of Phoenix depositions, but before the Feb. 9 fact

24   discovery cut-off. [Liang Decl. ¶23, Exh. 21]. Continuing its pattern of refusing

25   cooperation on discovery matters, GoDaddy refused. [*Id*.].

26

27   ---
28   [9] Paragraph 2 of her Standing Order provides (italics in original): "*The non-expert discovery cut-off date means the last day by which all depositions must be completed and responses to all previously served written discovery must be provided. It does not mean the last day to initiate discovery or to file a motion with the magistrate judge seeking to compel discovery.*"

1      Indeed, GoDaddy's entire motion is a catch-22 for AMPAS.  On the one

2 hand, GoDaddy attacks AMPAS for noticing the Parsons deposition before

3 completing its other 19 allotted depositions.  [Motion, at 2:21-26; 6:21-24.]  In

4 other words, GoDaddy accuses AMPAS of being too early.  On the other hand,

5 GoDaddy faults AMPAS for waiting from August until mid-November 2011 to

6 notice the Parsons deposition.  [Motion, at 5:16-19.]  GoDaddy accuses AMPAS of

7 being both too early and too late.

8      GoDaddy has consistently flip-flopped its positions throughout this case.

9 For example, after AMPAS noticed the Parsons deposition in mid-November

10 (setting the deposition for December 15 to accommodate GoDaddy's counsel's

11 trial schedule), GoDaddy told AMPAS that it would check with its client to see

12 whether GoDaddy would voluntarily produce Parsons for deposition.  [Liang

13 Decl., ¶19, Exh. 17.]  AMPAS waited patiently for a response from GoDaddy on

14 the Parsons deposition, as GoDaddy indicated that "any meet and confer efforts, if

15 necessary, will relate to [GoDaddy's protective order]."  [*Id.*]  Instead of providing

16 a "Yea" or "Nay" answer on the Parsons deposition, GoDaddy's next move was to

17 feign ignorance, claiming that GoDaddy had "been waiting patiently for several

18 weeks for AMPAS to explain why it believes it is appropriate and necessary to

19 take the deposition of [Parsons]."  [Liang Decl., ¶22, Exh. 20.]  Despite proceeding

20 in good faith, AMPAS finds itself in a catch-22 every time it seeks discovery.[10]

21

22 [10]  As the Court will recall, GoDaddy delayed producing the majority of its
23 documents responsive to AMPAS's First Requests for Production.  In an attempt to
speed up GoDaddy's production, in Feb. 2011 AMPAS negotiated an ESI search
24 with GoDaddy (1) from Jan. 2007 to present and (2) for 18 identified custodians.
25 In Sept. 2011, AMPAS learned that GoDaddy had actually started earning revenue
in 2005 from the Page Parking Programs.  AMPAS asked for discovery prior to
26 2007, and for other custodians, including the Executive Management Team.
27 GoDaddy refused, citing a phantom "agreement" that limited discovery to (1) just
the originally identified custodians, and (2) just the timeframe from 2007 to
28 present. Again, AMPAS was in a catch-22.  Fortunately, this Court rejected
GoDaddy's phantom "agreement" at the December 13, 2011 hearing.

## III.   **ARGUMENT**

### A. Recent Caselaw Favors Ordering the Parsons Deposition

Under FRCP 26(c), the Court may grant a protective order, which requires the moving party to demonstrate "good cause." "Thus, the standard for issuance of a protective order is high. A motion seeking to prevent the taking of a deposition is regarded unfavorably by the courts, And it is difficult to persuade a court to do so." *Minter v. Wells Fargo Bank, N.A.,* 258 F.R.D. 118, 124-25 (D. Md. 2009) (citation omitted).  To establish good cause, the moving party must make a clear showing of a particular and specific need for the order.  *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir.1975); *see also WebSideStory, Inc. v. NetRatings, Inc.*, 06CV408 WQH(AJB), 2007 WL 1120567, at *2 (S.D. Cal. Apr. 6, 2007) (cited by GoDaddy but actually permitting the deposition of the CEO).

After surveying numerous court decisions around the country, the *Minter* court discussed the apex deposition rule as being "bottomed on the apex executive lacking *any* knowledge of relevant facts."  *Minter*, 258 F.R.D. at 125-26 (original italics).  "However, when a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition.  Generally, a claimed lack of knowledge on behalf of the deponent does not alone provide sufficient grounds for a protective order." *WebSideStory,* 2007 WL 1120567 at *2.

