1  BOIES, SCHILLER & FLEXNER LLP
2  Stuart Singer *(pro hac vice)*
   ssinger@bsfllp.com
3  David Nelson *(pro hac vice)*
   dnelson@bsfllp.com
4  401 East Las Olas Blvd., Suite 1200
5  Fort Lauderdale, FL 33301
   Telephone:  954.356.0011
6  Facsimile:   954.356.0022
7
8  [Additional Counsel Listed on Signature Page]
9  *Attorneys for Plaintiff Academy of Motion Picture Arts and Sciences*

10             UNITED STATES DISTRICT COURT
11             CENTRAL DISTRICT OF CALIFORNIA
12                  WESTERN DIVISION
13

| | |
|---|---|
| ACADEMY OF MOTION PICTURE ARTS AND SCIENCES, a California nonprofit corporation, | Case No.:  2:10-cv-03738 ABC (CWx) |
| Plaintiff, | **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| GODADDY.COM, INC., et al., | |
| Defendant. | **PUBLIC REDACTED VERSION** |
| | **Date:**  Monday, April 22, 2013 **Time:** 10:00a.m. **Place:**  Courtroom 680 **Complaint Filed:** May 18, 2010 **Trial Date:**  May 21, 2013 **Judge:** Hon. Audrey B. Collins |

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................... 3

ARGUMENT ........................................................................................................ 5

I.   THE UNDISPUTED EVIDENCE DEMONSTRATES THAT
GODADDY "USED" AND "TRAFFICKED IN" THE
INFRINGING DOMAIN NAMESBY OBTAINING AND
EXERCISING CONTRACTUAL AUTHORIZATIONTO PARK
ITS REGISTRANTS' DOMAIN NAMES ............................................ 5

   A.   GoDaddy is the Authorized Licensee of its Free Parking
        Registrants ................................................................................. 6

   B.   GoDaddy is the Authorized Licensee of its CashParking
        Customers ................................................................................ 10

II.  GODADDY "USED" THE INFRINGING DOMAINS BY
MONETIZING, OR ATTEMPTING TO MONETIZE, ALL
SUCH DOMAIN NAMES IN ITS PARKED PAGE PROGRAM ..... 11

III. GODADDY CANNOT SHOW THAT IT IS ENTITLED TO
SUMMARY JUDGMENT ON THE ISSUE OF "CONFUSING
SIMILARITY" ...................................................................................... 16

IV.  GODADDY IS NOT ENTITLED TO SUMMARY JUDGMENT
ON WHETHER THE DISPUTED DOMAINS ARE "DILUTIVE
OF" THE AMPAS MARKS ................................................................. 20

V.   THE ACADEMY'S CONTRIBUTORY CYBERSQUATTING
CLAIM IS SUPPORTED BY SUFFICIENT EVIDENCE ................. 22

VI.  THERE IS A FACTUAL DISPUTE CONCERNING WHETHER
GODADDY WAS THE REGISTRANT OF THREE OF THE
INFRINGING DOMAIN NAMES ...................................................... 24

VII. GODADDY'S SUMMARY JUDGMENT MOTION ON THE
ACADEMY'S UNFAIR COMPETITION CLAIM FAILS ................ 25

CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

Page

## Cases

*Alitalia-Linee Aeree Italiane S.p.A. v. Casinoalitalia.com,*
128 F. Supp. 2d 340 (2001) ......................................................................... 11

*Atlas Copco AB v. Atlascopcoiran.com,*
533 F. Supp. 2d 610 (E.D. Va. 2008) .......................................................... 23

*Carson Harbor Vill., Ltd. v. Unocal Corp.,*
CV 96-3281 MMM (RCX), 2003 WL 22038700 (C.D. Cal. Aug. 8, 2003) ....... 19

*Christensen Firm v. Chameleon Data Corp.,*
2006 WL 3158246 (W.D. Wash. Nov. 1, 2006) ........................................... 28

*Crabb v. GoDaddy.com, Inc.,*
No. 2:10-cv-00940-NVW, 2011 WL 4479043 (D. Ariz. 2011) ..................... 8, 9

*DISC Intellectual Properties LLC v. Delman,*
CV 07-5306 PA PJWX, 2007 WL 4973849
C.D. Cal. Sept. 17, 2007) ................................................................ 20, 21, 22

*DSPT Intern. Inc. v. Nahum,*
624 F.3d 1213 (9th Cir. 2010) ..................................................................... 26

*Ford Motor Co. v. Greatdomains.Com, Inc.,*
177 F. Supp. 2d 635 (E.D. Mich. 2001) ....................................................... 20

*Fowle v. C & C Cola, a Div. of ITT-Cont'l Baking Co.,*
868 F.2d 59 (3d Cir. 1989) ........................................................................... 19

*Garden of Life, Inc. v. Letzer,*
318 F. Supp. 2d 946 (C.D. Cal. 2004) .......................................................... 22

*Lahoti v. Vericheck, Inc.,*
2007 WL 2570247 (W.D. Wash. Aug. 30, 2007) .......................................... 26

*Microsoft Corp. v. Shah,*
2011 WL 108954 (W.D. Wash. Jan. 12, 2011) ............................................. 25

*Moseley v. V Secret Catalogue, Inc.,*
537 U.S. 418 (2003) ..................................................................................... 24

*Omega S.A. v. Omega Eng'g, Inc.,*
228 F. Supp. 2d 112 (D. Conn. 2002).........................................................20, 22

*Petroliam Nasional Berhad v. GoDaddy.com, Inc.,*
2012 WL 10532 (C.D. Cal. Jan. 3, 2012) ...............................................18, 19, 25

*Porsche Cars N. Am., Inc. v. Spencer,*
2000 WL 641209 (E.D. Cal. May 18, 2000) ........................................................24

*Rescuecom Corp. v. Google, Inc.,*
562 F.3d 123 (2d Cir. 2009).................................................................................12

*Schmidheiny v. Weber,*
319 F.3d 581 (3d Cir. 2003).................................................................................29

*Solid Host, NL v. Namecheap, Inc.,*
652 F. Supp. 2d 1092 (C.D. Cal. 2009) ...............................................................25

*Sound Surgical Techs., LLC v. Leonard A. Rubenstein, M.D., P.A.,*
734 F. Supp. 2d 1262 (M.D. Fla. 2010) ...............................................................26

*Texas Int'l Prop. Associates v. Hoerbiger Holding AG,*
624 F. Supp. 2d 582 (N.D. Tex. 2009) ...........................................................22, 23

*Transamerica Corp. v. Moniker Online Services, LLC,*
672 F. Supp. 2d 1353 (S.D. Fla. 2009) ................................................................11

*Verizon California, Inc. v. Above.com Pty Ltd.,*
881 F. Supp. 2d 1173 (C.D. Cal. 2011) ...............................................................27

*Vulcan LLC v. Google, Inc,*
2010 WL 2363620 (N.D. Ill. 2010) ........................................................................6

*Wham-O, Inc. v. Paramount Pictures Corp.,*
286 F. Supp. 2d 1254 (N.D. Cal. 2003) ...............................................................24

