**WRENN BENDER  LLLP**
Aaron M. McKown, California Bar No. 208781
Paula L. Zecchini, California Bar No. 238731
2 Park Plaza, Suite 550
Irvine, California  92614
Telephone.: (949) 202-5810
Facsimile:   (949) 679-7939
E-Mail:       amckown@wrennbender.com
                    pzecchini@wrennbender.com

Attorneys for Defendant
GODADDY.COM, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACADEMY OF MOTION PICTURE ARTS AND SCIENCES, a California nonprofit corporation,<br><br>                    Plaintiff,<br><br>          v.<br><br>GODADDY.COM, INC., a Delaware corporation; THE GODADDY GROUP INC., a Delaware corporation; DOMAINS BY PROXY, INC., a Delaware Corporation; GREENDOMAINMARKET.COM, an unknown entity; BDS, an unknown entity; and XPDREAMTEAM LLC, a California limited liability corporation,<br><br>                    Defendants. | Case No. CV10-3738-ABC (CW)<br><br>Assigned to Hon. Audrey B. Collins Courtroom 680<br><br>**DEFENDANT GODADDY.COM, INC.'S RESPONSE IN OPPOSITION TO THE MOTION FOR PARTIAL SUMMARY JUDGMENT FILED BY PLAINTIFF ACADEMY OF MOTION PICTURE ARTS AND SCIENCES**<br><br>Date:  April 22, 2013<br>Time:  10:00 a.m.<br><br>Complaint Filed:  May 18, 2010<br>Trial Date:         May 21, 2013 |

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

# I.      INTRODUCTION

As the plaintiff and moving party, the Academy of Motion Pictures Arts and Sciences ("AMPAS") bears both the burden of production and the burden of persuasion on each of the four issues for which it seeks partial summary judgment. AMPAS fails to meet its burden on all counts.

The entirety of AMPAS' motion suffers from a single fundamental flaw:  its failure to submit sufficient admissible evidence to allow the Court to summarily adjudicate each of the four issues presented.  For example, AMPAS first asks this Court to find that five of its trademarks (the "AMPAS Marks") are famous under the Lanham Act.  Such a finding would effectively preclude all others from using these marks, regardless of whether the marks are in related fields or are those of competitors.  Yet, fatally absent from AMPAS' motion is a consumer survey or other credible evidence demonstrating what, if any, degree of actual recognition the general consuming public has with respect to each of the AMPAS marks.  The absence of such a survey alone warrants the denial of AMPAS' motion.

The affirmative evidence submitted by Go Daddy – a consumer survey, a linguist report, registrant declarations, and certified copies of existing third party trademark registrations for the OSCAR mark – also preclude summary judgment as to each of the AMPAS Marks on the issue of fame.  Indeed, the very same evidence creates triable issues of material fact relating to the second issue on which AMPAS seeks summary adjudication: whether the domain names identified in AMPAS Exhibit 1 are confusingly similar to the AMPAS Marks.

In addition to the evidentiary failures noted above, AMPAS also fails to submit any evidence demonstrating the specific wrongful conduct engaged in by Go Daddy with respect to each of the domain names in dispute (the "Disputed Domains").  Instead, AMPAS' motion focuses entirely on general aspects of Go Daddy's parked page programs.  But the inquiry for the third and fourth issues sought to be adjudicated by AMPAS—statutory immunity and ACPA liability—

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

1   does not begin and end with the mere existence of these programs.

2   In order to prevail on each of these issues, AMPAS must show that:  (1) each

3   domain name was registered through Go Daddy; (2) each domain name had its

4   domain name server ("DNS") designated to one of Go Daddy's parked page servers;

5   (3) each domain name routed *and* resolved to a parked page; and (4) each parked

6   page contained monetized content.  AMPAS fails to submit evidence under any one

7   of these prongs, much less all of them.  As such, AMPAS does not demonstrate that

8   Go Daddy registered, used, or trafficked in any of the Disputed Domains or that it

9   acted beyond its role as a registrar with respect to any of the Disputed Domains, so

10  as to preclude application of Go Daddy's statutory immunity as a domain name

11  registrar.

12  The motion for partial summary judgment filed by AMPAS should be denied

13  in its entirety.

14  **II.   RELEVANT FACTUAL BACKGROUND**

15  **A.   The Disputed Domains**

16  Pursuant to the Court's original Scheduling Order, fact discovery was set to

17  conclude on June 13, 2011; the deadline to disclose additional infringing domain

18  names was set for April 14, 2011.  *See* Scheduling Order [Dkt. 55].  The parties

19  subsequently stipulated to the extension of all deadlines, including the extension of

20  the Court-established deadline to disclose additional infringing domain names, to

21  September 14, 2011.  The Court adopted the parties' stipulation as its order.  *See*

22  Dkt. 95.

23  On September 14, 2011, AMPAS approached Go Daddy regarding a further

24  continuance of the existing deadlines.  *See* McKown Decl. ¶ 2, Exh. A.  On

25  September 15, 2011, Go Daddy informed AMPAS that it was agreeable to a further

26  90-day continuance with one exception – the deadline to disclose additional

27  infringing domains, which expired without extension the day prior.  *Id.*  After a

28  series of negotiations, the parties entered into the requested stipulation and

**WRENN BENDER LLLP**
2 Park Plaza, Suite 550
Irvine, California 92614

2

specifically excluded a continuance of the Court-established deadline for AMPAS to identify additional infringing domain names. *See* Dkt. 150. Although AMPAS agreed to the stipulation as filed, it "reserved its right" to seek relief from the Court to disclose additional infringing domain names beyond the expired deadline ordered by the Court. *See* McKown Decl. ¶ 3, Exh. B. AMPAS, however, never sought relief to extend the Court-established deadline. *Id.* AMPAS' failure to obtain such relief bars its inclusion of untimely domain names in this action.

### B.   Go Daddy's Domain Name Services

Go Daddy is a domain name registrar. *See* Declaration of Paul Nicks ("Nicks Decl.") ¶ 2. Go Daddy provides an automated registration process for any person who seeks to register a domain name (the "domain name registrant"). *Id.*

Go Daddy's automated "dashboard" prompts a registrant to designate a domain name server ("DNS") for the routing of a domain name at the time of registration. *Id.* at ¶ 3. A domain name is required to have its DNS designated at the time of registration in order to ensure the orderly process for acquiring domain names and the proper functioning of the DNS system. *Id.*

A registrant's routing options include the ability to configure his or her name server so that it routes to a "record not found" error message, to a newly created website on a server hosted by Go Daddy or another third party, or to an existing website already associated with another domain name. *Id.* at ¶ 6. Alternatively, the registrant can select Go Daddy's parked page servers or elect not to designate a DNS at all. *Id.* In the event a registrant does not select a DNS at the time of registration, the DNS for Go Daddy's parked page servers will be designated by default. *Id.* The registrant may change his or her DNS at any time. *Id.*

The designation of Go Daddy's parked page servers does not result in the creation of a webpage or any content. *Id.* at ¶ 7. Rather, a webpage will only resolve from a domain name whose DNS is designated to Go Daddy's parked page servers when an Internet user places the domain name in their web browser and

