# EXHIBIT E



# THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS, SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

March 11, 2013

THE ATTACHED U.S. TRADEMARK REGISTRATION 3,974,726 IS
CERTIFIED TO BE A TRUE COPY OF THE REGISTRATION ISSUED BY
THE UNITED STATES PATENT AND TRADEMARK OFFICE WHICH
REGISTRATION IS IN FULL FORCE AND EFFECT.

REGISTERED FOR A TERM OF *16* YEARS FROM   *June 07, 2011*
SAID RECORDS SHOW TITLE TO BE IN:  *Registrant*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

S. WILLIAMS
Certifying Officer



# United States of America

## United States Patent and Trademark Office

# OSCAR

**Reg. No. 3,974,726**

**Registered June 7, 2011**

**Int. Cl.: 41**

**SERVICE MARK**

**PRINCIPAL REGISTER**

ALLIANCE OF PROFESSIONALS & CONSULTANTS, INC. (NORTH CAROLINA CORPORATION)
8200 BROWNLEIGH DRIVE
RALEIGH, NC 27617

FOR: PROVIDING RECOGNITION AND INCENTIVES BY THE WAY OF AWARDS AND CONTESTS TO DEMONSTRATE EXCELLENCE IN THE FIELD OF BUSINESS CONSULTATION AND INFORMATION TECHNOLOGY, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

FIRST USE 3-13-2009; IN COMMERCE 3-13-2009.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SER. NO. 85-211,681, FILED 1-6-2011.

MICHAEL SOUDERS, EXAMINING ATTORNEY



*Director of the United States Patent and Trademark Office*



# THE UNITED STATES OF AMERICA

**TO ALL TO WHOM THESE PRESENTS; SHALL COME:**

**UNITED STATES DEPARTMENT OF COMMERCE**

United States Patent and Trademark Office

March 11, 2013

THE ATTACHED U.S. TRADEMARK REGISTRATION *3,965,914* IS CERTIFIED TO BE A TRUE COPY OF THE REGISTRATION ISSUED BY THE UNITED STATES PATENT AND TRADEMARK OFFICE WHICH REGISTRATION IS IN FULL FORCE AND EFFECT.

REGISTERED FOR A TERM OF *10* YEARS FROM *May 24, 2011*
SAID RECORDS SHOW TITLE TO BE IN: *Registrant*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

N. WILLIAMS

Certifying Officer



# United States of America

### United States Patent and Trademark Office

# OSCAR

**Reg. No. 3,965,914**
**Registered May 24, 2011**

**Int. Cl.: 9**

**TRADEMARK**

**PRINCIPAL REGISTER**

ERICSON MFG (OHIO CORPORATION)
4215 HAMANN PKWY
WILLOUGHBY, OH 44094

FOR: ELECTRICAL POWER PRODUCTS, NAMELY, TEMPORARY POWER DISTRIBUTION DEVICES, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 11-20-2001; IN COMMERCE 1-3-2002.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SER. NO. 85-137,217, FILED 9-24-2010.

ANDREW LEASER, EXAMINING ATTORNEY



Director of the United States Patent and Trademark Office



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

### UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

March 11, 2013

THE ATTACHED U.S. TRADEMARK REGISTRATION 3,117,429 IS
CERTIFIED TO BE A TRUE COPY WHICH IS IN FULL FORCE AND
EFFECT WITH NOTATIONS OF ALL STATUTORY ACTIONS TAKEN
THEREON AS DISCLOSED BY THE RECORDS OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE.

REGISTERED FOR A TERM OF 10 YEARS FROM July 18, 2006

AMENDMENT/CORRECTION/NEW CERT(SEC7) ISSUED
SAID RECORDS SHOW TITLE TO BE IN:
REGISTRANT

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

W. MONTGOMERY
Certifying Officer

Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36 and 38

Reg. No. 3,117,429

## United States Patent and Trademark Office

Registered July 18, 2006

TRADEMARK
PRINCIPAL REGISTER

# OSCAR

ALLIED VISION TECHNOLOGIES GMBH (FED REP GERMANY LIMITED COMPANY)
TASCHENWEG 2A
07646 STADTRODA, FED REP GERMANY

FOR: CAMERAS AND COMPONENTS THEREOF, INCLUDED IN THIS CLASS, FOR SCIENTIFIC AND INDUSTRIAL IMAGE CAPTURE AND IMAGE PROCESSING, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

PRIORITY DATE OF 8-23-2004 IS CLAIMED.

OWNER OF INTERNATIONAL REGISTRATION 0868411 DATED 2-23-2005, EXPIRES 2-23-2015.

SER. NO. 79-017,717, FILED 2-23-2005.

AISHA CLARKE, EXAMINING ATTORNEY

Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36 and 38

United States Patent and Trademark Office

Corrected

Reg. No. 3,117,429

Registered July 18, 2006

OG Date July 10, 2007

## TRADEMARK
## PRINCIPAL REGISTER

# OSCAR

ALLIED VISION TECHNOLOGIES GMBH (FED REP GERMANY LIMITED COMPANY),
TASCHENWEG 2A
07646 STADTRODA, FED REP GERMANY

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

PRIORITY DATE OF 8-23-2004 IS CLAIMED.

OWNER OF INTERNATIONAL REGISTRATION 0868411 DATED 2-23-2005.

FOR: CAMERAS * FOR STILL PICTURES * AND COMPONENTS THEREOF, INCLUDED IN THIS CLASS, FOR SCIENTIFIC AND INDUSTRIAL IMAGE CAPTURE AND IMAGE PROCESSING, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

SER. NO. 79-017,717, FILED 2-23-2005.

*In testimony whereof I have hereunto set my hand and caused the seal of The Patent and Trademark Office to be affixed on July 10, 2007.*

**DIRECTOR OF THE U.S. PATENT AND TRADEMARK OFFICE**



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

**March 11, 2013**

THE ATTACHED U.S. TRADEMARK REGISTRATION 3,336,221 IS CERTIFIED TO BE A TRUE COPY OF THE REGISTRATION ISSUED BY THE UNITED STATES PATENT AND TRADEMARK OFFICE WHICH REGISTRATION IS IN FULL FORCE AND EFFECT.

REGISTERED FOR A TERM OF *10* YEARS FROM *November 13, 2007*
SAID RECORDS SHOW TITLE TO BE IN: *Registrant*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

W. MONTGOMERY
Certifying Officer



Int. Cls.: 42 and 44

Prior U.S. Cls.: 100 and 101

United States Patent and Trademark Office

Reg. No. 3,336,221
Registered Nov. 13, 2007

## SERVICE MARK
### PRINCIPAL REGISTER

# OSCAR

ONE SOURCE CREDENTIALING LLC (ALABA-
MA LTD LIAB CO)
5176 COLONIAL PARK ROAD
BIRMINGHAM, AL 35242

FOR: PROVIDING TEMPORARY USE OF ON-
LINE NON-DOWNLOADABLE SOFTWARE FEA-
TURING HEALTHCARE INFORMATION FOR
HEALTHCARE PROVIDERS AND HEALTHCARE
INSTITUTIONS , IN CLASS 42 (U.S. CLS. 100 AND
101).

FIRST USE 1-1-2006; IN COMMERCE 1-1-2006.

FOR: PROVIDING A COMPUTERIZED DATA-
BASE FEATURING HEALTHCARE INFORMATION

FOR HEALTHCARE PROVIDERS AND HEALTH-
CARE INSTITUTIONS, IN CLASS 44 (U.S. CLS. 100
AND 101).

FIRST USE 1-1-2006; IN COMMERCE 1-1-2006.

THE MARK CONSISTS OF STANDARD CHAR-
ACTERS WITHOUT CLAIM TO ANY PARTICULAR
FONT, STYLE, SIZE, OR COLOR.

SN 78-634,877, FILED 5-23-2005.

JOHN E. MICHOS, EXAMINING ATTORNEY



7406056

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

March 11, 2013

THE ATTACHED U.S. TRADEMARK REGISTRATION 3,252,379 IS
CERTIFIED TO BE A TRUE COPY OF THE REGISTRATION ISSUED BY
THE UNITED STATES PATENT AND TRADEMARK OFFICE WHICH
REGISTRATION IS IN FULL FORCE AND EFFECT.

REGISTERED FOR A TERM OF *10* YEARS FROM   *June 12, 2007*
SAID RECORDS SHOW TITLE TO BE IN:   *Registrant*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

W. MONTGOMERY
Certifying Officer



Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36, and 38

United States Patent and Trademark Office

Reg. No. 3,252,379
Registered June 12, 2007

## TRADEMARK
### PRINCIPAL REGISTER

# OSCAR

SATCOM DIRECT, INC. (MINNESOTA COR-
  PORATION)
1901 HWY A1A
SATELLITE BEACH, FL 32937

FOR: COMPUTER SOFTWARE IN THE FIELD OF
BILLING, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND
38).

