# EXHIBIT J



FILED UNDER SEAL

# EXHIBIT K



# EXHIBIT L



# EXHIBIT M

# Expert Report of Geoffrey Nunberg

Academy of Motion Picture Arts and Sciences v. GoDaddy.Com, Inc.
Case No. 2:10-cv-03738-ABC-CW, U.S. District Court for the Central District of
California

January 11, 2013

## Scope of Retention and Qualifications

### *Scope of Assignment*

1. Wrenn Bender LLLP has retained me as an expert witness. I have been asked to give my opinion from a linguistic and lexicographical standpoint as to the similarity between the domain names oscar.com, oscars.com, oscarnight.com academyaward.com, and academyawards.com, belonging to Plaintiff Academy of Motion Picture Arts and Sciences (AMPAS), and the domain names designated by Plaintiff as "infringing" in its Second Amended Complaint, its notices of Additional Infringing Domain Names dated April 14, 2011 and September 26, 2011.

2. In the course of preparing this opinion, I have reviewed various documents, including Plaintiff's Second Amended Complaint of Oct. 27, 2011 and exhibits, Defendant's Answer and Counterclaims of May 31, 2011 and exhibits, Plaintiff's notices of Additional Infringing Domain Names dated April 14, 2011 and September 26, 2011, Plaintiff's Response to GoDaddy.com's Second Set of Requests for Admissions dated December 23, 2011, Plaintiff's First Supplemental Responses to GoDaddy.com's Requests for Admissions dated February 23, 2012, Plaintiff's Second Supplemental Responses to GoDaddy.com's Requests for Admissions dated May 21, 2012, the Declarations in Support of Defendant's Motion for Summary

Judgment of Carl Doss, Michael Alexander, Monique Birault, Oscar Betacur, David Acevedo, and Evgeny Belyakov and other sources as referenced herein.

3. As I continue to review additional information, I reserve the right to supplement, revise, or further explain the opinions set forth in this report.

## *Qualifications*

4. I hold a B.A. from Columbia University, an M.A. in Linguistics from the University of Pennsylvania and a Ph.D. in Linguistics from the City University of New York. I am currently an Adjunct Full Professor at the School of Information at the University of California at Berkeley, where I teach courses on language and on media and information technologies and serve also on the faculty of the Department of Linguistics and the Cognitive Science program. I have also held teaching positions at UCLA and Stanford University and have held Visiting Lectureships at the University of Rome, the University of Naples, the University of Texas, and Princeton University. When on the linguistics faculty at Stanford, I taught graduate and undergraduate courses in semantics and pragmatics, lexicography, the structure of written language, and in other language-related areas. I worked for many years as Principal Scientist at the Xerox Palo Alto Research Center.

5. My principal areas of linguistic specialization are semantics, the study of the meanings of words and expressions, and pragmatics, the study of the way language is interpreted in context. I have also taught courses in phonetics and have worked extensively in lexicography, the compilation of dictionaries, as well as on Internet search and classification technologies.

6. I have published numerous papers in refereed journals and other publications on various aspects of linguistics. I am a regular contributor of commentaries on language to the National Public Radio program "Fresh Air" and have written regularly appearing features on language for *The New York Times* in its Sunday Week in Review section. My articles and commentaries have also appeared in publications including *Fortune*, *Forbes*, *The Atlantic*, *The American Prospect*, *The Los Angeles Times*, *The Washington Post*, *The San Francisco Chronicle*, and several European periodicals. I have written a number of general-interest articles on language and the law, chiefly for *American Lawyer* and *California Lawyer*,

including articles on the use of dictionaries and linguistic evidence in legal proceedings.

7. I am chairman emeritus of the Usage Panel of the *American Heritage Dictionary* and have for many years been a consultant to the dictionary regarding matters of definition, usage, and other lexicographical questions. I have taught graduate-level courses in lexicography and related topics at Stanford University and at the Summer Institute of the Linguistic Society of America.

8. I have served as an expert witness in a number of civil, criminal, and trademark cases, and have been qualified as an expert in matters of word meaning and written language.

9. I have several publications and patents in the area of Internet search and classification technologies and have been qualified as an expert in these areas.

10. I am being compensated for my work on this matter at an hourly rate of $450 for preparing this report and for deposition and trial testimony. I have attached my curriculum vitae, which includes a list of my publications and the cases in which I have given expert testimony in depositions or trials over the last four years, as Exhibit A to this report.

## Methodological Assumptions

11. I am not an attorney and have no specialized legal training or expertise, nor do I have any specialized knowledge about the motion picture industry or the domain name registration industry. In what follows I will speak to the linguistic aspects of the marks in question. Accordingly, I will not take into consideration such questions as what use was made of the registered domain names, how much revenue Defendant derived from them, or whether Defendant has acted in good or bad faith, other than such as can be directly inferred from the linguistic evidence.

12. In determining whether two domain names are "confusingly similar," I will make several assumptions for purposes of analysis.[1] I assume (contrary to fact), that a site's domain name will play a major role in the determination about the contents of

---

[1] I use "domain name" here to refer to the top-level subdomain name in a url; e.g., the term *oscar* in the url oscar.com. For these purposes I ignore the top-level domain or extension (e.g., .com, .net, etc.)

a site made by the average information-seeker ("seeker"), as against, say, its prominence in search-engine results.[2] I assume also that the seeker knows nothing about the content of the website other than what can be reasonably inferred from the content of the url itself, what I will call the "presumptive" content of the site. Thus one would assume that the site bollywoodoscarawards.com provides information about awards presented to the Indian film industry and that uncleleoscarshop.com is the website of a car repair shop owned by someone going by the name of Uncle Leo. These inferences might prove to be wrong—Uncle Leo might in fact be running a gambling site under that name, and bollywoodoscarawards.com might be a porn site, or might contain simply an offer to sell the domain name.[3] Nonetheless, for these purposes I will assume that one does not have to visit two sites before determining whether their urls are confusingly similar. That is, we assume that the business of a site is whatever its url leads us to conclude it is, to the degree that we can draw such a conclusion at all.[4]

13. I assume that information seekers adopt the default assumption that the url of the website sponsored by the source or agent of a product, service, publication, institution, company, person, or event will usually contain the name of that entity (the subdomain) followed by the appropriate domain name extension (.com, .edu, etc.). I use "source" here in a broad way to include whoever bears official or institutional responsibility for the event, product, etc. associated with the site, whether or not its name has trademark status. Thus someone trying to go to the

---

[2] I use "information seeker" here rather than "consumer" or "member of the public," since it more accurately describes the person whose judgment is relevant to reckoning whether two domain names are confusingly similar. I assume that the information seeker in question is experienced in using the web and has a reasonable operational understanding of the way search and domain names work, though having no specialized expertise. For example, we can assume that his or her average search query is at least three words, per Google's internal data and Chitika research (see http://certifiedknowledge.org/?p=3459; http://goo.gl/txLCH). Thus when he or she is looking for gossip about the this year's Oscar nominations, the query will be something like "oscar nominations gossip 2012," rather than simply "oscar."

[3] Some of those factors might obviously be relevant in determining a registrant's liability, but they don't bear on the purely linguistic questions at stake.

[4] Cf McCarthy, § 25:78 "It is irrelevant under the ACPA that confusion about a Web site's source or sponsorship could be resolved by visiting the Web," citing Coca-Cola Co. v. Purdy, 382 F.3d 774, 72 U.S.P.Q.2d 1305 (8th Cir. 2004).

website of the Super Bowl without doing a search will most rationally enter www.superbowl.com, and so on. (The url may also be a well-known slogan associated with the source, as with Avis's use of wetryharder.com.) If information seekers did not make this assumption, of course, the activity of cybersquatting might not exist.

14. I assume also that information seekers know that the sponsors of websites will try to include the name of the site's subject or focus (product, event, institution, as the case may be) in their url, whether or not they are the source of the subject. Note that this does not necessarily presuppose an effort to deceive consumers that they are going to the site of the sponsor of the event etc. Thus while the domain name 49ers.com is sponsored by the San Francisco 49ers football team, as one might expect, there are fan sites with names like 49erswebzone.com, ninersnation.com and 49ersparadise.com. Indeed, one assumes that most fans who visit the latter sites do so not because they think they're going to the 49ers site, but rather because those sites provide information, gossip, and opportunities to chat of a sort that may not be available at the team's own site. Note that if the domain names of the latter *were* confusingly similar to that of the team, it would work to their disadvantage, since those seeking e.g., rumors about a quarterback controversy would not visit them.

15. I assume that seekers are aware that website sponsors have different purposes in posting the sites, including the sale of products or services or facilitation of such sales, the sale of advertisements on the site, self-promotion, promotion of one's views on politics, religion, sports, and other topics, provision of information about the activities of the sponsor (e.g., TV or baseball schedules), and a purely eleemosynary interest in entertaining or informing the public (these motives are of course often combined in various combinations). An assumption about a sponsor's motives will shape the seeker's expectations as to what information will be provided and about its reliability.

16. I assume as well that in the case of a url that can be associated with a well-known source, consumers will also bring to bear their knowledge of the activities, goods or services provided by the source, which will shape their expectations as to the purpose of the site, its intended audience, and what information they will find there.

Thus one will expect that the site bmw.com is aimed primarily at prospective BMW buyers or current owners of the cars, and that the site will provide reliable information about BMW car and motorcycle models, promotions, dealer locations, product recalls, and financial services and the like, aimed among other things at encouraging consumers to purchase BMW products and at facilitating the purchase process. It may also offer comparisons between BMW's and other makes, which consumers are likely to take with appropriate caution. By contrast, given the average seeker's knowledge of the Academy and its awards, he or she will assume that its sites are not chiefly in the business of selling goods or services to consumers, but rather of publicizing an event broadcast on free television, promoting the organization and its activities, and disseminating information about the motion picture industry.[5]

### *"Information comparability"*

17. These various considerations will determine whether two sites are assumed to be "informationally comparable": that is, whether they are providing information of the same type about the same topics. Comparability is reckoned relative to a particular interest, which may be narrow or broad. This is the rough informational equivalent of the likelihood of confusion criterion that the trademarks be associated with competing products, with the proviso that inasmuch as information is a non-rivalrous good which is often provided free to the seeker and with no intention of material gain, websites providing similar information are not always competing with each other. One would not say, for example, that Wikipedia and Iowa.gov are competing to provide people with the name of Iowa's current governor.

18. Thus, as one might expect from its name, the site oscargossip.com (a real site, but not one at issue here) provides gossip and rumors about Oscar candidates of the sort for which one would not be driven to go to the AMPAS sites. (It is in the essential nature of gossip and rumors, after all, that they are unofficial; it would be odd to

---

[5] The Academy does sell posters, books, and tickets to various public events through its oscars.org website, but this is obviously a minor function relative to the goal of publicizing the broadcast and the awards and promoting the other activities of the Academy, and one that will be of interest only to a small audience compared to those who visit the site for information.

describe an unattributed assertion about the Oscars that appears on an AMPAS site as a "rumor").[6] In that sense oscargossip.com is not informationally comparable to the AMPAS's sites and is unlikely to be mistaken for it. Nor are sites like myoscarpredictions.com, since one does not expect the AMPAS sites to offer predictions about awards or odds on winners, or media sites that provide critical discussion of the fairness of the Academy's selection and voting procedures. A presumption of informational comparability is a precondition for a judgment of confusing similarity; if one can assume from the urls of two sites that they are not providing similar information, then one is unlikely to confuse the one with the other.

19. I also assume that confusability presupposes that the urls in question might conceivably appear in the same context. This is the web equivalent of the likelihood of confusion criterion that products must share stores or distributional channels, though here it has a more absolute significance: if the two names could never appear in the same contexts, one could never mistake one for the other. By "context" here I mean the set of urls that are generated as a response to a specific instance of information-seeking activity, or that a seeker might enter in the course of such an activity, whether obtaining the kind of information provided at the AMPAS sites is the chief objective or only a collateral one. For example, one may ask whether the two urls might plausibly be returned in response to a single search-engine query or whether they might both appear on a directory of sites that share a common topic or purpose.

---

[6] To be sure, the oscar.com site does contain a tab for "buzz," but it turns out to contain only several Twitter feeds, combining random tweets by the public, media links to their own coverage, and anodyne tweets by AMPAS ("That's kinda cool, I got nominated. I get to go to the Oscars now." - @sethmacfarlane after his song nomination was announced.#OscarNoms"). It is dubious whether these third-party assertions count as "buzz"; certainly they doesn't satisfy the water-cooler interest of the general public and is not a strong motivation for gossip lovers to go to the site, as opposed, say, to perezhilton.com, gawker, or for that matter the blogs of the *New York Times*. See below §33 for further discussion.

20. Thus there is no plausible web search that would turn up both the urls oscars.com and derekoscarsen.com (one of the sites that Plaintiff identifies as infringing).[7] Nor can we plausibly imagine a page containing a directory of similar sites on which both of these urls would appear. Another way of putting this is to say that there is no single information-seeking interest that is likely to be answered by the information on both of these sites: no one looking for the information contained on one is likely to be satisfied by the information that he or she finds on the other, in the same way that no one shopping for a toothbrush could be misled by a store that plainly sells lawnmowers, however similar the names of the two. Independent of other considerations, then, two marks cannot be confusingly similar since there will virtually never be an occasion on which their material similarities must be weighed.[8]

## Varieties of "similarity"

21. As a general rule, the similarity of two domain names will be judged according to the well-known triad of sight, sound, or meaning. I assume that sound will be generally irrelevant in discussing domain names, though there are some situations in which it may play a role (see below). Some similarity of appearance is obviously a precondition for creating confusion, but short of absolute identity of two domain names (or of top-level subdomain names; i.e., extensions, such as .com and .net) it can never be a sufficient condition, since the presence or absence of distinguishing

---

[7] I except the trivial disjunction of terms, i.e. "oscarsen OR oscars," a search that it is improbable that anyone would enter, and certainly not in an effort to obtain information about the Academy Awards.

[8] There is a direct linguistic analogy here: The likelihood that someone will confuse two forms (and hence discern an ambiguity) depends not just on their phonetic or orthographic similarity, but on whether they are likely to occur in similar conversational contexts. It is a well-established linguistic principle that ambiguities are not pernicious so long as the context will generally make clear which reading is intended. Thus a language can comfortably tolerate pairs of homonyms like *heal/heel, him/hymn*, and *duck* "water bird"/*duck* "crouch down," which rarely if ever give rise to genuine uncertainty as to what is being referred to. But to take a classic example from southern French, a language is unlikely to use the same noun for cats and roosters, since a confusion as to which is intended (as in "Put the ____ in the barn") can lead to unhappy results. In sum: no common contexts, no possibility of confusion.

additional material may affect the meaning of the name.[9] Indeed, "identity of form" (whether aural or visual), is itself a criterion that can be resolved in different ways: we may speak of two forms as either identical or distinct depending on how we individuate them on formal, semantic and functional grounds.[10] "Similarity," that is, is always relative to a set of criteria.

### Substring identity

22. Plaintiff nowhere provides an explicit indication of how it construes the notion of "similarity" or under what circumstances a similarity is to be considered "confusing." Indeed, in identifying urls that it deems infringing, Plaintiff has interpreted "similarity" so broadly as to take it well past the point of absurdity. It is clear that in preparing its lists of allegedly infringing sites, Plaintiff simply relied on a dumb search—in the technical sense of the term—in a directory containing domain names parked by Defendant, which pulled up any url containing the strings of characters [oscar] or [academyaward] in any position in the url.[11] In some of these, the string does not even correspond to a word or other linguistic constituent, but rather appears across the overlap between different words. The urls that plaintiff cites as "infringing domain names" include doscarlos.net, coscaraudiosales.com and uncleleoscarshop.com. The claim that these urls are infringing names or confusingly similar to Plaintiff's mark is patently silly: in doscarlos.com, the string [oscar]

---

[9] For these purposes, the graphical features of the name are obviously irrelevant, since domain names are all ultimately reduced to ASCII characters.

[10] For this reason linguists distinguish several levels of formal analysis that correspond to strings, morphophonemes, morphemes, and lexical items. Thus on semantic grounds we may say that the same string [lie] corresponds to three distinct units in the sentences *The book will lie flat*, *The action must lie against the prosecutor*, and *She will lie to me*. On morphological grounds, however, we might identify the verbs in the first and second sentence as "the same" but the not the third, since they share the past tense *lay*. If the sentences are presented in isolation with no specified criteria of judgment, there is no fact of the matter.

[11] In what follows, I will use square brackets to indicate strings of characters, which may or may not form distinct words or phrases in context. Thus the string [cat] is found in the expressions *cat*, *scatter*, and *alpaca trousers*.

doesn't have anything to do with the name Oscar, much less with Plaintiff's mark.[12] By analogy, imagine the owners of well-known marks raising charges of infringement against companies using the urls marnissandals.com, janescafeteria.com or thintelephones.net. Note in this connection that it requires cognitive effort even to spot the relevant embedded strings *nissan*, *nescafe* and *intel*. One thinks of the children's puzzles on the last page of the Sunday comics: "Oscar has hidden himself in the following phrases—can you find him?"

*Name identity*

23. This substring similarity is one or four forms of linguistic similarity that Plaintiff has implicitly appealed to in identifying "infringing" urls, without acknowledging the differences among them. A second type is what we can think of as name identity, where Plaintiff's mark appears either as a given name or part of a surname or business name.[13] The following are examples of such marks that Plaintiff identifies as infringing:

> oscarandrew.com, oscarbetancur.com, oscardow.com, oscarhicks.com, oscarlarson.com, oscarmak.com, oscarnelson.com, oscarpardo.com, oscarpaul.com, oscarsenn.com, oscarspear.com, oscarandeden.com, oscarunruh.com, oscarwalters.com, oscarsantollala.com, derekoscarsen.com, oscarjaffe.com, oscarramirez.com, oscarwelch.com, oscarwelch.net, oscarylalo.com, moisesoscar.com, oscarsdressregistry.com, oscarsoasis,com, oscarseaton.com, oscarsdiscountedprices.com, makingtheroundswithoscar.com[14]

If one were to take Plaintiff's claim about these urls seriously, it would amount to accepting that anyone who sees a url such as oscarwelch.net or oscarhicks.com will not just associate the url with the Academy Awards, but assume that the site is

---

[12] Indeed, this is one situation in which sound is relevant to reckoning the similarity of written forms. In the first syllable of doscarlos.com, the vowel is pronounced as /o/ whereas in oscar.com is it pronounced as /a/. Even though the syllables are orthographically identical, that is, they could not be judged "the same," no more than the string [row] could be judged "the same word" in *We have a row house* and *We had a terrible row*. But this is over and above the obvious dissimilarities of the urls, independent of pronunciation.

[13] For these purposes I assume that two people with the given name John have the same name, rather than adopting the position which treats those as distinct but homonymous names.

[14] One assumes this last was the website for David Dosa's 2011 bestselling book *Making the Rounds with Oscar: The Extraordinary Gift of an Ordinary Cat.*

sponsored by the AMPAS, apparently on the assumption that the organization decided that the addition of the suffix "santollala" (or "betancur" or "larson") to its mark would be informative to a user in search of the Academy's site. Indeed, the claim presupposes that any name containing *oscar* will trigger such associations (even, e.g., Oscarsen), so that a charge of confusing similarity could be properly lodged against oscardelarenta.com and oscarmayer.com, not to mention against anyone who was rash enough to establish a site with a url containing the names of Oscar Hammerstein, Oscar Wilde, Oscar De La Hoya, or Oscar Robertson.[15] By that same logic, Ford would be warranted in challenging the urls bettyfordcenter.org, fordfoundation.org, fordstheater.org and fordham.edu, not to mention giftsfordad.com. In this connection, however, Professor McCarthy has observed that "...the domain name fordstheater.org used for a web page of Ford's Theater in Washington D.C. would probably not be confusingly similar [to the domain name ford.com] because it would convey a different meaning."[16]

24. These claims are absurd enough without additionally noting that any consumer of average intelligence and a passing familiarity with the web will naturally assume that these are personal websites belonging to the people whose names are contained in the urls, and which hence can in no way be informationally comparable to the sites academyawards.com or oscars.com. And finally, as I noted earlier, there is no plausible web search that would turn up any of these sites along with the AMPAS sites or directory of websites that would contain any of these urls along with the AMPAS sites.[17] Someone looking for information on the Academy Awards is extremely unlikely to run into Derek Oscarsen's website, and anyone who did would ignore the site as a distractor. And vice-versa for someone looking for information on Derek Oscarsen.

---

[15] Indeed, there is a better case to be made that oscar.com infringes the oscardelarenta.com url than vice-versa. The former, after all, could be taken by a consumer as an abbreviation of the latter, but the latter could not be taken as an expansion of the former.

[16] McCarthy on Trademarks, § 25: 78.

[17] For examples of such directory sites, see http://www.cubestat.com/tag/academy-award, http://www.bookmark4you.com/tag/academy-award, and http://www.classbrain.com/artteach/publish/article_136.shtml

25. It is easy—and entirely justified—to dismiss these two classes of alleged infringement as simple overreaching on the part of the Plaintiff. But the very fact that Plaintiff has identified marks like doscarlos.com and derekoscarsen.com as infringing is confirmation that Plaintiff's notion of what constitutes a "confusing similarity" between its own marks and those licensed by Defendant is so vague and inflated as to be empty of substantive content. In presupposing, absurdly, that the mere presence in a mark of a string of characters that duplicates the Plaintiff's mark is sufficient to demonstrate confusing similarity, that is, Plaintiff discharges itself of the need to make that notion more precise or to explain how it might bear on other marks that Plaintiff identifies as infringing. Does Plaintiff judge that oscar2011.com is confusingly similar to oscar.com in the same way as that doscarlos.com or oscarjaffe.com are? If not, is the difference a matter of degree or kind, and in what features does it inhere? There is no sign that Plaintiff has given these questions any thought.

## Generic Uses of Words Used as Marks

26. A third type of similarity involves urls containing distinct meanings of polysemous words (i.e., words having more than one sense). The Oxford English Dictionary defines Oscar as follows:

> 1. Any of the statuettes awarded annually since 1928 in Hollywood, United States, by the Academy of Motion Picture Arts and Sciences for excellence in film acting, directing, and other aspects of film-making; = Academy Award n. at academy n. Compounds 2. the Oscars: the ceremony at which these awards are presented.
> 2. In extended use. Any award for outstanding performance or achievement.

The OED dates sense 2 from 1939, and gives such citations as the following:

> TLS Nov. 662/3   Once a year it publishes an annual which is in effect a kind of collection of Oscars for design in these fields.

This use of the term has long been common, and is familiar to most speakers of English. One sees references to the "Oscar" for interior design,[18] real estate developments,[19] teaching,[20] sports,[21] advertising,[22] and numerous other spheres of art

---

[18] http://en.wikipedia.org/wiki/Jorge_Cañete

[19] http://internationalre.blogspot.com/2009/03/feb-2009-updated-dates-for.html

and commerce. This is clearly the sense of the word that is intended in a number of the urls that Plaintiff identifies as infringing, including themormonoscars.com, d-j-academyawards.com, bollywoodoscarawards.com, oscarworthymansion.com, traveloscars.com, textileoscars.com, thefantasyoscars.com, officeoscars.com, oscars4re.com, theimageoscars.com, theliquidoscars.com, and aksarbenoscars.com.[23]

27. The term *Academy Award* is also used in this generic fashion; one sees references to an Academy Award for homes,[24] real estate videos,[25] commercial real estate,[26] interior design,[27] business research,[28] and so forth.[29] The generic meaning of *Academy Award* is clearly the sense of the phrase in the urls metaverseacademyawards.com, collegiateacademyawards.com, socialmediaacademyawards.com, virtualworldacademyawards.com and petacademyawards.com, which are also identified by Plaintiff as confusingly similar

---

[20] http://www.nytimes.com/2010/12/13/opinion/l13teach.html?_r=0

[21] http://www.eturbonews.com/31898/rio-de-janeiro-hosts-laureus-world-sports-awards

[22] http://www.simonhua.com/2012/02/

[23] "ak-sar-ben" is a soubriquet for Nebraska used in the names of a fraternal order and in other contexts.

[24] www.palmbeachflorida.com/mls_listings/A1663370

[25] http://www.twylah.com/blockrealestate/tweets/115247773993025536

[26] https://members.rebny.com/.../Ingenious_Deals_Winners_4-5-11.pdf

[27] http://www.designandhealth.com/Advocacy/Interior-Design-Academy-Award-Winners-2011.aspx

[28] http://www.cbs.dk/en/News-Press/News/2010/November/Steen-Thomsen-receives-Danish-Business-Research-Academy-Award

[29] Both Academy Award and Oscar are generally capitalized in this generic use. This does not however reflect a nod to the trademark status of the words, but rather to their status as proper nouns. In this regard note that we also capitalize all the words in names like British Independent Film Award, Heisman Trophy, Nobel Prize, Lombardi Award, Ivy League, and so forth, though most people have no idea whether such names are trademarked or not. Note also that in English (but not in most other languages), capitalization is preserved when a proper noun is converted to a common noun via some figurative process (i.e., becomes an eponym). Thus we write "She met her Waterloo" and "She put on her Mae West" though we use lower-case as the connection becomes more obscure, as in *quisling* and *casanova*.

Indeed, in ordinary, nonlegal parlance it is misleading to describe OSCAR and ACADEMY AWARD as "famous marks," since their trademark status, like that of IVY LEAGUE, say, is not obviously a matter of common knowledge. They are marks, and they are famous, but that is not the same thing: it is like describing Hulk Hogan as a "famous Democrat."

to its marks. While these uses of *Oscar* and *Academy Award* are both historically derived from the Academy Awards of the AMPAS, they have distinct references which are wholly independent of the AMPAS awards and ceremonies. Analogously, when we speak of a product launch as D-Day or a product's failure as a company's Waterloo, we use terms in senses that are derived from the names of famous battles, but we are not referring to those battles; i.e., saying something about them.

28. Note moreover that both *Oscar* and *Academy Award* are often used figuratively to mean simply a prize in sentences like "TO [football player Terrell Owens] deserves an Academy Award for being a crybaby" and "[Porn star] Traci Lords deserves an Oscar for being the biggest bullshit artist this side of Mars," where no actual award is involved. These latter uses provide further evidence for the genericness of the words, though they are obviously less likely to occur in domain names.[30]

29. Here again there is no question of the sites being seen as informationally comparable. No one would imagine that the AMPAS's site would be providing information about awards for real estate, disc jockeys or pets, or even for Bollywood films—or conversely, that a site associated with any of these awards would be sponsored by the AMPAS. (After all, most people are aware that there is no Oscar category for best dog, best dj, or best housing subdivision.) And here again, the sites are unlikely to come up in the same searches or appear in the same website directories.

### Identity of Reference: Incomparables and Implausibles

30. We come finally to the fourth type of similarity that figures in the domain names that Plaintiff has identified as infringing, cases where the challenged url not only contains the Plaintiff's mark but uses it to refer to the things to which Plaintiff has attached it—that is, where the strings [oscar] and [academyaward] will be reasonably interpreted as referring to the awards and ceremony sponsored by the AMPAS. Unlike the names I have been discussing up to here, these names, which we can classify as coreferential, may come up in the same search context as the AMPAS sites, depending on the explicitness of the search.

---

[30] http://goo.gl/Njfv1; http://goo.gl/HPzQK

31. It does not follow from that, however, that they are likely to be confused with Plaintiff's. For one thing, the websites may not be informationally comparable to Plaintiff's (again, as judged by a seeker considering only their domain names). I cited earlier the example of oscargossip.com, on the basis of which url one would assume (correctly, as it happens) that the site provides gossip and rumors about Hollywood celebrities—e.g., "Colin Farrell Feared Sobriety"—which is not the sort of thing for which one would go to the "official" Oscars site, whatever minimal accommodation it actually makes to that interest (see above fn.6). Nor would we expect that the information on the AMPAS sites would be comparable to that offered at sites named academyawardbuzz.com and oscarsnubs.com, also among Plaintiff's "infringing" urls, or with the information at about the odds of various outcomes, and perhaps the opportunity to wager, that we would expect to find at the "infringing" urls oscarbets.com or betoscars.com. Then there are various domain names that we would associate with the merchandizing of goods and services that we would not expect AMPAS to be in the business of providing, such as oscarhotels.net, oscarsgoodiebags.com, oscartravelweb.com, traveloscars.com, and oscardvd.com, and oscarawardbooks.com.[31] None of these is likely to be confused with the AMPAS sites.

32. There is another set of domain names that Plaintiff deems "infringing" that we can think of as "implausibles." In these, the terms *oscar* and *academy award* can be assumed to denote the AMPAS awards, and there is no restrictor or modifier that explicitly indicates that they answer to an informational interest that one would not expect to be satisfied by the information at the AMPAS sites (as with "buzz," "bets" and so on). For various reasons, however, a seeker would find it implausible that these would in fact be the "official" AMPAS sites. Take the urls globeacademyawards.com and globeacademyaward.com. It is not exactly clear what a seeker would take from those names, which presuppose some confusion between the Oscars and the Golden Globes. The names might in fact draw traffic, but one

---

[31] The MPAA does in fact offer about a dozen books and catalogues for sale at its Oscars.org site, none about the Academy Awards. But the determination here rests on user expectations, and even if we were concerned with what the AMPAS sites actually provide, these few offerings wouldn't justify associating the Academy with the domain name oscarawardbooks.com.

would not expect the Academy itself to use a domain name that could be construed as validating this confusion of the two awards. (The site oscarandemmy.com might also presuppose such a confusion, or might simply suggest that it covers both awards: in either case, it is not plausible that the AMPAS would use such a domain name for its Academy Awards site, which contains nothing about the Emmys.) Similarly, it is hard to see why the AMPAS would use urls as theoscarsornot.com, oscardoesitagain.com, oscarsmile.com or myoscarcollection.com, which introduce content that seems extraneous to what one assumes to be the AMPAS interests.

Note that none of this means that the AMPAS could not decide to use such names for its sites, for whatever reason. But a third party who was trying to deceive seekers about the sponsorship of his or her site would have no incentive to use a domain name that was not a likely name for the site from which traffic was to be diverted. It is in the nature of deception that its representations must be plausible: a real gun can look like an umbrella or a pool table, but a fake gun has to look like a gun.

33. One further consideration is relevant here. In the "Saving Clause," Section 3008, the ACPA specifically references Lanham Act § 43(c)(4), which stipulates that "forms of news reporting and news commentary" are exempt from action on free speech grounds. I am not in a position to speak to the legal interpretation of this clause. But many of the sites I mentioned above would obviously qualify under this category, assuming for these purposes, as the statute obliges us to do, that their domain names are fair descriptions of the information they contain. Thus if the site academyawardbuzz.com does in fact contain rumors about the awards, as the user would expect from its url, it is providing news commentary. In fact it is no different from any of the hundreds of newspaper and magazine features bearing a heading such as "Oscar Buzz" or "Academy Awards: the Inside Scoop."

34. This point is relevant to the final set of domain names on Plaintiff's list of "infringing" sites. These have the following properties: They contain the string [oscar] or [academyaward], which is construed as making actual reference to the (AMPAS) Academy Awards; they contain no restrictor or modifier that explicitly indicates that they answer to an informational interest that one would not expect to be satisfied by the information at the AMPAS sites (as with "buzz," "bets" and so

on); and they are not on the face of things implausible candidates for the AMPAS own domain name.

35. The names in this group include oscars-2011.com, 2011oscars.com, academyawards2012.net, oscarnominations2011.com, 2013oscars.net, hollywoodoscar.com, oscarredcarpet.com, theoscars.co and perhaps others.[32] One question one must answer here, though, involves the point I made in § 15 in connection with the various sites associated with the San Francisco 49ers: the sponsors of sites dealing with a particular topic have an interest in using the name of the topic in their domain names, not in an effort to deceive seekers about the sponsorship of the site, but simply to inform them about its contents. In fact, as I noted, the sponsors of such sites very often have an interest in not being confused with the "official" site of the event or locus of interest, since they are in the business of providing information that the official site presumably can't provide as well. In many of these cases, moreover, the sponsors of the official site will welcome the activities of these sites, since they serve to promote the event or organization. Unlike other forms of commerce, the provision of information is not necessarily a zero-sum game.

36. Such sites can provide background and commentary that complements the offerings of the AMPAS sites. In this regard they differ only in tone from the coverage of the mainstream media, but are clearly distinct from the coverage at oscars.com. After the announcements of the 2012 Academy Award nominations on January 10, 2013 , for example, the oscar.com site offered only a list of nominees, and a window on the twitter feeds for #Oscar and #Oscarnoms, which were not exceptionally authoritative or informative:

---

[32] There are other items in the lists of "infringing" domains names provided by Plaintiff which satisfy the criteria I have mentioned here, but which are increasingly implausible candidates to be AMPAS' own domain names. Nor can one come up with a plausible reason why the Academy would register names like thinkquickoscar.com, oscardoesitagain.com, andtheoscargoestothehangover.com, or oscarclaim.com, among many others on Plaintiff's lists. I have not tried here to definitively classify each of the hundreds of domain names on these lists. Some names are ambiguous or opaque, and "confusability" is a gradient notion, though a very large proportion of the "infringing" domain names are clearly far outside its scope.

BlackWomenUnchecked @BlkWmnUNchecked Beyond ecstatic for Quvenzhane Wallis who killed it in "Beasts of Southern Wild" #OscarNoms

KristaSmith So now that #OscarNoms are out What your favorite movie?

Joanne Leung @jojocake I'm also a bit choked that The Sessions only got one nomination. It's such a beautiful (and funny) film! #OscarNoms

Sheena Medina @SheenaMedina In case you all were seriously wondering... catherine bigelow > ben affleck #BiggestSnub #OscarNoms

Rebecca Stanley @IamBeccaStanley "I just sent them a picture of Obama on a unicorn with a rainbow saying 'Congratulations." -Jennifer Lawrence #OscarNoms

Joanne Leung @jojocake It makes me sad that Life of Pi got so many #OscarNoms because I know I'll never watch it, thanks to the whale.

In fact the AMPAS site contained no reference to any of the aspects of the nominations that the media coverage was most focused on, such as the "snubs" of Ben Affleck, Kathryn Bigelow and Quentin Tarantino for Best Director and of Leonard DiCaprio and Samuel Jackson for Best Supporting Actor, the telecast's declining viewership, to which many attributed the choice of Seth McFarlane as host, or the significance of the selection of independent movies like *Amour* and *Beast of the Southern Wilds*.[33]

37. By contrast, the story in the Carpetbagger blog at the *New York Times* included passages like the following:

> ...the shocker was a triple snub in the best director category: Kathryn Bigelow("Zero Dark Thirty"),Ben Affleck ("Argo") and Quentin Tarantino ("Django Unchained") were passed over despite widespread expectations that one or all of them would be nominated....

> ...Mr. Spielberg's "Lincoln" was considered the picture to beat, and it led the field with 12 nominations. It remains to be seen, however, if "Lincoln" will end up more like "The Artist," which last year established dominance (with help from its cheery Jack Russell terrier co-star, Uggie) and won best picture, or Mr. Spielberg's own "Saving Private Ryan, "which seemed to lead through much of the 1999 awards season but lost out to "Shakespeare in Love."

---

[33] It is a sign of the irrelevance of the content of the AMPAS sites to the focus of media and water-cooler interest in the awards that the word *snub* does not appear anywhere on the sites oscars.com or academyawards.com. By contrast, a search of recent media stories at Google News on **snub oscar OR "academy awards"** on the day after the announcement of the 2012 nominees produced 354 results (see Exhibit B).

The nominations were announced at the Academy's Beverly Hills headquarters in an early-morning ceremony that paired the actress Emma Stone with the host of this year's Oscar telecast, Seth MacFarlane. The unusual inclusion of Mr. MacFarlane, creator of the animated television show "Family Guy," was an effort by the Academy to increase his public profile. Only once before (in 1972, when Charlton Heston did it) has a host announced nominees.

Mr. MacFarlane worked hard to squelch skepticism about his selection as host and to hint at what will come on Oscar night, cracking a series of one-liners that mocked the self-seriousness of the Oscars and the craft of moviemaking. The directing nominees, he said, are "the very best at sitting in a chair and watching other people make a movie." Of the foreign film "Amour," he said, "The last time Austria and Germany got together and co-produced something, it was Hitler." (Cue nervous laughter from the 400 or so reporters in the room.) [34]

The *Times* story attracted some 200 chatty and engagingly snarky comments. At the *New Yorker*'s site, Richard Brody's post began:

The exemplary fact of this year's Oscar nominations is the acknowledgment of "Beasts of the Southern Wild" in four major categories (Best Picture, Best Actress, Best Director, and Best Adapted Screenplay). The independently-produced film is Benh Zeitlin's first feature; he was under thirty when he made it, on a budget estimated at $1.8 million, and it made its première last January at Sundance. The very fact that the Academy is aware of its existence, let alone considers it for its highest honors, is a sign of an industry that is more fluid than ever—and of a time when the studios often function as distributors and the field of production is wide open to grassroots newcomers. But the movie itself is this year's "The Help," a romanticized and mythologized vision of poor Southern blacks (in this case, a father and daughter in a Louisiana bayou community called the Bathtub) that also sentimentalizes the very notion of self-help ("The Self-Help") in a story that spotlights a tough, poetic, independent-spirited child facing dangers in aquatic adventures (well, "Life of Pi" also fared well in the nominations).[35]

Needless to say, nothing of comparable interest was available at the oscar.com site, and it's a fair bet that no one, and certainly not Academy members, relied primarily on that site to satisfy their interest and curiosity about the nominations; they went instead to the far more complete, authoritative and lively coverage at sources like the *New York Times,* the New Yorker, the *Los Angeles Times,* and the *Hollywood*

---

[34] http://carpetbagger.blogs.nytimes.com/?p=30657

[35] http://goo.gl/F7GfD

*Reporter*, not to mention thewrap.com and perezhilton.com—and most likely a few of these.

