UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ACADEMY OF MOTION PICTURES ARTS AND SCIENCES, a California Non-Profit Corporation; | CV 10-3738 ABC (CWx) |
| Plaintiff, | ORDER RE: |
| v. | (1) PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; and |
| GODADDY.COM, INC., a Delaware Corporation; THE GODADDY GROUP, INC., a Delaware Corporation, DOMAINS BY PROXY, INC., a Delaware Corporation, GREENDOMAINMARKET.COM, an unknown entity; BDS, an unknown entity; XPDREAMTEAM, LLC, a California Limited Liability Corporation; | (2) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| Defendants. | |

Pending before the Court are a Motion for Partial Summary Judgment, docket no. 430, filed by Plaintiff Academy of Motion Pictures Arts and Sciences ("Academy"),and a Motion to for Summary Judgment, docket no. 341, filed by Defendants GoDaddy.com, Inc., and Domains By Proxy, Inc. ("GoDaddy").  The parties filed Oppositions and

Replies as to both Motions.  The Court finds the Motions appropriate for resolution without oral argument.  For the reasons below, the Court **GRANTS in part and DENIES in part** the Motions.

## I.  BACKGROUND

In this action, the Academy is suing GoDaddy for (1) Violation of the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d); (2) Unfair Conduct in Violation of California Business & Professions Code § 17200; (3) Unlawful Conduct in Violation of California Business & Professions Code § 17200; and (4) Contributory Cybersquatting.  See Second Amended Compl. ("SAC"), filed October 27, 2011 (docket no. 170).

The Academy claims that, through GoDaddy's Parked Pages Service – which consists of the Free Parking Program and the Cash Parking Program – GoDaddy has monetized or attempted to monetize, and therefore "used" and "trafficked in," domain names that are identical, confusingly similar, and/or dilutive of five of the Academy's trademarks, with bad faith intent, in violation of the ACPA.  See, e.g., SAC ¶¶ 35, 44, 53.  The Academy also alleges that GoDaddy has committed contributory cybersquatting because, through its Cash Parking Program, it encourages its registrants to engage in trademark infringement and has not put in place any mechanisms to prevent trademarked domain names from being entered into the Cash Parking Program.  See, e.g., SAC ¶¶ 38-39, 42, 109-110.  The Academy's § 17200 claims derive from its cybersquatting claims.

GoDaddy seeks summary judgment on all claims.  Academy seeks summary adjudication of the following issues: (1) that the Academy's marks are both famous and distinctive; (2) that GoDaddy is not

1  entitled to the "safe harbor" provision of 15 U.S.C. §

2  1114(2)(D)(iii); (3) that GoDaddy is liable under the ACPA for (a)

3  "using" the domain names in its Free Parking and Cash Parking

4  Programs, and for (b) "trafficking" in the accused domain names; and

5  (4) that 115 domain names in issue are identical or confusingly

6  similar to the Academy's marks.  These 115 names are identified in the

7  list entitled "Domain Names that are Identical or Confusingly Similar.

8  .. .".  Michaels Decl. Exh. 1 (last three pages).  The parties also

9  disagree as to whether the Academy's disclosure of domain names after

10 September 14, 2011 was timely.

11

12                      **II.  UNDISPUTED FACTS[1]**

13 1.   The Academy is a non-profit "founded for the purpose of advancing

14      the motion picture arts and sciences, by promoting cultural,

15      educational and technological achievements."  GRSUF 1.

16 2.   The Academy owns the following registered trademarks: OSCAR;

17      OSCARS; OSCAR NIGHT; ACADEMY AWARD; and ACADEMY AWARDS.  GRSUF 2.

18 3.   GoDaddy is the largest domain name registrar in the world.  ARSUF

19      1.

20 4.   GoDaddy's Parked Pages Program consists of two sub-programs: the

21      Free Parking Program and the Cash Parking Program.  Both sub-

22      programs monetize domain names.  See e.g. ARSUF 4, 6, 9, and 13.

23

24      [1]  The Court will refer to the undisputed facts by reference to
   the numbers in this list, e.g., "Fact 2."  The citations following
25 these facts show the source of the undisputed facts.  The citations
   are generally to either Academy's Reply Statement of Undisputed Fact
26 ("ARSUF," docket no. 470) or to GoDaddy's Reply Statement of
   Undisputed Fact ("GRSUF," docket no. 418).
27

28

5.   GoDaddy's Parked Pages Program is distinct from its domain registration programs.  For example, GoDaddy can register domain names without enrolling them in the Parked Pages Program or otherwise monetizing them.  ARSUF 2, 23, 24, 25, 26.

6.   GoDaddy's "Domain Name Registration Agreement" ("DNRA") governs GoDaddy's relationship with its registrants.  The January 2009 version of the DNRA states, in a section entitled "Parked Page Service," as follows: "You [the registrant] agree that Go Daddy may point the domain name or DNS [domain name server] to one of Go Daddy's or Go Daddy's affiliates web pages, and that they may place advertising on Your web page and Go Daddy specifically reserves this right.  Go Daddy also reserves the right to collect and retain all revenue obtained from such advertising."  ARSUF 6, 27, Michaels Decl. Exh. 3.

7.   The next section of the DNRA also states: "You [the registrant] agree that Go Daddy may place advertising on Your Parked Page and Go Daddy specifically reserves this right.  Go Daddy also reserve [sic] the right to collect and retain all revenue obtained from such advertising."  Michaels Decl. Exh. 23.

