BOIES, SCHILLER & FLEXNER, LLP
Stuart Singer (*pro hac vice*)
ssinger@bsfllp.com
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Tel: (954) 356-0011
Fax: (954) 356-0022
*Attorneys for Plaintiff*

Aaron M. McKown (CA Bar No. 208781)
amckown@wrennbender.com
Paula Zecchini (CA Bar No. 238731)
pzecchini@wrennbender.com
2 Park Plaza, Suite 550
Irvine, CA 92612
Tel: 949.202.5818
Fax: 949.679.7939
*Attorneys for Defendant*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACADEMY OF MOTION PICTURE ARTS AND SCIENCES, a California nonprofit corporation, | ) Case No. CV10 3738 ABC (CWx) |
| | ) |
| Plaintiff, | ) **JOINT STIPULATION RE: DEFENDANT'S MOTION TO COMPEL THE INSPECTION OF PRESBREY-RELATED COMPUTERS, PRODUCTION OF SUPPLEMENTAL RESPONSES, AND PRODUCTION OF A QUALIFIED 30(B)(6) WITNESS** |
| v. | ) |
| GODADDY.COM, INC., a Delaware corporation, | ) |
| | ) |
| Defendant. | ) DATE:  February 3, 2014 |
| | ) TIME:   10:00 a.m. |
| | ) |
| | ) Date Action Filed:     May 18, 2010 |
| | ) Trial Date:               July 28, 2014 |
| | ) |
| | [DISCOVERY MATTER] |

1

## **TABLE OF CONTENTS**

I. GODADDY'S POSITION ..................................................................... 1

   A. INTRODUCTION ............................................................... 1

   B. BACKGROUND ................................................................. 4

   C. GODADDY SHOULD BE ALLOWED TO INSPECT THE COMPUTERS AND
SERVERS USED BY PRESBREY ............................................... 7

     1. AMPAS Continues to Misrepresent The Existence of Relevant Data.......... 7

     2. Data Produced By AMPAS Is Contaminated and Incomplete Thereby
Necessitating Forensic Inspection .................................................. 10

     3. Web Cache is the Only Evidence Capable of Resolving Discrepancies in
Parties' Records and Determining Reliability of Presbrey's Software
Programs ...................................................................................... 11

     4. Inspection of Computers and Servers Is Also Relevant to Issue of
Spoliation of Evidence ................................................................ 14

     5. Presbrey Should Be Compelled to Appear for a Further Deposition to
Testify About Web Cache and Related Issues.................................. 15

   D. AMPAS HAS A CONTINUING OBLIGATION TO SUPPLEMENT DISCOVERY
RESPONSES ....................................................................... 15

   E. AMPAS DID NOT ADEQUATELY PREPARE ITS 30(B)(6) WITNESS REGARDING
THE DISCOVERY OF DOMAIN NAMES AND THE CAPTURING OF SCREENSHOTS ... 18

II. THE ACADEMY'S POSITION ................................................... 21

   A. INTRODUCTION ............................................................... 21

   B. THERE ARE NO "DATA DISCREPANCIES" JUSTIFYING GODADDY'S REQUEST TO
IMAGE COMPUTERS, SERVERS OR THE WEB CACHE ............................... 25

   C. THE ACADEMY DID NOT MISREPRESENT ANYTHING—EITHER TO GODADDY
OR THIS COURT .................................................................. 32

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

D.   THE WEB CACHE IS A RED HERRING ............................................................... 35

E.   THE ACADEMY ALREADY SUPPLEMENTED ITS INTERROGATORY RESPONSES 39

F.   ANOTHER 30(B)(6) DEPOSITION OF THE ACADEMY ON TOPICS 2, 6, AND 10 IS

not APPROPRIATE .................................................................................................... 40

G.   THE ACADEMY'S CONCLUSION ....................................................................... 41

1

2

3

**TABLE OF AUTHORITIES**

<u>C</u><small>ASES</small>

4

5

*B-K Lighting, Inc. v. Vision3 Lighting,*

 930 F.Supp.2d 1102 (C.D. Cal. 2013)------------------------------------------------ 16

6

7

*Board of Trustees of Leland Stanford Junior University v. Tyco Inten. Ltd.,*

 253 F.R.D. 524 (C.D. Cal. 2008)-------------------------------------------------------- 19

8

9

*Calzaturficio S.C.A.R.P.A. v. Fabiano Shoe Co., Inc.,*

 201 F.R.D. 33 (D. Mass. 2001)---------------------------------------------------------- 20

10

11

*Cambridge Electronics Corp. v. MGA Electronics, Inc.,*

 227 F.R.D. 313 (C.D. Cal. 2004)-------------------------------------------------------- 16

12

13

*Dawe v. Corrections USA,*

 263 F.R.D. 613 (E.D. Cal. 2009)----------------------------------------------10, 11, 39

14

15

*Hoffman v. Construction Protective Services, Inc.,*

 541 F.3d 1175 (9th Cir. 2008) ---------------------------------------------------------- 15

16

17

*Imax Corp. v. Cinema Technologies, Inc.,*

 152 F.3d 1161, n. 6 (9th Cir. 1998) ---------------------------------------------------- 16

18

19

*In re Vee Vinhee*

 (B.A.P. 9th Cir. 2005) 336 B.R. 437 -------------------------------------------- 12, 14

20

21

*Leon v. IDX Sys. Corp.,*

 464 F.3d 951 (9th Cir. 2006) ----------------------------------------------------------- 14

22

23

*Medicines Co. v. Mylan Inc.,*

 2013 WL 120245, at *4-5 (N.D. Ill. 2013) ------------------------------------------- 40

24

25

*Nursing Home Pension Fund v. Oracle Corp.,*

 254 F.R.D. 559 (N.D. Cal. 2008) ------------------------------------------------------ 14

26

27

*R&R Sails, Inc. v. Insurance. Co. of Pennsylvania,*

 673 F.3d 1240 (9th Cir. 2011) --------------------------------------------------------- 15

28

*Sprint Commc'n Co., L.P. v. Theglobe.com,*

    236 F.R.D. 524 (D. Kan. 2006) --------------------------------------------------------- 19

*West v. Goodyear Tire & Rubber Co.,*

    167 F.3d 776 (2d Cir. 1999) ----------------------------------------------------------- 14

<u>RULES</u>

Fed. R. Cic. P. 34(a)(1)(A) ------------------------------------------------------------- 11

Fed. R. Civ. P. 26(b)(1) ----------------------------------------------------------------- 11

Fed. R. Civ. P. 26(e)(1) ----------------------------------------------------------------- 15

Fed. R. Civ. P. 30(b)(6) ------------------------------------------------------------- 40, 41

Fed. R. Civ. P. 34(b)(2)(E) ------------------------------------------------------------- 11

Fed. R. Evid. 901(b)(9) ---------------------------------------------------------------- 12, 14

<u>TREATISES</u>

*Evidentiary Foundations* (5th ed. 2002) ----------------------------------------------- 12

**STATEMENT OF ISSUE PRESENTED**

Defendant GoDaddy.com, LLC ("GoDaddy") requests that the Court order Plaintiff Academy of Motion Pictures Arts and Sciences ("AMPAS") to (1) produce for forensic inspection computers and servers used by Joe Presbrey ("Presbrey") related to the discovery of the domain names at issue and the subsequent creation of purported screenshots for each, (2) supplement responses to Interrogatories relating to Presbrey for which AMPAS previously asserted a privilege, and (3) appear for a further 30(b)(6) deposition in light of AMPAS' admitted failure to properly prepare its corporate witness on issues within Presbrey's knowledge.  AMPAS opposes this motion.

## I.   GODADDY'S POSITION

### A.   Introduction

AMPAS has made a concerted and continual effort over the past four years to thwart GoDaddy's every attempt to conduct basic fact discovery into whom, how, and when AMPAS discovered each domain name at issue and the subsequent creation of purported screenshots produced by AMPAS during discovery.  Despite these repeated efforts, which culminated with Judge Collins continuing trial to permit such discovery, AMPAS continues to withhold relevant, non-privileged information.

The most egregious of AMPAS' discovery tactics relate to its refusal to produce electronically stored information.  GoDaddy first demanded the production of documents relating to the discovery of domain names on March 10, 2011.  AMPAS continually mislead GoDaddy to believe that it would produce documents in response.  After nine months of being strung along, GoDaddy finally discovered that AMPAS had hired a third party to search for domain names nearly a year before the lawsuit was filed.  Nonetheless, AMPAS refused to identify this person or to produce any documents or data generated by this person other than the screenshots at issue.  As a result, in September 2012, GoDaddy filed a motion to

compel data generated by AMPAS' litigation consultant relating to the discovery of the domain names at issue and the purported capturing of screenshots. In opposing the motion, AMPAS represented to the Court that no such data existed – a representation that was patently false at the time. Nonetheless, as a result of that representation, the Court denied GoDaddy's motion. GoDaddy has subsequently discovered that Presbrey had more than 257 gigabytes of data, which he produced on August 28, 2013.

Missing from the data production, however, was the web cache for each of the purported screenshots. Web cache contains the metadata for Internet web pages that is automatically captured and stored whenever a computer visits a website. Web cache includes, among other things, the date and time a webpage is created. When GoDaddy discovered that the hard drive produced by Presbrey did not contain any web cache, it requested the further production of web cache from AMPAS. In response, AMPAS' counsel claimed that no web cache was created and thus, none existed. This representation was again false.

Less than a month later, Presbrey confirmed at his deposition that web cache could indeed exist on the computers and servers used to search, locate, and capture screenshots. Given this admission, GoDaddy again requested that web cache be produced and again AMPAS' counsel falsely claimed that no web cache existed. As such, GoDaddy notified AMPAS of its intent to compel the inspection of the computers and servers. Two days later, AMPAS' counsel miraculously discovered the existence of web cache, which it produced to GoDaddy on a thumb drive.

The web cache produced, however, was both incomplete and contaminated. The web cache related to only 60 screenshots even though Presbrey testified at his deposition that his software captured more than 12,000. Even more problematic is the fact that the web cache was not properly preserved when transferred onto the thumb drive. As a result, the date and time information contained in the web cache

produced on the thumb drive was materially altered.  As a result, the only unaltered web cache that exists resides on the actual computers and servers used by Presbrey (which are located in the offices of AMPAS' counsel).

The web cache is not only relevant, but it is critical in resolving substantial, material discrepancies between GoDaddy's records and the records produced by Presbrey regarding when a purported screenshot was created.   Discrepancies between the records of GoDaddy and Presbrey exist for virtually every domain name at issue.  For example, Presbrey's records claim that he captured screenshots on days in which GoDaddy's records show that no one visited the domain name. These discrepancies raise genuine issues regarding the reliability and accuracy of the software and computer systems used by Presbrey to capture screenshots through automated processes.   The accuracy of Presbrey's records, in turn, is critical to the issue of whether the screenshots can be authenticated.   The web cache is the one evidence that can definitely resolve when a screenshot was created and whether Presbrey's software and computers systems maintained the necessary integrity to allow for the authentication of the screenshots.

