UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: | CV 10-03738-AB (CWx) | Date: | April 10, 2015 |
|---|---|---|---|

| Title: | *Academy of Motion Picture Arts and Sciences v. GoDaddy.com, Inc.* |
|---|---|

| Present: The Honorable | ANDRÉ BIROTTE JR. |
|---|---|

| Carla Badirian | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Appearing | None Appearing |

**Proceedings:**   [In Chambers] Order GRANTING IN PART and DENYING IN PART Defendant GoDaddy.com, LLC's Motion for Partial Summary Judgment (Dkt. No. 606.)

    Defendant GoDaddy.com, LLC ("GoDaddy") moves for partial summary judgment in this consolidated action on four discrete issues.  (*Academy of Motion Picture Arts and Sciences v. GoDaddy.com, Inc., et al.*, No. CV 10-03738-AB (CWx). ("*AMPAS I*"), Dkt. No. 606.)  The Court **GRANTS** the motion **IN PART** and **DENIES** the motion **IN PART**.  As stated more fully below, GoDaddy is correct that Plaintiff Academy of Motion Picture Arts and Sciences' ("AMPAS") claims for violation of California's Unfair Competition Law ("UCL," Cal. Bus. & Prof. Code §17200, *et seq*.) and for attorneys' fees under California Code of Civil Procedure section 1021.5 fail as a matter of law.  GoDaddy is also correct that AMPAS's claims under the Anticybersquatting Consumer Protection Act ("ACPA," 15 U.S.C. §1125(d)) fail as a matter of law for the domains 2OSCARS.COM, OSCAR-2011.COM, and INTERNETACADEMYAWARDS.COM because AMPAS cannot prove GoDaddy ever "used" or "trafficked in" those domains.  However, there are triable issues of fact as to whether AMPAS's five registered trademarks at issue in this action are "famous" for the purposes of the ACPA and whether GoDaddy ever "used" or "trafficked in" the domain OSCARSMOVIES.COM.

## I. BACKGROUND

### A. GoDaddy's Parked Pages Program and AMPAS's Consolidated Complaints

AMPAS originally brought this action in 2010 in *AMPAS I*. Founded in 1927, AMPAS is a non-profit organization dedicated to advancing the motion picture arts and sciences. (*Id.* at ¶ 8; *AMPAS I* Dkt. No. 418, ¶1.)[1] Among its activities, AMPAS organizes an annual awards ceremony for the film industry, which is generally known as the "Academy Awards," or the "Oscars." (*AMPAS I* Dkt. No. 170, ¶8.) In their singular form, individual awards are known as an "Academy Award" or an "Oscar."[2] (*Id.*) AMPAS owns registered trademarks for the terms ACADEMY AWARD, ACADEMY AWARDS, OSCAR, OSCARS, and OSCAR NIGHT.[3] (*AMPAS I* Dkt. Nos. 170, ¶¶9-11; 418, ¶2.)

GoDaddy is "the world's leading ICANN-accredited[4] domain name registrar for .COM, .NET, .ORG, .INFO, .BIZ, and .US domain extensions." (*AMPAS I* Dkt. Nos.

---

[1] In briefing the instant motion, the parties largely omit any discussion or evidence of many background facts that the Court summarizes here for context. In addition to the undisputed facts set forth in the instant motion, the Court draws from a number of undisputed allegations set out in the operative Second Amended Complaint as well as undisputed facts set forth in the parties' previous cross motions for summary judgment. (Dkt. Nos. 341, 430.) Namely, the Court draws from the parties' respective reply statements of uncontroverted facts submitted in support of those earlier motions. (Dkt. Nos. 418, 470.) The Honorable Audrey B. Collins previously summarized many of these undisputed facts in her order granting in part and denying in part the parties' cross-motions for summary judgment. (Dkt. No. 491, pp. 3-6.)

[2] The Oxford English dictionary defines an "OSCAR" as an award given "annually since 1928 in Hollywood, United States by the Academy of Motion Picture Arts and Sciences" and "THE OSCARS" as "the ceremony at which these awards are presented." (Dkt. NO. 614-8.) The Oxford English Dictionary also defines "ACADEMY AWARD" as "any of various annual awards given by the Academy of Motion Picture Arts and Sciences…for achievement in a field connected with cinema." (Dkt. No. 614-9, p. 10.)

[3] The Court takes judicial notice that the U.S. Patent and Trademark Office ("USPTO") identifies AMPAS as the registered owner of the following marks: ACADEMY AWARD (USPTO Reg. No. 2,245,965), ACADEMY AWARDS (USPTO Reg. Nos. 1,103,895; 1,880,473; 1,956,313), OSCAR (USPTO Reg. Nos. 1,096,990; 1,118,751; 1,996,585; 2,021,582), OSCARS (USPTO Reg. No. 1,528,890), and OSCAR NIGHT (USPTO Reg. No. 2,029,445). These facts are not subject to reasonable dispute, and are quickly and easily verified through the USPTO's website (http://tmsearch.uspto.gov). Fed. R. Evid. 201.

[4] "The Internet Corporation for Assigned Names and Numbers ("ICANN") is a nonprofit corporation that governs the Internet. It was established in 1998 and is officially recognized by the U.S. Department of Commerce as the global, non-profit consensus organization designed to carry on administration of the Internet name and address system. ICANN has four mandates, each in a different stage of completion. First, ICANN bears responsibility for overseeing the infrastructure of the Internet. Second, it bears responsibility for ensuring competition among domain name registrars of the [top-level domains on the

170, ¶15; 470, ¶1.) In addition to registering domain names, GoDaddy permits customers to "park" a domain with GoDaddy using GoDaddy's Parked Pages Program. (*AMPAS I* Dkt. No. 470, ¶4.) It is this Parked Pages Program that is the subject of this action and the instant motion. To understand what it means to "park" a "domain," it is important to first understand some basic facts about the structure of the Internet.

"On the Internet, computers find each other by reference to Internet Protocol (IP) addresses, which are a series of numbers that are used to specify the address of a particular machine connected to the Internet." *Columbia Ins. Co. v. seescandy.com*, 185 F.R.D. 573, 575 (N.D. Cal. 1999). However, long strings of numbers are difficult to remember, so the architects of the internet developed the concept of a "domain name." "Domain names are alphanumeric strings that are associated with particular IP addresses. Thus to find the computer at 129.99.135.66, a user might type in uscourts.gov, and would never need to know the actual IP address." *Id*. The Internet utilizes a universal Domain Name System ("DNS"), which consists of a network of "name servers" that maintain an active database associating domain names with their corollary IP addresses. *Id*. "Thus when a user types in a domain name, a message is sent to a name server which accesses the DNS, looks up the domain name, associates it with an IP address, and takes the user to that IP address." *Id*.