As shown above and discussed again below, Parsons' fingerprints are all over GoDaddy's domain name monetization programs.  He was (and remains) the single largest shareholder, owning 78% of GoDaddy before July 2011.  The public record shows that Parsons was very much involved and highly interested in domain name monetization issues affecting the Internet, as long as GoDaddy also made money.  Under similar facts, courts have ordered apex depositions.  *See, e.g.*, *Minter*, 258 F.R.D. at 126-127 (ordering deposition of CEO where "media reports [paint] a picture of Mr. Foster as very much involved in the management of L & F, and embroiled in the issue" and "has an enormous economic interest . . . (approximately 50% ownership))."  Accordingly, GoDaddy's "reliance on *Celerity,*

1  *Inc. v. Ultra Clean Holding, Incl*, 2007 WL 205067 (N.D. Jan. 25, 2007) is

2  unavailing. There the party seeking the deposition had not identified any unique

3  personal knowledge of the executive and had not yet taken the depositions of other

4  lower level employees." *In re Chase Bank USA, N.A. Check Loan Contract Litig.*,

5  MDL 2032, 2011 WL 5248158 (N.D. Cal. Nov. 3, 2011) (permitting apex

6  deposition).

7      Since Parsons has personal knowledge, AMPAS does not have to "wait and

8  see" until after the second round of Phoenix depositions. *Minter*, 258 F.R.D. at

9  127. Indeed, with a discovery cut-off of February 9, this Court should permit

10 AMPAS to depose Parsons during the same week as the second round of Phoenix

11 depositions (week of January 23). *WebSideStory*, 2007 WL 1120567, at *4.

12      GoDaddy claims that "the more active a CEO, the more likely that a

13 deposition will interfere with the day-to-day operations of the company." [Motion,

14 at 10:1-2.] Thankfully, Parsons is no longer CEO at GoDaddy. After July 2011,

15 Parsons became Executive Chairman of the Board, ceding the CEO position to

16 Warren Adelman. [Liang Decl., ¶18, Exh. 16]. A busy schedule no longer

17 justifies a protective order.

18 **B. Parsons Has Unique, First-Hand Knowledge of Key Issues in This**

19    **Case**

20      GoDaddy cannot reasonably dispute the fact that Parsons has significant

21 involvement in GoDaddy's monetization of domain names (including those

22 domain names that incorporate famous trademarks). For example, GoDaddy's

23 Senior Director of Domain Registration Services testified that Parsons' "influence

24 as the owner of the company is felt in all aspects," and that it wouldn't surprise

25 him if Parsons personally made the policy decision to start the Page Parking

26 Programs. [Liang Decl., Exh. 27, at 121-122.] Parsons was certainly involved in

27 deciding to offer the Page Parking Program in 2007 in connection with the new

28 <.mobi> extensions. [Liang Decl. Exh. 27 ("I wonder how we can make [Adsense

for Mobile] available to our .mobi customers so it is helpful to them")].

As far back as January 2007, Parsons himself a CashParking user, demanded specific changes to the CashParking user interface.  [Liang Decl., Exh. 5].  Parsons also personally reviewed and approved newsletter updates to GoDaddy's customers about CashParking, including GoDaddy's template CashParking Monthly Update.  [*Id.*. Exhs. 7-8.]  Parsons even decided on which nomenclature GoDaddy would use for referring to "Active" domain names (those actually resolving to a registrant's own website), as opposed to "Passive" domains (those without a website that were maintained in GoDaddy's Page Parking Programs generating passive income for the registrant).  [*Id.*, Exh. 9.]

Parsons has also made his views heard to the Internet-using public.  In a blog post complaining about "domain kiting," Parsons even set forth his philosophy on why domain name and traffic monetization is a "legitimate business."  [*Id.*. Exh. 1.]  Indeed, Parsons himself benefits from the Page Parking Programs.  There is no dispute that Parsons displays www.bobparsons.me banner ads on most, if not all, domain names parked in the Free Parking Program.  Though GoDaddy (and likely Parsons himself) tracks that revenue, [Liang Decl., par. 5(a), and Exh. 15], GoDaddy makes the incredulous assertion (without support) that Parsons is not involved in his own website!