**Statutes**

15 U.S.C. § 1125(c) .............................................................................................24

15 U.S.C. § 1125(c)(1).........................................................................................23

15 U.S.C. § 1125(c)(2).....................................................................................23, 24

15 U.S.C. § 1125(d)(1)(A) ................................................................................2, 20

-iii-

15 U.S.C. § 1125(d)(1)(A)(i) ................................................................ 15

15 U.S.C. § 1125(d)(1)(A)(ii) .............................................................. 19

15 U.S.C. § 1125(d)(1)(A)(ii)(II) ......................................................... 23

15 U.S.C. § 1125(d)(1)(D) ..................................................................... 6

15 U.S.C. § 1125(d)(1)(E) ..................................................................... 6

15 U.S.C. § 1127 ................................................................................. 24

**<u>Rules</u>**

Fed. R. Civ. P. 56(e) ........................................................................... 19

**<u>Other Authorities</u>**

*Trademark Dilution Revision Act of 2006,*
      PUB. L. 109-312, at § 3(e) ........................................................... 19

## INTRODUCTION

GoDaddy.com, Inc.'s ("GoDaddy") motion for summary judgment (the "Motion") should be denied. This Court has previously rejected GoDaddy's principal legal defenses, which GoDaddy now recycles in this motion.

Incredibly, GoDaddy argues it must not be "using" the domain names because it is not authorized by the registrants to place advertising on their domains.  That argument ignores the numerous agreements related to the Parked Page Programs giving contractual authorization by its registrants for GoDaddy to park and monetize their domain names.  That is sufficient to constitute "trafficking in" domain names, and to confer on GoDaddy a license to "use" its registrants domain names.  (*See* Order Denying GoDaddy's Motion to Dismiss ("Order") at 10-13, Dkt. 51.)  GoDaddy now takes the remarkable position that, because a federal district court invalidated a prior version of that agreement (on the basis that the registrants might not have knowingly consented to the parking and monetization of their domain names), GoDaddy did not have authority to do what it did in parking its registrants' domain names.  However, the controlling agreements at issue herein clearly provide GoDaddy with express authorization to park domain names.  Thus, GoDaddy cannot rely on its prior unlawful conduct to avoid liability for more recent unlawful conduct.

GoDaddy also rehashes the argument – previously rejected by this Court – that it is entitled to the ACPA's Registrar Safe Harbor immunity.  This time, though, GoDaddy argues that parking domain names is merely "domain routing," which courts have held is a "core registrar function."  That is nonsense.  The cases concerning "core" registrar functions do not involve the monetization of domain names on a registrar's own servers.  They involve purely passive, non-pecuniary conduct.

GoDaddy further asks the Court to resolve disputed issues of facts: whether the domain names at issue are confusingly similar to the Academy's "Oscar" and "Academy Awards marks."[1]  GoDaddy ignores that ACPA requires only straight-forward comparison with the marks.  It is improper to compare the purported goods and services of the infringing domain names with those of the Academy or to employ the likelihood of confusion analysis used in trademark infringement suits.  The ACPA requires only a *facial comparison* of the domain name to the trademarks.  This comparison must be done "without regard to the goods or services of the parties."  15 U.S.C. § 1125(d)(1)(A).  The correct legal standard shows that the infringing domain names all violate the ACPA.

Finally, GoDaddy argues that it cannot be liable for contributory cybersquatting of the domain names in its CashParking program absent evidence of the CashParking customers' intent to profit.  But the CashParking program has but one purpose:  to monetize domain names.  GoDaddy also claims that it cannot be contributorily liable because there is no evidence it ever recommended any domain name to any CashParking customer.  Though there is abundant evidence that GoDaddy recommends domain names incorporating the Academy's marks, contributory cybersquatting is not dependent on the defendant recommending the infringing names.  Regardless, it is undisputed that GoDaddy receives monthly enrollment fees from CashParking customers, meaning that GoDaddy *itself* monetizes the domain names.

GoDaddy's motion for summary judgment should be denied in its entirety, the Academy's partial summary judgment motions should be granted, leaving for trial the issue of whether GoDaddy acted with bad faith intent to profit.

---

[1]  GoDaddy's Parked Pages are also independently in violation of the ACPA because they are "dilutive" of the Academy's famous marks.

THE ACADEMY'S OPPOSITION TO GODADDY'S
MOTION FOR SUMMARY JUDGMENT

## STATEMENT OF FACTS

This lawsuit arises not from GoDaddy's role as a registrar, but from its subsequent activities involving two programs – the "Free Parking" and the "CashParking" programs (collectively, the "Parked Page Program"). Pursuant to those programs, registrants grant GoDaddy the right to point their domain names to websites hosted on GoDaddy's own servers that contain advertising. Doing so generates revenue for GoDaddy (and sometimes the registrant) when an Internet user visits the website and clicks on an advertisement. (CSUF 68.[2]) GoDaddy has parked hundreds of domain names on websites supplied with advertising calculated to trade on the confusing similarity of the domain names to the Academy's Marks – OSCAR, OSCARS, ACADEMY AWARD, and ACADEMY AWARDS. Examples of such domains include AcademyAwardz.com, 2011oscars.com and AcademyAwards.net. (Michaels Decl., Exs. 20-24). This is cybersquatting on a massive scale in violation of the ACPA. GoDaddy also dilutes the Academy's famous marks through this unauthorized use.

Consequently with the filing of its Second Amended Complaint, the Academy identified 167 infringing domain names. Despite repeated requests from the Academy, GoDaddy continued to register and park infringing domain names in its Parked Page Program during this litigation and the Academy has continued to identify such domain names to GoDaddy. (CSUF 69.) The total infringing domain names at issue now stands at over 300.[3]

---

[2] "CSUF" refers to Plaintiff's Counter-Statement of Uncontroverted Fact. "DSUF" refers to Defendant GoDaddy's Statement of Uncontroverted Facts.

[3] The Court's first scheduling allowed plaintiff 60 days before the discovery cut-off to identify any additional domain names. (*See* Dkt. No. 55.) Fact discovery was extended and ultimately closed on September 27, 2012. All 319 names in dispute were identified by July 29, 2012, 60 days before the discovery cutoff and are properly in the case.

Whenever a user registers a domain name through GoDaddy, and does not affirmatively designate another website to which to point the domain name, GoDaddy, by default, points the domain to its Free Parking program.  (CSUF 71.)  GoDaddy does not require express instruction from the registrant to do so.  That is because, in registering a domain name with GoDaddy, registrants also affirmatively grant GoDaddy the right to monetize their domain names in GoDaddy's Free Parking program.  (CSUF 72; Michaels Decl. Ex. 15, at GD1105.)

Numerous GoDaddy witnesses admitted that GoDaddy could change its default settings to direct domain names to parked pages that do not contain advertisements that generate revenue for GoDaddy (such as blank or "under construction" page), but GoDaddy does not do so.  (CSUF 73.)  In fact, when GoDaddy originally created the parked pages program, domain names defaulted to non-monetized pages.  (CSUF 74.)  GoDaddy also could filter domain names including trademarks, which it does for its own GoDaddy marks, but not for the marks of other parties, including the Academy.  (CSUF 75.)