Wrenn Bender LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

OPPOSITION TO MOTION FOR
PARTIAL SUMMARY JUDGMENT

presses enter.  *Id.*  At that point, a webpage will be created and exist only for the length of time that the Internet user keeps the webpage open.  *Id.*  Once the registrant closes the webpage, the webpage ceases to exist; the content is not stored or preserved on any host server.  *Id.*

Go Daddy has had a Parked Page Program since it became a domain name registrar.  *Id.* at ¶ 8.  Since its inception, the Parked Page Program has contained templates causing a domain name to resolve to a webpage containing non-monetized content.  *Id.*  This non-monetized content includes "coming soon" pages," "sorry this site is not currently available" pages, and blank pages, among others.  *Id.*

Go Daddy eventually added templates to its Parked Page Program that included Go Daddy banner ads as well as Google-provided contextual ads.  *Id.* at ¶ 9.  These templates were in addition to, not in lieu of, the non-monetized templates that have always existed in Go Daddy's Parked Page Program.  *Id.*  The content that resolves from a domain name whose DNS is designated to Go Daddy's parked page servers is dependent on the template assigned to the domain name.  *Id.* at ¶ 11.  Go Daddy maintains various templates associated with its parked page servers.  *Id.*  These templates include both monetized and non-monetized parked pages.  *Id.*  The template designation for a given domain name can change at any time based on the registrant's continual right to control content resolving from their domain name.  *Id.* at ¶ 12.

## III.   ARGUMENT

### A.   AMPAS Fails To Present Sufficient Evidence To Establish Fame As A Matter Of Law

With only limited evidence of marketing expenditures, the lay opinion testimony of Go Daddy's own expert witnesses, and no survey or other admissible evidence of actual recognition of the trademarks at issue, AMPAS seeks a finding that each of its marks are famous as a matter of law.  AMPAS has not met its burden.

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

4

"[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). "Because protection from dilution comes close to being a 'right in gross,' ... the FTDA extends dilution protection only to those whose mark is a 'household name.'" *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1011 (9th Cir. 2004).

"To determine whether a mark is recognized by the public, courts consider factors such as (1) the duration, extent, and geographic reach of advertising and publicity of the mark; (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register." *Id.*; *Coach, Inc. v. Sac a Main*, 2012 WL 5464347, at *5 (E.D. Cal. Nov. 7, 2012) (citations omitted).

To be famous, "a mark must be truly prominent and renowned." *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th Cir. 1999) (citations omitted); *see also Self-Insurance Institute of America, Inc. v. Software and Information Industry Ass.*, 208 F. Supp. 2d 1058, 1077 (CD. Cal. 2000) ("Unless a mark rises to the level of 'KODAK' or 'COKE,' it is not considered famous and thus not afforded protection from dilution.") By contrast, marks lacking fame are not as well known, such as "Trek" bicycles, "Avery" and "Dennison" office supplies, "M2" music and video software, "PostX" e-mail security services, "Star Markets" grocery stores, or "Tornado" vacuum cleaners.[1]

Establishing that a mark is "famous" for purposes of dilution "is not an easy

---

[1]   *Thane Int'l*, 305 F.3d 894; *Avery Dennison Corp.*, 189 F.3d 868; *M2 Software, Inc. v. Viacom, Inc.*, 119 F.Supp.2d 1061 (C.D. Cal. 2000), *rev'd on other grounds*, 30 Fed. Appx. 710 (9th Cir. 2002) (unpublished); *PostX Corp. v. docSpace Co., Inc.*, 80 F.Supp.2d 1056 (N.D. Cal. 1999); *Star Markets*, 950 F. Supp. 1030; *Breuer Elec. Mfg. Co. v. Hoover Co.*, No. 97 C 7443, 1998 WL 427595 (N.D. Ill. Jul 23, 1998) (Tornado).

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

1 standard to achieve." *Rosetta Stone v. Google, Inc*., 676 F.3d 144, 171 (4th Cir.

2 2012).  Although AMPAS asserts that a mark is considered famous for purposes of

3 the ACPA under the criteria laid out in 15 U.S.C. §1125(c)(2)(A), it undertakes no

4 analysis of that subsection's four criteria.  *See* Motion at 12:2-13:18.  Instead,

5 AMPAS' submissions on fame consist of the lay opinion testimony of four Go

6 Daddy employees and three of its expert witnesses, inadmissible documents, and a

7 statement by AMPAS' counsel that AMPAS has made a "substantial investment in

8 advertising which averaged $2 million a year from 2007 to 2010, and totaled over

9 $4 million in 2011."   Motion at 13:3-6.  The nominal evidence presented by

10 AMPAS is insufficient to establish fame as a matter of law.

11      In *TCPIP Holding Co., Inc. v. Haar Communications, Inc.,* 244 F.3d 88, 99

12 (2d Cir. 2001), the district court's preliminary injunction was vacated in part

13 because the plaintiff's evidentiary submissions failed to demonstrate the degree of

14 fame required by statute.  *Id*. at 99.  Although the plaintiff provided affidavit

15 testimony that its business had grown from $100 million in sales from 87 stores in

16 1994 to $280 million from 228 stores operating in 27 states in 1998, and that it had

17 expended tens of millions of dollars in advertising its mark over the previous

18 decade, the appellate court's ruling focused on the absence of consumer surveys,

19 press accounts, or "other evidence of fame," the absence of any statistics pertaining

20 to any year before 1994, and the unsubstantiated assertions that plaintiff had used

21 the mark for thirty years.  *Id*.; *see also Advantage Rent–A–Car, Inc. v. Enterprise

22 Rent–A–Car, Co*., 238 F.3d 378 (5th Cir. 2001) (affirming district court's

23 determination that defendant's slogan "We'll Pick You Up" was not sufficiently

24 famous even where defendant spent more than $130 million on advertising

25 containing the slogan, and had used the slogan in all of the media forms in which it

26 advertised, including commercials shown on prime time national television, major

27 broadcast networks, and cable stations).

28      The evidence presented by AMPAS is far less compelling than that presented

**WRENN BENDER LLLP**
2 Park Plaza, Suite 550
Irvine, California 92614

in *TCPIP Holding Co*. and *Advantage Rent–A–Car, Inc.*  AMPAS presents this Court with a markedly different accounting scenario, identifying advertising expenditures covering only a five year period, the sum of which totaled hundreds of millions of dollars *less than* the expenditures at issue in *TCPIP Holding Co*. and *Advantage Rent–A–Car, Inc.  See* Motion at 13:3-6.  AMPAS fails to present any evidence of revenues earned during the same time period.

AMPAS also fails to present this Court with any evidence addressing the actual recognition of the AMPAS Marks by the general consuming public of the United States, instead choosing to rely on the limited evidence cited above and "common sense."  Motion at 11:19-20; 15 U.S.C. § 1125(c)(2)(A)(iii).  Neither is sufficient to establish actual recognition under the Lanham Act.