FIRST USE 12-0-2003; IN COMMERCE 12-0-2003.

THE MARK CONSISTS OF STANDARD CHAR-
ACTERS WITHOUT CLAIM TO ANY PARTICULAR
FONT, STYLE, SIZE, OR COLOR.

SN 78-622,172, FILED 5-4-2005.

LINDA MICKLEBURGH, EXAMINING ATTORNEY



# THE UNITED STATES OF AMERICA

**TO ALL TO WHOM THESE PRESENTS SHALL COME:**
UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

March 11, 2013

THE ATTACHED U.S. TRADEMARK REGISTRATION 3,855,508 IS
CERTIFIED TO BE A TRUE COPY OF THE REGISTRATION ISSUED BY
THE UNITED STATES PATENT AND TRADEMARK OFFICE WHICH
REGISTRATION IS IN FULL FORCE AND EFFECT.

REGISTERED FOR A TERM OF 10 YEARS FROM  October 05, 2010
SAID RECORDS SHOW TITLE TO BE IN:  Registrant

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

W. MONTGOMERY
Certifying Officer



# United States of America

## United States Patent and Trademark Office

# OSCAR

**Reg. No. 3,855,508**

**Registered Oct. 5, 2010**

**Int. Cl.: 10**

**TRADEMARK**

**PRINCIPAL REGISTER**

ORTHOSONICS LIMITED (UNITED KINGDOM LIMITED LIABILITY COMPANY)
BREMRIDGE
BREMRIDGE HOUSE
ASHBURTON, SOUTH DEVON, UNITED KINGDOM TQ137JX

FOR: MEDICAL AND SURGICAL INSTRUMENTS, NAMELY, ULTRASONICALLY VIBRAT-ABLE TOOLS FOR REMOVING CEMENT DURING JOINT-PROSTHESIS REVISION AND ULTRASONICALLY VIBRATABLE OSTEOTOMES, IN CLASS 10 (U.S. CLS. 26, 39 AND 44).

FIRST USE 3-0-1997; IN COMMERCE 3-0-1997.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-TICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF UNITED KINGDOM REG. NO. 1555098, DATED 11-11-1994, EXPIRES 11-30-2010.

SER. NO. 77-751,491, FILED 6-3-2009.

SARA BENJAMIN, EXAMINING ATTORNEY



*David J. Kappos*

Director of the United States Patent and Trademark Office



# THE UNITED STATES OF AMERICA

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

March 11, 2013

THE ATTACHED U.S. TRADEMARK REGISTRATION 2,120,341 IS
CERTIFIED TO BE A TRUE COPY WHICH IS IN FULL FORCE AND
EFFECT WITH NOTATIONS OF ALL STATUTORY ACTIONS TAKEN
THEREON AS DISCLOSED BY THE RECORDS OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE.

REGISTERED FOR A TERM OF *10* YEARS FROM   *December 09, 1997*
*1st* RENEWAL FOR A TERM OF *10* YEARS FROM   *December 09, 2007*
SECTION 8
SAID RECORDS SHOW TITLE TO BE IN:
*AVOCENT REDMOND CORP.*
*A WASHINGTON CORPORATION*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office



W. MONTGOMERY
Certifying Officer

Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36, and 38

Reg. No. 2,120,341

United States Patent and Trademark Office     Registered Dec. 9, 1997

## TRADEMARK
### PRINCIPAL REGISTER

## OSCAR

APEX PC SOLUTIONS, INC. (WASHINGTON
    CORPORATION)
20031 - 142ND AVENUE N.E.
WOODINVILLE, WA 98072

  FOR: COMPUTER HARDWARE AND ASSO-
CIATED SOFTWARE FOR ON SCREEN PRO-
GRAMMING OF COMPUTER PERIPHERALS,
NAMELY, COMPUTER SWITCHING EQUIP-

MENT; AND MANUALS SOLD AS A UNIT, IN
CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).
  FIRST USE 9-0-1995; IN COMMERCE
12-0-1995.

  SN 75-018,078, FILED 11-13-1995.

SCHUYLA GOODSON, EXAMINING ATTOR-
  NEY



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

March 11, 2013

THE ATTACHED U.S. TRADEMARK REGISTRATION *1,793,558* IS
CERTIFIED TO BE A TRUE COPY WHICH IS IN FULL FORCE AND
EFFECT WITH NOTATIONS OF ALL STATUTORY ACTIONS TAKEN
THEREON AS DISCLOSED BY THE RECORDS OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE.

REGISTERED FOR A TERM OF *10* YEARS FROM   *September 21, 1993*
*1st* RENEWAL FOR A TERM OF *10* YEARS FROM   *September 21, 2003*
SECTION 8 & 15
SAID RECORDS SHOW TITLE TO BE IN:
   *ONGOING CARE SOULTIONS, INC.*
   *A FLORIDA CORPORATION*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

P. R.  GRANT
Certifying Officer



Int. Cl.: 10

Prior U.S. Cl.: 44

# United States Patent and Trademark Office

Reg. No. 1,793,558
Registered Sep. 21, 1993

## TRADEMARK
### PRINCIPAL REGISTER

# OSCAR

ORTHOSIS CORRECTIVE SYSTEMS, INC.
  (FLORIDA CORPORATION)
6554 44TH STREET N. #1001
PINELLAS PARK, FL 34665

FOR: MEDICAL DEVICE; NAMELY, ANKLE
FOOT ORTHOSIS, IN CLASS 10 (U.S. CL. 44).

FIRST USE 12–15–1992; IN COMMERCE
1–3–1993.

SER. NO. 74–358,617, FILED 2–12–1993.

ESTHER A. BORSUK, EXAMINING ATTOR-
NEY



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

March 11, 2013

THE ATTACHED U.S. TRADEMARK REGISTRATION *1,607,774* IS
CERTIFIED TO BE A TRUE COPY WHICH IS IN FULL FORCE AND
EFFECT WITH NOTATIONS OF ALL STATUTORY ACTIONS TAKEN
THEREON AS DISCLOSED BY THE RECORDS OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE.

REGISTERED FOR A TERM OF *10* YEARS FROM   *July 24, 1990*
*1st* RENEWAL FOR A TERM OF *10* YEARS FROM   *July 24, 2000*
SECTION 8 & 15
SAID RECORDS SHOW TITLE TO BE IN:
  *CALGON CORPORATION*
  *A DELAWARE CORPORATION*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

P. R.  GRANT
Certifying Officer

Int. Cl.: 42

Prior U.S. Cls.: 100 and 106

# United States Patent and Trademark Office

Reg. No. 1,607,774
Registered July 24, 1990

## SERVICE MARK
### PRINCIPAL REGISTER

## OSCAR

MERCK & CO., INC. (NEW JERSEY CORPORA-
TION)
126 E. LINCOLN AVENUE
RAHWAY, NJ 070650900

FOR: ANALYTICAL SERVICES - NAMELY,
PROVIDING PRODUCTIVE PERFORMANCE
RESULTS OF WATER TREATMENT PRO-
GRAMS FOR INDUSTRIAL AND MUNICIPAL
COOLING WATER SYSTEMS AND CONSULT-
ING SERVICES RELATED THERETO, IN
CLASS 42 (U.S. CLS. 100 AND 106).

FIRST USE 8-22-1988; IN COMMERCE
9-14-1988.

SER. NO. 73-791,515, FILED 4-6-1989.

EDWARD NELSON, EXAMINING ATTORNEY



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

March 11, 2013

THE ATTACHED U.S. TRADEMARK REGISTRATION *1,489,154* IS
CERTIFIED TO BE A TRUE COPY WHICH IS IN FULL FORCE AND
EFFECT WITH NOTATIONS OF ALL STATUTORY ACTIONS TAKEN
THEREON AS DISCLOSED BY THE RECORDS OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE.

REGISTERED FOR A TERM OF *20* YEARS FROM  *May 24, 1988*
*1st* RENEWAL FOR A TERM OF *10* YEARS FROM  *May 24, 2008*
SECTION 8 & 15
SAID RECORDS SHOW TITLE TO BE IN:
  *GRD ENTERPRISES, INC.*
  *AN OHIO CORPORATON*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

P. R. GRANT
Certifying Officer



Int. Cl.: 9

Prior U.S. Cl.: 38

# United States Patent and Trademark Office

Reg. No. 1,489,154
Registered May 24, 1988

## TRADEMARK
### PRINCIPAL REGISTER

# OSCAR

AP INDUSTRIES, INC. (OHIO CORPORATION)
ONE JOHN GOERLICH SQUARE
TOLEDO, OH 43696

FOR: COMPUTER PROGRAM FOR STORING AND SELECTIVELY RETRIEVING EXECUTION REPORTS OF PRIOR COMPUTER OPERATIONS, IN CLASS 9 (U.S. CL. 38).