38. In the event, the actual sites at domain names like 2011oscars.com may be more or less useful to someone seeking background and buzz about the awards. Some may have minimal content and be aimed simply at collecting clicks on ads. Even in that case, however, their sponsors have no particular interest in having their sites confused with the AMPAS sites, rather than in being taken as independent gossip or celebrity sites, which is presumably what most seekers are after. That is, in the words of Section 43(d)(1)(B)(i), the sponsor presumably has no "intent to divert consumers from the mark owner's online location...."

## Conclusion

39. I conclude that Plaintiff has interpreted "confusing similarity" in an excessively and at times absurdly broad way, so as to include many domain names that could not plausibly be confused with Plaintiff's mark. In particular, Plaintiff has included in its list of "infringing" names:

> Names that contain strings of characters which coincide with Plaintiff's domain names, but which do not constitute independent linguistic expressions;

> Names in which Oscar is clearly a part of a personal or business name that is wholly and manifestly irrelevant to the Academy Awards; and

> Names in which the terms Oscar and Academy Award are clearly used in a long-established generic sense.

40. Moreover, even when the domain names described as "infringing" use the terms Oscar or Academy Award to denote the AMPAS awards and events, they frequently suggest a purpose (as providing gossip or purveying goods) that is inconsistent with the Academy's presumed object or take a form that the Academy would be unlikely to use as a domain name for its own sites. Hence they would not be used by someone with the intention of deceiving people into believing they had hit upon the Academy's own site. In an attached appendix, I have classified the domain names that Plaintiff has deemed "infringing" according to these categories.

41. Furthermore, even when domain names cannot be excluded as possible names for AMPAS sites (as, e.g., 2011oscars.com), the names would be chosen to inform seekers about the content of the sites, rather than deceive them into thinking they are the sites of the AMPAS, since seekers know that it is in the nature of the purpose of the AMPAS sites that they will not provide the kind of information about the awards (such as about snubs, surprises, and scandals) that they are most interested in. Thus there is no reason to suppose that they were intended to divert consumers; on the contrary, such diversion would be counter-productive to the site's sponsors.

_Geoffrey Nunberg_                                   Jan. 14, 2013

Geoffrey Nunberg

**Appendix**

# Appendix: Classification of Some Domain Names Designated by Plaintiff as "Infringing"

The following lists classify marks Plaintiff has described as "infringing" according to the categories described in this report.

**String identity:** The url contains a string of characters identical to one of Plaintiff's marks, but the string does not correspond to a linguistic unit:

> coscaraudiosales.com, doscarlos.net, uncleleoscarshop.com

**Name identity:** The url contains an instance of the name Oscar, or a name containing the string [oscar], which is most plausibly interpreted as unconnected to the Academy Awards.

> derekoscarsen.com, moisesoscar.com, oscarandeden.com,oscarandrew.com,
> oscarbetancur.com, oscardow.com, oscarhicks.com, oscarhicks.net,
> oscarjaffe.com, oscarlarson.com, oscarmak.com, oscarmonsalves.com,
> oscarnelson.com, oscarpardo.com, oscarpaul.com, oscarrapp.com,
> oscarramirez.com, oscarsantollala.com, oscarsdiscountedonlineprices.com,
> oscarsdressregistry.com, oscarseaton.com, oscarsenn.com, oscarsoto.com,
> oscarspear.com, oscarunruh.com, oscarwalters.com, oscarwelch.com,
> oscarwelch.net, oscarylalo.com, theoscarbody.com,
> makingtheroundswithoscar.com, roundingwithoscar.com, rounding-with-
> oscar.com[36]

**Generic uses of *Oscar* and *Academy Award*:** The words *oscar* and *academyaward* in the url are most plausibly interpreted in the generic sense that the *Oxford English Dictionary* defines as "Any award for outstanding performance or achievement":

> aksarbenoscars.com.[37], app-oscars.com, apps-oscars.com, appsoscars.com,
> bollywoodoscarawards.com, d-j-academyawards.com, dogacademyaward.com,
> greenoscar.com, imageoscar.net, imageoscars.com,
>
> internetacademyawards.com, officeoscars.com, oscars4re.com,
> oscarworthymansion.com, textileoscars.com, textileoscars.net,

---

[36] The last three presumably reference David Dosa's 2011 bestselling book *Making the Rounds with Oscar: The Extraordinary Gift of an Ordinary Cat.*

[37] "ak-sar-ben" is a soubriquet for Nebraska used in the name of a fraternal order and in other contexts.

thefantasyoscars.com, theimageoscars.com, theliquidoscars.com,
thelocationoscars.com, theoscarsxxx.com, themormonoscars.com,
traveloscars.com, traveloscar.com, traveloscars.net, theoscardotcom.com,
theocarsatlanta.com, theoscartour.com, thinkoscar.com. thinkoscar.net,
voteoscarads.com, oscarcinemas.com,

collegiateacademyawards.com, metaverseacademyawards.com,
petacademyawards.com, socialmediaacademyawards.com,
virtualworldacademyawards.com, webacademyawards.com,
wormacademyawards.org

**Coreferential Incomparables and Implausibles:** The term *oscar* or *academyaward* in the url is
most plausibly interpreted as referring to the AMPAS Academy Awards, but on the most
plausible reading of the entire url, the purpose or content of the site is inconsistent with the
information presumably provided by oscar.com (incomparables). Or it is implausible for one
reason or another that the AMPAS would use the url for its own site, so that the name would not
serve the purposes of someone trying to divert traffic from the AMPAS site.[38]

globeacademyawards.com, globeacademyaward.com,
theworldawardacademy.com, theworldawardacademy.org, bootlegoscars.com,
futureoscarwinner.net, homevideooscars.com, myoscarcollection.com,
myoscarcollection.net, myoscarcollectionnow.com, oscarrun.com,
oscarsfantasy.com, oscargoodiebags.com, oscarsgoodies.com,
oscarshomemovies.com, oscarhotels.com, oscarsliveblogging.com, oscarsnub.com,
oscartel.com, oscartheaters.com, oscartravelweb.com, oscarwear.net,
oscarwinnerscommunity.com, oscarandemmy.com, oscarawardbooks.com,
oscarbets.com, oscarclaims.net, oscarclaim.com, oscardoesitagain.com,
oscardvds.com, oscargoodies.com, oscarhope.com, oscari.com, oscari.net, oscar-
int.com, academyawardsbuzz.com, oscarguru.com, oscargiftingsuite.com,
oscarsmile.com, theoscarguru.com, theoscarornot.com, theoscarsornot.com,
oscarchallenge.com, oscarchallenge.net, oscardvd.com, oscarnightdresses.com,
oscarwhimper.com, oscarwhimper.net, oasinoscar.com, oscartweets.com,
oasinoscar.com

---

[38] It is not always easy to determine in which category a domain name should be placed. Thus
theoscarbody.com might be the name of the site of an automobile repair shop owned by someone
called Theo (there are in fact car shops with such a name in Pennsylvania, New York, Arkansas,
and Hawaii). Or it might mean "the oscar body," though the import of that isn't clear (a fitness
center? sexy actresses?). One way or the other, though, it is highly implausible that it would be
the name used by the AMPAS for its own site—certainly no seeker would make that assumption.

**Exhibit A**

# Geoffrey D. Nunberg

Curriculum Vitae
March, 2012

School of Information,
South Hall
University of California at Berkeley
Berkeley CA 94720
nunberg@ischool.berkeley.edu
510-643-3894
http://people.ischool.berkeley.edu/~nunberg/

**Education:**

| | |
|---|---|
| 1972-1977 | Department of Linguistics, Graduate Center, City University of New York. January 1978: Ph.D. awarded |
| 1971-1972 | Department of Linguistics, Graduate School of Arts and Sciences, University of Pennsylvania. 1972: M.A. awarded |
| 1969-1971 | School of General Studies, Columbia University. 1971: B.A. awarded |
| 1962-1964 | Columbia College, Columbia University |

**Positions:**

| | |
|---|---|
| 2005- | Adjunct Full Professor, School of Information, University of California at Berkeley |
| 2004 | Visiting lecturer, School of Information Management and Systems, University of California at Berkeley |
| 2002-2003 | Marta Sutton Weeks Fellow, Stanford Humanities Center |
| 2001- | Senior Researcher, Center for the Study of Language and Information, Stanford University |
| 1999 | Fulbright Distinguished Chair, University of Naples |
| 1986-2001 | Xerox Corporation, Corporate Research and Technology. 1995-2002, Principal Scientist, Xerox Palo Alto Research Center 1993-1995. Senior Research Scientist, Rank Xerox Research Centre, Grenoble, France |
| | 1986-1993, Senior Research scientist, Xerox Palo Alto Research Center |
| 1988-present | Consulting Full Professor, Department of Linguistics, Stanford University |
| 1980-1985 | Visiting Assistant Professor, Department of Linguistics, Stanford University. Researcher, Center for the Study of Language and Information |
| 1979-1980 | Assistant Professor, Department of Linguistics, U.C.L.A. |
| 1978-1979 | Fulbright Lecturer, University of Rome |
| 1977-1978 | Postdoctoral Fellow, Institute for Human Learning, University of California at Berkeley |
| 1976-1977 | Instructor, Department of English, Brooklyn College of C.U.N.Y. |

1975-1976     Instructor, Department of Anthropology, Hunter College of C.U.N.Y.

**Other Affiliations:**

2009     Member of Faculty, Linguistic Society of America Summer Institute, University of California at Berkeley

1984-2001     Associate, Center for the Study of Language and Information, Stanford University

1992-present     Membre Associé, Institut Jean Nicaud (Centre de Recherche en Epistémologie Appliquée) (CNRS), Paris

1991     Member of Faculty, Linguistic Society of America Summer Institute, University of California at Santa Cruz

1999-present     Member of Board of Trustees, Center for Applied Linguistics

1999-2002     Member of Steering Committee, Coalition for Networked Information

1998-2003     Member of Scientific Board, Università degli Studi, San Marino

1998-2002     Member of Advisory Board, Ecole Nationale des Sciences de l'Information et des Bibliothèques, Lyon.

1987-1995     Affiliated Research Scientist, Institute for Research on Learning, Palo Alto, California

**Fellowships, Grants, Awards, and Special Lectureships:**

2007-08     Townsend Fellow, Townsend Humanities Center, University of California at Berkeley

2002-03     Martha Sutton Weeks fellowship, Stanford Humanities Center.

2002     Fellow, Council of the Humanities, Princeton University.

1999     Language and the Public Interest Prize, Linguistic Society of America

1998-99     Fulbright Distinguished Chair, University of Naples

1998     Harry Ransom Distinguished Visiting Humanities Professorship, University of Texas

1989     Xerox Corporate Research Group Award for Excellence in Science and Technology

1977-78     NIMH Postdoctoral Fellowship, Institute for Human Learning, University of California, Berkeley

1976-77     NSF Dissertation Grant

**Areas of Specialization**

Linguistics and Natural Language:

     Semantics and pragmatics, lexical semantics and lexicography

     Structures and genres of written language

     Normative grammar and language criticism

     Language policy (US and comparative)

     Text classification technologies

     Language and politics

Technology and communication (history and theory)

**Courses Taught**

Graduate and undergraduate courses in semantics and pragmatics, language policy, discourse analysis, structure and history of English, language and literature, language and politics, cultural implications of digital technologies, history of information technologies

**Books and Monographs:**

*Ascent of the A-Word,* to appear from PublicAffairs, July 2012.

*The Years of Talking Dangerously*, PublicAffairs, 2009.

*Talking Right,* PublicAffairs. 2006.
   Named as one of the ten best nonfiction books of 2006 by *Washington Monthly*. Hungarian edition, 2009.

*Going Nucular: Language, Politics, and Culture in a Confrontational Age*. Public Affairs, 2004.
   Named as one of the ten best nonfiction books of 2004 by Amazon.com; one of ten best books of 2004 by the San Jose *Mercury News*; best language book of 2004 by the Hartford *Courant;* one of ten best language books of the year by the *Chicago Tribune* and the *Boston Globe*.

*The Way We Talk Now,* Houghton Mifflin, 2001.

*The Future of the Book.* (ed.). University of California Press. 1996. Published in Spanish as *El Futuro del Libro*, Ediciones Paidos, Barcelona.

*Punctuation: An Exercise in the Linguistics of Written Language*. CSLI and University of Chicago Press, 1990. Reprinted 1995. Second edition, 2001.

*The Pragmatics of Reference* (dissertation) Indiana University Linguistics Club, 1978.

**Selected scholarly Articles, Research, and Shorter Publications:**

What's proper about proper names? (in prep)

On Derogative Words (in prep)

Counting on Google Books, The *The Chronicle of Higher Education Review,* Dec. 16, 2910.

Google's Book Search: A Disaster for Scholars. *The Chronicle of Higher Education Review*, August 31, 2009; reprinted in Spanish in *Texturas* (Spain), Dec. 2009.

Disclosure of Work for Hire. *International Journal of Speech, Language, and the Law*, Volume 16, Number 2, 2010.

The Shadow of Language. *Versus: Review of semiotic studies*, 2009:103.

Thinking About the Government, *The American Prospect*, April, 2005.

Privatization and the English Language, *The American Prospect*, February, 2005.

Indexical Descriptions and Descriptive Indexicals, in *Descriptions and Beyond: An Interdisciplinary Collection of Essays on Definite and Indefinite Descriptions and Other Related Phenomena*, Marga Reimer and Anne Bezuidenhout, eds., Oxford University Press, 2005.

The Internet: A New Babel? in Tony Judt and Denis Lacorne, eds., *The Politics of Language: Language, Nation, and State*. Palgrave, 2004.

The Bloody Crossroads of Grammar and Politics, in Stephen Pinker, ed., *Best Science and Nature Writing, 2004*. Houghton Mifflin, 2004.

The Liberal Label, *The American Prospect*, September, 2003.

The Pragmatics of Deferred Reference, article in *The Handbook of Pragmatics*, Laurence Horn and Gregory Ward, eds. Blackwell, 2003.

Authoritativeness Grading, Estimation and Sorting (with Francine Chen and Ayman Farahat), in Procedings of the Twenty-Fifth Annual International ACM-SIGIR Conference on Research and Development in Information Retrieval, 2002.

Do You Know What it Means to Miss New Orleans? Philology and Semantics: *Linguistics and Philosophy*, 25, 5-6, December, 2002.

Punctuation and Text-Category Indicators (with Edward Briscoe and Rodney Huddleston), chapter of *The Cambridge Grammar of English*, Rodney Huddleston and Geoffrey K. Pullum, eds., Cambridge University Press. 2002.

The Internet Filter Farce. *The American Prospect*, January 1, 2001.

Will the Internet Speak English? *The American Prospect*, March 27, 2000.
Reprinted in the *Guardian*, November 2000.
Reprinted in *The Economics of Language*, ed. D, Lamberton, Edward Elgar Publishing, to appear.

Usage in the *American Heritage Dictionary*, introductory essay to the *American Heritage Dictionary*, Fourth Edition, 2000.

The Persistence of English, introductory essay to the *Norton Anthology of English Literature*, Seventh edition, M. H. Abrams and Stephen Greenblatt, eds., Norton Publishing, 1999.

Les Enjeux Linguistiques d'Internet, *Critique Internationale*, 1999, 4.

Reprinted in *Le Multilinguisme et le Traitement de L'information*, F. Segond, ed., Editions Hermes, 2002.

Will Libraries Survive? *The American Prospect*, November-December, 1998.

L'Avenir des Bibliothèques Numériques. Actes du Colloque, "Le livre a-t-il un avenir?," Doc Forum, Lyon, 1998

Double Standards [the Ebonics controversy] *Natural Language and Linguistic Theory*, 15, 3. 1997.

Lingo jingo: Why English-only is a mistake. *The American Prospect,* July, 1997.
Reprinted in Fred Pincus and Howard Erlich, eds., *Race and Ethnic Conflict: Contending Views on Prejudice, Discrimination, and Ethnoviolence*, Westview Press, 1988.
Reprinted in Rebecca Wheeler, ed., *Language Alive*, Praeger, 1998.
Reprinted in Barbara Mori, ed. *STAND: Race and Ethnicity*, CourseWise Publishing, Bellevue, Ia, 1999.

Automatic Classification of Genre (with Hinrich Schütze and Brett Kessler), Procedings of The Annual Meeting, Association for Computational Linguistics, 1997.

L'Amérique par la Langue. *Cahiers de Médiologie*, April, 1997.

The View from Section Z [Linguistics as a science] Natural Language and Linguistic Theory, 14, 2. 1996.

Snowblind [On linguistic relativism]. *Natural Language and Linguistic Theory*, 14, 1. 1996

Farewell to the Information Age, in *The Future of the Book*, Geoffrey Nunberg, ed., University of California Press, 1996.

Gimcrack nation [Electronic discussion lists] *Natural Language and Linguistic Theory*, 13, 4. 1995.
Reprinted (as "To Delete or Not to Delete") in *Lingua Franca*, January, 1996.

The Future of Multilingualism and Multilingual Technologies (with Annie Zaenen). In *Computational Linguistics in the Netherlands*, 1995.

Les Langues du Discours Electronique. In Actes du colloque "Langues et Sciences en Europe", Roger Chartier and Pietro Corsi, eds., Ecole des Hautes Etudes en Sciences Sociales, Paris, November 1994.
Reprinted in *Alliages*, December 1995.
Reprinted in Italian, as Impiglati nella rete, *Sapere*, June, 1995.

Angels in America [Linguistic nativism], *Natural Language and Linguistic Theory*, 13, 2. 1995.

Meanings and Theories. In J.Klavans, ed., Procedings of AAAI Symposium on the Lexicon, March 1995.

A Touch of Crass: The popularizers we deserve, *Natural Language and Linguistic Theory*, 13, 1, 1995.

Transfers of Meaning. *Journal of Semantics*, Winter, 1995.

Les Téléthèques. In Actes du Colloque "Va-t-on vivre par l'écran interposé?", Institut National de l'Audiovisuel, Paris, 1994, ed. Régis Debray.

Idioms (with Ivan Sag and Thomas Wasow). *Language*, 70: 3, September, 1994.

The Places of Books in the Age of Electronic Reproduction. *Representations* 24, Spring, 1993.
Reprinted in *Future Libraries*, R. Howard Bloch and Carla Hesse, eds., University of California Press, 1994.

Indexicality and Deixis. *Linguistics and Philosophy*, 16: 1, 1993.

Text, Form, and Genre. Screening Words: Proceedings of 8th Annual Conference of Waterloo Center for the New OED, University of Waterloo, 1992

Systematic Polysemy in Lexicology and Lexicography (with Annie Zaenen). Hannu Tommola, Krista Varantola, Tarja Salmi-Tolonen and Jürgen Schopp, eds., Proceedings of Euralex II, University of Tampere, Tampere, Finland, 1992.
Reprinted in French translation in *Linguistique Française*, June, 1996

Two Kinds of Indexicality. Chris Barker and David Dowty, eds. Semantics and Linguistic Theory II, Ohio State, 1992.

Usage in the Dictionary. Introduction to the *American Heritage Dictionary*, Third Edition. Houghton Mifflin, 1992.

Reimagining America. James Crawford, ed. *Language Loyalties. A Sourcebook on the Official-Language Movement*. The University of Chicago Press, 1992.

The Official-English Movement. Karen Adams and Daniel Brink, eds., *Perspectives on Official English*, New York: Mouton, 1990.

From Criticism to Reference. *International Journal of Lexicography*, 3:1. 1990.

The Field of Linguistics. Publication of the Linguistic Society of America, 1990.

Indexicality in Contexts. Xerox PARC Tech Report, 1990.

What the Usage Panel Thinks. L. Michaels and C. Ricks, eds., *The State of the Language. University of California Press*, 1990.

Linguists and the Official Language Movement. Language, 66:3, September, 1989.

Common-Sense Semantics and the Lexicon. Proceedings of the Third Conference on Theoretical Issues in Natural-Language Processing, 1987.

Prosaic and Poetic Metaphors. Proceedings of the Third Conference on Theoretical Issues in Natural-Language Processing, 1987.

Contextualizing Individuation: "The same F." Papers from the Third West Coast Conference on Formal Linguistics, CSLI Publications, Stanford University, 1984.

Idioms: An Interim Report (with Thomas Wasow and Ivan Sag). Proceedings of the Plenary Sessions, XIII[th] International Congress of Linguists. Tokyo, 1982.

English and Good English. Introduction to *The American Heritage Dictionary*, Second College Edition. Boston: Houghton-Mifflin, 1982.

Validating Pragmatic Explanations. P. Cole, ed., *Radical Pragmatics*. New York: Academic Press, 1981.

The Reversal of a Reported Merger in Eighteenth-Century English. W. Labov, ed., *Locating Language in Space and Time*. New York: Academic Press, 1980.

Upper-class Speech in New York City. T. Shopen, ed., *Variation in the Structure and Use of English*. Boston: Newbury, 1980.

The Non-uniqueness of Semantic Solutions: Polysemy. *Linguistics and Philosophy*, 3:1, 1979.

Slang, Usage-conditions and l'Arbitraire du Signe. Papers from the Parasession on the Lexicon. Chicago: Chicago Linguistics Society, 1978.

Inferring Quantification in Generic Sentences (with Chiahua Pan). Proceedings of the Eleventh Annual Meeting, Chicago Linguistic Society. Chicago: Chicago Linguistics Society, 1975.

Syntactic Relations in Types and Tokens, in Proceedings of the Tenth Annual Meeting, Chicago Linguistic Society. Chicago: Chicago Linguistics Society, 1974.

Two Problematic Mergers (with William Labov). W. Labov, M. Yaeger, and R. Steiner, *The Quantificational Study of Sound Change in Progress*. Philadelphia: U.S. Regional Survey, 1974.

**Selected Book Reviews:**

Review of *The You Are What You Speak*, by Robert Lane Green, *The New York Times* Book Review, April 1, 2011.

Review of *The Information*, by James Gleick, *The New York Times* Book Review, March 18, 2011.

Review of *The Power of Babel*, by John McWhorter, the Los Angeles *Times* Book Review, February 24, 2002.

Review of *Language and the Internet*, by David Crystal. *Nature,* January 15, 2002..

Review of *The Scientific Voice,* by Scott Montgomery, *Science*, September 20,1996. Reprinted in Katherine Livingstone, ed., *Scientifically Yours*. Groupe Lavoisier, Paris, 1997.

Story time (commentary on "About Design," by J. S. Brown and Paul Duguid). *Human-Computer Interaction*, Winter, 1994.

Review of *Language of the Underworld*, by David Maurer. *The New York Times Book Review*, April 9, 1982.

Review of *The Psychology of Literacy*, by Sylvia Scribner and Michael Cole. *The New York Times Book Review*, December 13, 1981.

Review of *Beyond the Letter*, by Israel Scheffler. *The Philosophical Review*, 1981:2.

Review of *Forms of Talk*, by Erving Goffman. *The New York Times Book Review*, March 10, 1981.

**Electronic Publications:**

Time line of the history of information, for the Encyclopedia Britannica, CD-ROM version.

The Field of Linguistics: Web project for the Linguistic Society of America. Co-editor, with Thomas Wasow. See http://www.lsadc.org/flxtitlepg.html

Regular contributor to the blog Language Log and *The New Republic*'s Open University blog.

**General-Interest Articles and Regularly Appearing Features:**

Regular op-ed pieces, *Los Angeles Times*, 2006-2007.

Regular commentaries on language and politics, Sunday *New York Times* Week in Review section, 2002-2006

Regular language commentaries, "Fresh Air," National Public Radio, 1989-present. Individual "Fresh Air" pieces published in various magazines in US and Europe.

Regular "Letter from America" features, BBC4, 2004-2005

Bimonthly features on language and the law for *California Lawyer*, 2000-2002

"Topic... Comment." Quarterly column, *Natural Language and Linguistic Theory*. 1994-1998.

Other commentaries and opinion pieces in the *Washington Post*, the *Los Angeles Times*, the *San Jose Mercury News*, *Newsday*, the *San Francisco Chronicle*, and the *Chicago Tribune*.

General interest articles in *The Atlantic*, *Forbes ASAP*, *Fortune*, *American Lawyer*, and *The American Prospect*.

A number of these articles and commentaries are available at my Web pages at http://www-csli.stanford.edu/~nunberg

**Patents and Patent Applications:**

A method of determining the authoritativeness of texts using surface features of untagged texts, with Francine Chen and Ayman Farahat. US Patent application, 2002. (3 separate patents)

A method of automatically determining text genres using surface features of untagged texts, with Hinrich Schuetze. US Patent application, 1997.

Processing natural-language text using autonomous punctuational structure (first-named applicant, with Curtis Abbott and Brian Smith). US patent application 07/274,158 (1990) (Patent granted March 1991).

A method for manipulating digital data [natural-language structure editor] (first-named applicant, with Tayloe Stansbury, Curtis Abbott, and Brian Smith). European patent application 89312093.1-. (1989).

**Selected Presentations:**

On Having a Word, Humanities Center, University of Chicago, Nov. 3, 2011.

Slurs without Semantics, Semantics Workshop, University of Chicago, Nov. 4, 2011. Also at CNRS conference on Context and Interpretation, Cérisy-la-Salle, France, June, 2011.

What Future for the Book? UNESCO Conference on the future of the book, Monza, Italy, June, 2011.

How the Language of Politics is Different, Distinguished Lecture, Symbolic Systems Program, Stanford University, May 3, 2010.

Google Book Search: The Metadata Problem, Conference on Google Books, UC Berkeley, August 28, 2009.

Electronic Philology, Computers and the Humanities Lecture Series, Brandeis University, March 6, 2009.

Spatializations of Digital Discourse, Radcliffe Institute for Advanced Study, Harvard University, March 5, 2009.

"Bad Words: Expressives and Demonstrations," invited talk, Institut Jean Nicod (Collège de France), Paris, June 13, 2008.

Vulgar Civilities, Freeman Lecture, University of Massachusetts at Amherst, October 4, 2007.

The Philology of Civility, Yale Humanities Center, October 3, 2007.

The Counsel of Words, Barbara Gordon Lecture, Florida International University, March 5, 2007.

The Future of English, Dean's Symposium Lecture, San Jose State University, April 19, 2007.

Electronic Philology, Glasscock Center for the Humanities lecture, Texas A&M University, April 21, 2007.

What Future for Scholarly Monographs?, keynote talk, International Forum of University Publishing, Guadalajara, Mexico, November 2006.

Determining the Meanings of Words, invited talk, Conference on Language and Law, University of Düsseldorf, Germany, May, 2006.

What it Means to Speak the Same Language, invited talk, Cognitive Science Program, Rutgers University, March 2006.

The Shadow Cast by Language upon Truth, keynote talk, Western Humanities Conference, UC Santa Cruz, Oct. 22, 2004

Linguistic Issues in Trademark Law, invited talk at Midwest Intellectual Property Institute, Sept. 19, 2003.

The Future of Propaganda, McClatchy Lecture, Stanford University Department of Communication, May 10, 2003.

Building the Democratic Brand, presentation to U.S. Senate Democratic Caucus, Democratic Leadership Conference, May 1, 2003.

Language in the Public Eye, plenary talk, American Association of Applied Linguistics, Washington, D.C., March, 2003.

Language Questions and Questions of Language (two lectures), Princeton Humanities Council, November, 2002.

Why "Literacy"? Keynote talk, Conference on "Reading Literacy," Harvard Humanities Center, April 12, 2002.

Can There be an Electronic Dictionary?, invited talk, ATLAN conference, Paris, January 24, 2002.

The Future of Paper, invited talk, Conference on "The Future of Paper as a Communications Medium," Stockholm, March 20-22, 2001.

What Language for the Internet?, Keynote Address, Voice and Technology Forum, Santa Clara, CA December 12, 2000

En Quête de l'Ordre des Livres Numériques, Annual UNESCO Lecture, University of Grenoble, May 10, 2000.

The Order of Electronic Discourse, Invited Address, Victoria Library Association, Melbourne Australia, February 2000.

Languages in a Wired World. Conference on "La politique de la langue," Centre d'Etudes et Recherches Internationales, Paris, October 2, 1998.

The Future of Academic Publishing. Conference on "The Endangered Monograph," Berkeley Humanities Center, April 12, 1998.

Le Papier et les Nouvelles Technologies de l'Impression. Conference on "Le devenir du papier moderne," Bibliotheque Nationale de France, December, 1997.

L'Avenir de la Bibliothèque, DocForum, Lyon, November, 1997.

Individual and Collective Semantics, Conference on the future of semantics, San Marino, November, 1997.

The Compositionality of Idioms, International Congress of Linguists, Paris, July, 1997.

Does Cyberspace have Boundaries? Panel on cyberspace and community. University of Indiana, 1997.

Automatic Classification of Genre (with Hinrich Schütze and Brett Kessler), Annual Meeting, Association for Computational Linguistics, Madrid, 1997.

Variation in Written-Language Category Structure, keynote talk, ACL Workshop on punctuation and written language, Santa Cruz, CA, June 28, 1996.

Does the Book have a Future? Commonwealth Club of San Francisco, (broadcast on C-SPAN) June 4, 1996.

Regular Polysemy and Lexical Representation, plenary talk, Conference on the Lexicon, Courmayeur, Italy, September 6, 1996.

Underdetermination in the Lexicon, invited talk, conference on Lexical Underdetermination, Berlin, October 27, 1996.

Are there Universal Language Rights? Invited talk, Conference on Language Legislation and Linguistic Rights, University of Illinois, to be held March 20-23, 1996.

Language Standards and Language Science. Session on Language Standards and Language Science, Annual Meeting, American Association for the Advancement of Science. To be held February 28, 1996.

The Technologies of Reputation, Keynote talk, Conference on Literature and Libraries, Columbia University, October 27, 1995.

*Maux d'Archive*: Preservation and access in electronic collections, CARL conference on "Retooling Academic Libaries for the Digitial Age," San Francisco, October 21, 1995.

Les Langues du Discours Electronique. Colloquium on *Sciences et Langues en Europe*, Ecole des Hautes Etudes en Sciences Sociales, Paris, November 14, 1994.

The once and Future Dictionary. Conference on Dictionaries and Information Technology, Grenoble, October 17-19, 1994.

Farewell to the Information Age. Conference on the Future of the Book, San Marino, July 28, 1994.

The Future of the Book. Keynote talk, Annual Meeting, American Association of University Presses, Washington, D. C., June 23, 1994.

Information in its Place. Plenary talk, Annual meeting, American Society of Information Science, Portland, May 22, 1994.

Remarques sur les Téléthéques, Conference "Va-t-on vivre par l'ecran interposé?," University of the Sorbonne, Paris, April 15, 1994.

Transferts de Signification, Cognitive Science Seminar, Centre de Recherche en Epistémologie Appliquée, CNRS, Paris, Jan 20, 1994.

The Future of Information, Conference on The Electronic Book: A New Medium?, Grenoble, September 9, 1993.

Meaning and Metaphor, Invited address, Association for Computational Linguistics, Columbus, Ohio, June 20, 1993.

Taking Usage Seriously, Invited talk, Dictionary Society of North America, Las Vegas, May, 1993.

On Predicate Transfer, Invited talk, Conference on Lexical Universals, Dagstuhl, Germany, April, 1993.

Indexicality and Direct Reference, Conference on Context and Interpretation, Berkeley, March, 1993.

Dirty Words. Paper given at Special Session of Dickens Society on "Dirt," Modern Language Association, New York City, December, 1992.

Polysemy in Lexical Description. Conference on Computational Approaches to the Lexicon, Las Cruces, New Mexico; November 2, 1992.

Text, Form, and Genre, 8th Annual Conference of Waterloo Center for the New OED, Waterloo, Ontario, October, 1992.

The Shadow of Rruth, Conference on "Inscribing Grammar on Culture," Clark Library, Los Angeles, October, 1992.

The Compositionality of Phrasal Idioms (with Ivan Sag and Thomas Wasow), Conference on Idioms, Tilburg, Netherlands, September 1992.

Systematic Polysemy in Lexicology and Lexicography (with Annie Zaenen), Annual Meeting of the European Association of Lexicography (Euralex), Tampere, Finland, August, 1992.

Indexicality and Deixis, Conference on the Pragmatics of What is Said, Centre de la Recherche en Epistémologie Appliquèe, Paris, June, 1992.

The Places of Books in the Age of Electronic Reproduction, Conference on Future Libraries, University of California, Berkeley, April, 1992.

Two Kinds of Indexicality, Conference on Semantics and Linguistic Theory, Columbus, Ohio, April, 1992.

Good Grammar and Good Taste: Eighteenth-century prescriptivism and theories of aesthetics, Annual Meeting, North American Association for the History of Linguistic Science, Philadelphia, January, 1992.

Le Varietà della Metafora, Conference on Topics in Semantic Theory, Università degli Studi, San Marino, December, 1991.

The Teaching of Grammar: a historical overview, Special session on Linguistics in the K-12 Curriculum. Annual Meeting, Linguistic Society of America, Chicago, December 28, 1991.

On Document Genres. Xerox Corporation Symposium on the Document, Stamford, CT, April 15, 1991.

Usage and Naturalism, Meeting of American Dialect Society, Atlanta, October, 1990.

Indexicality in Context, CNRS conference on Philosophie et les Sciences Cognitives, Cérisy-la-Salle, France, 1990.

A survey of Prescriptive Attitudes (with Kristin Hanson), Annual Meeting, Linguistic Society of America, New Orleans, 1988.

Linguistic Nationalism in the English tradition, Conference on Language Rights and Public Policy, Stanford University April 17-18, 1988.

American Attitudes toward Second-Language Learning, Annual Meeting, Advocates for Language Learning, San Francisco, 1988.

What the 'English-only' People are After, Colloquium on the Official Language movement, Roundtable Conference on Languages and Linguistics, Georgetown University, 1987.

Common-Sense Semantics and Lexical Information, Third Conference on Theoretical Issues in Natural-Language Processing, Las Cruces, NM, 1987.

Prosaic and Poetic Metaphors, Third Conference on Theoretical Issues in Natural-Language Processing, Las Cruces, NM, 1987.

What we talk about when we talk about grammar, Annual Meeting, National Council of Teachers of English; Detroit, Michigan, 1985.

Some Difficulties for Direct-Reference Theories. Conference on "Themes from Kaplan," Stanford University, April, 1984.

Individuation in Context, Conference on Semantic Theory, Centro Di Studi Linguistici e Semiotici, Urbino, Italy, 1983.

Why there is no syntax of words, Conference on Morphology and Linguistic Theory, Stanford University, 1983.

Idiomaticity in Argumentation for Transformational Grammar, (with Ivan Sag and Thomas Wasow), U.C.L.A. Conference on the Extended Standard Theory, 1982.

'The same F,' NSF-CNRS Seminar on Discourse Comprehension, Cadarache, France, June, 1982.

The Compositionality of Idioms, (with Ivan Sag and Thomas Wasow), Annual Meeting, Linguistic Society of America, New York City, 1981.

The Case for Prescriptive Grammar, Conference on New Ways of Analyzing Linguistic Variation, Ann Arbor, 1981.

*Langue* and Competence: The bases of idealization in linguistics," Colloquium on the Object of Linguistic Theory, Annual Meeting, Linguistic Society of America, San Antonio, 1980.

What do We Mean by 'The Same Language'? Annual Meeting, Berkeley Linguistics Society, 1980.

Deferred Interpretation and Direct Reference, Sloan Workshop on Semantics, Asilomar, California, 1980.

Idealization in syntax and semantics, Conference on Pragmatics, Centro di Studi Linguistici e Semiotici, Urbino, 1979.

La Metafora nel Lessico, Conference on Metaphor, D.A.M.S., University of Bologna, 1979.

Methodology and Explanation in Sociolinguistics, First Berkeley Conference on Sociolinguistics, 1978.

Sociolinguistics and Social History, Conference on Linguistic Variation, S.U.N.Y. at Binghamton, 1976.

Lexical Ambiguity and Referential Indeterminacy, Annual Meeting, Linguistic Society of America, San Francisco, 1975.

The Semantics of Parenthetical Verbs, Annual Meeting, Linguistic Society of America, New York City, 1974.

English Pro-Complementizers, Annual Meeting, Linguistic Society of America, San Diego, 1973.

The Quantificational Study of a Sound Change in Progress: Social and linguistic setting, Summer Meeting, Linguistic Society of America, Ann Arbor, 1973.