8.   All registrants are bound by the January 2009 DNRA.  ARSUF 43-45.

9.   As such, all registrants registering domain names in the Parked Pages Program grant GoDaddy the right to point their domain names to GoDaddy's websites or servers, and to place on the webpages that resolve from registered domain names advertisements that generate revenue for GoDaddy whenever an internet user visits the

website and clicks on an advertisement.  ARSUF 4 and 6.[2]

10.  A domain name registrant can identify the domain name server where the domain name will be routed so that content resolving from the domain name can be located and viewed online.  GRSUF 9.

11.  Among the registrant's routing options is to route to a "record not found" error message, to a new or existing website, or to GoDaddy's parked page servers.  A registrant can also decline to designate a name server, in which case GoDaddy will designate by default its parked page server.  GRSUF 10-12.

12.  The designation of GoDaddy's parked page servers does not result in the creation of a webpage or any content.  ARSUF GoDaddy's Fact 9; see also GRSUF 14.

13.  Rather, a webpage will only resolve from a domain name whose domain name server is designated to GoDaddy's parked page servers when an internet user types the domain name into the web browser and presses enter.  At that point, a webpage will be created and exist only for the length of time that the internet user keeps the webpage open.  Once the webpage is closed, the parked webpage ceases to exist, and the content is not stored or preserved.  The next time the domain name is entered into a browser, a new page with entirely new content is created.  ARSUF GoDaddy's Fact 10-12; GRSUF 15, 16.

14.  In GoDaddy's Cash Parking Program, registrants pay GoDaddy a fee

---

[2]  GoDaddy purports to dispute elements of facts 6-9.  The Court has reviewed the record and finds that all of these facts are sufficiently supported and not genuinely undisputed.  The Court has also examined GoDaddy's legal argument that the DNRA is too vague to make GoDaddy a licensee of its registrants, and finds the argument utterly meritless for the reasons the Academy presents.  See section IV(B)(3)(a), infra.

1    to allow GoDaddy, through its advertising partner, to place ads

2    on the webpage associated with a domain name, and the revenue

3    generated from that advertising is split among the registrant,

4    GoDaddy, and the advertising partner.  ARSUF 9.

5  15.  GoDaddy does not pay domain name registrants any of the revenue

6    its receives from the advertising placed on webpages resolved

7    from domain names in the Free Parking Program.  ARSUF 13.

8  16.  The advertisements on webpages resolved from domain names in the

9    Parked Pages Program are either GoDaddy banner ads or ads that

10   are contextual to the domain name.  ARSUF 10.

11  17.  GoDaddy creates and hosts the webpages to which domain names in

12   the Parked Pages Program that have not been designated a

13   different domain name server resolve, places content

14   (advertisements) on those webpages, and generates revenue

15   whenever an internet user clicks on that content.  ARSUF 31.

16

17              **III.  LEGAL STANDARD FOR SUMMARY JUDGMENT**

18        "The court shall grant summary judgment if the movant shows that

19   there is no genuine dispute as to any material fact and the movant is

20   entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

21   moving party has the burden of demonstrating the absence of a genuine

22   issue of fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S.

23   242, 256 (1986).

24        Once the moving party satisfies its initial burden, the adverse

25   party must set forth specific facts showing that there is a genuine

26   issue for trial.  S. Cal. Gas Co. V. City of Santa Ana, 336 F.3d 885,

27   888 (9th Cir. 2003) ("[The non-moving party] can defeat summary

28   judgment by demonstrating the evidence, taken as a whole, could lead a

rational trier of fact to find in its favor.") (citations omitted).

Both the moving party and the adverse party must support their factual positions by "citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot product admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

An issue of fact is genuine if it reasonably can be resolved in favor of either party. Anderson, 477 U.S. at 250-51. "[A] district court is not entitled to weigh the evidence and resolve disputed underlying factual issues." Chevron Corp. v. Pennzoil Co., 974 F.2d 1156, 1161 (9th Cir. 1992). Rather, "the inferences to be drawn from the underlying fact. . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

However, the court must view the evidence presented "through the prism of the substantive evidentiary burden." S. Cal. Gas Co., 336 F.3d at 254. "[M]ere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment. Harper v. Wallingford, 877 F.2d 728, 731 (9th Cir. 1989). The "existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported summary judgment motion; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48 (emphasis in original). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury . . . could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict . . . ." Anderson, 477

U.S. at 252.   The "opponent must do more than simply show there is some metaphysical doubt as to the material facts."   Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## IV.   DISCUSSION

Although the parties' cross-motions are not entirely co-extensive, they make many of the same arguments.   The Court will first address the preliminary question of whether the Academy's disclosure of names after September 14, 2011 was timely.   The Court will then address the issues as to which the Academy seeks summary adjudication, and then separately address issues unique to GoDaddy's Motion that are not disposed of by the rulings on the Academy's Motion.