Given the significance of the web cache, AMPAS' long history of withholding relevant data, its repeated false representations regarding the non-existence of such data, its altering of the data produced, and the existence of unaltered data on the computers and servers used by Presbrey, GoDaddy respectfully requests that the Court compel the forensic inspection of all computers and servers used by Presbrey to search for domain names and to capture screenshots.

In addition to the inspection of these computers and servers, GoDaddy also requests that the Court compel AMPAS to provide supplemental responses to Interrogatory Nos. 3, 6, 26, and 27 and Requests for Production of Documents Nos. 9-10, 12, 25.   AMPAS has a continuing obligation to supplement its

1  discovery responses.  Once the Court permitted Presbrey to be a fact witness in this
2  case, AMPAS became obligated to supplement its responses to discovery by
3  incorporating information it previously withheld based on its assertion of the
4  attorney-client privilege and work product doctrine.  Nonetheless, six months have
5  passed and AMPAS has yet to supplement its discovery responses.

6  The same is true with respect to its 30(b)(6) testimony.  The law is well-
7  settled that a party must adequately prepare a corporate witness.  AMPAS
8  previously produced one corporate witness on 14 topics, including 4 topics directly
9  related to the discovery of the domain names and the creation of the purported
10  screenshots.  AMPAS' witness admitted that he did not discuss any of the topics
11  with Presbrey, a fact AMPAS' counsel recently confirmed.  The reason was that
12  AMPAS was asserting the attorney-client privilege and the attorney work product
13  doctrine to shield such information from discovery.  Now that AMPAS has waived
14  the privilege, and now that the Court has ordered discovery relating to Presbrey,
15  AMPAS is obligated to produce a supplemental 30(b)(6) witness that is adequately
16  prepared to discuss the knowledge Presbrey has relating to the topics noticed.
17  AMPAS' continuing refusal to produce such a witness is without justification.

18  **B.   Background**

19  In October 2009, AMPAS' counsel retained a "non-testifying litigation
20  consultant" by the name of Joe Presbrey to identify domain names containing
21  AMPAS' marks within domain name strings resolving from GoDaddy's parked
22  page servers.  *See* Declaration of Aaron McKown ("McKown Decl.") ¶ 2, Exh. A.
23  Eight months later, AMPAS filed the instant action based entirely on the domain
24  names discovered by this "consultant."  *See id.* at ¶ 3.  Despite being the only fact
25  witness with knowledge regarding the discovery of these domain names and the
26  creation of purported screenshots related thereto, AMPAS refused to identify the
27  witness in its Initial Disclosures or at any other time during the course of
28

discovery.  *See id.*  Indeed, AMPAS refused to disclose even the existence of this witness for years.  *See id.*

GoDaddy propounded its first Requests for Production of Documents ("First RFPs") on March 10, 2011 and its second Requests for Production of Documents ("Second RFPs") on November 22, 2011.  *See id.* at ¶ 4, Exhs. B, C.  These requests included requests regarding how and when AMPAS first discovered each of the domain names at issue, any investigations conducted by AMPAS relating to its claims, and its trademark policing efforts, including processes and vendors used.  *See id.* (Requests Nos. 9-10, 12, 25).

For nine months, the parties met and conferred over AMPAS responses, particularly AMPAS' failure to provide basic information regarding whom, when, and how the domain names were discovered as well as the origins of the screenshots produced.[1]  *See id.* at ¶ 5.  When GoDaddy threatened to file a motion to compel to this information, AMPAS initially claimed *in writing* that its counsel had used a computer software to discovery the domain names – a statement that AMPAS knew was false at the time it was made.  *See id.*, Exh. D.  Only after additional inquisition by GoDaddy did AMPAS finally admit on December 5, 2011 that it had retained a "non-testifying litigation consultant" who was responsible for discovering all of the domain names and for creating all of the screenshots at issue.  *See id.*

Nonetheless, AMPAS refused not only to disclose the identity of this fact witness (as Judge Collins confirmed him to be in her July 12, 2013 minute order), but AMPAS also refused to produce any data generated by the processes he employed.  *See id.*, Exh. E; *see also* Dkt. 504 ("[T]he Court hereby clarifies that Mr. Presbrey may testify as a fact witness only, not as an expert witness.").  As a

---

[1]     During that same time, AMPAS also produced three separate privilege logs identifying a total of 661 documents, <u>none</u> of which disclosed either the existence of a litigation consultant or any privileged documents generated by him.

result, GoDaddy filed a motion to compel the production of such data and, at the hearing, requested the identity of this fact witness to allow for discovery into basic information about the identification of the domain names and the origins of the screenshots at issue. *See* Dkt. 298.

In opposing GoDaddy's motion, AMPAS claimed that "the documents created by the Academy's . . . litigation consultant are not, as GoDaddy claims, 'factual in nature and simply tend[] to show the time and manner in which the parked pages that allegedly support AMPAS' ACPA claims were discovered.'" McKown Decl. ¶ 6, Exh. F at p. 21-22.  This representation to the Court was patently false.  Contrary to AMPAS' initial contention, the data that resides on the computers and servers used by Presbrey contains factual information critical to resolving substantial discrepancies regarding when, who, and how often Presbrey visited a domain name at issue in this case.  *See id.* ¶ 7, Exh. G (Deposition of Joe Presbrey) at 273:19-275:3; *see also* Declaration of Michael Kunkel ("Kunkel Decl.") ¶¶ 9-10.

Nonetheless, the Court upheld AMPAS' assertion of the attorney-client privilege and work product doctrine to shield the discovery of this fact witness and his related data.  In so ruling, however, the Court admonished AMPAS:

> At this point, I'm certainly not going to order disclosure of the consultant's name, but, you know, at some point . . . Somebody's going to have to testify what these pages looked like when they went there and you may want to just make up your mind about that sooner rather than later.

McKown Decl. ¶ 8 at Exh. H at 28:7-13.   Instead, AMPAS continued to shield both the identity of the witness and all data he created in searching for, locating, and capturing screenshots of domain names at issue through both fact and expert discovery. *See id.* at ¶ 9.

1   In light of AMPAS' failure to produce its "non-testifying litigation
2   consultant" as either a fact or expert witness, GoDaddy filed a motion to exclude
3   this witness from testifying either on summary judgment or at trial.  *See* Dkt. 414.
4   Despite the mandatory sanctions under Rule 37 of the Federal Rules of Civil
5   Procedure, Judge Collins denied GoDaddy's motion.  *See* Dkt. 492.  However,
6   Judge Collins specifically re-opened fact discovery in order to allow GoDaddy an
7   opportunity to conduct the discovery it had been attempting to take for nearly four
8   years. *See* Dkt. 504.

9       Consistent with the Court's order, GoDaddy served a document subpoena on
10  Presbrey on July 26, 2013.  *See* McKown Decl. ¶ 10, Exh. I.  Despite AMPAS'
11  prior representation to this Court that there was no data to produce, on August 28,
12  2013, Presbrey produced a hard drive containing 257 Gigabytes of data!  *See id.*
13  The following day, Presbrey produced emails.  *See id.*

14  **C.   GoDaddy Should Be Allowed To Inspect The Computers And**
15  **Servers Used By Presbrey**

16      1.   AMPAS Continues to Misrepresent The Existence of Relevant
17           Data

18      The production of the hard drive by Presbrey required GoDaddy to retain a
19  forensic consultant to analyze the data, including the functionality of the software
20  programs created by Presbrey to search for domain names and to capture
21  screenshots.  *See* McKown Decl. ¶ 11.  GoDaddy's consultant received the hard
22  drive on August 29, 2013 – one day after GoDaddy's receipt from Presbrey.  *See*
23  *id.*  Because of the volume of data produced, the consultant did not complete its
24  analysis of the data until October 2013.  *See id.*; Kunkel Decl. ¶ 8.  During the
25  course of conducting its analysis, GoDaddy's consultant discovered that no web
26  cache data had been produced.  *See* Kunkel Decl. at ¶ 9.  Web cache is the
27  temporary storage (caching) of Internet documents, such as HTML pages and

28

images. *See id.* A web cache essentially stores copies of documents passing through it, including critical metadata that details information about the Internet document such as the date and time of its creation. *See id.*

In this case, web cache would have existed for every screenshot purportedly captured by Presbrey. *See id.* The web cache that exists on the computers in its original form would allow GoDaddy to establish an accurate chronology surrounding the creation of each screenshot, as well as to ascertain a greater understanding of how the software programs developed and/or utilized by Presbrey evolved and changed over time to search for, locate, and create such screenshots. *See id.* at ¶ 10; *see also* McKown Decl. ¶ 7, Exh. G at 271:7-13 (acknowledging that the web cache for the domain names at issue would contain significant static information, including date and time data).

When it became clear that web cache had not been produced by Presbrey, counsel for GoDaddy sent an email to AMPAS' counsel on October 14, 2013 requesting the production of the web cache and associated logs (metadata). *See* McKown Decl. ¶ 12, Exh. K. The following day, AMPAS' counsel claimed that "[a] web cache was not utilized – our application contacted GoDaddy's servers directly without a cache each time a screen shot was taken." *Id.* Once again, the representation by AMPAS' counsel regarding the lack of data was false.

Presbrey was deposed in Boston, Massachusetts on November 12, 2013. *See id.* at ¶ 7. During his deposition, Presbrey testified as follows:

> Q.   Were the screenshots that were captured by the screenshot program actually captured on computers at Foote Meyers?
> A.   Yes.
> Q.   Would any of the web cache information for the screenshots still be on those computers?
> A.   Could be.

1    *Id.* at ¶ 7, Exh. G at 271:7-13.[2]  In light of this testimony, GoDaddy sent a follow-

2    up request to AMPAS for the production of all data that existed on the computers,

3    including web cache, which neither Presbrey nor AMPAS had produced.  *See id.* at

4    ¶ 13, Exh. L.  In response, AMPAS continued to take the position that "'web

5    cache' wouldn't exist on the server itself. . . . Mr. Presbrey testified web cache, as

6    temporary storage, is not something that was tracked or saved on the computers he

7    used." *Id.*  Again, this representation was false.