Generally one registers a domain name to link it to a particular website hosted at a particular IP address. But this is not always the case. Sometimes a person or an organization will register a domain name without linking that domain to a particular IP address. When someone registers a domain but does not wish to associate that domain name with an IP address, GoDaddy gives that person two options. First, the registrant may configure the name server to omit any associated IP address. (*AMPAS I* Dkt. No. 418, ¶10.) If a registrant chooses this option and someone types the domain name into their Internet browser, the browser will display an error message reflecting that no such website exists. (*Id*.)

Second (and important for the instant action), a registrant may choose to "park" its domain name with GoDaddy. (*AMPAS I* Dkt. No. 418, ¶11.) When a registrant "parks" a domain with GoDaddy, they associate that domain name with one of GoDaddy's "parked page servers" in the DNS. (*Id*.) Once a registrant "parks" its domain with GoDaddy, users who type the domain name into their internet browser will no longer receive an error message, but will be directed to a dynamically-created website on one of GoDaddy's servers. (*Id*. at ¶¶14, 68.) This second option is known as GoDaddy's Parked Pages

---

Internet]. Third, ICANN bears partial responsibility for establishing domain name dispute resolution policies. And, fourth, ICANN bears responsibility for determining whether and when to add new" top-level domains to the Internet. *Lockheed Martin Corp. v. Network Solutions, Inc*., 141 F. Supp. 2d 648, 651 (N.D. Tex. 2001).

Program. A registrant who fails to associate their website with an IP address is entered into the Parked Page Program by default unless the registrant chooses a different option. (*Id*. at ¶¶12, 13.)

GoDaddy's Parked Pages Program monetizes parked domain names by dynamically creating a website with advertisements from GoDaddy and GoDaddy's advertising partner (Google) that are contextual to the domain name. (*AMPAS I* Dkt. Nos. 418, ¶ 24; 470, ¶4, 6, 10 .) GoDaddy's Parked Pages Program consists of two sub-programs. The first, known as "Free Parking," is the default option. (*AMPAS I* Dkt. No. 470, ¶5.) Under the Free Parking option, GoDaddy keeps all of the advertising revenue generated from the parked page whenever an Internet user visits the parked page and clicks on an advertisement. (*AMPAS I* Dkt. No. 470, ¶4, 13.) The second option is known as "Cash Parking." With cash parking, a domain registrant chooses to pay GoDaddy a fee in exchange for sharing in the ad revenue generated from ad-clicks on the parked page. (*Id*. at ¶9; *AMAPA I* Dkt. No. 418, ¶30-32.)[5]

These consolidated lawsuits concern certain registered domains enrolled in GoDaddy's Parked Page Program that include at least part of one or more of AMPAS's marks in the domain name (e.g., 2011OSCARS.COM or OSCARWINNERS.NET). (*See, e.g.*, Dkt. No. 170, ¶ 35.) At their heart, these consolidated actions allege that, by enrolling domain names with AMPAS's marks in the Parked Pages Program, GoDaddy has "intentionally used domains that it knew or should have known infringed on" AMPAS's marks and unlawfully profited off of those marks with advertising revenue. (*See AMPAS I*, Dkt. No. 170, ¶¶22,-24, 35, 44; *AMPAS II*, Dkt. No. 23, ¶¶19-21, 30, 35.) AMPAS first brought suit in *AMPAS I* in 2010, and subsequently brought suit for identical relief related to identical marks, but concerning different domain names in *Academy of Motion Picture Arts and Sciences v. GoDaddy.com, Inc., et al* ("*AMPAS II*")., No. CV 13-08458-ABC (CWx) in 2013. On March 27, 2014, the Honorable Audrey B. Collins consolidated *AMPAS I* and *AMPAS II* for all purposes, including trial. (*AMPAS I*, Dkt. No. 548; *AMPAS II*, Dkt. No. 45.)

In these consolidated proceedings, AMPAS asserts causes of action against GoDaddy for:[6]

---

[5] *See also uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421, 425 (7th Cir. 2010) (summarizing GoDaddy's Parked Pages Program).

[6] AMPAS also alleges a claim for contributory cybersquatting under the ACPA against GoDaddy in *AMPAS I*. (*AMPAS I*, Dkt. No. 170, ¶¶106-110.) On June 21, 2013, Judge Collins denied GoDaddy's motion for summary judgment on that claim (*AMPAS I*, Dkt. No. 491, pp. 26-28), and GoDaddy does not seek summary judgment on that claim now. However, on December 4, 2013, the Ninth Circuit held "that there is no cause of action for contributory cybersquatting under the ACPA." *Petroliam Nasional Berhad v. GoDaddy.com, Inc*., 737 F.3d 546, 554 (9th Cir. 2013). When AMPAS filed its First Amended Complaint in *AMPAS II* two weeks after the Ninth Circuit's holding in *Petroliam Nasional*, AMPAS

- Violation of the ACPA;

- Violation of California's UCL – Unfair Conduct

- Violation of California's UCL – Unlawful Conduct

### B.     Prior Summary Judgment Orders

The parties filed an initial round of cross-motions for summary judgment in March of 2013. (*AMPAS I*, Dkt. Nos. 341, 430.) In an order granting the motions in part and denying them in part, Judge Collins made a number of rulings relevant to the instant motion. First, Judge Collins held that AMPAS's claim for violation of the ACPA includes

"four elements: [¶]

    (1)  the plaintiff's mark is distinctive or famous; [¶]

    (2)  the accused domain name is identical or confusingly similar to the plaintiff's mark, or, if the mark is famous, the domain name is dilutive of the mark; [¶]

    (3)  the defendant registered, trafficked in, or used the accused domain name; and [¶]

    (4)  the defendant acted with bad faith."

(*AMPAS I*, Dkt. No. 493, p. 10.) As to the first element, Judge Collins held AMPAS's five registered marks are "distinctive" as a matter of law, and granted AMPAS's motion for summary judgment on that point. (*AMPAS I*, Dkt. No. 493, p. 10; *see also AMPAS I*, Dkt. No. 430, p. 13 (AMPAS's prior motion for summary judgment seeking determination that its marks are "distinctive" as a matter of law).) On the related question of whether AMPAS's marks were "famous" as a matter of law, Judge Collins held AMPAS had not met its burden and concluded there was a triable issue of fact as to whether AMPAS's marks are "famous." (*AMPAS I*, Dkt. No. 493, pp. 10-11; *see also* Dkt. No. 430, pp. 13-14 (AMPAS's prior motion for summary judgment seeking determination that its marks are "famous" as a matter of law).)

---

dropped its claim for contributory cybersquatting in *AMPAS II*. (*See AMPAS II*, Dkt. No. 20.) It is unclear whether AMPAS continues to pursue its claim for contributory cybersquatting in *AMPAS I* notwithstanding the Ninth Circuit's holding in *Petroliam Nasional*. If AMPAS intends to abandon that claim in *AMPAS I* (as it did in *AMPAS II*), the Court encourages the parties to stipulate to dismissal of that claim under Fed. R. Civ. Proc. 41(a) in an effort to streamline the pleadings. However, if AMPAS intends to pursue its claim for contributory cybersquatting in *AMPAS I*, the Court will address the issue at an appropriate time.