Parsons—in a radio broadcast—discussed how GoDaddy avoids domain name hijacking/cybersquatting.  In that broadcast, Parsons recommended to the public (1) that they register different possible combinations of their trademarks (thereby generating more revenue for registrars like GoDaddy), and, (2) they sign up for GoDaddy's "Deep Monitor" program, which would identify domain names that had a brand owner's marks encapsulated therein (thereby generating more revenue for GoDaddy).  [Liang Decl., ¶2(a).]  Parsons also bragged about GoDaddy's "tight controls" to prevent cybersquatting on the GODADDY family of marks.  [*Id.*]  In yet another radio broadcast, Parsons discussed how GoDaddy focused on "education" to prevent the monetization/sale of domain names that incorporated famous trademarks.  [Liang Decl., ¶2(b).]   In other radio interviews,

1  Parsons even discussed one of the key pieces of evidence in this case—GoDaddy's

2  October 2007 patent application for "Systems and Methods for Filtering Online

3  Advertisements Containing Third Party Trademarks."  Though an idea has to be

4  reduced to practice in order to be patented, [35 U.S.C. Section 112], Parsons told

5  the public that the patent application was just an "idea."  [Liang Decl., ¶2(b).]

6      Finally, in December 2008, Parsons told the world in a radio broadcast about

7  Standard Tactics, a GoDaddy subsidiary that itself trademarked and monetized at

8  least 3 domain names incorporating AMPAS's trademarks.  [Liang Decl., ¶2(b).]

9  In this broadcast, Parsons stated that he discontinued the Standard Tactics program,

10  claiming it was merely for "research" "to understand the whole monetization,

11  parked page deal," despite admitting that GoDaddy had itself registered 33,000

12  domain names generating $40,000 a month in revenue.[11]  [*Id.*]

13     This is no "handful of communications relating to the parked page

14  programs," as GoDaddy would have the Court believe.  [Motion, at 12:18-20.]

15  **C. AMPAS Has Exhausted Other Avenues of Discovery, including**

16       **Requests for Production (RFPs), Requests for Admission (RFAs),**

17       **and Depositions of GoDaddy Witnesses**

18     As this Court is no doubt aware given the number of discovery motions in

19  this matter, GoDaddy has frustrated AMPAS's attempts to obtain relevant

20  discovery at every turn.  GoDaddy has stymied both AMPAS's written discovery

21  and AMPAS's depositions.  Yet, when faced with a deposition notice of Bob

22  Parsons, GoDaddy has the temerity to argue to this Court that it has provided

23  sufficient written discovery responses and witnesses for deposition, making the

24  Parsons deposition unnecessary.

25

26

27

28

---

[11] Of course, Parsons' own words disavow the statement that "the two programs were separate and distinct . . . [and that] the Standard Tactics program was entirely unrelated to the parked page program."  [Motion, at 11:18-22.]

**1. GoDaddy has stonewalled AMPAS's attempts to take written discovery.**

Setting aside for now GoDaddy's refusal to search for ESI prior to Jan. 2007[12], GoDaddy has continually and consistently stonewalled AMPAS's attempts to take written discovery on relevant issues.  Because Parsons clearly has relevant, personal, and unique knowledge on these issues, AMPAS should be permitted to take his deposition.  Below are just a few examples where GoDaddy has simply refused to respond to written discovery:

- GoDaddy will not admit that the Free and Cash Parking Programs monetize domain names:  GoDaddy responded to AMPAS's Second Set of RFAs on Nov. 29, 2011.  [Liang Decl., ¶21, Exh. 19].  AMPAS's Second RFAs Nos. 43, 44, and 47 asked GoDaddy to admit that it "monetizes domain names" in Free/ Cash Parking.  GoDaddy refused to, despite Parsons' clear comments to the contrary.  [Liang Decl., Exh. 1].

- GoDaddy will not admit that it can parse/divide domain names into Keywords to compare to trademarks:  AMPAS's Second RFAs, No. 59 asked GoDaddy to admit that it could parse a domain name into Keywords. [Liang Decl., Exh. 19].   GoDaddy refused to admit, despite Parsons' clear comments to the contrary about DEEP MONITOR. [Liang Decl., ¶2(a)].