In GoDaddy's CashParking program, registrants pay GoDaddy a monthly enrollment fee to allow GoDaddy, through its advertising partner, to place ads on the web page associated with a domain name; the revenue generated is split among the registrant, GoDaddy, and the advertising partner.  (CSUF 76.)

Both programs are used on a litany of pages that infringe the Academy's marks.  The advertisements on any given domain in the Parked Page Program are contextual to the domain name.  (CSUF 77.)  Consequently, the parked pages for the domain names at issue all contain advertisements referring to the general subject of Academy's business and activities, such as Hollywood, cinema, movies, awards, and "red carpet" fashion.  (CSUF 78.)  These advertisements are placed on domain names that infringe the Academy's marks without the

-4-

Academy's permission.  Between for the years 2002 through 2010 GoDaddy generated at least $60.5 million in net revenue from its Parked Page Programs. (CSUF 79.)  GoDaddy does not share the revenue it generates from the advertising it places on Free Parked pages with the owners (registrants) of the domain names associated with such pages.  (CSUF 80.)

## ARGUMENT

**I.  GODADDY "USED" AND "TRAFFICKED IN" THE INFRINGING DOMAIN NAMES BY OBTAINING AND EXERCISING CONTRACTUAL AUTHORIZATION TO PARK ITS REGISTRANTS' DOMAIN NAMES**

The ACPA imposes liability upon persons who "use" a domain name that is confusingly similar to the plaintiff's, provided that the "use" is made either by the registrant or the registrant's "authorized licensee." 15 U.S.C. § 1125(d)(1)(D).  The ACPA also imposes liability on persons who "traffic in" infringing domain names, which the ACPA defines broadly as "transactions that include, but are not limited to, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration."  15 U.S.C. § 1125(d)(1)(E); *see Vulcan LLC v. Google, Inc.*, 2010 WL 2363620, * 8 (N.D. Ill. 2010).  Hence, the Academy moved for partial summary judgment on this issue.  (*See* Dkt. No. 339).

GoDaddy's motion for summary judgment is based on the premise that GoDaddy parks these pages but does so without contractual authorization and so cannot be held liable for "use".  This counter-intuitive and illogical position is also flatly wrong.

**A.  GoDaddy is the Authorized Licensee of its Free Parking Registrants**

GoDaddy argues that it did not "use" or "traffic in" the domain names it placed in its Free Parking Program, because a court subsequently invalidated the contractual provision authorizing GoDaddy to do so.    (Motion at 7-11). GoDaddy's operative January 2009 Domain Name Registration Agreement ("DNRA") gives GoDaddy the right to place its registrants' domain names in the Parked Page Programs and monetize such domain names.  (Michaels Dec., Ex. 15.)  Paragraph 8 of the DNRA – entitled "Parked Page Service" – provides:

> **You [the registrant] agree that Go Daddy may point the domain name** or DNS to one of Go Daddy's or Go Daddy's affiliates web pages, and that they **may place advertising on Your web page and Go Daddy specifically reserves this right**. Go Daddy also reserves **the right to collect and retain all revenue** obtained from such advertising."

Ex. 15 at GD1105 (emphasis added).[4]   This language, drafted by GoDaddy, clearly requires that registrants authorize GoDaddy to place advertising on the domains in GoDaddy's Parked Page Programs, and confers to GoDaddy the right to collect and retain all revenue obtained from that advertising.   Absent these contractual provisions, GoDaddy would have no right to do so. GoDaddy's DNRA thus establishes that GoDaddy is its registrants' authorized licensee under the ACPA.[5]   As this Court recognized in denying GoDaddy's motion to dismiss:

> Here, the Academy has alleged the existence of agreements that provided

---

[4] Almost identical language is found in the next paragraph, which states:  "You [the registrant] agree that **Go Daddy may place advertising on Your Parked Page and Go Daddy specifically reserves this right**.  Go Daddy also reserves the right to collect and retain all revenue obtained from such advertising." (Michaels Dec., Ex. 15, GD1106).

[5] The fact that GoDaddy the authorized licensee of its registrants is confirmed by GoDaddy's agreements with Google re the placement of advertising on parked pages. *See, e.g.*, Michaels Decl. Ex. 17 at GD11249; Ex. 19, at ¶¶6, 3.23, 5.3.

> GoDaddy.com with the right to post advertising links on the web page owned by the registrant and located at a registrant's domain name. Absent such an agreement, GoDaddy.com would have no right to enter those pages and post advertising. Regardless of the labels attached by the parties to those agreements, this agreement could have conferred a status on GoDaddy.com as the "registrant's authorized licensee."

(*See* Dkt. 51, 9/20/2010 Order at 11.) GoDaddy itself has stated to another court that the above-quoted contractual language "expressly authorized GoDaddy to place advertisements on web pages associated with the [registrants'] domain names." (Michaels Dec., Ex. 35, Summary Judgment Brief of GoDaddy, *Crabb v. GoDaddy.com, Inc.*, No. 2:10-cv-00940-NVW, at 5 (D. Ariz. Mar. 3, 2011) (Dkt. No. 167). This also has been confirmed by GoDaddy's witnesses including it former General Counsel, Christine Jones. (CSUF 82 [Michaels Dec. Ex. 8, 77:21-25].) It should therefore be undisputed that GoDaddy is its registrants' authorized licensee.

Despite its previous position, GoDaddy now claims that it does not have such a right because the necessary authorization was not incorporated into the DNRA. In other words, GoDaddy argues that it was operating the Parked Page Programs without lawful authorization. In support of this bizarre position, GoDaddy relies solely on *Crabb v. GoDaddy.com, Inc.*, No. 2:10-cv-00940-NVW, 2011 WL 4479043 (D. Ariz. 2011). In *Crabb*, the plaintiffs – who registered domain names with GoDaddy – sued GoDaddy for monetizing their domain names in the Parked Page Program, claiming that the right to do so was not clearly and unequivocally disclosed and therefore did not become part of their agreement. *Id.* at *2. When the plaintiffs registered their domain names, they were required to agree to the terms of GoDaddy's DNRA and Uniform Terms of Service ("UTOS"). *Id.* at *1.

At that time, however, neither the DNRA nor the UTOS expressly authorized GoDaddy to park domain names. Rather, that authorization was

-7-

contained in a third, separate agreement:  GoDaddy's Parked Page Services Agreement ("PPSA").  *Id.* at \*2.  The Court ruled in favor of the plaintiffs, concluding that the DNRA and the UTOS "did not clearly and unequivocally inform Plaintiffs that the [PPSA] was among those agreements incorporated by reference . . . ."  *Id.* at \*4.