AMPAS' failure to provide any evidence of actual recognition leaves AMPAS without the proof necessary to establish fame as a matter of law.  *See Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 878-79 (1999) (reversing the district court's award of summary judgment due to the plaintiff's failure to proffer evidence of "whether consumers in general have any brand association with 'Avery' and 'Avery Dennison'."); *TCPIP Holding Co. v. Haar Comm'ns, Inc.,* 244 F.3d 88, 99-100 (2d Cir. 2001) (dismissing a preliminary injunction motion based on dilution due to plaintiff's failure to "submit consumer surveys, press accounts, or other evidence of fame"); *BigStar Entertainment, Inc. v. Next Big Star, Inc.,* 105 F. Supp. 2d 185,218 (S.D.N.Y. 2000) (noting the "absence in this record of any consumer surveys documenting the extent of actual public identification of plaintiff's marks" when finding marks not famous).

Nor can AMPAS rely upon the lay opinion testimony of Go Daddy's expert witnesses or the four employees that it blatantly misrepresents as "every Go Daddy witness deposed in this case"—to demonstrate actual recognition.[2]  As with the

---

[2]    Contrary to AMPAS' representation, it deposed more 14 Go Daddy employees throughout the conduct of this litigation.  *See* McKown Decl. at ¶ 20.

Wrenn Bender LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

1 scant evidence presented in *Avery Dennison*, the statements of these seven

2 individuals "add nothing to the discussion of whether consumers in general have any

3 brand association with [AMPAS] and no evidence of product awareness relate[d]

4 specifically to the [OSCAR, OSCARS, ACADEMY AWARD or ACADEMY

5 AWARDS] trademarks." *Avery Dennison*, 189 F.3d at 879.  AMPAS' attempt to

6 rely upon any actual recognition associated with the Oscar Statuette is similarly

7 unavailing—the sole Academy trademarks at issue in this action are the word marks.

8 AMPAS' failure to present any evidence to support the actual recognition of any of

9 the AMPAS Marks warrants denial of its motion on the issue of fame.

10      The denial of AMPAS' motion is also compelled by affirmative evidence

11 supporting the lack of actual recognition of the trademarks OSCAR and OSCARS.

12 *See* McKown Decl. at ¶ 5, Exh. D.  Go Daddy expert witness Dr. Carol Scott

13 surveyed over 19,000 people relating to 75 of the domain names at issue in this case,

14 each of which included the string "oscar" or "oscars".  *See* McKown Decl. at ¶ 5,

15 Exh. D at ¶6.  Net associations between the domain name and the entertainment

16 industry in general for these domain names was generally between 0–6%.  *Id.* at ¶4.

17 These results suggest, at a minimum, a triable issue of fact regarding the lack of

18 actual market recognition of the OSCAR and OSCAR marks by the general

19 consuming public of the United States.

20      It is well-recognized that a finding of fame affords the trademark owner with

21 "extensive relief—preventing all others from using the mark, regardless of whether

22 the marks are in related fields or are those of competitors." *Star Markets, Ltd. v.*

23 *Texaco Refining & Marketing, Inc.,* 950 F. Supp. 1030, 1033 (D. Haw. 1996).  In

24 addition to the reasons presented above, such a finding would deprive at least 18

25 third party trademark owners of their own valid, subsisting, and incontestable rights

26 in their own registered trademarks for "OSCAR". *See* McKown Decl. at ¶ 6, Exh. E.

27      AMPAS fails to meet its burden to establish the absence of a genuine issue of

28 material fact regarding the famous nature of the Academy Marks.  The Court should

**WRENN BENDER LLLP**
2 Park Plaza, Suite 550
Irvine, California 92614

8

1  deny AMPAS' motion.

2  **B.**   **AMPAS Fails To Present Evidence Negating Go Daddy's**

3  **Entitlement To The "Safe Harbor" Provision for Registrars Set**

4  **Forth In 15 U.S.C. §1114(2)(D)(iii)**

5  AMPAS seeks partial summary judgment on the issue of whether registrar

6  immunity under 15 U.S.C. section 1114(2)(D)(iii) of the Lanham Act (the

7  "Registrar's Safe Harbor") applies to Go Daddy's alleged conduct in this case.

8  AMPAS, however, fails to carry its burden of demonstrating that no triable issue of

9  fact exists as to Go Daddy's entitlement to immunity afforded by the Registrar's

10  Safe Harbor.

11  Whether the Registrar's Safe Harbor applies in this case depends on the

12  nature of the conduct at issue.  Under the Lanham Act, registrars are protected from

13  liability for engaging in activities related to the "registration and maintenance of

14  domain names."  15 U.S.C. §1114(2)(D)(iii).  Such activities include maintaining

15  directories that link domain names with IP addresses of domain name servers,

16  routing domain names to domain name servers, and forwarding domain names to

17  commercial websites.  *See Lockheed Martin Corp. v. Network Solutions, Inc.*, 194

18  F.3d 980, 984-85 (9th Cir. 1999) (registration and routing of a domain name does

19  not extend registrar's involvement beyond registration services); *Lockheed Martin*

20  *Corp. v. Network Solutions, Inc.* ("Lockheed II"), 141 F. Supp. 2d 648, 655 (N.D.

21  Tex. 2001) (defendant, which maintained a directory that linked domain names with

22  IP addresses of domain name servers that connected the domain names with other

23  Internet computers that host websites not subject to ACPA liability); *Petronas*, 2012

24  WL 10532, at *3-4 (finding that Go Daddy was not liable for forwarding a domain

25  name to a commercial pornography site).

26  AMPAS relies heavily on its claim that the act of placing advertisements on

27  webpages resolving from the Disputed Domains is beyond the scope of conduct

28  protected by the Registrar's Safe Harbor.  In doing so, AMPAS ignores its own

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

9

1    allegations, which are not limited to post-registration acts by Go Daddy.  Rather,

2    AMPAS expressly alleges that Go Daddy's assistance in the registration of the

3    Disputed Domains, its creation of the infrastructure to rout the Disputed Domains,

4    and the subsequent commercialization of the Disputed Domains all constitute

5    violations of the ACPA.  *See* SAC at ¶¶ 1, 43-44 [Dkt 170]; McKown Decl. ¶ 7, Exh

6    F ("Our theory of use is that they've pointed the domain name to a parked page.  It's

7    irrelevant whether someone goes there or not to our theory of use.")).  Based on the

8    allegations made in this case, the Registrar's Safe Harbor provision does indeed

9    apply to at least some of Go Daddy's alleged conduct.

10           In order to demonstrate that the Registrar's Safe Harbor does not apply to any

11   of Go Daddy's alleged conduct as a matter of law, AMPAS must show that each of

12   the Disputed Domains routed to a parked page server *and* that the Disputed

13   Domains resolved to a webpage provided by Go Daddy containing monetized

14   content.   Absent such evidence, the Registrar's Safe Harbor shields Go Daddy from

15   liability relating for registering, routing, forwarding, or otherwise maintaining a

16   directory linking the Disputed Domains with IP addresses of domain name servers.