FIRST USE 12-0-1984; IN COMMERCE 12-0-1984.

SER. NO. 683,335, FILED 9-10-1987.

MARY FRANCES BRUCE, EXAMINING ATTORNEY



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:
### UNITED STATES DEPARTMENT OF COMMERCE
#### United States Patent and Trademark Office

March 11, 2013

THE ATTACHED U.S. TRADEMARK REGISTRATION 1,081,451 IS
CERTIFIED TO BE A TRUE COPY WHICH IS IN FULL FORCE AND
EFFECT WITH NOTATIONS OF ALL STATUTORY ACTIONS TAKEN
THEREON AS DISCLOSED BY THE RECORDS OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE.

REGISTERED FOR A TERM OF 20 YEARS FROM   *January 10, 1978*
2nd RENEWAL FOR A TERM OF *10* YEARS FROM   *January 10, 2008*
SECTION 8 & 15
SAID RECORDS SHOW TITLE TO BE IN:
  *OSCAR DE LA RENTAL, LLC*
  *A LIMITED LIABILITY COMPANY OF DELAWARE*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

W. MONTGOMERY
Certifying Officer



Int. Cl.: 3

Prior U.S. Cl.: 51

# United States Patent Office

Reg. No. 1,081,451
Registered Jan. 10, 1978

## TRADEMARK
### Principal Register

# OSCAR

Oscar de la Renta, Ltd. (New York corporation)
550 7th Ave.
New York, N.Y. 10018

For: PERFUME, in CLASS 3 (U.S. CL. 51).

First use at least as early as May 25, 1976; in commerce at least as early as May 25, 1976.

The name "Oscar de la Renta" is that of a living individual, whose consent is of record.

Ser. No. 95,499, filed Aug. 3, 1976.

M. MERCHANT, Examiner



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:
### UNITED STATES DEPARTMENT OF COMMERCE
#### United States Patent and Trademark Office

March 11, 2013

THE ATTACHED U.S. TRADEMARK REGISTRATION 3,275,440 IS
CERTIFIED TO BE A TRUE COPY OF THE REGISTRATION ISSUED BY
THE UNITED STATES PATENT AND TRADEMARK OFFICE WHICH
REGISTRATION IS IN FULL FORCE AND EFFECT.

REGISTERED FOR A TERM OF *10* YEARS FROM   *August 07, 2007*
SAID RECORDS SHOW TITLE TO BE IN:   *Registrant*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office



W. MONTGOMERY
Certifying Officer



Int. Cls.: 1 and 5

Prior U.S. Cls.: 1, 5, 6, 10, 18, 26, 44, 46, 51 and 52

United States Patent and Trademark Office

Reg. No. 3,275,440

Registered Aug. 7, 2007

## TRADEMARK
### PRINCIPAL REGISTER

# OSCAR

THE UNIVERSITY COURT; OF THE UNIVERSITY OF EDINBURGH (UNITED KINGDOM CORPORATION)
OLD COLLEGE
SOUTH BRIDGE, EDINBURGH EH8 9YL
UNITED KINGDOM

FOR: CHEMICALS FOR USE IN SCIENCE AND INDUSTRY; CHEMICAL PRODUCTS FOR USE IN SCIENCE AND INDUSTRY, NAMELY, NUCLEIC ACIDS; CHEMICAL PRODUCTS FOR USE IN MEDICAL SCIENCE, NAMELY, NUCLEIC ACIDS AND NUCLEIC ACID VECTORS, CULTURED MAMMALIAN CELLS; CHEMICAL PRODUCTS FOR USE IN SCIENTIFIC AND INDUSTRIAL RESEARCH AND MOLECULAR BIOLOGY, NAMELY, NUCLEIC ACIDS, NUCLEIC ACID VECTORS AND CULTURED MAMMALIAN CELLS; BIOLOGICAL AND CHEMICAL PREPARATIONS AND BIOLOGICAL AND CHEMICAL PRODUCTS, NAMELY, NUCLEIC ACIDS, NUCLEIC ACID VECTORS AND CULTURED MAMMALIAN CELLS; ALL FOR SALE IN KIT FORM AND ALL FOR THE PRODUCTION AND EXPRESSION OF CLONED PROTEINS; BIOLOGICAL PREPARATIONS FOR USE IN SCIENCE; BIOLOGICAL PREPARATIONS FOR USE IN BIO-

LOGICAL SCIENCE OR MOLECULAR BIOLOGY, IN CLASS 1 (U.S. CLS. 1, 5, 6, 10, 26 AND 46).

FOR: CHEMICAL PRODUCTS FOR VETERINARY PURPOSES, NAMELY, NUCLEIC ACIDS, NUCLEIC ACID VECTORS; BIOLOGICAL PREPARATIONS FOR MEDICAL AND VETERINARY USE, IN CLASS 5 (U.S. CLS. 6, 18, 44, 46, 51 AND 52).

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

PRIORITY DATE OF 5-7-2005 IS CLAIMED.

OWNER OF INTERNATIONAL REGISTRATION 0887453 DATED 11-7-2005, EXPIRES 11-7-2015.

SER. NO. 79-024,820, FILED 11-7-2005.

AMY HELLA, EXAMINING ATTORNEY



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

March 11, 2013

THE ATTACHED U.S. TRADEMARK REGISTRATION 2,273,233 IS
CERTIFIED TO BE A TRUE COPY WHICH IS IN FULL FORCE AND
EFFECT WITH NOTATIONS OF ALL STATUTORY ACTIONS TAKEN
THEREON AS DISCLOSED BY THE RECORDS OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE.

REGISTERED FOR A TERM OF *10* YEARS FROM   *August 31, 1999*
*1st* RENEWAL FOR A TERM OF *10* YEARS FROM   *August 31, 2009*
SECTION 8 & 15
SAID RECORDS SHOW TITLE TO BE IN:
   *Registrant*

By Authority of the

Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

M. TARVER
Certifying Officer

Int. Cl.: 34

Prior U.S. Cls.: 2, 8, 9 and 17

Reg. No. 2,273,233

## United States Patent and Trademark Office
Registered Aug. 31, 1999

## TRADEMARK
### PRINCIPAL REGISTER

## OSCAR

RODRIGUEZ, OSCAR A. (UNITED STATES CITIZEN)
205 EAST 63RD STREET, SUITE 17G
NEW YORK, NY 10021

FOR: CIGARS, IN CLASS 34 (U.S. CLS. 2, 8, 9 AND 17).

FIRST USE 12-26-1986; IN COMMERCE 12-26-1986.

SER. NO. 75-153,375, FILED 8-20-1996.

CONRAD WONG, EXAMINING ATTORNEY



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

### UNITED STATES DEPARTMENT OF COMMERCE
#### United States Patent and Trademark Office

March 11, 2013

THE ATTACHED U.S. TRADEMARK REGISTRATION 2,258,525 IS
CERTIFIED TO BE A TRUE COPY WHICH IS IN FULL FORCE AND
EFFECT WITH NOTATIONS OF ALL STATUTORY ACTIONS TAKEN
THEREON AS DISCLOSED BY THE RECORDS OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE.

REGISTERED FOR A TERM OF 10 YEARS FROM  July 06, 1999
1st RENEWAL FOR A TERM OF 10 YEARS FROM  July 06, 2009
SECTION 8
SAID RECORDS SHOW TITLE TO BE IN:

*SOCIETE COOPERATIVE AGRICOLE D' AMOU ET DES PRODUCTEURS*
*DE KIWIFRUITS DE FRANCE*
*A SOCIETE COOPERATIVE AGRICOLE OF FRANCE*

By Authority of the

Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

M. TARVER
Certifying Officer

Int. Cl.: 31

Prior U.S. Cls.: 1 and 46

Reg. No. 2,258,525

## United States Patent and Trademark Office

Registered July 6, 1999

## TRADEMARK
### PRINCIPAL REGISTER



SOCIETE COOPERATIVE AGRICOLE DES PRODUCTEURS DE KIWIFRUITS DE FRANCE (FRANCE AGRICULTURAL COOPERATIVE)

LABATUT 40300, FRANCE , BY CHANGE OF NAME COOPERATIVE AGRICOLE DES PRODUCTEURS DE KIWIFRUITS DE FRANCE (FRANCE AGRICULTURAL COOPERATIVE) 32800 EAUZE, FRANCE

FOR: FRESH KIWIFRUIT , IN CLASS 31 (U.S. CLS. 1 AND 46).

FIRST USE 11-0-1982; IN COMMERCE 12-7-1996.

THE DRAWING IS LINED FOR THE COLORS BROWN, GREEN AND YELLOW.

SER. NO. 75-307,889, FILED 6-12-1997.