**Invited Lectures:**

LINGUISTICS DEPARTMENTS

University of Arizona, 1988, 1997

University of British Columbia, 1992

Cambridge University, 1994, 1998

University of California, Berkeley, 1979, 1987, 1993, 1997, 2006

University of Chicago, 2011

Edinburgh University 2002

Florida International University, 2007

Georgetown University, 1985, 2003

University of Grenoble, 1994

University of Illinois, 1989, 1995

University of Kentucky, 1991

University of California at Los Angeles, 1981, 1989

University of California at San Diego, 1997

Massachusetts Institute of Technology, 1986

University of Massachusetts, 2007

University of Naples, 1999

California State University at Northridge, 2003

Ohio State University, 1993

University of Pennsylvania, 1986, 1992

Pitzer College, 1995

Princeton University, 2002

University of Rome, La Sapienza, 1999

Rutgers University, 2006

San Jose State, 1995

University of California, Santa Cruz, 1984, 1991

University of Southern California, 1987

Stanford University, numerous colloquia

University of Strasbourg, 1993

University of Texas at Austin, 1987. 1998

University of Washington, 2004

OTHER DEPARTMENTS AND PROGRAMS

Max-Plank-Gesellschaft, Arbeitsgruppe Strukturelle Grammatik, Berlin 1996

Cognitive Science Program, University of Illinois, 1989

Cognitive Science Program, University of Edinburgh, 1994
Cognitive Science (ICSC), University of Pennsylvania, 1996
Computer Science, Yale University, 1988
Computer Science, Brandeis University, 2009
Computer Science, University of Brighton, 1998
Computer Science, University of Pennsylvania, 1992
Communications, University of Grenoble, 2000
Communications, University of California at San Diego, 2002
Digital Libraries program, University of California, Berkeley, 1996
Digital Libraries program, Stanford University, 1996
English and Rhetoric, University of Southern California, 1987
English, Frei Universität, Berlin
English, University of California at Irvine, 1985
English, University of British Columbia, 1992
English, University of Michigan, 1986
English, Graduate Center of C.U.N.Y., 1998
English, University of California, Santa Cruz, 1984
English, University of Minnesota, 1979
Humanities Center, University of Chicago, 2011
Humanities Center, Yale University, 2007
Humanities Center, Texas A&M University, 2007
Humanties Center, Harvard University, 2003, 2009
Informatics, University of Edinburgh, 2002
Library Science, University of Texas, 1998
Library Science, University of Arizona, 1997
Library Science, University of California at Berkeley, 1992
Library Science, University of California at Los Angeles, 1999
Library Science, San Jose State, 1994
Library, Stanford University, 1992
School of Information Management and Systems, U. C. Berkeley, 1999, 2003
National Foreign Language Center, Washington D.C., 1988
Natural Language Group, Bell Laboratories, 1985
Philosophy, Stanford University, 1983, 1990
Philosophy, University of California at Berkeley, 1980
Philosophy, University of Bologna, 1980
Psychology, The American University, 1996
Radcliffe Institute for Advanced Study, Harvard University, 2009
Istituto di Psicologia, CNR, Rome, 1979, 1983
CNRS, Groupe de Recherche sur la Cognition, Paris, 1992, 1994, 1998
CNRS, Groupe de Recherche sur les Orthographes et Systèmes d'Ecriture, Paris, 1992
American Association of University Presses, 1994, 1998
DAMS, University of Bologna, 1999

**Conferences, Conference Sessions, and Workshops Organized:**

Panel on Information Access & Freedom in the Digital Age, School of Information, UC Berkeley, March 20, 2012.

Books Tomorrow, UNESCO conference in Monza, Italy, July 5-7 2011, Member of organizing committee.

The future of academic publishing. Workshop at annual meeting of American Association of University Presses, Berkeley, CA, October 14, 1998.

Does the book have a future? University of California, San Francisco, April 23, 1996.

Genre in Digitial Documents. Track of Hawaii International Conference on Systems Science, Maui, Jan 5-7, 1997. Also organized this session for 1998, 1999.

Fencing off the Public Sphere (Envelope technologies and fair use). Xerox PARC, May 5, 1996.

Language Standards and Linguistic Science. Conference session, Annual Meeting, American Association for the Advancement of Science. To be held February 28, 1996.

Conference on the Future of the Book, San Marino, July 28-30, 1994. Co-sponsored by Rank Xerox European Research Centre, Grenoble, and the Center for Cognitive and Semiotic Studies, San Marino. (Co-organizer with Patrizia Violi, University of Bologna.)

Conference on The Electronic Book: A New Medium?, Grenoble, September 9-10, 1993. Co-sponsored by Rank Xerox European Research Centre and the Bibliothèque de France. Also subject of seminar presentation at RXRC inaguration, October 15, 1993.

NSF Conference on Digital Libraries, Xerox Palo Alto Research Center, March 10-11, 1992. (Co-organizer, with David Levy, Xerox PARC, and Y. T. Chien, NSF.)

Workshop on Linguistics and Lexicography, Center for the Study of Language and Information, Stanford University, April 18-19, 1991.

Special session on Linguistics in the K-12 curriculum, Annual Meeting, Linguistic Society of America, Chicago, January 11, 1991. (Co-Organizer with Penelope Eckert, Institute for Research on Learning.)

Conference on Language Rights and Public Policy, Stanford University, April 17-18, 1988. Sponsored by Californians United, ACLU, and NEA. (Co-organizer with Edward Chen, American Civil Liberties Union, and Martha Jimenez, MALDEF.)

**Expert testimony since 2008:**

The Hershey Company et al. v. Promotion in Motion, Inc., United States District Court, District of New Jersey (deposition; 2009)

**Other Professional and Public Activities:**

Townsend Center for the Humanities, Faculty Advisory Committee. 2010-

Member of editorial board, *Representations*, 2008-

Member of Board of Trustees, Center for Applied Lingistics, 1999-2004

Member of Steering Committee, Coalition for Networked Information, 1999-2003

Referee of articles or manuscripts: *Language, Linguistic Inquiry, General Linguistics, Linguistics and Philosophy, Recherches Linguistiques, Natural Language and Linguistic Theory, Philosophical Review, Synthese,* Yale University Press, Cambridge University Press, Stanford University Press, Oxford University Press, University of Chicago Press, MIT Press, D. Reidel, Sage Publishing.

Perennial reviewer for various program committees (WCCFL, SALT, etc.),

Referee of grant proposals: National Science Foundation (sections on linguistics, computer science, AI and robotics, psychology); National Foreign Language Center; National Institute of Mental Health, National Endowment for the Humanities.

Executive Committee, National Coalition for Language Rights (co-founder).

Committee on Political and Social Concerns, Linguistic Society of America, 1990-1997

Usage Editor, *The American Heritage Dictionary*, second edition.

Usage Editor and Chair of Usage Panel, *The American Heritage Dictionary*, third and fourth editions. Ongoing consultancy with Houghton Mifflin.

Host of programs for City Arts and Lectures, San Francisco (broadcast on NPR), 2001-: Interviewees include Eavan Boland, A. S. Byatt, Robert Hass, Maxine Hong Kingston, Michael Ondaatje, Simon Winchester, Tobias Wolff.

Exhibit B

Make Your Pick /

be determined

/ ►
ition

**Life of Pi**
Gil Netter, Ang Lee and David
Womark, Producers

View Trailer / ►
More Information



*- Zero Dark Thirty*

Ben Affleck and
ey, Producers

/ ►
ition

**Lincoln**
Steven Spielberg and Kathleen
Kennedy, Producers

View Trailer / ►
More Information



THE NEW SANTA FE
WITH AVAILABLE 264 HORSEPOWE

*Learn More* ＠ HY

*Build & Price | Locate a Dealer | Schedule a Test Drive | Payment*

Southern Wild
osh Penn and
ald, Producers

/ ►
ition

**Silver Linings Playbook**
Donna Gigliotti, Bruce Cohen and
Jonathan Gordon, Producers

View Trailer / ►
More Information



**OSCAR BUZZ**
—— *Trending Topics* 🐦

01 **Emma Stone**

02 **Pharrell Williams**

03 **Oprah Winfrey**

More on Oscar

ained
eginald Hudlin and
roducers

/ ►
ition

**Zero Dark Thirty**
Mark Boal, Kathryn Bigelow and
Megan Ellison, Producers

View Trailer / ►
More Information



**My Picks**
—— Think you know
Oscar? Create your
ballot and play
with friends

See the List / ►

s
: Fellner, Debra
Cameron
roducers

/ ►
ition



Official Oscars App /
Get the latest news
and other exclusive
content

Download the app / ►

Make Your Pick /

Top ^



Oscar Blog /
Stay on Top of the
Latest Oscar News

Read the Blog / ►



## ACTOR
—— *in a Leading Role*

**Bradley Cooper**
Silver Linings Playbook

View Trailer / ►
More Information

**Joaquin Phoenix**
The Master

View Trailer / ►
More Information

**Daniel Day-Lewis**
Lincoln

View Trailer / ►
More Information

**Denzel Washington**
Flight

View Trailer / ►
More Information

**Hugh Jackman**
Les Misérables

View Trailer / ►



LIVE OSCAR SUNDAY
FEB 24 7@4p

THE
OSCARS

HOME   NOMINEES   PHOTOS   OSCAR BUZZ   VIDEO   BLOGS   MY PICKS   OSC

# OSCAR BUZZ
—— Join the Conversation



○ #OSCAR#NOMS

Tweet #OSCARS

**BlackWomenUnchecked** @BlkWmnUNchecked · 11m
Beyond ecstatic for Quvenzhane Wallis who killed it in "Beasts of Southern Wild" #OscarsNoms
Details          ← Reply  ⇄ Retweet  ★ Favorite

**Krista Smith** @KristaSmith · 11m
So now that #OscarNoms are out What your favorite movie?
Details          ← Reply  ⇄ Retweet  ★ Favorite

**Joanne Leung** @spocake · 25m
I'm also a bit choked that The Sessions only got one nomination. It's such a beautiful (and funny) film!
#OscarNoms
Details          ← Reply  ⇄ Retweet  ★ Favorite

**Sheena Medina** @SheenaMedina · 17m
In case you all were seriously wondering... catherine bigelow > ben affleck #BiggestSnub #OscarNoms
Details          ← Reply  ⇄ Retweet  ★ Favorite

**Rebecca Stanley** @iamRebeccaStanley · 24m
"I just sent them a picture of Obama on a unicorn with a rainbow saying 'Congratulations'" -Jennifer
Lawrence #OscarNoms
Details          ← Reply  ⇄ Retweet  ★ Favorite

**Joanne Leung** @spocake · 25m
It makes me sad that Life of Pi got so many #OscarNoms because I know I'll never watch it, thanks to the
whale.

\\

OSCARS

HOME   NOMINEES   PHOTOS   OSCAR BUZZ   VIDEO   BLOGS   MY PICKS   OSCA

# OSCAR BUZZ
—— Join the Conversation

○   #OSCARS

Tweet #OSCARS

**Sabertooth Tiger** @Conossewd_1a · 11m
Django got nominated for the oscars
Details          ← Reply  ⇄ Retweet  ★ Favorite

**Jessie** @kams · 19m
Jennifer Lawrence loses to Jessica Chastain of Zero Dark Thirty for Best Actress at Critics' Choice
Awards. bad foreshadowing for Oscars?!
Details          ← Reply  ⇄ Retweet  ★ Favorite

**Steven Zeitchik** @ZeitchikLAT · 38m
So is #CCMA pick of Affleck as best director a retort to #Oscars or just really, really weird timing?
@showmp411?
Details          ← Reply  ⇄ Retweet  ★ Favorite

**Subhash Kamath** @Subham · 38m
Our good friend Jayashri Raremath got an #Oscar nomination for best Original Song in #The Life Of Pi. So
very proud of her!
Details          ← Reply  ⇄ Retweet  ★ Favorite

**Matthew Rosenberg** @AsicanPress · 5m
I don't much care about the Oscars or any awards show but I am really happy to see Beasts Of The Southern
Wild got some love
Details          ← Reply  ⇄ Retweet  ★ Favorite

**Keaton J Smith** @KeatonDogSmith · 1m

Behind the Scenes Photos from @TheAcademy        Tweet #Oscars

- In Theaters
- Coming Soon
- Critics' Picks
- On DVD
- Tickets & Showtimes
- Trailers
- ArtsBeat





January 10, 2013, 7:35 am190 Comments

# 'Lincoln' Leads Oscar Field With 12 Nominations

By *MICHAEL CIEPLY AND BROOKS BARNES*



The 2013 Academy Award nominations have been announced. Following is a look at some of this year's nominees.

*Start your Oscar Ballot here.*

View a slide show of nominees here.

LOS ANGELES — Torture. Terror. Mental illness. Revolt. Where's Uggie the dog when you need him?

The 85th Academy Awards season jolted into place on Thursday as the heaviest number of Oscar nominations — including nods for best picture — went to "Lincoln," about a president's struggle with the Civil War; "Life of Pi," about a shipwreck survivor and a tiger; "Silver Linings Playbook," a comedy, of sorts, about a man with bipolar disorder; and "Les Misérables," filled with songs of the oppressed.

THE ACADEMY AWARDS
**MAKE YOUR PICKS**



## Vote for, share and keep track of your Oscar favorites with The Times's interactive awards ballot.

### Start your Oscar Ballot

Close behind were "Argo," about political captivity; "Amour," a French-language film about aging and dying; and "Django Unchained," a tale of slavery and retribution.

"Beasts of the Southern Wild," which chronicles a child's encounters with rising floodwaters in the bayou, and "Zero Dark Thirty," about the murky pursuit of a national enemy, also received best picture nominations.

But the shocker was a triple snub in the best director category:Kathryn Bigelow("Zero Dark Thirty"),Ben Affleck("Argo") andQuentin Tarantino("Django Unchained") were passed over despite widespread expectations that one or all of them would be nominated. Instead, the nominations went toSteven Spielberg("Lincoln"),Ang Lee("Life of Pi"),Michael Haneke("Amour"),David O. Russell("Silver Linings Playbook") and Benh Zeitlin ("Beasts of the Southern Wild,"his first film).

"We didn't destroy the hotel room too badly, but it was definitely a blind celebratory panic that we went into," Mr. Zeitlin said in a telephone interview.

In all, nine films received best picture nominations in a field that can include as many as 10 or as few as 5, depending on how voters from the Academy of Motion Picture Arts and Sciences spread their hand.

Mr. Spielberg's "Lincoln" was considered the picture to beat, and it led the field with 12 nominations. It remains to be seen, however, if "Lincoln" will end up more like"The Artist,"which last year established dominance (with help from its cheery Jack Russell terrier co-star, Uggie) and won best picture, or Mr. Spielberg's own"Saving Private Ryan,"which seemed to lead through much of the 1999 awards season but lost out to"Shakespeare in Love."

The nominations were announced at the Academy's Beverly Hills headquarters in an early-morning ceremony that paired the actress Emma Stone with the host of this year's Oscar telecast, Seth MacFarlane. The unusual inclusion of Mr. MacFarlane, creator of the animated television show "Family Guy," was an effort by the Academy to increase his public profile. Only once before (in 1972, whenCharlton Heston did it) has a host announced nominees.

Mr. MacFarlane worked hard to squelch skepticism about his selection as host and to hint at what will come on Oscar night, cracking a series of one-liners that mocked the self-seriousness of the Oscars and the craft of moviemaking. The directing nominees, he said, are "the very best at sitting in a chair and watching other people make a movie." Of the foreign film "Amour," he said, "The last time Austria and Germany got together and co-produced something, it wasHitler." (Cue nervous laughter from the 400 or so reporters in the room.)

 McCarten/Reuters

Hollywood faces a somewhat longer than usual campaign period. A new digital voting system — despite its reported hitches — allowed the Academy to announce nominees two weeks earlier than it did last year, and more than six weeks before the awards ceremony, which ABC will broadcast on Feb. 24.

"Lincoln" was followed closely in the balloting by "Life of Pi," which surpassed expectations by coming up second with 11 nominations, even as "Zero Dark Thirty," an early favorite, fell into the pack, with just 5.

Mr. Spielberg's directing nomination was his seventh, whileDaniel Day-Lewisreceived his fifth best actor nomination, this time for his portrayal of Lincoln. (He has won twice.)Sally Fieldwas among the "Lincoln" nominees, as a supporting actress for playingMary Todd Lincoln, as wasTony Kushner, for writing the film's adapted script.

All of that, as well as an aggressive promotional campaign that found the film playing as a civics lesson of a sort when it was screened for the United States Senate, has helped create a sense that "Lincoln" is the most important picture in a self-consciously important field.

"You never ever know how these things are going to go, so it's really gratifying," saidKathleen Kennedy, a producer of "Lincoln," who spoke by telephone on Thursday morning. She noted, however, that it was not a perfect day for the "Lincoln" team. "I was very disappointed that our makeup and hair people weren't recognized," she said.

Though no slouch when it comes to importance, "Zero Dark Thirty," about the pursuit ofOsama bin Laden, may have been hurt by controversy, as several senators and a number of political critics tore into the film for the way it portrayed torture.

But Oscar voters gave the film a nomination for Mark Boal's screenplay and nominated its star,Jessica Chastain, for best actress.

All of the year's best actress nominees hailed from movies that have yet to find a broad audience. ("Zero Dark Thirty" did not have widespread release until this weekend.) Along with Ms. Chastain the nominees in that category areJennifer Lawrence("Silver Linings Playbook"),Emmanuelle Riva("Amour"),Naomi Watts("The Impossible") and Quvenzhané Wallis ("Beasts of the Southern Wild"), at age 9 the youngest best actress nominee ever.

Joining Mr. Day-Lewis in the running for best actor areBradley Cooper("Silver Linings Playbook"),Joaquin Phoenix("The Master"),Hugh Jackman("Les Misérables") andDenzel Washington("Flight").

Among the clear winners on Thursday was Walt Disney Studios, which had three of the five nominees in the category for best animated feature: "Brave," "Frankenweenie" and "Wreck-It Ralph." The rival DreamWorks Animation had none. "The Pirates! Band of Misfits," released by Sony Pictures, and"ParaNorman," from Focus Features, were the other animation nominees.

"Silver Linings Playbook," from the Weinstein Company, also came up a winner, as seven of its eight nominations came in prominent categories.Robert De Nirowas nominated for best supporting actor andJacki Weaverfor best supporting actress. The film was the first to be nominated in all four acting categories since"Reds,"released in 1981, according to Libby Wertin, a researcher with the Academy. It slightly outstripped "Lincoln" in the major categories, and handily surpassed "Life of Pi," which had no acting nominees.

In keeping with recent tradition the Academy brushed off the best box-office performers. There were no nominations in acting or directing categories for"The Hobbit: An Unexpected Journey,""The Dark Knight Rises"or"Skyfall."

The Oscar process has been especially rough this year, as the Academy began phasing out paper ballots in favor of online voting. The idea was to get quicker results, which allowed the group to break precedent by announcing its nominations before the presentation ceremony of the rival Golden Globes, set for Sunday.

But some of the Academy's roughly 6,000 potential voters remained unaware of the shift until balloting was near. Others had trouble accessing a heavily secured voting system. The Oscar nominating vote was ultimately extended by a day, after the documentary branch members got an extension for voting on their shortlist, which was selected under new rules.

The new documentary process, intended to broaden the pool of voters making a first cut of the candidates, yielded what appeared to be a fairly conventional list of culturally hip or politically progressive nominees. Those were "5 Broken Cameras,"about Palestinian resistance to the Israeli Army; "The Gatekeepers," about the Israeli security apparatus; "How to Survive a Plague," about AIDS; "The Invisible War," which deals with rape in the United States military; and"Searching for Sugar Man," about the lost career of the singer Rodriguez.

Tom Hooperwas bypassed as the director of "Les Misérables," from Universal. But the film received eight nominations overall, and its presumed strength among actors —Anne Hathawaywas nominated for best supporting actress, along with Mr. Jackman's best actor nomination — still make it a force to be reckoned with.

On ABC's Oscar telecast "Skyfall" will presumably be part of a special retrospective on the 50-year-old James Bond franchise. Any other year a Bond montage might be a routine bid for the pop audience. But after the mass killings in Newtown, Conn., and Aurora, Colo., and with Hollywood receiving criticism for its reliance on showy violence, the tribute may pose a challenge for the event's producers, Neil Meron and Craig Zadan, who will have to decide whether to serve up their killer-spy with or without his guns blazing.

The Academy has fought a perennial battle to win younger viewers and to maintain the ratings for its telecast, even as its voters have leaned toward smaller films and sober fare.

For Mr. MacFarlane, who was nominated as writer of the lyrics for "Everybody Needs a Best Friend," from"Ted,"the biggest challenge may be the need to wring laughs out of so many serious pictures.

But he is trying.

"If you don't know who I am, just pretend I'm Donny Osmond," he said, getting mileage from a crack about his own baby face. "We'll get along fine."

- 
- 
- 
- Save
- E-mail
- Share

# THE NEW YORKER

- « DVD of the Week: "Our Beloved Month of August"
- Main

January 10, 2013

# The Oscar Nominations

Posted by *Richard Brody*



The exemplary fact of this year's Oscar nominations is the acknowledgment of "Beasts of the Southern Wild" in four major categories (Best Picture, Best Actress, Best Director, and Best Adapted Screenplay). The independently-produced film is Benh Zeitlin's first feature; he was under thirty when he made it, on a budget estimated at $1.8 million, and it made its première last January at Sundance. The very fact that the Academy is aware of its existence, let alone considers it for its highest honors, is a sign of an industry that is more fluid than ever—and of a time when the studios often function as distributors and the field of production is wide open to grassroots newcomers. But the movie itself is this year's "The Help," a romanticized and mythologized vision of poor Southern blacks (in this case, a father and daughter in a Louisiana bayou community called the Bathtub) that also sentimentalizes the very notion of self-help ("The Self-Help") in a story that spotlights a tough, poetic, independent-spirited child facing dangers in aquatic adventures (well, "Life of Pi" also fared well in the nominations).

Hollywood—I suppose, in the image of the country at large—acknowledges the primacy of matters of race (a batch of nominations for "Django Unchained" as well, plus, of course, "Lincoln") but not too closely: Quentin Tarantino and Steven Spielberg look at the country's original sin (or one of the original sins) from a historical distance, and Zeitlin, for all the sincere, warm-hearted, poetic (though rather self-consciously poetic) energy with which he invests the film, conjures a neo-

primitive world apart that reeks of an (utterly unintentional) condescension. The movie offers not just an apolitical but an anti-political, by-the-bootstraps view of essentially political matters that—centered as the story is on the aftermath of Hurricane Katrina—is the basis of the sentimental consensus that won it an audience and a batch of nominations. I'll revisit it soon, though, and follow up here.

The most pleasant surprise, for me, was the nomination of the three principals of Paul Thomas Anderson's "The Master"— Joaquin Phoenix for Best Actor, Philip Seymour Hoffman for Best Supporting Actor, and Amy Adams for Best Supporting Actress. It's inconceivable that the movie wasn't nominated for Best Picture and that Anderson wasn't on the Best Director list—three such performances don't just materialize from the ether. It's pleasant to note that "Moonrise Kingdom" received one (though, sadly, only one) nomination (Best Original Screenplay), though there was no reason to expect that it would do better. Not all of the films that the Academy honors have been big commercial successes (and they never have been—the victory of "Crash," in 2005, still makes the industry cringe) but they tend to substitute emotional expression for emotion itself ("Silver Linings Playbook" grabs the audience by the lapels and shrieks, "Feel! Feel!" as Robert De Niro looms in the background growling, "Or else..."), or a proud display of seriousness and importance for audacious approaches to actual substance. It was ever so. Hollywood (and, indeed, its New York studio predecessors) has made great movies from the very start; they're not necessarily the ones that make the most money, or the ones that the industry itself is most proud of.

The contradictions are built into the very nature of the cinema, which isn't just an art form and, of course, a business (as publishing, the art world, the theatre, music are, too)—but (as André Malraux famously noted) also an industry. It's highly technical and capital-intensive; it depends heavily on scientific innovations; and, most of all, its inherent documentary power —the sense that even its fictions are crucial realities—make it automatically political. The controversies over "Zero Dark Thirty" and "Django Unchained," the debate over possible connections between actual violence and movie violence, make the Oscars, more than ever, feel like reruns of Presidential campaigns, with leading candidates and favorite sons (and daughters) and dark horses. It isn't the image or self-image of the industry that seems to be in play, but that of the country.

### Keywords

- Oscars

### POSTED IN

- The Front Row

You might like
Most shared







Republicans Apologize to Top 1.5 Per Cent
**BY ANDY BOROWITZ**

A "Homeland" Conspiracy Theory
**BY EMILY NUSSBAUM**

Reconsidering Mary
**BY MICHELLE DEAN**

The New Yorker's Oscar Reading
**BY THE NEW YORKER**

Our Hillary Problem
**BY AMY DAVIDSON**



+Geoff    Search    Images    Maps    Play    YouTube    News    Gmail    Drive    Calendar    More ∨

snub site:academyawards.com OR site:oscar.com                    Geoff Nunberg          Share

News    More ∨    Search tools                    SafeSearch

Your search - **snub site:academyawards.com OR site:oscar.com** - did not match any news results. Reset search tools

Suggestions:

- Make sure all words are spelled correctly.
- Try different keywords.
- Try more general keywords.
- Try fewer keywords.

The selection and placement of stories on this page were determined automatically by a computer program. The time or date displayed reflects when an article was added to or updated in Google News.

Google Home    Advertising Programs    Business Solutions    Privacy & Terms
About Google

+Geoff   Search   Images   Maps   Play   YouTube   News   Gmail   Drive   Calendar   More

snub "academy awards" OR oscar                    Geoff Nunberg          Share

News   More ▾   Search tools                                      SafeSearch

Add "snub "academy awards" OR oscar" section to my Google News homepage

**The 2013 Oscars**
abcnews.go.com/Oscars
Get the latest news on The Academy Awards online at ABC News here!

See your ad here »


### Jessica Chastain upset at Kathryn Bigelow Oscar snub
FansShare   50 minutes ago
Jessica Chastain and Kathryn Bigelow were considered sure bets to be nominated for Best Actress and Best Director when the Oscar nominations were ...


### Quentin Tarantino disappointed by Leonardo DiCaprio Oscar snub
Toronto Sun   1 hour ago
Quentin Tarantino disappointed by Leonardo DiCaprio Oscar snub ... star Leonardo DiCaprio missed out on a nomination for the 2013 Academy Awards.

Belfast Teleg...


### Box office update: Despite Kathryn Bigelow snub, 'Zero Dark Thirty' ...
Entertainment Weekly (blog)   by Grady Smith   2 hours ago
Director Kathryn Bigelow may not have earned an Oscar nomination (her snub, along with Ben Affleck's, proved the main talking point on the morning of the ...

ABC News


### 85th Academy Awards - The Spectacular Snubs
Movies.ie   8 hours ago
85th Academy Awards - The Spectacular Snubs ... Editing and Sound Mixing -- and while this is the first time a Bond film has been Oscar nominated since 1982's ...


### Quentin Tarantino thinks Ben Affleck's Oscar snub was worse than his
CanIndia News   8 hours ago
Quentin Tarantino feels sorry for Ben Affleck. Both directors missed out on Best Director Oscar nominations on Thursday even though their movies Django ...


### Ben Affleck Talks Argo Best Director Oscar Snub, Gushes Over ...
E! Online   9 hours ago
More Oscar snubs and shockers! ... Here's the complete list of Oscar nominees! "I was in bed with ... See all the notable nominees for the 2013 Academy Awards ...


### Some snubs and surprises came with Oscar nominations
News Sentinel   15 hours ago
Some snubs and surprises came with Oscar nominations. Copyright .... His character, after all, shared the name of the Academy Awards' statuette. But this year ...

New York Ti...


### The Bigelow Snub
Wall Street Journal   19 hours ago
We're talking about what the trade press is dubbing "The Bigelow Snub. ... Ms. Bigelow, who in 2010 won a Best Director Oscar for "The Hurt Locker," was ...


### Oscar-snubbed Ben Affleck wears a good luck message from his ...
Yahoo! News (blog)   21 hours ago
Mere hours earlier, he was denied an Oscar nomination in the same category, a fact some feel was the biggest snub of the entire awards season. The omission ...



### Ben Affleck Thanks "The Academy" at Critics Choice Awards After ...
Opposing Views   Jan 11, 2013
... Awards on Thursday, just hours after he was snubbed by the **Academy Awards**. The filmmaker failed to score an **Oscar** nomination from the Academy for his ...



### Ben Affleck Makes **Oscar Snub** Joke While Accepting Critics Choice ...
International Business Times   Jan 11, 2013
Ben Affleck may have been **snubbed** for a Best Director **Oscar** nomination, but the "Argo' helmer is clearly taking it in stride as he continues to recieve accolades ...



### **Oscar** Nominations 2013 **Snubs**, Surprises; Fans Disagree, Think ...
Design & Trend   Jan 11, 2013
(Photo : Reuters) Ben Affleck for Best Director for "Argo" was **snubbed** by the ... Everyone is talking about the **Oscar** nominations and if everyone is worthy or not ...



### Ben Affleck **Oscar Snub** Hasn't Dented His Humor; Makes Quip At ...
Contactmusic.com   Jan 11, 2013
Ben Affleck would no doubt have been smarting at being left out of the reckoning for Best Director when the Oscars nominations were announced yesterday, so it ...



### **Oscar snub** of Kathryn Bigelow for Best Director is an outrage! Zero ...
Hollywoodnews.com   Jan 11, 2013
The only **Oscar snub** that qualifies as an outrage is the omission of Kathryn Bigelow for Best Director. Not because it's a bigger slight than snubbing Ben Affleck ...



### Ben Affleck not upset about **Oscar snub**
TheCelebrityCafe.com   Jan 11, 2013
Ben Affleck not upset about Oscar snub. Athira Nair 1/11/2013. Ben Affleck's name didn't appear on the **Academy Awards**' list of nominees for Best Director for ...

New York Da...




### Ben Affleck jokes about **Oscar snub** at Critics' Choice awards
Los Angeles Times   by John Horn   Jan 11, 2013
**Oscar snub**: 'Zero Dark Thirty' is undeserving victim of politics ... INTERACTIVE: **Oscar** Watch 2013 · TIMELINE: **Academy Awards** through the years. Copyright ...

New York Da...

### 2012 **Oscar** nominations announced, major director **snubs**
Critical Mob   Jan 11, 2013
2012 **Oscar** nominations announced, major director **snubs**. By Marlee Walters ... The winners of the 85th **Academy Awards** will be announced February 24.

New York Ti...



### Jennifer Garner Is In Good Spirits Despite Ben Affleck's **Oscar Snub** ...
Babble   Jan 11, 2013
While husband Ben Affleck is more than likely not having the best of days after having been **snubbed** from a Best Director **Oscar** nomination for his work in Argo ...

New York Da...



### Ben Affleck's Argo Co-Stars "Confused" Over Director **Oscar Snub** ...
Glamour (blog)   Jan 11, 2013
Ben Affleck's Argo Co-Stars "Confused" Over Director **Oscar Snub** and More Critics' Choice Awards Scoop! author name. by Jessica Radloff Email me ...

New York Da...



### Judi Dench Discovers Skyfall **Oscar Snub** Live on Radio, It's a 'Great ...
Contactmusic.com   Jan 11, 2013
When the **Oscar** nominations were released the whole of Britain sighed, not with relief but with disappointment, due to the absence of Skyfall nominations.

### Movie Forum Oscars Edition: **Snubs** and 'Silver Linings'
USA TODAY   Jan 11, 2013
This week, however, we're devoting the entire hour to this morning's **Oscar** nominations! **Snubs**, surprises, sure things...we'll cover them all! And we want your ...



### Zero Dark Thirty star 'stunned' by **Oscar snub**
Montreal Gazette   Jan 11, 2013
The **Oscar**-celebrated Zero Dark Thirty, which opened in Canada Jan. 11, continues to be a convenient target for scolding American politicians.



### Millions More To Get Outraged About Kathryn Bigelow's **Oscar Snub** ...
Forbes   Jan 11, 2013
There were a fair amount of **snubs** at yesterday morning's **Oscar** nomination announcement. Ben Affleck certainly should have ranked in the Best Director ...



### Ben Affleck laughs off **Oscar snub** at Critics' Choice Awards [VIDEO]
UPI.com (blog)   Jan 11, 2013
Actor and director Ben Affleck attends the 18th annual Critics' Choice Movie Awards held at Barker Hangar in Santa Monica, California on January 10, 2013.



### Some blame Washington for 'Zero Dark Thirty' **Oscar snub**
China Post   Jan 11, 2013
LOS ANGELES -- Kathryn Bigelow's **snub** by **Academy Awards** voters ... for the "Zero Dark Thirty" director's omission from the best director **Oscar** shortlist.



### Dame Judi Dench: I'm Very Sorry 'Terrific' 'Skyfall' Was **Snubbed** By ...
Entertainmentwise   Jan 11, 2013
Dame Judi Dench: I'm Very Sorry 'Terrific' 'Skyfall' Was **Snubbed** By The Oscars ... got **Oscar** recognition, and she's "very sorry" that the Academy **snubbed** what ...



### Fresh off **Oscar snub**, Affleck wins best director, 'Argo' best movie at ...
Ottawa Citizen   Jan 11, 2013
Molly Sims arrives at the 18th annual Critics' Choice Movie Awards at the Barker Hangar on Thursday, Jan. 10, 2013, in Santa Monica, Calif. (Photo by Jordan ...



### Kathryn Bigelow's **Oscar Snub** and Other Academy Award Surprises
Philadelphia Magazine (blog)   Jan 11, 2013
Kathryn Bigelow's **Oscar Snub** and Other Academy Award Surprises ... Some are saying Tom Hooper's lack of director nomination (for Les Mis) is a **snub**. I do not ...



### Ben Affleck **Oscar Snub** Speech "I Would Like To Thank The ...
Beauty World News   Jan 11, 2013
Ben Affleck **Oscar Snub** Speech "I Would Like To Thank The Academy. ... best friend Matt who also have been notorious **snubbed** by the **Academy Awards**.



### Ben Affleck Weighs In On **Oscar Snub**
Access Hollywood   Jan 11, 2013
LOS ANGELES, Calif. -- Ben Affleck attends the 18th Annual Critics' Choice Movie Awards held at Barker Hangar on Caption Ben Affleck attends the 18th ...



### Ben Affleck Jokes About Oscars Snub At Critics' Choice Awards ...
Huffington Post  Jan 11, 2013
Affleck's snub was the most-talked about post-Oscar nominations news on
Thursday. Many thought ... Master" star said about the Academy Awards last
year</a>.

New York Da...



### Ben Affleck Jokes About Oscar Snub At Critics' Choice Awards As
...
The Inquisitr  by Page Mackinley  Jan 11, 2013
Ben Affleck joked about his best director Oscar snub as Argo won big at the 18th
Annual Critics' Choice Awards (CCA) last night. In a reference to the glaring ...



### Bigelow, Affleck among 2013 Oscar snubs and surprises
BurlingtonFreePress.com  Jan 11, 2013
Quvenzhane Wallis is in, Kathryn Bigelow is out and the Oscar nominations are
filled yet again with snubs and surprises. On Thursday, Academy voters had no ...

New York Ti...



### Judi Dench hopes Skyfall Oscar snub is not down to snobbery
stv.tv  Jan 11, 2013
Dame Judi Dench has revealed that she hopes Skyfall's Oscar snub is not ... hotly
tipped for success at the Academy Awards following a series of nominations at ...

Daily Mail



### Oscars 2013: Why did Ben Affleck get snubbed for best director? [Poll]
Los Angeles Times  Jan 11, 2013
Oscar nomination snubs include Affleck, Bigelow and 'Skyfall' ... INTERACTIVE:
Oscar Watch 2013 · TIMELINE: Academy Awards through the years. Copyright ...

New York Da...



### Ben Affleck Wins Critics' Choice Awards, Jokes About Oscars Snub
...
Wetpaint  Jan 11, 2013
Being snubbed for an Oscar nod will probably just make him an even more
respected underdog in the industry, which is always better than being considered ...

New York Da...



### 'I'd Like To Thank The Academy': Ben Affleck Jokes About Oscar ...
Entertainmentwise  Jan 11, 2013
Ben Affleck laughed off his double Oscar snub last night as he scooped the Best
Director Award at the 2013 Critics Choice Awards in New York for thriller 'Argo', ...

New York Da...



### Ben Affleck and Skyfall are Critics' Choice after Oscar snub
The Sun  Jan 11, 2013
BEN Affleck took a swipe at Oscar bosses after winning a Best Director gong --
hours after being snubbed in the Academy Award nominations. The Argo director
...



### A royal Oscar snub: Suraj Sharma and Life of Pi
Firstpost  by Sandip Roy  Jan 11, 2013
It garnered 11 nominations. But Suraj Sharma, the young Pi, was certainly
overlooked. Forget Kathryn Bigelow and Ben Affleck. This was THE Oscar snub.

IBNLive



### DAME JUDI DENCH: 'SKYFALL'S OSCAR SNUB IS A GREAT PITY'
Express.co.uk  Jan 11, 2013
DAME JUDI DENCH: 'SKYFALL'S OSCAR SNUB IS A GREAT PITY' ... out on
major nominations for the 2013 Academy Awards, branding the snub "a great
pity".

Daily Mail

### 'Skyfall' Oscars snub is a pity, says Judi Dench



Digital Spy  Jan 11, 2013
'Skyfall' Oscars **snub** is a pity, says Judi Dench ... said that it is a "great pity" that
Skyfall has not been nominated for 'Best Picture' at the 2013 **Academy Awards**.

Daily Mail



### Reviews and news of films, foreign and mainstream
Albany Times Union (blog)  Jan 11, 2013
Today, as it is every year at this time, the blogosphere and the online entertainment
community is awash in that traditional mid-winter sighting – the "**Oscar snubs** ...