**A.   The Academy's Disclosure of Domain Names After September 14, 2011 was Untimely.**

In the Court's initial Scheduling Order, the Academy's deadline to identify any additional domain names was 60 days before the discovery cut-off date.   See Oct. 5, 2010 Minute Order (docket no. 15).   Thereafter, the Court accepted the parties' stipulation continuing pretrial and trial deadlines.   See June 9, 2011 Order (docket no.95).   This Order continued the deadline by which the Academy was to disclose additional infringing domain names to a specific date – September 14, 2011.   Thereafter, the parties again stipulated to continue certain dates, and the Court accepted the parties' stipulation.   See Sept. 27, 2011 Order (docket no. 150). This final schedule, however, did not continue the Academy's deadline for identifying additional domain names.   The operative deadline for the Academy to disclose additional names was therefore September 14, 2011.   During their meet and confer process surrounding the second

stipulation, the parties evidently discussed whether to extend the
Academy's deadline to disclose additional domains.  See McKown Decl.
ISO GoDaddy's Opp'n, Exhs. A, B.  The Academy also evidently
recognized that the stipulation submitted to the Court did not extend
its deadline to disclose because the Academy informed GoDaddy that it
reserved its right to ask the Court to extend the deadline.  Id.  If
the stipulation as submitted did not accurately reflect the parties'
agreement, the Academy could have promptly sought relief from the
Court.  Similarly, if the parties could not agree about this deadline,
the Academy could have filed a motion asking the Court to extend it.
But the Academy did not seek relief from the order that was entered,
and the Court will not grant relief from that order at summary
judgment.  Thus, the operative deadline was September 14, 2011.
Accordingly, domain names that the Academy disclosed after September
14, 2011 were not timely disclosed so they are not at issue

**B.    The Academy's Cybersquatting Claim**

        Congress enacted the ACPA on November 29, 1999, to "protect
consumers and American businesses, to promote the growth of online
commerce, and to provide clarity in the law for trademark owners by
prohibiting bad-faith and abusive registration of distinctive marks as
Internet domain names with the intent to profit from the goodwill
associated with such marks."  Sporty's Farm L.L.C. v. Sportsman's
Market, Inc., 202 F.3d 489, 495 (2d Cir. 2000) (quoting S.Rep. No.
106-140, at 4 (1999)).

        In pertinent part, the ACPA provides,

                A person shall be liable in a civil action by the
                owner of a mark . . . if, without regard to the
                goods and services of the parties, that person (i)
                has a bad faith intent to profit from that mark . .
                .; and (ii) registers, traffics in, or uses a

domain name that-

> > (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
> >
> > (II) in the case of a famous mark that is famous at the time of the registration of the domain name, is identical or confusingly similar to or dilutive of that mark;. . .

15 U.S.C. § 1125(d)(1)(A).

Thus, to prevail on an ACPA claim, a plaintiff must prove the following four elements: (1) the plaintiff's mark is distinctive or famous; (2) the accused domain name is identical or confusingly similar to the plaintiff's mark, or, if the mark is famous, the domain name is dilutive of the mark; (3) the defendant registered, trafficked in, or used the accused domain name; and (4) the defendant acted with bad faith. <u>See</u> <u>Sporty's Farm</u>, 202 F.3d at 497-99.

**1.    The Academy's Marks are Distinctive; Whether the Academy's Marks are Famous is a Triable Issue of Fact.**

Marks registered with the United States Patent and Trademark Office are presumptively distinctive.  15 U.S.C. § 1115(a).  It is undisputed that all five of the Academy's marks are registered with the USPTO.  GoDaddy makes no attempt to rebut this presumption.  As such, the Academy's marks are distinctive.

A mark is "famous if it is widely recognized by the general consuming public of the United States."  15 U.S.C. § 1125(c)(2)(A). The Lanham Act provides a non-exclusive list of four factors that a court can assess to determine whether a mark is sufficiently recognized to be famous:

> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

10

> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
>
> (iii) The extent of actual recognition of the mark.
>
> (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

Id.

Having reviewed the evidence in light of the foregoing factors, the Court finds that whether the Academy's five marks are famous is a triable issue of fact.

## 2. GoDaddy is Not Entitled to 15 U.S.C. § 1114(2)(D)(iii)'s Safe Harbor.

The Academy also argues that, as a matter of law, GoDaddy is not entitled to ACPA's safe harbor provision for domain name registrars. That provision creates immunity for "[a] domain name authority" from claims for damages "for the registration or maintenance of a domain name for another absent a showing of bad faith intent to profit from such registration or maintenance of the domain name." 15 U.S.C. § 1114(2)(D)(iii). As the Court noted in its September 20, 2010 Order resolving GoDaddy's Motion to Dismiss, this provision shelters only those registrars acting solely in the "registration" or "maintenance" capacity; registrars are not immunized from liability for conduct that goes beyond mere registration and maintenance of domain names. See Sept. 20 Order (docket no. 51), 8:23-10:15. GoDaddy argues that the safe harbor provision "appl[ies] to at least some of GoDaddy's alleged conduct." Opp'n 10:7-9. But, the Academy stresses that its motion "is limited to the activity related to the Parked Pages Program." Reply 14, fn. 11. The undisputed facts show that, with regard to its operation of the Parked Pages Program, GoDaddy does not function solely as a registrar. First, the Parked Pages Program applies to

pages already registered with GoDaddy, indicating that GoDaddy has fulfilled its registration role by the time it implements the parking programs.  The Parked Pages Program is  distinct from GoDaddy's registrar function.  Fact 5.  Second, through its Parked Pages Program, GoDaddy uses its servers to create webpages for registered domain names, and to place advertising on those pages for which it can collect a fee-per-click.  Facts 9, 13, 17.  Creating webpages, placing ads, and collecting ad revenue is not registration activity.