8         Recognizing AMPAS' familiar pattern of making intentional and false

9    representations regarding the existence of relevant information, GoDaddy

10   continued to press AMPAS for the production of web cache, including GoDaddy's

11   stated intent to compel the production of the Presbrey-related computers and

12   servers for inspection.  *See id.* at ¶ 14, Exh. M.  Miraculously, two days later,

13   AMPAS discovered approximately 258MB of web cache that it agreed to produce

14   in order to appease GoDaddy's production demand.  *See id.*  Contemporaneous

15   with the reversal of its position regarding the non-existence of web cache was

16   AMPAS' assertion that no additional data existed on any of the computers or

17   servers used by Presbrey to search, capture, and print screenshots of the domain

18   names at issue.  *See id.*  Nonetheless, AMPAS refused to permit any inspection of

19   the Presbrey computers and servers.  *See id.*

20        In its opposition, AMPAS will likely represent to this Court that it has now

21   produced all data to GoDaddy, data that it previously represented to both GoDaddy

22   and this Court did not exist.  Given the history between the parties and AMPAS'

23   repeated false representations both to GoDaddy and this Court about the non-

24   existence of data that in fact existed (*see* Dkt. 298 at pp. 2:19-5:9 (detailing history

25   of obstreperous conduct by AMPAS throughout discovery), AMPAS should be

26

27   [2]     Presbrey also testified that the software programs contained on the computers and servers
     could also contain other relevant information, including the date on which the software was
28   created.  *See* McKown Decl. ¶ 7, Exh. G at 45:18-22.

1  compelled to produce all computers and servers for forensic inspection used by

2  Presbrey to locate domain names and capture screenshots.  *See Dawe v.*

3  *Corrections USA*, 263 F.R.D. 613, 619 (E.D. Cal. 2009) (compelling forensic

4  inspection of computer because, among other things, "most persuasive is the level

5  of contention and distrust that permeates this litigation, and [opponent's] adamant

6  refusal to permit even a limited inspection of the computer").

7              2.    Data Produced By AMPAS Is Contaminated and Incomplete

8                    Thereby Necessitating Forensic Inspection

9              Even if AMPAS had a good faith belief that there was no data or that it has

10 now produced all data from the computers and servers used by Presbrey, including

11 all web cache, there is a more fundamental reason why the Court should compel

12 the forensic inspection of the Presbrey computers and servers.  **AMPAS' transfer**

13 **of the web cache from the its computers and servers to the thumb drive**

14 **contaminated the data.**  *See* Kunkel Decl. ¶ 11.  Specifically, the transferring of

15 the web cache to the thumb drive altered the date and time information thereby

16 precluding GoDaddy's ability to determine an accurate chronology for the

17 screenshots.  *See id.*  The only way to ensure that the data is produced in its

18 original state is to conduct a forensic inspection of the computers and servers used

19 by Presbrey to search for, capture, and print the screenshots at issue.  *See id.*

20            Another factor that further warrants the forensic inspection of the Presbrey

21 computers and servers is that the 258MB of web cache finally produced by

22 AMPAS is substantially less than what would be expected given the number of

23 screenshots purportedly captured.  *See id.* at ¶ 12 (web cache for only 60

24 screenshots produced); *see also id.* at ¶ 7, Exh. G at 214:2-217:14 (Presbrey Depo.)

25 (admitting that his software system captured more than 12,000 screenshots).

26 AMPAS will claim that this is all the web cache that exists on these computers and

27 servers, however, AMPAS represented just six weeks ago that there was no web

28

cache at all. At this point, GoDaddy should not be forced to accept AMPAS' representations regarding what data does and does not exist on the Presbrey computers and servers. Rather, GoDaddy should be permitted to conduct its own forensic analysis to determine what data exists. *See Dawe*, 263 F.R.D. at 615 ("The court is persuaded that relevant information, not previously disclosed, may be obtained pursuant to inspection of the computer, including but not limited to documents and communications contained therein.") (citing FRCP 26(b)(1) ("[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense"); FRCP 34(a)(1)(A), (b)(2)(E) (discoverable information includes electronically stored information)).

> 3.  Web Cache is the Only Evidence Capable of Resolving Discrepancies in Parties' Records and Determining Reliability of Presbrey's Software Programs

Not only is there a likelihood that data not produced by AMPAS resides on the computers and servers used by Presbrey to locate domain names and capture screenshots, but the data that is likely to reside on those computers and servers is directly relevant to outstanding issues pending in this case. One of the outstanding issues that remain from the parties' cross-motions for summary judgment is whether the domain names at issue in this case were "in" GoDaddy's parked page programs. *See* Dkt. 491. At the core of this issue is AMPAS' ability to authenticate screenshots for each of the domain names.

Here, the authentication of the screenshots is not as simple as having someone testify that he or she personally located and printed the screenshots given that the screenshots were not captured by a person. Rather, Presbrey created a software program that searched for, captured, and created a link for printing the purported screenshots of the disputed domains. *See* McKown Decl. ¶ 7, Exh. G at 43:5-46:20. Evidence provided by or regarding a computer program can be

authenticated by providing "[e]vidence describing a process or system and showing that it produces an accurate result." FRE, Rule 901(b)(9). According to the Advisory Committee Notes on Rule 901(b)(9), the rule "is designed for situations in which the accuracy of a result is dependent upon a process or system which produces it."

Recognizing the need to ensure accurate results in a purely automated process, the Ninth Circuit established an eleven-step process for authenticating computer records. *See In re Vee Vinhee* (B.A.P. 9th Cir. 2005) 336 B.R. 437, 446-47 (relying on Professor Edward Imwinkelried's *Evidentiary Foundations* (5th ed. 2002)). The *Vinhee* court identified the fourth factor, "[t]he procedure has built-in safeguards to ensure accuracy and identify errors" as warranting amplification, explaining that "built-in safeguards to ensure accuracy and identify errors in the fourth step subsume details regarding computer policy and system control procedures, including control of access to the database, control of access to the program, recording and logging of changes, backup practices, and audit procedures to assure the continuing integrity of the records." *Id*. at 446-47.

In this case, there are genuine issues regarding the reliability of the software programs used by Presbrey. While GoDaddy need not detail the myriad issues identified by Presbrey during his deposition for purposes of this motion, chief amongst the issues is the fact that Presbrey's automated records regarding when his software program visited a domain name and captured a screenshot are substantially inconsistent with GoDaddy's records regarding when an impression was made by a computer with an IP address of either Presbrey or Foote Meyers. *See* McKown Decl. ¶ 15, Exh. N (comparing Presbrey's records with GoDaddy's). Discrepancies exist between Presbrey's records and GoDaddy's records for virtually every domain name at issue. *See id.* These discrepancies include

Presbrey's claim to have captured a screenshot on a date for which GoDaddy has no record of any person visiting the domain name.  *See id.*

Indeed, substantial discrepancies exist even amongst Presbrey's own records.  According to Presbrey, when the software he created visited a parked page, the program took a screenshot of the parked page and then automatically saved the screenshot to the server at issue with a file name that included the domain name visited.  *See* McKown Decl. ¶ 7, Exh. G at 43:5-46:20.  On at least one occasion of which we are aware, however, the screenshot taken was saved with a name of a completely different domain name, calling into question the reliability of the very evidence claimed to be so pivotal to AMPAS' case.  *See id.* at ¶ 7, Exh. G at 238:20-243:17; ¶ 10, Exh. J.  Notably, we are only aware of the discrepancy from an email inquiry sent to Presbrey from counsel for AMPAS upon discovering the issue.  *See id.*, Exh. J.  Presbrey could not recall the instance even when pressed at deposition nor could he recall whether this was a recurring issue with his software.  *See id.* at ¶ 7, Exh. G at 238:20-239:11.  The only means available to Go Daddy to test the reliability of the software, as well as the screenshots purportedly taken by the system, is to examine the data stored on the computers and servers used by Presbrey, in their unaltered state, including but not limited to the web cache for the alleged 12,000 times Presbrey's program visited a Go Daddy parked page.  *See* McKown Decl. ¶ 7, Exh. G at 214:2-217:14

There is no doubt that the web cache for each screenshot would resolve the above noted discrepancies that exist with regard to documents produced  by both AMPAS and Presbrey; discrepancies that GoDaddy has been attempting to solve for the majority of this litigation.  The web cache would provide the critical metadata necessary to test the reliability of Presbrey's records, which in turn would allow the parties to determine the accuracy and reliability of the software programs used by Presbrey to capture the screenshots.  In the event Presbrey's records

regarding the capturing of the screenshots are inconsistent with the data from the web cache, then the lack of accuracy and reliability precludes the authenticity of the screenshots.  *See* FRE 901(b)(9); *In re Vee Vinhee* 336 B.R. at 446-47.  As such, GoDaddy should be permitted to inspect the computers and servers used by Presbrey to search for domain names and to capture screenshots of each.

4.   <u>Inspection of Computers and Servers Is Also Relevant to Issue of Spoliation of Evidence</u>

Even if, as AMPAS will argue, the computers and servers do not contain any additional web cache other than what AMPAS only recently produced, the absence of such evidence is relevant to the issue of spoliation of evidence.  The law is well established that "[s]poliation includes not only the destruction of evidence, but also 'the failure to preserve property for another's use as evidence.'"  *Nursing Home Pension Fund v. Oracle Corp.*, 254 F.R.D. 559, 567 (N.D. Cal. 2008) (imposing sanctions for failing to preserve evidence) (citing *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) and *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006)).  Courts have recognized three types of sanctions as a result of a party's failure to preserve evidence:  (1) an adverse inference; (2) exclusion of the witness; and (3) dismissal of a party's claim of the party responsible for the spoliation.  *See id.* at 563 (citations omitted).  Among the factors a court will consider in determining which sanction to impose is "the degree of fault of the party" responsible for the spoliation.  *See id.*

Here, if AMPAS is correct in its assertion that no further web cache exists on the Presbrey computers and servers, then an inspection will assist in determining the quantity of data that does exist and will allow an expert to determine how much evidence AMPAS failed to preserve.  This is especially true given Presbrey's testimony that he was not instructed to save web cache despite the critical information it contains relating to the origins of the screenshots.  *See*

McKown Decl. ¶ 7, Exh. G at 270:10-20 ("The cache was not asked of me to be saved by the firm.").  In turn, that will assist in determining the type of sanction, if any, that should be imposed on AMPAS for its failure to preserve critical data in this case.

> 5.   Presbrey Should Be Compelled to Appear for a Further Deposition to Testify About Web Cache and Related Issues

GoDaddy made every effort to secure web cache and related metadata from AMPAS in advance of Presbrey's deposition.  *See* McKown Decl. ¶ 12, Exh. K. AMPAS refused to produce such data, instead, claiming that no such data existed. *See id.*  Indeed, AMPAS continued to claim that no such data existed even after Presbrey testified that web cache could indeed still exist on the computers and servers used to capture the screenshots.  *See id.* at ¶ 14, Exh. M.  Only after the threat of filing this motion did AMPAS produce web cache.  *See id.*  The web cache produced, however, was contaminated as a result of the manner in which AMPAS produced it.  *See id.*  In the event the Court orders the inspection of the computers and servers, GoDaddy should be permitted to depose Presbrey further regarding the web cache as well as issues reasonably related thereto.