Judge Collins further held that GoDaddy "uses" and "traffics" in domain names enrolled in its Parked Pages Program for the purposes of the ACPA (15 U.S.C. §1125(d)(1)(A)(ii) and granted AMPAS's motion for summary judgment on that point. (*AMPAS I*, Dkt. No. 493, pp. 12-17; *see also* Dkt. No. 430, pp. 16-22 (AMPAS's motion for summary judgment seeking determination that GoDaddy "uses" and "traffics in" domain names enrolled in its Parked Pages Program).) However, Judge Collins concluded that AMPAS failed to meet its burden to present undisputed evidence "that the accused domain names are in fact in the Parked Pages Program." (*AMPAS I*, Dkt. No. 493, p. 17.) On that point, Judge Collins decided to "wait until the evidence is properly disclosed, developed, and presented." (*Id.*)

On the element of confusing similarity, Judge Collins concluded after a lengthy analysis that the ACPA demands an objective, facial comparison between a domain name and a trademark to determine whether the domains are "confusingly similar" to the mark. (*AMPAS I*, Dkt. No. 493, pp. 17-24.) Nonetheless, Judge Collins declined to rule on the parties' competing assertions that various domain names were or were not confusingly similar as a matter of law until the parties' presented Judge Collins with a "unified list" of the domain names at issue. (*Id.* at p. 24.) On the alternative question of whether a domain is "dilutive of" a famous mark, Judge Collins held the ACPA "imposes liability for domain names that have a tendency to dilute a famous mark" and not a showing that the domain has *actually diluted* the mark. (*Id.*, at pp. 25-26.) Judge Collins did not determine whether any particular domain name at issue in the litigation was "dilutive of" AMPAS's marks as a matter of law.

Subsequent to the June 21, 2013 order on the parties' cross-motions for summary judgment, the parties submitted two joint lists of domain names for a determination on the issue of confusing similarity. (*AMPAS I*, Dkt. Nos. 506, 507.) Upon receipt of those joint lists, Judge Collins issued a second order granting in part and denying in part the parties' cross motions for summary judgment. (*AMPAS I*, Dkt. No. 508.) In that follow-up order Judge Collins held that a number of domain names at issue in this litigation are confusingly similar to AMPAS's registered marks as a matter of law while a number of other domain names were not. (*AMPAS I*, Dkt. No. 508.) After consolidating the *AMPAS I* and *AMPAS II* matters, AMPAS moved for partial summary judgment on 88 additional domain names at issue in *AMPAS II*. (*AMPAS I*, Dkt. No. 563.) Judge Collins granted the motion, holding that each of the 88 domain names set forth in that motion were confusingly similar to AMPAS's marks and adopted the remainder of her rulings from the *AMPAS I* cross-motions to apply in *AMPAS II*. (*AMPAS I*, Dkt. Nos. 568, 569.)

      **C.**    **The Instant Motion and Undisputed Evidence**

GoDaddy now moves for partial summary judgment on a handful of issues. First, GoDaddy contends AMPAS cannot prevail on its claim that certain domain names are

"dilutive of" AMPAS's marks because AMPAS has not produced any evidence to support a finding that its marks are "famous." (*AMPAS I*, Dkt. No. 606-1, pp. 6-11.) GoDaddy further argues that AMPAS cannot prove GoDaddy "trafficked in" or "used" four specific domain names at issue in this action because AMPAS failed to produce any evidence that those four domains were ever enrolled in the Parked Pages Program. (*Id*. at pp. 11-12.) GoDaddy next seeks summary judgment of AMPAS's causes of action under California's UCL because AMPAS cannot prove it is entitled to either injunctive relief or restitution – the only two remedies available under that statute. (*Id*. at pp. 12-17.) Finally, GoDaddy moves for summary judgment of AMPAS's prayer for attorneys' fees under California Code of Civil Procedure section 1021.5. (*Id*. at pp. 17-25.) Because each issue is relatively discrete, the Court summarizes the relevant undisputed evidence separately as it discusses each issue below.

## II.   Legal Standard

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine issue of fact." *Mende v. Dun & Bradstreet, Inc.*, 670 F.2d 129, 132 (9th Cir. 1982) (quoting Advisory Committee Notes to Rule 56). An issue is "disputed" for the purposes of summary judgment so long as "reasonable minds could differ as to the import of the evidence… ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). In determining whether summary judgment is appropriate, the court may not weigh evidence to resolve disputed questions (*Chevron Corp. v. Pennzoil, Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992)), and must draw all reasonable inferences in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, the "existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson*, 477 U.S. at 251. "The mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient… ." *Id*., at 252. To avoid summary judgment "there must be evidence on which the jury could reasonably find for the" party opposing summary judgment in light of the "substantive evidentiary burden" applicable at trial. *Id*., at 252, 254.

The party moving for summary judgment bears the initial burden of demonstrating with admissible evidence that there is no disputed issue of material fact as to a claim for relief or affirmative defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may meet this burden in one of two ways. In its most traditional form, a party may obtain summary judgment by submitting uncontroverted evidence that affirmatively disproves an essential element of the opposing party's claim or defense. *Adickes v. S.H. Kress & Co.* 398 U.S. 144, 158-60 (1970). This is sometimes referred to

as the "tried-and-true" form of summary judgment. Alternatively, the moving party may carry its initial burden by demonstrating that the opposing party lacks sufficient evidence to prove its claim or affirmative defense at trial. Fed. R. Civ. Proc. 56(c)(1)(B); *Celotex*, 477 U.S. at 325. This form of summary judgment is sometimes known as a "no evidence" motion for summary judgment, and summary judgment on that ground will only lie after the opposing party has had an adequate opportunity to conduct discovery. Fed. R. Civ. Proc. 56(d); *Celotex Corp. v. Catrett*, 477 U.S. at 326.

Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to show a triable issue of material fact. At that point, "[t]he non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial." *Fed. Ins. Co. v. Burlington N. & Santa Fe Ry. Co.*, 270 F.Supp.2d 1183, 1185 (C.D. Cal. 2003). The party opposing summary judgment may "not rest on his allegations … to get to a jury" and avoid summary judgment. *Anderson*, 477 U.S. at 249. "[I]nstead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Fazio v. City & County of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997) (quoting *Anderson*, 477 U.S. at 249). The question is not whether the non-moving party is able to muster *any* evidence that would support its claim for relief but "whether [the evidence] is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52 Nor can a party oppose summary judgment based on theories of liability or affirmative defenses not set forth in the pleadings because "the issues in the complaint guide the parties during discovery and put the defendant on notice of what evidence is necessary to defend against the allegations." *Ortiz v. Lopez*, 688 F.Supp.2d 1072, 1082 (citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292–1293 (9th Cir.2000).

If a nonmoving party fails to properly address the moving party's assertions of undisputed fact, courts may consider the fact undisputed for the purposes of the motion. Fed. R. Civ. P. 56(e)(2); Local Civ. R. 56-3. The Court may grant summary judgment if the facts considered undisputed by virtue of the nonmoving party's failure to address them) show that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(e)(3); Local Civ. R. 7-12.