- GoDaddy has refused to provide any documents relating to www.bobparsons.me and relating to revenue from clicks on banner ads, including at www.bobparsons.me:  GoDaddy responded to AMPAS's Fourth Set of RFPs on Dec. 13, 2011.  [Liang Decl., ¶20, Exh. 18].  AMPAS's Fourth RFPs Nos. 5, 6, and 7 asked for documents relating to

---

[12]  Pursuant to the Court's Dec. 13, 2011 ruling, AMPAS intends to meet and confer with GoDaddy on a targeted, date range search for ESI prior to Jan. 2007.  Given its conduct in this case however, AMPAS is not hopeful that GoDaddy will cooperate.   Accordingly, if GoDaddy refuses to produce pre-2007 documents, AMPAS has no choice but to seek deposition discovery.

revenue generated on www.bobparsons.me, as well as revenue from orders placed from clicks on GoDaddy's banner ads in Page Parking.

GoDaddy refused to provide any documents, even though both parties know that GoDaddy tracks these metrics. [Liang Decl., Exh. 15 (this email bates labeled GD10638-GD10640 is the exact document that AMPAS asked about in its Fourth RFPs).

- GoDaddy has refused to provide any documents relating to GoDaddy's BRAND CATCHER program (related to GoDaddy's DEEP MONITOR program): AMPAS's Fourth RFPs Nos. 1-3 asked for documents related to GoDaddy's BRAND CATCHER brand protection and monitoring program, including the decision to offer it and the decision to cancel it. [Liang Decl., Exh. 18].

GoDaddy stonewalled and refused to provide any documents, despite Parsons' recommendation of DEEP MONITOR (a program plainly related to BRAND CATCHER—see Liang Decl., Exhs. 22 and 23) during an April 2005 radio broadcast. [Liang Decl., ¶2(a).]

- GoDaddy has refused to admit that it can resolve parked domains to a generic "Under Construction" page unpopulated by sponsored links: AMPAS asked GoDaddy to admit that it could stop providing Parked Pages with sponsored links. [Liang Decl., Exh. 19, RFAs 54 and 56].

GoDaddy denied all of AMPAS's requests, despite clear evidence that upon receiving complaints from trademark holders, Parsons directs GoDaddy to resolve domain names containing trademarks to generic websites unpopulated by sponsored links. [Liang Decl., ¶15, Exh. 13.]

GoDaddy made its choice—to stymie all written discovery. Now, GoDaddy must live with the consequences—the deposition of Parsons.

## 2. GoDaddy has failed to provide knowledgeable witnesses for 30(b)(6) depositions.

GoDaddy claims that it "made each of its witnesses with firsthand knowledge regarding GoDaddy.com's products and programs, including its trademark policies with respect to the page parking program, available for full-day depositions" and that each witness "was prepared and responded fully to AMPAS' questions." [Motion, at 6:1-12.]  Not true.  Instead, the witnesses produced by GoDaddy have been unable to answer the most basic questions asked of them despite their designation as 30(b)(6) witnesses and their high ranking positions within the company.  GoDaddy continues to play the proverbial game of "hide the ball" and in an effort to avoid giving answers to issues central to this litigation.

**<u>Deposition of GoDaddy Senior Director Richard Merdinger:</u>**  Merdinger is GoDaddy's Senior Director of Domain Registration Services and was listed as the inventor on GoDaddy's patent application for "Systems and Methods for Filtering Online Advertisements Containing Third Party Trademarks."  Merdinger is in a "strategic leadership role responsible for the groups that make it possible for GoDaddy to register domains . . . and also the park[ing] system."  [Liang Decl., Exh. 26, at 11-12].  GoDaddy designated Merdinger as its 30(b)(6) witness on numerous topics, including the creation and history of the Page Parking Programs (Topic Nos. 1 and 7), as well as GoDaddy's patent application (Topic No. 12).  [Liang Decl., Exh. 24 (Third Amended 30b6 Notice)].