*Crabb* is of no help to GoDaddy here, even aside from fact that it is not controlling on this Court, did not arise under the ACPA, and that GoDaddy in sworn declarations took positions in that case completely contrary to what it argues here.  **First,** *Crabb* addressed an entirely different version of the DNRA than the one at issue in this case.  In January 2009 – likely in response to the *Crabb* litigation – GoDaddy revised the DNRA to incorporate expressly the PPSA language authorizing GoDaddy to park domain names.  (CSUF 83; Michaels Dec. Ex. 15; *see also* Michaels Dec. Ex. 7 (Jett Depo. at 19:3-23, 13:19-14:2, 25:18-21, 37:1-10.)  The amended January 2009 DNRA, however, does apply to the domain names at issue in this case.  Because the amendment to the DNRA became effective in January 2009, all domain name registrants were bound by the terms of the amendment as of that date.  (CSUF 85; Michaels Dec. Ex. 7 (Linda Jett Depo. at 19:3-23, 13:19-14:2, 25:18-21, 37:1-10) (explaining that the "archive date" is the date a GoDaddy agreement is "published live.").)  The undisputed evidence shows that all of the domain names at issue resolved to parked pages after January 13, 2009.  (CSUF 86.)

**Second,** even if the pre-2009 version of the DNRA applied to the domains at issue, GoDaddy's motion should be rejected.  As an initial matter, GoDaddy misconstrues the term "authorized licensee" as requiring a contract.  It does not.  As this Court recognized in denying GoDaddy's motion to dismiss on these grounds, "other courts have concluded that an authorized licensee may be

-8-

created absent an agreement."[6]  ((*See* Dkt. 51, 9/20/2010 Order at 11 (citation omitted).) This makes sense, as otherwise the law would reward a party for making actual "use" or "trafficking" in domain names, but doing so without authority from the registrant. It would be akin to a defendant trespassing upon a third-party's property to put up a sign infringing a trademark and then arguing that, as a trespasser, it could not be liable for infringement.

Accepting GoDaddy's argument – which no court we are aware of has done – would lead to perverse results: defendants could structure their contracts to circumvent the ACPA. Congress could not have intended such an absurd result. Indeed, this Court cautioned against such a result. (*See* Dkt. 51 at 11) ("imposing this stringent requirement for an authorized licensee would only encourage registrants and potential authorized licensees to creatively word agreements" to avoid liability under the ACPA); *see also Alitalia-Linee Aeree Italiane S.p.A. v. Casinoalitalia.com*, 128 F. Supp. 2d 340, 343-47 (2001) (declining to interpret the plain language of the ACPA in a manner that would lead to absurd results); *Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123, 133 (2d Cir. 2009) (rejecting an interpretation of the Lanham Act that made "no sense

---

[6] In a similar effort to disavow its own contracts, GoDaddy argues that "the terms of [GoDaddy's] agreements do not evidence any 'transfer for consideration or receipt in exchange for consideration' between Go Daddy and the registrants as required for a finding of trafficking under the ACPA." (Motion at 9.) A "transfer for consideration or receipt in exchange for consideration" is but one of many ways one can traffic in domain names under the ACPA. A defendant also "traffics" in domain names if it "receives a fee each time an internet user clicks on one of the links attached to the infringing domain sites; such payment establishes at least partial ownership in the domain name." *Transamerica Corp. v. Moniker Online Services, LLC*, 672 F. Supp. 2d 1353, 1366 (S.D. Fla. 2009).  Here, GoDaddy receives a fee each time an internet user clicks on one of the advertisements parked pages it creates. That is enough to satisfy the ACPA's "trafficking" in element.

THE ACADEMY'S OPPOSITION TO GODADDY'S
MOTION FOR SUMMARY JUDGMENT

1   whatsoever" because it was "inconceivable that the statute could have intended
2   to exempt infringers from liability because they acted in bad faith.").

3   **B.     GoDaddy is the Authorized Licensee of its CashParking Customers**

4

5          GoDaddy also contends there is no evidence that it "used" or "trafficked
6   in" the domain names in its CashParking Program, because its CashParking
7   customers "did not provide any license rights to GoDaddy." (Motion at 10).
8   Rather, according to GoDaddy, the language of the Cash Parking Agreements
9   "demonstrates that it was the registrant who licensed the relevant software
10  necessary to utilize the Cash Parking service from Go Daddy, not the other way
11  around." *Id.* GoDaddy's argument fails. <u>First</u>, GoDaddy again misconstrues
12  the term "authorized licensee" as requiring an express grant of licensing rights.
13  This Court already rejected that argument. (*See* Dkt. 51, at 11.) Irrespective of
14  the terms it used in its agreements, GoDaddy in fact obtained the right to
15  monetize its CashParking customers' domain names.     Indeed, GoDaddy
16  repeatedly represented to Google that it had the right to control such domain
17  names. *See* CSUF 88, Michaels Dec. Ex. 17 at GD11249, GD11238, GD11241
18  (a more legible copy of Ex. 17 is Michaels Dec. Ex. 19, at ¶¶ 6, 3.23, 5.3.)

19         <u>Second</u>, *Crabb* did not invalidate GoDaddy's authorization to park its
20  *CashParking* customers' domain names.     The PPSA was clearly and
21  unequivocally incorporated into the agreements of customers who purchased
22  services – e.g., CashParking – from GoDaddy apart from standard domain
23  registration.  Because it is undisputed that CashParking is such a pay service,
24  (*e.g.*, DSUF ¶ 32), GoDaddy cannot argue that the PPSA was not incorporated
25  into its CashParking agreements.  Therefore, GoDaddy cannot argue that it
26  lacked the authority to park its CashParking customers' domain names.

27

28

-10-

Third, GoDaddy also receives a monthly enrollment fee from those users choosing Cash Parking. (CSUF 95; Michaels Dec., Ex. 27.) Hence, GoDaddy itself is monetizing those domain names that are in Cash Parking.

## II.   GODADDY "USED" THE INFRINGING DOMAINS BY MONETIZING, OR ATTEMPTING TO MONETIZE, ALL SUCH DOMAIN NAMES IN ITS PARKED PAGE PROGRAM

GoDaddy concedes that there is evidence that it monetized, or attempted to monetize, 80 of the 317 infringing domain names. GoDaddy moves for summary judgment on the "use" element for 237 of the 317 infringing domains on the ground that there is no evidence that GoDaddy monetized, or attempted to monetize, these 237 domains. For 68 of the 237, GoDaddy claims that there is no evidence that the domains were routed to its parked servers. For 169 of the 237, GoDaddy admits they were routed to parked servers, but claims there is no evidence that they were parked on pages with actual ads. GoDaddy is wrong.

As to all 237 domain names, there is a wealth of evidence that such domain names were parked on pages with advertisements. The Academy produced screenshots of the GoDaddy parked pages associated with each domain name. (CSUF 89.) Every page displays cost-per-click links and/or banner ads. *Id.* GoDaddy generates and is able to generate revenue from these advertisements.

Moreover, additional evidence shows the 237 domains were in the Parked Page Program. For example, GoDaddy, by default, routes all domain names to its parked servers. GoDaddy concedes that 169 domains were routed there, and has produced no evidence that the 68 domain names were not routed there. (CSUF 90.)