17           **1.     Go Daddy's Alleged Registration Of The Disputed Domains**

18                    **Falls Squarely Within The Immunity Provided By The**

19                    **Registrar's Safe Harbor**

20           The mere registration of the Disputed Domains falls squarely within the

21   Registrar's Safe Harbor unless AMPAS can demonstrate that Go Daddy registered

22   each of the Disputed Domains with a bad faith intent to profit from the AMPAS

23   Marks.  *See* 15 U.S.C. § 1114(2)(D)(iii).  AMPAS, however, fails to submit any

24   evidence to support a finding that Go Daddy had a bad faith intent to profit from the

25   registration of any of the Disputed Domains as a matter of law.  Thus, to the extent

26   Go Daddy provided registration services for the Disputed Domains, Go Daddy is

27   entitled to statutory immunity for such registration under the Registrant's Safe

28   Harbor.

**WRENN BENDER LLLP**
2 Park Plaza, Suite 550
Irvine, California 92614

**2.**  **Go Daddy's Creation Of The Infrastructure By Which The Disputed Domains May Be Routed Constitutes "Maintenance" For Purposes Of Registrar Immunity**

AMPAS argues that Go Daddy acted beyond its role as a registrar by allowing the Disputed Domains to participate in its Free and Cash Parking Program. *See* Motion 14:27-15. In order to support this contention, however, AMPAS must first demonstrate that each of the Disputed Domains had its DNS designated to one of Go Daddy's parked page programs (as opposed to a third party hosting server). No such evidence was submitted.

Regardless, the mere "pointing" of the Disputed Domains to such servers does not remove Go Daddy from the protections of the Registrar's Safe Harbor. It is undisputed that a domain name must have its DNS selected at the time of registration. *See* Nicks Decl. at ¶ 3; *see also* McKown Decl. 8, Exh. G. Go Daddy's creation and maintenance of the infrastructure used to route a domain name at some point in time in the future squarely falls within the "maintenance" component of registrar immunity. *Id.* The location to which a domain name may route in the event an Internet user places the domain name into his or her browser is of no consequence. *See Petronas*, 2012 WL 10532, at *3-4; *see also Lockheed*, 194 F.3d at 984-85; *Lockheed II*, 141 F. Supp. 2d at 655. As such, even if AMPAS submitted evidence sufficient to show that each of the Disputed Domains had its DNS designated to Go Daddy's parked page servers, the Registrar's Safe Harbor would still apply.

**3.**  **Resolution Of A Domain Name to A Go Daddy Parked Page Does Not Take Go Daddy Outside Its Role As Registrar**

Nor would AMPAS be entitled to summary judgment on the issue of registrar immunity had it submitted evidence establishing that a parked page resolved from each of the Disputed Domains. Rather, in order to prove that Go Daddy acted beyond its role as registrar with respect to each of the Disputed Domains, AMPAS

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

11

is required to show that each of the Disputed Domains resolved to a parked page containing advertisements.  It simply fails to do so.

The DNS system mandates that a domain name not contain blanks in its DNS at the time of registration.  In other words, the domain name must have a landing page associated with it at the time of registration in order to ensure the orderly process for acquiring domain names and thus, the proper functioning of the DNS system.  *See Petronas*, 2012 WL 10532, at *1; Nicks Decl. at ¶ 3; McKown Decl. at ¶ 8, Exh. G.  As discussed above, Go Daddy's parked page programs are not limited to monetized parked pages nor does Go Daddy prevent a registrant from changing its DNS at any time.  *See* Nicks Decl. at ¶ 6; McKown Decl. at ¶ 8, Exh. G.  Absent evidence that each of the Disputed Domains resolved to a monetized parked page, AMPAS cannot prove that Go Daddy did anything other than provide registration and maintenance services for each of the Disputed Domains—acts for which Go Daddy enjoys registrar immunity.  *See Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984-85 (9th Cir. 1999); *Lockheed Martin Corp. v. Network Solutions, Inc.* ("Lockheed II"), 141 F. Supp. 2d 648, 655 (N.D. Tex. 2001); *Petronas*, 2012 WL 10532, at *3-4.

**C.**   **AMPAS Fails To Present Any Evidence Establishing That Go Daddy Used The Disputed Domains**

**1.**   **Go Daddy Is Not The Registrant's Authorized Licensee For Any of the Domain Names**

As AMPAS points out in its moving papers, a party can only be liable for "use" under the ACPA if it is the registrant of a domain name or the "registrant's authorized licensee."  Motion at 17:4-7 (citing 15 U.S.C. § 1125(d)(1)(D)).

In support of its motion for partial summary judgment, AMPAS relies on a single version of the Domain Name Registration Agreement produced by Go Daddy in this case to support a finding that Go Daddy was the authorized licensee for each of the Disputed Domains.  *See* Motion at 17:23-18:7.  As addressed in Go Daddy's

Wᴇʀᴇɴɴ Bᴇɴᴅᴇʀ LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

12

**WRENN BENDER LLLP**
2 Park Plaza, Suite 550
Irvine, California 92614

own motion for summary judgment, however, none of the Domain Name Registration Agreements at issue in this action actually confer such authority. Indeed, a reading of those agreements compels the conclusion that not a single one of the registrants for each of the Disputed Domains "clearly and unequivocally" authorize Go Daddy to place advertisements on his or her domain names.

In support of its position, AMPAS relies on only one of the 51 versions of the Domain Name Registration Agreement produced in this case. *See* McKown Decl. at ¶¶ 9-10, Exhs. H-I. This version, dated May 28, 2010, along with 33 others published in between 2009 and 2010, includes a Paragraph 8 entitled Parked Page Service. *See* McKown Decl. at ¶ 9, Exh. H. As AMPAS admits, "absent these contractual provisions, Go Daddy would have no right" to place advertisements on the Disputed Domains. Motion at 18:8-12. AMPAS fails to mention, however, that 18 versions of the Domain Name Registration Agreement produced in this action and in use prior to 2009 do not include the language it admits is required for a finding of authority.[3] *See* McKown Decl. at ¶ 10, Exh. I. Because AMPAS fails to produce any evidence demonstrating if and when each of the Disputed Domains was registered with Go Daddy, it is impossible to determine which, if any, of the Domain Name Registration Agreements applied to a specific domain name.[4]

Moreover, even if AMPAS produced evidence showing that the registrants for each of the Disputed Domains agreed to the version of the Domain Name Registration Agreement relied upon by AMPAS in its motion, the agreement does not clearly and unequivocally authorize Go Daddy to place advertisements on webpages resolving from the registrants' domain names. Rather, the language of the Parked Page Service section merely advises the registrant that "[f]or every

---

[3]     Thus, pursuant to AMPAS' own admission, Go Daddy is not the registrant's authorized licensee for any domain name registered prior to 2009. *Cf.* Motion at 18:8-12; McKown Decl. at ¶ 10, Exh. I.

[4]     Even more problematic for AMPAS is the fact that it produced no evidence demonstrating that any of the Disputed Domains were actually registered with Go Daddy.

domain registered, Go Daddy will provide the Parked Page service free to its customers."  The agreement further states, "**If You [the registrant] are using Go Daddy's Parked Page services**, You [the registrant] agree that Go Daddy may point the domain name or DNS to one of Go Daddy's or Go Daddy's affiliates web pages, and that they may place advertising on Your web page."  McKown Decl. at ¶ 9, Exh. H (emphasis added).  Nothing contained in the Domain Name Registration Agreement establishes that the registrants actually agreed to use the Parked Page Service, thus triggering Go Daddy's right to place advertisements.