SAMUEL E. SHARPER JR., EXAMINING ATTORNEY



7406056

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

March 11, 2013

THE ATTACHED U.S. TRADEMARK REGISTRATION 2,270,174 IS
CERTIFIED TO BE A TRUE COPY WHICH IS IN FULL FORCE AND
EFFECT WITH NOTATIONS OF ALL STATUTORY ACTIONS TAKEN
THEREON AS DISCLOSED BY THE RECORDS OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE.

REGISTERED FOR A TERM OF *10* YEARS FROM  *August 17, 1999*
*1st* RENEWAL FOR A TERM OF *10* YEARS FROM  *August 17, 2009*
SECTION 8
SAID RECORDS SHOW TITLE TO BE IN:
*SOCIETE COOPERATIVE AGRICOLE D'AMOU ET DES PRODUCTEURS*
*DE KIWIFRUITS DE FRANCE*
*A SOCIETE COOPERATIVE AGRICOLE OF FRANCE*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

M. TARVER
Certifying Officer

Int. Cl.: 31

Prior U.S. Cls.: 1 and 46

Reg. No. 2,270,174

## United States Patent and Trademark Office

Registered Aug. 17, 1999

### TRADEMARK
### PRINCIPAL REGISTER

## OSCAR

SOCIETE COOPERATIVE AGRICOLE DES PRODUCTEURS DE KIWIFRUITS (FRANCE AGRICULTURAL COOPERATIVE)
LABATUT 40300
FRANCE , BY MERGER AND CHANGE OF NAME FROM COOPERATIVE AGRICOLE DES PRODUCTEURS DE KIWIFRUITS DE FRANCE (FRANCE AGRICULTURAL COMPANY) 32800 EAUZE, FRANCE

FOR: FRESH KIWIFRUIT, IN CLASS 31 (U.S. CLS. 1 AND 46).

FIRST USE 11-0-1982; IN COMMERCE 12-7-1996.

SER. NO. 75-307,895, FILED 6-12-1997.

SAMUEL E. SHARPER JR., EXAMINING ATTORNEY



# THE UNITED STATES OF AMERICA

### TO ALL TO WHOM THESE PRESENTS SHALL COME:

### UNITED STATES DEPARTMENT OF COMMERCE
#### United States Patent and Trademark Office

March 11, 2013

THE ATTACHED U.S. TRADEMARK REGISTRATION 2,487,260 IS
CERTIFIED TO BE A TRUE COPY WHICH IS IN FULL FORCE AND
EFFECT WITH NOTATIONS OF ALL STATUTORY ACTIONS TAKEN
THEREON AS DISCLOSED BY THE RECORDS OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE.

REGISTERED FOR A TERM OF *10* YEARS FROM  *September 11, 2001*
*1st* RENEWAL FOR A TERM OF *10* YEARS FROM  *September 11, 2011*
SECTION 8 & 15
SAID RECORDS SHOW TITLE TO BE IN:
  *ATW AUTOMATION INC.*
  *A MICHIGAN CORPORATION*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

M. TARVER
Certifying Officer

Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36 and 38

United States Patent and Trademark Office

Reg. No. 2,487,260
Registered Sep. 11, 2001

## TRADEMARK
### PRINCIPAL REGISTER



# O S C A R

DT INDUSTRIES, INC. (DELAWARE CORPORA-
TION)
CORPORATE CENTRE, SUITE 2-300
1949 E. SUNSHINE
SPRINGFIELD, MO 65804

FOR: MANUFACTURING CELL CONTROL,
ANALYSIS AND MONITORING SOFTWARE, IN
CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 0-0-1985; IN COMMERCE 0-0-1985.

SER. NO. 76-078,461, FILED 6-27-2000.

NICHOLAS ALTREE, EXAMINING ATTORNEY



# THE UNITED STATES OF AMERICA

**TO ALL TO WHOM THESE PRESENTS SHALL COME:**

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

March 11, 2013

THE ATTACHED U.S. TRADEMARK REGISTRATION 3,693,335 IS
CERTIFIED TO BE A TRUE COPY OF THE REGISTRATION ISSUED BY
THE UNITED STATES PATENT AND TRADEMARK OFFICE WHICH
REGISTRATION IS IN FULL FORCE AND EFFECT.

REGISTERED FOR A TERM OF *10 YEARS FROM* *October 06, 2009*
SAID RECORDS SHOW TITLE TO BE IN: *Registrant*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

N. WILLIAMS
Certifying Officer



# United States of America
## United States Patent and Trademark Office

# OSCAR

**Reg. No. 3,693,335**
Registered Oct. 6, 2009

**Int. Cl.: 33**

**TRADEMARK**
**PRINCIPAL REGISTER**

IDELL, RICHARD J. (UNITED STATES INDIVIDUAL)
12 GREENFIELD COURT
MILL VALLEY, CA 94941 AND

IDELL, SUSAN K. (UNITED STATES INDIVIDUAL)
12 GREENFIELD COURT
MILL VALLEY, CA 94941

FOR: WINES, IN CLASS 33 (U.S. CLS. 47 AND 49).

FIRST USE 4-9-2009; IN COMMERCE 4-9-2009.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-
TICULAR FONT, STYLE, SIZE, OR COLOR.

THE NAME "OSCAR" DOES NOT IDENTIFY A LIVING INDIVIDUAL.

SN 77-353,926, FILED 12-17-2007.

ALYSSA STEEL, EXAMINING ATTORNEY



Director of the United States Patent and Trademark Office



# THE UNITED STATES OF AMERICA

### TO ALL TO WHOM THESE PRESENTS SHALL COME;

**UNITED STATES DEPARTMENT OF COMMERCE**
United States Patent and Trademark Office

March 11, 2013

THE ATTACHED U.S. TRADEMARK REGISTRATION 3,867,542 IS CERTIFIED TO BE A TRUE COPY OF THE REGISTRATION ISSUED BY THE UNITED STATES PATENT AND TRADEMARK OFFICE WHICH REGISTRATION IS IN FULL FORCE AND EFFECT.

REGISTERED FOR A TERM OF *10* YEARS FROM *October 26, 2010*
SAID RECORDS SHOW TITLE TO BE IN: *Registrant*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

N. WILLIAMS
Certifying Officer



# United States of America

## United States Patent and Trademark Office

# OSCAR

**Reg. No. 3,867,542**

**Registered Oct. 26, 2010**

**Int. Cl.: 9**

**TRADEMARK**

**PRINCIPAL REGISTER**

AUSTRALIAN SEMICONDUCTOR; TECHNOLOGY COMPANY PTY LTD (AUSTRALIA COMPANY)
LEVEL 5
76 WAYMOUTH STREET; ADELAIDE SA 5000
AUSTRALIA

FOR: SIMULATION SOFTWARE FOR USE IN DIGITAL COMPUTERS, NAMELY, SIMULATION SOFTWARE FOR CIRCUITRY AND ELECTRONIC SYSTEM APPLICATIONS IN THE NATURE OF DESIGN AND MANUFACTURING IN THE AREAS OF AUTOMOTIVE, TRANSPORTATION, INDUSTRIAL CONTROL, COMMUNICATIONS, TELECOMMUNICATIONS, CONSUMER ELECTRONICS AND ELECTRICAL SYSTEMS, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF INTERNATIONAL REGISTRATION 1009721 DATED 7-1-2009, EXPIRES 7-1-2019.

SER. NO. 79-071,670, FILED 7-1-2009.

GINA FINK, EXAMINING ATTORNEY



David J. Kappos

Director of the United States Patent and Trademark Office



# THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

March 11, 2013

THE ATTACHED U.S. TRADEMARK REGISTRATION 4,144,675 IS
CERTIFIED TO BE A TRUE COPY OF THE REGISTRATION ISSUED BY
THE UNITED STATES PATENT AND TRADEMARK OFFICE WHICH
REGISTRATION IS IN FULL FORCE AND EFFECT.

REGISTERED FOR A TERM OF 10 YEARS FROM  *May 22, 2012*
SAID RECORDS SHOW TITLE TO BE IN:  *Registrant*

By Authority of the

Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

N. WILLIAMS

Certifying Officer



# United States of America

## United States Patent and Trademark Office

# Oscar

**Reg. No. 4,144,675**

**Registered May 22, 2012**

**Int. Cl.: 31**

**TRADEMARK**

**PRINCIPAL REGISTER**

SELECTA KLEMM GMBH & CO. KG (FED REP GERMANY LIMITED PARTNERSHIP)
HANFÄCKER 10
STUTTGART, FED REP GERMANY 70378

FOR: CARNATIONS; PLANT PROPAGATION MATERIAL FOR CARNATIONS, NAMELY, SEEDS, LIVING PLANT CELLS, LIVING PLANT TISSUES, GRAFTS OF CARNATIONS, BUDS OF CARNATIONS, BULBS OF CARNATIONS AND SHOOTS OF CARNATIONS; ALL THE AFORESAID GOODS EXCEPT CUT FOLIAGE FOR DECORATION, IN CLASS 31 (U.S. CLS. 1 AND 46).