### 5 Oscar snubs
Waterbury Republican American  Jan 11, 2013
The biopic "Lincoln" and the cast of "Silver Linings Playbook" dominated the **Oscar**
nominations (read about it on Pages 1,4D). Here are some of this year's ...



### Video: Helen Hunt Says John Hawkes's Oscar Snub Was "Not the ...
PopSugar.com  by Lauren Bradshaw  Jan 10, 2013
Helen Hunt hit the Critics' Choice Awards red carpet after receiving some good
news earlier today: she's been nominated for an **Oscar** for The Sessions!

Film News



### PNJ analysis: Oscar nominations packed with snubs, surprises
Pensacola News Journal  Jan 10, 2013
Daniel Day-Lewis, center, as Abraham Lincoln, earned an **Oscar** nomination, ... to
be some **snubs** when nominations for the **Academy Awards** were announced ...

New York Ti.



### Ben Affleck wins Critics' Choice Best Director Award after being ...
Zap2it.com (blog)  Jan 10, 2013
... Best Director Award after being **snubbed** by **Academy Awards** nominations ...
being left out of the **Oscar** nominations for Best Director was a bit of a **snub**.



### Oscars: Bigelow, Hooper snubs not unusual
CBS News  Jan 10, 2013
2013 **Oscar** nominees: **Snubs** and surprises ... Guild and Golden Globe nominee
for "Argo," so the Academy's **snub** might be interpreted as the directors branch's ...



### Oscar Nominations 2013: The Biggest Surprises, Snubs, and Front ...
Us Magazine  Jan 10, 2013
... unveiled the nominees for the 85th annual **Academy Awards**, airing Sunday, ...
Reinstein says of what she calls "the biggest **snub**," adding that the film was ...



### Alan Arkin on his Oscar nod for 'Argo,' Ben Affleck's snub: 'I think he's ...
Entertainment Weekly  Jan 10, 2013
Of all the **snubs** for this year's **Academy Awards**, one of the biggest shockers has
easily been Ben Affleck's missing nomination for directing Argo. But Affleck ...

New York Da.



### Why Ben Affleck's Oscar Snub Might Be a Good Thing and Other ...
Wired  Jan 10, 2013
Ben Affleck got **snubbed** in the Best Director category for his film Argo (above)
during Thursday's **Oscar** nomination announcements. But that may not be the ...

Stay up to date on these results:
- Create an email alert for **snub "academy awards" OR oscar**

# EXHIBIT N

BOIES, SCHILLER & FLEXNER, LLP
Stuart Singer (*pro hac vice*)
ssinger@bsfllp.com
David Nelson (*pro hac vice*)
dnelson@bsfllp.com
Joshua Riley (*pro hac vice*)
jriley@bsfllp.com
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

ACADEMY OF MOTION PICTURE ARTS AND SCIENCES, a California nonprofit corporation,

   Plaintiff,

  v.

GODADDY.COM, INC., a Delaware corporation; THE GODADDY GROUP INC., a Delaware corporation; DOMAINS BY PROXY, INC., a Delaware Corporation; GREENDOMAINMARKT.COM, an unknown entity; BDS, an unknown entity; and XPDREAMTEAM LLC, a California limited liability corporation,

   Defendants.

) Case No. CV10 3738 ABC (CWx)
)
)
)
)
) **PLAINTIFF'S SECOND**
) **SUPPLEMENTAL RESPONSES TO**
) **GODADDY.COM, INC.'S SECOND**
) **SET OF REQUESTS FOR**
) **ADMISSIONS**
)
)
)
)
)
)
)
)
)
)
)

Pursuant to Fed. R. Civ. P. 26 and 36, the Academy of Motion Picture Arts and Sciences ("the Academy" or "Plaintiff"), hereby responds and objects to GoDaddy.com, Inc.'s ("GoDaddy" or "Defendant") Second Set of Request[s] for Admission[s] as follows:

## **GENERAL OBJECTIONS**

1.      Plaintiff objects to Defendant's Definitions, Instructions, and Requests for Admission insofar as the information sought is protected from disclosure by the work product doctrine, the attorney-client privilege, or any other privilege or doctrine, on the ground that such information is not properly discoverable under the Federal Rules of Civil Procedure.

2.      Plaintiff objects to Defendant's Definitions, Instructions, and Requests for Admission insofar as they seek information not in Plaintiff's possession, custody, or control, and insofar as they seek to impose upon Plaintiff an obligation to obtain or provide information that Plaintiff is not able to obtain or provide after a reasonably diligent investigation.  Because discovery is not complete and because Plaintiff has not yet completed its investigation into all claims and defenses at issue in this action, Plaintiff is may be unable, at this time, to make informed admissions or denials in connection with such Requests.

3.      Plaintiff objects to Defendant's Definitions, Instructions, and Requests for Admission insofar as the information requested can be more readily attained from Defendants' own records and knowledge.

4.      Plaintiff objects to Defendant's Definitions, Instructions, and Requests for Admission insofar as they call for legal conclusions or other information about which it is beyond Plaintiff's competence to testify.

5.      Plaintiff objects to Defendant's Definitions, Instructions, and Requests for Admission insofar as they pertain to issues that are not relevant or that are not likely to lead to admissible evidence.

6.      Plaintiff specifically objects to Defendant's Instruction No. 1, which seeks to impose upon Plaintiff obligations beyond those required by Rules 26 and 36 of the Federal Rules of Civil Procedure and which makes each Request unduly burdensome.

7.      Plaintiff specifically objects to the definition of "Domain Names," which is vague and ambiguous.  In particular, the definition of "Domain Names" provides that "the term 'Domain Names' refers to the alleged Deceptive Domain Names, as that phrase is defined in the First Amended Complaint."  *See* Def. First RFA at 1.  First, the operative complaint is the Second Amended Complaint.  The Second Amended Complaint does not specifically define the term "Deceptive Domain Names."  Instead, the Second Amended Complaint refers to "Deceptive Domains" as the "infringing parked domains" to which Defendants "knowingly divert internet traffic" in order to "achieve monetary gain."  *See* FAC at ¶ 3. Plaintiffs therefore interpret "Domain Names" in accordance with the discussion of "Deceptive Domains" contained in the First Amended Complaint.

8.      Plaintiff's response to any Request for Admission is made without waiving any objections as to relevancy, admissibility, competency, materiality, privilege, or any other objection.

9.      Plaintiff provides the enclosed responses even though discovery in this matter is ongoing, meaning that Plaintiff has not yet completed its investigation into the claims and defenses at issue.  Accordingly, Plaintiff reserves the right to amend, modify, correct, or otherwise change any response provided herein.

10.      Each of the foregoing General Objections is incorporated by reference into each of the Responses set forth below, which Responses Plaintiff makes without waiver of these General Objections and without committing to treat future discovery requests in a similar manner.

## RESPONSES TO REQUESTS FOR ADMISSION

**40.    Admit that the term "oscar" in a domain name could refer to a juicer.**

**ANSWER:**   The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997).  Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation.  For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to a type of juicer.  Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

**FIRST SUPPLEMENTAL ANSWER:** N/A

**SECOND SUPPLEMENTAL ANSWER:**   The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997).  Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation.  For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to a type of juicer.  Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

Subject to said objections, the Academy admits RFA No. 40.

**41.** **Admit that the term "oscar" in a domain name could refer to an acronym for the federal court system's program known as Online System for Application and Review (OSCAR).**

**ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to a federal court system program. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

**FIRST SUPPLEMENTAL ANSWER:** N/A

**SECOND SUPPLEMENTAL ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to a federal court system program. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

Subject to said objections, the Academy admits RFA No. 41.

**42.** **Admit that the term "oscar" in a domain name could refer to an acronym for a Linux-based software installation called Open Source Cluster Application Resources.**

1  **ANSWER:**  The Academy objects in that this RFA is a hypothetical and
2  improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL
3  153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997).  Even if an
4  answer to a hypothetical request were required, it is an incomplete  hypothetical
5  rendering any answer incomplete and speculation.  For example, in the domain
6  name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer
7  to a Linux-based software.  Moreover, as the Academy has explained repeatedly,
8  even if the RFA were correct, it is not the domain name itself that the Academy
9  objects to; instead, it is the monetization of the domain name by GoDaddy to
10 promote goods and services obviously relating to the Academy Awards® and the
11 OSCARS®.

12   **FIRST SUPPLEMENTAL ANSWER:** N/A

13   **SECOND SUPPLEMENTAL ANSWER:**  The Academy objects in that
14 this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley*
15 *Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92
16 (N.D.N.Y.1997).  Even if an answer to a hypothetical request were required, it is
17 an incomplete  hypothetical rendering any answer incomplete and speculation.  For
18 example, in the domain name oscaracademeyaward.com, the Academy denies the
19 term "Oscar" could refer to a Linux-based software.  Moreover, as the Academy
20 has explained repeatedly, even if the RFA were correct, it is not the domain name
21 itself that the Academy objects to; instead, it is the monetization of the domain
22 name by GoDaddy to promote goods and services obviously relating to the
23 Academy Awards® and the OSCARS®.

24   Subject to said objections, the Academy admits RFA No. 42.

25   **43.    Admit that the term "oscar" in a domain name could refer to an**
26   **acronym for Occupational and Skill Computer Assisted**
27   **Researcher.**

28   **ANSWER:**  The Academy objects in that this RFA is a hypothetical and
improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL

153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to an acronym for Occupation and Skill Computer Assisted Researcher. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

**FIRST SUPPLEMENTAL ANSWER:** N/A

**SECOND SUPPLEMENTAL ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to an acronym for Occupation and Skill Computer Assisted Researcher. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

Subject to said objections, the Academy admits RFA No. 43.

**44.** **Admit that the term "oscar" in a domain name could refer to an acronym for Optimised Supply Chain Active Resource.**

**ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation. For example, in the domain name

oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to an acronym for Optimised Supply Chain Active Resource. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

**FIRST SUPPLEMENTAL ANSWER:** N/A

**SECOND SUPPLEMENTAL ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to an acronym for Optimised Supply Chain Active Resource. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

Subject to said objections, the Academy admits RFA No. 44.

**45. Admit that the term "oscar" in a domain name could refer to an acronym for Open System for communication in Realtime.**

**ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to any acronym for Open System for communication in Realtime. Moreover, as the

Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

**FIRST SUPPLEMENTAL ANSWER:** N/A

**SECOND SUPPLEMENTAL ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to any acronym for Open System for communication in Realtime. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

Subject to said objections, the Academy admits RFA No. 45.

**46. Admit that the term "oscar" in a domain name could refer to an acronym for Orbital Satellite Carrying Amateur Radio.**

**ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to an acronym for Orbital Satellite Carrying Amateur Radio. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of

1  the domain name by GoDaddy to promote goods and services obviously relating to

2  the Academy Awards® and the OSCARS®.

3  **FIRST SUPPLEMENTAL ANSWER:** N/A

4  **SECOND SUPPLEMENTAL ANSWER:**  The Academy objects in that

5  this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley*

6  *Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92

7  (N.D.N.Y.1997).  Even if an answer to a hypothetical request were required, it is

8  an incomplete  hypothetical rendering any answer incomplete and speculation.  For

9  example, in the domain name oscaracademeyaward.com, the Academy denies the

10  term "Oscar" could refer to an acronym for Orbital Satellite Carrying Amateur

11  Radio.  Moreover, as the Academy has explained repeatedly, even if the RFA were

12  correct, it is not the domain name itself that the Academy objects to; instead, it is

13  the monetization of the domain name by GoDaddy to promote goods and services

14  obviously relating to the Academy Awards® and the OSCARS®.

15  Subject to said objections, the Academy admits RFA No. 46.

16

17  **47.  Admit that the term "oscar" in a domain name could refer to an
18  acronym for a type of Australian train known as Outer Suburban
       CARs (OSCARs).**

19  **ANSWER:**  The Academy objects in that this RFA is a hypothetical and improper

20  under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260

21  (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997).  Even if an answer

22  to a hypothetical request were required, it is an incomplete hypothetical rendering

23  any answer incomplete and speculation.  For example, in the domain name

24  oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to an

25  acronym for an Australian train.   Moreover, as the Academy has explained

26  repeatedly, even if the RFA were correct, it is not the domain name itself that the

27  Academy objects to; instead, it is the monetization of the domain name by

28  GoDaddy to promote goods and services obviously relating to the Academy

     Awards® and the OSCARS®.

**FIRST SUPPLEMENTAL ANSWER:** N/A

**SECOND SUPPLEMENTAL ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to an acronym for an Australian train. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

Subject to said objections, the Academy admits RFA No. 47.

**48.  Admit that the term "oscar" in a domain name could refer to an acronym for Out of School Care and Recreation.**

**ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to an acronym for Out of School Care and Recreation. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

**FIRST SUPPLEMENTAL ANSWER:** N/A

SECOND SUPPLEMENTAL ANSWER: The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to an acronym for Out of School Care and Recreation. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

Subject to said objections, the Academy admits RFA No. 48.

**49. Admit that the term "oscar" in a domain name could refer to a project aiming to design an open source vehicle known as an open source car.**

**ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to an acronym for an open source car. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

**FIRST SUPPLEMENTAL ANSWER:** N/A

**SECOND SUPPLEMENTAL ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley*

1  *Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92
2  (N.D.N.Y.1997).  Even if an answer to a hypothetical request were required, it is
3  an incomplete  hypothetical rendering any answer incomplete and speculation.  For
4  example, in the domain name oscaracademeyaward.com, the Academy denies the
5  term "Oscar" could refer to an acronym for an open source car.  Moreover, as the
6  Academy has explained repeatedly, even if the RFA were correct, it is not the
7  domain name itself that the Academy objects to; instead, it is the monetization of
8  the domain name by GoDaddy to promote goods and services obviously relating to
9  the Academy Awards® and the OSCARS®.

10          Subject to said objections, the Academy admits RFA No. 49.

12          **51.    Admit that the term "oscar" in a domain name could refer to a
                radio station run by the pupils of the Oundle School.**

**ANSWER:**  The Academy objects in that this RFA is a hypothetical and improper
under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260
(N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997).  Even if an answer
to a hypothetical request were required, it is an incomplete  hypothetical rendering
any answer incomplete and speculation.   For example, in the domain name
oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to a
radio station.  Moreover, as the Academy has explained repeatedly, even if the
RFA were correct, it is not the domain name itself that the Academy objects to;
instead, it is the monetization of the domain name by GoDaddy to promote goods
and services obviously relating to the Academy Awards® and the OSCARS®.

**FIRST SUPPLEMENTAL ANSWER:**  N/A

**SECOND SUPPLEMENTAL ANSWER:**   The Academy objects in that this
RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley
Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92
(N.D.N.Y.1997).  Even if an answer to a hypothetical request were required, it is
an incomplete  hypothetical rendering any answer incomplete and speculation.  For

example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to a radio station. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

Subject to said objections, the Academy admits this RFA No. 51.

**52. Admit that the term "oscar" in a domain name could refer to a human gene.**

**ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to refer to human gene. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

**FIRST SUPPLEMENTAL ANSWER:** N/A

**SECOND SUPPLEMENTAL ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to refer to human gene. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself

that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

Subject to said objections, the Academy admits this RFA No. 52.

**53. Admit that the term "oscar" in a domain name could refer to a class of Soviet and Russian submarines.**

**ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to a class of Soviet and Russian submarines. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

**FIRST SUPPLEMENTAL ANSWER:** N/A

**SECOND SUPPLEMENTAL ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to a class of Soviet and Russian submarines. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization

of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

Subject to said objections, the Academy admits this RFA No. 53.

**54.    Admit that the term "oscar" in a domain name could refer to a city in Louisiana.**

**ANSWER:**  The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997).  Even if an answer to a hypothetical request were required, it is an incomplete  hypothetical rendering any answer incomplete and speculation.  For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to a city in Louisiana.  Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

**FIRST SUPPLEMENTAL ANSWER:** N/A

**SECOND SUPPLEMENTAL ANSWER:**  The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997).  Even if an answer to a hypothetical request were required, it is an incomplete  hypothetical rendering any answer incomplete and speculation.  For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to a city in Louisiana.  Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

Subject to said objections, the Academy admits this RFA No. 54.

55.     **Admit that the term "oscar" in a domain name could refer to a city in Oklahoma.**

**ANSWER:**  The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997).  Even if an answer to a hypothetical request were required, it is an incomplete  hypothetical rendering any answer incomplete and speculation.  For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to a city in Oklahoma.  Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

**FIRST SUPPLEMENTAL ANSWER:** N/A

**SECOND SUPPLEMENTAL ANSWER:**  The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997).  Even if an answer to a hypothetical request were required, it is an incomplete  hypothetical rendering any answer incomplete and speculation.  For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to a city in Oklahoma.  Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

Subject to said objections, the Academy admits this RFA No. 55.


56.     **Admit that the term "oscar" in a domain name could refer to a city in West Virginia.**

**ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to a city in West Virginia. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

**FIRST SUPPLEMENTAL ANSWER:** N/A

**SECOND SUPPLEMENTAL ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to a city in West Virginia. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

Notwithstanding said objections, the Academy admits this RFA No. 56.

**57.** **Admit that the term "oscar" in a domain name could refer to an electronic medical record system.**

**ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer

1  to a hypothetical request were required, it is an incomplete hypothetical rendering

2  any answer incomplete and speculation. For example, in the domain name

3  oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to

4  refer to an electronic medical record system. Moreover, as the Academy has

5  explained repeatedly, even if the RFA were correct, it is not the domain name itself

6  that the Academy objects to; instead, it is the monetization of the domain name by

7  GoDaddy to promote goods and services obviously relating to the Academy

8  Awards® and the OSCARS®.

9  **FIRST SUPPLEMENTAL ANSWER:** N/A

10  **SECOND SUPPLEMENTAL ANSWER:** The Academy objects in that this

11  RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley*

12  *Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92

13  (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is

14  an incomplete hypothetical rendering any answer incomplete and speculation. For

15  example, in the domain name oscaracademeyaward.com, the Academy denies the

16  term "Oscar" could refer to refer to an electronic medical record system.

17  Moreover, as the Academy has explained repeatedly, even if the RFA were correct,

18  it is not the domain name itself that the Academy objects to; instead, it is the

19  monetization of the domain name by GoDaddy to promote goods and services

20  obviously relating to the Academy Awards® and the OSCARS®.

21  Subject to said objections, the Academy admits this RFA No. 57.

22

23  **58.  Admit that the term "oscar" in a domain name could refer to a**
     **synthesizer manufactured by the Oxford Synthesizer Company.**

24  **ANSWER:** The Academy objects in that this RFA is a hypothetical and improper

25  under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260

26  (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer

27  to a hypothetical request were required, it is an incomplete hypothetical rendering

28  any answer incomplete and speculation. For example, in the domain name

oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to a synthesizer manufactured by Oxford Synthesizer Company. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

**FIRST SUPPLEMENTAL ANSWER:** N/A

**SECOND SUPPLEMENTAL ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to a synthesizer manufactured by Oxford Synthesizer Company. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

Subject to said objections, the Academy admits this RFA No. 58.

**59.** **Admit that the term "oscar" in a domain name could refer to a name of a hotel.**

**ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to a name of a hotel. Moreover, as the Academy has explained repeatedly, even if the

1 RFA were correct, it is not the domain name itself that the Academy objects to;
2 instead, it is the monetization of the domain name by GoDaddy to promote goods
3 and services obviously relating to the Academy Awards® and the OSCARS®.

4 **FIRST SUPPLEMENTAL ANSWER:** N/A

5 **SECOND SUPPLEMENTAL ANSWER:**   The Academy objects in that this
6 RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley*
7 *Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92
8 (N.D.N.Y.1997).  Even if an answer to a hypothetical request were required, it is
9 an incomplete  hypothetical rendering any answer incomplete and speculation.  For
10 example, in the domain name oscaracademeyaward.com, the Academy denies the
11 term "Oscar" could refer to a name of a hotel.  Moreover, as the Academy has
12 explained repeatedly, even if the RFA were correct, it is not the domain name itself
13 that the Academy objects to; instead, it is the monetization of the domain name by
14 GoDaddy to promote goods and services obviously relating to the Academy
15 Awards® and the OSCARS®.

16          Subject to said objections, the Academy admits this RFA No. 59.

17

18          **66.     Admit that the term "oscar" in a domain name could refer to an**
19          **acronym for Outstanding Service to Client – Award &**
          **Recognition (OSCAR).**

20 **ANSWER:**  The Academy objects in that this RFA is a hypothetical and improper
21 under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260
22 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997).  Even if an answer
23 to a hypothetical request were required, it is an incomplete  hypothetical rendering
24 any answer incomplete and speculation.   For example, in the domain name
25 oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to an
26 acronym for Outstanding Service to Client – Award & Recognition.  Moreover, as
27 the Academy has explained repeatedly, even if the RFA were correct, it is not the
28 domain name itself that the Academy objects to; instead, it is the monetization of

1 the domain name by GoDaddy to promote goods and services obviously relating to

2 the Academy Awards® and the OSCARS®.

3 **FIRST SUPPLEMENTAL ANSWER:** N/A

4 **SECOND SUPPLEMENTAL ANSWER:** The Academy objects in that this

5 RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley*

6 *Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92

7 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is

8 an incomplete hypothetical rendering any answer incomplete and speculation. For

9 example, in the domain name oscaracademeyaward.com, the Academy denies the

10 term "Oscar" could refer to an acronym for Outstanding Service to Client – Award

11 & Recognition. Moreover, as the Academy has explained repeatedly, even if the

12 RFA were correct, it is not the domain name itself that the Academy objects to;

13 instead, it is the monetization of the domain name by GoDaddy to promote goods

14 and services obviously relating to the Academy Awards® and the OSCARS®.

15      Subject to said objections, the Academy admits this RFA No. 66.

16

17 **67.**    **Admit that the term "oscar" in a domain name could refer to an**
          **acronym for the Open Source Creative & Artistic Recognition**
18          **(OSCAR) Awards.**

19 **ANSWER:** The Academy objects in that this RFA is a hypothetical and improper

20 under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260

21 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer

22 to a hypothetical request were required, it is an incomplete hypothetical rendering

23 any answer incomplete and speculation. For example, in the domain name

24 oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to an

25 acronym for Open Source Creative & Artistic Recognition (OSCAR) Awards.

26 Moreover, as the Academy has explained repeatedly, even if the RFA were correct,

27 it is not the domain name itself that the Academy objects to; instead, it is the

28 monetization of the domain name by GoDaddy to promote goods and services

obviously relating to the Academy Awards® and the OSCARS®.

**FIRST SUPPLEMENTAL ANSWER:** N/A

**SECOND SUPPLEMENTAL ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculation. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to an acronym for Open Source Creative & Artistic Recognition (OSCAR) Awards. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

      Subject to said objections, the Academy admits this RFA No. 67.

DATED: May 21, 2012      By: <u>/s/ Enoch Liang</u>

BOIES, SCHILLER & FLEXNER, LLP
Stuart Singer (*pro hac vice*)
David Nelson (*pro hac vice*)
Joshua Riley (*pro hac vice*)
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

LEE TRAN & LIANG APLC
James M. Lee, California Bar No. 192301
Enoch H. Liang California Bar No. 212324
601 South Figueroa Street, Suite 4025
Los Angeles, CA 90017
Telephone: (213) 612-3737
Facsimile: (213) 612-3773

FOOTE, MEYERS, MIELKE FLOWERS LLC
Robert M. Foote (*pro hac vice*)
Kathleen Chavez (*pro hac vice*)
Matthew Herman (*pro hac vice*)
30 North LaSalle Street, Suite 2340
Chicago, IL 60602
Telephone: (630) 232-6333
Facsimile: (630) 845-8982

*Attorneys for Plaintiff*

# EXHIBIT O

BOIES, SCHILLER & FLEXNER, LLP
Stuart Singer (*pro hac vice*)
ssinger@bsfllp.com
David Nelson (*pro hac vice*)
dnelson@bsfllp.com
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

ACADEMY OF MOTION PICTURE ARTS AND SCIENCES, a California nonprofit corporation,

        Plaintiff,

    v.

GODADDY.COM, INC., a Delaware corporation; THE GODADDY GROUP INC., a Delaware corporation; DOMAINS BY PROXY, INC., a Delaware Corporation; GREENDOMAINMARKT.COM, an unknown entity; BDS, an unknown entity; and XPDREAMTEAM LLC, a California limited liability corporation,

        Defendants.

) Case No. CV10 3738 ABC (CWx)
)
)
)
)
)
) **PLAINTIFF'S FIRST**
) **SUPPLEMENTAL RESPONSES TO**
) **GODADDY.COM, INC.'S SECOND**
) **SET OF REQUESTS FOR**
) **ADMISSIONS**
)
)
)
)
)
)
)
)
)
)
)
)

1

2    Pursuant to Fed. R. Civ. P. 26 and 36, the Academy of Motion Picture Arts

3    and Sciences ("the Academy" or "Plaintiff"), hereby supplements certain of its

4    responses to GoDaddy.com, Inc.'s ("GoDaddy" or "Defendant") Second Set of

5    Request[s] for Admission[s].  The Academy incorporates herein by reference the

6    General Objections contained in its initial responses to GoDaddy's Second Set of

7    Requests for Admissions.

8

9                    **RESPONSES TO REQUESTS FOR ADMISSION**

10

11   **33.    Admit that AMPAS does not have any evidence demonstrating**
          **that GoDaddy.com knew that the Domain Registrants registered**
12        **or used their Domain Names with a bad faith intent to profit from**
          **AMPAS' Marks.**
13

14          **ANSWER:**   The Academy objects as this RFA is compound and

15   vague and ambiguous.  Notwithstanding said objections, the Academy denies this

16   RFA No. 33.

17          The Academy has described in detail numerous instances of bad faith

18   by GoDaddy.com under the ACPA, including, for example, in response to

19   GoDaddy's Interrogatory No. 14.

20          Moreover, the Academy has described in detail both the facts showing

21   why the Domain Registrants were engaged in cybersquatting, as well as the facts

22   showing that GoDaddy knew that the Domain Registrants were registering and/or

23   using the Domain Names with a bad faith intent to profit from the Academy's

24   marks.  See the Academy's responses to GoDaddy's Interrogatory Nos. 29, 32, and

25   35.

26          **SUPPLEMENTAL ANSWER:**  The Academy objects as this RFA

27   as compound and vague and ambiguous.  Notwithstanding said objections, the

28   Academy denies this RFA No. 33.

The Academy has described in detail numerous instances of bad faith by GoDaddy.com under the ACPA, including, for example, in response to GoDaddy's Interrogatory No. 14.

Moreover, the Academy has described in detail both the facts showing why the Domain Registrants were engaged in cybersquatting, as well as the facts showing that GoDaddy knew that the Domain Registrants were registering and/or using the Domain Names with a bad faith intent to profit from the Academy's marks.  <u>See</u> the Academy's First Supplemental Responses to GoDaddy's Interrogatory Nos. 29, 31, 32, 33, 34, and 35.

**34.    Admit that AMPAS does not have any evidence demonstrating that any of the Domain Names in the Cash Parking Program were selected at the suggestion of GoDaddy.com as alleged in Paragraph 110 of the Second Amended Complaint.**

**ANSWER:**  The Academy objects to this RFA as vague and ambiguous as to the phrase "selected at the suggestion of".  The Academy further objects as GoDaddy mischaracterizes Paragraph 110 of the Second Amended Complaint—it does not allege the Domain Names in the Cash Parking Program were selected at the suggestion of GoDaddy.com and therefore this RFA No. 34 is denied.

**SUPPLEMENTAL ANSWER:**  The Academy objects to this RFA as vague and ambiguous as to the phrase "selected at the suggestion of".  The Academy further objects as GoDaddy mischaracterizes Paragraph 110 of the Second Amended Complaint—it does not allege the Domain Names in the Cash Parking Program were selected at the suggestion of GoDaddy.com.  Regardless, this RFA No. 34 is denied for the reasons stated in the Academy's first supplemental responses to GoDaddy's Interrogatory Nos. 31, 32, and 33.

**35. Admit that AMPAS does not have any evidence regarding the intent of the Domain Name Registrants in the Cash Parking Program relating to the selection of their Domain Names.**

**ANSWER:** The Academy objects as this RFA is compound and vague and ambiguous as to the phrases "regarding the intent of" and "relating to the selection of their Domain Names." Notwithstanding said objections, the Academy denies this RFA No. 35.

The Academy has described in detail numerous instances of bad faith by GoDaddy.com under the ACPA, including, for example, in response to GoDaddy's Interrogatory No. 14.

Moreover, the Academy has described in detail both the facts showing why the Domain Registrants were engaged in cybersquatting, as well as the facts showing that GoDaddy knew that the Domain Registrants were registering and/or using the Domain Names with a bad faith intent to profit from the Academy's marks. <u>See</u> the Academy's responses to GoDaddy's Interrogatory Nos. 29, 32, and 35.

**SUPPLEMENTAL ANSWER:** The Academy objects as this RFA as compound and vague and ambiguous. Notwithstanding said objections, the Academy denies this RFA No. 33.

The Academy has described in detail numerous instances of bad faith by GoDaddy.com under the ACPA, including, for example, in response to GoDaddy's Interrogatory No. 14.

Moreover, the Academy has described in detail both the facts showing why the Domain Registrants were engaged in cybersquatting, as well as the facts showing that GoDaddy knew that the Domain Registrants were registering and/or using the Domain Names with a bad faith intent to profit from the Academy's marks. <u>See</u> the Academy's first supplemental responses to GoDaddy's Interrogatory Nos. 29, 31, 32, 33, 34, and 35.

**36.    Admit that AMPAS does not have any evidence regarding the intent of the Domain Name Registrants in the Cash Parking Program relating to their use of their Domain Names.**

**ANSWER:**   The Academy objects as this RFA is compound and vague and ambiguous as to the phrases "regarding the intent of" and "relating to their use of their Domain Names."  Notwithstanding said objections, the Academy denies this RFA No. 36.

The Academy has described in detail numerous instances of bad faith by GoDaddy.com under the ACPA, including, for example, in response to GoDaddy's Interrogatory No. 14.

Moreover, the Academy has described in detail both the facts showing why the Domain Registrants were engaged in cybersquatting, as well as the facts showing that GoDaddy knew that the Domain Registrants were registering and/or using the Domain Names with a bad faith intent to profit from the Academy's marks.  See the Academy's responses to GoDaddy's Interrogatory Nos. 29, 32, and 35.

**SUPPLEMENTAL ANSWER:**   The Academy objects as this RFA as compound and vague and ambiguous.  Notwithstanding said objections, the Academy denies this RFA No. 33.

The Academy has described in detail numerous instances of bad faith by GoDaddy.com under the ACPA, including, for example, in response to GoDaddy's Interrogatory No. 14.

Moreover, the Academy has described in detail both the facts showing why the Domain Registrants were engaged in cybersquatting, as well as the facts showing that GoDaddy knew that the Domain Registrants were registering and/or using the Domain Names with a bad faith intent to profit from the Academy's marks.  See the Academy's first supplemental responses to GoDaddy's Interrogatory Nos. 29, 31, 32, 33, 34, and 35.

**37.  Admit that the term "Oscar" in a domain name could refer to a name of a person.**

**ANSWER:**  The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997).  Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculative.  For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to the name of a person.  Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

**SUPPLEMENTAL ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36.  *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997).  Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculative.  Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name alone that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

Notwithstanding said objections, the Academy admits RFA No. 37.

**38.  Admit that the term "oscar" in a domain name could refer to a type of fish.**

**ANSWER:**  The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997).  Even if an

answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculative. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to a type of fish. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

**SUPPLEMENTAL ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculative. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name alone that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

Notwithstanding said objections, the Academy admits RFA No. 38.

**39. Admit that the term "oscar" in a domain name could refer to a type of steak preparation.**

**ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculative. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to a type of steak preparation. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by

GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

**SUPPLEMENTAL ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculative. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name alone that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

Notwithstanding said objections, the Academy admits RFA No. 39.

50. **Admit that the term "oscar" in a domain name could refer to the letter O in the NATO phonetic alphabet.**

**ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculative. For example, in the domain name oscaracademeyaward.com, the Academy denies the term "Oscar" could refer to the letter O in the NATO phonetic alphabet. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name itself that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

**SUPPLEMENTAL ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley*

*Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculative. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name alone that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®.

Notwithstanding said objections, the Academy admits RFA No. 50.

60. **Admit that it is not possible to know the intent of any Domain Name Registrant in selecting their Domain Names by looking only at the Domain Name itself.**

**ANSWER:** The Academy objects as this RFA is compound and vague and ambiguous as to the phrases "know the intent of any Domain Name Registrant" and "selecting their Domain Names." Notwithstanding said objections, the Academy denies this RFA No. 60, as it was the intent of the Domain Name Registrant to register the Domain Name they selected.

**SUPPLEMENTAL ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculative. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name alone that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®. Finally, this RFA is impossibly compound, given the numerous domain names at issue in this lawsuit.

Notwithstanding said objections, the Academy denies this RFA No. 60. First, it was at least the intent of the Domain Name Registrant to register the Domain Name they selected. Second, there are numerous domain names where the Registrant's intent to trade on the goodwill of the Academy's trademarks is clear from the domain name itself. Examples of such domain names include www.2012academyawards.com, www.2011oscars.com, www.academyawards.net, www.academyawardz.com, www.listofacademyawardwinners.com, www.oscarlist.com, www.oscarwinningmovies.com, and www.oscarresults.net, among many others.

**61.** **Admit that you do not know the intent of any Domain Name Registrant in selecting any of their Domain Names.**

**ANSWER:** Objection, vague and ambiguous as to "the intent of any Domain Name Registrant." Notwithstanding said objection, the RFA No. 61 is denied.

**SUPPLEMENTAL ANSWER:** The Academy objects in that this RFA is a hypothetical and improper under Rule 36. *Storck USA L.P. v. Farley Candy Co., Inc.,* 1995 WL 153260 (N.D.Ill. 1995); *Abbot v. U.S.,* 177 F.R.D. 92 (N.D.N.Y.1997). Even if an answer to a hypothetical request were required, it is an incomplete hypothetical rendering any answer incomplete and speculative. Moreover, as the Academy has explained repeatedly, even if the RFA were correct, it is not the domain name alone that the Academy objects to; instead, it is the monetization of the domain name by GoDaddy to promote goods and services obviously relating to the Academy Awards® and the OSCARS®. Finally, this RFA is impossibly compound, given the numerous domain names at issue in this lawsuit.

Notwithstanding said objections, the Academy denies this RFA No. 61. First, it was at least the intent of the Domain Name Registrant to register the

Domain Name they selected. Second, there are numerous domain names where the Registrant's intent to trade on the goodwill of the Academy's trademarks is clear from the domain name itself. Examples of such domain names include www.2012academyawards.com, www.2011oscars.com, www.academyawards.net, www.academyawardz.com, www.listofacademyawardwinners.com, www.oscarlist.com, www.oscarwinningmovies.com, and www.oscarresults.net, among many others.

**62.    Admit that you do not have the exclusive right to the use of the term "oscar."**

ANSWER: The Academy denies this RFA No. 62, as it clearly has the exclusive right to use "OSCAR" as set forth in the Second Amended Complaint and the trademark registrations attached thereto.

SUPPLEMENTAL ANSWER: The Academy objects to this Request on the ground that it is vague and overbroad. Notwithstanding said objections, the Academy admits that it does "not have the exclusive right to use the term 'oscar'" as a general matter. However, the Academy does have the "exclusive right to the use of the term 'oscar'" as set forth in its various trademark registrations attached to the Second Amended Complaint.

**63.    Admit that you are not the only person to have a federal trademark in the term "oscar."**

ANSWER: The Academy admits that there are currently third parties with a trademark that contains the characters "oscar".

SUPPLEMENTAL ANSWER: The Academy admits that there is currently third parties who have federal trademarks containing the characters "oscar." However, the Academy will challenge (or has already challenged)

registrations of those trademarks that infringe on the OSCAR® and OSCARS® mark as registered by the Academy.

**64.    Admit that you are not the only person to have a federal trademark in the term "oscar" relating to an award or recognition of excellence.**

   **ANSWER:**  Objection, vague and ambiguous as to the "term 'oscar'" and this request is not limited in time or scope.

   **SUPPLEMENTAL ANSWER:** The Academy admits that there is currently one federal trademark registration that it is aware of containing the characters "oscar" relating to an award or recognition of excellence.  However, the Academy has already petitioned to cancel this registration.

**65.    Admit that Alliance of Professionals & Consultants, Inc. has a federally registered trademark relating to its OSCAR Awards.**

   **ANSWER:**  Denied.  Based upon a search of the TESS database it does not reveal the Alliance of Professionals & Consultants Inc. has a federally registered trademark to "OSCAR Awards".