GoDaddy contends that it is still entitled to safe harbor protection because the Academy has not shown that it has in fact received revenues from ads placed on webpages resolved from the accused domain names.  This position is unavailing.  The safe harbor provision immunizes only (1) registration or maintenance, (2) "absent a showing of bad faith intent to profit."  The safe harbor provision simply does not apply to conduct, like operating the Parked Pages Program, that goes beyond mere registration and maintenance. Furthermore, a registrar's mere bad faith *intent* to profit – as opposed to actual profit – is sufficient to disqualify it from safe harbor protection.  For these reasons, GoDaddy is not entitled to the safe harbor provision of § 1114(2)(D)(iii) for its Parked Pages Program.

**3.  Through its Parked Pages Program, GoDaddy "Uses" and "Traffics In" Domain Names.**

The ACPA imposes liability for "register[ing], traffic[king] in, or us[ing]" a domain name that is identical to or confusingly similar to a distinctive mark.  15 U.S.C. § 1125(d)(1)(A).  The disjunctive "or" shows that only one type of conduct is sufficient to establish liability.

1    The Academy argues that, as a matter of law, GoDaddy has "used"

2  and "trafficked in" the accused domain names in its Parked Pages

3  Program.

4              **a.   GoDaddy is an "Authorized Licensee."**

5    ACPA imposes liability upon persons who "use" a domain name that

6  is confusingly similar to another's mark "only if that person is the

7  domain name registrant or that registrant's authorized licensee."  15

8  U.S.C. § 1125(d)(1)(D).

9    It cannot be reasonably disputed that GoDaddy was authorized by

10  the domain name registrants to place advertising on webpages resolved

11  from their domain names, and that GoDaddy was therefore an authorized

12  licensee for that purpose.  Facts 6-9.  GoDaddy argues this point at

13  length, but none of its arguments is availing.  Pursuant to the DNRA

14  that they assent to when registering a domain name with GoDaddy, all

15  registrants consent to GoDaddy's placement of advertising on their

16  parked pages and to GoDaddy's receipt and retention of any revenue

17  obtained from such advertising.  Although this aspect of the agreement

18  between GoDaddy and its registrants may not be identified in the

19  agreement by the label "license," it is a license in function.

20    GoDaddy relies primarily on Crabb v. GoDaddy.com, Inc.,

21  CV10-00940-PHX-NVW, 2011 WL 4479043 (D. Ariz. 2011) for its rather

22  strange argument to the contrary, that is, that GoDaddy is not an

23  authorized licensee.[3]  But Crabb is readily distinguishable.  First,

24  Crabb concerned a previous version or versions of the DNRA and related

25  agreements, so it simply is not relevant to the discussion here.  As

26

27    [3] GoDaddy's argument is strange because it would mean that
GoDaddy is not authorized to place ads on parked web pages, conduct
28  that could expose it to liability.

13

noted above, it is undisputed that all registrants are bound by the January 2009 version of the DNRA, and that that DNRA contains language by which registrants authorize GoDaddy to point their domain names to GoDaddy pages that may incorporate advertising.  Facts 6-9.

Second, _Crabb_ is distinguishable based on the claims in issue. There, the plaintiff, a domain name registrant, sued GoDaddy for placing ads on his webpages on the ground that he did not authorize GoDaddy to do so.  GoDaddy argued, contrary to its present position, that through the DNRA and other agreements incorporated in the DNRA, the plaintiff-registrant did grant it a license to use the domains as advertising space.  Construing the agreements against the drafter – GoDaddy – the court ruled that the key authorizing language was not unequivocally incorporated into the agreement between GoDaddy and the plaintiff and that therefore the plaintiff did not authorize GoDaddy to place ads on the plaintiff's registered domain names.  _Crabb_, 2011 WL 4479043 at *3-4.  That conclusion does not apply here because the current agreement does incorporate the license language.  Furthermore, the dispute here is between GoDaddy and a non-party to the agreement, so the rule that ambiguities in an agreement should be construed against the drafter – a rule that ordinarily applies to disputes between parties to an agreement – simply does not apply.

### b.  GoDaddy "Uses" and "Traffics In" Domain Names in its Parked Pages Program.

The Academy's ACPA claim, whether it is for use or trafficking, turns on whether a particular accused domain name is in the Parked Pages Program.  As the Court noted in the September 20, 2010 Order, the Program as described in the Academy's complaint is sufficient to demonstrate use and trafficking.  And, based on the undisputed facts,

the Parked Pages Program does function substantially as alleged.  The Parked Pages Program creates webpages from which GoDaddy can generate advertising revenue.  When an internet user attempts to access a domain name in GoDaddy's Parked Pages Program for which the registrant has not specified a different server, GoDaddy's parked page servers create an ephemeral webpage with paid advertising links.  Facts 11-13.  GoDaddy receives revenue any time a user clicks an advertisement on those parked pages.  Facts 14-16.  This is "use" within the meaning of the APCA.

The ACPA defines "trafficking in" to mean "transactions that include, but are not limited to, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration."  15 U.S.C. § 1125(d)(1)(E).  As discussed above, through the DNRA, GoDaddy's registrants granted GoDaddy a license to place ads on their parked webpages and retain the resulting revenue.  GoDaddy is therefore an authorized licensee of its registrants, and therefore is involved in "transactions that include . . . licenses. . ."  GoDaddy therefore traffics in those domain names as to which it is an authorized licensee.

GoDaddy argues that the Academy cannot show "use" or "trafficking" as to 68 domain names because there is no evidence that these names were actually routed to the parked page server.  As to another 169 names that *were* routed to the parked page server, GoDaddy contends that there is no evidence that it or its affiliates actually placed ads on the parked pages.  See Mot. 11:18-12:25.