**D.   AMPAS Has A Continuing Obligation To Supplement Discovery Responses**

Under FRCP 26, AMPAS has a duty to supplement its discovery responses. FRCP 26(e)(1) imposes a general duty on parties to "supplement or correct its disclosure or response" in two situations:  (1) when "the party learns that in some material respect the disclosure or response is incomplete or incorrect," and (2) "as ordered by the Court."  This duty to supplement has been recognized and applied by the Ninth Circuit.  *See, e.g.*, *R&R Sails, Inc. v. Insurance. Co. of Pennsylvania,* 673 F.3d 1240, 1246 (9th Cir. 2011); *Hoffman v. Construction Protective Services, Inc.,* 541 F.3d 1175, 1179 (9th Cir. 2008); *see also Imax Corp. v. Cinema*

*Technologies, Inc.,* 152 F.3d 1161, 1165, n. 6 (9th Cir. 1998) ("Fed.R.Civ.P. 26(e) imposes a duty on a party to 'supplement or correct' their interrogatory responses.").

The duty to supplement has also been recognized by this Court.  *See, e.g.*, *B-K Lighting, Inc. v. Vision3 Lighting,* 930 F.Supp.2d 1102, 1136 (C.D. Cal. 2013) ("A party's failure to supplement answers to interrogatories in a timely fashion can be grounds for exclusion of the undisclosed information."); *Cambridge Electronics Corp. v. MGA Electronics, Inc.,* 227 F.R.D. 313, 320-21 (C.D. Cal. 2004) (litigants have a continuing duty to supplement all interrogatory responses if their prior responses are either incomplete or incorrect).

In this case, AMPAS excluded from its prior discovery responses information known to it as a result of the work performed by Presbrey on the grounds that such information was protected by the attorney-client privilege and the attorney work product doctrine.  On July 12, 2013, the Court held that Presbrey was a fact, not expert, witness.  *See* Dkt. 504.  As a result, since at least that date, AMPAS has been obligated to supplement its responses relating to the discovery of the domain names at issue and the subsequent capturing of screenshots, including responses to the following Interrogatories:

**INTERROGATORY NO. 3:**

Describe in detail how AMPAS first became aware of the registration of each of the Domain Names, including the date that AMPAS first became aware of the registration of each, the identity of the persons involved in each discovery, a description of any internal review processes, a description of the use of any outside vendors, and a description of all communications relating to such discovery.

**INTERROGATORY NO. 6:**

Describe in detail how AMPAS polices its trademarks with respect to domain names, including, without limitation, the identity of all persons

involved, any internal review processes, policies, and procedures, and the identity and description of any outside vendors used.

**INTERROGATORY NO. 26:**

For each Domain Name at issue in this action, identify the total number of impressions made on any GoDaddy.com parked page resolving from each Domain Name by any person affiliated, associated, or related to AMPAS, including its counsel, employees, or agents.

**INTERROGATORY NO. 27:**

For each Domain Name at issue in this action, identify the name and date of each person affiliated, associated, or related to AMPAS, including its counsel, employees, or agents, who opened a GoDaddy.com parked page that resolved from each of Domain Name at issue.

McKown Decl. ¶ 16, Exhs. O, P.  The same is true with respect to the following document requests:

**DOCUMENT REQUEST NO. 9:**

All documents and things concerning how AMPAS first learned of each of the Domain Names, including, without limitation, documents concerning any formal review process.

**DOCUMENT REQUEST NO. 10:**

All documents and things concerning when AMPAS first learned of each of the Domain Names.

**DOCUMENT REQUEST NO. 12:**

All documents and things concerning any investigation, determination, assertion, notification, conclusion or charge by or on behalf of AMPAS of any alleged violation of the ACPA by any person, including any of the GoDaddy Entities.

**DOCUMENT REQUEST NO. 25:**

All documents and things concerning AMPAS' procedure for policing its trademarks, including, without limitation, documents sufficient to evidence the individuals involved, internal review processes, outside vendors used, and/or methods of communication.

McKown Decl. ¶ 4, Exhs. B, C.

Despite having a continuing obligation to supplement its discovery responses, and despite being made aware on July 12, 2013 that Presbrey was deemed a fact witness, AMPAS has yet to supplement its discovery responses, including its responses to the above interrogatories.   *See id.* at ¶ 17.   Indeed, AMPAS appeared bothered by the notion that it had such an obligation and only agreed to consider doing so after GoDaddy raised the issue.   *See id.*, Exh. Q. Nonetheless, despite promising to provide supplemental responses just weeks before the close of fact discovery, AMPAS has yet to provide those supplemental responses. *See id.*

**E.     AMPAS Did Not Adequately Prepare Its 30(b)(6) Witness Regarding The Discovery Of Domain Names And The Capturing Of Screenshots**

In September 2012, GoDaddy filed a motion to compel further 30(b)(6) testimony from AMPAS on the grounds that AMPAS refused to produce a witness on various subjects.   *See* Dkt. 298.   AMPAS subsequently agreed to produce a corporate representative to testify on 14 of the 16 topics noticed by GoDaddy, including the following topics:

**Topic No. 2:**  All efforts made by AMPAS to police or otherwise protect its trademarks, including how such efforts are selected, the individuals involved in the efforts to police and protect, all outside vendors used to conduct such efforts, and the amount of money AMPAS has spent policing its trademarks for each year since 2006.

**Topic No. 6:**  The manner in which AMPAS first became aware of the registration of each of the Domain Names, including (1) the date that AMPAS first became aware of the registration of each Domain Name and its placement in one of GoDaddy.com's Parked Page Programs, (2) how AMPAS first became aware of the registration of each Domain Name and its placement in one of GoDaddy.com's Parked Page Programs; (3) the identity of the persons involved in each discovery; (4) a description of any internal review processes; (5) all communications relating to such discovery of the registration of each Domain Name and its placement in the Parked Page Programs; and (6) all actions taken as a result of such discovery.

**Topic No. 7:**  The number of Impressions made on any GoDaddy.com Parked Page resolving from any of the Domain Names by any person affiliated, associated, or related to AMPAS, including the date each Impression was made, the person(s) who made each Impression, and any click throughs made on any Parked Page after an Impression was made.

**Topic No. 10:**  The alleged use of the Domain Names at issue, including the date and nature of each use, the number of alleged uses of each Domain Name, and the nature of GoDaddy.com's intent in allegedly using each Domain Name.

*See* McKown Decl. ¶ 18, Exh. R.

As this court has previously noted, "companies 'have a duty to make a conscientious, good-faith effort to designate knowledgeable persons for Rule 30(b)(6) depositions and to prepare them to fully and unevasively answer questions about the designated subject matter." *Board of Trustees of Leland Stanford Junior University v. Tyco Inten. Ltd.,* 253 F.R.D. 524, 526 (C.D. Cal. 2008) (quoting *Sprint Commc'n Co., L.P. v. Theglobe.com*, 236 F.R.D. 524, 527-28 (D. Kan. 2006). "[T]he law is well-established that a 30(b)(6) deponent does have an

affirmative obligation to educate himself as to the matters regarding the corporation. 'Rule 30(b)(6) explicitly requires [a company] to have persons testify on its behalf as to all matters known or reasonably available to it and, therefore, implicitly requires persons to review all matters known or reasonably available to it in preparation for the 30(b)(6) deposition." *Calzaturficio S.C.A.R.P.A. v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 36 (D. Mass. 2001). Despite this obligation, AMPAS failed to produce a witness sufficiently educated on these topics based on the information available to it.

AMPAS produced Scott Miller, its in-house counsel, to testify on each of the 14 topics agreed to by AMPAS, including Topics 2, 6, 7, and 10. *See* McKown Decl. at ¶ 19. Miller explained that he met with his counsel, he read some interrogatory responses, and he read some deposition transcript pages in preparing for his deposition. *See id.*, Exh. S at 9:6-13 (October 29, 2012) (Vol. I); Exh. T at 126:25-127:4 (November 27, 2012) (Vol. II). Notably, Miller made no effort to communicate with Presbrey or to otherwise educate himself regarding Presbrey's efforts to search for and locate domain names resolving from GoDaddy's parked page servers or to capture screenshots of such parked pages in order to prepare himself to answer questions on these topics. *See id.* at ¶ 20, Exh. U (confirming on November 25, 2013 that "Presbrey has never spoken to Mr. Miller or anyone at AMPAS" to prepare AMPAS for its 30(b)(6) testimony).

In light of AMPAS' affirmative obligation to educate its witnesses on each of the topics noticed, AMPAS' subsequent waiver of any privilege as it relates to Presbrey (whom the Court has deemed a fact witness), and Miller's admitted failure to educate himself regarding Presbrey's involvement in the searching, discovery, and capturing of domain names at issue in this case, GoDaddy respectfully requests that AMPAS produce a further 30(b)(6) witness on each of

these topics who is sufficiently educated so as to discuss each in a non-evasive manner.

## II.    THE ACADEMY'S POSITION

### A.    Introduction

The deposition ordered by Judge Collins of Joe Presbrey was purely for the purpose of authenticating screenshots. There is not a single GoDaddy witness GoDaddy who has *ever* testified claiming that the screenshots-at-issue are *not in fact* GoDaddy Parked Pages.   Why?   Because the screenshots-at-issue are GoDaddy templates, bear GoDaddy copyright notices, and contain other statements like "This Web page is parked FREE, courtesy of GoDaddy.com."   GoDaddy's effort to delay this case by manufacturing discrepancies where there are in fact non, asking for additional forensic computer imaging, web cache, and demanding further depositions, should not be indulged.

**GoDaddy's misstatements to this Court:**   This entire exercise—of demanding documents/data from and a deposition of Presbrey—could have been avoided had GoDaddy's counsel told the Court the truth about GoDaddy's internal data-metrics in April 2012.   If the Court will recall, in Dkt No. 242, GoDaddy sought to compel the Presbrey data and documents so that it could determine when/how many times the Academy (including its counsel and litigation consultant) visited a particular Parked Page, ostensibly to support its defenses of non-use, laches, and unclean hands. [*See* McKown Decl. Exh. F (joint stipulation for Dkt 242]. The Academy argued that GoDaddy *already had* this information in its possession, as it should have records showing the exact date/time when a particular IP Address made a "hit" on a Parked Page.  [*Id.*, at 27-28].  At the April 10, 2012 hearing on this motion, Your Honor questioned GoDaddy's counsel on this specific issue.   Below is the transcript, showing GoDaddy's answer on **four separate occasions** [Herman Decl., Exh. 10, at 17-18 (emphasis added)]:

[After discussing about how an "impression" on a website is the same as a "hit" on a website]

**THE COURT:**  *And so you have records of how many times somebody visited a particular domain name.*

**MR. MC KOWN:** An impression was made. And I want to make it clear because they argue or **they claim in their Supplemental Responses that we have the ability to determine the specific I.P. address for each of those. [1] That is not true.**  There has been no discovery to that affect. **[2] As far as I understand, that is not an option.**  All GoDaddy does, it keeps its typical analytics where it keeps and identifies the number of impressions that were made on it and the number of times somebody clicked on an ad and that ad generated revenue.  That's the information that GoDaddy maintains with respect to each specific parked page.