///

///

///

### III. Discussion

The Court addresses each of GoDaddy's bases for partial summary judgment in turn.

### A. "Famous" Marks Under the ACPA

Judge Collins already held, and GoDaddy does not dispute in this motion, that AMPAS's five marks at issue in this litigation are "distinctive" trademarks as that term is used in the ACPA. 15 U.S.C. §1125(d)(1)(A)(ii)(I). Because Judge Collins additionally held that GoDaddy "traffics in" and "uses" domains enrolled in its Parked Pages Program and that many of the domains at issue in this action are "confusingly similar" to AMPAS's marks, AMPAS may establish liability under the ACPA so long as AMPAS is able to prove:

(1) the confusingly similar domains were enrolled in the Parked Pages Program; and

(2) GoDaddy had a bad faith intent to profit from AMPAS's marks.

15 U.S.C. §1125(d)(1)(A). With the exception of four domains (discussed in section III.B, below), AMPAS's ability to prove those remaining elements as to the "confusingly similar" domain names is not at issue in this motion.

Rather, this motion concerns a more limited number of 14 domain names which Judge Collins held were not "confusingly similar." (*AMPAS I*, Dkt. No. 606-1, p. 11; Dkt. No. 631-4, ¶6.) As to those marks, AMPAS may still establish liability under the ACPA notwithstanding the fact that they are not confusingly similar if AMPAS can *also* prove:

(1) its marks were "famous" at the time the 14 domain names were registered; and

(2) that the 14 domain names are "dilutive of" AMPAS's marks.

15 U.S.C. §1125(d)(1)(A)(ii)(II). As to those 14 domain names, GoDaddy contends AMPAS cannot prevail as a matter of law because AMPAS has failed to produce sufficient evidence to support a finding that AMPAS's marks are "famous." (*AMPAS I*, Dkt. NO. 606-1, pp. 7-11.)

#### 1. GoDaddy's Undisputed Evidence

Between 2007 and 2011, AMPAS spent an average of $2,000,000 per year on advertising. (Dkt. No. 631-4, ¶3.) However, in this litigation, AMPAS did not conduct a consumer survey to assess consumer recognition of AMPAS's marks, nor did AMPAS designate a consumer survey expert to provide testimony about consumer recognition of AMPAS's marks. (*Id.* at ¶¶4, 5.)

#### 2. AMPAS's Undisputed Evidence

Between 36.3 million and 43.7 million viewers watched the Academy Awards ceremony from 2009 to 2014. (*AMPAS I*, Dkt. No. 631-4, ¶27.) In 2010, the cost of a

30-second advertising segment during the annual televised Academy Awards ceremony was $1.4 million, which increased to $1.8 million by 2013. (*Id.* at ¶28.) The Academy Awards annual ceremony receives extensive media coverage each year, including in the most widely circulated newspapers and magazines in the United States. (*Id.* at ¶31.) Because of the widespread interest in the annual awards ceremony, AMPAS licenses its trademarks for substantial sums of money.[7] Both "Oscar" and the "Academy Awards" have their own entries in the Oxford English Dictionary, referring specifically to AMPAS's annual awards ceremony. (*Id.* at ¶34-35.) Similarly, the Encyclopedia Britannica includes an entry for the Academy Awards, noting that winning an award frequently "bestow[s] international recognition and prestige," "can significantly increase the box office earnings of a winning film," and frequently results in "higher salaries and increased media attention" for winning actors and directors. (*Id.* at ¶36; Dkt. No. 614-10.) Indeed, GoDaddy's own expert in this action noted an article from October 2007 hailing AMPAS's marks as among the "fifteen most recognizable marks in the world…." (*AMPAS I*, Dkt. Nos. 631-4, ¶37; 429, Exh. 24, ¶18.)

### 3. Whether AMPAS's Marks Are Famous Is a Triable Issue of Fact

A trademark is "famous if it is widely recognized by the general consuming public of the United States." 15 U.S.C. §1125(c)(2)(A). The Lanham Act provides a non-exclusive list of four factors to consider when determining whether a mark is sufficiently "widely recognized" to enjoy the additional protections famous marks enjoy:

   i. The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

   ii. The amount, volume, and geographic extent of sales of goods or services offered under the mark.

   iii. The extent of actual recognition of the mark.

   iv. Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. §1125(c)(2)(A).

As one leading commentator observes, famousness "is a difficult and demanding requirement," and "is difficult to prove." 4 McCarthy on Trademarks and Unfair

---

[7] The evidence of the specific value of AMPAS's licensing agreements is filed under seal in this action. (*AMPAS I*, Dkt. No. 429, Exh. 24, ¶¶9, 18.) Rather than repeat the numbers here and require the Court to file a portion of this order under seal, the Court thinks it sufficient to note that the numbers are significant by any objective standard. GoDaddy does not dispute this point. (*See* Dkt. No. 631-4, ¶33.)

Competition § 24:104 (4th ed.) (quoting *Coach Services, Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373); *accord Everest Capital, Ltd. v. Everest Funds Mgmt. LLC*, 393 F.3d 755, 763 (8th Cir.2005) ("The judicial consensus is that 'famous' is a rigorous standard.") To qualify as a "famous" mark, then, "the mark must be a household name" and "a part of the collective national consciousness." *Thane Int'l v. Trek Bicycle Corp*, 305 F.3d 894, 911-912 (9th Cir. 2002) (superseded by statute on other grounds as stated in *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1069 (9th Cir. 2015). Generally, whether a mark has reached this level of widespread recognition is a question of fact for the trier of fact, not summary judgment. *See, e.g. Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 635 (9th Cir. 2007) (reversing summary judgment because reasonable jury could conclude "HOT WHEELS" mark was famous where evidence showed mark had "been in use for over thirty-seven years; 350 million dollars ha[d] been expended in advertising the mark; three billion HOT WHEELS units ha[d] been sold since the inception of the mark; and HOT WHEELS [were] sold in all fifty states and throughout the world").

GoDaddy contends AMPAS cannot make this admittedly stringent showing that its marks are famous "based solely on nominal evidence of its advertising expenditures form 2007 to 2011 – expenditures that averaged $2 million a year from 2007 to 2010 and just over $4 million in 2011." (*AMPAS I*, Dkt. No. 606-1, p. 8.) Though perhaps true, this point is irrelevant as it misstates the evidence in the record. AMPAS has submitted significant evidence to demonstrate the widespread recognition of its marks, including evidence from GoDaddy's own expert that AMPAS's marks are among *the top 15 most recognizable marks in the world*. AMPAS has been operating the awards ceremony for close to 90 years, and the ceremony "has been televised annually since 1953, and is seen across the United States and throughout the world." *Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1454-55 (9th Cir. 1991). AMPAS's awards ceremony is quite literally the definition of the terms "Oscar" and "Academy Award" – both marks have their own entries in the Oxford English Dictionary and are discussed in the Encyclopedia Britannica. "When a trademark attains dictionary recognition as a part of the language, we take it to be reasonably famous." *B.V.D. Licensing Corp. v. Body Action Design, Inc.*, 846 F.2d 727, 728 (Fed. Cir. 1988); *accord Self-Insurance Institute of America, Inc. v. Software and Information Industry Ass'n*, 208 F. Supp. 2d 1058, 1077 (C.D. Cal. 2000) (same).