However, Merdinger testified that he did not know why the Page Parking Programs were created  and he was not familiar with the rationale for their creation [Liang Decl., Exh. 25 , at 84-85].  Merdinger also testified that he did not know who designed the template pages in the Parking Programs, and that he did not know who made the decision to default all domain names to the Free Parking Program.  [*Id*., Exh. 25, at 96-97].  In fact, Merdinger testified that whoever made that decision made it from a "business" standpoint, not an operational one.  [*Id*.]  This, despite Merdinger's admission that he was involved "[a]t a very high level"

1   in "strategic decisions as it relates to the park[ing] system generally." [Liang

2   Decl., Exh. 26, at 11-12.]

3        When asked about GoDaddy's patent application, Merdinger also lacked

4   answers.  When asked why the patent application's systems/methods were not

5   developed, Merdinger replied "I don't know." [Liang Decl., Exh. 25, at 62:16-21.]

6   **Deposition of GoDaddy Director Paul Nicks:**   Nicks is GoDaddy's

7   Director of Product Development, Aftermarket. [Liang Decl., Exh. 29, at 7-8].  As

8   such, he is responsible for managing "and leading the direction of GoDaddy's

9   aftermarket products," including Free Parking, Cash Parking, and domain name

10  auction services. [*Id.*, at 7-8].  Among other 30(b)(6) topics (2, 3, 4, 6, and 8),

11  GoDaddy designated Nicks to testify about the operations of the Page Parking

12  Program.  [*Id.*, Exh. 28, at 6-7].

13       Nicks admitted at his deposition that GoDaddy could send all domain names

14  to Under Construction pages which do not contain advertising links (instead of

15  Free Parking which does contain advertising links), but GoDaddy chooses not to.

16  [Liang Decl., Exh. 28, at 13-15].  When asked why, Nicks said he did not know;

17  Nicks even testified that he was unaware of who at GoDaddy would even be

18  responsible for making that decision.  [*Id.*]

19       Nicks admitted at his deposition that GoDaddy could (1) parse or divide a

20  domain name into certain keywords, (2) could compare keywords to a database of

21  trademarks, *but* (3) had not implemented a program that does both.  [Liang Decl.,

22  Exh. 28, at 70-71].  When asked why GoDaddy had not taken step (3), GoDaddy's

23  counsel refused to let Nicks answer.  [*Id.*, at 71:8-18].  Similarly, Nicks admitted

24  that GoDaddy had the technology to stop domain names containing trademarks

25  from being placed into the Free Parking Program.  [*Id.*, at 77-78.]  When asked

26  why GoDaddy has not done so, Nicks said he didn't know, and also didn't know

27  who would have knowledge.  [*Id.*]

28       As the Court will recall from previous briefing on AMPAS's motion to

compel a second round of depositions in Iowa, GoDaddy's counsel repeatedly

1   instructed Nicks not to answer.   Moreover, GoDaddy's counsel repeatedly

2   represented to AMPAS that GoDaddy would produce a witness on Topic No. 9,

3   regarding trademark-related issues in the Page Parking Programs, including why

4   GoDaddy has or has not implemented certain policies or procedures to prevent

5   trademark infringement in the Page Parking Programs.  [Liang Decl., Exh. 28, at

6   64-65, 66-68, 71, 73-74, 77-78.]   Taking GoDaddy at its word, AMPAS waited

7   patiently to take the deposition of a 30(b)(6) witness on Topic No. 9.  [Liang Decl.,

8   Exh. 24 (Third Amended 30b6 Notice)].

9      **Deposition of Jessica Hanyen:**   Finally, GoDaddy produced a witness to

10   testify about Topic No. 9 in AMPAS's 30(b)(6) Notice—Jessica Hanyen.  [Liang

11   Decl., Exh. 30, at 9.]      Yet when GoDaddy presented Jessica Hanyen as the

12   30(b)(6) designee to answer the policy questions under Topic No. 9 she testified:

13      Regarding Free Parking:  Hanyen did not know who at GoDaddy made the

14   policy decision to direct all domain names into Free Parking, instead of a generic

15   landing page without sponsored links.  [Liang Decl., Exh. 30, at 27.]   Since

16   GoDaddy does not filter for trademarks, when asked if it would be a more effective

17   policy to simply direct all domain names to a generic page without sponsored

18   links, Hanyen again said she did not know.  [*Id.*, at 19.]  In fact, Hanyen even

19   testified that she did not know whether GoDaddy was capable of directing all

20   domain names to a generic page without sponsored links.  [*Id.*, at 20.]

21      Hanyen also did not know if GoDaddy was capable of screening for

22   trademarks before placing a domain name into Free Parking.  [Liang Decl., Exh.