For 68 of the domain names in its Appendix 2, GoDaddy also claims there is no evidence that it routed such domain names to its parked page servers,

because "none of the registrant, impression, or revenue data *produced by Go Daddy* in this action identify any of these Disputed Domains." (Motion at 11-12 (emphasis added).)  GoDaddy, however, refused to produce any discovery for 63 of the 68 domains, claiming that they were identified the cut-off date for identifying infringing domains, and that the domains were irrelevant.  (CSUF 96; Michaels Dec. ¶3.)  GoDaddy cannot refuse to produce any evidence on those domains in Appendix 2, and then claim that the Academy has no evidence on those domains on summary judgment.  Moreover, the screenshots for these 63 domains are themselves evidence that GoDaddy used those 63 domain names in the Parked Page Program.  *See generally* Presbrey Decl., Quinto Decl., Herman Decl., Liang Decl. (attaching screenshots for all domain names). [7]

GoDaddy does not dispute that 169 of the domain names were routed to GoDaddy's parked servers.   Instead, GoDaddy contends it is entitled to summary judgment on these domain names because there is no evidence that they generated any revenue.  GoDaddy appears to be conflating "use" with "monetization"; the ACPA requires only the former, not the latter.  Indeed, the statute speaks of "bad faith *intent* to profit," not bad faith profit in fact.   15 U.S.C. § 1125(d)(1)(A)(i).

GoDaddy further claims there is no evidence that GoDaddy placed advertisements on parked pages associated with the 169 domain names.  (Motion

---

[7]   As for the remaining 5 domains on Appendix 2, GoDaddy *has produced* evidence that those were in Free or CashParking.  For example, GoDaddy's own spreadsheets show that academyawards.net was parked in Free Parking as of January 28, 2009, in Cash parking from March 11, 2009 until February 2, 2010, and in Free Parking from February 2, 2010 to "Current."  (Michaels Decl. Ex. 25A.) In addition, GoDaddy's own spreadsheets show that oscargoodiebags.com was in CashParking from March 2009 until "Current."  (Michaels Decl. Ex. 25A.)  And   GoDaddy's   own   damages   expert   admitted   that academyawardslive.com   and   oscarwinners.net   both   generated   revenue. (Michaels Dec. Ex. 1 [Pampinella Report, Schedule 1].).

-12-

at 12.)  This, too, is a red herring.  The Academy produced screenshots of every parked page of every domain name at issue, and every page contained advertisements—there were no parked pages that were "blank" or "under construction."  Thus, regardless of whether the Parked Page Programs contain templates for non-monetized pages, GoDaddy defaults every domain name to a monetized page instead of a non-monetized page.  (CSUF 90.)  When GoDaddy routes a domain name to its parked page servers, there is clearly "use" under the ACPA.  At a minimum, there is a disputed issue of fact on this issue.

Lastly, GoDaddy seeks to dispute the authenticity of the very Parked Pages that bear the GoDaddy logo and which were identified by the Academy's lawyers and consultants in connection with this action.  Not only are the screenshots authenticated by the declarations of Matt Herman, Enoch Liang, and David Quinto, they are also authenticated by the testimony of numerous GoDaddy witnesses.[8]  For example, multiple GoDaddy witnesses admitted at their depositions that the screenshots they were shown were in fact GoDaddy Parked Pages.  (CSUF 91.)  In addition, the screenshots themselves contain indicia of reliability sufficient to establish their authenticity:

---

[8] GoDaddy objects to the use of Mr. Presbrey to authenticate these pages because he was a non-testifying litigation consultant.  The Academy seeks to use his testimony solely for the purpose of authenticating the screenshots of web-pages, which does not require he become a testifying expert on matters of opinion.  The use of Mr. Presbrey for this purpose was required by GoDaddy's continued bad faith refusal to either stipulate to authenticity of these screenshots or to respond to Requests for Admissions regarding their authenticity.  On April 2nd, the Academy will file a joint stipulation to compel answers to its requests for admission.  In any event, the additional evidence and declarations discussed in text suffices to defeat GoDaddy's motion for summary judgment predicated on the lack of authentication for screenshots.

-13-

- All of the parked pages in Free Parking contain numerous banner ads and logos for "GoDaddy.com," together with the phrase "This Web page is parked FREE, courtesy of GoDaddy.com".[9] (CSUF 101).
- The parked pages in Cash Parking contain the phrase "This page is provided courtesy of GoDaddy.com, LLC.  Copyright © 1999-2012 GoDaddy.com LLC.  All rights reserved." (CSUF 102).
- A GoDaddy-produced spreadsheet shows whether and when a particular domain name was parked in Free Parking, Cash Parking, not parked, or parked with another company. (Michaels Dec., Ex. 25A.)  And, a parked domain name is necessarily "monetized," as admitted by GoDaddy CEO Bob Parsons in a blog post. (CSUF 93; Michaels Dec., Ex. 30.)
- As Paul Nicks from GoDaddy testifies, the parked pages themselves are "dynamic" and not "static," meaning they are *only* created and exist for the period of time that a user types that domain name into a browser. [DSUF 14, 15, and 16.]  Hence, *it is impossible for anyone but GoDaddy* to create a parked page through its parked page servers.  Those screenshots had to have been generated by GoDaddy at exactly that time.

Given the foregoing facts, it is surprising that GoDaddy disputes authenticity.

GoDaddy also claims that, regardless of the foregoing evidence that it monetized or attempted to monetize all the 317 infringing domain names in its Parked Page Program, such conduct does not constitute "use" under the ACPA, but is rather mere "routing" which is a "core registrar function."  In support

---

[9] GoDaddy has a contract with Google, which supplies the advertising links on the GoDaddy Parked Pages.  Attached to the GoDaddy-Google contract is a template for how a GoDaddy Parked Page will appear.  Unsurprisingly, the screenshots submitted by the Academy match up to the template in the GoDaddy-Google contract. (Michaels Dec. Ex. 38.)

THE ACADEMY'S OPPOSITION TO GODADDY'S
MOTION FOR SUMMARY JUDGMENT

1   GoDaddy relies on *Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 2012 WL
2   10532 (C.D. Cal. Jan. 3, 2012).

3       *Petroliam* is completely inapposite.  The *Petroliam* court's holding was
4   explicitly limited to "domain name forwarding," *id.* at *9, in which "the
5   *registrant* . . . configure[s] the nameserver so that it routes either to a 'record not
6   found' error message, or to a newly created website on a server hosted by the
7   registrar or some third party, or to an existing website already associated with
8   another domain name.'"  *Id.* at *2 (emphasis added).  In the case of domain
9   forwarding, unlike GoDaddy's Parked Page Programs, the *registrant* (not
10  GoDaddy) decides the webpage a particular domain name points to. *Id.* at *2-3.

11      Indeed, GoDaddy argued in *Petroliam* that it "neither created the website
12  to which the Disputed Domains pertain, nor placed any content on such website,
13  nor ever had any association with such website." *Id.* at *6.  Here, to the
14  contrary, GoDaddy created and hosts the websites to which the disputed
15  domains resolve, and placed content (advertisements) on those websites, and
16  generates revenue whenever an Internet user clicks on that content.   In
17  *Petroliam*, GoDaddy argued that "its role was limited to providing the
18  infrastructure for the registrant to route the Disputed Domains automatically to a
19  website of his own choosing." *Petroliam*, 2012 WL 10532, at *6.  Here,
20  GoDaddy's role is not so limited.  Through its CashParking and Free Parking
21  programs, GoDaddy does the opposite:  it affirmatively routes the domain name
22  to a parked page of *its own creation and choosing*.