As discussed in Go Daddy's own motion for summary judgment, the language quoted above is the very language adjudged by the court in *Crabb v. GoDaddy.com*, Inc., CV10-00940-PHX-NVW, 2011 WL 4479043 (D. Ariz. Sept. 27, 2011) to be insufficient to put registrants on notice that they were authorizing Go Daddy to place advertisements on parked pages resolving from their domain names as a matter of law.  *Crabb*, 2011 WL 4479043 at *4 ("And the portion of the Parked Page Service Agreement to which Go Daddy looks for authority is unhelpful because it is circular with respect to the question at hand: 'If You are using any of Go Daddy's Parked Page services, You agree that Go Daddy may point the domain name or DNS to one of Go Daddy's or Go Daddy's affiliates['] webpages ....But how does a customer know if he is 'using any of Go Daddy's Parked Page services'?").

In refusing to accept Go Daddy's claimed right to place advertisements on domain names in the Parked Page program, the *Crabb* court specifically determined that, as here, the Domain Name Registration Agreement neither authorized Go Daddy to place advertisements on domain names nor prohibited it.  *Id.* at *1.  Under Arizona law, which governs these agreements, such authority must be clear and unequivocal.  *Id.* at *3-*4 (citing *United Cal. Bank v. Prudential Ins. Co. of Am.*, 681 P.2d 390, 420 (AZ Ct. App. 1983)).  Absent such clear and unequivocal authority, Go Daddy cannot, as a matter of law, be the registrant's authorized

W**RENN** B**ENDER** LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

licensee.  *Id.*

Nor does AMPAS' claim that "Go Daddy *acted as* the registrants' authorized licensee [for] the accused domain names," somehow demonstrate that Go Daddy had actual authority from the registrants to do so.  Motion at 17:9-11.  The deposition testimony from Go Daddy's prior general counsel and the language contained in its agreements with Google are simply insufficient to demonstrate that Go Daddy was the legally authorized licensee of any of the registrants.  Neither Go Daddy's own belief nor its representations to third parties regarding the legal status of domain names generally establish as a matter of law that Go Daddy was the registrant's authorized licensee for any of the Disputed Domains.  Indeed, Go Daddy's subjective belief is irrelevant to the determination of whether the registrant authorized Go Daddy to use his or her domain name for purposes of the ACPA. *Crabb*, 2011 WL 4479043 at *3-*4.

Absent citation to specific language in an agreement or other such evidence between Go Daddy and the registrant of each Disputed Domain demonstrating the registrant's specific agreement to (1) participate in the Parked Page service and (2) allow the placement of advertisements on webpages resolving from his or her domain name(s), AMPAS cannot demonstrate that Go Daddy was the *authorized* licensee of any registrant with respect to any of the Disputed Domains.  Thus, the Court should deny AMPAS' motion for partial summary judgment on this issue.

**2.  AMPAS Fails To Produce Evidence Supporting Its Claim That Go Daddy Placed Advertisements On The Disputed Domains**

AMPAS contends, without a single citation to evidence, that "[i]t is undisputed that GoDaddy exercises its contractual right to point domain names, including the Accused Domain Names, to websites hosted by Go Daddy, and that GoDaddy, through its advertisement providers, places advertisements on those websites; and that the advertisements generate revenue for GoDaddy whenever an

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

15

Internet user visits a parked website and clicks on an advertisement." Motion at 19:23-28. Not only did AMPAS fail to submit evidence sufficient to support this statement, but contrary to AMPAS' contention, this "fact" is in dispute.

AMPAS relies on either inadmissible or inapposite evidentiary references in support of its contention that Go Daddy used each of the Disputed Domains by placing advertisements on them. Motion 8:20-21:13 (citing SUF ¶¶ 10, 11, 30, and 31). The admissible evidence presented in AMPAS No. SUF 10, 30 and 31 cited, however, does not relate to any specific domain name, but rather, relates to generalized discussions regarding limited components of the parked page programs. *See* AMPAS SUF 10, 30, and 31, evidence cited in support thereof and the related evidentiary objections of Go Daddy filed concurrently herewith.[5]

As stated above, AMPAS' unsubstantiated statement is based on the false assumption that all of the Disputed Domains (1) had their DNS designated to Go Daddy's parked page servers (2) that each resolved to a parked page and (3) that all of the parked pages contained advertisements. All three of these assumptions lack supporting evidence and are, in fact, contradicted by undisputed evidence adduced to date in this case. *See* Nicks Decl. at ¶¶ 6, 8-9, 11-12; McKown Decl. at ¶¶ 8, 11, Exhs. G at 34:13-17, 35:9-37:4; J at 9:20-12:10, 50:15-51:21. AMPAS' failure to submit admissible evidence demonstrating Go Daddy's placement of advertisements on each of the Disputed Domains requires the denial of its motion.

**D.      AMPAS Fails To Produce Evidence To Support Its Claim That Go Daddy Trafficked In Any Of The Domain Names**

Under the ACPA, the term "traffics in" means to engage in a transaction including but not limited to sales, purchases, loans, pledges, licenses, exchanges of currency, and other transfer for or exchange of consideration. *See* 15 U.S.C. § 1125(d)(1)(E). AMPAS hinges its trafficking argument on two grounds: (1) the

---

[5]     The inadmissible evidence set forth in support of AMPAS SUF 11 need not be addressed here.

16

alleged license between Go Daddy and the registrant of each domain name as contained in the Domain Name Registration Agreement and (2) an unsupported statement that Go Daddy derived revenue from the advertisements it placed on the Disputed Domains.  Both arguments fail.

### 1.   AMPAS Fails To Produce Evidence Establishing That Go Daddy Acquired A License Or Ownership Interest In Any Of The Domain Names

As discussed in Section C.1 *supra*, the language contained in the Domain Name Registration Agreement cited by AMPAS is insufficient to confer upon Go Daddy a license of or ownership interest in any of the Disputed Domains.  Nor did AMPAS submit any other evidence, such as correspondence between the registrants and Go Daddy, conferring any such rights.  On this basis alone, AMPAS is not entitled to a finding that Go Daddy trafficked in the Disputed Domains as a matter of law.

### 2.   AMPAS Fails To Produce Evidence Demonstrating That Go Daddy Earned Revenue From The Placement Of Advertisements On Any Of The Disputed Domains.

AMPAS' reliance on the unsupported statement that "Go Daddy has taken such an ownership interest by sharing in (or taking all of) the revenue derived from the advertisements it has placed on domains" does not save its claim.  Motion at 22:11-14.  In attempting to establish that Go Daddy trafficked in the Disputed Domains, AMPAS cites to *Transamerica Corp. v. Moniker Online Services LLC*, 672 F. Supp. 1353, 1364 (S.D. Fla. 2009) for the proposition that the receipt of a fee from pay-per-click advertisements placed on a domain name establishes an ownership interest in a domain name.  *Id.*  AMPAS, however, fails to present any evidence to bring the allegations of this case in line with those presented in *Transamerica*.

Specifically, AMPAS fails to present any admissible evidence demonstrating

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

that (1) pay-per-click advertisements were placed on the Disputed Domains, (2) Go Daddy derived any revenue from pay-per-click advertisements on the Disputed Domains, and (3) that Go Daddy had the right to generate *and keep* such revenue. Instead, AMPAS again attempts to prove its claim with the deposition testimony of two Go Daddy employees speaking in generalities about Go Daddy's parked page programs. *See* AMPAS SUF 13 and 30, evidence cited in support thereof and the related evidentiary objections of Go Daddy filed concurrently herewith. The fact that Go Daddy may, in certain scenarios, place advertisements on webpages resolving from domain names in the parked page program and, in some instances, receive revenue generated by those advertisements, is plainly insufficient to demonstrate that Go Daddy did so with respect to any of the Disputed Domains.