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-TICULAR FONT, STYLE, SIZE, OR COLOR.

PRIORITY DATE OF 7-12-2010 IS CLAIMED.

OWNER OF INTERNATIONAL REGISTRATION 1065905 DATED 1-12-2011, EXPIRES 1-12-2021.

THE NAME(S), PORTRAIT(S), AND/OR SIGNATURE(S) SHOWN IN THE MARK DOES NOT IDENTIFY A PARTICULAR LIVING INDIVIDUAL.

SER. NO. 79-092,862, FILED 1-12-2011.

MICHAEL WIENER, EXAMINING ATTORNEY



Director of the United States Patent and Trademark Office

# EXHIBIT F

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION - LOS ANGELES


| | | |
|---|---|---|
| ACADEMY OF MOTION PICTURE ARTS AND SCIENCES, | ) ) ) | CASE NO:  2:10-CV-3738-ABC-CW |
| Plaintiff, | ) ) | CIVIL |
| vs. | ) ) | Los Angeles, California |
| GO DADDY.COM, INC., ET AL., | ) ) | Tuesday, April 10, 2012 |
| Defendants. | ) | (10:07 a.m. to 10:48 a.m.) |


DEFENDANTS' MOTION TO COMPEL FURTHER PRODUCTION
OF RESPONSIVE DOCUMENTS (DKT. NO. 241)

BEFORE THE HONORABLE CARLA M. WOEHRLE,
UNITED STATES MAGISTRATE JUDGE



Appearances:            See Next Page

Court Reporter:         Recorded; CourtSmart

Deputy Clerk:           Donna Y. Thomas

Transcriber:            Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>APPEARANCES FOR:</u>

Plaintiff:                    DAVID I. MICHAELS, ESQ.
                              Boies Schiller and Flexner LLP
                              225 Santa Monica Blvd., 11th Floor
                              Santa Monica, CA 90401

GoDaddy.com:                  AARON M. McKOWN, ESQ.
                              PAULA L. ZECCHINI, ESQ.
                              Bryan Cave LLP
                              3161 Michelson Drive
                              Suite 1500
                              Irvine, CA 92612-4414

1    <u>Los Angeles, California; Tuesday, April 10, 2012; 10:07 a.m.</u>

2                    (Call to Order)

3           **THE CLERK:**  Calling Case Number CV 10-3738, *Academy*

4    *of Motion Pictures Arts and Sciences versus GoDaddy.com*.

5    Counsel.

6           **MR. MICHAELS:**  David Michaels for the Academy.

7           **MR. MC KOWN:**  Aaron McKown on behalf of GoDaddy.com.

8           **MS. ZECCHINI:**  Paula Zecchini on behalf of

9    GoDaddy.com.

10          **THE COURT:**  Good morning.

11          **MS. ZECCHINI:**  Good morning.

12          **THE COURT:**  Okay.  Thank you.  So, I'm sorry I don't

13   have a written Tentative but I can give you my tentative

14   ruling.  The -- which is to deny the Motion to Compel.

15          What I understand we're talking about would be the

16   documents generated by the litigation consultant who searched

17   for and identified potentially infringing domain names using a

18   computer program of some sort.  And then the communications

19   between the consultant and counsel regarding that process.

20          It doesn't seem to me that there's any real dispute

21   that there are some work product issues.  I think it would be

22   pretty clear to me that communications with counsel regarding

23   that process would at least likely and partially implicate

24   opinion work product.  To the extent we're talking about

25   documents generated and are documents that are generated by the

1    consultant, and in some instances I guess, conveyed to counsel,

2    I can see that that would not necessarily be opinion work

3    product.  I think it probably wouldn't.  It would be fact work

4    product.

5              And, in some, like the screen shots assuming that

6    those were generated and conveyed to counsel, I don't even

7    think -- and I don't think the Academy disagrees that those are

8    not work product at all.  So, there's the work product, some

9    opinion possibly and some fact work product.

10             I don't find GoDaddy's theories of labor to be

11   persuasive.  I don't think that just bringing suit on the

12   domain names that are identified by that process puts the work

13   product at issue to the degree that that would be a waiver, and

14   I don't think that the production of the screen shots or the

15   use of the screen shots either puts those at issue or creates a

16   subject matter waiver because I don't think the screen shots

17   are protected to begin with.  So I don't think there's any

18   waiver there.

19             And I also did not find persuasive the theories for

20   substantial need even taking it to the, you know, the lower

21   standard of fact work product and substantial need.  I don't

22   rule out the possibility of laches as a defense.  I think

23   GoDaddy is correct that the fact that it hasn't been, you know,

24   you don't have a case saying it has been used, doesn't mean

25   it's not a defense you can raise and conduct discovery on.  But

1 I don't think that, you know, given the time frame of what the

2 litigation consultant was doing, that there's a substantial

3 need for the laches defense to discover this protected

4 material.

5       I do think there's an argument about the need for

6 discovery in the narrow area of the number of impressions made

7 by the consultant for GoDaddy's theory that for at least some

8 domain names, and I know the Academy doesn't put much stock in

9 it, but I understand the theory and I think it's a, you know, a

10 plausible theory that for some domain names there was no use.

11 Because as I understand it, the theory is that for some domain

12 names there's only one impression and if that one impression

13 was made by the consultant then you're going to say that for

14 those domain names there was no use by GoDaddy.  The Academy

15 would have another argument, but I understand your theory.

16       So understanding that theory, I do still think that

17 there's not a substantial need -- certainly not a substantial

18 need to discover the wide range of everything generated by the

19 consultant to address that theory.  And, you know, looking at

20 the Supplemental Interrogatory Response that the Academy

21 provided and with the potential that there would be more

22 information provided by actually identifying the I.P. addresses

23 that would have been used for any impressions made by counsel

24 or I assume by the consultant, that really that addresses the

25 substantial need on that theory.

1          So going through all of that, I am really not finding

2    that there's a basis to Order this production.  So, do you want

3    to be heard?

4          **MR. MC KOWN:**  Yes, please.  First I want to start

5    with a clarification.  We -- I hope that we had made this clear

6    in the Reply.  We are not seeking communications between the

7    litigation consultant and counsel.  I think we've always tried

8    to focus on the fact that what we are seeking by way of this

9    discovery are the facts relating to how and when AMPAS first

10   discovered GoDaddy's alleged use of the domain names in this

11   case.

12         **THE COURT:**  So it's -- you would be talking about

13   just documents generated by the consultant?

14         **MR. MC KOWN:**  Correct.  According to GoDaddy -- I'm

15   sorry, according to the Academy, there were essentially two

16   categories of documents that would fall within that -- within

17   what the litigation consultant generated.

18         One are the screen shots.  They've attached it to the

19   Complaint.  They've used it in the discovery in this case to

20   cross-examine GoDaddy witnesses at depositions and it's the

21   evidence that they appear to attend to rely on to demonstrate

22   that there was use by GoDaddy of each of the domain names in

23   this case.

24         The other element . . .

25         **THE COURT:**  Well, the -- the -- it's the -- they're

1  using the screen shots to show what the parked page looked

2  like, right?

3          **MR. MC KOWN:**  Well, two, two -- two parts of it.

4  First what they have to show is that there is a -- that there

5  is a confusingly similar -- that the domain name itself is

6  confusingly similar to . . .

7          **THE COURT:**  Right.

8          **MR. MC KOWN:**  To their trademark.  And in order to do

9  that, they would have to show that GoDaddy used that domain

10 name in a fashion that resulted in the confusingly similar

11 standard being applied.  And so, before you even look at the

12 content, they need to show that GoDaddy used these domain

13 names.  That's the fundamental threshold issue.  Because if

14 GoDaddy doesn't use the domain names of any of the particular

15 domain names, then there's no liability under the ACPA.

16         They claim that -- the way they allege in their

17 Complaint that the way that GoDaddy uses these domain names is

18 that it has a parked page that resolves from the domain name

19 and then it places advertisement.

20         **THE COURT:**  Right.

21         **MR. MC KOWN:**  So in order to show that GoDaddy used,

22 that it actually had these parked pages, there was a parked

23 page that was generated from these domain names, they submit,

24 they've identified them in response to discovery responses,

25 they've attached them to the Complaint, they've brought them up

Page 8

in cross-examining GoDaddy witnesses at deposition, is that the
screen shots evidence GoDaddy's use. That's what they've
produced so far.