   **SUPPLEMENTAL ANSWER:**  Admitted.  However, the Academy has already petitioned to cancel this trademark registration.

DATED:  February 23, 2012      By:  /s/ Enoch Liang

BOIES, SCHILLER & FLEXNER LLP
Stuart Singer (*pro hac vice*)
ssinger@bsfllp.com
David Nelson (*pro hac vice*)
dnelson@bsfllp.com
401 East Las Olas Blvd, Suite 1200
Fort Lauderdale, FL 33301
Tel: 954-356-0011

Fax: 954-356-0022

David L. Zifkin (SBN 232845)
dzifkin@bsfllp.com
David I. Michaels (SBN 276100)
dmichaels@bsfllp.com
225 Santa Monica Blvd., 11th Fl.
Santa Monica, CA 90401
Tel: 310-395-5800
Fax: 310-578-7898

LEE, TRAN & LIANG APLC
James M. Lee (SBN 192301)
jml@ltlcounsel.com
Enoch H. Liang (SBN 212324)
ehl@ltlcounsel.com
601 South Figueroa Street, Suite 4025
Los Angeles, CA 90017
Tel: 213-612-3737
Fax: 213-612-3773

FOOTE, MEYERS, MIELKE
& FLOWERS LLC
Robert M. Foote (*pro hac vice*)
rmf@foote-meyers.com
Kathleen Chavez (*pro hac vice*)
kchavez@foote-meyers.com
Matthew Herman (*pro hac vice*)
mherman@foote-meyers.com
30 North LaSalle Street, Suite 2340
Chicago, IL 60602
Tel: 630-232-6333
Fax: 630-845-8982

*Attorneys for Plaintiff*

# EXHIBIT P

## GO DADDY
## CASHPARKING SERVICE AGREEMENT

This GoDaddy.com, Inc., CashParking Service Agreement ("Agreement") is entered into by and between GoDaddy.com, Inc. ("Go Daddy") a/n Arizona corporation and you and your heirs, agents, successors and assigns (collectively, "You"), and is made effective as of the date of electronic execution. This Agreement sets forth the terms and conditions of Your use of Go Daddy's CashParking service and its related services (collectively, the "Services") and represents the entire agreement between You and Go Daddy concerning the subject matter hereof. By using the Services, You acknowledge that You have read, understand, acknowledge and agree to be bound by all the terms and conditions of this Agreement, along with any new, different or additional terms, conditions or policies including, but not limited to, the Universal Terms of Service that Go Daddy may establish from time to time, in its sole discretion, and any agreements that Go Daddy is currently bound by or may become bound by in the future. Such Agreements may be found here. All Go Daddy policies and agreements related to Your use of the Services are incorporated herein and made part of this Agreement by reference.

## THE SERVICE

Go Daddy grants You a non-exclusive license to use the Services, provided, however, that You abide by the terms and conditions set forth herein and in each of Go Daddy's policies and procedures.

The Services generally allow You to:

    i.  provide a platform for advertising link on parked pages;

    ii.  generate revenue from the advertising links on a per click basis; and

    iii.  receive a portion of the revenue generated from the advertising links.

**Availability of Services**

Subject to the terms and conditions of this Agreement and each of Go Daddy's policies and procedures, Go Daddy shall use commercially reasonable efforts to attempt to provide the Services on a twenty-four (24) hours a day, seven (7) days a week basis throughout the term of this Agreement. You acknowledge and agree that from time to time the Services may be inaccessible or inoperable for any reason, including, without limitation: (i) equipment malfunctions; (ii) periodic maintenance procedures or repairs that Go Daddy may undertake from time to time; or (iii) causes beyond the reasonable control of Go Daddy or that are not reasonably foreseeable by Go Daddy, including, without limitation, interruption or failure of telecommunication or digital transmission links, hostile network attacks, network congestion or other failures. You acknowledge and agree that Go Daddy has no control over the availability of the Services on a continuous or uninterrupted basis.

**Calculation of Revenue; Cancellation**

Go Daddy shall use commercially reasonable efforts to provide You with accurate daily estimates of the revenue Your web site(s) generates. You acknowledge and agree that any daily estimates are not an exact determination, do not represent an exact determination and that the actual amount(s) determined at the end of any revenue generating period may be different. Additionally, in calculating the distribution of revenue generated by any web site, amounts may include fractions of a cent. Go Daddy shall use commercially reasonable efforts to round these amounts to the nearest cent in a manner so as to benefit You. However, You acknowledge and agree that in calculating the distribution of revenue generated by any web site, Go Daddy's determination of any amount owed to You shall be the final and binding determination. Upon Your cancellation of Your Services, You acknowledge and agree that Go Daddy has the right to charge You a Fifteen and No/100 Dollar ($15.00) administrative fee in connection with Your cancellation. This amount shall be deducted from any unpaid funds in Your Service account. Any funds in excess shall be paid to You in accordance with Your selected payment option.

## TRADEMARK DISPUTE POLICY

Go Daddy supports the protection of intellectual property, and has developed policies and procedures to assist intellectual property rights owners in the protection of their brands. If You believe a domain name is in itself an infringement of Your intellectual property, please follow the dispute procedure outlined below. If You believe the advertising and links present on a domain name using the Services is infringing, please submit a complaint to

GD 001822

trademarkclaims@godaddy.com , and insert "CashParking Trademark Claim" in the subject line.

To be considered effective, the email notification must contain the following information:

i. sufficient evidence that the party posting the trademark that is claimed to be infringing is a Go Daddy customer;

ii. the trademark, service mark, trade dress, name, or other indicia of origin (the "Mark") that is claimed to be infringed;

iii. the name, post office address and telephone number of the owner of the Mark identified above;

iv. the goods and/or services covered by or offered under the Mark identified above;

v. the date of first use of the Mark identified above;

vi. the date of first use in interstate commerce of the Mark identified above;

vii. the advertisement, text link or domain name You believe is an infringement of the Mark identified above;

viii. the goods and/or services covered by or offered under the mark claimed to be infringing;

ix. the precise location of the advertisement, text link or domain name that is claimed to be infringing, including electronic mail address, etc.; and

x. a good faith certification signed under penalty of perjury, stating: (i) the mark [identify mark] infringes the rights of another party; (ii) the name of such said party; (iii) the mark [identify mark] being infringed, and (iv) that the use of the mark [identify mark] claimed to be infringing at issue is not defensible.

Upon receipt of the appropriate information identified above, Go Daddy will initiate an investigation. If Go Daddy determines in its sole discretion that You have raised a legitimate trademark claim, Go Daddy may, in its sole discretion and without any legal obligation to do so, notify the posting party, remove any disputed domain name and/or redirect the offending domain name to an alternative page.

**Notification to Go Daddy Customers and Account Holders**

It is Go Daddy's policy to provide for the termination, in appropriate circumstances, of Go Daddy customers and account holders who are repeat infringers of trademarks or any other intellectual property.

## LIMITATION OF LIABILITY

THE SERVICES AND THE ASSOCIATED SOFTWARE (IF ANY) ARE BEING PROVIDED AND/OR LICENSED "AS IS" AND GO DADDY DISCLAIMS ANY AND ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTIBILITY OR FITNESS FOR A PARTICULAR PURPOSE, TO THE FULLEST EXTENT PERMITTED OR AUTHORIZED BY LAW. WITHOUT LIMITATION OF THE FOREGOING, GO DADDY EXPRESSLY DOES NOT WARRANT THAT THE SERVICES OR THE ASSOCIATED SOFTWARE WILL MEET YOUR REQUIREMENTS OR THAT USE OF THE SERVICES OR OPERATION OF THE ASSOCIATED SOFTWARE WILL BE UNINTERRUPTED OR ERROR FREE.

IN NO EVENT SHALL GO DADDY BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, OR CONSEQUENTIAL DAMAGES (INCLUDING, BUT NOT LIMITED TO, PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES; LOSS OF USE, DATA, OR PROFITS; OR BUSINESS INTERRUPTION) HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY, WHETHER IN CONTRACT, STRICT LIABILITY, OR TORT (INCLUDING NEGLIGENCE OR OTHERWISE) ARISING IN ANY WAY OUT OF THE USE OF THE SERVICES, EVEN IF GO DADDY IS AWARE OF OR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

## GO DADDY 'S RIGHTS AND RESTRICTIONS; REMEDIES AND PENALTIES

Go Daddy explicitly reserves the right and sole discretion to: (i) modify its pricing, if desired by Go Daddy ; (ii) review Your use of the Services for excessive space and bandwidth utilization, if applicable, and to terminate Your use of the Services or apply additional fees if You exceed allowed levels; (iii) establish limits and guidelines concerning the use of the Services; (iv) terminate Your use of the Services for use of the Services to unnecessarily or illegally harass, non-payment of fees for the Services, activities designed to defame, embarrass, harm, abuse, threaten, slander or harass third parties, activities prohibited by the laws of the United

GD 001823

States and/or foreign territories in which You conduct business, activities designed to encourage unlawful behavior by others, such as hate crimes, terrorism and child pornography, activities that are tortious, vulgar, obscene, invasive of the privacy of a third party, racially, ethnically, or otherwise objectionable in the sole opinion of Go Daddy, activities designed to impersonate the identity of a third party, activities designed to harm minors in any way, and other activities whether lawful or unlawful that Go Daddy determines, in its sole discretion, to be harmful to its other customers, operations, or reputation; (v) terminate Your use of the Services if Your use of the Services results in, or is the subject of, legal action or threatened or proposed legal action, against Go Daddy or any of its affiliates or partners, without consideration for whether such legal action or threatened or proposed legal action is eventually determined to be with or without merit, and (vi) terminate Your use of the Services if You have not accessed or logged into it for more than ninety (90) days.

You may not generate traffic to Your website or Go Daddy's links by any of the following methods: listing on newsgroups, bulk e-mailing, icq postings, chatroom postings, iframes, zero pixel frames, hitbots, clickbots, spiders, cgi-scripts, JavaScript, click farms or any other similar method. You may not beg, ask, entice or incentivize users into clicking on Go Daddy's links. You may not mislead visitors into believing that he/she shall receive anything other than an internet search by clicking on a textlink or search box. Referring pages must not be password protected in any way.

### Remedies and Penalties

Notwithstanding anything to the contrary in this Agreement, in addition to any and all other remedies to which Go Daddy is entitled, Go Daddy specifically reserves the right to (i) immediately suspend any domain names that Go Daddy believes in its sole discretion to be violating the terms of this Agreement, (ii) charge You a Twenty Nine and No/100 Dollars ($29.00) administrative fee for any and each domain name that Go Daddy believes in its sole discretion to be violating the terms of this Agreement, (iii) require the forfeiture of any previously earned revenue in connection with the Services, which has yet to be paid, (iv) deactivate any and all accounts and domains that Go Daddy believes in its sole discretion to be violating the terms of this Agreement, and (v) provide advertising partners with any and all domain names that Go Daddy believe in its sole discretion to be violating the terms of this Agreement.

### Additional Restrictions

You shall not: (a) edit, modify, filter or change the order of the information contained in any search results page or on the landing page without Go Daddy's prior written consent; (b) host the search results pages; (c) redirect an end user away from the search results page, provide a version of the search results page different from the page served to an end user by or as directed by Go Daddy, cache, capture, or store any search results; or intersperse any content between the landing page and the search results page, including, without limitation, content framing landing pages or search results pages; (d) display any search results pages or landing pages, or the content thereof, in part or in total, to any third parties, including, without limitation, display on any Your Web sites or anywhere else; (e) enter into any arrangement or agreement under which any third party pays You fees or shares in any revenue payments and/or royalties for any search results displayed on the Your Web site, except as permitted in this Agreement; (f) display graphical or text units in any form (including but not limited to pop-up, pop-under or exit windows, expanding buttons and animation) that block or otherwise inhibit the full and complete display to end users of any search results pages, landing pages, and/or Web pages accessed by clicking on any part of a search result; (g) provide any interface for downloading any computer software application (each, an "Downloadable App"), any marketing materials for any Downloadable App, or any hyperlinks to any of the foregoing. You shall also abide by the following limitations, among others: (a) under no circumstances shall You Web site be a downloadable or internet accessible application, as determined by Go Daddy in its sole reasonable discretion; (b) search results pages accessed through the Program shall be solely through Go Daddy ?s servers (or such other servers as Go Daddy in its sole discretion may use), hosted on Go Daddy ?s servers or domains, meaning that Go Daddy shall host or on its behalf provide for hosting of all Search Results Pages in response to valid queries; (d) Your Web site may not place or display any unauthorized branding or attribution of any kind, including without limitation on any landing page, search results page or framed in conjunction with any such pages, to indicate that any search engine is providing such results or for other promotional purposes; (e) Your Web site shall not contain any pornographic, hate-related or violent content or contain any other material, products or services that (i) violate or encourage conduct that would violate any criminal laws, any other applicable laws, or any third party rights, or (ii) would otherwise give rise to civil liability ; or (f) under no circumstances shall You include content above or below the landing page unless that content is pre-approved in writing by Go Daddy, and all changes to any such content must also be pre-approved in writing by Go Daddy.

GD 001824

Revised: 11/27/2006
Copyright © 2006 GoDaddy.com, Inc. All Rights Reserved.

Archived by: Linda J Jett - (4602) - 5/21/2007 9:15:12 AM

GD 001825

## GO DADDY
## CASHPARKING SERVICE AGREEMENT

This GoDaddy.com, Inc., CashParking Service Agreement ("Agreement") is entered into by and between GoDaddy.com, Inc. ("Go Daddy") a/n Arizona corporation and you and your heirs, agents, successors and assigns (collectively, "You"), and is made effective as of the date of electronic execution. This Agreement sets forth the terms and conditions of Your use of Go Daddy's CashParking service and its related services (collectively, the "Services") and represents the entire agreement between You and Go Daddy concerning the subject matter hereof. By using the Services, You acknowledge that You have read, understand, acknowledge and agree to be bound by all the terms and conditions of this Agreement, along with any new, different or additional terms, conditions or policies including, but not limited to, the Universal Terms of Service that Go Daddy may establish from time to time, in its sole discretion, and any agreements that Go Daddy is currently bound by or may become bound by in the future. Such Agreements may be found here. All Go Daddy policies and agreements related to Your use of the Services are incorporated herein and made part of this Agreement by reference.

## THE SERVICE

Go Daddy grants You a non-exclusive license to use the Services, provided, however, that You abide by the terms and conditions set forth herein and in each of Go Daddy's policies and procedures.

The Services generally allow You to:

    i.  provide a platform for advertising link on parked pages;

    ii.  generate revenue from the advertising links on a per click basis; and

    iii.  receive a portion of the revenue generated from the advertising links.

**Availability of Services**

Subject to the terms and conditions of this Agreement and each of Go Daddy's policies and procedures, Go Daddy shall use commercially reasonable efforts to attempt to provide the Services on a twenty-four (24) hours a day, seven (7) days a week basis throughout the term of this Agreement. You acknowledge and agree that from time to time the Services may be inaccessible or inoperable for any reason, including, without limitation: (i) equipment malfunctions; (ii) periodic maintenance procedures or repairs that Go Daddy may undertake from time to time; or (iii) causes beyond the reasonable control of Go Daddy or that are not reasonably foreseeable by Go Daddy, including, without limitation, interruption or failure of telecommunication or digital transmission links, hostile network attacks, network congestion or other failures. You acknowledge and agree that Go Daddy has no control over the availability of the Services on a continuous or uninterrupted basis.

**Calculation of Revenue; Cancellation**

Go Daddy shall use commercially reasonable efforts to provide You with accurate daily estimates of the revenue Your web site(s) generates. You acknowledge and agree that any daily estimates are not an exact determination, do not represent an exact determination and that the actual amount(s) determined at the end of any revenue generating period may be different. Additionally, in calculating the distribution of revenue generated by any web site, amounts may include fractions of a cent. Go Daddy shall use commercially reasonable efforts to round these amounts to the nearest cent in a manner so as to benefit You. However, You acknowledge and agree that in calculating the distribution of revenue generated by any web site, Go Daddy's determination of any amount owed to You shall be the final and binding determination. Upon Your cancellation of Your Services, You acknowledge and agree that Go Daddy has the right to charge You a Fifteen and No/100 Dollar ($15.00) administrative fee in connection with Your cancellation. This amount shall be deducted from any unpaid funds in Your Service account. Any funds in excess shall be paid to You in accordance with Your selected payment option.

## TRADEMARK DISPUTE POLICY

Go Daddy supports the protection of intellectual property, and has developed policies and procedures to assist intellectual property rights owners in the protection of their brands. If You believe a domain name is in itself an infringement of Your intellectual property, please follow the dispute procedure outlined below. If You believe the advertising and links present on a domain name using the Services is infringing, please submit a complaint to

GD 001826

trademarkclaims@godaddy.com , and insert "CashParking Trademark Claim" in the subject line.

To be considered effective, the email notification must contain the following information:

    i. sufficient evidence that the party posting the trademark that is claimed to be infringing is a Go Daddy customer;

    ii. the trademark, service mark, trade dress, name, or other indicia of origin (the "Mark") that is claimed to be infringed;

    iii. the name, post office address and telephone number of the owner of the Mark identified above;

    iv. the goods and/or services covered by or offered under the Mark identified above;

    v. the date of first use of the Mark identified above;

    vi. the date of first use in interstate commerce of the Mark identified above;

    vii. the advertisement, text link or domain name You believe is an infringement of the Mark identified above;

    viii. the goods and/or services covered by or offered under the mark claimed to be infringing;

    ix. the precise location of the advertisement, text link or domain name that is claimed to be infringing, including electronic mail address, etc.; and

    x. a good faith certification signed under penalty of perjury, stating: (i) the mark [identify mark] infringes the rights of another party; (ii) the name of such said party; (iii) the mark [identify mark] being infringed, and (iv) that the use of the mark [identify mark] claimed to be infringing at issue is not defensible.

Upon receipt of the appropriate information identified above, Go Daddy will initiate an investigation. If Go Daddy determines in its sole discretion that You have raised a legitimate trademark claim, Go Daddy may, in its sole discretion and without any legal obligation to do so, notify the posting party, remove any disputed domain name and/or redirect the offending domain name to an alternative page.

**Notification to Go Daddy Customers and Account Holders**

It is Go Daddy's policy to provide for the termination, in appropriate circumstances, of Go Daddy customers and account holders who are repeat infringers of trademarks or any other intellectual property.

## LIMITATION OF LIABILITY

THE SERVICES AND THE ASSOCIATED SOFTWARE (IF ANY) ARE BEING PROVIDED AND/OR LICENSED "AS IS" AND GO DADDY DISCLAIMS ANY AND ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTIBILITY OR FITNESS FOR A PARTICULAR PURPOSE, TO THE FULLEST EXTENT PERMITTED OR AUTHORIZED BY LAW. WITHOUT LIMITATION OF THE FOREGOING, GO DADDY EXPRESSLY DOES NOT WARRANT THAT THE SERVICES OR THE ASSOCIATED SOFTWARE WILL MEET YOUR REQUIREMENTS OR THAT USE OF THE SERVICES OR OPERATION OF THE ASSOCIATED SOFTWARE WILL BE UNINTERRUPTED OR ERROR FREE.

IN NO EVENT SHALL GO DADDY BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, OR CONSEQUENTIAL DAMAGES (INCLUDING, BUT NOT LIMITED TO, PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES; LOSS OF USE, DATA, OR PROFITS; OR BUSINESS INTERRUPTION) HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY, WHETHER IN CONTRACT, STRICT LIABILITY, OR TORT (INCLUDING NEGLIGENCE OR OTHERWISE) ARISING IN ANY WAY OUT OF THE USE OF THE SERVICES, EVEN IF GO DADDY IS AWARE OF OR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

## GO DADDY 'S RIGHTS AND RESTRICTIONS; REMEDIES AND PENALTIES

Go Daddy explicitly reserves the right and sole discretion to: (i) modify its pricing, if desired by Go Daddy ; (ii) review Your use of the Services for excessive space and bandwidth utilization, if applicable, and to terminate Your use of the Services or apply additional fees if You exceed allowed levels; (iii) establish limits and guidelines concerning the use of the Services; (iv) terminate Your use of the Services for use of the Services to unnecessarily or illegally harass, non-payment of fees for the Services, activities designed to defame, embarrass, harm, abuse, threaten, slander or harass third parties, activities prohibited by the laws of the United

GD 001827

States and/or foreign territories in which You conduct business, activities designed to encourage unlawful behavior by others, such as hate crimes, terrorism and child pornography, activities that are tortious, vulgar, obscene, invasive of the privacy of a third party, racially, ethnically, or otherwise objectionable in the sole opinion of Go Daddy, activities designed to impersonate the identity of a third party, activities designed to harm minors in any way, and other activities whether lawful or unlawful that Go Daddy determines, in its sole discretion, to be harmful to its other customers, operations, or reputation; (v) terminate Your use of the Services if Your use of the Services results in, or is the subject of, legal action or threatened or proposed legal action, against Go Daddy or any of its affiliates or partners, without consideration for whether such legal action or threatened or proposed legal action is eventually determined to be with or without merit, and (vi) terminate Your Use of the Services if You have not accessed or logged into it for more than ninety (90) days.

You may not purchase or generate traffic to Your website or Go Daddy's links by any of the following methods: listing on newsgroups, bulk e-mailing, icq postings, chatroom postings, iframes, zero pixel frames, hitbots, clickbots, spiders, cgi-scripts, JavaScript, click farms, advertising the domain name or purchasing advertising for the domain name or any other similar method. You may not beg, ask, entice or incentivize users into clicking on Go Daddy's links. You may not mislead visitors into believing that he/she shall receive anything other than an internet search by clicking on a textlink or search box. Referring pages must not be password protected in any way.

## Remedies and Penalties

Notwithstanding anything to the contrary in this Agreement, in addition to any and all other remedies to which Go Daddy is entitled, Go Daddy specifically reserves the right to (i) immediately suspend any domain names that Go Daddy believes in its sole discretion to be violating the terms of this Agreement, (ii) charge You a Twenty Nine and No/100 Dollars ($29.00) administrative fee for any and each domain name that Go Daddy believes in its sole discretion to be violating the terms of this Agreement, (iii) require the forfeiture of any previously earned revenue in connection with the Services, which has yet to be paid, (iv) deactivate any and all accounts and domains that Go Daddy believes in its sole discretion to be violating the terms of this Agreement, and (v) provide advertising partners with any and all domain names that Go Daddy believe in its sole discretion to be violating the terms of this Agreement.

## Additional Restrictions

You shall not: (a) edit, modify, filter or change the order of the information contained in any search results page or on the landing page without Go Daddy's prior written consent; (b) host the search results pages; (c) redirect an end user away from the search results page, provide a version of the search results page different from the page served to an end user by or as directed by Go Daddy, cache, capture, or store any search results; or intersperse any content between the landing page and the search results page, including, without limitation, content framing landing pages or search results pages; (d) display any search results pages or landing pages, or the content thereof, in part or in total, to any third parties, including, without limitation, display on any Your Web sites or anywhere else; (e) enter into any arrangement or agreement under which any third party pays You fees or shares in any revenue payments and/or royalties for any search results displayed on the Your Web site, except as permitted in this Agreement; (f) display graphical or text units in any form (including but not limited to pop-up, pop-under or exit windows, expanding buttons and animation) that block or otherwise inhibit the full and complete display to end users of any search results pages, landing pages, and/or Web pages accessed by clicking on any part of a search result; (g) provide any interface for downloading any computer software application (each, an "Downloadable App"), any marketing materials for any Downloadable App, or any hyperlinks to any of the foregoing. You shall also abide by the following limitations, among others: (a) under no circumstances shall You Web site be a downloadable or internet accessible application, as determined by Go Daddy in its sole reasonable discretion; (b) search results pages accessed through the Program shall be solely through Go Daddy ?s servers (or such other servers as Go Daddy in its sole discretion may use), hosted on Go Daddy ?s servers or domains, meaning that Go Daddy shall host or on its behalf provide for hosting of all Search Results Pages in response to valid queries; (d) Your Web site may not place or display any unauthorized branding or attribution of any kind, including without limitation on any landing page, search results page or framed in conjunction with any such pages, to indicate that any search engine is providing such results or for other promotional purposes; (e) Your Web site shall not contain any pornographic, hate-related or violent content or contain any other material, products or services that (i) violate or encourage conduct that would violate any criminal laws, any other applicable laws, or any third party rights, or (ii) would otherwise give rise to civil liability ; or (f) under no circumstances shall You include content above or below the landing page unless that content is pre-approved in writing by Go Daddy, and all changes to any such content must also be pre-approved in writing by Go Daddy.

GD 001828

Revised: 5/21/2007
Copyright    2007 GoDaddy.com, Inc. All Rights Reserved.
**Archived by: Jewel L Eldridge - (6009) - 11/12/2008 11:32:38 AM**

# GO DADDY
# CASHPARKING SERVICE AGREEMENT

This CashParking Service Agreement ("Agreement") is entered into by and between GoDaddy.com, Inc. ("Go Daddy") a/n Arizona corporation and you and your heirs, agents, successors and assigns (collectively, "You"), and is made effective as of the date of electronic execution. This Agreement sets forth the terms and conditions of Your use of Go Daddy's CashParking service and its related services (collectively, the "Services") and represents the entire agreement between You and Go Daddy concerning the subject matter hereof. By using the Services, You acknowledge that You have read, understand, acknowledge and agree to be bound by all the terms and conditions of this Agreement, along with any new, different or additional terms, conditions or policies including, but not limited to, the Universal Terms of Service that Go Daddy may establish from time to time, in its sole discretion, and any agreements that Go Daddy is currently bound by or may become bound by in the future. Such Agreements may be found here. All Go Daddy policies and agreements related to Your use of the Services are incorporated herein and made part of this Agreement by reference.

## 1. THE SERVICE

Go Daddy grants You a non-exclusive license to use the Services, provided, however, that You abide by the terms and conditions set forth herein and in each of Go Daddy's policies and procedures.

The Services generally allow You to:

    i.  provide a platform for advertising link on parked pages;

    ii.  generate revenue from the advertising links on a per click basis; and

    iii.  receive a portion of the revenue generated from the advertising links.

### Availability of Services

Subject to the terms and conditions of this Agreement and each of Go Daddy's policies and procedures, Go Daddy shall use commercially reasonable efforts to attempt to provide the Services on a twenty-four (24) hours a day, seven (7) days a week basis throughout the term of this Agreement. You acknowledge and agree that from time to time the Services may be inaccessible or inoperable for any reason, including, without limitation: (i) equipment malfunctions; (ii) periodic maintenance procedures or repairs that Go Daddy may undertake from time to time; or (iii) causes beyond the reasonable control of Go Daddy or that are not reasonably foreseeable by Go Daddy, including, without limitation, interruption or failure of telecommunication or digital transmission links, hostile network attacks, network congestion or other failures. You acknowledge and agree that Go Daddy has no control over the availability of the Services on a continuous or uninterrupted basis.

### Calculation of Revenue; Cancellation

Go Daddy shall use commercially reasonable efforts to provide You with accurate daily estimates of the revenue Your web site(s) generates. You acknowledge and agree that any daily estimates are not an exact determination, do not represent an exact determination and that the actual amount(s) determined at the end of any revenue generating period may be different. Additionally, in calculating the distribution of revenue generated by any web site, amounts may include fractions of a cent. Go Daddy shall use commercially reasonable efforts to round these amounts to the nearest cent in a manner so as to benefit You. However, You acknowledge and agree that in calculating the distribution of revenue generated by any web site, Go Daddy's determination of any amount owed to You shall be the final and binding determination. Upon Your cancellation of Your Services, You acknowledge and agree that Go Daddy has the right to charge You a Fifteen and No/100 Dollar ($15.00) administrative fee in connection with Your cancellation. This amount shall be deducted from any unpaid funds in Your Service account. Any funds in excess shall be paid to You in accordance with Your selected payment option.

## 2. TRADEMARK DISPUTE POLICY

Go Daddy supports the protection of intellectual property, and has developed policies and procedures to assist intellectual property rights owners in the protection of their brands. If You believe a domain name is in itself an infringement of Your intellectual property, please follow the dispute procedure outlined below. If You believe the advertising and links present on a domain name using the Services is infringing, please submit a complaint to trademarkclaims@godaddy.com , and insert "CashParking Trademark Claim" in the subject line.

GD 001830

To be considered effective, the email notification must contain the following information:

i. sufficient evidence that the party posting the trademark that is claimed to be infringing is a Go Daddy customer;

ii. the trademark, service mark, trade dress, name, or other indicia of origin (the "Mark") that is claimed to be infringed;

iii. the name, post office address and telephone number of the owner of the Mark identified above;

iv. the goods and/or services covered by or offered under the Mark identified above;

v. the date of first use of the Mark identified above;

vi. the date of first use in interstate commerce of the Mark identified above;

vii. the advertisement, text link or domain name You believe is an infringement of the Mark identified above;

viii. the goods and/or services covered by or offered under the mark claimed to be infringing;

ix. the precise location of the advertisement, text link or domain name that is claimed to be infringing, including electronic mail address, etc.; and

x. a good faith certification signed under penalty of perjury, stating: (i) the mark [identify mark] infringes the rights of another party; (ii) the name of such said party; (iii) the mark [identify mark] being infringed, and (iv) that the use of the mark [identify mark] claimed to be infringing at issue is not defensible.

Upon receipt of the appropriate information identified above, Go Daddy will initiate an investigation. If Go Daddy determines in its sole discretion that You have raised a legitimate trademark claim, Go Daddy may, in its sole discretion and without any legal obligation to do so, notify the posting party, remove any disputed domain name and/or redirect the offending domain name to an alternative page.

**Notification to Go Daddy Customers and Account Holders**

It is Go Daddy's policy to provide for the termination, in appropriate circumstances, of Go Daddy customers and account holders who are repeat infringers of trademarks or any other intellectual property.

## 3. GO DADDY 'S RIGHTS AND RESTRICTIONS; REMEDIES AND PENALTIES

Go Daddy explicitly reserves the right and sole discretion to: (i) modify its pricing, if desired by Go Daddy ; (ii) review Your use of the Services for excessive space and bandwidth utilization, if applicable, and to terminate Your use of the Services or apply additional fees if You exceed allowed levels; (iii) establish limits and guidelines concerning the use of the Services; (iv) terminate Your use of the Services for use of the Services to unnecessarily or illegally harass, non-payment of fees for the Services, activities designed to defame, embarrass, harm, abuse, threaten, slander or harass third parties, activities prohibited by the laws of the United States and/or foreign territories in which You conduct business, activities designed to encourage unlawful behavior by others, such as hate crimes, terrorism and child pornography, activities that are tortious, vulgar, obscene, invasive of the privacy of a third party, racially, ethnically, or otherwise objectionable in the sole opinion of Go Daddy, activities designed to impersonate the identity of a third party, activities designed to harm minors in any way, and other activities whether lawful or unlawful that Go Daddy determines, in its sole discretion, to be harmful to its other customers, operations, or reputation; (v) terminate Your use of the Services if Your use of the Services results in, or is the subject of, legal action or threatened or proposed legal action, against Go Daddy or any of its affiliates or partners, without consideration for whether such legal action or threatened or proposed legal action is eventually determined to be with or without merit, and (vi) terminate Your use of the Services if You have not accessed or logged into it for more than ninety (90) days.

You may not purchase or generate traffic to Your web site or Go Daddy's links by any of the following methods: listing on newsgroups, bulk e-mailing, icq postings, chatroom postings, iframes, zero pixel frames, hitbots, clickbots, spiders, cgi-scripts, JavaScript, click farms, advertising the domain name or purchasing advertising for the domain name or any similar method. You may not beg, ask, entice or incentivize users into clicking on Go Daddy's links. You may not mislead visitors into believing that he/she shall receive anything other than an internet search by clicking on a textlink or search box. Referring pages must not be password protected in any way.

**Remedies and Penalties**

GD 001831

Notwithstanding anything to the contrary in this Agreement, in addition to any and all other remedies to which Go Daddy is entitled, Go Daddy specifically reserves the right to (i) immediately suspend any domain names that Go Daddy believes in its sole discretion to be violating the terms of this Agreement, (ii) charge You a Twenty Nine and No/100 Dollars ($29.00) administrative fee for any and each domain name that Go Daddy believes in its sole discretion to be violating the terms of this Agreement, (iii) require the forfeiture of any previously earned revenue in connection with the Services, which has yet to be paid, (iv) deactivate any and all accounts and domains that Go Daddy believes in its sole discretion to be violating the terms of this Agreement, and (v) provide advertising partners with any and all domain names that Go Daddy believe in its sole discretion to be violating the terms of this Agreement.

## Additional Restrictions

You shall not: (a) edit, modify, filter or change the order of the information contained in any search results page or on the landing page without Go Daddy's prior written consent; (b) host the search results pages; (c) redirect an end user away from the search results page, provide a version of the search results page different from the page served to an end user by or as directed by Go Daddy, cache, capture, or store any search results; or intersperse any content between the landing page and the search results page, including, without limitation, content framing landing pages or search results pages; (d) display any search results pages or landing pages, or the content thereof, in part or in total, to any third parties, including, without limitation, display on any Your Web sites or anywhere else; (e) enter into any arrangement or agreement under which any third party pays You fees or shares in any revenue payments and/or royalties for any search results displayed on the Your web site, except as permitted in this Agreement; (f) display graphical or text units in any form (including but not limited to pop-up, pop-under or exit windows, expanding buttons and animation) that block or otherwise inhibit the full and complete display to end users of any search results pages, landing pages, and/or web pages accessed by clicking on any part of a search result; (g) provide any interface for downloading any computer software application (each, an "Downloadable App"), any marketing materials for any Downloadable App, or any hyperlinks to any of the foregoing. You shall also abide by the following limitations, among others: (a) under no circumstances shall Your web site be a downloadable or internet accessible application, as determined by Go Daddy in its sole reasonable discretion; (b) search results pages accessed through the Program shall be solely through Go Daddy ?s servers (or such other servers as Go Daddy in its sole discretion may use), hosted on Go Daddy ?s servers or domains, meaning that Go Daddy shall host or on its behalf provide for hosting of all Search Results Pages in response to valid queries; (d) Your Web site may not place or display any unauthorized branding or attribution of any kind, including without limitation on any landing page, search results page or framed in conjunction with any such pages, to indicate that any search engine is providing such results or for other promotional purposes; (e) Your web site shall not contain any pornographic, hate-related or violent content or contain any other material, products or services that (i) violate or encourage conduct that would violate any criminal laws, any other applicable laws, or any third party rights, or (ii) would otherwise give rise to civil liability; or (f) under no circumstances shall You include content above or below the landing page unless that content is pre-approved in writing by Go Daddy, and all changes to any such content must also be pre-approved in writing by Go Daddy.

Revised: 11/12/2008
Copyright    2008 GoDaddy.com, Inc. All Rights Reserved.

Archived by: Jewel L Eldridge - (6009) - 5/7/2009 9:40:45 AM

## GO DADDY
## CASHPARKING SERVICE AGREEMENT

This CashParking Service Agreement ("Agreement") is entered into by and between GoDaddy.com, Inc. ("Go Daddy") a/an Arizona corporation and you and your heirs, agents, successors and assigns (collectively, "You"), and is made effective as of the date of electronic execution. This Agreement sets forth the terms and conditions of Your use of Go Daddy's CashParking service and its related services (collectively, the "Services") and represents the entire agreement between You and Go Daddy concerning the subject matter hereof. By using the Services, You acknowledge that You have read, understand, acknowledge and agree to be bound by all the terms and conditions of this Agreement, along with any new, different or additional terms, conditions or policies including, but not limited to, the Universal Terms of Service that Go Daddy may establish from time to time, in its sole discretion, and any agreements that Go Daddy is currently bound by or may become bound by in the future. Such Agreements may be found here. All Go Daddy policies and agreements related to Your use of the Services are incorporated herein and made part of this Agreement by reference.

## 1. THE SERVICE

Go Daddy grants You a non-exclusive license to use the Services, provided, however, that You abide by the terms and conditions set forth herein and in each of Go Daddy's policies and procedures.

The Services generally allow You to:

    i.  provide a platform for advertising link on parked pages;

    ii.  generate revenue from the advertising links on a per click basis; and

    iii.  receive a portion of the revenue generated from the advertising links.

### Availability of Services

Subject to the terms and conditions of this Agreement and each of Go Daddy's policies and procedures, Go Daddy shall use commercially reasonable efforts to attempt to provide the Services on a twenty-four (24) hours a day, seven (7) days a week basis throughout the term of this Agreement. You acknowledge and agree that from time to time the Services may be inaccessible or inoperable for any reason, including, without limitation: (i) equipment malfunctions; (ii) periodic maintenance procedures or repairs that Go Daddy may undertake from time to time; or (iii) causes beyond the reasonable control of Go Daddy or that are not reasonably foreseeable by Go Daddy, including, without limitation, interruption or failure of telecommunication or digital transmission links, hostile network attacks, network congestion or other failures. You acknowledge and agree that Go Daddy has no control over the availability of the Services on a continuous or uninterrupted basis.

### Calculation of Revenue; Cancellation

Go Daddy shall use commercially reasonable efforts to provide You with accurate daily estimates of the revenue Your web site(s) generates. You acknowledge and agree that any daily estimates are not an exact determination, do not represent an exact determination and that the actual amount(s) determined at the end of any revenue generating period may be different. Additionally, in calculating the distribution of revenue generated by any web site, amounts may include fractions of a cent. Go Daddy shall use commercially reasonable efforts to round these amounts to the nearest cent in a manner so as to benefit You. However, You acknowledge and agree that in calculating the distribution of revenue generated by any web site, Go Daddy's determination of any amount owed to You shall be the final and binding determination. Upon Your cancellation of Your Services, You acknowledge and agree that Go Daddy has the right to charge You a Fifteen and No/100 Dollar ($15.00) administrative fee in connection with Your cancellation. This amount shall be deducted from any unpaid funds in Your Service account. Any funds in excess shall be paid to You in accordance with Your selected payment option.