First, concurrent with this Order, the Court is issuing another Order extending the discovery deadline as to the Academy's witness Joe

Presbrey.  The evidence is likely to bear on whether the above-referenced domain names were routed to GoDaddy's parked page server and whether advertisements were placed on the parked pages.

Second, in any event, GoDaddy's legal argument is not convincing. As the Court understands it, GoDaddy's argument is that, unless a domain name in its Parked Pages Program is actually resolved to a parked webpage  (which happens when an internet user enters that domain name into an internet browser), and an internet user actually clicks on an ad to create revenue for GoDaddy, GoDaddy has not "used" the domain name.  In the Court's view, by placing domain names in the Parked Pages Program, GoDaddy has acted affirmatively and done something with the domain names other than mere passive registration or routing: GoDaddy placed the domain names in a program it designed to make revenue.  This is sufficient to establish "use" even absent actual monetization.

As for trafficking, ACPA requires only that a defendant have engaged in a transaction that includes a license and consideration; it is undisputed that in exchange for consideration, GoDaddy received from registrants a license to place revenue-generating ads on webpages resolved from domain names in its Parked Pages Program.  This is sufficient to constitute "trafficking" even absent actual monetization.  If any accused domain name has not been visited by an internet user or did not generate actual revenue for GoDaddy, that may go to damages, but not to liability.

Finally, GoDaddy's contention that it is merely routing domain names is unsupported by the facts.  Through its Parked Pages Program, GoDaddy creates and hosts websites to which the accused names resolve, and places revenue-generating advertisements thereon.

For the foregoing reasons, the Court finds that GoDaddy's Parked Pages Program allows it to "use" and "traffic in" domain names.

### c. The Court Defers Ruling on Whether the Accused Domain Names are in the Parked Pages Program.

On the present record, the Academy has not demonstrated that the accused domain names are in fact in the Parked Pages Program. Although the Academy contends that GoDaddy "concedes that there is evidence that it monetized, or attempted to monetize, 80 of 317 infringing domain names," Reply 16:26-27, neither the Academy nor GoDaddy has identified these 80 domain names in any list.  Nor has the Academy shown that any of the 115 names as to which the Academy is moving are in the Parked Pages Program.  The Academy expected to rely on screen shots prepared by its litigation consultant Joe Presbrey to demonstrate that the 115 accused domain names are in the Parked Pages Program.  But because the Academy did not timely disclose Mr. Presbrey, the Court cannot consider his declaration or the exhibits he purported to authenticate.  In an Order issued concurrently with this one, the Court is extending the discovery deadline to allow the Academy to cure this error and, accordingly, to allow GoDaddy to depose Presbrey.  Thus, the Court will not yet reach this question but instead will wait until the evidence is properly disclosed, developed, and presented.

### 4. The Court Defers Ruling on Whether the Accused Domain Names are "Confusingly Similar" to the Academy's Marks.

The parties ask the Court to determine whether certain domain names either are, or are not, identical or confusingly similar to the Academy's marks as a matter of law.  The Academy has identified 115 domain names that it claims are confusingly similar as a matter of law.  See Michaels Decl. Exh. 1 (last three pages).  GoDaddy argues

17

that a number of domain names are not confusingly similar as a matter
of law; these domain names are listed in Appendices 4-6 of GoDaddy's
Motion.

To be clear, "[t]he question under the ACPA is not whether the
[accused] domain names . . . are likely to be confused with a
plaintiff's *domain name*, but whether they are identical or confusingly
similar to a plaintiff's *mark*." Coca-Cola Co. v. Purdy, 382 F.3d 774,
783 (8th Cir. 2004) (emphasis in original).

The parties present somewhat different legal standards for how to
evaluate "confusingly similar."  As per the statute's language,
"confusingly similar" should be determined "without regard to the
goods and services of the parties."

There is no dispute that "'[c]onfusingly similar' is a different
standard from the 'likelihood of confusion' standard for trademark
infringement."  Sporty's Farm., 202 F.3d at 498 n. 11 (citing Wella
Corp. v. Wella Graphics, Inc., 37 F.3d 46, 48 (2d Cir. 1994)).  There
is also no dispute that the ACPA "confusingly similar" analysis
entails a direct comparison between the domain name and the mark.  As
a result, for example, even if it might be evident from the content of
the website that it is not affiliated with the plaintiff, there may
nonetheless be a violation of the ACPA. See People for Ethical
Treatment of Animals v. Doughney, 263 F.3d 359 (4th Cir.2001) (holding
that domain name www.peta.org violated the ACPA because it was
identical to the mark of the plaintiff, People for the Ethical
Treatment of Animals, even though a visit to the site itself revealed
that it was a parody and that the initials "peta" stood for People
Eating Tasty Animals).

However, the parties appear to disagree over whether the direct

18

or facial comparison the court must make means the court should make only a "facial comparison of the domain name to the mark," DISC Intellectual Properties LLC v. Delman, 2007 WL 4973849, at *5 (C.D. Cal. 2007), or whether it should "compar[e] . . . plaintiff's marks and defendants' domain names, including their intrinsic sound, sight, and meaning. . ." Omega S.A. v. Omega Eng'g, Inc., 228 F. Supp. 2d 112, 127 (D. Conn. 2002).