**THE COURT:**  *So you can't tell what I.P. address visited a specific parked page?*

**MR. MC KOWN: [3] That's correct.** As far as I know, there's been no evidence in this case despite all of the 30(b)(6) and every other testimony that we've had to that affect.   **[4] And as far as I understand, that is not an option.**

**THE COURT:** Okay.

Now, 20 months after that hearing, it appears GoDaddy in fact can and does track *exactly when* a particular IP address visits a specific Parked Page.  In support of this motion, GoDaddy submitted Exhibit N to the McKown Declaration. Exhibit N identifies "the dates and times on which GoDaddy's records show a person visited a domain name . . . .," listed by *IP address*.  [*See* McKown Decl., ¶15, and Exh. N].  GoDaddy has apparently *always* had this data.

**Why is this important?**  GoDaddy has spent countless hours and wasted the Court's time trying to avoid admitting that the screenshots-at-issue are actually GoDaddy's Parked Pages.  GoDaddy argued that its Parked Pages are "dynamic," not "static," and hence it cannot admit or deny exactly what a particular Parked Page looked like on a particular date/time.   But GoDaddy, it now appears, always had in its possession the impression data for each Parked Page—including the exact date/time/IP Address that corroborated the exact date/time/IP Address that the Academy took the screenshots-at-issue.  GoDaddy has apparently withheld this impression data to avoid having to authenticate the screenshots-at-issue.

**The Academy's Data and GoDaddy's Impression Data Match:** GoDaddy claims that it needs to image the computers and obtain the web cache to resolve "discrepancies" between GoDaddy's records and Presbrey's records. But a close examination reveals that there is no such discrepancy. For example, the first domain listed on GoDaddy's <u>Exhibit N</u> is 2011OSCARS.COM. The table below shows that the parties' data only differs by two hours and two seconds:

| Domain Name | Presbrey Screenshot with UNIX stamp | UNIX time stamp converted to Eastern Time | GoDaddy's Data from Exh. N |
|---|---|---|---|
| 2011OSCARS.COM | 2011OSCARS.COM _1266952295[1] | Tue Feb 23 2010 14:11:35 EST | 2/23/10 12:11:33 [no indication of time zone] |

***Regarding the two hour difference:*** The GoDaddy data does not indicate the time zone, but assuming GoDaddy's servers are in Arizona, that would be Mountain Time, which is exactly two hours behind Eastern Standard Time (14:11 EST is 12:11 MST). ***Regarding the two second difference:*** Common sense dictates that it would take Presbrey's program time to visit the Parked Page and take a screenshot—hence, there will likely be a short delay between GoDaddy's impression records and the time stamp from Presbrey's program.

In fact, GoDaddy knows there are no real discrepancies. If there were, then one would think that GoDaddy would have asked Presbrey to explain them at his 7-hour deposition on November 12, 2013. Instead, GoDaddy did not ask a *single question* about these alleged time/date discrepancies at the Presbrey deposition.

**The requested web cache is a red herring.** As background, there are only two relevant computers kept at Foote Meyers: (1) the Linux Server—there is and never was a web cache on the Linux server; however, Presbrey produced all 257 GB of data on the Linux database, which included all the screenshots-at-issue; and (2) the Dell "Screenshot Bot" personal computer—this Dell PC ran the browser program, took the screenshots, and then reported them to the Linux Server's database. After the Presbrey deposition, the Academy's counsel determined that

there was web cache on this "screenshot bot" Dell, which the Academy produced to GoDaddy (258 MB as a zipped file, or about 330 MB as an unzipped file).

GoDaddy's purported justifications for wanting to forensically image the web cache on the "Screenshot Bot" Dell PC are listed below—each is wrong:

- <u>GoDaddy claims the produced web cache is too small (258 MB).</u>  Not true.  The web cache setting on the Dell "Screenshot Bot" PC was 320MB.  The web cache produced by the Academy is 330MB when it is unzipped (uncompressed).

- <u>GoDaddy claims the web cache's time/date data was corrupted or contaminated.</u>  GoDaddy points to no examples, but in any event, the time/date data in the web cache is present and uncorrupted in the identical copy kept by the Academy, which the Academy can submit to the Court for inspection at the February 2014 hearing.

  Had GoDaddy met and conferred on this issue as required by Local Rule 37-1, instead of filing a motion, this "corruption" issue could likely have been resolved.

- <u>GoDaddy claims the web cache would provide it with accurate time/date information to prepare a chronology.</u>  Presbrey testified at his deposition that neither Google nor GoDaddy permit their dynamic (*i.e.* non-static) advertising content to be cached, meaning that the information GoDaddy seeks won't be in the web cache.

  GoDaddy does not deny this in its motion or rebut it with its Kunkel Declaration.  Indeed, GoDaddy has told this Court *multiple times* that its Parked Pages are "dynamic"—meaning they only exist while the address is typed in the browser.  A web cache, though, only captures "static" data.

**<u>Interrogatories // 30b6 Deposition of the Academy:</u>**  The Academy previously told GoDaddy it would supplement its interrogatory responses and it has done so.

As for a 30(b)(6) deposition of the Academy, it is unnecessary and harassing—everyone agrees that the Academy's 30(b)(6) witnesses already testified that they left the identification of domain names for this lawsuit up to its outside counsel.  Nobody at the Academy has worked with or communicated Presbrey, and it is pointless to have a 30(b)(6) witness of the Academy testify as to that.  Judge Collins only ordered a deposition *of Presbrey*, not anyone else.

**B.      There are no "Data Discrepancies" Justifying GoDaddy's Request to Image Computers, Servers or the Web Cache**

GoDaddy argues in its portion of this joint stipulation that it needs to image the Presbrey computers to resolve alleged discrepancies between the parties' impression data.   Specifically, GoDaddy submits an <u>Exhibit N</u> that compares Presbrey's records and GoDaddy's records of impressions made on those Parked Pages.    GoDaddy then claims that "[d]iscrepancies exist between Presbrey's records and GoDaddy's records for virtually every domain name at issue."  [Joint Stip., at 12-13].  Because GoDaddy is wrong, the entire premise of this motion is also wrong—hence, it should be denied out of hand.

**<u>First</u>**, the relevant comparisons are alleged discrepancies between the GoDaddy data *and the screenshots authenticated by Presbrey on summary judgment*.   Other comparisons are not relevant.   In support of its MSJ, the Academy submitted a declaration from Presbrey to authenticate many of the screenshots-at-issue.[3]  [*See* Presbrey MSJ Decl., Dkt 377-7, ¶¶6-7, and Exhs. 2 and 3 thereto; attached as Exhs. 1, 2, and 3 to the Herman Decl., ¶¶4-8.  As part of that declaration, a spreadsheet was submitted as Presbrey <u>Exhibit 2</u> showing the domain name, the name of the actual file saved with the UNIX time stamp in the file name, and the conversion of the UNIX time stamp into an actual time.  [*Id*.]  The Academy also submitted as Presbrey <u>Exhibit 3 a CD-ROM</u> containing all of the actual screenshot files names and images themselves.  [*Id.*]

As Presbrey testified on MSJ, the file name of each screenshot contains the UNIX time stamp; converting that UNIX time stamp to regular time, one can compare the time/date of the screenshots authenticated by Presbrey (<u>Exhibits 2 and 3</u>) to GoDaddy's own impression data (<u>Exhibit N</u>) for each of the screenshots authenticated by Presbrey at MSJ.

---

[3] The Academy also authenticated other screenshots through declarations from its outside counsel, who would also investigate certain domain names independently of Presbrey.

In order to make an apples-to-apples comparison, one would need to know the time zone where GoDaddy's servers is located—either Pacific Time, Mountain Time, Central Time, Eastern Time, or something else—which GoDaddy does not provide. [4]   Nevertheless, the Academy has created a chart comparing the time stamp data from the Presbrey MSJ screenshots-at-issue to the date/time/IP address submitted by GoDaddy in its Exh. N.  [Herman Decl., ¶¶9-12, Exh. 7].  A review of Exh. 7 to the Herman Declaration reveals very little (if any) discrepancy between the GoDaddy data and the Presbrey data.

Example #1:  2011OSCARS.COM (Line 2 on Herman Decl., Exh. 7)

The file name of the Presbrey screenshot contains the UNIX time stamp embedded therein.  For this particular screenshot, it is 2011OSCARS.COM_*1266952295*[1].

- Running the *1266952295* UNIX time stamp in a converter (like www.epochconverter.com) shows GMT/UCT time of 2.23.2010, at 19:11:35 GMT.

- Then, converting the GMT time to Mountain Time, where GoDaddy's servers are likely based, would yield, after subtracting seven (7) hours ➔ 2.23.2010, at 12:11:35 MT.

- Unsurprisingly, GoDaddy's own data shows that Presbrey visited the 2011OSCARS.COM Parked Page on 2.23.2010 at 12:11:33 [time zone omitted].

- ***This shows a two second difference.***

Example #2:  2013OSCARS.COM (Line 3 on Herman Decl., Exh. 7)

The file name of the Presbrey screenshot contains the UNIX time stamp embedded therein. For this particular screenshot, it is 2013OSCARS.COM_*1273788943*.

- Running the *1273788943* UNIX time stamp in a converter (like www.epochconverter.com) shows GMT/UCT time of 5.13.2010, at 22:15:43 GMT.

- Then, converting the GMT time to Mountain Time, where GoDaddy's servers are likely based, would yield, after subtracting seven (7) hours ➔ 5.13.2010, at 15:15:43 MT.

---

[4] A UNIX time stamp can be converted to UTC time (Universal Time Coordinated, formerly known as Greenwich Mean Time or GMT), which can then be further converted to the desired time zone.  The Court can obviously take judicial notice that Pacific Time is UTC/GMT-8; Mountain Time is UTC/GMT-7; Central Time is UTC/GMT-6, and Eastern Time is UTC/GMT-5.

- Unsurprisingly, GoDaddy's own data shows that Presbrey visited this 2013OSCARS.COM Parked Page on <u>5.13.2010 at 15:15:43</u> [time zone omitted].