GoDaddy contends the fact that the "OSCAR" and "ACADEMY AWARD" marks are defined in the Oxford English Dictionary actually supports a finding that the terms are not famous. (*AMPAS I*, Dkt. No. 631, pp. 8-9.) Though creative, this argument is unpersuasive. It may be that it is more difficult to show fame where a mark is a *preexisting* English word with a *preexisting* English definition because "whole swaths of the dictionary could be taken out of circulation." *Visa Int'l Service Ass'n v. JSL Corp.*, 610 F.3d 1088, 1092 (9th Cir. 2010). But the calculus is surely different where the definition is *added* to the dictionary expressly to reflect *the mark's prominence* in the

English language. GoDaddy offers nothing to suggest that there was any pre-existing definition of an Academy Award. To the contrary, the Oxford English Dictionary defines an Academy Award *exclusively* in relation to AMPAS's mark, and even identifies the term as "a proprietary name in the United States." (*AMPAS I*, Dkt. No. 614-9, Exh. 7, p. 10.) And even GoDaddy concedes that a mark with a preexisting use as a common word or a proper name (like "Oscar") may still be famous if "the common or proper noun uses of the term and third-party uses of the mark are now eclipsed by the owner's use of the mark" and "the mark has become the principal meaning of the word." (*AMPAS I*, Dkt. No. 631, p. 9 (quoting *Toro Co. v. ToroHead, Inc.*, 61 U.S.P.Q.2d 1164 (P.T.O. Dec. 12, 2001).) Though not dispositive, the Court notes the Oxford English Dictionary identifies AMPAS's marks as the *primary* definition of the terms "Oscar" and "the Oscars." The fame of the "OSCAR" (and derivative) marks may be a closer call than "ACADEMY AWARD" (and derivative) marks, but GoDaddy offers nothing to suggest it would be appropriate to make that call on summary judgment rather than at trial.

AMPAS's marks reach tens of millions of viewers in the United States every year who watch the annual awards ceremony – numbers that do not reflect the untold number of additional Americans who do not watch the awards ceremony but are exposed to the marks through the undisputed media saturation AMPAS's marks receive. *See TCPIP Holding Co., Inc. v. Haar Communications, Inc.*, 244 F.3d 88, 99 (2d Cir. 2001) (noting "press accounts" are one form of evidence a proponent of a "famous" mark may introduce to show widespread recognition). Indeed, more than 20 years ago Ninth Circuit identified the "OSCAR" mark as a quintessential example of a "famous" mark along with the likes of "TIFFANY, POLAROID, ROLLS ROYCE, [] KODAK" and "CENTURY 21." *Fruit of the Loom, Inc. v. Girouard*, 994 F.2d 1359, 1362-63 (9th Cir. 1993).[8] "[P]eople throughout the world associate the award with excellence in film" and "Oscar [can] be considered a relatively strong mark because it enjoys recognition among many members of our society." *Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1454-55 (9th Cir. 1991) (holding the mark for the Oscar statuette "should be given the strongest possible protection against infringement").

It may be that AMPAS has spent relatively little in advertising since 2007, but GoDaddy cites nothing to suggest a large advertising budget is a prerequisite to fame. Section 1125 itself speaks of the "*duration, extent, and geographic reach* of advertising

---

[8] The Ninth Circuit's illustration of TIFFANY as an example of a famous mark is significant in light of the Court's discussion above because, like "OSCAR," "TIFFANY" is a proper name that predates the famous "TIFFANY" mark. Nonetheless, TIFFANY is a household name. Likewise, an "apple" is a fruit, but "APPLE" has defined the way people interact with the world for the better part of a generation. It may be *difficult* for a mark to become a household name separate and apart from its linguistic namesake when so many people are still named "Tiffany," or "Oscar," and when so many people eat apples. But even difficult things are not impossible. "Because a thing is difficult for you, do not therefore suppose it to be beyond mortal power." Marcus Aurelius, *Meditations*, VI. 19 (trans. Maxwell Stainforth).

*and publicity* of the mark," not the size of an advertising budget. In fact, in light of the other evidence of the extensive reach of the "OSCAR"- and "ACADEMY AWARD"-related marks[9] and the extensive level of free publicity the marks receive in the media, it is equally possible to draw the opposite inference: that AMPAS's marks are so famous AMPAS does not need to advertise them. Whether that inference or any other is the appropriate one to make in light of the evidence is a question for trial, not summary judgment.

Nor does GoDaddy offer any authority to suggest that AMPAS's claim to fame cannot succeed as a matter of law without survey evidence. There is no dispute that "proper consumer surveys might be highly relevant to a showing of fame." *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 879 (9th Cir. 1999). But that is not the same as saying such surveys are necessary. *See Thane Int'l, Inc. v. Trek Bicycle Corp.*, *supra*, 305 F.3d at 912 (noting "surveys showing that a large percentage of the general public recognizes the brand, press accounts about the popularity of the brand, or pop-culture references involving the brand" all "provide *evidence* of fame," but not holding that any individual item of evidence is essential) (emphasis added). In fact, some marks are so are so widely ingrained in the popular culture that their fame may be subject to judicial notice, without the need for further evidence. *See I.P. Lund trading ApS v. Kohler Co.*, 136 F.3d 27, 47 (noting "some marks, such as COCA-COLA, may be so famous as to be judicially noticed"). While the Court need not decide on this motion whether the five "OSCAR"- and "ACADEMY AWARD"-related marks at issue in this litigation are so widely recognized that their fame is subject to judicial notice, it cannot conclude they are not famous as a matter of law simply because AMPAS fails to offer any survey evidence. *Apple, Inc. v. Samsung Electronics Co.*, No. 11-CV-01846-LHK, 2012 WL 2571719, at *8 (N.D. Cal. June 30, 2012) ("The factors to be established for fame are non-exhaustive, so survey results are not required."); *adidas-Am., Inc. v. Payless Shoesource*, Inc., 546 F. Supp. 2d 1029, 1063 n.12 (D. Or. 2008) ("Given the extensive evidence adidas submitted as to each of the statutory 'fame' factors, its failure to conduct a fame survey is not dispositive."); *Google Inc. v. Am. Blind & Wallpaper*, No. C 03-5340JF(RS), 2007 WL 1159950, at *11

---

[9] GoDaddy faults AMPAS for not offering evidence going to each of the five marks independently. (*AMPAS I*, Dkt. No. 631, pp. 4-5.) This argument is unpersuasive for several reasons. The first, and most important is that it presumes GoDaddy has met its initial burden to disprove this element of AMPAS's claim or to show that GoDaddy cannot make such a showing as a matter of law. Unless and until GoDaddy met that evidentiary burden, AMPAS had no obligation to offer any evidence in opposition whatsoever. Fed. R. Civ. Proc. 56(a), (e)(3). As discussed more fully herein, GoDaddy's evidence that AMPAS failed to conduct a market survey and spend an average of $2 million per year on advertising its marks between 2007 and 2011 fall woefully short of meeting that burden. Moreover, although the action involves five separate marks, two of those – "OSCARS" and "ACADEMY AWARDS" – are merely the plural form of two of the other marks. Likewise, the fifth mark "OSCAR NIGHT" is, though technically distinct, derivative of the "OSCAR" mark. Finally, all five marks refer to the same annual event. Though not one single "mega mark" (*see AMPAS I*, Dkt. No. 631, p. 4), it is almost guaranteed that the evidence as to all five marks will largely be identical.