23   30, at 12-13.]   When asked why GoDaddy has not tried to implement such a

24   filtering system, Hanyen replied that she did not know.  [*Id.*, at 22-23.]   When

25   asked whether GoDaddy would implement such a filtering system if it had one,

26   Hanyen testified that she did not know; in fact, she didn't even know who at

27   GoDaddy would make the decision.  [*Id.*, at 72.]

28      Hanyen admitted that GoDaddy waits until a complaint is received from a

trademark holder before redirecting a domain name from Free Parking to a generic

1  page without sponsored links.  [Liang Decl., Exh. 30 at 14.]  When asked whether

2  it would be a more effective policy to filter for trademarks *before* placing domain

3  names into Free Parking, Hanyen said she did not know.  [*Id*., at 14-15.]

4  Facing a witness without knowledge, AMPAS literally read from the

5  deposition of Paul Nicks regarding how GoDaddy could (1) parse or divide a

6  domain name into certain keywords, (2) could compare keywords to a database of

7  trademarks, but (3) had not implemented a program that does both.  [Liang Decl.,

8  Exh. 30, at 25-26].  When asked why GoDaddy had not done Step (3), Hanyen

9  replied that she did not know.  [*Id.*]

10  <u>Regarding CashParking:</u>  Hanyen did not know GoDaddy's policies and

11  practices regarding screening for trademarks in CashParking.  [Liang Decl., Exh.

12  30, at 11].  Hanyen did not know that GoDaddy used trademark validation for

13  keywords in CashParking.  [*Id*., at 27.]  She also did not know how GoDaddy

14  reviewed domain names in CashParking to see whether they infringed trademarks.

15  [*Id*., at 28-29.]  She did not even know when GoDaddy would review a domain

16  name for trademark infringement in CashParking.  [*Id*., at 29.]

17  <u>Other:</u>  Hanyen also testified that she did not know if GoDaddy could

18  implement a practice of tracking known trademark violations to a central source,

19  and then block those names from certain GoDaddy products.  [Liang Decl., Exh.

20  30, at 21.]

21  **Deposition of GoDaddy VP Tim Ruiz:**  Seeking to find someone at

22  GoDaddy who could testify about the business and policy reasons behind why the

23  Parked Page Programs were implemented, why GoDaddy defaulted domain names

24  to Free Parking, and why GoDaddy did or did not take certain steps to prevent

25  trademark infringement in the Page Parking Programs, AMPAS took the

26  deposition of Tim Ruiz—GoDaddy's Vice President of Corporate Development

27  and Policy since 2003.  Mr. Ruiz testified that even though he had a broad title, his

28  work responsibility was solely limited to policy planning as it related to ICANN.

[Liang Decl., Exh. 31, at 15:2-23].  Yet another dead end.

IV.   **CONCLUSION**

       GoDaddy cannot shield Bob Parsons from a deposition.  His fingerprints—and voice and image—are all over GoDaddy's scheme to monetize domain names, including those that incorporate famous trademarks.  Under these circumstances, a 7-hour deposition of Bob Parsons is both appropriate and necessary.


DATED:  December 27, 2011          By:  /s/ Enoch Liang

                                   BOIES, SCHILLER & FLEXNER, LLP
                                   Stuart Singer (*pro hac vice*)
                                   David Nelson (*pro hac vice*)
                                   401 East Las Olas Blvd., Suite 1200
                                   Fort Lauderdale, FL 33301
                                   Telephone: (954) 356-0011
                                   Facsimile: (954) 356-0022

                                   LEE TRAN & LIANG APLC
                                   James M. Lee, California Bar No. 192301
                                   Enoch H. Liang California Bar No.  212324
                                   601 South Figueroa Street, Suite 4025
                                   Los Angeles, CA 90017
                                   Telephone: (213) 612-3737
                                   Facsimile: (213) 612-3773

                                   FOOTE, MEYERS, MIELKE FLOWERS LLC
                                   Robert M. Foote (*pro hac vice*)
                                   Kathleen Chavez (*pro hac vice*)
                                   Matthew Herman (*pro hac vice*)
                                   30 North LaSalle Street, Suite 2340
                                   Chicago, IL 60602
                                   Telephone: (630) 232-6333
                                   Facsimile: (630) 845-8982

                                   *Attorneys for Plaintiff*