23      As this Court has already held in denying GoDaddy's motion to dismiss,
24  the safe-harbor does not protect the activity GoDaddy engages in as part of its
25  Parked Page Program because such activity is not required to discharge
26  GoDaddy's role as a registrar. (*See* Dkt. 51, at 8-10.)

27
28

-15-

## III.  GODADDY CANNOT SHOW THAT IT IS ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF "CONFUSING SIMILARITY"

Under the ACPA, liability can be predicated on two independent bases: the use or trafficking in an identical or confusingly similar name to that of a distinctive mark of the plaintiffs, or, if plaintiff has a famous mark, the use or trafficking in a domain name that is dilutive of that mark. *See* 15 U.S.C. Section 1125(d)(1)(A)(ii). GoDaddy's motion for summary judgment on the factual issue of "confusingly similar" relies on two unsworn expert reports,[10] which both apply a test for confusing similarity in direct contravention of the plain language of the statute and case law.  *See* Nunberg Report, dated January 11, 2013 ("Nunberg Report"), McKown Dec., Exh. P; Scott Report, dated January 14, 2013 ("Scott Report"), McKown Dec., Exh. O.[11]  GoDaddy itself makes this error as well, citing to the irrelevant testimony of numerous domain name registrants in support of its motion.

However, an application of the correct legal standard demonstrates that the infringing domain names all violate the ACPA. While expert testimony is

---

[10] GoDaddy's relies on the *unsworn* expert reports of Mr. Nunberg and Professor Scott. It is well-settled that, under Fed. R. Civ. P. 56(e), unsworn expert reports are not admissible to support or oppose summary judgment. *See, e.g., Carson Harbor Vill., Ltd. v. Unocal Corp.*, CV 96-3281 MMM (RCX), 2003 WL 22038700, at *7 (C.D. Cal. Aug. 8, 2003) (unsworn expert report is inadmissible on summary judgment); *see also, e.g., Fowle v. C & C Cola, a Div. of ITT-Cont'l Baking Co.*, 868 F.2d 59, 67 (3d Cir. 1989) (unsworn expert report violates Fed. R. Civ. P. 56(e) and "is not competent to be considered on a motion for summary judgment.").

[11] Concurrently with this Opposition, the Academy is filing two *Daubert* motions to exclude the expert reports of Professors Scott and Nunberg, setting those motions for hearing on April 29, 2013.  The Academy incorporates by reference those motions herein.

-16-

not required for this purpose, this interpretation is confirmed by the Academy's expert who, in contrast to GoDaddy's, applied a test for "confusingly similar" that is consistent with ACPA case law. *See generally*, Declaration of Greg Lastowka. The ACPA "requires only facial comparison of the domain name to the mark rather than the more involved likelihood of confusion analysis." *DISC Intellectual Properties LLC v. Delman*, CV 07-5306 PA PJWX, 2007 WL 4973849, at *5 (C.D. Cal. Sept. 17, 2007) (citation omitted). There is no requirement for expert testimony or any survey. This direct comparison must be done "without regard to the goods or services of the parties." 15 U.S.C. § 1125(d)(1)(A); *see also Omega S.A. v. Omega Eng'g, Inc.*, 228 F. Supp. 2d 112, 127 (D. Conn. 2002).[12]

GoDaddy relies on Professor Scott's survey to argue that 75 cherry-picked domain names are not "confusingly similar" as a matter of law. Professor Scott's survey asked an open-ended association question: "When you see [domain name] what product(s), services(s), organizations(s), activitie(s), or other associations, if any, come to mind?" *See* Scott Report ¶ 8. Instead of focusing on open-ended associations that participants might draw after being presented with an infringing domain name, Professor Scott should have asked respondents to perform a direct comparison with the Academy's marks as

---

[12] In moving for summary judgment on "confusingly similar," GoDaddy cited to only one case that actually addressed the ACPA, from the Eastern District of Michigan: *Ford Motor Co. v. Greatdomains.Com, Inc.*, 177 F. Supp. 2d 635 (E.D. Mich. 2001). The court's decision in that case is inconsistent with the vast majority of ACPA case law and at least one court has explicitly disagreed, explaining: "[This] Court respectfully disagrees with the suggestion in *Ford* . . . that 'fordstheatre.org . . . incorporates the FORD mark with the addition of the generic word 'theatre' but, from its context, is not 'confusingly similar to' the FORD mark.' That analysis under the ACPA is flawed because it improperly considers the 'goods and services of the parties.'" *Omega S.A. v. Omega Eng'g, Inc.*, 228 F. Supp. 2d 112, 128 (D. Conn. 2002).

required by the ACPA.  *See, e.g., DISC*, 2007 WL 4973849, at *5.  At a fundamental level, Professor Scott did not determine whether any of the domain names she tested meet the test for "confusing similarity" under the ACPA.

Like Professor Scott, Professor Nunberg used his own test for "confusingly similar" in order to conclude that certain infringing domain names did not meet the ACPA's standard.  At Par. 17 of his expert report, Professor Nunberg actually defines his "information comparability" criterion as a corollary to the §32 and §43(a) "likelihood of confusion" test, which requires that "trademarks be associated with competing products." (Nunberg Report ¶¶ 17, 19). At deposition, Mr. Nunberg repeatedly reiterated his reliance on the parties' goods or services in determining whether the infringing domain names were confusingly similar.  (Michaels Decl. Ex. 13 (Nunberg Depo. at 32:24-33:7, 46:17-24, 47:7-13, 55:1-10, 60:15-61:10, 66:13-22).)  This is precisely what is precluded by both the ACPA and by case law under the ACPA.  (*See also* Lastowka Dec., ¶¶ 13-24).  By employing the wrong test, Nunberg opines that such obviously confusingly similar names such as "thinkoscars.net," "theoscarsxxx.com," "futureoscarwinner.net," and "oscardvds.com" are not confusingly similar.

GoDaddy also relies on the declarations of registrants who claim that the domain names they registered, which incorporate the Academy's marks, were chosen for reasons unrelated to infringement of the Academy's marks. *See, e.g.,* Dkt. No. 343-2.  GoDaddy may be correct that the mere registration of the domain OscarDow.com (the name of the registrant's son), without more, does not violate the ACPA.  However, this would be because of a lack of bad faith intent to profit–not because the domain name is not confusingly similar or dilutive of the Academy's marks. (*See* Lawstowka Decl. ¶¶ 21-23.)  And this lack of bad faith of intent to profit would be true for the registrant, *but not for*

THE ACADEMY'S OPPOSITION TO GODADDY'S
MOTION FOR SUMMARY JUDGMENT

*GoDaddy* who nonetheless places advertising on these parked pages that relates to the Academy's services, thereby using confusingly similar names with bad faith intent to profit. (*See* DSUF 3.)