As demonstrated by the deposition testimony omitted from AMPAS' citation of evidence, not every webpage resolving from a domain name in Go Daddy's parked page program contains advertisements. *See* McKown Decl. at ¶¶ 8, 11, Exhs. G at 34:13-17, 35:9-37:4; J at 9:20-12:10, 50:15-51:21; *see also* Nicks Decl. at ¶¶ 6, 8, 11, 12. Nor did AMPAS submit any admissible evidence demonstrating that Go Daddy placed advertisements on any of the Disputed Domains.

AMPAS cannot prove that Go Daddy trafficked in each of the Disputed Domains by claiming generally that Go Daddy has a parked page program that includes *inter alia* templates set to populate with advertisements when a domain name is entered by an Internet user. *See* Motion 22:11-14. This is especially true where, as here, AMPAS fails to present admissible evidence demonstrating that any such templates were displayed to an Internet user with regard to each of the Disputed Domains. Nor can AMPAS prevail on its motion by simply referring to the fact that for those domain names that are ultimately populated with templates displaying advertisements, Go Daddy retains any revenue generated. Again, AMPAS' failure to present evidence demonstrating that Go Daddy earned or retained any revenue from the placement of advertisements on any of the Disputed

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

18

Domains bars the requested relief.

In light of AMPAS' failure to present this Court with any evidence demonstrating that Go Daddy (1) had the right to place advertisements on each of the Disputed Domains, (2) actually placed advertisements on each of the Disputed Domains, and (3) had the right to generate and keep revenue from any such advertisements, AMPAS' motion must be denied.

**E.      AMPAS Fails To Present Any Evidence Demonstrating That It Is Entitled To A Judgment On Confusing Similarity For The Domain Names Identified In AMPAS Exhibit 1**

AMPAS seeks partial summary judgment on a subset of domain names it deems confusingly similar to the Academy Marks.  In support of its argument, AMPAS takes inconsistent positions, first stating that (1) the ACPA requires that the confusingly similar analysis include only a review of the domain name and the Academy Marks, but then insisting that (2) the Court should look to the actual material on the webpages to confirm a finding of confusing similarity.

**1.      At The Very Least, A Triable Issue Of Fact Exists As To Whether The Domains Names And The AMPAS Marks Are Confusingly Similar In Sight, Sound, Or Meaning**

Contrary to AMPAS' contention, courts have consistently held that confusing similarity is determined only by comparing the sight, sound and meaning of an accused domain name and the trademarks at issue.  *RingCentral, Inc. v. Quimby*, 711 F. Supp. 2d 1048, 1060, 1061 (N.D. Cal. 2010); *see also Super-Krete International, Inc. v. Rod Sadleir et al.*, 712 F. Supp. 2d 1023, 1031(C.D. Cal. 2010) (accord).  Despite this fact, neither the cases upon which AMPAS relies, nor the unique circumstances presented by the trademarks and Disputed Domains in this case, compel a finding of confusing similarity as a matter of law.

Although the court in *DISC Intellectual Properties*, *LLC v. Delman* CV 07-5306 PA PJWX, 2007 WL 4973849 (C.D. Cal. Sept. 17, 2007) discussed the

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

confusing similarity standard, it based its determination of confusing similarity on the fact that the domain name strings were identical to the trademarks.  *Id* at *5.  Only one domain name at issue in this case matches the factual scenario presented in *DISC Intellectual Properties*: www.academyawards.net.[6]  Regardless, AMPAS does not seek summary judgment on the issue of whether any of the Disputed Domains are identical to the AMPAS Marks.  *See* Motion at 22:15-26:8.

Although noting similarities between the domain names and the marks at issue, the court in *Garden of Life, Inc. v. Letzer*, 318 F. Supp. 2d 946 (C.D. Cal. 2004), relied upon evidence of actual confusion in making its determination on the issue of confusing similarity.  *Garden of Life,* 318 F. Supp. 2d at 962.  AMPAS admits that it has no evidence of actual confusion.  *See* McKown Decl., ¶ 13, Exh. L at 156:11-16.

The decision in *Omega S.A. v. Omega Eng'g, Inc.*, 228 F. Supp. 2d 112, 127 (D. Conn. 2002)*,* relied upon AMPAS, actually supports Go Daddy's position.  In ruling on the summary judgment motion before it, the court in *Omega* expressly noted the absence of any evidence indicating whether the domain names were confusingly similar.  *See* Motion at 22:24-23:4 (citing *Omega*, 228 F. Supp. at 127).  Here, not only did AMPAS fail to submit any evidence of confusion, but Go Daddy presents affirmative evidence demonstrating a lack of confusion, including (1) the expert report of a noted linguist that discusses the issue of confusing similarity with specific regard to 22 of the domain names and (2) the declarations of 14 individuals whose domain names are involved in this lawsuit.  *See* McKown Decl. at Exh. M at Appendix; Declarations of Registrants [Dkt. 342-344, 352].

Nor does the language in the *Omega* opinion support AMPAS' proposition that the use of a trademarked term and a generic term in a single domain name automatically dictates a finding of confusing similarity.  The *Omega* court

---

[6]      On March 27, 2013, Go Daddy agreed to stipulate to the fact that this domain name is identical to one of the Academy's Marks.  *See* McKown Decl., ¶ 19.

Wrenn Bender LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

specifically referenced the need to conduct an evaluation of the sight, sound, and meaning of the mark and domain names themselves. *Omega*, 228 F. Supp. 2d at 127. This is the very analysis conducted by Go Daddy's linguistics expert in providing a basis for this Court to determine the existence of a lack of confusing similarity as to the domain names in AMPAS' Exhibit 1.[7] *See* McKown Decl., ¶ 14, Exh. M, ¶¶ 23-25, 26-29, 30-38 and Appendix.

The survey results presented by Go Daddy demonstrate why this Court should refuse to find confusing similarity based solely on the presence of both a generic term and a trademarked term in a domain name. *See* McKown Decl., ¶ 5, Exh. D at ¶ 4. Although AMPAS wisely abstained from seeking summary judgment on the issue of confusing similarity as to any of the domain names surveyed by Dr. Scott, the results remain relevant. The net association percentages for the domain names surveyed demonstrate a compelling lack of correlation between (1) the presence of AMPAS' OSCAR mark and generic term in the same domain name string and (2) confusion on the part of a consumer. *Id.* As such, it would be improper to base a finding of confusing similarity solely on the presence of a generic term and a trademarked term, without taking into account the "sight, sound, and meaning of the mark and domain names themselves." *Omega*, 228 F. Supp. 2d at 12.