The other information or other documents they claim
that were generated by a litigation consultant is what they
call data. They haven't described what the data is. I'm
assuming it's some information stored within the software
program that would allow us to determine how many impressions
were made, whether the impression was made by the software
program itself or whether it was made by the litigation
consultant after he discovered or she discovered the domain
name or the parked page. So it's that raw data, the facts, and
that's what I had hoped we had conveyed in our Reply was it's
the raw data, the facts of how and when the litigation
consultant discovered each of these parked pages.

And while the screen shot may -- may suggest a
time -- a time period when at least they went on once, it's not
self authenticating, so we don't have any information regarding
when that actually occurred, who actually did it, or how that
came about. All we have is a screen shot. And by asking for
the data, the data that was also generated surrounding those
screen shots, we would hope that we could get the foundational
information to understand how each of those screen shots came
into place.

Because at this point we don't know -- we don't know

EXCEPTIONAL REPORTING SERVICES, INC

1    the identity of the litigation consultant so we can't depose

2    him or her to figure out how these screen shots came about.

3            **THE COURT:**  But other than -- what theory is it

4    relevant to for you other than the theory about the number of

5    times that these impressions were made?

6            **MR. MC KOWN:**  Well . . .

7            **THE COURT:**  I mean, there's not really a dispute, is

8    there, that at least for -- for some domains -- for some domain

9    names, what happens is that if somebody types it in, they go to

10   this page and it looks like what it looks like.  I mean, I

11   understand it looks different arguably, as it's been explained

12   by GoDaddy, it looks different each time it's created.  And if

13   nobody ever typed in that domain name, it would exist only in

14   theory.  But we don't really have a substantial dispute, do we,

15   about the fact that this program exists?  This is what happens

16   if you type in the domain name?  It goes there -- it generates

17   a page?

18           **MR. MC KOWN:**  The substantial need for the data that

19   we're seeking by way of this Motion is twofold.  One, it's to

20   conduct discovery into the evidence that they've produced to

21   date that supports their claim that GoDaddy used these domain

22   names.  Right?  So what we have is they've produced screen

23   shots.  It's the only evidence that they've produced to date

24   that they claim supports their argument or their allegation

25   that GoDaddy used each of these domain names.  But those aren't

1   self -- those are not self authenticating documents.  So we

2   need to conduct discovery and this is why we did this.  It's

3   pretty basic.  How and when did you -- produce documents

4   showing how and when you first discovered each of those domain

5   names.  Now, . . .

6          THE COURT:  Well, that's the -- the first discovered

7   is an entirely different issue that frankly I don't understand

8   why it's relevant at all other than to the laches defense.

9   But, but I understand what you're saying about the documents

10  themselves I suppose.  Although I'm not really sure I

11  understand, if what you're talking about is just authenticating

12  the documents, I'm not sure that all of the data adds or

13  subtracts from that.

14         MR. MC KOWN:  Well, I think those . . .

15         THE COURT:  But I'll ask what the data is.

16         MR. MC KOWN:  Well, and, hold on before we get there.

17  From a practical standpoint, let's fast forward to either

18  Summary Judgment or Trial and they put on their case and

19  they're trying to demonstrate that GoDaddy used -- what we're

20  going to see from them are these screen shots.  And my guess

21  is, they've indicated they're likely or they may finally

22  designate their litigation consultant as an expert at which

23  time after the close of fact discovery, we can finally get

24  information about who did the impressions, who's the one who

25  found these screen shots, how they came about, how often?

1      **THE COURT:**  But what does that -- what does that

2  matter unless they designate him as a witness?

3      **MR. MC KOWN:**  Well, so we would have no ability to

4  conduct fact discovery as to that evidence until after fact

5  discovery is closed is what they're suggesting to us.  The

6  other problem is . . .

7      **THE COURT:**  But I'm saying that that evidence is not

8  relevant other than for authentication and if they try to

9  introduce them and they don't have a witness who's

10  authenticating them, then obviously you're -- you're going to

11  have an objection.  I mean, it just -- it seems to me a very

12  thin thread to get to work product.  But I'll be interested to

13  hear what that data is.

14      **MR. MC KOWN:**  And here's a couple of the ways that I

15  could see us needing this information in.

16      **THE COURT:**  Uh-huh.

17      **MR. MC KOWN:**  One is, and I know your Honor, the

18  laches defense is important.  It's not just because -- what

19  they want to say is well, the litigation consultant only found

20  this stuff three months ago because we said so.  All right?

21  Okay.  So now we're required to accept their allegation, their

22  representation.

23      The problem is, that's not what they allege in their

24  Complaint.  What they allege in their Complaint is they started

25  discovering these domain names in August of 2007.  So either,

1   one hand, these domain names were all discovered by this

2   litigation consultant which undercuts their claim in their

3   Complaint that this has been a long history of complaining to

4   GoDaddy about, you know, discovering these domain names.

5   That's inconsistent with what they've suggested.  I think we

6   should be able to figure out indeed is there a laches defense

7   here?  Did you first discover these back in August of 2007?

8   Did you have -- was it this litigation consultant or did you

9   find it another way?

10          And, also, if you found it again, was it only as a

11  result of the litigation consultant that you finally moved

12  forward?  So I think it's, it is relevant to the issue of

13  laches.

14          It's also relevant to the issue of unclean hands,

15  right?  And this goes back to the impression issue.  The

16  data -- what we have here is, we have a production of a screen

17  shot for each domain name.  So we know there's at least been

18  one impression.  If you actually look at their responses to --

19  to their Supplemental Responses to discovery, they don't even

20  admit that that impression was made by their litigation

21  consultant or that the screen shots were made by the litigation

22  consultant.  But they say it was presumably made by the

23  litigation consultant.

24          So we don't even know as a result of that -- they say

25  we don't know if our attorneys did it or not.  We kept no

1  records so we can't tell you whether our counsel made any

2  impressions and we only presume -- we're not going to actually

3  tell you whether or not our litigation consultant made any of

4  those impressions -- made any impressions.  There is a screen

5  shot but we won't even acknowledge that the screen shot was

6  generated by the -- by the litigation consultant.  Moreover,

7  we're not going to tell you how many times the screen shot was

8  made or whether it was made by the litigation consultant

9  himself or whether it was simply done through an automated

10  process with the software program.  And that is important to

11  the issues.

12       If the software program was the only thing that

13  generated the screen shots, then they cannot authenticate that

14  evidence and we should be able to know that as part of fact

15  discovery.  That to us is an important fact to know.  Who --

16  whether or not the litigation consultant was actually the one

17  who typed it in or whether this was done through apparently

18  potentially a software program that he developed.

19       So that, again, goes to the -- who made the

20  impressions, how many were made and whether or not there were

21  impressions made by anyone other than AMPAS or its counsel or

22  its litigation consultant.  And, unfortunately, what normally

23  would happen is you would have -- when you have fact discovery

24  there is a witness.  You know, maybe AMPAS itself had gone on

25  to -- an employee within the company had gone on and discovered

1   this and then passed that information on to counsel.  I don't

2   think anyone here would say, well, you know, that would be

3   somehow privileged because it was communicated -- that fact was

4   communicated to counsel.  We would be able to depose the

5   witness.

6           Here, what we have is nobody within AMPAS did any of

7   the investigation apparently.  Accordingly it was all done --

8   according to AMPAS, it was all done by the litigation

9   consultant.  So he's now a fact -- he's become a fact witness

10  in this case.  A fact witness as to whether or not he made --

11  how many impressions he or she made, how often they went on

12  that web site, what they did to get there, how they discovered

13  it.  Because it really does go back to our theory of because

14  GoDaddy does not use a domain name because there's not a parked

15  page generated until somebody types it in URL and it doesn't

16  exist otherwise and it only exists for that moment in time that

17  it's open on the internet user's computer.

18          So the question really is if that was the only person

19  who created a parked page that was generated from GoDaddy's

20  parked page system from one of these domain names was a

21  litigation consultant, that makes him or her a fact witness to

22  this case.  And the fact that it's a litigation consultant

23  doesn't, shouldn't shield it.  As a matter of fact, I don't

24  even think that would constitute work product.  It's just like

25  the screen shots aren't work product.  They are facts that

1    relate to it.  And so -- and at the very least there should be

2    a substantial need because we need to understand, which we

3    don't get from the screen shots, which is the only thing we

4    have so far, we need to understand how often their litigation

5    consultant went on and made impressions on each of these.  And

6    the data should be the basis for which we are able to determine

7    that.  That's why we want the data.  And we should also be able

8    to -- they should have to identify the expert and we should be

9    able to depose him on that or her on that.

10            In fact, it's really no different than when in an

11   environmental context; when somebody believes that they have

12   contaminated soil or contaminated ground water, they go and

13   they hire a consultant.  The consultant does sampling of the

14   water or the soil and then they take those results and they put

15   them in their Complaint.  And they say, you know, we've done

16   sampling and we've discovered that there's "x" amount of

17   certain contaminate.  And as a result we're suing for clean up.