## 2. PAYMENT

Commission payments for all domestic Cashparking Customers ("?You?") will be paid by via direct deposit into the U.S. bank account of their choice ("Direct Deposit Account"). You understand it is Your responsibility to provide a valid U.S. bank account number and the related direct deposit information by signing into the Go Daddy Control Center. Failure to provide a valid Direct Deposit Account will cause Your commission payments to be withheld pending receipt by Go Daddy of proper direct deposit instructions. You can find the instructions

GD 001833

on how to set up a Direct Deposit Account at any time by clicking on the "Payment Information" link from Your home page on the Go Daddy Control Center.

Domestic Cashparking Customers hereby authorize Go Daddy to initiate and post credit (positive) entries for commission payments to the Direct Deposit Account. Domestic Cashparking Customers understand the amount initiated and posted to the Direct Deposit Account on a monthly basis will represent payment for commissions earned in the preceding second month, less any applicable fees and/or charge backs. For example commissions earned in January 2009 would be paid by March 15 th 2009. Direct Deposit Account owners hereby authorize their Depository Institution to accept credits on behalf of the Direct Deposit Account owner. Direct deposit transactions will be initiated on the 15th day of each month or if the 15th falls on a non-banking day, then direct deposit transactions will be initiated the next banking day. A $15.00 minimum threshold is required before a payment is made to the Direct Deposit Account.

Domestic Cashparking Customers hereby authorize Go Daddy to initiate and post debit (negative) entries to the Direct Deposit Account to reverse erroneous commission payments and/or make adjustments to incorrect commission payments.

The authority granted to Go Daddy by the Direct Deposit Account owner herein will remain in full force and effect until Go Daddy or the Depository Institution has received written notification from the Direct Deposit Account owner that such authority has been revoked, but in any event, such writing shall be provided in such a manner as to afford Go Daddy or the Depository Institution a reasonable opportunity to act on such revocation, or until Go Daddy or the Depository Institution has sent notice of Go Daddy or the Depository Institution?s termination of this Agreement.

Commission checks for domestic Cashparking Customers who fail to establish a Direct Deposit Account will be cut monthly on the 15th of the month for the previous second month?s commission. A $50.00 minimum threshold is required before a check will be issued. Domestic Cashparking Customers receiving commission payments via paper checks acknowledge a $10 check processing fee will be levied each time a commission check is printed. This fee will be waived for the first three (3) months for new customers. This fee is not applicable to foreign Cashparking Customers.

Commission checks for foreign Cashparking Customers will be cut quarterly on the 15th of the month for the previous quarter?s commissions. A $100.00 minimum threshold is required before a check will be issued. Quarterly pay dates are May 15, August 15, November 15, and February 15th.

## 3. TRADEMARK DISPUTE POLICY

Go Daddy supports the protection of intellectual property, and has developed policies and procedures to assist intellectual property rights owners in the protection of their brands. If You believe a domain name is in itself an infringement of Your intellectual property, please follow the dispute procedure outlined below. If You believe the advertising and links present on a domain name using the Services is infringing, please submit a complaint to trademarkclaims@godaddy.com , and insert "CashParking Trademark Claim" in the subject line.

To be considered effective, the email notification must contain the following information:

i. sufficient evidence that the party posting the trademark that is claimed to be infringing is a Go Daddy customer;

ii. the trademark, service mark, trade dress, name, or other indicia of origin (the "Mark") that is claimed to be infringed;

iii. the name, post office address and telephone number of the owner of the Mark identified above;

iv. the goods and/or services covered by or offered under the Mark identified above;

v. the date of first use of the Mark identified above;

vi. the date of first use in interstate commerce of the Mark identified above;

vii. the advertisement, text link or domain name You believe is an infringement of the Mark identified above;

viii. the goods and/or services covered by or offered under the mark claimed to be infringing;

ix. the precise location of the advertisement, text link or domain name that is claimed to be infringing, including electronic mail address, etc.; and

x. a good faith certification signed under penalty of perjury, stating: (i) the mark [identify mark]

GD 001834

infringes the rights of another party; (ii) the name of such said party; (iii) the mark [identify mark] being infringed, and (iv) that the use of the mark [identify mark] claimed to be infringing at issue is not defensible.

Upon receipt of the appropriate information identified above, Go Daddy will initiate an investigation. If Go Daddy determines in its sole discretion that You have raised a legitimate trademark claim, Go Daddy may, in its sole discretion and without any legal obligation to do so, notify the posting party, remove any disputed domain name and/or redirect the offending domain name to an alternative page.

### Notification to Go Daddy Customers and Account Holders

It is Go Daddy's policy to provide for the termination, in appropriate circumstances, of Go Daddy customers and account holders who are repeat infringers of trademarks or any other intellectual property.

## 4. GO DADDY 'S RIGHTS AND RESTRICTIONS; REMEDIES AND PENALTIES

Go Daddy explicitly reserves the right and sole discretion to:

i. modify its pricing, if desired by Go Daddy ;

ii. review Your use of the Services for excessive space and bandwidth utilization, if applicable, and to terminate Your use of the Services or apply additional fees if You exceed allowed levels;

iii. establish limits and guidelines concerning the use of the Services;

iv. terminate Your use of the Services for use of the Services to unnecessarily or illegally harass, non-payment of fees for the Services, activities designed to defame, embarrass, harm, abuse, threaten, slander or harass third parties, activities prohibited by the laws of the United States and/or foreign territories in which You conduct business, activities designed to encourage unlawful behavior by others, such as hate crimes, terrorism and child pornography, activities that are tortious, vulgar, obscene, invasive of the privacy of a third party, racially, ethnically, or otherwise objectionable in the sole opinion of Go Daddy, activities designed to impersonate the identity of a third party, activities designed to harm minors in any way, and other activities whether lawful or unlawful that Go Daddy determines, in its sole discretion, to be harmful to its other customers, operations, or reputation;

v. terminate Your use of the Services if Your use of the Services results in, or is the subject of, legal action or threatened or proposed legal action, against Go Daddy or any of its affiliates or partners, without consideration for whether such legal action or threatened or proposed legal action is eventually determined to be with or without merit; and

vi. terminate Your use of the Services if You have not accessed or logged into it for more than ninety (90) days.

You may not purchase or generate traffic to Your web site or Go Daddy's links by any of the following methods: listing on newsgroups, bulk e-mailing, icq postings, chatroom postings, iframes, zero pixel frames, hitbots, clickbots, spiders, cgi-scripts, JavaScript, click farms, advertising the domain name or purchasing advertising for the domain name or any other similar method. You may not beg, ask, entice or incentivize users into clicking on Go Daddy's links. You may not mislead visitors into believing that he/she shall receive anything other than an internet search by clicking on a textlink or search box. Referring pages must not be password protected in any way.

### Remedies and Penalties

Notwithstanding anything to the contrary in this Agreement, in addition to any and all other remedies to which Go Daddy is entitled, Go Daddy specifically reserves the right to:

i. immediately suspend any domain names that Go Daddy believes in its sole discretion to be violating the terms of this Agreement;

ii. charge You a Twenty Nine and No/100 Dollars ($29.00) administrative fee for any and each domain name that Go Daddy believes in its sole discretion to be violating the terms of this Agreement;

iii. require the forfeiture of any previously earned revenue in connection with the Services, which has yet to be paid;

GD 001835

    iv. deactivate any and all accounts and domains that Go Daddy believes in its sole discretion to be violating the terms of this Agreement; and

    v. provide advertising partners with any and all domain names that Go Daddy believe in its sole discretion to be violating the terms of this Agreement.

## Additional Restrictions

You shall not:

    i. edit, modify, filter or change the order of the information contained in any search results page or on the landing page without Go Daddy's prior written consent;

    ii. host the search results pages;

    iii. redirect an end user away from the search results page, provide a version of the search results page different from the page served to an end user by or as directed by Go Daddy, cache, capture, or store any search results; or intersperse any content between the landing page and the search results page, including, without limitation, content framing landing pages or search results pages;

    iv. display any search results pages or landing pages, or the content thereof, in part or in total, to any third parties, including, without limitation, display on any Your Web sites or anywhere else;

    v. enter into any arrangement or agreement under which any third party pays You fees or shares in any revenue payments and/or royalties for any search results displayed on the Your web site, except as permitted in this Agreement;

    vi. display graphical or text units in any form (including but not limited to pop-up, pop-under or exit windows, expanding buttons and animation) that block or otherwise inhibit the full and complete display to end users of any search results pages, landing pages, and/or web pages accessed by clicking on any part of a search result;

    vii. provide any interface for downloading any computer software application (each, an "Downloadable App"), any marketing materials for any Downloadable App, or any hyperlinks to any of the foregoing.

You shall also abide by the following limitations, among others:

    i. under no circumstances shall Your web site be a downloadable or internet accessible application, as determined by Go Daddy in its sole reasonable discretion;

    ii. search results pages accessed through the Program shall be solely through Go Daddy's servers (or such other servers as Go Daddy in its sole discretion may use), hosted on Go Daddy's servers or domains, meaning that Go Daddy shall host or on its behalf provide for hosting of all Search Results Pages in response to valid queries;

    iii. Your Web site may not place or display any unauthorized branding or attribution of any kind, including without limitation on any landing page, search results page or framed in conjunction with any such pages, to indicate that any search engine is providing such results or for other promotional purposes;

    iv. Your web site shall not contain any pornographic, hate-related or violent content or contain any other material, products or services that (a) violate or encourage conduct that would violate any criminal laws, any other applicable laws, or any third party rights, or (b) would otherwise give rise to civil liability; or

    v. under no circumstances shall You include content above or below the landing page unless that content is pre-approved in writing by Go Daddy, and all changes to any such content must also be pre-approved in writing by Go Daddy.

Revised: 5/7/2009
Copyright    2006-2009 GoDaddy.com, Inc. All Rights Reserved.

**Archived by: Jewel L Eldridge - (6009) - 6/17/2009 10:11:27 AM**

GD 001836

## GO DADDY
## CASHPARKING SERVICE AGREEMENT

This CashParking Service Agreement ("Agreement") is entered into by and between GoDaddy.com, Inc. ("Go Daddy") a/an Arizona corporation and you and your heirs, agents, successors and assigns (collectively, "You"), and is made effective as of the date of electronic execution. This Agreement sets forth the terms and conditions of Your use of Go Daddy's CashParking service and its related services (collectively, the "Services") and represents the entire agreement between You and Go Daddy concerning the subject matter hereof. By using the Services, You acknowledge that You have read, understand, acknowledge and agree to be bound by all the terms and conditions of this Agreement, along with any new, different or additional terms, conditions or policies including, but not limited to, the Universal Terms of Service that Go Daddy may establish from time to time, in its sole discretion, and any agreements that Go Daddy is currently bound by or may become bound by in the future. Such Agreements may be found here. All Go Daddy policies and agreements related to Your use of the Services are incorporated herein and made part of this Agreement by reference.

## 1. THE SERVICE

Go Daddy grants You a non-exclusive license to use the Services, provided, however, that You abide by the terms and conditions set forth herein and in each of Go Daddy's policies and procedures.

The Services generally allow You to:

    i.  provide a platform for advertising link on parked pages;

    ii.  generate revenue from the advertising links on a per click basis; and

    iii.  receive a portion of the revenue generated from the advertising links.

### Availability of Services

Subject to the terms and conditions of this Agreement and each of Go Daddy's policies and procedures, Go Daddy shall use commercially reasonable efforts to attempt to provide the Services on a twenty-four (24) hours a day, seven (7) days a week basis throughout the term of this Agreement. You acknowledge and agree that from time to time the Services may be inaccessible or inoperable for any reason, including, without limitation: (i) equipment malfunctions; (ii) periodic maintenance procedures or repairs that Go Daddy may undertake from time to time; or (iii) causes beyond the reasonable control of Go Daddy or that are not reasonably foreseeable by Go Daddy, including, without limitation, interruption or failure of telecommunication or digital transmission links, hostile network attacks, network congestion or other failures. You acknowledge and agree Go Daddy has no control over the availability of the Services on a continuous or uninterrupted basis.

### Calculation of Revenue; Cancellation

Go Daddy shall use commercially reasonable efforts to provide You with accurate daily estimates of the revenue Your web site(s) generates. You acknowledge and agree any daily estimates are not an exact determination, do not represent an exact determination and the actual amount(s) determined at the end of any revenue generating period may be different. Additionally, in calculating the distribution of revenue generated by any web site, amounts may include fractions of a cent. Go Daddy shall use commercially reasonable efforts to round these amounts to the nearest cent in a manner so as to benefit You. However, You acknowledge and agree that in calculating the distribution of revenue generated by any web site, Go Daddy's determination of any amount owed to You shall be the final and binding determination. Upon Your cancellation of Your Services, You acknowledge and agree Go Daddy has the right to charge You a Fifteen and No/100 Dollar ($15.00) administrative fee in connection with Your cancellation. This amount shall be deducted from any unpaid funds in Your Service account. Any funds in excess shall be paid to You in accordance with Your selected payment option.

## 2. PAYMENT

Commission payments for all domestic Cashparking Customers ("You") will be paid by via direct deposit into the U.S. bank account of their choice ("Direct Deposit Account"). You understand it is Your responsibility to provide a valid U.S. bank account number and the related direct deposit information by signing into the Go Daddy Control Center. Failure to provide a valid Direct Deposit Account will cause Your commission payments to be withheld pending receipt by Go Daddy of proper direct deposit instructions. You can find the instructions

GD 001837

on how to set up a Direct Deposit Account at any time by clicking on the "Payment Information" link from Your home page on the Go Daddy Control Center.

Domestic Cashparking Customers hereby authorize Go Daddy to initiate and post credit (positive) entries for commission payments to the Direct Deposit Account. Domestic Cashparking Customers understand the amount initiated and posted to the Direct Deposit Account on a monthly basis will represent payment for commissions earned in the preceding second month, less any applicable fees and/or charge backs. For example -- commissions earned in January 2009 would be paid by March 15, 2009. Direct Deposit Account owners hereby authorize their Depository Institution to accept credits on behalf of the Direct Deposit Account owner. Direct deposit transactions will be initiated on the 15th day of each month or if the 15th falls on a non-banking day, then direct deposit transactions will be initiated the next banking day. A $50.00 minimum threshold is required before a payment is made to the Direct Deposit Account.

Domestic Cashparking Customers hereby authorize Go Daddy to initiate and post debit (negative) entries to the Direct Deposit Account to reverse erroneous commission payments and/or make adjustments to incorrect commission payments.

The authority granted to Go Daddy by the Direct Deposit Account owner herein will remain in full force and effect until Go Daddy or the Depository Institution has received written notification from the Direct Deposit Account owner that such authority has been revoked, but in any event, such writing shall be provided in such a manner as to afford Go Daddy or the Depository Institution a reasonable opportunity to act on such revocation, or until Go Daddy or the Depository Institution has sent notice of Go Daddy or the Depository Institution's termination of this Agreement.

Commission checks for domestic Cashparking Customers who fail to establish a Direct Deposit Account will be cut monthly on the 15th of the month for the previous second month's commission. Should the fifthteenth (15th) day of the month fall on a Saturday, the payout date will be on the previous business day. Should the fifthteenth (15th) day of the month fall on a Sunday or holiday, the payout date will be on the next business day.  A $100.00 minimum threshold is required before a check will be issued. Domestic Cashparking Customers receiving commission payments via paper checks acknowledge a $25 check processing fee will be levied each time a commission check is printed. This fee is not applicable to foreign Cashparking Customers.

Commission checks for foreign Cashparking Customers will be cut quarterly on the 15th of the month for the previous quarter's commissions. A $100.00 minimum threshold is required before a check will be issued. Quarterly pay dates are May 15, August 15, November 15, and February 15th.

Domestic Cashparking Customers utilizing PayPal will be paid out monthly on the fifthteenth (15th) day of the month. Should the fifthteenth (15th) day of the month fall on a Saturday, the payout date will be on the previous business day. Should the fifthteenth (15th) day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A Twenty-Five Dollar ($25.00) minimum threshold is required before payment will be made to those accounts. Transaction fees for PayPal will be the responsibility of Go Daddy and will not be deducted from Your Commission Payment.

Domestic Cashparking Customers utilizing Go Daddy's "Good As Gold" program will be paid out monthly on the fifthteenth (15th) day of the month. Should the fifthteenth (15th) day of the month fall on a Saturday, the payout date will be on the previous business day. Should the fifthteenth (15th) day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A Five Dollar ($5.00) minimum threshold is required before payment will be made to those accounts.

## 3. TRADEMARK DISPUTE POLICY

Go Daddy supports the protection of intellectual property, and has developed policies and procedures to assist intellectual property rights owners in the protection of their brands. If You believe a domain name is in itself an infringement of Your intellectual property, please follow the dispute procedure outlined below. If You believe the advertising and links present on a domain name using the Services is infringing, please submit a complaint to trademarkclaims@godaddy.com , and insert "CashParking Trademark Claim" in the subject line.

To be considered effective, the email notification must contain the following information:

    i. sufficient evidence the party posting the trademark that is claimed to be infringing is a Go Daddy customer;

    ii. the trademark, service mark, trade dress, name, or other indicia of origin (the "Mark") that is

GD 001838

      claimed to be infringed;

  iii. the name, post office address and telephone number of the owner of the Mark identified above;

  iv. the goods and/or services covered by or offered under the Mark identified above;

   v. the date of first use of the Mark identified above;

  vi. the date of first use in interstate commerce of the Mark identified above;

 vii. the advertisement, text link or domain name You believe is an infringement of the Mark identified above;

viii. the goods and/or services covered by or offered under the mark claimed to be infringing;

  ix. the precise location of the advertisement, text link or domain name that is claimed to be infringing, including electronic mail address, etc.; and

   x. a good faith certification signed under penalty of perjury, stating: (i) the mark [identify mark] infringes the rights of another party; (ii) the name of such said party; (iii) the Mark [identify mark] being infringed, and (iv) that the use of the mark [identify mark] claimed to be infringing at issue is not defensible.

Upon receipt of the appropriate information identified above, Go Daddy will initiate an investigation. If Go Daddy determines in its sole discretion that You have raised a legitimate trademark claim, Go Daddy may, in its sole discretion and without any legal obligation to do so, notify the posting party, remove any disputed domain name and/or redirect the offending domain name to an alternative page.

**Notification to Go Daddy Customers and Account Holders**

It is Go Daddy's policy to provide for the termination, in appropriate circumstances, of Go Daddy customers and account holders who are repeat infringers of trademarks or any other intellectual property.

## 4. GO DADDY 'S RIGHTS AND RESTRICTIONS; REMEDIES AND PENALTIES

Go Daddy explicitly reserves the right and sole discretion to:

   i. modify its pricing, if desired by Go Daddy ;

  ii. review Your use of the Services for excessive space and bandwidth utilization, if applicable, and to terminate Your use of the Services or apply additional fees if You exceed allowed levels;

  iii. establish limits and guidelines concerning the use of the Services;

  iv. terminate Your use of the Services for use of the Services to unnecessarily or illegally harass, non-payment of fees for the Services, activities designed to defame, embarrass, harm, abuse, threaten, slander or harass third parties, activities prohibited by the laws of the United States and/or foreign territories in which You conduct business, activities designed to encourage unlawful behavior by others, such as hate crimes, terrorism and child pornography, activities that are tortious, vulgar, obscene, invasive of the privacy of a third party, racially, ethnically, or otherwise objectionable in the sole opinion of Go Daddy, activities designed to impersonate the identity of a third party, activities designed to harm minors in any way, and other activities whether lawful or unlawful that Go Daddy determines, in its sole discretion, to be harmful to its other customers, operations, or reputation;

   v. terminate Your use of the Services if Your use of the Services results in, or is the subject of, legal action or threatened or proposed legal action, against Go Daddy or any of its affiliates or partners, without consideration for whether such legal action or threatened or proposed legal action is eventually determined to be with or without merit; and

  vi. terminate Your use of the Services if You have not accessed or logged into it for more than ninety (90) days.

You may not purchase or generate traffic to Your web site or Go Daddy's links by any of the following methods: listing on newsgroups, bulk e-mailing, icq postings, chatroom postings, iframes, zero pixel frames, hitbots, clickbots, spiders, cgi-scripts, JavaScript, click farms, advertising the domain name or purchasing advertising for the domain name or any other similar method. You may not beg, ask, entice or incentivize users into clicking on Go Daddy's links. You may not mislead visitors into believing that he/she shall receive anything other than an internet search by clicking on a textlink or search box. Referring pages must not be password protected in any way.

GD 001839

## Remedies and Penalties

Notwithstanding anything to the contrary in this Agreement, in addition to any and all other remedies to which Go Daddy is entitled, Go Daddy specifically reserves the right to:

i. immediately suspend any domain names that Go Daddy believes in its sole discretion to be violating the terms of this Agreement;

ii. charge You a Twenty Nine and No/100 Dollars ($29.00) administrative fee for any and each domain name that Go Daddy believes in its sole discretion to be violating the terms of this Agreement;

iii. require the forfeiture of any previously earned revenue in connection with the Services, which has yet to be paid;

iv. deactivate any and all accounts and domains that Go Daddy believes in its sole discretion to be violating the terms of this Agreement; and

v. provide advertising partners with any and all domain names that Go Daddy believe in its sole discretion to be violating the terms of this Agreement.

## Additional Restrictions

You shall not:

i. edit, modify, filter or change the order of the information contained in any search results page or on the landing page without Go Daddy's prior written consent;

ii. host the search results pages;

iii. redirect an end user away from the search results page, provide a version of the search results page different from the page served to an end user by or as directed by Go Daddy, cache, capture, or store any search results; or intersperse any content between the landing page and the search results page, including, without limitation, content framing landing pages or search results pages;

iv. display any search results pages or landing pages, or the content thereof, in part or in total, to any third parties, including, without limitation, display on any Your Web sites or anywhere else;

v. enter into any arrangement or agreement under which any third party pays You fees or shares in any revenue payments and/or royalties for any search results displayed on the Your web site, except as permitted in this Agreement;

vi. display graphical or text units in any form (including but not limited to pop-up, pop-under or exit windows, expanding buttons and animation) that block or otherwise inhibit the full and complete display to end users of any search results pages, landing pages, and/or web pages accessed by clicking on any part of a search result;

vii. provide any interface for downloading any computer software application (each, an "Downloadable App"), any marketing materials for any Downloadable App, or any hyperlinks to any of the foregoing.

You shall also abide by the following limitations, among others:

i. under no circumstances shall Your web site be a downloadable or internet accessible application, as determined by Go Daddy in its sole reasonable discretion;

ii. search results pages accessed through the Program shall be solely through Go Daddy's servers (or such other servers as Go Daddy in its sole discretion may use), hosted on Go Daddy's servers or domains, meaning that Go Daddy shall host or on its behalf provide for hosting of all Search Results Pages in response to valid queries;

iii. Your Web site may not place or display any unauthorized branding or attribution of any kind, including without limitation on any landing page, search results page or framed in conjunction with any such pages, to indicate that any search engine is providing such results or for other promotional purposes;

iv. Your web site shall not contain any pornographic, hate-related or violent content or contain any other material, products or services that (a) violate or encourage conduct that would violate any criminal laws, any other applicable laws, or any third party rights, or (b) would otherwise give rise to

GD 001840

civil liability; or

v. under no circumstances shall You include content above or below the landing page unless that content is pre-approved in writing by Go Daddy, and all changes to any such content must also be pre-approved in writing by Go Daddy.

Revised: 1/29/2010
Copyright © 2006-2009 GoDaddy.com, Inc. All Rights Reserved.

Archived by: Linda J. Jett (ljett), 2010-01-29 4:17:02 PM

GD 001841

## GO DADDY
## CASHPARKING SERVICE AGREEMENT

This CashParking Service Agreement ("Agreement") is entered into by and between GoDaddy.com, Inc. ("Go Daddy") a/an Arizona corporation and you and your heirs, agents, successors and assigns (collectively, "You"), and is made effective as of the date of electronic execution. This Agreement sets forth the terms and conditions of Your use of Go Daddy's CashParking service and its related services (collectively, the "Services") and represents the entire agreement between You and Go Daddy concerning the subject matter hereof. By using the Services, You acknowledge that You have read, understand, acknowledge and agree to be bound by all the terms and conditions of this Agreement, along with any new, different or additional terms, conditions or policies including, but not limited to, the Universal Terms of Service that Go Daddy may establish from time to time, in its sole discretion, and any agreements that Go Daddy is currently bound by or may become bound by in the future. Such Agreements may be found here. All Go Daddy policies and agreements related to Your use of the Services are incorporated herein and made part of this Agreement by reference.

## 1. THE SERVICE

Go Daddy grants You a non-exclusive license to use the Services, provided, however, that You abide by the terms and conditions set forth herein and in each of Go Daddy's policies and procedures.

The Services generally allow You to:

    i. provide a platform for advertising link on parked pages;

    ii. generate revenue from the advertising links on a per click basis; and

    iii. receive a portion of the revenue generated from the advertising links.

### Availability of Services

Subject to the terms and conditions of this Agreement and each of Go Daddy's policies and procedures, Go Daddy shall use commercially reasonable efforts to attempt to provide the Services on a twenty-four (24) hours a day, seven (7) days a week basis throughout the term of this Agreement. You acknowledge and agree that from time to time the Services may be inaccessible or inoperable for any reason, including, without limitation: (i) equipment malfunctions; (ii) periodic maintenance procedures or repairs that Go Daddy may undertake from time to time; or (iii) causes beyond the reasonable control of Go Daddy or that are not reasonably foreseeable by Go Daddy, including, without limitation, interruption or failure of telecommunication or digital transmission links, hostile network attacks, network congestion or other failures. You acknowledge and agree Go Daddy has no control over the availability of the Services on a continuous or uninterrupted basis.

### Calculation of Revenue; Cancellation

Go Daddy shall use commercially reasonable efforts to provide You with accurate daily estimates of the revenue Your web site(s) generates. You acknowledge and agree any daily estimates are not an exact determination, do not represent an exact determination and the actual amount(s) determined at the end of any revenue generating period may be different. Additionally, in calculating the distribution of revenue generated by any web site, amounts may include fractions of a cent. Go Daddy shall use commercially reasonable efforts to round these amounts to the nearest cent in a manner so as to benefit You. However, You acknowledge and agree that in calculating the distribution of revenue generated by any web site, Go Daddy's determination of any amount owed to You shall be the final and binding determination. Upon Your cancellation of Your Services, You acknowledge and agree Go Daddy has the right to charge You a Fifteen and No/100 Dollar ($15.00) administrative fee in connection with Your cancellation. This amount shall be deducted from any unpaid funds in Your Service account. Any funds in excess shall be paid to You in accordance with Your selected payment option.

## 2. PAYMENT

Commission payments for all domestic Cashparking Customers ("You") will be paid by via direct deposit into the U.S. bank account of their choice ("Direct Deposit Account"). You understand it is Your responsibility to provide a valid U.S. bank account number and the related direct deposit information by signing into the Go Daddy Control Center. Failure to provide a valid Direct Deposit Account will cause Your commission payments to be withheld pending receipt by Go Daddy of proper direct deposit instructions. You can find the instructions

GD 001842

on how to set up a Direct Deposit Account at any time by clicking on the "Payment Information" link from Your home page on the Go Daddy Control Center.

Domestic Cashparking Customers hereby authorize Go Daddy to initiate and post credit (positive) entries for commission payments to the Direct Deposit Account. Domestic Cashparking Customers understand the amount initiated and posted to the Direct Deposit Account on a monthly basis will represent payment for commissions earned in the preceding second month, less any applicable fees and/or charge backs. For example -- commissions earned in January 2009 would be paid by March 15, 2009. Direct Deposit Account owners hereby authorize their Depository Institution to accept credits on behalf of the Direct Deposit Account owner. Direct deposit transactions will be initiated on the 15th day of each month or if the 15th falls on a non-banking day, then direct deposit transactions will be initiated the next banking day. A $50.00 minimum threshold is required before a payment is made to the Direct Deposit Account.

Domestic Cashparking Customers hereby authorize Go Daddy to initiate and post debit (negative) entries to the Direct Deposit Account to reverse erroneous commission payments and/or make adjustments to incorrect commission payments.

The authority granted to Go Daddy by the Direct Deposit Account owner herein will remain in full force and effect until Go Daddy or the Depository Institution has received written notification from the Direct Deposit Account owner that such authority has been revoked, but in any event, such writing shall be provided in such a manner as to afford Go Daddy or the Depository Institution a reasonable opportunity to act on such revocation, or until Go Daddy or the Depository Institution has sent notice of Go Daddy or the Depository Institution's termination of this Agreement.

Commission checks for domestic Cashparking Customers who fail to establish a Direct Deposit Account will be cut monthly on the 15th of the month for the previous second month's commission. Should the fifthteenth (15th) day of the month fall on a Saturday, the payout date will be on the previous business day. Should the fifthteenth (15th) day of the month fall on a Sunday or holiday, the payout date will be on the next business day.  A $100.00 minimum threshold is required before a check will be issued. Domestic Cashparking Customers receiving commission payments via paper checks acknowledge a $25 check processing fee will be levied each time a commission check is printed. This fee is not applicable to foreign Cashparking Customers.

Commission checks for foreign Cashparking Customers will be cut quarterly on the 15th of the month for the previous quarter's commissions. A $100.00 minimum threshold is required before a check will be issued. Quarterly pay dates are May 15, August 15, November 15, and February 15th.

Domestic Cashparking Customers utilizing PayPal will be paid out monthly on the fifthteenth (15th) day of the month. Should the fifthteenth (15th) day of the month fall on a Saturday, the payout date will be on the previous business day. Should the fifthteenth (15th) day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A Twenty-Five Dollar ($25.00) minimum threshold is required before payment will be made to those accounts. If the payment amount exceeds $10,000.00, it will be split into two PayPal payment transactions. Transaction fees for PayPal will be the responsibility of Go Daddy and will not be deducted from Your Commission Payment.

Domestic Cashparking Customers utilizing Go Daddy's "Good As Gold" program will be paid out monthly on the fifthteenth (15th) day of the month. Should the fifthteenth (15th) day of the month fall on a Saturday, the payout date will be on the previous business day. Should the fifthteenth (15th) day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A Five Dollar ($5.00) minimum threshold is required before payment will be made to those accounts.

## 3. TRADEMARK DISPUTE POLICY

Go Daddy supports the protection of intellectual property, and has developed policies and procedures to assist intellectual property rights owners in the protection of their brands. If You believe a domain name is in itself an infringement of Your intellectual property, please follow the dispute procedure outlined below. If You believe the advertising and links present on a domain name using the Services is infringing, please submit a complaint to trademarkclaims@godaddy.com , and insert "CashParking Trademark Claim" in the subject line.

To be considered effective, the email notification must contain the following information:

    i. sufficient evidence the party posting the trademark that is claimed to be infringing is a Go Daddy customer;

GD 001843

ii. the trademark, service mark, trade dress, name, or other indicia of origin (the "Mark") that is claimed to be infringed;

iii. the name, post office address and telephone number of the owner of the Mark identified above;

iv. the goods and/or services covered by or offered under the Mark identified above;

v. the date of first use of the Mark identified above;

vi. the date of first use in interstate commerce of the Mark identified above;

vii. the advertisement, text link or domain name You believe is an infringement of the Mark identified above;

viii. the goods and/or services covered by or offered under the mark claimed to be infringing;

ix. the precise location of the advertisement, text link or domain name that is claimed to be infringing, including electronic mail address, etc.; and

x. a good faith certification signed under penalty of perjury, stating: (i) the mark [identify mark] infringes the rights of another party; (ii) the name of such said party; (iii) the Mark [identify mark] being infringed, and (iv) that the use of the mark [identify mark] claimed to be infringing at issue is not defensible.

Upon receipt of the appropriate information identified above, Go Daddy will initiate an investigation. If Go Daddy determines in its sole discretion that You have raised a legitimate trademark claim, Go Daddy may, in its sole discretion and without any legal obligation to do so, notify the posting party, remove any disputed domain name and/or redirect the offending domain name to an alternative page.

### Notification to Go Daddy Customers and Account Holders

It is Go Daddy's policy to provide for the termination, in appropriate circumstances, of Go Daddy customers and account holders who are repeat infringers of trademarks or any other intellectual property.

## 4. GO DADDY 'S RIGHTS AND RESTRICTIONS; REMEDIES AND PENALTIES

Go Daddy explicitly reserves the right and sole discretion to:

i. modify its pricing, if desired by Go Daddy ;

ii. review Your use of the Services for excessive space and bandwidth utilization, if applicable, and to terminate Your use of the Services or apply additional fees if You exceed allowed levels;

iii. establish limits and guidelines concerning the use of the Services;

iv. terminate Your use of the Services for use of the Services to unnecessarily or illegally harass, non-payment of fees for the Services, activities designed to defame, embarrass, harm, abuse, threaten, slander or harass third parties, activities prohibited by the laws of the United States and/or foreign territories in which You conduct business, activities designed to encourage unlawful behavior by others, such as hate crimes, terrorism and child pornography, activities that are tortious, vulgar, obscene, invasive of the privacy of a third party, racially, ethnically, or otherwise objectionable in the sole opinion of Go Daddy, activities designed to impersonate the identity of a third party, activities designed to harm minors in any way, and other activities whether lawful or unlawful that Go Daddy determines, in its sole discretion, to be harmful to its other customers, operations, or reputation;

v. terminate Your use of the Services if Your use of the Services results in, or is the subject of, legal action or threatened or proposed legal action, against Go Daddy or any of its affiliates or partners, without consideration for whether such legal action or threatened or proposed legal action is eventually determined to be with or without merit; and

vi. terminate Your use of the Services if You have not accessed or logged into it for more than ninety (90) days.

You may not purchase or generate traffic to Your web site or Go Daddy's links by any of the following methods: listing on newsgroups, bulk e-mailing, icq postings, chatroom postings, iframes, zero pixel frames, hitbots, clickbots, spiders, cgi-scripts, JavaScript, click farms, advertising the domain name or purchasing advertising for the domain name or any other similar method. You may not beg, ask, entice or incentivize users into clicking on Go Daddy's links. You may not mislead visitors into believing that he/she shall receive anything other than an internet search by clicking on a textlink or search box. Referring pages must not be password protected in any

GD 001844

way.

## Remedies and Penalties

Notwithstanding anything to the contrary in this Agreement, in addition to any and all other remedies to which Go Daddy is entitled, Go Daddy specifically reserves the right to:

i. immediately suspend any domain names that Go Daddy believes in its sole discretion to be violating the terms of this Agreement;

ii. charge You a Twenty Nine and No/100 Dollars ($29.00) administrative fee for any and each domain name that Go Daddy believes in its sole discretion to be violating the terms of this Agreement;

iii. require the forfeiture of any previously earned revenue in connection with the Services, which has yet to be paid;

iv. deactivate any and all accounts and domains that Go Daddy believes in its sole discretion to be violating the terms of this Agreement; and

v. provide advertising partners with any and all domain names that Go Daddy believe in its sole discretion to be violating the terms of this Agreement.

## Additional Restrictions

You shall not:

i. edit, modify, filter or change the order of the information contained in any search results page or on the landing page without Go Daddy's prior written consent;

ii. host the search results pages;

iii. redirect an end user away from the search results page, provide a version of the search results page different from the page served to an end user by or as directed by Go Daddy, cache, capture, or store any search results; or intersperse any content between the landing page and the search results page, including, without limitation, content framing landing pages or search results pages;

iv. display any search results pages or landing pages, or the content thereof, in part or in total, to any third parties, including, without limitation, display on any Your Web sites or anywhere else;

v. enter into any arrangement or agreement under which any third party pays You fees or shares in any revenue payments and/or royalties for any search results displayed on the Your web site, except as permitted in this Agreement;

vi. display graphical or text units in any form (including but not limited to pop-up, pop-under or exit windows, expanding buttons and animation) that block or otherwise inhibit the full and complete display to end users of any search results pages, landing pages, and/or web pages accessed by clicking on any part of a search result;

vii. provide any interface for downloading any computer software application (each, an "Downloadable App"), any marketing materials for any Downloadable App, or any hyperlinks to any of the foregoing.

You shall also abide by the following limitations, among others:

i. under no circumstances shall Your web site be a downloadable or internet accessible application, as determined by Go Daddy in its sole reasonable discretion;

ii. search results pages accessed through the Program shall be solely through Go Daddy's servers (or such other servers as Go Daddy in its sole discretion may use), hosted on Go Daddy's servers or domains, meaning that Go Daddy shall host or on its behalf provide for hosting of all Search Results Pages in response to valid queries;

iii. Your Web site may not place or display any unauthorized branding or attribution of any kind, including without limitation on any landing page, search results page or framed in conjunction with any such pages, to indicate that any search engine is providing such results or for other promotional purposes;

iv. Your web site shall not contain any pornographic, hate-related or violent content or contain any other material, products or services that (a) violate or encourage conduct that would violate any

GD 001845

criminal laws, any other applicable laws, or any third party rights, or (b) would otherwise give rise to civil liability; or

v. under no circumstances shall You include content above or below the landing page unless that content is pre-approved in writing by Go Daddy, and all changes to any such content must also be pre-approved in writing by Go Daddy.

Revised: 2/26/2010
Copyright © 2006-2009 GoDaddy.com, Inc. All Rights Reserved.