In the Court's view a "facial comparison" and comparing sight, sound, and perhaps meaning, are not different approaches.  To perform a "facial comparison" between a domain name and a mark, one must specify the qualities of the domain name and mark that one is comparing.  Accordingly, some cases – and the leading treatise – note that a direct, facial comparison between a domain name and a mark entails an examination of whether the domain name and mark are similar in sight, sound, and/or meaning.[4]  See, e.g., J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 25:78(4th ed. 2002) ("In the cybersquatting context, 'confusingly similar' must simply mean that the plaintiff's mark and the defendant's domain name are so similar in sight, sound, or meaning that they could be confused.").

---

[4]  These three elements comprise the test for similarity of the marks element of the *Sleekcraft* test for likelihood of confusion applied to traditional trademark infringement claims.  See AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 351 (9th Cir. 1979) abrogated on other grounds by Mattel, Inc. v. Walking Mountain Prods., 353 F.3d 792 (9th Cir. 2003) ("Similarity of the marks is tested on three levels: sight, sound, and meaning.")  Although it appears to the Court that a comparison of sight and sound is consistent with ACPA's directive that confusingly similar be determined without regard to the goods and services of the parties, comparing meaning may in some instances be inconsistent with that directive because meaning requires context, which may entail comparing goods and services.

Under this test, "slight differences between domain names and
registered marks, such as the addition of minor or generic words to
the disputed domain names are irrelevant." Omega S.A., 228 F. Supp.
2d at 128-29.  Similarly, the addition or removal of punctuation do
not render a domain name dissimilar from a mark.  Super-Krete Intern.,
Inc. v. Sadler, 712 F. Supp. 2d 1023, 1032 (C.D. Cal. 2010).

Based upon the foregoing principles, courts have ruled as
follows:

- that "sportys.com" is confusingly similar to "sporty's"
  under the ACPA, see Sporty's Farm, 202 F.3d at 498;

- that the domain names "OMEGATIME" and "OMEGAWATCH" are
  confusingly similar to the marks "omega" or "O", see Omega
  S.A., 228 F. Supp. 2d at 127;

- that "ctvoices.com" is confusingly similar to the mark
  "Voices," see Prime Publishers, Inc. v. American-Republican,
  Inc., 160 F. Supp. 2d. 266, 277 (D. Conn. 2001) (stating,
  "[w]e do not believe the Defendant's addition of a generic
  or geographic term such as 'ct' is sufficient to distinguish
  the domain name from Plaintiff's protected mark. . .");

- that "barbiesplaypen.com" is confusingly similar to the mark
  "Barbie" because "1) both contain the name 'barbie'; 2) the
  name 'Barbie' on the front page of the web site and the logo
  BARBIE both have approximately the same font, slant, size,
  etc.; 3)and both BARBIE and 'barbiesplaypen.com' are
  inextricably associated with the verb 'play' in the broad
  sense of the term," see Mattel, Inc. v. Internet Dimensions,
  2000 WL 973745, at *3 (S.D.N.Y. 2000);

- that domain names using "harrodsbank," "harrodsbanking,"

20

"harrodsstore," and "harrodsshopping" are confusingly similar to the "Harrods" mark because they bore "a visual resemblance to the Harrods mark," see Harrods Ltd. v. Sixty Internet Domain Names, 157 F. Supp. 2d. 658, 677–78 (E.D. Va. 2001);

- that allegation that "4fordparts.com" and "4fordtrucks.com" are confusingly similar to the "Ford" mark is sufficient to overcome Rule 12(b)(6) motion to dismiss, see Ford Motor Co. v. Greatdomains.Com, Inc., 177 F. Supp. 2d. 635, 641 (E.D. Mich. 2001);

- that domain names "my-washingtonpost," "mymcdonalds," and "drinkcoke" with various top-level domain suffixes are confusingly similar to the "Washington Post," "McDonald's," and "Coke" marks, see Coca-Cola Co., 382 F.3d at 784; and

- that "supercrete.com" is confusingly similar to the mark "Super-Crete," see Super-Krete Int'l, 712 F. Supp. 2d at 1032.

The briefing and the cases do reflect a genuine disagreement concerning the extent to which the addition of other words or text to a trademark can distinguish an accused domain name from the mark. The following passage from Ford reflects a position that GoDaddy favors: "This court similarly concludes that, unless words or letters added to the plaintiff's mark within the domain name clearly distinguish it from the plaintiff's usage, allegations that a domain name incorporates a protected mark generally will suffice to satisfy the 'identical or confusingly similar to' requirement." Ford Motor, 177 F. Supp. 2d at 642. The Court then provided the following example: "[t]he domain name 'fordstheatre.org' – the homepage of the renowned

Ford's Theatre in Washington, D.C. - incorporates the FORD mark with
the addition of the generic word 'theatre' but, from its context, is
not 'confusingly similar to' the FORD mark.  No reasonable person
could conclude that such a site was 'used or approved' by the Ford
Motor Company."  Id. at 642, fn. 3.

This approach, broadly interpreted, is inconsistent with ACPA's
command that confusing similarity must be assessed "without regard to
the parties' goods or services," because the distinction it makes
turns precisely on the difference between the parties' goods or
services.  Accord Omega S.A., 228 F. Supp. 2d at 128 (disagreeing with
Ford on this basis).  However, there may be instances where the
meaning of the words used in a domain name and the meaning of a
plaintiff's mark can be ascertained without regard to the parties'
actual goods or services.  In such instances, considering meaning when
determining confusing similarity may be consistent with ACPA.

In short, the Court finds that, for purposes of assessing
confusing similarity under ACPA, it must perform a direct comparison
between the accused domain name and the plaintiff's trademark; this
comparison may include consideration of sight, sound, and, to a more
limited extent, meaning.