- ***This shows a zero second difference.***

<u>Example #3</u>:   ACADEMYAWARDS2011LIVE.COM (Line 12 on Herman Decl., Exh. 7)

The file name of the Presbrey screenshot contains the UNIX time stamp embedded therein.    For    this    particular    screenshot,    it    is ACADEMYAWARDS2011LIVE_COM_*1315544970*.

- Running the *1315544970* UNIX time stamp in a converter (like www.epochconverter.com) shows GMT/UCT time of 9.9.2011, at 05:09:30 GMT.

- Then, converting the GMT time to Mountain Time, where GoDaddy's servers are likely based, would yield, after subtracting seven (7) hours ➜ <u>9.8.2011, at 22:09:30 MT</u> (day before).

- Unsurprisingly, GoDaddy's own data shows that Presbrey visited this 2011OSCARS.COM Parked Page on <u>9.8.2011 at 22:09:06</u> [time zone omitted].

- ***This shows a twenty-four second difference.***

- Indeed, the overwhelming majority of the screenshots-at-issue showed ***less than a 25 second difference*** when compared to GoDaddy's time/date/IP Address data.  [Herman Decl., ¶9 and 12].

Common sense, and Mr. Presbrey's deposition, explains the difference of mere seconds between this data.  As Presbrey explained in his summary judgment affidavit and at deposition, he would use a computer that was running his program to capture screenshots.  [Presbrey Decl., ¶ 2; Herman Decl., Exh. 15, at 76:15-77:17].  The computer asks the Linux server for a domain name, browses to the domain, takes a screenshot and sends it back to the server where it is saved, time stamped and fingerprinted.  [*Id.*].  This automated process—and variances in Internet speed—obviously explain the difference of mere seconds between when an impression or "hit" registered on GoDaddy's server, as compared to when the screenshot was saved/time stamped on the Linux server by Presbrey.

In addition to GoDaddy's own date/time/IP address data, GoDaddy's forensic computer expert Mr. Kunkel's testimony further confirms the authenticity

of the screenshots.  Mr. Kunkel testified that a "MD5 hashsum" is a mathematical verification "to demonstrate that the original source of the data was not altered and that a true forensic duplication has been produced."  [Kunkel Decl., ¶7].  As Presbrey testified, the screenshots-at-issue that the Academy sought to authenticate on summary judgment contained the "file content md5" which Presbrey explained was the "unique key and authenticity computation on the screenshot data." [Presbrey MSJ Decl., ¶4, Exh. 1 to Herman Decl.].   Mr. Kunkel further corroborates what Presbrey told the Court—that the MD5 content provides an independent basis to authenticate the screenshots-at-issue.

**Second**, GoDaddy claims that Presbrey claimed "to have captured a screenshot on a date for which GoDaddy has no record of any person visiting the domain name."  [Joint Stip, at 12-13].  GoDaddy, however, does not point out which domain name it is referring to in this alleged discrepancy, making it hard for the Academy to respond.[5]  GoDaddy bears the burden of demonstrating why it needs the requested relief, yet it has failed to submit a *single screenshot, declaration or any other evidence* showing alleged mismatches.

Nevertheless, there are several simple explanations for this alleged "discrepancy"—including that Presbrey took *screenshots* (regardless of whether it was a GoDaddy Parked Page or not), whereas GoDaddy only measured *impressions* on its domains.  Those are not the same thing—Presbrey's program could have taken a screenshot that was not a GoDaddy domain.  [Presbrey Decl., ¶6].  For example, there may have been times where Presbrey's program took a screenshot when the relevant computer was not connected to the Internet.  Though the screenshot was taken by Presbrey's program, GoDaddy's server would not

_____

[5] The Academy also has no way of verifying whether GoDaddy's <u>Exhibit N</u> contains the full, complete, and accurate "hit" or "impression" data (time/date/IP Address information) for each domain name.

have registered it because Presbrey's program was not taking a screenshot of the GoDaddy Parked Page. [*Id.*]

Example #1: BETACADEMYAWARDS.COM [Herman Decl. Exh. 17].

Presbrey took a screenshot of BETACADEMYAWARDS.COM with a UNIX time stamp of 1275170409.

- Running the *1275170409* UNIX time stamp in a converter (like www.epochconverter.com) shows GMT/UCT time of 5.29.2010 at 22:00:09 GMT.

- On GoDaddy's Exh. N, there is no corresponding impression data on 5.29.2010 for this domain name.

- Looking at the Presbrey screenshot shows why:

  o "This program cannot display the webpage. Most likely causes: You are not connected to the Internet [and/or] The website is encountering problems." [Herman Decl., Exh. 17].

  This shows that the screenshot captured on that date by Presbrey obviously would *not have* made an impression on GoDaddy's Parked Page servers.

Example #2: ACADEMYAWARDSPREVIEW.COM [Herman Decl. Exh. 18].

Presbrey took a screenshot of ACADEMYAWARDSPREVIEW.COM with a UNIX time stamp of 1315532541.

- Running the *1315532541* UNIX time stamp in a converter (like www.epochconverter.com) shows GMT/UCT time of 9.9.2011 at 01:42:21 GMT.

- On GoDaddy's Exh. N, there is no corresponding impression data on 9.9.2011 for this domain name.

- Looking at the Presbrey screenshot shows why:

  o "Oops! This link appears to be broken." [Herman Decl. Exh. 18].

  This shows that the screenshot captured on that date by Presbrey obviously would *not have* made an impression on GoDaddy's Parked Page servers.

There are other explanations as well.  For example, Presbrey's program could have taken a screenshot on a date/time when GoDaddy was no longer hosting that domain name.  [Presbrey Decl., ¶6].

Example #3:  2013OSCARS.COM [Herman Decl. Exh. 19].

Presbrey took a screenshot of 2013OSCARS.COM with a UNIX time stamp of 1315536083.

- Running the *1315536083* UNIX time stamp in a converter (like www.epochconverter.com) shows GMT/UCT time of 9.9.2011 at 2:41:23 GMT.

- On GoDaddy's Exh. N, there is no corresponding impression data on 9.9.2011 for this domain name.

- Looking at the Presbrey screenshot shows why:

  o "Sorry!  This site is not currently available."  [Herman Decl. Exh. 19].

  Instead of it being a problem with Presbrey's program, one simple explanation is that GoDaddy did not keep impression data on domain names without an available site.

Example #4:  411-ACADEMYAWARDS.COM [Herman Decl. Exh. 20].

Presbrey took a screenshot of 411-ACADEMYAWARDS.COM with a UNIX time stamp of 1315546872.

- Running the *1315546872* UNIX time stamp in a converter (like www.epochconverter.com) shows GMT/UCT time of 9.9.2011 at 205:41:12 GMT.

- On GoDaddy's Exh. N, there is no corresponding impression data on 9.9.2011 for this domain name.

- Looking at the Presbrey screenshot shows why:  It is totally blank.

  Instead of it being a problem with Presbrey's program, one simple explanation is that GoDaddy did not keep impression data on domain names that were totally blank or were not hosted by GoDaddy. [Herman Decl. Exh. 20].

**Third**, GoDaddy makes yet another unsupported claim—arguing that "[o]n at least one occasion of which we are aware, however, the screenshot taken was saved with the name of a completely different domain name calling into question the reliability of the very evidence claimed to be so pivotal to AMPAS's case."

[Joint Stip. at 13]. The domain name at issue here was PETACADEMYAWARDS.COM. [Herman Decl., Exh. 15, at 240:4-243:14].

The Academy *never sought* to authenticate this domain name through Presbrey, because Presbrey did not take the screenshot for this domain name— instead, it was taken by the Academy's outside counsel during the course of its own investigation in this matter on or about February 11, 2011. [*Compare* Presbrey MSJ Decl., Herman Decl. Exhs. 1-3 (showing no PETACADEMYAWARDS.COM screenshots on Presbrey's MSJ Exh. 2 or Exh. 3) *with* Liang MSJ Decl. (Dkt. No. 376), ¶4, Lines 7-8, Exhs. 7-8 for PETACADEMYAWARDS.INFO and PETACADEMYAWARDS.COM) (authenticating these screenshots on MSJ *not* through Presbrey].

In any event, Presbrey actually testified that he did not believe that a screenshot was taken and saved with a different domain name and attributed the error to GoDaddy's counsel's misunderstanding. [Herman Decl., Exh. 15, at 243:4-8, 263:8-13]. When Presbrey asked "Do we have this screenshot in particular?", GoDaddy's counsel refused to show it to Presbrey. [*Id.*, 241-242]. Instead of producing an actual screenshot that was "mislabeled", which is likely impossible, GoDaddy misconstrued the above cited testimony to provide the appearance of a discrepancy on a domain name that the Academy is not even authenticating through Presbrey.

**Fourth**, it should also be noted that GoDaddy admits that it received Presbrey's hard drive from the Linux Server containing 257 GB of data on August 28, 2013, and that its consultant Mr. Kunkel completed his analysis in October 2013. GoDaddy then took Presbrey's deposition on November 13, 2013. Despite the alleged discrepancies between Presbrey's data and GoDaddy's data, GoDaddy *failed to pose a single question* about alleged discrepancies between GoDaddy's Exhibit N and Presbrey's Exh. 2/Exh. 3 MSJ screenshots. [Herman Decl., ¶¶19-

20].  Why?  Because there really is no discrepancy.  GoDaddy waived any right to further explore alleged discrepancies.

Had GoDaddy viewed this data with an unbiased view, inquired of Presbrey at his deposition, and/or engaged in a meaningful meet and confer process, then it possible that these purported discrepancies could have been resolved.

## C. The Academy did not Misrepresent Anything—either to GoDaddy or this Court

**The Academy made no misrepresentations regarding the existence of data (257 GB of data produced on August 28, 2013):**  Without citing any evidence at all, GoDaddy boldly states that "in September 2012, GoDaddy filed a motion to compel data generated by AMPAS' litigation consultant" and that "in opposing the motion, AMPAS represented to the Court that no such data existed." [Joint Stip. at 1-2; *see also* 7:9-13].[6]

That is the *exact opposite* of the Academy's position on the litigation consultant motion.  Instead, as the Court will recall, the Academy argued that "the ESI, emails, and supporting data"—all of which *clearly existed*—was shielded by the work product doctrine because that information revealed "the Academy's counsel's and its agent's mental impressions, processes, and litigation strategy," including revealing "which [domain names violated the ACPA, and which ones arguably did not."  [*See* Dkt 242, McKown Decl., Exh. F at 17:22-25 and 21:3-22:17].  The Academy's argument was *not* that the data and ESI did not exist—it was that GoDaddy was not entitled to it.  Indeed, the Academy's work product defense pre-supposed that the ESI and data sought by GoDaddy *did* exist.