(N.D. Cal. Apr. 18, 2007) ("ABWF has not conducted a fame survey, but its failure to perform such a survey is not dispositive of the question before the Court").

The record shows, at minimum, a triable issue of fact on the famousness of AMPAS's marks. GoDaddy does not separately move for summary judgment on whether any of the 14 domains at issue in this portion of the motion are actually "dilutive of" AMPAS's marks, and the Court **DENIES** GoDaddy's motion for partial summary judgment on AMPAS's theory of dilution predicated on a showing of famousness.[10]

### B. "Trafficking In" or "Using" Four Specific Domains

To succeed on its claims under the ACPA, AMPAS must prove GoDaddy "register[ed], traffic[ked] in, or use[ed]" each of the domain names at issue. 15 U.S.C. §1125(d)(1)(A)(ii). As discussed above, Judge Collins previously held that enrolling a domain in GoDaddy's Parked Pages Program constituted "use" or "trafficking in" that domain for the purposes of the ACPA. However, Judge Collins concluded AMPAS failed to provide undisputed evidence that any of the domains at issue were ever enrolled in the Parked Pages Program, and deferred ruling on that limited question until the record was more fully developed. GoDaddy now moves for summary judgment on AMPAS's claims as they relate to four specific domains:

1. INTERNETACADEMYAWARDS.COM;
2. 2OSCARS.COM;
3. OSCARMOVIES.COM; and
4. OSCAR-2011.COM

(*AMPAS I*, Dkt. No. 606-1, pp. 11-12.) GoDaddy contends AMPAS has failed to produce any evidence that those four domain names were ever enrolled in the Parked Pages Program and, therefore, AMPAS cannot prove GoDaddy ever "used" or "trafficked in" them. (*Id.*)

AMPAS concedes it has no evidence that the domains OSCAR-2011.COM and INTERNETACADEMYAWARDS.COM ever participated in the Parked Pages Program. (*AMPAS I*, Dkt. No. 614, pp. 7-8.) AMPAS states it is "no longer pursuing [those] two domain names in this action" and effectively concedes that summary judgment is appropriate as to them. (*Id.* at p. 8 n.10.) The Court agrees and **GRANTS** the motion as to the domains INTERNETACADEMYAWARDS.COM and OSCAR-2011.COM. AMPAS cannot succeed on its claims as to those domains as a matter of law.

---

[10] Because the Court independently concludes there is a triable issue of fact on this question, the Court does not separately address AMPAS's contention that Judge Collins' prior finding of a triable issue of fact on this issue constitutes the law of the case. (*See AMPAS I*, Dkt. Nos. 614, pp. 2-3; 631, p. 3.)

With respect to the domain 2OSCARS.COM, AMPAS cites to three computer screenshots it claims prove that "consumers who entered this domain name in their web browser in December 2011 would be directed to a GoDaddy parked page." (*AMPAS I*, Dkt. No. 614, p. 8; Dkt. Nos. 614-23, 614-24, 614-25.) The first of those screenshots appears to display a GoDaddy parked page with advertisements, but offers no indication of the domain associated with those screenshot. (*AMPAS I*, Dkt. Nos. 614-23.) The second also appears to display a GoDaddy parked page with advertisements, and reads "Welcome to: twooscars.com." (*AMPAS I*, Dkt. Nos. 614-24.) The third screenshot does display the domain TWOOSCARS.COM, but reflects a webpage that simply says: "[W]ebsite coming soon! Please check back soon to see if the site is available." (*AMPAS I*, Dkt. Nos. 614-25.) The third screenshot does not reflect any advertisements or other indications that the website is enrolled in the Parked Pages Program or that GoDaddy is otherwise attempting to monetize the domain. (*Id*.) The only screenshot that could potentially show the 2OSCARS.COM domain was ever enrolled in the Parked Pages Program is the second. (*AMPAS I*, Dkt. Nos. 614-24.)

But even that document lacks an adequate foundation in the record. AMPAS's counsel Matthew Herman attaches the exhibit to his declaration. (*AMPAS I*, Dkt. No. 614-21, ¶¶3, 4.) Mr. Herman does not declare that he took the screenshot or was present when someone else took the screenshot. Instead, Mr. Herman declares that he received the screenshots from AMPAS's litigation consultant Joe Presbery and refers the Court to Mr. Presbery's 2013 declaration in support of AMPAS's previous motion for summary judgment. (*Id*. at ¶3 (citing *AMPAS I*, Dkt. No. 377, ¶6).) However, Judge Collins previously declined to consider that precise declaration on the ground that AMPAS failed to timely disclose Mr. Presbery as a witness pursuant to Federal Rule of Civil Procedure 26. (*AMPAS I*, Dkt. No. 491, p. 17.) Judge Collins then reopened discovery for the limited purpose of permitting AMPAS to designate Mr. Presbery and allowing GoDaddy to depose him. (*AMPAS I*, Dkt. No. 492, pp. 10-13.) To the extent the parties ultimately complied with Judge Collins' order and Mr. Presbery is now a competent percipient witness upon whom AMPAS may rely to lay a foundation for the "TWOOSCARS.COM" screenshot, AMPAS was obligated to submit competent testimony by Mr. Presbery to that effect. AMPAS failed to do so, and cannot oppose summary judgment on a declaration that the Court has already rejected as inconsistent with Rule 26. AMPAS fails to offer any competent evidence to suggest that the website "2OSCARS.COM" was ever enrolled in GoDaddy's Parked Pages Program, and the Court **GRANTS** the motion as to that domain.

Turning to the final domain name GoDaddy identifies, OSCARMOVIES.COM, AMPAS argues that its reference to that domain in the *AMPAS II* First Amended Complaint was the result of an inadvertent typographical error. (*AMPAS I*, Dkt. No. 614, p. 8.) This argument is consistent with the record, which shows that AMPAS's pre-suit cease-and-desist letter referenced the domain name OSCARSMOVIES.COM (including the letter "s" between "OSCAR" and "MOVIE"). (*Compare AMPAS I*, Dkt. No. 614-26

(May 28 2013 cease-and-desist letter from AMPAS to GoDaddy identifying the domain OSCARSMOVIES.COM); with *AMPAS II*, Dkt. No. 20, ¶30 (December 17, 2013 First Amended Complaint in *AMPAS II* identifying the domain name OSCARMOVIES.COM). In reply, GoDaddy does not dispute that AMPAS has produced evidence the domain name OSCARSMOVIES.COM was enrolled in the Parked Pages Program, but contends AMPAS's untimely disclosure of that domain name "within the timeline set by the Court renders that domain name not at issue." (*AMPAS I*, Dkt. No. 631, p. 12.)