In fact, every infringing domain name in this case includes the Academy's marks along with the addition of irrelevant or minor terms. Such domain names have universally been held to be "confusingly similar" under the ACPA. *See, e.g., DISC*, 2007 WL 4973849, at *5 ("Defendants have incorporated Plaintiffs' marks . . . into the domain names registered by Defendants . . . . Because Defendants have used words that are identical to Plaintiffs' marks, the Court finds that Defendants' use of those terms is infringing under . . . the ACPA's 'confusingly similar' [test]"); *Garden of Life, Inc. v. Letzer*, 318 F. Supp. 2d 946, 962 (C.D. Cal. 2004); *Omega*, 228 F. Supp. 2d at 127. Applying the correct formulation for the test of confusingly similar under the ACPA, the Academy's expert concluded that "the vast majority (if not all)" of the infringing domain names "were confusingly similar to the Academy's marks. (*See* Lastowka Decl. ¶ 4.)

Although the test for similarity in an ACPA case involves "only facial comparison of the domain name to the mark," *see DISC*, 2007 WL 4973849, at *5, several courts have looked to the actual material on the webpages themselves to confirm a finding of confusingly similar. *Texas Int'l Prop. Associates v. Hoerbiger Holding AG*, 624 F. Supp. 2d 582, 588 (N.D. Tex. 2009) (that the accused website "provide[d] advertising links . . . [for] the same products" sold by the trademark holder "provid[ed] further support for a finding" the accused "domain name is identical or confusingly similar to the [trademark holder's] mark."); *Atlas Copco AB v. Atlascopcoiran.com*, 533 F. Supp. 2d 610, 614 (E.D. Va. 2008) (granting summary judgment on plaintiff's ACPA claim after reviewing the content displayed on the defendant's websites). Here, as in

*Mattel*, *Hoerbiger* and *Atlas Copco*, the content on the infringing websites themselves confirms that the infringing domain names are confusingly similar to the Academy's marks. Each domain name at issue defaulted to a parked page which contained advertisements referring to the general subject of Academy's business and activities, such as Hollywood, acting, movies, entertainment, etc. (*See generally* Screenshots attached to the Presbrey, Quinto, Herman, and Liang Declarations, as well as Michaels Dec., Exs. 20-24 and Ex. 38.)

## IV. GODADDY IS NOT ENTITLED TO SUMMARY JUDGMENT ON WHETHER THE DISPUTED DOMAINS ARE "DILUTIVE OF" THE AMPAS MARKS

As noted above, use of a domain name that is "dilutive" of a famous mark is an independent basis for liability under the ACPA – one which does not require proof of confusing similarity. 15 U.S.C. § 1125(d)(1)(A)(ii)(II). Here, there can be no dispute that the Academy's marks are famous under 15 U.S.C. Section 1125(c)(1) and (c)(2)—in fact the Academy moved for summary judgment on the fame of its trademarks. (CSUF 100). Unable to challenge the fame of the Academy's marks, GoDaddy instead argues that, for famous marks, a plaintiff must show "actual dilution by objective proof of actual injury to the economic value of its marks." (Motion at 20.) That is not the law.

Interpretation of the term "dilutive" under the ACPA is not a matter of first impression, as GoDaddy asserts. The Lanham Act's definition of dilution was previously codified at 15 U.S.C. § 1127. That definition was applied in both ACPA and non-ACPA trademark cases, *e.g.*, *Porsche Cars N. Am., Inc. v. Spencer*, 2000 WL 641209, at *3 (E.D. Cal. May 18, 2000) (ACPA case); *Wham-O, Inc. v. Paramount Pictures Corp.*, 286 F. Supp. 2d 1254, 1260 (N.D. Cal. 2003) (trademark dilution case), and it required a showing of *actual dilution. See Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 433 (2003). In

response to the *Moseley* case, however, Congress repealed the definition of "dilution" in 15 U.S.C. § 1127, *see Trademark Dilution Revision Act of 2006*, PUB. L. 109-312, at § 3(e), and replaced it with a definition, now codified at 15 U.S.C. § 1125(c), that does *not* require a showing of actual dilution.  For famous marks, the statute makes it unlawful to use the mark "that is *likely to cause dilution* by blurring or dilution by tarnishment of the famous mark, *regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury*."  15 U.S.C. § 1125(c).  This is consistent with the plain language of the ACPA which does not require "actual dilution" but only that the defendant's action be "dilutive."   Therefore, GoDaddy's argument is simply incorrect as a matter of law.

Moreover, under 15 U.S.C. Section 1125(c)(2), the Academy has facts showing how each likelihood of dilution factor weighs in its favor (subpart i), there is clearly a high degree of similarity between the domains themselves and the Academy's famous trademarks.  The Academy's marks are certainly highly distinctive, whether inherently or through the decades of use by the Academy (Quinto Decl., par. 13); (subpart iii) In the field of entertainment, acting, and movies, the Academy clearly is the exclusive user of its famous marks (Quinto Decl., par. 14); (subpart iv) as noted above, there is a high degree of recognition of the Academy's marks—indeed, as shown in the Academy's affirmative MSJ, numerous GoDaddy fact and expert witnesses admitted this fact; (subpart v) Even if the registrant did not intend to create an association with the Academy's marks, GoDaddy's parked page program clearly does, returning sponsored links and advertising relating to entertainment, acting, and the movies; and (subpart vi) GoDaddy's parked page program clearly returns sponsored links relating to the Academy's field, showing that GoDaddy actually associates the domain with the Academy's marks.  As such, at a minimum, there are disputed issues of fact

regarding whether each of the infringing domain names is likely to dilute the Academy's famous trademarks.

## V.   THE ACADEMY'S CONTRIBUTORY CYBERSQUATTING CLAIM IS SUPPORTED BY SUFFICIENT EVIDENCE

A defendant who provides a service is liable for contributory cybersquatting if (1) the defendant exercises control over the service, and (2) the defendant knows or should know that the direct infringer is using the service to infringe upon trademarks, which can be demonstrated by the existence of "exceptional circumstances." *See* Order Granting Academy's Motion to Amend the Complaint, at 4 (Dkt. No. 138); *Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092 (C.D. Cal. 2009); *Microsoft Corp. v. Shah*, 2011 WL 108954 (W.D. Wash. Jan. 12, 2011). GoDaddy contends that it is entitled to summary judgment on the Academy's contributory cybersquatting claim, arguing that there is no evidence of direct infringement, and no evidence of exceptional circumstances required for contributory liability. GoDaddy is wrong.

Ample evidence supports a finding of cybersquatting by the CashParking registrants. Relying on *Petroliam*, GoDaddy claims that the Academy offers no evidence of the registrants' intent. Once again, GoDaddy's reliance on *Petroliam* is misplaced. There, the registrants used GoDaddy's domain name forwarding service to direct internet traffic from a domain name using plaintiff's mark to a pornographic website. 2012 WL 10532, at *11. The court observed that this was "sufficient to show some degree of bad faith"; however, there was "absolutely no evidence of bad faith *intent to profit* from the [plaintiff's] mark." *Id.* at *12.