The proposition that domain names combining trademarks and a generic term should not be automatically deemed "confusingly similar" to a trademark is also supported by the decision in *Ford Motor Co. v. Greatdomains.com, Inc.*, 177 F. Supp. 2d 635, 642 (E.D. Mich. 2001), which specifically noted that where "words or letters added to the plaintiff's mark within the domain name clearly distinguish it from the plaintiff's usage," the existence of the plaintiff's mark in the domain name

---

[7]     Courts routinely admit expert testimony from linguists in trademark cases to assist in determining the similarity of trademarks, words, and sounds. *See e.g.*, *Sanofi-Aventis v. Advancis Pharm. Corp.*, 453 F. Supp. 2d 834, 848-49 (D. Del. 2006); *Donald F. Duncan, Inc. v. Royal Tops Mfg. Co.*, 343 F.2d 655, 660-61 (7th Cir. 1965).

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

alone is insufficient to establish confusing similarity. *Id.* at 642. The *Ford* court further clarified its statement in a footnote stating:

> For example, the domain name "fordstheatre.org"—the homepage of the renowned Ford's Theatre in Washington, D.C.—incorporates the FORD mark with the addition of the generic word "theatre" but, from its context, is not "confusingly similar to" the FORD mark. No reasonable person could conclude that such a site was "used or approved" by the Ford Motor Company.

*Id.* at 642, fn. 3.

In 2008, the ABA agreed with the interpretation proffered by the *Ford* court and included the above example in Model Jury Instruction § 2.7.4, which addresses the confusing similarity element of the ACPA:

> For purposes of the ACPA, [domain name] is confusingly similar to [mark] if you find that the [domain name] is so similar to [mark] in sight, sound, or meaning that [they] could be confused. For example, the domain name <fordtrucks.com> would be confusingly similar to the automaker's mark FORD, but the domain name <fordstheater.com> would not be.

ABA MODEL JURY INSTRUCTIONS HANDBOOK ON COPYRIGHT, TRADEMARK AND TRADE DRESS LITIGATION, § 2.7.4 (1st ed. 2008)

When read together with the cases discussing confusing similarity, the ABA Model Jury Instruction on the topic, the survey results offered by Go Daddy, the testimony of Go Daddy's linguistic expert, the declarations filed by the accused registrants, and the third party trademark registrations for an OSCAR mark, the unique circumstances presented here—where the predominant trademarks at issue have myriad applications and meanings unrelated to the trademark owner—all compel a denial of AMPAS' Motion.

Indeed, the predominate trademarks at issue in this case—OSCAR and OSCARS—provides a unique circumstance in conducting an analysis of confusing similarity because of the generic nature of those terms when not associated with any

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

specific goods and services.  As AMPAS admits, the word "oscar" has at least 25 common meanings and usages, any one of which can be at issue in analyzing confusing similarity based on the context of the other words present in the domain name.  McKown Decl., ¶¶ 15-16, Exhs. N at 40-59, 66, 67 and O at 37-39.  AMPAS also admits that (1) the term "oscar" is defined in the common English language as a general award of achievement and (2) the USPTO has registered other OSCAR trademarks related to awards of achievement undermines AMPAS' confusing similarity argument.   McKown Decl., ¶ 16, Exh. O at 63, 65.

The same is true for domain names incorporating the trademarked terms ACADEMY AWARD and ACADEMY AWARDS, which Go Daddy's linguistic expert opines may be used in a "generic fashion . . . hav[ing] distinct references which are wholly independent of the AMPAS awards and ceremonies," without causing confusion to a consumer. *See* McKown Decl., ¶ 14, Exh. M, ¶ 27.

In light of the evidence presented by Go Daddy related to the absence of actual confusion, as well as the sight, sound, and myriad meanings of the various domain names and trademarked terms, there is, at the very least, a genuine issue of material fact as to whether a jury would find the domain names identified in AMPAS Exhibit 1 confusingly similar to one of the AMPAS Marks.

### 2.    The Confusing Similarity Analysis Does Not Allow For An Examination of Website Content

The law is well-settled that a court shall not look to the content of a website to determine whether a domain name is confusingly similar to a trademark.   *Coca-Cola v. Purdy*, 382 F.3d 774 (8th Cir. 2004) ("It is irrelevant under the ACPA that confusion about a Website's source or sponsorship could be resolved by visiting the Web site identified by the accused domain name.").  Despite this fact, AMPAS asks the court to "confirm" a finding of confusing similarity based on a review of the webpages resolving from each of the disputed domains.

As an initial matter, none of the cases cited by AMPAS support its contention

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

23

**Wren Bender LLLP**
2 Park Plaza, Suite 550
Irvine, California 92614

1   that the Court should look to the webpage resolving from the Disputed Domains to

2   confirm a finding of confusing similarity.  Rather, in each case cited by AMPAS,

3   the court noted the appearance of the webpage after addressing the issue of whether

4   the domain names were confusingly similar to the marks absent resort to content

5   contained on a webpage.  *See Mattel, Inc. v. Internet Dimensions*, No. 99 CIV.

6   10066, 2000 WL 973745 at *3 (S.D.N.Y. July 13, 2000); *Texas Int'l Prop.*

7   *Associates v. Hoerbiger Holding AG*, 624 F. Supp. 2d 582, 588; *Atlas Copco AB v.*

8   *Atlascopcoiran.com*, 533 F. Supp. 2d 610, 614 (E.D. Va. 2008).

9          Even assuming *arguendo* that AMPAS is correct in its statement of the law,

10  "confirmation" of a finding of confusing similarity is not warranted based on the

11  lack of admissible evidence presented by AMPAS.  Indeed, AMPAS submits only a

12  series of unauthenticated screenshots of webpages alleged to have resolved from

13  domain names identified on AMPAS Exhibit 1.  These screenshots must be

14  disregarded based on the evidentiary objections, concurrently filed herewith.

15  AMPAS submitted no other screenshots.

16         Although it is Go Daddy's position that the evidence presented concurrent

17  with the filing of this opposition compels a finding of no "confusing similarity" as to

18  the domain names identified in AMPAS' Exhibit 1, at the very least, the evidence

19  submitted creates a triable issue of fact.  Based on AMPAS' failure to present this

20  Court with any admissible evidence on which to base a finding of confusing

21  similarity of the domain names identified on Exhibit 1 with the Academy's Marks,

22  its motion should be denied.

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

OPPOSITION TO MOTION FOR
PARTIAL SUMMARY JUDGMENT

## IV.    CONCLUSION

In light of the foregoing, Go Daddy respectfully requests that the Court deny the partial motion for summary judgment filed by AMPAS in its entirety.

Dated:  April 1, 2013

**WRENN BENDER LLLP**
Aaron M. McKown
Paula L. Zecchini

_____

By:  */s/ Aaron M. McKown*
     Aaron M. McKown
Attorneys for Defendant
GODADDY.COM, INC.