18   They don't get to hide the sampling.  They don't get to say,

19   well, you don't get to discover the sampling, the data that

20   relates to the sampling that we took.  That information is

21   fully discoverable.

22            Now, any communications, I agree, any communications

23   that consultant had with the attorneys is privileged and work

24   product.  And we're not seeking that as a result of this.  But

25   the raw data, the sampling that was done would be discoverable

1   and that's exactly what happened here.  It's the raw data, the

2   sampling or the information that was determined, that was

3   gleaned by the consultant relating to how many times that

4   consultant went and made an impression on each of these parked

5   pages is a fact in this case.

6          THE COURT:  What's an impression?

7          MR. MC KOWN:  An impression is -- so, an impression

8   is the number of times that an internet user goes to a domain

9   name that resolves to a parked page.  Or to really any, any,

10  any web page.

11         THE COURT:  So, I'm not familiar with impression.  Is

12  that different than a hit?

13         MR. MC KOWN:  It's the same thing.  So if I went on

14  GoDaddy.com.  I type it into my URL.  The screen pops up.  I've

15  now made an impression on that --

16         THE COURT:  Okay.

17         MR. MC KOWN:  -- that web page.

18         THE COURT:  So it's a visit?

19         MR. MC KOWN:  Exactly.

20         THE COURT:  Okay.

21         MR. MC KOWN:  Exactly.  You often see those little

22  counters at the bottom.

23         THE COURT:  It doesn't mean that they've printed it

24  out or they . . .

25         MR. MC KOWN:  No, you just see the little count.

1    Sometimes web sites have little counters on the bottom.

2              **THE COURT:**  Right.

3              **MR. MC KOWN:**  That counts the number of times someone

4    has made an impression --

5              **THE COURT:**  Okay.

6              **MR. MC KOWN:**  -- someone has visited that particular

7    site.

8              **THE COURT:**  And so you have records of how many times

9    somebody visited a particular domain name.

10             **MR. MC KOWN:**  An impression was made.  And I want to

11   make it clear because they argue or they claim in their

12   Supplemental Responses that we have the ability to determine

13   the specific I.P. address for each of those.  That is not true.

14   There has been no discovery to that affect.  As far as I

15   understand, that is not an option.  All GoDaddy does, it keeps

16   its typical analytics where it keeps and identifies the number

17   of impressions that were made on it and the number of times

18   somebody clicked on an ad and that ad generated revenue.

19   That's the information that GoDaddy maintains with respect to

20   each specific parked page.

21             **THE COURT:**  So you can't tell what I.P. address

22   visited a specific parked page?

23             **MR. MC KOWN:**  That's correct.  As far as I know,

24   there's been no evidence in this case despite all of the

25   30(b)(6) and every other testimony that we've had to that

1  affect.  And as far as I understand, that is not an option.

2        **THE COURT:**  Okay.

3        **MR. MICHAELS:**  It probably makes sense to start with

4  the nature of the documents themselves.

5        **THE COURT:**  Uh-huh.

6        **MR. MICHAELS:**  Because I think there's some confusion

7  about what they are.  They're primarily communications between

8  counsel and the litigation consultant.  Any ESI or data we've

9  referred to is not some kind of -- there isn't data about when

10  he's -- when the consultant visited a parked page or not.  So I

11  don't think they'll be able to get what they're looking for by

12  producing the Academy's work product.  I think if I . . .

13        **THE COURT:**  Well, what -- what does the -- what does

14  the consultant have?

15        **MR. MICHAELS:**  The consultant, I can't explain the

16  software itself.  The -- I liken it to an algorithm, as it's

17  been explained to me, where he uses this technology that he's

18  developed to locate domain names within the parked page program

19  that contain the Academy's trademarks.  And he developed -- he

20  would develop a list of domain names that potentially infringe

21  on the Academy's marks and there's communications with counsel

22  back and forth about that list that he provided to counsel.

23  Counsel would then filter, you know, would go through those

24  domain names and decide which ones to include in the Complaint

25  and which ones not to include.

1          I think, you know, the data we've referred to is

2    throughout that process, the consultant would upload a list of

3    domain names to a server.  And from that server, to make things

4    efficient, counsel could then download that list, sort through

5    them and then that process would go on and on.  And it has been

6    going on throughout the extensions of fact discovery as we've

7    been trying to locate other domain names that infringe on the

8    Academy's trademarks.

9          **THE COURT:**  Is there something in the -- is there

10   data maintained in the software program itself that identifies

11   when the screen shots are produced and how many, you know, how

12   many times the consultant visited a particular domain name?

13         **MR. MICHAELS:**  My understanding is no.  I don't think

14   that that's what the data is.  I think the data that we've

15   referred to is the data that was stored.  The, you know, the

16   lists and screen shots.  And I agree with your Honor, the

17   screen shots themselves are not work product.  We don't believe

18   that the -- they have said that the consultant generated them

19   but I'm confused about that, you know, the consultant visited a

20   page, he generated a screen shot.  He didn't create anything.

21   We don't assert that that was work product.

22         **THE COURT:**  Well, he printed out something that

23   preserved what the -- or maybe he didn't print it out; maybe

24   he . . .

25         **MR. MICHAELS:**  Sure.

1          **THE COURT:**  . . . did it electronically, but there

2  was some preservation made of what he was seeing on the screen.

3          **MR. MICHAELS:**  Right.

4          **THE COURT:**  And I don't -- we're not arguing about

5  that.  That's not work product.

6          **MR. MICHAELS:**  Sure.

7          **THE COURT:**  You produced that.  But the question

8  would be whether there was some, some data not communicated to

9  counsel but stored within the software itself associated with a

10  particular screen shot that would identify, you know, when it

11  was made or how many, I suppose how many times there was a

12  particular visit to a domain name.  But you say that there may

13  not be.

14          **MR. MICHAELS:**  Right.  My understanding is that's not

15  the information that we have.  That's not the data that we

16  have.  The data is the storing of the screen shots.  The larger

17  list of domain names . . .

18          **THE COURT:**  Which is work product which I don't think

19  there's a substantial need for, okay.

20          **MR. MICHAELS:**  Right.  And so I think there might be

21  some confusion about what we have.  We offered to -- we made a

22  good faith effort to determine when and who visited GoDaddy

23  parked pages.  We offered . . .

24          **THE COURT:**  Both the consultant and counsel.

25          **MR. MICHAELS:**  Right.  And the notion of the

1   consultant was the -- was driving the process of locating

2   infringing domain names is not accurate.  It goes back way

3   before the consultant was hired in February of 2010.  Quinn

4   Emanuel has been representing the Academy for years.  They have

5   received and we sent them in response to their discovery

6   requests our cease and desist letters when we, you know --

7   because those represented the dates at which we found

8   infringing domain names.  And I can represent to this Court

9   that we had no involvement with the litigation consultant prior

10  to February when we retained him.  I mean, I understand that

11  they want to conduct discovery to that, but I can make that

12  representation to this Court subject to my own duties.

13          **THE COURT:**  Okay.

14          **MR. MICHAELS:**  So I think that there might be just

15  some confusion about the nature of our relationship with this

16  consultant and like you said, I don't see how any of the data

17  side of the documents that we have, which are lists of domain

18  names, some of which we decided not to include as not work

19  product because that would be able to tell them what we think

20  is and what we think is not infringing domain names, some of

21  them that actually could, you know, possibly contain characters

22  that are similar to the Academy's trademarks.

23          **THE COURT:**  Okay.  All right.

24          **MR. MICHAELS:**  Thank you.

25          **MR. MC KOWN:**  I do want to clarify this.  Again,

1  we're not seeking, and I didn't ask for this in the Reply or in

2  the moving papers, I agree, to the extent there is an

3  aggregated list of domain names that were potentially

4  considered and discovered by the litigation consultant, I've

5  never suggested and we've never suggested that that list needs

6  to be produced.  It has always been focused on the data

7  specific to the domain names that are at issue in this case.

8        What's interesting is, today is the first time we've

9  heard, despite the Motion, despite countless meet and confers,

10 and we've been meeting and conferring for almost a year now,

11 that the data is actually nothing more than lists and screen

12 shots.  It's a little bit -- it's a little bit -- it's

13 certainly not in their papers and it's certainly not something

14 I had heard before.  If that is . . .

15        **THE COURT:**  Well, in their papers they say that -- in

16 their papers they say that what's been withheld is all

17 communications with counsel.  But there is this reference to

18 data and I was unclear what it was, too.

19        **MR. MC KOWN:**  Right.  And so I guess this raises a

20 question.

21        **THE COURT:**  Let him finish.