Archived by: Christine Claffey (cclaffey), 2010-02-26 1:02:05 PM

GD 001846

## GO DADDY
## CASHPARKING SERVICE AGREEMENT

This CashParking Service Agreement ("Agreement") is entered into by and between GoDaddy.com, Inc. ("Go Daddy") a/an Arizona corporation and you and your heirs, agents, successors and assigns (collectively, "You"), and is made effective as of the date of electronic execution. This Agreement sets forth the terms and conditions of Your use of Go Daddy's CashParking service and its related services (collectively, the "Services") and represents the entire agreement between You and Go Daddy concerning the subject matter hereof. By using the Services, You acknowledge that You have read, understand, acknowledge and agree to be bound by all the terms and conditions of this Agreement, along with any new, different or additional terms, conditions or policies including, but not limited to, the Universal Terms of Service that Go Daddy may establish from time to time, in its sole discretion, and any agreements that Go Daddy is currently bound by or may become bound by in the future. Such Agreements may be found here. All Go Daddy policies and agreements related to Your use of the Services are incorporated herein and made part of this Agreement by reference.

## 1. THE SERVICE

Go Daddy grants You a non-exclusive license to use the Services, provided, however, that You abide by the terms and conditions set forth herein and in each of Go Daddy's policies and procedures.

The Services generally allow You to:

    i.  provide a platform for advertising link on parked pages;

    ii.  generate revenue from the advertising links on a per click basis; and

    iii.  receive a portion of the revenue generated from the advertising links.

### Availability of Services

Subject to the terms and conditions of this Agreement and each of Go Daddy's policies and procedures, Go Daddy shall use commercially reasonable efforts to attempt to provide the Services on a twenty-four (24) hours a day, seven (7) days a week basis throughout the term of this Agreement. You acknowledge and agree that from time to time the Services may be inaccessible or inoperable for any reason, including, without limitation: (i) equipment malfunctions; (ii) periodic maintenance procedures or repairs that Go Daddy may undertake from time to time; or (iii) causes beyond the reasonable control of Go Daddy or that are not reasonably foreseeable by Go Daddy, including, without limitation, interruption or failure of telecommunication or digital transmission links, hostile network attacks, network congestion or other failures. You acknowledge and agree Go Daddy has no control over the availability of the Services on a continuous or uninterrupted basis.

### Calculation of Revenue; Cancellation

Go Daddy shall use commercially reasonable efforts to provide You with accurate daily estimates of the revenue Your web site(s) generates. You acknowledge and agree any daily estimates are not an exact determination, do not represent an exact determination and the actual amount(s) determined at the end of any revenue generating period may be different. Additionally, in calculating the distribution of revenue generated by any web site, amounts may include fractions of a cent. Go Daddy shall use commercially reasonable efforts to round these amounts to the nearest cent in a manner so as to benefit You. However, You acknowledge and agree that in calculating the distribution of revenue generated by any web site, Go Daddy's determination of any amount owed to You shall be the final and binding determination. Upon Your cancellation of Your Services, You acknowledge and agree Go Daddy has the right to charge You a Fifteen and No/100 Dollar ($15.00) administrative fee in connection with Your cancellation. This amount shall be deducted from any unpaid funds in Your Service account. Any funds in excess shall be paid to You in accordance with Your selected payment option.

## 2. PAYMENT

Commission payments for all domestic Cashparking Customers ("You") will be paid by via direct deposit into the U.S. bank account of their choice ("Direct Deposit Account"). You understand it is Your responsibility to provide a valid U.S. bank account number and the related direct deposit information by signing into the Go Daddy Control Center. Failure to provide a valid Direct Deposit Account will cause Your commission payments to be withheld pending receipt by Go Daddy of proper direct deposit instructions. You can find the instructions

GD 001847

on how to set up a Direct Deposit Account at any time by clicking on the "Payment Information" link from Your home page on the Go Daddy Control Center.

Domestic Cashparking Customers hereby authorize Go Daddy to initiate and post credit (positive) entries for commission payments to the Direct Deposit Account. Domestic Cashparking Customers understand the amount initiated and posted to the Direct Deposit Account on a monthly basis will represent payment for commissions earned in the preceding second month, less any applicable fees and/or charge backs. For example -- commissions earned in January 2009 would be paid by March 15, 2009. Direct Deposit Account owners hereby authorize their Depository Institution to accept credits on behalf of the Direct Deposit Account owner. Direct deposit transactions will be initiated on the 15th day of each month or if the 15th falls on a non-banking day, then direct deposit transactions will be initiated the next banking day. A $50.00 minimum threshold is required before a payment is made to the Direct Deposit Account.

Domestic Cashparking Customers hereby authorize Go Daddy to initiate and post debit (negative) entries to the Direct Deposit Account to reverse erroneous commission payments and/or make adjustments to incorrect commission payments.

The authority granted to Go Daddy by the Direct Deposit Account owner herein will remain in full force and effect until Go Daddy or the Depository Institution has received written notification from the Direct Deposit Account owner that such authority has been revoked, but in any event, such writing shall be provided in such a manner as to afford Go Daddy or the Depository Institution a reasonable opportunity to act on such revocation, or until Go Daddy or the Depository Institution has sent notice of Go Daddy or the Depository Institution's termination of this Agreement.

Commission checks for domestic Cashparking Customers who fail to establish a Direct Deposit Account will be cut monthly on the 15th of the month for the previous second month's commission. Should the fifthteenth (15th) day of the month fall on a Saturday, the payout date will be on the previous business day. Should the fifthteenth (15th) day of the month fall on a Sunday or holiday, the payout date will be on the next business day.  A $100.00 minimum threshold is required before a check will be issued. Domestic Cashparking Customers receiving commission payments via paper checks acknowledge a $25 check processing fee will be levied each time a commission check is printed. This fee is not applicable to foreign Cashparking Customers.

Commission checks for foreign Cashparking Customers will be cut quarterly on the 15th of the month for the previous quarter's commissions. A $100.00 minimum threshold is required before a check will be issued. Quarterly pay dates are May 15, August 15, November 15, and February 15th.

Domestic Cashparking Customers utilizing PayPal will be paid out monthly on the fifthteenth (15th) day of the month. Should the fifthteenth (15th) day of the month fall on a Saturday, the payout date will be on the previous business day. Should the fifthteenth (15th) day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A Twenty-Five Dollar ($25.00) minimum threshold is required before payment will be made to those accounts. If the payment amount exceeds $10,000.00, it will be split into two PayPal payment transactions. Please refer to the PayPal account set-up requirements for Your country, which may be found here, to ensure Your PayPal account has the ability to receive payments from third parties. Transaction fees for PayPal will be the responsibility of Go Daddy and will not be deducted from Your Commission Payment.

Domestic Cashparking Customers utilizing Go Daddy's "Good As Gold" program will be paid out monthly on the fifthteenth (15th) day of the month. Should the fifthteenth (15th) day of the month fall on a Saturday, the payout date will be on the previous business day. Should the fifthteenth (15th) day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A Five Dollar ($5.00) minimum threshold is required before payment will be made to those accounts.

## 3. TRADEMARK DISPUTE POLICY

Go Daddy supports the protection of intellectual property, and has developed policies and procedures to assist intellectual property rights owners in the protection of their brands. If You believe a domain name is in itself an infringement of Your intellectual property, please follow the dispute procedure outlined below. If You believe the advertising and links present on a domain name using the Services is infringing, please submit a complaint to trademarkclaims@godaddy.com , and insert "CashParking Trademark Claim" in the subject line.

To be considered effective, the email notification must contain the following information:

GD 001848

i. sufficient evidence the party posting the trademark that is claimed to be infringing is a Go Daddy customer;

ii. the trademark, service mark, trade dress, name, or other indicia of origin (the "Mark") that is claimed to be infringed;

iii. the name, post office address and telephone number of the owner of the Mark identified above;

iv. the goods and/or services covered by or offered under the Mark identified above;

v. the date of first use of the Mark identified above;

vi. the date of first use in interstate commerce of the Mark identified above;

vii. the advertisement, text link or domain name You believe is an infringement of the Mark identified above;

viii. the goods and/or services covered by or offered under the mark claimed to be infringing;

ix. the precise location of the advertisement, text link or domain name that is claimed to be infringing, including electronic mail address, etc.; and

x. a good faith certification signed under penalty of perjury, stating: (i) the mark [identify mark] infringes the rights of another party; (ii) the name of such said party; (iii) the Mark [identify mark] being infringed, and (iv) that the use of the mark [identify mark] claimed to be infringing at issue is not defensible.

Upon receipt of the appropriate information identified above, Go Daddy will initiate an investigation. If Go Daddy determines in its sole discretion that You have raised a legitimate trademark claim, Go Daddy may, in its sole discretion and without any legal obligation to do so, notify the posting party, remove any disputed domain name and/or redirect the offending domain name to an alternative page.

**Notification to Go Daddy Customers and Account Holders**

It is Go Daddy's policy to provide for the termination, in appropriate circumstances, of Go Daddy customers and account holders who are repeat infringers of trademarks or any other intellectual property.

## 4. GO DADDY 'S RIGHTS AND RESTRICTIONS; REMEDIES AND PENALTIES

Go Daddy explicitly reserves the right and sole discretion to:

i. modify its pricing, if desired by Go Daddy ;

ii. review Your use of the Services for excessive space and bandwidth utilization, if applicable, and to terminate Your use of the Services or apply additional fees if You exceed allowed levels;

iii. establish limits and guidelines concerning the use of the Services;

iv. terminate Your use of the Services for use of the Services to unnecessarily or illegally harass, non-payment of fees for the Services, activities designed to defame, embarrass, harm, abuse, threaten, slander or harass third parties, activities prohibited by the laws of the United States and/or foreign territories in which You conduct business, activities designed to encourage unlawful behavior by others, such as hate crimes, terrorism and child pornography, activities that are tortious, vulgar, obscene, invasive of the privacy of a third party, racially, ethnically, or otherwise objectionable in the sole opinion of Go Daddy, activities designed to impersonate the identity of a third party, activities designed to harm minors in any way, and other activities whether lawful or unlawful that Go Daddy determines, in its sole discretion, to be harmful to its other customers, operations, or reputation;

v. terminate Your use of the Services if Your use of the Services results in, or is the subject of, legal action or threatened or proposed legal action, against Go Daddy or any of its affiliates or partners, without consideration for whether such legal action or threatened or proposed legal action is eventually determined to be with or without merit; and

vi. terminate Your use of the Services if You have not accessed or logged into it for more than ninety (90) days.

You may not purchase or generate traffic to Your web site or Go Daddy's links by any of the following methods: listing on newsgroups, bulk e-mailing, icq postings, chatroom postings, iframes, zero pixel frames, hitbots, clickbots, spiders, cgi-scripts, JavaScript, click farms, advertising the domain name or purchasing advertising for

GD 001849

the domain name or any other similar method. You may not beg, ask, entice or incentivize users into clicking on Go Daddy's links. You may not mislead visitors into believing that he/she shall receive anything other than an internet search by clicking on a textlink or search box. Referring pages must not be password protected in any way.

## Remedies and Penalties

Notwithstanding anything to the contrary in this Agreement, in addition to any and all other remedies to which Go Daddy is entitled, Go Daddy specifically reserves the right to:

i. immediately suspend any domain names that Go Daddy believes in its sole discretion to be violating the terms of this Agreement;

ii. charge You a Twenty Nine and No/100 Dollars ($29.00) administrative fee for any and each domain name that Go Daddy believes in its sole discretion to be violating the terms of this Agreement;

iii. require the forfeiture of any previously earned revenue in connection with the Services, which has yet to be paid;

iv. deactivate any and all accounts and domains that Go Daddy believes in its sole discretion to be violating the terms of this Agreement; and

v. provide advertising partners with any and all domain names that Go Daddy believe in its sole discretion to be violating the terms of this Agreement.

## Additional Restrictions

You shall not:

i. edit, modify, filter or change the order of the information contained in any search results page or on the landing page without Go Daddy's prior written consent;

ii. host the search results pages;

iii. redirect an end user away from the search results page, provide a version of the search results page different from the page served to an end user by or as directed by Go Daddy, cache, capture, or store any search results; or intersperse any content between the landing page and the search results page, including, without limitation, content framing landing pages or search results pages;

iv. display any search results pages or landing pages, or the content thereof, in part or in total, to any third parties, including, without limitation, display on any Your Web sites or anywhere else;

v. enter into any arrangement or agreement under which any third party pays You fees or shares in any revenue payments and/or royalties for any search results displayed on the Your web site, except as permitted in this Agreement;

vi. display graphical or text units in any form (including but not limited to pop-up, pop-under or exit windows, expanding buttons and animation) that block or otherwise inhibit the full and complete display to end users of any search results pages, landing pages, and/or web pages accessed by clicking on any part of a search result;

vii. provide any interface for downloading any computer software application (each, an "Downloadable App"), any marketing materials for any Downloadable App, or any hyperlinks to any of the foregoing.

You shall also abide by the following limitations, among others:

i. under no circumstances shall Your web site be a downloadable or internet accessible application, as determined by Go Daddy in its sole reasonable discretion;

ii. search results pages accessed through the Program shall be solely through Go Daddy's servers (or such other servers as Go Daddy in its sole discretion may use), hosted on Go Daddy's servers or domains, meaning that Go Daddy shall host or on its behalf provide for hosting of all Search Results Pages in response to valid queries;

iii. Your Web site may not place or display any unauthorized branding or attribution of any kind, including without limitation on any landing page, search results page or framed in conjunction with any such pages, to indicate that any search engine is providing such results or for other

promotional purposes;

iv. Your web site shall not contain any pornographic, hate-related or violent content or contain any other material, products or services that (a) violate or encourage conduct that would violate any criminal laws, any other applicable laws, or any third party rights, or (b) would otherwise give rise to civil liability; or

v. under no circumstances shall You include content above or below the landing page unless that content is pre-approved in writing by Go Daddy, and all changes to any such content must also be pre-approved in writing by Go Daddy.

Revised: 3/12/2010
Copyright © 2006-2009 GoDaddy.com, Inc. All Rights Reserved.

**Archived by: Christine Claffey (cclaffey), 2010-03-12 2:53:06 PM**

GD 001851

# EXHIBIT Q

# GO DADDY
# CASHPARKING® TERMS OF SERVICE AGREEMENT

## 1. OVERVIEW

This CashParking Terms of Service Agreement (this "Agreement") is entered into by and between GoDaddy.com, Inc., a/an Arizona corporation ("Go Daddy") and you, and is made effective as of the date of electronic acceptance. This Agreement sets forth the terms and conditions of your use of Go Daddy's CashParking services ("CashParking" or the "Services").

Your electronic acceptance of this Agreement signifies that you have read, understand, acknowledge and agree to be bound by this Agreement, along with Go Daddy's Universal Terms of Service Agreement, which is incorporated herein by reference.

The terms "we", "us" or "our" shall refer to Go Daddy. The terms "you", "your", "User" or "Customer" shall refer to any individual or entity who accepts this Agreement. Nothing in this Agreement shall be deemed to confer any third-party rights or benefits.

Go Daddy, in its sole and absolute discretion, may change or modify this Agreement, and the Universal Terms of Service Agreement which is incorporated herein, at any time, and such changes or modifications shall be effective immediately upon the earlier of (i) our email notification to you advising you of such changes or modifications or (ii) your electronic acceptance of this Agreement after such changes or modifications have been made to this Agreement.

## 2. DESCRIPTION OF SERVICES

CashParking allows you to:

    i. Provide a platform for advertising links on parked pages;

    ii. Generate revenue from the advertising links on a pay-per-click basis; and

    iii. Receive a portion of the revenue generated from the advertising links.

Your privilege to use CashParking is dependent on your continued compliance with this Agreement, along with the Universal Terms of Service Agreement, which is incorporated herein.

Go Daddy reserves the right to revoke your privileges, terminate your account, or take any other measures deemed to be appropriate (as determined by Go Daddy in its sole and absolute discretion) to enforce this Agreement.

## 3. AVAILABILITY OF SERVICES

Subject to the terms and conditions of this Agreement and Go Daddy's policies and procedures, Go Daddy shall use commercially reasonable efforts to attempt to provide the Services on a twenty-four (24) hours a day, seven (7) days a week basis throughout the term of this Agreement. You acknowledge and agree that from time to time the Services may be inaccessible or inoperable for any reason, including, without limitation:

    i. Equipment malfunctions;

    ii. Periodic maintenance, repairs or replacements that Go Daddy may undertake from time to time; or

    iii. Causes beyond the reasonable control of Go Daddy or that are not reasonably foreseeable by Go Daddy, including, but not limited to, interruption or failure of telecommunication or digital transmission links, hostile network attacks, network congestion or other failures.

You acknowledge and agree that Go Daddy has no control over the availability of the Services on a continuous or uninterrupted basis, and assumes no liability to you or any other party with regard thereto.

## 4. RESTRICTIONS ON SERVICES; REMEDIES AND PENALTIES

**Restrictions on Services**

You shall not:

GD 001852

i. Purchase or generate traffic to your website or Go Daddy's links by any of the following methods: listing on newsgroups, bulk emailing, icq postings, chatroom postings, iframes, zero pixel frames, hitbots, clickbots, spiders, cgi-scripts, JavaScript®, click farms, advertising the domain name or purchasing advertising for the domain name or any other similar method;

ii. Lure, induce, entice, incite, or trick visitors to your website into clicking on Go Daddy's hyperlinks;

iii. Mislead visitors to your website into believing that they shall receive anything other than an internet search by clicking on a text link or search box;

iv. Password protect any search result pages accessed through your website in response to a valid internet search or query;

v. Provide any interface for downloading any computer software application (each, a "Downloadable App"), any marketing materials for any Downloadable App, or any hyperlinks to any of the foregoing;

vi. Allow your website to be a downloadable or internet accessible application, as determined by Go Daddy in its sole and absolute discretion;

vii. Host the search results pages or otherwise access the search results pages except through Go Daddy's servers (or such other servers as Go Daddy may choose in its sole and absolute discretion);

viii. Edit, modify, filter, or change the order of the information contained in any search results page or on the landing page without Go Daddy's prior written consent;

ix. Do any of the following: (a) redirect an end user away from the search results page, (b) provide a version of the search results page different from the page served to an end user by or as directed by Go Daddy, (c) cache, capture, or store any search results, or (d) intersperse any content between the search results page and the landing page, including, without limitation, framing the content of search results pages or landing pages;

x. Display (on your website or anywhere else) any search results pages or landing pages, or the content thereof, in part or in total, to any third party;

xi. Enter into any arrangement or agreement under which any third party pays you fees or shares in any Commission Payments (as defined below) for any search results displayed on your website;

xii. Display graphical or text units in any form (including but not limited to pop-up, pop-under or exit windows, expanding buttons and animation) that block or otherwise inhibit the full and complete display to end users of any search results pages, landing pages, and/or web pages accessed by clicking on any part of a search result;

xiii. Place or display any unauthorized branding or attribution of any kind, including without limitation on any search results page, landing page, or framed in connection with any such pages, to indicate that any search engine is providing such results or for other promotional purposes; or

xiv. Include content above or below the landing page (or change content above or below the landing page) unless that content is pre-approved in writing by Go Daddy.

**Remedies and Penalties**

Notwithstanding anything to the contrary in this Agreement, in addition to any and all other remedies to which Go Daddy is entitled, Go Daddy specifically reserves the right to:

i. Immediately suspend or deactivate any and all domain names or accounts that Go Daddy believes in its sole and absolute discretion to be violating the terms of this Agreement;

ii. Charge you an administrative fee for each and every domain name or account that Go Daddy believes in its sole and absolute discretion to be violating the terms of this Agreement;

iii. Require the forfeiture of any previously earned revenue in connection with the Services, which has yet to be paid; and/or

iv. Provide advertising partners with any and all domain names that Go Daddy believes in its sole and absolute discretion to be violating the terms of this Agreement.

## 5. CALCULATION OF COMMISSION PAYMENTS; CANCELLATION

Go Daddy shall use commercially reasonable efforts to provide you with accurate daily estimates of the revenue

GD 001853

your website generates. You acknowledge and agree that any daily estimates do not represent an exact determination of your "Commission Payment" and the exact amount of your Commission Payment, as determined at the end of the applicable revenue generating period, may be different. Additionally, in calculating your Commission Payment, amounts may include fractions of a cent. Go Daddy shall use commercially reasonable efforts to round these amounts to the nearest cent in a manner so as to benefit you. However, you acknowledge and agree that in calculating your Commission Payment Go Daddy's determination regarding the same shall be the final and binding determination. Upon your cancellation of the Services, you acknowledge and agree that Go Daddy has the right to charge you the lesser of (i) $15.00 or (ii) the unpaid funds remaining in your CashParking account as an "Administrative Fee" in connection with your cancellation of the Services. Any funds remaining in your CashParking account after the deduction of the Administrative Fee shall be paid to you in accordance with your selected payment option.

## 6. PAYMENT OF COMMISSION PAYMENTS

### Direct Deposit

Commission Payments for all domestic CashParking Customers will be paid via direct deposit into the U.S. bank account of their choice ("Direct Deposit Account"). You understand it is your responsibility to provide a valid U.S. bank account number and the related direct deposit information by signing into the Go Daddy Control Center. Failure to provide a valid Direct Deposit Account will cause your Commission Payments to be withheld pending receipt by Go Daddy of proper direct deposit instructions. You can find the instructions on how to set up a Direct Deposit Account at any time by clicking on the "Payment Information" link from your home page on the Go Daddy Control Center.

Domestic CashParking Customers hereby authorize Go Daddy to initiate and post credit (positive) entries for Commission Payments to the Direct Deposit Account. Domestic CashParking Customers understand the amount initiated and posted to the Direct Deposit Account on a monthly basis will represent payment for commissions earned in the preceding second month, less any applicable fees and/or charge backs. For example, commissions earned in January 2010 would be paid by March 15, 2010. Direct Deposit Account owners hereby authorize their "Depository Institution" to accept credits on behalf of the Direct Deposit Account owner. Direct deposit transactions will be initiated on the 15th day of each month or if the 15th falls on a non-banking day, then direct deposit transactions will be initiated the next banking day. A $50.00 minimum threshold is required before a payment is made to the Direct Deposit Account.

Domestic CashParking Customers hereby authorize Go Daddy to initiate and post debit (negative) entries to the Direct Deposit Account to reverse erroneous Commission Payments and/or make adjustments to incorrect Commission Payments.

The authority granted to Go Daddy by the Direct Deposit Account owner herein will remain in full force and effect until Go Daddy or the Depository Institution has received written notification from the Direct Deposit Account owner that such authority has been revoked, but in any event, such writing shall be provided in such a manner as to afford Go Daddy or the Depository Institution a reasonable opportunity to act on such revocation, or until Go Daddy or the Depository Institution has sent notice of Go Daddy or the Depository Institution's termination of this Agreement.

### PayPal®

Domestic CashParking Customers utilizing PayPal will be paid out monthly on the 15th day of the month for the previous second month's commissions. Should the 15th day of the month fall on a Saturday, the payout date will be on the previous business day. Should the 15th day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A $25.00 minimum threshold is required before payment will be made to those accounts. If the payment amount exceeds $10,000.00, it will be split into two PayPal payment transactions. Please refer to the PayPal account set-up requirements for your country, which may be found here, to ensure your PayPal account has the ability to receive payments from third parties. Transaction fees for PayPal will be the responsibility of Go Daddy and will not be deducted from your Commission Payment.

### Good As Gold

Domestic CashParking Customers utilizing Go Daddy's "Good As Gold" program will be paid out monthly on the 15th day of the month for the previous second month's commissions. Should the 15th day of the month fall on a Saturday, the payout date will be on the previous business day. Should the 15th day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A $5.00 minimum threshold is required

GD 001854

before payment will be made to those accounts.

**Check**

CashParking Customers who fail to establish a Direct Deposit Account, PayPal account, or Good As Gold account, will receive their Commission Payment via paper check. Commission checks for domestic CashParking Customers will be cut monthly on the 15th of the month for the previous second month's commissions. Should the 15th day of the month fall on a Saturday, the payout date will be on the previous business day. Should the 15th day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A $100.00 minimum threshold is required before a check will be issued. Domestic CashParking Customers receiving Commission Payments via paper checks acknowledge a $25.00 check processing fee will be levied each time a commission check is printed. This fee is not applicable to foreign CashParking Customers.

Commission checks for foreign CashParking Customers will be cut quarterly on the 15th of the month for the previous quarter's commissions. A $100.00 minimum threshold is required before a check will be issued. Quarterly pay dates are May 15th, August 15th, November 15th, and February 15th.

## 7. TRADEMARK AND/OR COPYRIGHT CLAIMS

Go Daddy supports the protection of intellectual property. If you would like to submit (i) a trademark claim for violation of a mark on which you hold a valid, registered trademark or service mark, or (ii) a copyright claim for material on which you hold a bona fide copyright, please refer to Go Daddy's Trademark and/or Copyright Infringement Policy.

## 8. TITLES AND HEADINGS; INDEPENDENT COVENANTS; SEVERABILITY

The titles and headings of this Agreement are for convenience and ease of reference only and shall not be utilized in any way to construe or interpret the agreement of the parties as otherwise set forth herein. Each covenant and agreement in this Agreement shall be construed for all purposes to be a separate and independent covenant or agreement. If a court of competent jurisdiction holds any provision (or portion of a provision) of this Agreement to be illegal, invalid, or otherwise unenforceable, the remaining provisions (or portions of provisions) of this Agreement shall not be affected thereby and shall be found to be valid and enforceable to the fullest extent permitted by law.

## 9. DEFINITIONS; CONFLICTS

Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Universal Terms of Service Agreement. In the event there is a conflict between the provisions of this Agreement and the provisions of the Universal Terms of Service Agreement, the provisions of this Agreement shall control.

Revised: 5/24/2010
Copyright © 2006-2010 GoDaddy.com, Inc. All Rights Reserved.
Archived by: Christine Claffey (cclaffey), 2010-05-24 4:15:47 PM

GD 001855

# GO DADDY
# CASHPARKING® TERMS OF SERVICE AGREEMENT

## 1. OVERVIEW

This CashParking Terms of Service Agreement (this "Agreement") is entered into by and between GoDaddy.com, Inc., a/an Arizona corporation ("Go Daddy") and you, and is made effective as of the date of electronic acceptance. This Agreement sets forth the terms and conditions of your use of Go Daddy's CashParking services ("CashParking" or the "Services").

Your electronic acceptance of this Agreement signifies that you have read, understand, acknowledge and agree to be bound by this Agreement, along with Go Daddy's Universal Terms of Service Agreement, which is incorporated herein by reference.

The terms "we", "us" or "our" shall refer to Go Daddy. The terms "you", "your", "User" or "Customer" shall refer to any individual or entity who accepts this Agreement. Nothing in this Agreement shall be deemed to confer any third-party rights or benefits.

Go Daddy, in its sole and absolute discretion, may change or modify this Agreement, and the Universal Terms of Service Agreement which is incorporated herein, at any time, and such changes or modifications shall be effective immediately upon the earlier of (i) our email notification to you advising you of such changes or modifications or (ii) your electronic acceptance of this Agreement after such changes or modifications have been made to this Agreement.

## 2. DESCRIPTION OF SERVICES

CashParking allows you to:

   i. Provide a platform for advertising links on parked pages;

   ii. Generate revenue from the advertising links on a pay-per-click basis; and

   iii. Receive a portion of the revenue generated from the advertising links.

Your privilege to use CashParking is dependent on your continued compliance with this Agreement, along with the Universal Terms of Service Agreement, which is incorporated herein.

Go Daddy reserves the right to revoke your privileges, terminate your account, or take any other measures deemed to be appropriate (as determined by Go Daddy in its sole and absolute discretion) to enforce this Agreement.

## 3. AVAILABILITY OF SERVICES

Subject to the terms and conditions of this Agreement and Go Daddy's policies and procedures, Go Daddy shall use commercially reasonable efforts to attempt to provide the Services on a twenty-four (24) hours a day, seven (7) days a week basis throughout the term of this Agreement. You acknowledge and agree that from time to time the Services may be inaccessible or inoperable for any reason, including, without limitation:

   i. Equipment malfunctions;

   ii. Periodic maintenance, repairs or replacements that Go Daddy may undertake from time to time; or

   iii. Causes beyond the reasonable control of Go Daddy or that are not reasonably foreseeable by Go Daddy, including, but not limited to, interruption or failure of telecommunication or digital transmission links, hostile network attacks, network congestion or other failures.

You acknowledge and agree that Go Daddy has no control over the availability of the Services on a continuous or uninterrupted basis, and assumes no liability to you or any other party with regard thereto.

## 4. RESTRICTIONS ON SERVICES; REMEDIES AND PENALTIES

**Restrictions on Services**

You shall not:

GD 001991

i. Purchase or generate traffic to your website or Go Daddy's links by any of the following methods: listing on newsgroups, bulk emailing, icq postings, chatroom postings, iframes, zero pixel frames, hitbots, clickbots, spiders, cgi-scripts, JavaScript®, click farms, advertising the domain name or purchasing advertising for the domain name or any other similar method;

ii. Lure, induce, entice, incite, or trick visitors to your website into clicking on Go Daddy's hyperlinks;

iii. Mislead visitors to your website into believing that they shall receive anything other than an internet search by clicking on a text link or search box;

iv. Password protect any search result pages accessed through your website in response to a valid internet search or query;

v. Provide any interface for downloading any computer software application (each, a "Downloadable App"), any marketing materials for any Downloadable App, or any hyperlinks to any of the foregoing;

vi. Allow your website to be a downloadable or internet accessible application, as determined by Go Daddy in its sole and absolute discretion;

vii. Host the search results pages or otherwise access the search results pages except through Go Daddy's servers (or such other servers as Go Daddy may choose in its sole and absolute discretion);

viii. Edit, modify, filter, or change the order of the information contained in any search results page or on the landing page without Go Daddy's prior written consent;

ix. Do any of the following: (a) redirect an end user away from the search results page, (b) provide a version of the search results page different from the page served to an end user by or as directed by Go Daddy, (c) cache, capture, or store any search results, or (d) intersperse any content between the search results page and the landing page, including, without limitation, framing the content of search results pages or landing pages;

x. Display (on your website or anywhere else) any search results pages or landing pages, or the content thereof, in part or in total, to any third party;

xi. Enter into any arrangement or agreement under which any third party pays you fees or shares in any Commission Payments (as defined below) for any search results displayed on your website;

xii. Display graphical or text units in any form (including but not limited to pop-up, pop-under or exit windows, expanding buttons and animation) that block or otherwise inhibit the full and complete display to end users of any search results pages, landing pages, and/or web pages accessed by clicking on any part of a search result;

xiii. Place or display any unauthorized branding or attribution of any kind, including without limitation on any search results page, landing page, or framed in connection with any such pages, to indicate that any search engine is providing such results or for other promotional purposes; or

xiv. Include content above or below the landing page (or change content above or below the landing page) unless that content is pre-approved in writing by Go Daddy.

**Remedies and Penalties**

Notwithstanding anything to the contrary in this Agreement, in addition to any and all other remedies to which Go Daddy is entitled, Go Daddy specifically reserves the right to:

i. Immediately suspend or deactivate any and all domain names or accounts that Go Daddy believes in its sole and absolute discretion to be violating the terms of this Agreement;

ii. Charge you an administrative fee for each and every domain name or account that Go Daddy believes in its sole and absolute discretion to be violating the terms of this Agreement;

iii. Require the forfeiture of any previously earned revenue in connection with the Services, which has yet to be paid; and/or

iv. Provide advertising partners with any and all domain names that Go Daddy believes in its sole and absolute discretion to be violating the terms of this Agreement.

## 5. CALCULATION OF COMMISSION PAYMENTS; CANCELLATION

Go Daddy shall use commercially reasonable efforts to provide you with accurate daily estimates of the revenue

your website generates. You acknowledge and agree that any daily estimates do not represent an exact determination of your "Commission Payment" and the exact amount of your Commission Payment, as determined at the end of the applicable revenue generating period, may be different. Additionally, in calculating your Commission Payment, amounts may include fractions of a cent. Go Daddy shall use commercially reasonable efforts to round these amounts to the nearest cent in a manner so as to benefit you. However, you acknowledge and agree that in calculating your Commission Payment Go Daddy's determination regarding the same shall be the final and binding determination. Upon your cancellation of the Services, you acknowledge and agree that Go Daddy has the right to charge you the lesser of (i) $15.00 or (ii) the unpaid funds remaining in your CashParking account as an "Administrative Fee" in connection with your cancellation of the Services. Any funds remaining in your CashParking account after the deduction of the Administrative Fee shall be paid to you in accordance with your selected payment option.

## 6. PAYMENT OF COMMISSION PAYMENTS

### Direct Deposit

Commission Payments for all domestic CashParking Customers will be paid via direct deposit into the U.S. bank account of their choice ("Direct Deposit Account"). You understand it is your responsibility to provide a valid U.S. bank account number and the related direct deposit information by signing into the Go Daddy Control Center. Failure to provide a valid Direct Deposit Account will cause your Commission Payments to be withheld pending receipt by Go Daddy of proper direct deposit instructions. You can find the instructions on how to set up a Direct Deposit Account at any time by clicking on the "Payment Information" link from your home page on the Go Daddy Control Center.

Domestic CashParking Customers hereby authorize Go Daddy to initiate and post credit (positive) entries for Commission Payments to the Direct Deposit Account. Domestic CashParking Customers understand the amount initiated and posted to the Direct Deposit Account on a monthly basis will represent payment for commissions earned in the preceding second month, less any applicable fees and/or charge backs. For example, commissions earned in January 2010 would be paid by March 15, 2010. Direct Deposit Account owners hereby authorize their "Depository Institution" to accept credits on behalf of the Direct Deposit Account owner. Direct deposit transactions will be initiated on the 15th day of each month or if the 15th falls on a non-banking day, then direct deposit transactions will be initiated the next banking day. A $10.00 minimum threshold is required before a payment is made to the Direct Deposit Account.

Domestic CashParking Customers hereby authorize Go Daddy to initiate and post debit (negative) entries to the Direct Deposit Account to reverse erroneous Commission Payments and/or make adjustments to incorrect Commission Payments.

The authority granted to Go Daddy by the Direct Deposit Account owner herein will remain in full force and effect until Go Daddy or the Depository Institution has received written notification from the Direct Deposit Account owner that such authority has been revoked, but in any event, such writing shall be provided in such a manner as to afford Go Daddy or the Depository Institution a reasonable opportunity to act on such revocation, or until Go Daddy or the Depository Institution has sent notice of Go Daddy or the Depository Institution's termination of this Agreement.

### PayPal®

Domestic CashParking Customers utilizing PayPal will be paid out monthly on the 15th day of the month for the previous second month's commissions. Should the 15th day of the month fall on a Saturday, the payout date will be on the previous business day. Should the 15th day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A $25.00 minimum threshold is required before payment will be made to those accounts. If the payment amount exceeds $10,000.00, it will be split into two PayPal payment transactions. Please refer to the PayPal account set-up requirements for your country, which may be found here, to ensure your PayPal account has the ability to receive payments from third parties. Transaction fees for PayPal will be the responsibility of Go Daddy and will not be deducted from your Commission Payment.

### Good As Gold

Domestic CashParking Customers utilizing Go Daddy's "Good As Gold" program will be paid out monthly on the 15th day of the month for the previous second month's commissions. Should the 15th day of the month fall on a Saturday, the payout date will be on the previous business day. Should the 15th day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A $5.00 minimum threshold is required

GD 001993

before payment will be made to those accounts.

### Check

CashParking Customers who fail to establish a Direct Deposit Account, PayPal account, or Good As Gold account, will receive their Commission Payment via paper check. Commission checks for domestic CashParking Customers will be cut monthly on the 15th of the month for the previous second month's commissions. Should the 15th day of the month fall on a Saturday, the payout date will be on the previous business day. Should the 15th day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A $100.00 minimum threshold is required before a check will be issued. Domestic CashParking Customers receiving Commission Payments via paper checks acknowledge a $25.00 check processing fee will be levied each time a commission check is printed. This fee is not applicable to foreign CashParking Customers.

Commission checks for foreign CashParking Customers will be cut quarterly on the 15th of the month for the previous quarter's commissions. A $100.00 minimum threshold is required before a check will be issued. Quarterly pay dates are May 15th, August 15th, November 15th, and February 15th.

## 7. TRADEMARK AND/OR COPYRIGHT CLAIMS

Go Daddy supports the protection of intellectual property. If you would like to submit (i) a trademark claim for violation of a mark on which you hold a valid, registered trademark or service mark, or (ii) a copyright claim for material on which you hold a bona fide copyright, please refer to Go Daddy's Trademark and/or Copyright Infringement Policy.

## 8. TITLES AND HEADINGS; INDEPENDENT COVENANTS; SEVERABILITY

The titles and headings of this Agreement are for convenience and ease of reference only and shall not be utilized in any way to construe or interpret the agreement of the parties as otherwise set forth herein. Each covenant and agreement in this Agreement shall be construed for all purposes to be a separate and independent covenant or agreement. If a court of competent jurisdiction holds any provision (or portion of a provision) of this Agreement to be illegal, invalid, or otherwise unenforceable, the remaining provisions (or portions of provisions) of this Agreement shall not be affected thereby and shall be found to be valid and enforceable to the fullest extent permitted by law.

## 9. DEFINITIONS; CONFLICTS

Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Universal Terms of Service Agreement. In the event there is a conflict between the provisions of this Agreement and the provisions of the Universal Terms of Service Agreement, the provisions of this Agreement shall control.