The Court will now characterize the categories of domain names as
to which the parties seek summary adjudication.

The 115 names the Academy moved on consist of the Academy's exact
trademarks, with the addition of other, primarily generic, terms.

GoDaddy moves the Court to rule that several different sets of
domain names are not confusing as a matter of law, specifically, those
domain names listed in Appendices 4, 5, and 6 of its Motion.  (GoDaddy
has not indicated how many domain names are in each of its lists, and

neither party has indicated whether GoDaddy's lists overlap with each other or with the Academy's 115-domain name list.)  For the domain names listed in GoDaddy's Appendices 4 and 5, GoDaddy relies on the reports of its experts Geoffrey Nunberg and Carol Scott to demonstrate these names are not confusing.  In its concurrently-issued Order, the Court is excluding these experts' reports and testimony at trial.  As to the domain names listed in Appendix 6, GoDaddy contends they are not similar based on what the registrant intended the domain name to refer to, and that none of the registrants meant their domain names to refer to the Academy's marks.  For example, the registrant of oscarramirez.com states that the domain name refers to his own first and last names, Oscar Ramirez.  Similarly, the registrant of theoscars.co states that the domain name "[r]efers to oscar fish." See Mot. Appx. 6.  Assuming that the registrants of these domain names intended the names to refer to something other than the Academy's marks, that fact is not relevant to whether the marks are confusingly similar under ACPA.  As discussed above, this determination is made by comparing the domain names to the marks, and may take account of sight, sound, and to a certain extent meaning, but without other context.  Thus, whether a name is confusingly similar under ACPA must be determined objectively, from the point of view of a consumer, and not based on a particular registrant's subjective intention when he or she selected a name, even if that intention is innocent.  See, e.g., Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1060 (9th Cir. 1999) ("Likelihood of confusion is determined on the basis of a 'reasonably prudent consumer.'") (citation omitted).

Nevertheless, a domain name that is clearly a person's proper name is not confusingly similar to the Academy's marks.  For example,

on its face, the domain name "oscarramirez.com" is significantly
different from the Academy's OSCAR marks because it includes not only
the letters "oscar," but also the clearly recognizable last name,
"ramirez."  Notably, "ramirez" is not a mere generic term appended to
the Academy's mark, so "oscarramirez.com" is not analogous to, for
example, "my-washingtonpost.com."  The sight and sound of
"oscarramirez.com" is therefore different from the sight and sound of
OSCAR.  As to meaning, a proper name has no meaning except to refer to
its bearer.  To the extent oscarramirez.com has meaning, that meaning
is self-evident: it is a person's name registered as a domain name.
As such, whatever meaning oscarramirez.com has, that meaning is not
confusingly similar to the meaning of the Academy's marks.

As for whether any of the domain names as to which the parties
move are, or are not, confusingly similar as a matter of law, the
Court will refrain from ruling until the parties present the Court
with a unified list.

> **5.   There is No Genuine Issue of Fact as to Whether GoDaddy is
> the Registrant of Three Accused Domains because those Three
> Domains Names were Not Timely Disclosed.**

GoDaddy argues that it cannot be held liable as a registrant
because the Academy has no evidence that it is the registrant – that
is, that it owns – any of the domain names.  The Academy contends that
there is a genuine issue as to whether GoDaddy is the registrant as to
three names: 2006AcademyAwards.com, AcademyAwardsShow.com, and
TheAcademyAwardsLive.com.  See Opp'n 24:20-23.  However, the Academy
disclosed these three names on March 8, 2013, after September 14, 2011
deadline.  See GoDaddy's Mot. Appx. 1 (last page).  As such, the
Academy did not timely disclose these domain names, so they are not at
issue.  Accordingly, there is no genuine issue of fact as to whether

GoDaddy is a registrant of any of the names at issue.

**6.   ACPA's "Dilutive" Prong Does Not Require Actual Dilution.**

GoDaddy argues that the Academy's claim in so far as it is based on the accused domain names being "dilutive of" the Academy's marks fails because the ACPA requires actual dilution and the Academy has no evidence of actual dilution.  The statute imposes liability for domain names that are "dilutive of that [famous] mark."  <u>See</u> 15 U.S.C. § 1125(d)(1)(A)(ii)(II).  Thus, to decide this aspect of GoDaddy's motion, the Court must determine whether "dilutive of" means "dilutes."

To ask the question is to answer it.  Had Congress intended to require actual dilution, the statute would have imposed liability for domain names that "dilute that mark," rather than for domain names that are merely "dilutive of that mark."  According to the Oxford English Dictionary, the suffix "-ive" means "having a tendency to, having the nature, character, or quality of, given to (some action)."  <u>See</u> Oxford English Dictionary Online, http://www.oed.com/view/Entry/100370?redirectedFrom=-ive#eid <last visited June 19, 2013>.  Thus, the statute imposes liability for domain names that have a tendency to dilute a famous mark.  One could argue about how strong that tendency to dilute must be before liability attaches, but the statute does not require actual dilution.