Afterwards, during the MSJ rulings, Judge Collins ruled that GoDaddy could take a deposition of Presbrey to authenticate the screenshots-at-issue.  [Herman

---

[6] Presumably, the reference to September 2012 is mistaken, since in September 2012 the only issues heard by this Court were relating to Bob Parsons.  [*See* Dkt No. 296 and 297].  The briefing on the litigation consultant was in March 2012 and heard April 10, 2012.  [*See* Dkt No. 242 and 248].

Decl., Exh. 6].  GoDaddy then sent a subpoena to Presbrey asking for ESI and other data.  In response, the Academy produced Presbrey's data from the Linux Server on August 28, 2013, totaling 257 GB of data.

**The 257 GB of data from the Linux Server did not contain any web cache.**  GoDaddy accuses the Academy of failing to produce the web cache in this 257 GB of data.  [Joint Stip., at 7-8].  That is true.  But that is because the Linux Server *never contained any web cache*—there is no web cache to produce from the Linux Server.  [Presbrey Decl., ¶ 3].

Instead, the 257 GB of data from the Linux Server that was produced contained the numerous Verisign downloads Presbrey conducted—in other words, the list of every single registered .com and .net domain name on the entire Internet. [Presbrey Decl., ¶¶ 3-4].  Presbrey downloaded *every single* .com and .net domain name that Verisign maintains, which is *every single* domain name on the Internet. At first, Presbrey did this on a daily basis, but later switched to a weekly basis. [Herman Decl., Exh. 15, at 108-110].[7]

That gigantic list was then winnowed down to those domain names that included the Academy's trademarks, were registered by GoDaddy, and were possibly monetized:

- First, Presbrey would winnow the list down to those domain names that included the Academy's trademarks [Herman Decl. Exh. 15, at 190:2-21, 216:25-217:14, 247:13-248:13];

- Then, Presbrey would winnow that list to just those domain names including the Academy's trademarks that were registered by GoDaddy.  [*Id.*, at 131:14-132:2].

---

[7] To provide context, viewing VeriSign's website on December 16, 2013 reveals there are 111,808,001 domains in the active .com zone and 15,180,427 active .net domains.

Only then, would screenshots be taken and saved on the Linux Server.  [*Id.*, at 216:25-217:14].   The Academy did not misstate anything about data kept and produced by Presbrey.

**In contrast, GoDaddy misrepresented GoDaddy's data-metrics to this Court:**   In opposing GoDaddy's motion to compel the litigation consultant ESI and data, the Academy told this Court that (1) the Academy would provide the various IP addresses for its agents from whom a visit may have originated, and (2) using this information, would work with GoDaddy "to determine when and how many times the Academy's outside counsel or their agents made an impression on a particular Parked Page."  [*See* Dkt 242, Exh. F, at 27-28; Herman Decl., Exh. 9.]

At the hearing on April 10, 2012, Your Honor specifically asked GoDaddy's counsel whether GoDaddy kept records showing the date/time when a particular IP address made an impression (or "hit") on a particular Parked Page.  **Four times** GoDaddy's counsel told the Court "[t]hat is not true"; "that is not an option"; "that's correct [that GoDaddy can't tell what I.P. address visited a specific parked page]"; and "that is not an option."   [*See* Herman Decl., Exh. 10, 4.10.2012 Transcript, at 17-18].

Now, in December 2013, it turns out that GoDaddy has had that information all along.  [*See* McKown Decl., Exh. N].  This entire motion to compel process in April 2012, as well as the subsequent post-summary judgment discovery of Presbrey could have been avoided if GoDaddy had disclosed the data-metrics that it maintains for its Parked Pages—as both Your Honor and the Academy asked of GoDaddy.  GoDaddy's own time/date/IP Address data would have corroborated the Academy's time/date/IP Address data for the screenshots-at-issue.  With that corroborating information, GoDaddy simply could not deny that the screenshots were of GoDaddy's Parked Pages.

### D.     The Web Cache is a Red Herring

GoDaddy argues that the Academy hid the existence of a web cache, then produced a corrupted and incomplete web cache, and that if GoDaddy had the correct web cache, it would be able to resolve alleged discrepancies in the data. [Joint Stip, at 7-8].   Setting aside the fact that the parties' data actually match, GoDaddy is wrong on every single aspect regarding the web cache:   (1) the Academy did not mislead GoDaddy about the web cache, (2) there cannot be more data than what the web cache was set to maintain, (3) it is unsurprising that the web cache does not contain certain data, because dynamic Parked Pages and dynamic Google advertising links would *not* be captured by a web cache, (4) the web cache data produced by the Academy was *not* corrupted, and (5) the imaging case cited by GoDaddy is inapposite.

**The Academy did not mislead GoDaddy about the web cache.**  GoDaddy claims that the Academy mislead it when stating in October 2013 that "[a] web cache was not *utilized* – our application contacted GoDaddy's servers directly without a cache each time a screen shot was taken."   [Joint Stip., at 8:17-19 (emphasis added)].  That statement was, and remains, true.  The Presbrey program did not *utilize* a web cache; instead, it contacted GoDaddy's servers directly. [Presbrey Decl., ¶¶ 11-12, and 14; Herman Decl., ¶ 20].

After the November 2013 Presbrey deposition, it was clear that there was (1) a Linux Server (which never utilized a web cache), and (2) a Dell Screenshot Bot PC, which "could" have screenshot information in the web cache.  Even though the subpoena to Presbrey did not call for the web cache, the Academy still voluntarily produced the 330 MB web cache from the Dell Screenshot Bot PC.  [Herman Decl., ¶ 20, and Exh. 12 (Herman informing GoDaddy that the web cache from the Dell Screenshot Bot PC "will be useless given Mr. Presbrey's testimony that he

1   didn't believe GoDaddy (or Google for that matter) allowed for the parked pages to

2   be 'cached'".]⁸

3   **The Dell "Screenshot Bot" PC's Web Cache was set at 320 MB, which**

4   **was what the Academy produced to GoDaddy.**   Everyone agrees that a web

5   cache, by definition, is a mechanism for the *temporary storage* (caching) of web

6   documents.  Since a web cache has maximum size settings, older files in the web

7   cache are automatically overwritten by newer files.  [Presbrey Decl., ¶ 10].

8   Here, the setting for the web cache on the Dell "Screenshot Bot" PC was 320

9   MB.  [Presbrey Decl., ¶¶3, 7-9, Exh. A].  The Academy produced to GoDaddy a

10  258 MB zipped file, which when unzipped, was 330 MB.  [Presbrey Decl., ¶¶ 8-9,

11  Exh. A].⁹

12  GoDaddy argues there should have been more than 258MB of data for what

13  it claims are approximately 12,000 domain names.  [Joint Stip., at 10-11; Kunkel

14  Decl., ¶ 12.]  Setting aside the fact that GoDaddy completely misunderstands the

15  Presbrey testimony on this issue—there were not 12,000 domain names [Herman

16  Decl. Exh. 15, at 214-217]—the simple fact remains that a web cache is a

17  temporary mechanism with maximum size settings, which are overwritten by

18  newer files once the maximum size is reached.

19  **The web cache would not provide GoDaddy with the time/date**

20  **chronology that it claims to need.**   As shown below, it is entirely unsurprising

21  that the web cache produced by the Academy contained very little (if any) useful

22  information for GoDaddy.  [Joint Stip, at 10:20-11:10].   A web cache is by

23  definition temporary storage, constantly being overwritten, that rarely (if ever)

24

25  _____

    ⁸ A review of the July 2013 subpoena reveals that there is no request asking for the web

26  cache.  Nor does GoDaddy point to any particular request asking for the web cache in its
    subpoena.

27  ⁹ The extra 10 MB are index metadata which is allowed to exceed the 320 MB maximum
    size setting to improve access and update performance.  [Presbrey Decl., ¶9].

28

1    captures non-static, *i.e.*, dynamic webpages, which is what GoDaddy claims the

2    Parked Pages actually are—hence, they would not appear in web cache.

3         Presbrey testified at his deposition specifically about web cache and how it

4    works.  Presbrey testified that the Internet advertising industry does not allow their

5    content to be cached.  [Herman Decl., Exh. 15, at 270-273; *see also* Presbrey Decl.,

6    ¶¶ 11-12].  This includes Google pay-per-click advertisements, because Google has

7    always prevented web caching of its advertisements.  [*Id.*, at 273-275; Presbrey

8    Decl., ¶¶11-12].  Further, Presbrey also testified that he checked whether GoDaddy

9    allows for the caching of its Parked Pages—GoDaddy also does not permit web

10   caching of its pages.[10]  [*Id.*, at 271-272; Presbrey Decl., ¶¶ 11-12].

11        GoDaddy's citations to the Presbrey deposition transcript are misleading.

12   GoDaddy claims that Presbrey testified that the web cache would contain

13   "significant static information, including date and time data."  [Joint Stip, at 8:4-

14   12].  What GoDaddy omits is that:  (1) GoDaddy's position in this case all along

15   has been that its Parked Pages are "dynamic," not "static," existing only for the

16   amount of time the address is in the browser.  [*See, e.g.*, Nicks Decl., Dkt. 384, at

17   ¶¶ 7 and 10, attached as Herman Decl., Exh. 21]; *and* (2) Presbrey then testified

18   that the web cache would "[p]robably not" contain the "time and date"

19   information, unless you got "really lucky to have a . . . full report from the web

20   cache.  It would be very, very difficult."  [Herman Decl. Exh. 15, at 274-275].  Nor

21   would the web cache provide the IP Address.  [*Id.*, at 275].

22        Hence, GoDaddy's argument that the web cache would include critical

23   metadata that "would allow GoDaddy to establish an accurate chronology

24   surrounding the creation of each screenshot" is simply wrong.  [Joint Stip., at 8:4-

25   ---

26   [10] The technical details are as follows.  Presbrey used a tool called cURL, which allows for one to view the HTTP headers.  cURL is a highly prominent tool among web engineers to see how the Web works.  This tool allows one to see "all the headers that a browser sees but doesn't tell you about, things like cache control."  [Herman Decl. Exh. 15, at 270-272]. When he viewed these headers for GoDaddy, it showed that GoDaddy's Parked Pages would not be cached.

12].  Mr. Kunkel's affidavit refutes none of Mr. Presbrey's testimony.  Nor does Mr. Kunkel testify regarding whether GoDaddy's "dynamic" Parked Pages or Google's advertising pay-per-clicks are in fact even cached in the web cache.[11]

**The web cache produced by the Academy was not "corrupted" or "contaminated".**  GoDaddy argues that the Academy's transfer of the web cache to the produced thumb drive contaminated the data, altering the time/date information.  [Joint Stip., at 10:9-19].  GoDaddy, however, does not provide any details or examples as to exactly what was altered or contaminated, simply concluding that "[i]ncluded amongst the data altered was the date and time record for web cache produced."  [Kunkel Decl., ¶ 11].