This is not akin to AMPAS's previous attempt to introduce an entirely new slate of domain names into the litigation. (*See AMPAS I*, Dkt. No. 491, pp. 8-9.) Rather, the undisputed evidence reflects AMPAS timely disclosed the relevant domain name, but made an inadvertent typographical error in drafting its First Amended Complaint in *AMPAS II*. GoDaddy does not suggest it would suffer any prejudice by permitting AMPAS to proceed on the disclosed-but-mistyped domain name OSCARSMOVIES.COM, and the Court **GRANTS** AMPAS's request to amend the First Amended Complaint to reflect the domain name OSCARSMOVIES.COM rather than OSCARMOVIES.COM. Fed. R. Civ. Proc. 15(b); *accord Smith v. CMTA-IAM Pension Trust*, 654 F.2d 650, 654 n.2 (9th Cir. 1981) (permitting amendment Federal Rule of Civil Procedure 15(b) to conform to evidence introduced at summary judgment). GoDaddy does not argue (even in reply) that AMPAS cannot prove the domain OSCARSMOVIES.COM was enrolled in the Parked Pages Program, and the Court **DENIES** GoDaddy's motion as to that domain name.

### C. The UCL Claims

GoDaddy next seeks summary judgment on AMPAS's claims for relief under California's UCL on the ground that AMPAS cannot prove it is entitled to either restitution or injunctive relief, which are the only two remedies available under that statute. (*AMPAS I*, Dkt. No. 606-1, pp. 12-13 (citing Cal. Bus. & Prof. Code §17203).) In opposition, AMPAS states it has abandoned its claim for restitution under the UCL, and does not oppose summary judgment on its claim for restitution under that statute. (*AMPAS I*, Dkt. No. 614, pp. 8-9 n.11.) In light of AMPAS's concession, the Court **GRANTS** GoDaddy's request for summary judgment on AMPAS's claims under California's UCL to the extent AMPAS seeks restitution on those substantive claims.

GoDaddy further seeks summary judgment on the remaining portion of AMPAS's UCL claims on the ground that AMPAS's request for injunctive relief is moot. In both *AMPAS I* and *AMPAS II*, AMPAS seeks an injunction under California's UCL prohibiting GoDaddy from placing domain names with AMPAS's marks in the Parked Pages Program. (*See AMPAS I*, Dkt. No. 170, ¶¶74, 80; *AMPAS II*, Dkt. No. 20, ¶¶63, 68.) However, in July 2013, GoDaddy implemented a voluntary keyword filter that prevents the placement of any advertisements on current or prospective domain names that include any of

AMPAS's marks. (*AMPAS I*, Dkt. No. 631-4, ¶15.) Now, all such domains that are not linked to an independent IP address through the DNS will resolve to a blank web page rather than a parked page with advertisements. (*Id*.) GoDaddy has no plans to modify or abandon its AMPAS-specific keyword filter in the future. (*Id*. at ¶16.) Although GoDaddy implemented the AMPAS-specific keyword filter in 2013, it was capable of doing so as early as 2007. (*AMPAS I*, Dkt. No. 631-4, ¶44.) GoDaddy has declined to apply it to all registered trademarks, and only does so as to AMPAS's registered marks. (*Id*. at ¶45.) GoDaddy elected not to implement a keyword filter for all registered marks because it would result in the removal of the majority of domain names enrolled in the Parked Pages Program. (*Id*. at ¶46.)

GoDaddy moves for summary judgment on AMPAS's claim for injunctive relief under the UCL on the ground that any such relief is now moot. A claim for injunctive relief under California's UCL "requires a threat that the misconduct to be enjoined is likely to be repeated in the future." *Madrid v. Perot Systems Corp.*, 130 Cal.App.4th 440, 465, 30 Cal.Rptr.3d 210, 229 (Cal. Ct. App. 2005). Injunctive relief should not:

> "be exercised in the absence of any evidence establishing the reasonable probability the acts will be repeated in the future. Indeed, a change in circumstances at the time of the hearing, rendering injunctive relief moot or unnecessary, justifies denial of the request."

*Gafcon, Inc. v. Ponsor & Associates* (2002) 98 Cal.App.4th 1388, 1403 n.6, 120 Cal.Rptr.2d 392 (Cal. Ct. App. 2002)). Where a defendant has ceased the allegedly wrongful conduct, "an injunction should be denied" under California's UCL absent "absent a showing that past violations will probably recur." *Madrid v. Perot Systems Corp.*, 130 Cal.App.4th at 465 (internal quotes omitted). Once a defendant shows it has voluntarily ceased the allegedly unlawful conduct, the burden shifts to the plaintiff to "show[] that the conduct will probably recur." *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1123 (9th Cir. 1999) (abrogated on other grounds as stated in *Perfect 10 v. Google, Inc.*, 653 F.3d 976, 979 (9th Cir. 2011).[11] California law generally presumes "there is no reasonable probability that the past acts complained of will recur … where the defendant voluntarily discontinues the wrongful conduct." *People ex rel. Herrera v.*

---

[11] As GoDaddy correctly observers, this standard under California's UCL is distinct from the "voluntary cessation" doctrine applied in federal trademark law, which "place[s] the burden on [the defendant] to prove that its conduct would not recur" because the defendant's "reform" is "irrefutably demonstrated in total." *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d at 1123. As the Ninth Circuit has expressly recognized, that more stringent standard is a creature of federal trademark law, and it is reversible error to apply it to California's UCL. *Id*; accord *Feitelberg v. Credit Suisse First Boston, LLC*, 134 Cal.App.4th 997, 1012, 36 Cal.Rptr.3d 592 (Cal. Ct. App. 2005).

*Stender*, 212 Cal.App.4th 614, 631 152 Cal.Rptr.3d 16, 31 (Cal. Ct. App. 2012) (internal quotes omitted).

The evidence is undisputed that GoDaddy has ceased its practice of placing advertisements on parked domains that include any of AMPAS's marks in the domain name, and GoDaddy has met its initial burden to establish that it has discontinued the allegedly unlawful conduct. The presumption under the UCL, then, is that injunctive relief should be denied. *People ex rel. Herrera v. Stender*, 212 Cal.App.4th at 631. Moreover, GoDaddy introduces evidence that it has no intention of modifying or abandoning its practice of filtering out AMPAS's marks from its Parked Pages Program. AMPAS attempts to overcome this presumption and meet its burden to show a triable issue of fact by showing that GoDaddy:

1. Waited several years to implement the AMPAS-specific filter;
2. Has declined to implement a similar filter for all trademarked terms; and
3. Is reluctant to implement a filter to all trademarked terms because it would remove the majority of domain names from the Parked Pages Program.