In stark contrast, GoDaddy's CashParking Program serves only one purpose: to generate revenue for its users from their domain names. GoDaddy promotes CashParking as a way to "[c]ash in on your domains with pay-per-click ads," and exhorts customers to "**[m]ake money from your domains'**

**parked pages!**  It's easy with CashParking®.  Whether you have one domain or a growing portfolio, CashParking can turn those domains into a cash generator!" (Michaels Dec., Ex. 27, at AMPAS8550 (bold in original).)  Therefore, the fact that a customer pays a monthly fee to enroll a domain in GoDaddy's CashParking Program is sufficient evidence of that customers' intent to profit off of the domain name.[13]  At a minimum, there is a disputed issue of fact.

GoDaddy focuses narrowly on a single aspect of the Academy's position on contributory cybersquatting: GoDaddy's "name spinning technology."  <u>First</u>, when a user attempts to register a domain name that is already registered, GoDaddy's technology will recommend similar domain names to the one requested.  (Michaels Dec., Ex. 31.)  Thus, a registrant seeking to register AcademyAward.com will be told that name is taken, but GoDaddy suggests multiple similar names including <u>AcademyAwardSite.com</u>, <u>AcademyAwardToday.com</u>, and/or "Premium Domains" like <u>AcademyAwardsMovies.com</u> (for $4,995).  (CSUF 93; Michaels Dec. Ex. 31.) This is direct probative evidence of contributory cybersquatting by encouraging users to register names confusingly similar to the Academy's marks.  Even if there were no evidence of any particular registrant relying on this technology, a reasonable fact finder could find that GoDaddy makes these recommendations in

---

[13]  GoDaddy appears to argue that evidence of the registrants' motives *at the time of registration* is required.  (Motion at 22:22-23.)  That is not what the ACPA requires.  Rather, a bad faith intent may arise anytime, even long after registration is complete, for example, when the registrant decides to monetize the domain(s) by buying CashParking.  *See DSPT Intern. Inc. v. Nahum*, 624 F.3d 1213, 1220 (9th Cir. 2010) ("Evidence of bad faith may arise well after registration of the domain name"); *Lahoti v. Vericheck, Inc.*, 2007 WL 2570247, at *7 (W.D. Wash. Aug. 30, 2007) ("[E]vidence of bad faith may arise long after registration of the domain name."); *Sound Surgical Techs., LLC v. Leonard A. Rubenstein, M.D., P.A.*, 734 F. Supp. 2d 1262 (M.D. Fla. 2010) ("a bad faith intent to profit from a domain name can arise either at the time of registration or at any time afterwards.").

order to assist the registration and bad faith intent to profit off domain names that include third party's famous trademarks.  After all, there must be a reason why GoDaddy denotes <u>AcademyAwardsMovies.com</u> as a "Premium Domain" costing $4,995 to register, when other domains are only $10-$15 to register.

<u>Second</u>, GoDaddy ignores the wealth of evidence beyond the name spinning technology that is highly probative of contributory cybersquatting.

The court found allegations were sufficient to support the inference "that Defendants should have known that cybersquatting was occurring as to Verizon's famous marks specifically." *Id.* at 1181.  Here, there is extensive evidence that GoDaddy knew that cybersquatting was occurring as to the Academy's famous trademarks.  This evidence includes GoDaddy's patent application for filtering domain names incorporating third party trademarks (Michaels Dec., Ex. 36, pars. 32-34), numerous complaints from third party trademark owners about GoDaddy's Page Parking Program (*id.*, Ex. 37), and over 50 cease/desist letters from the Academy both before and after this litigation commenced (Quinto Decl., Exs. 1-57).

## VI.  THERE IS A FACTUAL DISPUTE CONCERNING WHETHER GODADDY WAS THE REGISTRANT OF THREE OF THE INFRINGING DOMAIN NAMES

GoDaddy is not entitled to summary judgment on the issue of whether it was the registrar for three of the domain names at issue: 2006AcademyAwards.com;       AcademyAwardsShow.com;       and TheAcademyAwardsLive.com.  The Academy learned in discovery that these domain names were part of "Standard Tactics" – a portfolio of domain names owned and controlled by GoDaddy and monetized in GoDaddy's Parked Page Program.  (Michaels Dec., Ex. 29; CSUF 94.)  As GoDaddy's Director of Product Development testified:  Standard Tactics "was a portfolio of owned

GoDaddy domain names. . . . Names that GoDaddy was the registrant of." (Michaels Decl. Ex. 4, at 41:16-24; *see also* Ex. 5, Ede Depo. at 171:9-16.) Therefore, GoDaddy was the ***registrant*** of the domain names, because ownership constitutes registration under the ACPA. *See Christensen Firm v. Chameleon Data Corp.*, 2006 WL 3158246, at *4 (W.D. Wash. Nov. 1, 2006); *Schmidheiny v. Weber*, 319 F.3d 581, 582 (3d Cir. 2003). As such, summary should be denied on GoDaddy's status as the *registrant* of these three Standard Tactics domain names.

## VII. GODADDY'S SUMMARY JUDGMENT MOTION ON THE ACADEMY'S UNFAIR COMPETITION CLAIM FAILS

GoDaddy's sole argument is that the UCL claim stands or falls with the Academy's cybersquatting claims. Because GoDaddy is not entitled to summary judgment on those claims, its summary judgment motion on the UCL claim likewise fails.

## CONCLUSION

For the foregoing reasons, GoDaddy's motion for summary judgment should be denied in its entirety.

Respectfully submitted,

DATED: April 1, 2013          BOIES, SCHILLER & FLEXNER LLP

FOOTE, MIELKE, CHAVEZ, & O'NEIL LLC

LEE, TRAN & LIANG APLC

By: /s/ David Michaels
David Michaels (SBN 276100)

BOIES, SCHILLER & FLEXNER LLP
Stuart Singer (*pro hac vice*)
ssinger@bsfllp.com
David Nelson (*pro hac vice*)
dnelson@bsfllp.com

-25-

1

401 East Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
Tel: 954-356-0011
Fax: 954-356-0022

2

3

4

David L. Zifkin (SBN 232845)
dzifkin@bsfllp.com
David Michaels (SBN 276100)
dmichaels@bsfllp.com
225 Santa Monica Blvd., 11th Fl.
Santa Monica, CA 90401
Tel:  310-393-9119
Fax:  310-395-5877

5

6

7

8

9

10

FOOTE, MIELKE, CHAVEZ, & O'NEIL LLC
Robert M. Foote (*pro hac vice*)
rmf@fmcolaw.com
Matthew Herman (*pro hac vice*)
mjh@fmcolaw.com
10 West State Street, Suite 200
Geneva, Illinois 60134
Tel:  630-232-7450
Fax:  630-232-7452

11

12

13

14

15

16

17

LEE, TRAN & LIANG APLC
James M. Lee (SBN 192301)
jml@ltlcounsel.com
Enoch H. Liang (SBN 212324)
ehl@ltlcounsel.com
601 South Figueroa Street, Suite 4025
Los Angeles, CA 90017
Tel: 213-612-3737
Fax: 213-612-3773

18

19

20

21

22

23

*Attorneys for Plaintiff Academy of
Motion Picture Arts and Sciences*

24

25

26

27

28

THE ACADEMY'S OPPOSITION TO GODADDY'S
MOTION FOR SUMMARY JUDGMENT