**WRENN BENDER LLLP**
2 Park Plaza, Suite 550
Irvine, California 92614

OPPOSITION TO MOTION FOR
PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 1

II.   RELEVANT FACTUAL BACKGROUND ............................................... 2

      A.    The Disputed Domains ..................................................................... 2

      B.    Go Daddy's Domain Name Services ............................................... 3

III.  ARGUMENT ............................................................................................. 4

      A.    AMPAS Fails To Present Sufficient Evidence To Establish Fame As A Matter Of Law ....................................................................................... 4

      B.    AMPAS Fails To Present Evidence Negating Go Daddy's Entitlement To The "Safe Harbor" Provision for Registrars Set Forth In 15 U.S.C. §1114(2)(D)(iii)... 9

            1.    Go Daddy's Alleged Registration Of The Disputed Domains Falls Squarely Within The Immunity Provided By The Registrar's Safe Harbor ...................................................................................... 10

            2.    Go Daddy's Creation Of The Infrastructure By Which The Disputed Domains May Be Routed Constitutes "Maintenance" For Purposes Of Registrar Immunity ....................................................... 11

            3.    Resolution Of A Domain Name to A Go Daddy Parked Page Does Not Take Go Daddy Outside Its Role As Registrar ......................................... 11

      C.    AMPAS Fails To Present Any Evidence Establishing That Go Daddy Used The Disputed Domains ................................................................ 12

            1.    Go Daddy Is Not The Registrant's Authorized Licensee For Any of the Domain Names ................................................................ 12

            2.    AMPAS Fails To Produce Evidence Supporting Its Claim That Go Daddy Placed Advertisements On The Disputed Domains ..................... 15

      D.    AMPAS Fails To Produce Evidence To Support Its Claim That Go Daddy Trafficked In Any Of The Domain Names ...................................... 16

            1.    AMPAS Fails To Produce Evidence Establishing That Go Daddy Acquired A License Or Ownership Interest In Any Of The Domain Names .............................................................................. 17

            2.    AMPAS Fails To Produce Evidence Demonstrating That Go Daddy Earned Revenue From The Placement Of Advertisements On Any Of The Disputed Domains ............................................................... 17

      E.    AMPAS Fails To Present Any Evidence Demonstrating That It Is Entitled To A Judgment On Confusing Similarity For The Domain Names Identified In AMPAS Exhibit 1 ................................................................................ 19

            1.    At The Very Least, A Triable Issue Of Fact Exists As To Whether The Domains Names And The AMPAS Marks Are Confusingly Similar In Sight, Sound, Or Meaning ...................................................... 19

WRENN BENDER LLLP<br>2 Park Plaza, Suite 550<br>Irvine, California 92614

1

2.      The Confusing Similarity Analysis Does Not Allow For An Examination of Website Content ........................................................... 23

**IV.     CONCLUSION** ...................................................................................... 25

**WRENN BENDER LLLP**
2 Park Plaza, Suite 550
Irvine, California 92614

2

# TABLE OF AUTHORITIES

**Cases**

*Advantage Rent–A–Car, Inc. v. Enterprise Rent–A–Car, Co.*,
238 F.3d 378 (5th Cir. 2001) ................................................................ 7
*Atlas Copco AB v. Atlascopcoiran.com*,
533 F. Supp. 2d 610, 614 (E.D. Va. 2008) ...................................... 27
*Avery Dennison Corp. v. Sumpton*,
189 F.3d 868, 875 (9th Cir. 1999) ...................................................... 5
*Avery Dennison Corp. v. Sumpton*,
189 F.3d 868, 878-79 (1999) .............................................................. 8
BigStar Entertainment, Inc. v. Next Big Star, Inc.,
105 F. Supp. 2d 185,218 (S.D.N.Y. 2000) ........................................ 8
*Coach, Inc. v. Sac a Main*,
2012 WL 5464347, at *5 (E.D. Cal. Nov. 7, 2012).......................... 5
*Coca-Cola v. Purdy*,
382 F.3d 774 (8th Cir. 2004) ............................................................ 26
*Crabb v. GoDaddy.com*, Inc.,
CV10-00940-PHX-NVW, 2011 WL 4479043 (D. Ariz. Sept. 27, 2011) ...... 16
*DISC Intellectual Properties, LLC v. Delman*
CV 07-5306 PA PJWX, 2007 WL 4973849 (C.D. Cal. Sept. 17, 2007)........ 22
*Ford Motor Co. v. Greatdomains.com, Inc.*,
177 F. Supp. 2d 635, 642 (E.D. Mich. 2001) .................................. 24
*Garden of Life, Inc. v. Letzer*,
318 F. Supp. 2d 946 (C.D. Cal. 2004) ............................................. 22
*Lockheed Martin Corp. v. Network Solutions, Inc.* ("Lockheed II"),
141 F. Supp. 2d 648, 655 (N.D. Tex. 2001) ............................. 11, 14
*Lockheed Martin Corp. v. Network Solutions, Inc.*,
194 F.3d 980, 984-85 (9th Cir. 1999)........................................ 10, 14
*Nissan Motor Co. v. Nissan Computer Corp.*,
378 F.3d 1002, 1011 (9th Cir. 2004) .................................................. 5
*Omega S.A. v. Omega Eng'g, Inc.*,
228 F. Supp. 2d 112, 127 (D. Conn. 2002)...................................... 22
*Petronas*, 2012 WL 10532, at *3-4 ........................................................ 14
*RingCentral, Inc. v. Quimby*,
711 F. Supp. 2d 1048, 1060, 1061 (N.D. Cal. 2010)...................... 21
*Rosetta Stone v. Google, Inc.*,
676 F.3d 144, 171 (4th Cir. 2012) ...................................................... 6
*See Mattel, Inc. v. Internet Dimensions*,
No. 99 CIV. 10066, 2000 WL 973745 at *3 (S.D.N.Y. July 13, 2000) ...... 26
*Self-Insurance Institute of America, Inc. v. Software and Information Industry Ass.*,
208 F. Supp. 2d 1058, 1077 (CD. Cal. 2000) .................................... 5
Star Markets, Ltd. v. Texaco Refining & Marketing, Inc.,
950 F. Supp. 1030, 1033 (D. Haw. 1996) .......................................... 9
*Super-Krete International, Inc. v. Rod Sadleir et al.*,
712 F. Supp. 2d 1023, 1031(C.D. Cal. 2010) ................................. 21
TCPIP Holding Co. v. Haar Comm'ns, Inc.,
244 F.3d 88, 99-100 (2d Cir. 2001)................................................... 8
*TCPIP Holding Co., Inc. v. Haar Communications, Inc.,*
244 F.3d 88, 99 (2d Cir. 2001) ........................................................... 6
*Texas Int'l Prop. Associates v. Hoerbiger Holding AG*,
624 F. Supp. 2d 582, 588 .................................................................. 27
*Transamerica Corp. v. Moniker Online Services LLC*,
672 F. Supp. 1353, 1364 (S.D. Fla. 2009)....................................... 19
*United Cal. Bank v. Prudential Ins. Co. of Am.*,

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

681 P.2d 390, 420 (AZ Ct. App. 1983) ............................................................ 16

**Statutes**

15 U.S.C. § 1114(2)(D)(iii) ............................................................................... 12
15 U.S.C. § 1125(c)(2)(A) ................................................................................... 5
15 U.S.C. § 1125(c)(2)(A)(iii) ............................................................................. 8
15 U.S.C. § 1125(d)(1)(D) ................................................................................. 14
15 U.S.C. § 1125(d)(1)(E) ................................................................................. 18
15 U.S.C. §1114(2)(D)(iii) ................................................................................ 10
15 U.S.C. §1125(c)(2)(A) .................................................................................... 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**W**renn **B**ender **LLLP**
2 Park Plaza, Suite 550
Irvine, California 92614

OPPOSITION TO MOTION FOR
PARTIAL SUMMARY JUDGMENT