22        **MR. MC KOWN:**  I guess this raises a question.  If it

23 really -- and I'm willing to accept their representation that

24 the only thing that's contained within the data are either the

25 screen shots or these aggregated lists of domain names and

1    communications with counsel, but then it raises the question of

2    if the data itself doesn't show, then do we have some

3    outstanding discovery to them regarding the identity of anybody

4    who made an impression on a domain name to try to figure this

5    issue out?  They've refused to identify the name of the

6    litigation consultant and I think it would be a fair area of

7    inquiry for a deposition to ask specific questions relating to

8    how many times he made an impression, whether an impression was

9    made by the software program or by him personally, et cetera,

10   this line -- this narrow line of questioning.  And so I guess

11   if we want to leave here today, I'm willing to accept your

12   Honor's Tentative based on the representation that the data is

13   strictly the screen shots, the aggregated domain name list and

14   communications with counsel, if they are willing to provide the

15   name of the litigation consultant so we can figure out this

16   issue, we can conduct discovery as to the facts of how many

17   times the consultant made an impression.

18        Because as we put in our Reply, the response is all

19   they've said with respect to the litigation consultant --

20   they've said their attorneys, they don't know.  They can't

21   identify how many impressions were made by its counsel.  But

22   for the litigation consultant, they just say at minimum a

23   litigation consultant to the Academy's outside counsel

24   presumably would have made an impression when capturing screen

25   shots for each domain name.  It doesn't say whether he did, how

1   many times he did, whether it was done through the computer

2   program or not and those are -- I think those are relevant

3   facts.  Those are relevant facts that we need in order to

4   determine whether or not the use that they allege by GoDaddy

5   was done by anyone other than the Academy, was the result of

6   any activity other than the Academy investigating the claims in

7   this case.

8           THE COURT:  Do you have -- do you know how many -- I

9   know in some of the responses they've asked for you to identify

10  how many impressions there are for each domain name.  Has that

11  been provided?

12          MR. MC KOWN:  We have provided, I certainly know

13  we've done it for cash parking.  We've done right in the

14  beginning of this case, two years ago, we produced a bunch of

15  Excel spreadsheets that contained the number of impressions,

16  the number of what we call click-throughs, clicks on the ad, on

17  Google advertisements, any revenue, if there was any revenue

18  generated, we provided that.  I've gone back to the client to

19  see if there are any additional updated data.  I think we've

20  updated it once but we're trying to update it again.  So all of

21  that information certainly either has been or is in the process

22  of being provided to counsel.

23          THE COURT:  Okay.  And you say that there are some of

24  them where there's only one impression?

25          MR. MC KOWN:  Correct.

1          **THE COURT:**  There's a single impression?

2          **MR. MC KOWN:**  Yes.

3          **THE COURT:**  And how many are we talking about?

4          **MR. MC KOWN:**  Well, there's about 260 domain names in

5    this case.

6          **THE COURT:**  Uh-huh.

7          **MR. MC KOWN:**  My rough estimate is it appeared from

8    my recollection off that spreadsheet about a third, maybe more.

9    There's also some with two or three or four impressions.  Their

10   counsel acknowledges that they went on them as well.  They just

11   don't know how many times.

12         **THE COURT:**  Uh-huh.

13         **MR. MC KOWN:**  And I think that's going to be a burden

14   of proof that they're going to struggle with.  But ultimately

15   our -- what we would like to be able to argue to the Court is

16   that they can't demonstrate that it was used -- that these

17   parked pages were generated by anyone other than their own use.

18         **THE COURT:**  Okay.

19         **MR. MICHAELS:**  I want to clarify.  My representation

20   was not that the data is exclusively lists of the domain names

21   that the litigation consultant found and screen shots.  I'm not

22   a tech person and I don't fully understand the way the

23   software, the mechanism behind the software and how the data is

24   stored.  My understanding is that it doesn't -- we don't have

25   as part of that data the information that he claims he's

1    looking for, which is the dates and the quantity of his visits

2    to parked pages.  I can go back and check.  My understanding

3    was that was not what -- that was not what they were seeking.

4    And if we can find a way to get at that information and I don't

5    think that we can, because we looked into this issue in

6    responding to their discovery requests, so my understanding is

7    that data is not contained in the data that we've referenced.

8           But I don't know what residual data might be in there

9    that is more than just the screen shots and the list of domain

10   names.

11          **THE COURT:**  And that could address that particular

12   concern.

13          **MR. MICHAELS:**  It could.  It might not.  I'm not

14   making -- the representation I'm making is not that it's

15   exclusively those two things.

16          **THE COURT:**  Okay.

17          **MR. MICHAELS:**  As to the use issue, I think they're

18   just -- they're misstating our theory of use.  Our theory of

19   use is that they've pointed the domain name to a parked page.

20   It's irrelevant whether someone goes there or not to our theory

21   of use.  This notion that the user somehow generates the parked

22   page is I think one that is theoretically interesting but

23   practically absurd.  You know, we made reference in our papers

24   that it's sort of like setting up a trap and then it's not --

25   the trap has not been complete until it ensnares something but

1   then you claim that the, the party ensnared by the trap was the

2   one who created it.

3           You know, our theory of use is that they've set up a

4   system where domain names containing infringing -- containing

5   trademarks of third parties and those domain names are

6   confusingly similar to third-party trademark holders, GoDaddy

7   points those into a parked page program where it monetizes

8   them.  It's not about how it's actually generated.

9           **THE COURT:**  That's your overall theory of liability

10  that you have "x" number of domain names that you're claiming

11  they're responsible for.  So, I mean, you'll have your approach

12  for how you expect the case and want the case to go.  But they

13  will, too.  And it's, you know, it's a reasonable argument for

14  them to make.  And I think that they are entitled to discovery

15  on that subject.  Whether they're entitled to work product,

16  even fact work product, depends on some kind of showing of

17  need.  And part of that is -- you know, part of that is whether

18  there are other ways to get at it.  Part of it is how critical

19  it is.  And part of it is what level of intrusion there is in

20  producing it.  And if it's pure data, like the screen shots are

21  closely associated with the screen shots, then I can see the

22  possibility of that being appropriately discoverable.

23          Where I am going to come out is I'm going to stick

24  with the Tentative, but with the qualification that I'm going

25  to direct counsel to meet and confer further regarding this

1  narrow area.  There's obviously been some lack of communication

2  and I don't really fault one or the other.  Sometimes that

3  happens.

4         But you're very focused now, and you know what my

5  feeling is, is that that is the one narrow area where I can see

6  the potential for Ordering some further production relating to

7  the consultant's work.  At this point, I'm certainly not going

8  to Order disclosure of the consultant's name, but, you know, at

9  some point -- I don't know how close you're getting to expert

10  disclosure.  I mean, it's true.  Somebody's going to have to

11  testify what these pages looked like when they went there and

12  you may want to just make up your mind about that sooner rather

13  than later.

14         **MR. MICHAELS:**  Thank you, your Honor.  And the narrow

15  issue is, so that I understand it, the number of times the

16  litigation consultant visited a parked page and the date of

17  those visits, is that -- just so that I accurately understand

18  what the issue is?

19         **THE COURT:**  That's what -- yes, that's how I see it.

20  I know counsel has articulated it more broadly as how they got

21  there, what they were thinking.  I understand how from your

22  perspective you'd like to have a broader understanding of the

23  process.  That's not what I'm Ruling.  I'm not Ruling that you

24  can inquire into what, you know, the whole process of the

25  consultant's search with respect to those screen shots.

1          But I do think that there is a factual question about

2    how many times there was a visit and how that relates to the

3    particular screen shots that have been presented as the

4    evidence.  And I think if there's -- as I said, one way would

5    have been -- and I know you're not 100 percent sure about this,

6    is whether GoDaddy can identify if you have the I.P. addresses

7    of all of the people who on the Academy's side might have been

8    one of these impressions.  Then their providing you those I.P.

9    addresses may be able to address this issue.

10          But if you don't have that information and they have

11    data in the software that the consultant used, then that may

12    answer the question.  And I think you just both need to -- both

13    need to look at that.

14          **MR. MC KOWN:**  And just so -- because I want to make

15    sure our conversations, our discussions are constructive, would

16    it be fair to say that you are asking us to meet and confer

17    regarding whether the data or the software program that was

18    used by the consultant contains information relating to the

19    number of impressions and when those impressions were made?

20          **THE COURT:**  Yes.

21          **MR. MICHAELS:**  Thank you, your Honor.

22          **THE COURT:**  Okay?

23          **MR. MC KOWN:**  Great.   Thank you, your Honor.

24          **MS. ZECCHINI:**  Thank you.

25          **THE COURT:**  Okay.  Thank you.

(This proceeding was adjourned at 10:48 a.m.)


                         CERTIFICATION


I certify that the foregoing is a correct transcript from the

electronic sound recording of the proceedings in the above-

entitled matter.




_____          __May 18, 2012 _


                   TONI HUDSON, TRANSCRIBER

# EXHIBIT G



FILED UNDER SEAL