Revised: 6/29/2010
Copyright © 2006-2010 GoDaddy.com, Inc. All Rights Reserved.
Archived by: Christine Claffey (cclaffey), 2010-06-29 1:00:01 PM

GD 001994

# GO DADDY
# CASHPARKING® TERMS OF SERVICE AGREEMENT

## 1. OVERVIEW

This CashParking Terms of Service Agreement (this "Agreement") is entered into by and between GoDaddy.com, Inc., a/an Arizona corporation ("Go Daddy") and you, and is made effective as of the date of electronic acceptance. This Agreement sets forth the terms and conditions of your use of Go Daddy's CashParking services ("CashParking" or the "Services").

Your electronic acceptance of this Agreement signifies that you have read, understand, acknowledge and agree to be bound by this Agreement, along with Go Daddy's Universal Terms of Service Agreement, which is incorporated herein by reference.

The terms "we", "us" or "our" shall refer to Go Daddy. The terms "you", "your", "User" or "Customer" shall refer to any individual or entity who accepts this Agreement. Nothing in this Agreement shall be deemed to confer any third-party rights or benefits.

Go Daddy, in its sole and absolute discretion, may change or modify this Agreement, and the Universal Terms of Service Agreement which is incorporated herein, at any time, and such changes or modifications shall be effective immediately upon the earlier of (i) our email notification to you advising you of such changes or modifications or (ii) your electronic acceptance of this Agreement after such changes or modifications have been made to this Agreement.

## 2. DESCRIPTION OF SERVICES

CashParking allows you to:

 i. Provide a platform for advertising links on parked pages;
 ii. Generate revenue from the advertising links on a pay-per-click basis; and
 iii. Receive a portion of the revenue generated from the advertising links.

Your privilege to use CashParking is dependent on your continued compliance with this Agreement, along with the Universal Terms of Service Agreement, which is incorporated herein.

Go Daddy reserves the right to revoke your privileges, terminate your account, or take any other measures deemed to be appropriate (as determined by Go Daddy in its sole and absolute discretion) to enforce this Agreement.

## 3. AVAILABILITY OF SERVICES

Subject to the terms and conditions of this Agreement and Go Daddy's policies and procedures, Go Daddy shall use commercially reasonable efforts to attempt to provide the Services on a twenty-four (24) hours a day, seven (7) days a week basis throughout the term of this Agreement. You acknowledge and agree that from time to time the Services may be inaccessible or inoperable for any reason, including, without limitation:

 i. Equipment malfunctions;
 ii. Periodic maintenance, repairs or replacements that Go Daddy may undertake from time to time; or
 iii. Causes beyond the reasonable control of Go Daddy or that are not reasonably foreseeable by Go Daddy, including, but not limited to, interruption or failure of telecommunication or digital transmission links, hostile network attacks, network congestion or other failures.

You acknowledge and agree that Go Daddy has no control over the availability of the Services on a continuous or uninterrupted basis, and assumes no liability to you or any other party with regard thereto.

## 4. RESTRICTIONS ON SERVICES; REMEDIES AND PENALTIES

**Restrictions on Services**

You shall not:

GD 001995

i. Purchase or generate traffic to your website or Go Daddy's links by any of the following methods: listing on newsgroups, bulk emailing, icq postings, chatroom postings, iframes, zero pixel frames, hitbots, clickbots, spiders, cgi-scripts, JavaScript®, click farms, advertising the domain name or purchasing advertising for the domain name or any other similar method;

ii. Lure, induce, entice, incite, or trick visitors to your website into clicking on Go Daddy's hyperlinks;

iii. Mislead visitors to your website into believing that they shall receive anything other than an internet search by clicking on a text link or search box;

iv. Password protect any search result pages accessed through your website in response to a valid internet search or query;

v. Provide any interface for downloading any computer software application (each, a "Downloadable App"), any marketing materials for any Downloadable App, or any hyperlinks to any of the foregoing;

vi. Allow your website to be a downloadable or internet accessible application, as determined by Go Daddy in its sole and absolute discretion;

vii. Host the search results pages or otherwise access the search results pages except through Go Daddy's servers (or such other servers as Go Daddy may choose in its sole and absolute discretion);

viii. Edit, modify, filter, or change the order of the information contained in any search results page or on the landing page without Go Daddy's prior written consent;

ix. Do any of the following: (a) redirect an end user away from the search results page, (b) provide a version of the search results page different from the page served to an end user by or as directed by Go Daddy, (c) cache, capture, or store any search results, or (d) intersperse any content between the search results page and the landing page, including, without limitation, framing the content of search results pages or landing pages;

x. Display (on your website or anywhere else) any search results pages or landing pages, or the content thereof, in part or in total, to any third party;

xi. Enter into any arrangement or agreement under which any third party pays you fees or shares in any Commission Payments (as defined below) for any search results displayed on your website;

xii. Display graphical or text units in any form (including but not limited to pop-up, pop-under or exit windows, expanding buttons and animation) that block or otherwise inhibit the full and complete display to end users of any search results pages, landing pages, and/or web pages accessed by clicking on any part of a search result;

xiii. Place or display any unauthorized branding or attribution of any kind, including without limitation on any search results page, landing page, or framed in connection with any such pages, to indicate that any search engine is providing such results or for other promotional purposes; or

xiv. Include content above or below the landing page (or change content above or below the landing page) unless that content is pre-approved in writing by Go Daddy.

**Remedies and Penalties**

Notwithstanding anything to the contrary in this Agreement, in addition to any and all other remedies to which Go Daddy is entitled, Go Daddy specifically reserves the right to:

i. Immediately suspend or deactivate any and all domain names or accounts that Go Daddy believes in its sole and absolute discretion to be violating the terms of this Agreement;

ii. Charge you an administrative fee for each and every domain name or account that Go Daddy believes in its sole and absolute discretion to be violating the terms of this Agreement;

iii. Require the forfeiture of any previously earned revenue in connection with the Services, which has yet to be paid; and/or

iv. Provide advertising partners with any and all domain names that Go Daddy believes in its sole and absolute discretion to be violating the terms of this Agreement.

## 5. CALCULATION OF COMMISSION PAYMENTS; CANCELLATION

Go Daddy shall use commercially reasonable efforts to provide you with accurate daily estimates of the revenue

GD 001996

your website generates. You acknowledge and agree that any daily estimates do not represent an exact determination of your "Commission Payment" and the exact amount of your Commission Payment, as determined at the end of the applicable revenue generating period, may be different. Additionally, in calculating your Commission Payment, amounts may include fractions of a cent. Go Daddy shall use commercially reasonable efforts to round these amounts to the nearest cent in a manner so as to benefit you. However, you acknowledge and agree that in calculating your Commission Payment Go Daddy's determination regarding the same shall be the final and binding determination. Upon your cancellation of the Services, you acknowledge and agree that Go Daddy has the right to charge you the lesser of (i) $15.00 or (ii) the unpaid funds remaining in your CashParking account as an "Administrative Fee" in connection with your cancellation of the Services. Any funds remaining in your CashParking account after the deduction of the Administrative Fee shall be paid to you in accordance with your selected payment option.

## 6. PAYMENT OF COMMISSION PAYMENTS

### Direct Deposit

Commission Payments for all domestic CashParking Customers will be paid via direct deposit into the U.S. bank account of their choice ("Direct Deposit Account"). You understand it is your responsibility to provide a valid U.S. bank account number and the related direct deposit information by signing into the Go Daddy Control Center. Failure to provide a valid Direct Deposit Account will cause your Commission Payments to be withheld pending receipt by Go Daddy of proper direct deposit instructions. You can find the instructions on how to set up a Direct Deposit Account at any time by clicking on the "Payment Information" link from your home page on the Go Daddy Control Center.

Domestic CashParking Customers hereby authorize Go Daddy to initiate and post credit (positive) entries for Commission Payments to the Direct Deposit Account. Domestic CashParking Customers understand the amount initiated and posted to the Direct Deposit Account on a monthly basis will represent payment for commissions earned in the preceding second month, less any applicable fees and/or charge backs. For example, commissions earned in January 2010 would be paid by March 15, 2010. Direct Deposit Account owners hereby authorize their "Depository Institution" to accept credits on behalf of the Direct Deposit Account owner. Direct deposit transactions will be initiated on the 15th day of each month or if the 15th falls on a non-banking day, then direct deposit transactions will be initiated the next banking day. A $10.00 minimum threshold is required before a payment is made to the Direct Deposit Account.

Domestic CashParking Customers hereby authorize Go Daddy to initiate and post debit (negative) entries to the Direct Deposit Account to reverse erroneous Commission Payments and/or make adjustments to incorrect Commission Payments.

The authority granted to Go Daddy by the Direct Deposit Account owner herein will remain in full force and effect until Go Daddy or the Depository Institution has received written notification from the Direct Deposit Account owner that such authority has been revoked, but in any event, such writing shall be provided in such a manner as to afford Go Daddy or the Depository Institution a reasonable opportunity to act on such revocation, or until Go Daddy or the Depository Institution has sent notice of Go Daddy or the Depository Institution's termination of this Agreement.

### PayPal®

Domestic CashParking Customers utilizing PayPal will be paid out monthly on the 15th day of the month for the previous second month's commissions. Should the 15th day of the month fall on a Saturday, the payout date will be on the previous business day. Should the 15th day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A $25.00 minimum threshold is required before payment will be made to those accounts. If the payment amount exceeds $20,000.00, it will be split into two PayPal payment transactions. Please refer to the PayPal account set-up requirements for your country, which may be found here, to ensure your PayPal account has the ability to receive payments from third parties. Transaction fees for PayPal will be the responsibility of Go Daddy and will not be deducted from your Commission Payment.

### Good As Gold

Domestic CashParking Customers utilizing Go Daddy's "Good As Gold" program will be paid out monthly on the 15th day of the month for the previous second month's commissions. Should the 15th day of the month fall on a Saturday, the payout date will be on the previous business day. Should the 15th day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A $5.00 minimum threshold is required

GD 001997

before payment will be made to those accounts.

**Check**

CashParking Customers who fail to establish a Direct Deposit Account, PayPal account, or Good As Gold account, will receive their Commission Payment via paper check. Commission checks for domestic CashParking Customers will be cut monthly on the 15th of the month for the previous second month's commissions. Should the 15th day of the month fall on a Saturday, the payout date will be on the previous business day. Should the 15th day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A $100.00 minimum threshold is required before a check will be issued. Domestic CashParking Customers receiving Commission Payments via paper checks acknowledge a $25.00 check processing fee will be levied each time a commission check is printed. This fee is not applicable to foreign CashParking Customers.

Commission checks for foreign CashParking Customers will be cut quarterly on the 15th of the month for the previous quarter's commissions. A $100.00 minimum threshold is required before a check will be issued. Quarterly pay dates are May 15th, August 15th, November 15th, and February 15th.

## 7. TRADEMARK AND/OR COPYRIGHT CLAIMS

Go Daddy supports the protection of intellectual property. If you would like to submit (i) a trademark claim for violation of a mark on which you hold a valid, registered trademark or service mark, or (ii) a copyright claim for material on which you hold a bona fide copyright, please refer to Go Daddy's Trademark and/or Copyright Infringement Policy.

## 8. TITLES AND HEADINGS; INDEPENDENT COVENANTS; SEVERABILITY

The titles and headings of this Agreement are for convenience and ease of reference only and shall not be utilized in any way to construe or interpret the agreement of the parties as otherwise set forth herein. Each covenant and agreement in this Agreement shall be construed for all purposes to be a separate and independent covenant or agreement. If a court of competent jurisdiction holds any provision (or portion of a provision) of this Agreement to be illegal, invalid, or otherwise unenforceable, the remaining provisions (or portions of provisions) of this Agreement shall not be affected thereby and shall be found to be valid and enforceable to the fullest extent permitted by law.

## 9. DEFINITIONS; CONFLICTS

Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Universal Terms of Service Agreement. In the event there is a conflict between the provisions of this Agreement and the provisions of the Universal Terms of Service Agreement, the provisions of this Agreement shall control.

Revised: 11/16/2010
Copyright © 2006-2010 GoDaddy.com, Inc. All Rights Reserved.
Archived by: Christine Claffey (cclaffey), 2010-11-16 6:32:38 PM

GD 001998

# GO DADDY
# CASHPARKING® TERMS OF SERVICE AGREEMENT

## 1. OVERVIEW

This CashParking Terms of Service Agreement (this "Agreement") is entered into by and between GoDaddy.com, Inc., a/an Arizona corporation ("Go Daddy") and you, and is made effective as of the date of electronic acceptance. This Agreement sets forth the terms and conditions of your use of Go Daddy's CashParking services ("CashParking" or the "Services").

Your electronic acceptance of this Agreement signifies that you have read, understand, acknowledge and agree to be bound by this Agreement, along with Go Daddy's Universal Terms of Service Agreement, which is incorporated herein by reference.

The terms "we", "us" or "our" shall refer to Go Daddy. The terms "you", "your", "User" or "Customer" shall refer to any individual or entity who accepts this Agreement. Nothing in this Agreement shall be deemed to confer any third-party rights or benefits.

Go Daddy, in its sole and absolute discretion, may change or modify this Agreement, and the Universal Terms of Service Agreement which is incorporated herein, at any time, and such changes or modifications shall be effective immediately upon the earlier of (i) our email notification to you advising you of such changes or modifications or (ii) your electronic acceptance of this Agreement after such changes or modifications have been made to this Agreement.

## 2. DESCRIPTION OF SERVICES

CashParking allows you to:

    i. Provide a platform for advertising links on parked pages;

    ii. Generate revenue from the advertising links on a pay-per-click basis; and

    iii. Receive a portion of the revenue generated from the advertising links.

Your privilege to use CashParking is dependent on your continued compliance with this Agreement, along with the Universal Terms of Service Agreement, which is incorporated herein.

Go Daddy reserves the right to revoke your privileges, terminate your account, or take any other measures deemed to be appropriate (as determined by Go Daddy in its sole and absolute discretion) to enforce this Agreement.

## 3. AVAILABILITY OF SERVICES

Subject to the terms and conditions of this Agreement and Go Daddy's policies and procedures, Go Daddy shall use commercially reasonable efforts to attempt to provide the Services on a twenty-four (24) hours a day, seven (7) days a week basis throughout the term of this Agreement. You acknowledge and agree that from time to time the Services may be inaccessible or inoperable for any reason, including, without limitation:

    i. Equipment malfunctions;

    ii. Periodic maintenance, repairs or replacements that Go Daddy may undertake from time to time; or

    iii. Causes beyond the reasonable control of Go Daddy or that are not reasonably foreseeable by Go Daddy, including, but not limited to, interruption or failure of telecommunication or digital transmission links, hostile network attacks, network congestion or other failures.

You acknowledge and agree that Go Daddy has no control over the availability of the Services on a continuous or uninterrupted basis, and assumes no liability to you or any other party with regard thereto.

## 4. RESTRICTIONS ON SERVICES; REMEDIES AND PENALTIES

**Restrictions on Services**

You shall not:

GD 001999

i. Purchase or generate traffic to your website or Go Daddy's links by any of the following methods: listing on newsgroups, bulk emailing, icq postings, chatroom postings, iframes, zero pixel frames, hitbots, clickbots, spiders, cgi-scripts, JavaScript®, click farms, advertising the domain name or purchasing advertising for the domain name or any other similar method;

ii. Lure, induce, entice, incite, or trick visitors to your website into clicking on Go Daddy's hyperlinks;

iii. Mislead visitors to your website into believing that they shall receive anything other than an internet search by clicking on a text link or search box;

iv. Password protect any search result pages accessed through your website in response to a valid internet search or query;

v. Provide any interface for downloading any computer software application (each, a "Downloadable App"), any marketing materials for any Downloadable App, or any hyperlinks to any of the foregoing;

vi. Allow your website to be a downloadable or internet accessible application, as determined by Go Daddy in its sole and absolute discretion;

vii. Host the search results pages or otherwise access the search results pages except through Go Daddy's servers (or such other servers as Go Daddy may choose in its sole and absolute discretion);

viii. Edit, modify, filter, or change the order of the information contained in any search results page or on the landing page without Go Daddy's prior written consent;

ix. Do any of the following: (a) redirect an end user away from the search results page, (b) provide a version of the search results page different from the page served to an end user by or as directed by Go Daddy, (c) cache, capture, or store any search results, or (d) intersperse any content between the search results page and the landing page, including, without limitation, framing the content of search results pages or landing pages;

x. Display (on your website or anywhere else) any search results pages or landing pages, or the content thereof, in part or in total, to any third party;

xi. Enter into any arrangement or agreement under which any third party pays you fees or shares in any Commission Payments (as defined below) for any search results displayed on your website;

xii. Display graphical or text units in any form (including but not limited to pop-up, pop-under or exit windows, expanding buttons and animation) that block or otherwise inhibit the full and complete display to end users of any search results pages, landing pages, and/or web pages accessed by clicking on any part of a search result;

xiii. Place or display any unauthorized branding or attribution of any kind, including without limitation on any search results page, landing page, or framed in connection with any such pages, to indicate that any search engine is providing such results or for other promotional purposes; or

xiv. Include content above or below the landing page (or change content above or below the landing page) unless that content is pre-approved in writing by Go Daddy.

**Remedies and Penalties**

Notwithstanding anything to the contrary in this Agreement, in addition to any and all other remedies to which Go Daddy is entitled, Go Daddy specifically reserves the right to:

i. Immediately suspend or deactivate any and all domain names or accounts that Go Daddy believes in its sole and absolute discretion to be violating the terms of this Agreement;

ii. Charge you an administrative fee for each and every domain name or account that Go Daddy believes in its sole and absolute discretion to be violating the terms of this Agreement;

iii. Require the forfeiture of any previously earned revenue in connection with the Services, which has yet to be paid; and/or

iv. Provide advertising partners with any and all domain names that Go Daddy believes in its sole and absolute discretion to be violating the terms of this Agreement.

## 5. CALCULATION OF COMMISSION PAYMENTS; CANCELLATION

Go Daddy shall use commercially reasonable efforts to provide you with accurate daily estimates of the revenue

GD 002000

your website generates. You acknowledge and agree that any daily estimates do not represent an exact determination of your "Commission Payment" and the exact amount of your Commission Payment, as determined at the end of the applicable revenue generating period, may be different. Additionally, in calculating your Commission Payment, amounts may include fractions of a cent. Go Daddy shall use commercially reasonable efforts to round these amounts to the nearest cent in a manner so as to benefit you. However, you acknowledge and agree that in calculating your Commission Payment Go Daddy's determination regarding the same shall be the final and binding determination. Upon your cancellation of the Services, you acknowledge and agree that Go Daddy has the right to charge you the lesser of (i) $15.00 or (ii) the unpaid funds remaining in your CashParking account as an "Administrative Fee" in connection with your cancellation of the Services. Any funds remaining in your CashParking account after the deduction of the Administrative Fee shall be paid to you in accordance with your selected payment option.

## 6. PAYMENT OF COMMISSION PAYMENTS

### Direct Deposit

Direct deposit is available only to domestic CashParking Customers (CashParking Customers based in the U.S.). Domestic CashParking Customers utilizing direct deposit will be paid Commission Payments to the U.S. bank account of their choice ("Direct Deposit Account"). You understand it is your responsibility to provide a valid U.S. bank account number and the related direct deposit information by signing into the Go Daddy Control Center. Failure to provide a valid Direct Deposit Account will cause your Commission Payments to be withheld pending receipt by Go Daddy of proper direct deposit instructions. You can find the instructions on how to set up a Direct Deposit Account at any time by clicking on the "Payment Information" link from your home page on the Go Daddy Control Center.

Domestic CashParking Customers hereby authorize Go Daddy to initiate and post credit (positive) entries for Commission Payments to the Direct Deposit Account. Domestic CashParking Customers understand the amount initiated and posted to the Direct Deposit Account on a monthly basis will represent payment for commissions earned in the preceding second month, less any applicable fees and/or charge backs. For example, commissions earned in January 2010 would be paid by March 15, 2010. Direct Deposit Account owners hereby authorize their "Depository Institution" to accept credits on behalf of the Direct Deposit Account owner. Direct deposit transactions will be initiated on the 15th day of each month or if the 15th falls on a non-banking day, then direct deposit transactions will be initiated the next banking day. A $10.00 minimum threshold is required before a payment is made to the Direct Deposit Account.

Domestic CashParking Customers hereby authorize Go Daddy to initiate and post debit (negative) entries to the Direct Deposit Account to reverse erroneous Commission Payments and/or make adjustments to incorrect Commission Payments.

The authority granted to Go Daddy by the Direct Deposit Account owner herein will remain in full force and effect until Go Daddy or the Depository Institution has received written notification from the Direct Deposit Account owner that such authority has been revoked, but in any event, such writing shall be provided in such a manner as to afford Go Daddy or the Depository Institution a reasonable opportunity to act on such revocation, or until Go Daddy or the Depository Institution has sent notice of Go Daddy or the Depository Institution's termination of this Agreement.

### PayPal®

PayPal is available to both domestic CashParking Customers (CashParking Customers based in the U.S.) and international CashParking Customers (CashParking Customers based outside the U.S.). CashParking Customers utilizing PayPal will be paid out monthly on the 15th day of the month for the previous second month's commissions. Should the 15th day of the month fall on a Saturday, the payout date will be on the previous business day. Should the 15th day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A $25.00 minimum threshold is required before payment will be made to those accounts. If the payment amount exceeds $20,000.00, it will be split into two PayPal payment transactions. Please refer to the PayPal account set-up requirements for your country, which may be found here, to ensure your PayPal account has the ability to receive payments from third parties. Transaction fees for PayPal will be the responsibility of Go Daddy and will not be deducted from your Commission Payment.

### Good As Gold

Go Daddy's "Good As Gold" program is available to both domestic CashParking Customers (CashParking

GD 002001

Customers based in the U.S.) and international CashParking Customers (CashParking Customers based outside the U.S.). CashParking Customers utilizing Go Daddy's "Good As Gold" program will be paid out monthly on the 15th day of the month for the previous second month's commissions. Should the 15th day of the month fall on a Saturday, the payout date will be on the previous business day. Should the 15th day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A $5.00 minimum threshold is required before payment will be made to those accounts.

**Check**

CashParking Customers (domestic and international) who fail to establish a Direct Deposit Account, PayPal account, or Good As Gold account, will receive their Commission Payment via paper check.

Commission checks for domestic CashParking Customers will be cut monthly on the 15th of the month for the previous second month's commissions. Should the 15th day of the month fall on a Saturday, the payout date will be on the previous business day. Should the 15th day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A $100.00 minimum threshold is required before a check will be issued. Domestic CashParking Customers receiving Commission Payments via paper checks acknowledge a $25.00 check processing fee will be levied each time a commission check is printed.

Commission checks for international CashParking Customers will be cut monthly on the 15th of the month for the previous quarter's commissions. Quarterly pay dates are May 15th, August 15th, November 15th, and February 15th. Should the 15th day of the month fall on a Saturday, the payout date will be on the previous business day. Should the 15th day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A $100.00 minimum threshold is required before a check will be issued. No check processing fee is charged for international CashParking Customers.

## 7. TRADEMARK AND/OR COPYRIGHT CLAIMS

Go Daddy supports the protection of intellectual property. If you would like to submit (i) a trademark claim for violation of a mark on which you hold a valid, registered trademark or service mark, or (ii) a copyright claim for material on which you hold a bona fide copyright, please refer to Go Daddy's Trademark and/or Copyright Infringement Policy.

## 8. TITLES AND HEADINGS; INDEPENDENT COVENANTS; SEVERABILITY

The titles and headings of this Agreement are for convenience and ease of reference only and shall not be utilized in any way to construe or interpret the agreement of the parties as otherwise set forth herein. Each covenant and agreement in this Agreement shall be construed for all purposes to be a separate and independent covenant or agreement. If a court of competent jurisdiction holds any provision (or portion of a provision) of this Agreement to be illegal, invalid, or otherwise unenforceable, the remaining provisions (or portions of provisions) of this Agreement shall not be affected thereby and shall be found to be valid and enforceable to the fullest extent permitted by law.

## 9. DEFINITIONS; CONFLICTS

Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Universal Terms of Service Agreement. In the event there is a conflict between the provisions of this Agreement and the provisions of the Universal Terms of Service Agreement, the provisions of this Agreement shall control.

Revised: 11/17/2010
Copyright © 2006-2010 GoDaddy.com, Inc. All Rights Reserved.

**Archived by: Christine Claffey (cclaffey), 2010-11-17 6:20:04 PM**

# GO DADDY
# CASHPARKING® TERMS OF SERVICE AGREEMENT

**Last Revised: December 22, 2010**

**PLEASE READ THIS AGREEMENT CAREFULLY, AS IT CONTAINS IMPORTANT INFORMATION REGARDING YOUR LEGAL RIGHTS AND REMEDIES.**

## 1. OVERVIEW

This CashParking Terms of Service Agreement (this "Agreement") is entered into by and between GoDaddy.com, Inc., a/an Arizona corporation ("Go Daddy") and you, and is made effective as of the date of electronic acceptance. This Agreement sets forth the terms and conditions of your use of Go Daddy's CashParking services ("CashParking" or the "Services").

Your electronic acceptance of this Agreement signifies that you have read, understand, acknowledge and agree to be bound by this Agreement, along with Go Daddy's Universal Terms of Service Agreement, which is incorporated herein by reference.

The terms "we", "us" or "our" shall refer to Go Daddy. The terms "you", "your", "User" or "customer" shall refer to any individual or entity who accepts this Agreement. Nothing in this Agreement shall be deemed to confer any third-party rights or benefits.

Go Daddy, in its sole and absolute discretion, may change or modify this Agreement, and any policies or agreements which are incorporated herein, at any time, and such changes or modifications shall be effective immediately upon posting to the Go Daddy website (this "Site"). You acknowledge and agree that (i) Go Daddy may notify you of such changes or modifications by posting them to this Site and (ii) your use of this Site or the Services found at this Site after such changes or modifications have been made (as indicated by the "Last Revised" date at the top of this page) shall constitute your acceptance of this Agreement as last revised. If you do not agree to be bound by this Agreement as last revised, do not use (or continue to use) this Site or the Services found at this Site. In addition, Go Daddy may occasionally notify you of changes or modifications to this Agreement by email. It is therefore very important that you keep your account ("Account") information, including your email address, current. Go Daddy assumes no liability or responsibility for your failure to receive an email notification if such failure results from an inaccurate or out-of-date email address.

## 2. DESCRIPTION OF SERVICES

CashParking allows you to:

    i. Provide a platform for advertising links on parked pages;

    ii. Generate revenue from the advertising links on a pay-per-click basis; and

    iii. Receive a portion of the revenue generated from the advertising links.

Your privilege to use CashParking is dependent on your continued compliance with this Agreement, along with the Universal Terms of Service Agreement, which is incorporated herein.

Go Daddy reserves the right to revoke your privileges, terminate your account, or take any other measures deemed to be appropriate (as determined by Go Daddy in its sole and absolute discretion) to enforce this Agreement.

## 3. AVAILABILITY OF SERVICES

Subject to the terms and conditions of this Agreement and Go Daddy's policies and procedures, Go Daddy shall use commercially reasonable efforts to attempt to provide the Services on a twenty-four (24) hours a day, seven (7) days a week basis throughout the term of this Agreement. You acknowledge and agree that from time to time the Services may be inaccessible or inoperable for any reason, including, without limitation:

    i. Equipment malfunctions;

    ii. Periodic maintenance, repairs or replacements that Go Daddy may undertake from time to time; or

    iii. Causes beyond the reasonable control of Go Daddy or that are not reasonably foreseeable by Go

GD 002003

Daddy, including, but not limited to, interruption or failure of telecommunication or digital transmission links, hostile network attacks, network congestion or other failures.

You acknowledge and agree that Go Daddy has no control over the availability of the Services on a continuous or uninterrupted basis, and assumes no liability to you or any other party with regard thereto.

## 4. RESTRICTIONS ON SERVICES; REMEDIES AND PENALTIES

### Restrictions on Services

You shall not:

i. Purchase or generate traffic to your website or Go Daddy's links by any of the following methods: listing on newsgroups, bulk emailing, icq postings, chatroom postings, iframes, zero pixel frames, hitbots, clickbots, spiders, cgi-scripts, JavaScript®, click farms, advertising the domain name or purchasing advertising for the domain name or any other similar method;

ii. Lure, induce, entice, incite, or trick visitors to your website into clicking on Go Daddy's hyperlinks;

iii. Mislead visitors to your website into believing that they shall receive anything other than an internet search by clicking on a text link or search box;

iv. Password protect any search result pages accessed through your website in response to a valid internet search or query;

v. Provide any interface for downloading any computer software application (each, a "Downloadable App"), any marketing materials for any Downloadable App, or any hyperlinks to any of the foregoing;

vi. Allow your website to be a downloadable or internet accessible application, as determined by Go Daddy in its sole and absolute discretion;

vii. Host the search results pages or otherwise access the search results pages except through Go Daddy's servers (or such other servers as Go Daddy may choose in its sole and absolute discretion);

viii. Edit, modify, filter, or change the order of the information contained in any search results page or on the landing page without Go Daddy's prior written consent;

ix. Do any of the following: (a) redirect an end user away from the search results page, (b) provide a version of the search results page different from the page served to an end user by or as directed by Go Daddy, (c) cache, capture, or store any search results, or (d) intersperse any content between the search results page and the landing page, including, without limitation, framing the content of search results pages or landing pages;

x. Display (on your website or anywhere else) any search results pages or landing pages, or the content thereof, in part or in total, to any third party;

xi. Enter into any arrangement or agreement under which any third party pays you fees or shares in any Commission Payments (as defined below) for any search results displayed on your website;

xii. Display graphical or text units in any form (including but not limited to pop-up, pop-under or exit windows, expanding buttons and animation) that block or otherwise inhibit the full and complete display to end users of any search results pages, landing pages, and/or web pages accessed by clicking on any part of a search result;

xiii. Place or display any unauthorized branding or attribution of any kind, including without limitation on any search results page, landing page, or framed in connection with any such pages, to indicate that any search engine is providing such results or for other promotional purposes; or

xiv. Include content above or below the landing page (or change content above or below the landing page) unless that content is pre-approved in writing by Go Daddy.

### Remedies and Penalties

Notwithstanding anything to the contrary in this Agreement, in addition to any and all other remedies to which Go Daddy is entitled, Go Daddy specifically reserves the right to:

i. Immediately suspend or deactivate any and all domain names or accounts that Go Daddy believes in its sole and absolute discretion to be violating the terms of this Agreement;

GD 002004

ii. Charge you an administrative fee for each and every domain name or account that Go Daddy believes in its sole and absolute discretion to be violating the terms of this Agreement;

iii. Require the forfeiture of any previously earned revenue in connection with the Services, which has yet to be paid; and/or

iv. Provide advertising partners with any and all domain names that Go Daddy believes in its sole and absolute discretion to be violating the terms of this Agreement.

## 5. CALCULATION OF COMMISSION PAYMENTS; CANCELLATION

Go Daddy shall use commercially reasonable efforts to provide you with accurate daily estimates of the revenue your website generates. You acknowledge and agree that any daily estimates do not represent an exact determination of your "Commission Payment" and the exact amount of your Commission Payment, as determined at the end of the applicable revenue generating period, may be different. Additionally, in calculating your Commission Payment, amounts may include fractions of a cent. Go Daddy shall use commercially reasonable efforts to round these amounts to the nearest cent in a manner so as to benefit you. However, you acknowledge and agree that in calculating your Commission Payment Go Daddy's determination regarding the same shall be the final and binding determination. Upon your cancellation of the Services, you acknowledge and agree that Go Daddy has the right to charge you the lesser of (i) $15.00 or (ii) the unpaid funds remaining in your CashParking account as an "Administrative Fee" in connection with your cancellation of the Services. Any funds remaining in your CashParking account after the deduction of the Administrative Fee shall be paid to you in accordance with your selected payment option.

## 6. PAYMENT OF COMMISSION PAYMENTS

### Direct Deposit

Direct deposit is available only to domestic CashParking Customers (CashParking Customers based in the U.S.). Domestic CashParking Customers utilizing direct deposit will be paid Commission Payments to the U.S. bank account of their choice ("Direct Deposit Account"). You understand it is your responsibility to provide a valid U.S. bank account number and the related direct deposit information by signing into the Go Daddy Control Center. Failure to provide a valid Direct Deposit Account will cause your Commission Payments to be withheld pending receipt by Go Daddy of proper direct deposit instructions. You can find the instructions on how to set up a Direct Deposit Account at any time by clicking on the "Payment Information" link from your home page on the Go Daddy Control Center.

Domestic CashParking Customers hereby authorize Go Daddy to initiate and post credit (positive) entries for Commission Payments to the Direct Deposit Account. Domestic CashParking Customers understand the amount initiated and posted to the Direct Deposit Account on a monthly basis will represent payment for commissions earned in the preceding second month, less any applicable fees and/or charge backs. For example, commissions earned in January 2010 would be paid by March 15, 2010. Direct Deposit Account owners hereby authorize their "Depository Institution" to accept credits on behalf of the Direct Deposit Account owner. Direct deposit transactions will be initiated on the 15th day of each month or if the 15th falls on a non-banking day, then direct deposit transactions will be initiated the next banking day. A $10.00 minimum threshold is required before a payment is made to the Direct Deposit Account.

Domestic CashParking Customers hereby authorize Go Daddy to initiate and post debit (negative) entries to the Direct Deposit Account to reverse erroneous Commission Payments and/or make adjustments to incorrect Commission Payments.

The authority granted to Go Daddy by the Direct Deposit Account owner herein will remain in full force and effect until Go Daddy or the Depository Institution has received written notification from the Direct Deposit Account owner that such authority has been revoked, but in any event, such writing shall be provided in such a manner as to afford Go Daddy or the Depository Institution a reasonable opportunity to act on such revocation, or until Go Daddy or the Depository Institution has sent notice of Go Daddy or the Depository Institution's termination of this Agreement.

### PayPal®

PayPal is available to both domestic CashParking Customers (CashParking Customers based in the U.S.) and international CashParking Customers (CashParking Customers based outside the U.S.). CashParking Customers utilizing PayPal will be paid out monthly on the 15th day of the month for the previous second month's commissions. Should the 15th day of the month fall on a Saturday, the payout date will be on the

GD 002005

previous business day. Should the 15th day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A $25.00 minimum threshold is required before payment will be made to those accounts. If the payment amount exceeds $20,000.00, it will be split into two PayPal payment transactions. Please refer to the PayPal account set-up requirements for your country, which may be found here, to ensure your PayPal account has the ability to receive payments from third parties. Transaction fees for PayPal will be the responsibility of Go Daddy and will not be deducted from your Commission Payment.

**Good As Gold**

Go Daddy's "Good As Gold" program is available to both domestic CashParking Customers (CashParking Customers based in the U.S.) and international CashParking Customers (CashParking Customers based outside the U.S.). CashParking Customers utilizing Go Daddy's "Good As Gold" program will be paid out monthly on the 15th day of the month for the previous second month's commissions. Should the 15th day of the month fall on a Saturday, the payout date will be on the previous business day. Should the 15th day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A $5.00 minimum threshold is required before payment will be made to those accounts.

**Check**

CashParking Customers (domestic and international) who fail to establish a Direct Deposit Account, PayPal account, or Good As Gold account, will receive their Commission Payment via paper check.

Commission checks for domestic CashParking Customers will be cut monthly on the 15th of the month for the previous second month's commissions. Should the 15th day of the month fall on a Saturday, the payout date will be on the previous business day. Should the 15th day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A $100.00 minimum threshold is required before a check will be issued. Domestic CashParking Customers receiving Commission Payments via paper checks acknowledge a $25.00 check processing fee will be levied each time a commission check is printed.

Commission checks for international CashParking Customers will be cut monthly on the 15th of the month for the previous quarter's commissions. Quarterly pay dates are May 15th, August 15th, November 15th, and February 15th. Should the 15th day of the month fall on a Saturday, the payout date will be on the previous business day. Should the 15th day of the month fall on a Sunday or holiday, the payout date will be on the next business day. A $100.00 minimum threshold is required before a check will be issued. No check processing fee is charged for international CashParking Customers.

## 7. TRADEMARK AND/OR COPYRIGHT CLAIMS

Go Daddy supports the protection of intellectual property. If you would like to submit (i) a trademark claim for violation of a mark on which you hold a valid, registered trademark or service mark, or (ii) a copyright claim for material on which you hold a bona fide copyright, please refer to Go Daddy's Trademark and/or Copyright Infringement Policy.

## 8. TITLES AND HEADINGS; INDEPENDENT COVENANTS; SEVERABILITY

The titles and headings of this Agreement are for convenience and ease of reference only and shall not be utilized in any way to construe or interpret the agreement of the parties as otherwise set forth herein. Each covenant and agreement in this Agreement shall be construed for all purposes to be a separate and independent covenant or agreement. If a court of competent jurisdiction holds any provision (or portion of a provision) of this Agreement to be illegal, invalid, or otherwise unenforceable, the remaining provisions (or portions of provisions) of this Agreement shall not be affected thereby and shall be found to be valid and enforceable to the fullest extent permitted by law.

## 9. DEFINITIONS; CONFLICTS

Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Universal Terms of Service Agreement. In the event there is a conflict between the provisions of this Agreement and the provisions of the Universal Terms of Service Agreement, the provisions of this Agreement shall control.

Revised: 12/22/2010
Copyright © 2006-2010 GoDaddy.com, Inc. All Rights Reserved.

**Archived by: Christine Claffey (cclaffey), 2010-12-22 12:25:51 PM**

GD 002006

GD 002007