GoDaddy argues that the Ninth Circuit has already resolved this issue in <u>Bosley Med. Inst., Inc. v. Kremer</u>, 403 F.3d 672 (9th Cir. 2005), wherein it "construed the phrase 'dilutive of' to mean 'dilutes,' i.e., actual dilution."  <u>See</u> Mot. 20:21-23.  This argument is not convincing.  In <u>Bosley</u>, the Ninth Circuit used the word "dilutes" to paraphrase.  Specifically, rather than fully quote ACPA's

elements (iii)(I) and (II), which read "(ii) registers, traffics in, or uses a domain name that- (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark," the Court instead paraphrased them with the language "a domain name [that is confusingly similar to another's mark or dilutes another's famous mark]." Bosley, 403 F.3d at 680. While it is true that, in its paraphrase, the Ninth Circuit replaced "dilutive of" with "dilutes," it did so without discussion and without expressly holding that dilutive means actual dilution. Indeed, Bosley's discussion of ACPA concerned only whether the ACPA has a commercial use requirement; it did not purport to construe the phrase "dilutive of." The Court cannot accord the Ninth Circuit's casual paraphrasing of a statute, in dicta, the precedential value GoDaddy argues for.

## C. Academy's Contributory Cybersquatting Claim

GoDaddy moves for summary judgment on the Academy's contributory cybersquatting claim. This claim concerns GoDaddy's Cash Parking Program. In the Cash Parking Program, domain name registrants pay GoDaddy a fee to register a domain name; revenue from ads placed on those webpages is split among the registrant, GoDaddy, and GoDaddy's advertising partner. Fact 14. GoDaddy creates and hosts the webpages to which domain names in the Cash Parking Program that have not been designated a different server resolve, and places content (advertisements) on those webpages. Fact 17. GoDaddy argues that it cannot be liable for contributory cybersquatting based on its operation of the Cash Parking Program because there is no evidence

26

1   that registrants of the disputed domain names actually used GoDaddy's

2   "name spinning technology"[5] when they registered the names.

3        The Court addressed the elements of contributory

4   cybersquatting in its September 6, 2011 Order granting the

5   Academy's Motion to Amend:

6        A person is liable for contributory trademark
         infringement when he or she "either intentionally induces
7        a third party to infringe the plaintiff's mark or
         supplies a product to a third party with actual or
8        constructive knowledge that the product is being used to
         infringe the service mark." Lockheed Martin Corp. v.
9        Network Solutions, Inc., 194 F.3d 980, 983 (9th Cir.
         1996). Because contributory liability for a domain name
10       registrar implicates a service, and not a product, the
         Court must consider "the extent of control exercised by
11       the defendant over the third party's means of
         infringement." Id. at 984. Thus, under the "extent of
12       control" theory at issue here, "[f]or liability to
         attach, there must be '[d]irect control and monitoring of
13       the instrumentality used by a third party to infringe the
         plaintiff's mark.'" Perfect 10, Inc. v. Visa Int'l Serv.
14       Ass'n, 494 F.3d 788, 807 (9th Cir. 2007) (quoting
         Lockheed Martin, 194 F.3d at 984; alteration in
15       original); see also Solid Host, NL v. Namecheap, Inc.,
         652 F. Supp. 2d 1092, 1112. In the specific context of
16       the ACPA, to be liable for contributory liability, a
         defendant must have known or have had reason to know that
17       the direct cybersquatter was acting in bad faith; this
         can be demonstrated by the existence of "exceptional
18       circumstances." Ford Motor Co. v. Greatdomains.com,
         Inc., 177 F. Supp. 2d 635, 647 (E.D. Mich. 2001).

19  Sept. 6, 2011 Order (docket no. 138), p. 4.

20       The Academy does not have to prove that a registrant actually

21  relied on GoDaddy's "name spinning technology" to select an accused

22  domain name, because that technology is not the only way in which

23  GoDaddy is accused of "induc[ing]" infringement or "suppl[ying] a

24  product [or service] to a third party. . ." For example, GoDaddy's

25

26

27       [5] GoDaddy's name spinning technology suggests alternative domain
    names if the domain name the registrant wishes to register is already
28  taken.

27

Cash Parking Program may be said to "induce" infringement, independent of the name spinning technology, because it offers potential registrants the opportunity to monetize an infringing name even where the name spinning technology does not provide the name.  In addition, GoDaddy supplies a service that the registrants use for their alleged direct cybersquatting because GoDaddy creates the parked webpages and places advertisements on them.  Nor must the Academy depose each and every registrant to determine his or her bad faith intent to profit because intent may be inferred from other evidence.  Accordingly, this aspect of GoDaddy's Motion is **DENIED**.

**V.   CONCLUSION**

For the foregoing reasons, the Court rules as follows:

- Domain names that the Academy disclosed after September 14, 2011 are not at issue.
- The Academy's marks are distinctive; whether the Academy's marks are famous is a triable issue of fact.
- GoDaddy is not entitled to 15 U.S.C. § 1114(2)(D)(iii)'s safe harbor.
- As to whether GoDaddy's conduct constitutes "using" and "trafficking in" domain names:
  - GoDaddy is an "Authorized Licensee" for purposes of ACPA liability.
  - GoDaddy "uses" and "traffics in" domain names in its Parked Pages Program.
  - The Court defers ruling on whether the accused domain names are in the Parked Pages Program.

1 •     The Court defers ruling on whether the accused domain names are

2      "confusingly similar" to the Academy's marks.

3 •     GoDaddy is not liable under ACPA as a registrant

4 •     ACPA's "dilutive" prong does not require actual dilution.

5 •     GoDaddy's Motion for Summary Judgment is **DENIED.**

6

7      **IT IS SO ORDERED.**

8 **DATED: June 21, 2013**

                                    _____

9                                         **AUDREY B. COLLINS**
                           **UNITED STATES DISTRICT JUDGE**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28