First, GoDaddy failed to meet and confer on this alleged "contamination" or "corruption" issue of the web cache.  [Herman Decl., ¶¶ 21-22].  If GoDaddy had met and conferred, it might have discovered that its outside own counsel's efforts to view the web cache was the cause of the contamination or corruption.  [Herman Decl., Exh. 16].  That is precisely why Local Rule 37-1 contains a meet/confer requirement—to resolve discovery disputes before the Court has to be bothered.

In any event, there was no corruption or contamination.  The Academy's counsel kept a copy of the 258MB web cache zip file that it sent to GoDaddy.  [Herman Decl., ¶ 21].  Upon review, the Academy's counsel and Presbrey can open and view the zip file sent to GoDaddy, which shows that the dates/times associated with each file are intact.  [Presbrey Decl., ¶13, Exh. B].  Thus it is

---

[11]  Mr. Kunkel's failure to testify on this issue is not an oversight—he simply isn't qualified.  Mr. Kunkel provides "litigation support to attorneys and project management of our computer forensic and electronic discovery specialists."  While possibly skilled in computer forensics, very little of his experience relates to the Internet, programming, Internet advertising, or Parked Pages.

Compare that to Presbrey, who works with and under Tim Berners-Lee, the inventor of the Web; Presbrey meets Mr. Berners-Lee semimonthly.  Presbrey also has deep involvement with Internet advertising, having started and sold several companies in that space.  Presbrey also is "very familiar with Google's advertising systems," including how Google technically provides advertising content to GoDaddy's Parked Pages.  [Herman Decl. Exh. 15, at 14-15, 17-19, 24-25, 253-254].

puzzling why GoDaddy contends the date/time were altered. The Academy will bring a thumb drive to the hearing with the exact same file produced to GoDaddy for the Court's inspection.

**The caselaw cited by GoDaddy is inapposite:** Finally, GoDaddy cites only a single case in support of its request to image the computers. *Dawe v. Corrections USA*, 263 F.R.D. 613 (E.D. Cal. 2009) is inapposite to the facts here. In *Dawe*, the non-movant did not produce any computer data at all. *Id.*, at 619. Here, the Academy has produced literally mountains of ESI—257 GB of data from the Linux Server and 320 MB of unzipped data from the Dell PC web cache.

Also, in *Dawe*, there had been previous computers that were "forensically cleaned" prior to inspection. *Id.*, at 619. There are no such allegations here.

Finally, the web cache is by definition temporary back-up storage that is constantly overwritten. [Presbrey Decl., ¶¶ 3, 9-10]. The Academy has produced the actual source files themselves in the 257 GB of data from the Linux Server— Presbrey copied everything on the Linux Server and produced it. [Herman Decl., Exh. 15, at 67, 81, 157-159]. There is no need for the transient web cache, which does not cache "dynamic" information anyway, when the Academy already produced the actual source files themselves. [Herman Decl., Exh. 12].

**E.     The Academy Already Supplemented its Interrogatory Responses**

The Academy previously agreed to supplement its discovery responses to reflect the deposition of Presbrey, specifically stating it would do so "by the second week of December." [Herman Decl., ¶16, Exh. 12]. Instead of waiting, GoDaddy sent the Academy its portion of this Joint Stipulation on December 13. The Academy subsequently supplemented its responses to the complained of interrogatories on December 17. [Herman Decl. ¶17, Exhs. 13-14].

**F.     Another 30(b)(6) Deposition of the Academy on Topics 2, 6, and 10 is not Appropriate**

Everyone agrees that the Academy's 30(b)(6) witness (in-house counsel Scott Miller) testified extensively about what the Academy does to police its trademarks (including using Quinn Emanuel and a trademark watch service).  All parties also agree that the Academy and Mr. Miller relied on outside litigation counsel in this litigation to identify the Parked Pages and screenshots-at-issue.  Finally, it is undisputed that nobody from the Academy (including Mr. Miller) ever worked with or spoke to Presbrey.  Despite these undisputed facts, GoDaddy nevertheless asks for yet another 30(b)(6) deposition of the Academy specifically on the Presbrey issues—essentially asking the Academy to educate itself on what outside litigation counsel and Presbrey did so that it can produce a 30(b)(6) witness to testify about a subject on which the Academy has no knowledge.

"Rule 30(b)(6) only requires a corporate witness to 'testify about information known or **reasonably available** to the organization,' not to arm its witnesses with information outside of its corporate knowledge Fed.R.Civ.P. 30(b)(6)." *Medicines Co. v. Mylan Inc*., 2013 WL 120245, at *4-5 (N.D. Ill. 2013) (emphasis added).  Here, the only persons with knowledge as to Topics 6, 7 and 10 were the Academy's outside counsel and Presbrey, the litigation consultant retained by outside counsel.  The Academy is not required to look outside of its knowledge in order to educate a witness.  Mr. Miller already testified to best of the Academy's knowledge.

The fact that outside counsel or Presbrey had better or more accurate knowledge about these topics does not mean that the Academy's witness was not adequately prepared or failed to investigate.  Otherwise, all corporate parties would be required to educate themselves about what their outside litigation counsel did during the course of the litigation and testify about it in a 30(b)(6) deposition.

In any event, the deadline for discovery in this case closed on March 4, 2013.  On June 21, 2013, Judge Collins re-opened discovery "***for the limited purpose*** of allowing the Academy to disclose Presbrey and GoDaddy to depose him."  [Dkt. 492, Herman Decl. Exh. 6, at 12-13 (6/21/13 Order re Motions to Exclude) at 12 (emphasis added); *see also* Dkt. 491, Herman Decl. Exh. 4 (6/21/13 MSJ Order) at 17 (discovery deadline extended "as to the Academy's witness Joe Presbrey" only)].  The Court's order does not permit GoDaddy to reopen Rule 30(b)(6) or any other fact discovery from the Academy.

## G.    The Academy's Conclusion

Judge Collins re-opened discovery for the limited purpose of authentication of the screenshots-at-issue on summary judgment.  Despite receiving 257 GB of data from the Linux Server and 330 MB of data from the web cache on the Dell "Screenshot Bot" PC and despite taking a full 7-hour deposition of Presbrey, GoDaddy is now trying to turn this limited re-opening of discovery into a wide-ranging forensic examination of computers, another Presbrey deposition, and another 30(b)(6) deposition of the Academy.

This attempt by GoDaddy should not be countenanced, especially since (1) GoDaddy's own data in Exhibit N actually corroborates the Presbrey screenshots-at-issue; (2) GoDaddy never bothered to meet/confer on the alleged contamination of the 330 MB web cache before filing this motion; and (3) GoDaddy failed to ask a single question about alleged time/date discrepancies at the full 7-hour Presbrey deposition, thereby waiving its complaints now.


DATED: April 1, 2013            By  /s/ Enoch Liang

                                BOIES, SCHILLER & FLEXNER, LLP
                                Stuart Singer (*pro hac vice*)
                                David Nelson (*pro hac vice*)
                                401 East Las Olas Blvd., Suite 1200
                                Fort Lauderdale, FL 33301

1

Telephone: (954) 356-0011
Facsimile: (954) 356-0022
*Attorneys for Plaintiff*

2

3

4

LEE TRAN & LIANG APLC
James M. Lee, California Bar No. 192301
Enoch H. Liang California Bar No.  212324
601 South Figueroa Street, Suite 4025
Los Angeles, CA 90017
Telephone: (213) 612-3737
Facsimile: (213) 612-3773
*Additional Attorneys for Plaintiff*

5

6

7

8

9

10

FOOTE, MEYERS, MIELKE FLOWERS  LLC
Kathleen Chavez (*pro hac vice*)
Matthew Herman (*pro hac vice*)
30 North LaSalle Street, Suite 2340
Chicago, IL 60602
Telephone: (630) 232-6333
Facsimile: (630) 845-8982
*Additional Attorneys for Plaintiff*

11

12

13

14

15

16

DATED:  April 1, 2013              By  /s/ *Aaron McKown*       _

17

18

WRENN BENDER, LLP
Aaron M. McKown
Paula L. Zecchini
2 Park Plaza, Suite 550
Irvine, CA 92612
Tel: 949.202.5818
Fax: 949.679.7939
*Attorneys for Defendant*

19

20

21

22

23

24

25

26

27

28

## Certificate of Service

Pursuant to L.R. 5–3, I hereby certify that on December 24, 2013, I electronically filed the foregoing document, JOINT STIPULATION RE: DEFENDANT'S MOTION TO COMPEL THE INSPECTION OF PRESBREY-RELATED COMPUTERS, PRODUCTION OF SUPPLEMENTAL RESPONSES, AND PRODUCTION OF A QUALIFIED 30(B)(6) WITNESS, with the Clerk of the Court by using the CM/ECF system and that the foregoing document is being served on all counsel of record identified below via transmission of Notice of Electronic Filing generated by CM/ECF:

| | |
|---|---|
| Enoch H. Liang<br>James M. Lee<br>**Lee Tran & Liang APLC**<br>601 South Figueroa Street, Suite 4025<br>Los Angeles, CA 90017 | Attorneys for Plaintiff Academy of Motion Picture Arts and Sciences<br>Phone:  213-612-3737<br>Fax:  213-612-3773<br>E-mail: jml@ltlcounsel.com;<br>ehl@ltlcounsel.com |
| Stuart Singer<br>David Nelson<br>**Boies, Schiller & Flexner LLP**<br>401 East Las Olas Blvd., Suite 1200<br>Fort Lauderdale, FL 33301 | Phone:  954-356-0011<br>Fax:  954-356-0022<br>E-mail:  ssinger@bsfllp.com;<br>dnelson@bsfllp.com |
| David Michels, Esq.<br>David L. Zifkin, Esq.<br>**Boies, Schiller & Flexner LLP**<br>401 Wilshire Blvd., Suite 850<br>Santa Monica, CA  90401 | Phone:  310-752-2400<br>Fax:  310-752-2490<br>Email:  dzifkin@bsfllp.com;<br>dmichaels@bsfllp.com |
| Robert M. Foote<br>Kathleen Chavez<br>Matthew Herman<br>**Foote, Mielke, Chavez & O'Neil LLC**<br>10 West State Street, Suite 200<br>Geneva, IL 60134 | Phone:  630-232-6333<br>Fax:  630-845-8982<br>E-mail:  rmf@fmcolaw.com;<br>kchavez@fmcolaw.com;  and<br>mherman@fmcolaw.com |

_Carlie Peisley_
_____
CARLIE PEISLEY