Plaintiff offers no authority to suggest that GoDaddy's delay in implementing the AMPAS filter would create a triable issue of fact on GoDaddy's likelihood to abandon the filter and resume placing ads on parked domains that include AMPAS's marks. To the contrary, courts have held that a voluntary abandonment of a long-standing practice in response to litigation generally moots a claim for injunctive relief under California's UCL. *Mathews v. Gov't Employees Ins. Co.*, 23 F. Supp. 2d 1160, 1165 (S.D. Cal. 1998) (holding request for injunctive relief under California's UCL was moot because "there [was] no evidence in the record that there [was] any probability of future violations" because defendant offered evidence "that it terminated the use of its illegal policy nearly two years" earlier in response to that lawsuit).

AMPAS' also argues that its claim for injunctive relief is still viable to broadly restrain GoDaddy's conduct as to other trademarks held by third-parties. (*See AMPAS I*, Dkt. No. 614, pp. 11-12.) It is true, as AMPAS suggests, that the UCL permits a plaintiff to obtain broad injunctive relief beyond the limited scope of a Plaintiff's individual injuries (*see Wilner v. Sunset Life Ins. Co.* 78 Cal.App.4th 952, 969, 93 Cal.Rptr.2d 413 (Cal. Ct. App. 2000), but AMPAS's claims in this litigation were not so sweeping. Rather, AMPAS brought suit to obtain limited "redress for …[GoDaddy's] unauthorized monetization, registration, trafficking in, licensing and/or other such use of domain names belonging to and/or that are confusingly similar to [AMPAS's] valuable, protected, distinctive and famous marks." (*AMPAS I*, Dkt. No. 170, ¶1; *AMPAS II*, Dkt. No. 20, ¶1.) With respect to the threat of future harm, AMPAS has achieved its goal. The evidence is undisputed that GoDaddy ceased the allegedly harmful conduct nearly two years ago and

"nothing in the record indicates any intention on the part of [GoDaddy] to reinstate it." *Midpeninsula Citizens for Fair Hous. v. Westwood Investors*, 221 Cal.App.3d 1377, 1393, 271 Cal. Rptr. 99 (Cal. Ct. App. 1990). [U]nder these circumstances" injunctive relief under the UCL "would be meaningless." *Id*. (reversing trial court's grant of injunction under the UCL where "the challenged policy was withdrawn nearly four years" prior and directing trial court to dismiss action as moot).

Because AMPAS has abandoned its request for restitution, its only remedy under the UCL is for injunctive relief. The evidence is undisputed that GoDaddy ended the conduct for which AMPAS seeks redress nearly two years ago, and AMPAS fails to meet its burden under California law to establish that the harm is likely to recur. Because AMPAS's only remedy under the UCL is moot, it cannot proceed on those claims as a matter of law, and the Court **GRANTS** GoDaddy's motion for partial summary judgment on AMPAS's causes of action for violation of California's UCL. *Midpeninsula Citizens for Fair Hous. v. Westwood Investors*, 221 Cal.App.3d at 1393 (dismissing UCL claim where plaintiff's only remedy under the UCL was moot).

### D. Attorneys' Fees

The parties debate the propriety of AMPAS's claim for attorneys' fees under California Code of Civil Procedure section 1021.5. However, the Court grant of summary judgment in Defendants' favor on AMPAS's UCL claims is dispositive of this issue, as well. "Because the Court has [entered summary judgment on] the state causes of action, the Court may not grant an award of attorneys' fees under" California Code of Civil Procedure section 1021.5. *Yates v. Union Square*, No. C 07-04087 JSW, 2008 WL 346418, at *4 (N.D. Cal. Feb. 7, 2008). Even if AMPAS is successful on its federal claim under the ACPA, it would be inappropriate to award AMPAS attorneys' fees under California Code of Civil Procedure section 1021.5 without a viable cause of action under California law. *Klein v. City of Laguna Beach*, 983 F. Supp. 2d 1162, 1169 (C.D. Cal. 2013) ("because [plaintiff] prevailed only on pure federal questions, it would be inappropriate for the Court to award fees under section 1021.5"). AMPAS cannot obtain attorneys' fees under that provision as a matter of law, and the Court **GRANTS** GoDaddy's motion for partial summary judgment on AMPAS's claim for attorneys' fees under California Code of Civil Procedure section 1021.5. To the extent that AMPAS is correct that summary judgment is *never* a proper vehicle to address the issue of attorneys' fees, the Court **STRIKES** AMPAS's prayer for attorneys' fees under California law (*AMPAS I*, Dkt. No. 170, p. 32:6-7; *AMPAS II*, Dkt. No. 20, p. 22:16-17) on its own motion as immaterial. Fed. R. Civ. Proc. 12(f)(1)

### IV. Conclusion

In light of the foregoing, the Court **GRANTS** GoDaddy's motion for partial summary judgment **IN PART** and **DENIES** the motion **IN PART**. (Dkt. No. 606.)

19

Whether AMPAS's marks are "famous" for the purposes of the ACPA is a question of fact that must be resolved at trial.  As for the four domain names which for which GoDaddy contends there is no evidence of "use" or "trafficking" through the Parked Pages Program, AMPAS concedes as to two domains (INTERNETACADEMYAWARDS.COM and OSCAR-2011.com), and the Court agrees as to a third (2OSCARS.COM).   However, the undisputed evidence shows that AMPAS's reference to OSCARMOVIES.COM in *AMPAS II* was an inadvertent typographical error and GoDaddy was on notice of the true domain in dispute (OSCARSMOVIES.COM) as early as May 2013, before AMPAS filed *AMPAS II*.  The Court **GRANTS** AMPAS's request to amend the First Amended Complaint in *AMPAS II* to correct its inadvertent typographical error and to conform to proof.  GoDaddy fails to meet its burden to show that AMPAS cannot prove the domain OSCARSMOVIES.COM was enrolled in the Parked Pages Program, and there is a triable issue of fact about whether GoDaddy trafficked in or used that domain name.

Turning to AMPAS's state law claims under California's UCL, AMPAS abandons its claim for restitution.  The only other remedy available to AMPAS under the UCL – injunctive relief – is moot, and AMPAS's claims for relief under California's UCL fail as a matter of law.  Because AMPAS's prayer for attorneys' fees under California Code of Civil Procedure section 1021.5 requires a viable claim for substantive relief under California law, AMPAS's prayer for attorneys' fees falls along with its UCL claims.

The Court **GRANTS** AMPAS's request for judicial notice.  Fed. R. Evid. 201.

Pursuant to Federal Rule of Civil Procedure 78(b) and Local Rule 7-15, the Court finds this matter appropriate for determination without oral argument, and the hearing previously scheduled for April 13, 2015 at 10:00 a.m. is hereby **VACATED**.

**IT IS SO ORDERED**