1 **WILMER CUTLER PICKERING HALE AND DORR**
Robert Galvin, California Bar No. 171508
2 950 Page Mill Road
Palo Alto, California 94304
3 Telephone: (650) 858-6017
E-mail:      robert.galvin@wilmerhale.com
4
William Lee, *pro hac vice*
5 60 State St.
Boston, MA 02109
6 Telephone: (617) 526-6000
Email: william.lee@wilmerhale.com
7
**RING BENDER  LLLP**
8 Aaron M. McKown, California Bar No. 208781
Paula L. Zecchini, California Bar No. 238731
9 2 Park Plaza, Suite 550
Irvine, California  92614
10 Telephone: (949) 202-5810
E-Mail:     amckown@ringbenderlaw.com
11              pzecchini@ringbenderlaw.com

12 Attorneys for Defendant
GODADDY.COM, LLC (f/k/a GoDaddy.com, Inc.)
13

14 

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ACADEMY OF MOTION PICTURE ARTS AND SCIENCES, a California nonprofit corporation, | Case No. CV10-3738 AB (CWx) [consolidated with Case No. CV13-08458-ABC (CW) |
| Plaintiff, | Assigned to Hon. André Birotte Jr. |
| v. | **GODADDY.COM, LLC'S LOCAL RULE 16-2.2 PROPOSED STIPULATED FACTS** |
| GODADDY.COM, INC., a Delaware corporation; THE GODADDY GROUP INC., a Delaware corporation; DOMAINS BY PROXY, INC., a Delaware Corporation; GREENDOMAINMARKET.COM, an unknown entity; BDS, an unknown entity; and XPDREAMTEAM LLC, a California limited liability corporation, | Final Pretrial Conference: July 13, 2015 |
| | Complaint Filed:    May 18, 2010 Trial Date:          August 4, 2015 |
| Defendants. | |

*Left margin (vertical):* RING BENDER LLLP / 2 Park Plaza, Suite 550 / Irvine, California 92614

Pursuant to Local Rule 16-4 and the Court's Orders, Defendant GoDaddy.com, LLC ("GoDaddy") respectfully submits the following Memorandum of Contentions of Law and Fact, addressing the contentions of the parties in relation to the trial scheduled to commence on August 4, 2015.

## I.   INTRODUCTION

GoDaddy is the world's largest domain registrar, managing over 59 million domains registered by its customers around the world.  Plaintiff Academy of Motion Picture Arts and Sciences ("AMPAS") alleges that GoDaddy violated the Anti-Cybersquatting Consumer Protection Act (the "ACPA"), codified at 15 U.S.C. § 1125(d), based on 293 accused domain names registered by GoDaddy's customers ("Accused Domains") that contain a text string corresponding to one of five AMPAS trademarks ("AMPAS Marks") within the domain name (e.g., "oscarcomedy.com" or "collegiateacademyawards.com").   Specifically, AMPAS alleges that GoDaddy violated the ACPA because dynamically generated web pages associated with these Accused Domains could automatically display ads, if someone typed the Accused Domains into the address bar of a web browser.  AMPAS seeks an award of nearly $30 million in statutory damages against GoDaddy.

Although the Court must still adjudicate certain issues relating to confusing similarity for 57 of the 293 Accused Domains (as discussed below), the primary issue presented for trial is whether GoDaddy's alleged conduct was done with a "bad faith intent to profit" from the AMPAS Marks with respect to each of the Accused Domains.  This determination requires (1) an examination of the nine non-exclusive and permissive statutory factors set forth in the ACPA; (2) application of the unique circumstances of this case; and (3) consideration of whether GoDaddy had reasonable grounds to believe that its use of each domain name was a fair use or otherwise lawful.  The evidence at trial belies any bad faith intent on the part of GoDaddy.  To the contrary, the evidence will show that:

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

1

1  · GoDaddy did not select the names of the Accused Domains to be
2     registered; its customers did.
3  · GoDaddy required its customers to certify that any domain name
4     registered did not infringe any third party intellectual property
5     rights, including trademarks.
6  · Because GoDaddy receives thousands of new domain
7     registrations from its customers each day through its automated
8     registration system, GoDaddy could not have formed any intent,
9     much less a "bad faith intent to profit," as to any of the Accused
10    Domains until it received a specific complaint.
11 · When complaints were received from AMPAS (or other
12    trademark owners) that a specific domain name registered by a
13    GoDaddy customer potentially infringed on a trademark,
14    GoDaddy promptly overrode its automated systems to ensure
15    that any accused domain would resolve to a parked page without
16    advertisements until the dispute was resolved;
17 · In 2013, GoDaddy implemented a filter to prevent any
18    advertisements from appearing on a parked page associated with
19    any past or future domain registered with GoDaddy that
20    contained a text string corresponding to one of the AMPAS
21    Marks.
22 · In 2014, after the significant expenditure of money and
23    engineering effort, GoDaddy deployed an even broader filter
24    designed to prevent the display of advertisements on parked
25    pages associated with domain names containing strings
26    corresponding to a broader list of non-AMPAS Marks as well.
27   Because AMPAS has brought this action against GoDaddy, rather than the
28 individuals who registered the Accused Domains, special care should be given to

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

2

ensure that the scope of liability under the ACPA is not unduly extended.  For example, in *Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 737 F.3d 546 (9th Cir. 2013), the Ninth Circuit explained that cybersquatting is generally understood to refer to "registering a domain name associated with a protected trademark either to ransom the domain name to the mark holder or divert business from the mark holder."  In *Petroliam*, the court refused to recognize a claim for secondary liability under the ACPA against GoDaddy, noting, among other things, "Because direct cybersquatting requires subjective bad faith, focusing on direct liability also spares neutral service providers from having to divine the intent of their customers." *Id.* at 553.  The court also expressed concern about the potential to "incentivize 'false positives,' in which the lawful use of a domain name is restricted by a risk-adverse third party service provider." *Id.*

A similar concern was expressed in the legislative history leading up to passage of the ACPA, "In seeking to curb [cybersquatting], Congress must not cast its net too broadly or impede the growth of technology, and it must be careful to balance the legitimate interests of Internet users with the other interests sought to be protected."  S. Rep. 106-140, 10.  As the Ninth Circuit warned in a related context, "It is the wholesale prohibition of nominative use in domain names that would be unfair…. The only winners would be companies like Toyota, which would acquire greater control over the markets for goods and service related to their trademark brands, to the detriment of competition and consumers." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1180 (9th Cir. 2010) (vacating injunction for trademark infringement against auto brokers using domain "buy-a-lexus.com").

GoDaddy, like other Internet-based companies, faces a constant challenge in striking the right balance between the legitimate interests of their customers with the potential rights of third parties.  GoDaddy contends that the unique circumstances of this case demonstrate that GoDaddy has acted reasonably and in

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

good faith and that its continued efforts to improve trademark compliance by its customers should be rewarded, not punished.

Even if the Court were to determine GoDaddy acted in bad faith, AMPAS cannot produce evidence demonstrating an entitlement to the nearly $30 million dollar statutory damage award it seeks.  Given GoDaddy's lack of involvement in the selection and registration of the domain names, its prompt redirection of the Accused Domains, the *de minimus* direct advertising revenue received by GoDaddy ($107) from only 72 of the Accused Domains (the remaining 221 did not generate any revenues), the lack of evidence of any quantifiable harm to AMPAS, the numerous facts supporting a determination of good faith, and GoDaddy's implementation of trademark filters during the pendency of this lawsuit, such an award would create an inappropriate financial windfall for AMPAS.

## II.    CLAIMS AND DEFENSES OF THE PARTIES [L.R. 16-4.1]

This is a civil action concerning the alleged violation of the ACPA in relation to 293 domain names identified by AMPAS.  Jurisdiction is asserted under 28 U.S.C. § 1331.

AMPAS originally asserted six (6) causes of action against six (6) defendants in relation to 347 domain names.  Over the course of this litigation, five causes of action, five defendants, and 54 domain names have been dismissed.

### A.    AMPAS' Claim for Violation of the ACPA [L.R. 16-4.1(a)]

AMPAS alleges that GoDaddy violated the ACPA in relation to each of the Accused Domains.  AMPAS contends that GoDaddy trafficked in and/or used the Accused Domains by monetizing parked pages resolving from each and that GoDaddy did so with a bad faith intent to profit from the AMPAS Marks.  AMPAS clarified during discovery that, "it is not the [Accused Domain] itself that the Academy objects to; instead, it is the monetization of the [Accused Domain] by GoDaddy to promote goods and services obviously relating to the Academy

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

Awards® and the OSCARS®" from revenue generating advertisements resolving from the Accused Domains.

**B.   Elements Required to Establish AMPAS' Claim for Violation of the ACPA [L.R. 16-4.1(b)]**

AMPAS bears the burden of proving by a preponderance of the evidence the following elements as to each of the 293 Accused Domains: (1) GoDaddy registered, trafficked in, or used the Accused Domain; (2) the AMPAS Marks were distinctive at the time of registration of the domain name and the domain name is identical to or confusingly similar to one of the AMPAS Marks;[1] and (3) GoDaddy committed the act(s) with a bad faith intent to profit from the AMPAS Marks. Evidence sufficient to satisfy the above elements must be produced for each of the Accused Domains since liability under the ACPA is domain name specific.

In addition to the unique circumstances presented by the facts of this case, the following factors may be considered in determining whether a domain name has been registered in bad faith:

·   Whether the registrant used, or had a good faith intent to use, the domain name identified by AMPAS as a trademark for his own goods or services;

·   The extent to which the domain name identified by AMPAS reflects the registrant's legal name or a name that is commonly used to identify the individual registrant, a family member or friend of the individual registrant;

---

[1]    As part of the parties' pre-trial conferences, AMPAS elected to waive its claim that each the Accused Names were "dilutive of" AMPAS' Marks.  Thus, for 57 of the Accused Domains, the Court will not need to determine bad faith for any of those 57 Accused Domains that it finds are not confusingly similar to the AMPAS Marks.

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

· The extent of the registrant's prior use of the domain name identified by AMPAS in connection with good faith offering of goods or services;

· Whether the AMPAS Marks were being used non-commercially or as a "fair use" in a website accessible under the domain name;

· Whether GoDaddy intended to divert consumers from AMPAS' own website to a website under the domain name identified by AMPAS that could harm the goodwill represented by the AMPAS Marks;

· Whether GoDaddy offered to transfer, sell, or otherwise assign the domain name identified by AMPAS to AMPAS or any other person for financial gain without having used or having an intent to use, the domain name in connection with a good faith offering goods or services; or whether GoDaddy has exhibited a pattern of such conduct in the past;

· Whether GoDaddy: (a) provided false or misleading information regarding the individual registrant's contact information when the registrant applied for the registration of the domain name identified by AMPAS; (b) intentionally failed to maintain accurate contact information for the individual registrant; or (c) has established a pattern of such conduct in the past;

· Whether GoDaddy registered or otherwise acquired multiple domain names in addition to the domain name identified by the AMPAS that GoDaddy knows are identical to, confusingly similar to, or dilutive of other marks such that GoDaddy would be liable under the ACPA with respect to those additional domain names; and

· The extent to which each of the marks owned by AMPAS is or is not distinctive and famous.

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

6

1    AMPAS has elected to receive statutory damages.  The ACPA authorizes an

2  award of statutory damages between $1,000 and $100,000 per domain name in the

3  event AMPAS prevails on its ACPA claim.

4    Source: 15 U.S.C. §§ 1125(d), 1117(d); ABA MODEL JURY INSTRUCTIONS

5  HANDBOOK ON COPYRIGHT, TRADEMARK AND TRADE DRESS LITIGATION, §§ 2.6.1,

6  2.6.2, 2.7.11, 2.7.2, 2.7.4, 2.7.5 (1st ed. 2008); NINTH CIRCUIT PATTERN JURY

7  INSTRUCTIONS (CIVIL CASES) 2011, 15.5, 15.23; *Interstellar Starship Services, Ltd.*

8  *v. Epix, Inc.*, 304 F.3d 936, 946-947 (9th Cir. 2002); *Newport News Holdings Corp.*

9  *v. Virtual City Vision, Inc.*, 650 F.3d 423, 436 (4th Cir. 2011) cert. denied, 132 S.

10  Ct. 575 (2011); *Virtual Works, Inc. v. Volkswagen*, 238 F.3d 264, 269 (4th Cir.

11  2001); *FieldTurf, Inc. v. Triexe Mgmt. Group, Inc.*, 69 U.S.P.Q. 2d 1861, 1863

12  (N.D. Ill. 2003); *Bosley Medical Inst., Inc. v. Kremer*, 403 F.3d 672, 680 (9th Cir.

13  2005); *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 428 (2003); *Harrods Ltd.*

14  *v. Sixty Internet Domain Names*, 302 F.3d 214, 239 (4th Cir. 2002); *Petroliam*

15  *Nasional Berhad v. GoDaddy.com, Inc.*, 737 F.3d 546 (9th Cir. 2013); *Coach Servs.*

16  *v. Triumph Learning LLC*, 668 F.3d 1356, 1373 (Fed. Cir. 2012); *Storey v. Cello*

17  *Holdings*, L.L.C., 347 F.3d 370, 385 (2d Cir. 2003); *Gioconda Law Grp. PLLC v.*

18  *Kenzie*, 941 F. Supp. 2d 424, 428; *Lewittes v. Cohen*, No. 03 Civ. 189, 2004 WL

19  1171261, at *8 (S.D.N.Y. May 26, 2004); *Lucas Nursery & Landscaping, Inc. v.*

20  *Grosse*, 359 F.3d 806, 810 (6th Cir. 2004); *TMI, Inc. v. Maxwell*, 368 F.3d 433, 439

21  (5th Cir. 2004); *S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1246–47 (11th

22  Cir. 2009); *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1177 (9th

23  Cir. Cal. 2010); *Apple Inc. v. Samsung Electronics Co.*, No. 11-CV-01846-LHK,

24  2014 WL 4145499, at *9 (N.D. Cal. Aug. 20, 2014); *Simon & Schuster, Inc. v. Dove*

25  *Audio, Inc.*, 970 F. Supp. 279, 302 (S.D.N.Y. 1997).

26  ///

27  ///

28

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

**A.     Brief Description of Key Evidence in Opposition to AMPAS' Sole Claim for Violation of the ACPA [L.R. 16-4.1(c)]**

GoDaddy will introduce the following categories of evidence demonstrating (a) a lack of confusing similarity between the 57 Accused Domains yet to receive an adjudication on the issue of confusing similarity with respect to the AMPAS Marks for "OSCAR" and "OSCARS";[2] and (b) the lack of evidence to support a determination that GoDaddy acted with a bad faith intent to profit from any of the AMPAS Marks with respect to each of the 293 Accused Domains.

**1.     Evidence In Opposition to a Finding of Confusing Similarity as to 57 of the 293 Accused Domains[3]**

For the 57 domain names yet to receive an adjudication on the issue of confusing similarity, GoDaddy will introduce (a) documentary evidence of the domain names themselves; (b) testimony from AMPAS' employees regarding the myriad definitions and meanings of the term "oscar"; (c) judicial admissions by AMPAS as to the myriad definitions and meanings of the term "oscar"; and (d) testimony or declarations from registrants of a number of the Accused Domains identifying the basis for their inclusion of the term "oscar" in the domain name string, including the fact that their name or a family member's name was "Oscar."

///

///

---

[2]     A list of the 57 domain names that have not received a final adjudication on the issue of confusing similarity is attached as Exhibit A.

[3]     The Court previously adjudicated the issue of confusing similarity as to 236 of the 293 domain names at issue.  *See* Orders dated November 4, 2013 and July 24, 2014, [Dkt. Nos. 508 and 568].  The issue of whether each of the remaining 57 domain names is confusingly similar to one or more of the AMPAS Marks is set to be adjudicated at trial.

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

### 2. Evidence in Opposition to A Finding of Bad Faith Intent to Profit from the AMPAS Marks

GoDaddy will introduce the following evidence relative to the nine non-exhaustive bad faith factors enumerated in the ACPA, as well as evidence relating to the unique circumstances, which in their totality support a finding that GoDaddy did not have a bad faith intent to profit from the AMPAS Marks:

#### a. <u>Factor 1</u>: Trademarks or Other Intellectual Property Rights in the Domains

GoDaddy will introduce documentary and testimonial evidence demonstrating that at least two of the registrants hold federally-registered trademarks in relation to at six (6) of the domain names at issue and that the registrants for at least ten (10) other Accused Domains have common law trademark rights in their domain names.

#### b. <u>Factor 2</u>: Extent to Which Accused Domains Consist of the Legal Name of the Registrants or Names Otherwise Commonly Used to Identify the Registrants

GoDaddy will introduce documentary and testimonial evidence demonstrating that for at least sixteen (16) of the Accused Domains, the domain name consists of the legal name of the registrant or the registrant's child, or constitutes a name commonly used to identify the registrant or its business.

#### c. <u>Factor 3</u>: Prior Use of the Accused Domains in Bona Fide Offering of Goods or Services

GoDaddy will introduce evidence that at least nineteen (17) of the Accused Domains involve domain names registered for the purpose of creating a website to provide the bona fide offering of goods and services.

///

///

**d.      Factor 4: Bona Fide Noncommercial or Fair Use of the Mark in a Site Accessible Under the Domain Name**

GoDaddy will present documentary evidence, including screenshots of the Accused Domains and internal GoDaddy records, demonstrating that a subset of the Accused Domains resolved to websites containing Google-placed, third-party advertisements that incorporated one or more of the AMPAS Marks. GoDaddy will also introduce documentary evidence demonstrating that each of the websites on which the advertisements at issue appeared expressly identified the advertisements as "Sponsored Listings" or "Ads"; clearly stated that the website being visited was actually a page parked by GoDaddy; and that any non-AMPAS advertisement incorporating one or more of the AMPAS Marks: (a) used no more of the AMPAS Marks than necessary; and (b) did nothing to suggest AMPAS' sponsorship or endorsement of either the advertisement or linked content.

GoDaddy will also present testimony from AMPAS employees demonstrating that AMPAS has (a) no knowledge of any non-AMPAS affiliated person visiting the Accused Domains; and (b) no knowledge of any instance of actual confusion arising from any Google-placed, third-party advertisements on the Accused Domains. This includes documentary and testimonial evidence demonstrating that visits to the Accused Domains by AMPAS, its litigation consultant, and its outside counsel account for the majority of all visits to the Accused Domains, and in the case of a number of the Accused Domains, the only visits.

**e.      Factor 5: Intent to Divert Consumers either for Commercial Gain or With an Intent to Tarnish or Disparage the AMPAS Marks**

GoDaddy will present documentary and testimonial evidence that GoDaddy and AMPAS are not competitors and that GoDaddy did not engage in any conduct with the purpose of competing with AMPAS. GoDaddy will also present documentary and testimonial evidence that GoDaddy did not register any of the

10

Accused Domains, did not select any of the Accused Domains for registration and neither intended to use nor actually used any of the Accused Domains to divert consumers for a commercial gain, to tarnish the AMPAS Marks, or to harm the goodwill of the AMPAS Marks.  GoDaddy will also produce documentary and testimonial evidence indicating that the Accused Domains would not have appeared in response to a search query on any of the major search engines (*i.e.*, Google, Yahoo!, or Bing) and an Internet user would arrive at the domain name only after typing the domain into the URL.

GoDaddy will introduce documentary and testimonial evidence, including screenshots of the Accused Domains produced by AMPAS, demonstrating that (a) AMPAS participated as an advertiser in Google's AdSense for Domains program, resulting in the display of AMPAS own advertisements on parked pages resolving from domain names incorporating both generic terms and third-party trademarks; and (b) AMPAS' own advertisements appeared as "Sponsored Listings" and/or "Ads" on a number of websites resolving from the Accused Domains.

### f.      <u>Factor 6:</u> Offering to Sell the Accused Domains

GoDaddy will introduce documentary evidence demonstrating that GoDaddy never offered to sell any of the Accused Domains to AMPAS nor claimed any ownership interest in the Accused Domains.  This presentation will also include the introduction of documentary evidence demonstrating that GoDaddy lodged each of the Accused Domains by way of three (3) "Registrar's Certificates" filed with the Court over the course of this litigation.  Under the ACPA, a registrar's certificate is understood to constitute a "document[ ] sufficient to establish [a district court's] control and authority regarding . . . the use of the domain name." 15 U.S.C. § 1125(d)(2)(C)(ii).   Depositing such documentation with the district court also serves to signify, in the manner of interpleader, the registrar's disinterested surrender of the disputed property to the adjudicative authority of the court.  *See id*. § 1125(d)(2)(D).

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

g.      **Factor 7:** Misleading False Contact Information When Applying for the Accused Domains**

GoDaddy will introduce documentary and testimonial evidence indicating that GoDaddy did not register any of the Accused Domains nor did GoDaddy provide any misleading or false contact information on behalf of the registrants as part of the registration process.  This evidence will demonstrate that to the extent not publically available, GoDaddy disclosed the identities of the registrants of the Accused Domains either in response to a letter from AMPAS' counsel or as part of this litigation.

h.      **Factor 8:** Registration of Multiple Domain Names that are Identical, Confusingly Similar, or, in the Case of Famous Marks, Dilutive of the Marks of Others**

GoDaddy will present documentary and testimonial evidence demonstrating that GoDaddy did not register any of the 293 Accused Domains.

i.      **Factor 9:** Extent to Which the Marks in the Domain Name Are Not Distinctive or Famous**

GoDaddy will rely upon documentary evidence setting forth the domain names themselves, as well as testimonial evidence from AMPAS' employees regarding the myriad definitions and meanings of the term "oscar" and judicial admissions by AMPAS as to the array of uses for the term "oscar" unrelated to AMPAS.  GoDaddy will also introduce documentary evidence demonstrating (a) the issuance of federal trademarks containing the term "oscar" to persons other than AMPAS.

j.      **Unique Circumstances Impacting the Bad Faith Analysis**

With regard to the unique circumstances presented by this case, GoDaddy intends to present documentary and testimonial evidence from GoDaddy employees as to the automated nature of (a) the registration, routing and parked page processes

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

for the Accused Domains; (b) the technical and consumer user experience rationales underlying the development of the parked pages services; (c) the manner in which templates for the Accused Domains were selected for display upon resolution to a website (e.g., monetized or non-monetized) and (d) the display of advertisements, whether GoDaddy or Google-placed, on the Accused Domains.  GoDaddy will also introduce evidence demonstrating that at the time of registration, GoDaddy required every domain name owner utilizing its parked page services, including those utilizing GoDaddy's CashParking program, to represent and warrant that the registration of their selected domain names does not infringe third-party intellectual property rights.

GoDaddy will also introduce evidence establishing that it made no effort to promote or otherwise drive traffic to the Accused Domains, nor did it promote the display of AMPAS-related advertisements; specifically, GoDaddy will present documentary and testimonial evidence, including expert testimony, demonstrating that (a) only a handful of Accused Domains were visited by anyone other than AMPAS, its counsel and/or its hired consultant; (b) GoDaddy made no attempt to promote or otherwise drive traffic to any of the Accused Domains, did not advertise the Accused Domains, did not provide third parties with links to the Accused Domains, and did not engage in efforts to optimize any of the Accused Domains or otherwise promote their appearance in search engine results; (c)  GoDaddy made no effort to direct the placement of AMPAS-related advertisements on the domain names at issue; and (d) 221 of the 293 Accused Domains generated no revenue at all and the remaining 72 Accused Domains generated total revenue of $107 from the Google AdSense for Domains program.

GoDaddy will also introduce evidence demonstrating that it did not choose or otherwise have the ability to control the content or selection of the advertisements placed on the websites resolving from the Accused Domains, nor the manner in which Google chose to determine which advertisements to display on the Accused

Domains. This evidence will establish that at all times relevant, (a) Google maintained wholesale control and discretion over the selection and placement of third-party advertisements appearing on the Accused Domains; and (b) GoDaddy was contractually prohibited from modifying, reviewing, or otherwise preventing the display of advertisements delivered by Google to a GoDaddy parked page.

GoDaddy will also introduce documentary and testimonial evidence regarding the robust enforcement actions taken by GoDaddy in assisting AMPAS and other trademark holders police their marks on the Internet, including evidence of (a) GoDaddy's Trademark Infringement Policy ("TM Policy") and the standard operating procedure for processing a trademark claim related to Google-placed advertisements on GoDaddy parked pages; (b) GoDaddy's resolution of thousands of trademark disputes each year through their TM Policy, often within ten (10) days of receipt of a complaint; (c) GoDaddy's manual override of its automated systems to ensure that a domain name in the parked page program always resolves to a non-monetized page upon notification of a potential infringement by a trademark owner; (d) GoDaddy's implementation of a VIP program for trademark holders with repeat infringement concerns to further expedite the notification and override process; (e) the industry-leading nature of GoDaddy's trademark dispute resolution procedure, as well as the speed and efficiency of its notification and override processes; and (f) general brand owner satisfaction with the operation of GoDaddy's trademark dispute resolution process.

With specific reference to AMPAS, GoDaddy will introduce evidence that (a) AMPAS availed itself of GoDaddy's trademark dispute resolution procedure in policing its intellectual property on the Internet from 2006 to 2010 without objection; (b) for those complaints related to Google's placement of third-party advertisements on websites incorporating one or more of the AMPAS Marks, GoDaddy routinely responded to each complaint by removing all advertisements from the domain name at issue and providing notice of same; (c) at no time prior to

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

14

the filing of the Complaint in this action, did AMPAS further complain about any of the domain names identified in any of the pre-litigation correspondence nor did it notify GoDaddy that the immediate removal of the advertisements was an insufficient response to its demands; (d) AMPAS did not name any of the domain names identified by way of a cease and desist letter prior to May 2010 in this lawsuit; and (e) AMPAS declined GoDaddy's invitation to place AMPAS in its VIP Program.

GoDaddy will also introduce evidence that despite its continued good faith belief in the lawfulness of the conduct at issue, GoDaddy created and implemented a filter in 2013 to prevent the display of advertisements on any domain name containing one or more of the AMPAS Marks in the domain string (the "AMPAS Filter"). GoDaddy will also introduce evidence demonstrating that contemporaneous with the implementation of the AMPAS Filter, GoDaddy began work on a more wide-ranging trademark filter designed to, among other things, prevent the display of any advertisements on any parked domain that contains one of nearly 1400 registered trademarks in the domain name string. After significant time and expense—including the acquisition of a competing entity that claimed to have created and implemented a similar filter utilizing regular downloads from the USPTO database—GoDaddy implemented its comprehensive trademark filter in December 2014.[4] GoDaddy will introduce testimony and documents showing that

---

[4]    Although the claims of the acquired entity proved to be overstated, GoDaddy persisted in its attempts to create and implement a trademark filter that utilized the entire USPTO database—a technological possibility conceived by GoDaddy employee Richard Merdinger in relation to a patent application placed at issue by AMPAS. Despite dedicating significant capital and employee time to the development of a USPTO-based trademark filter over the course of a year and a half, GoDaddy was ultimately unable to implement such a filter due to commercial impracticalities created by, in part, the sheer volume of registered trademarks (over a terabyte of data) consisting of (a) one- and two-letters terms and (b) common suffixes, e.g., -ion.

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

implementing a broad trademark filter was technically challenging and required a substantial expenditure of money and engineering effort.  GoDaddy will also introduce evidence showing that it has voluntarily blacklisted specific domain names flagged by its trademark filter out of an abundance of caution, meaning that those domains will never resolve to a GoDaddy parked page bearing any form of monetized ads.

### 3.   Evidence in Opposition to AMPAS' Demand for Maximum Statutory Damages

GoDaddy incorporates by reference the evidence set forth in Section II., C. and F., which demonstrates GoDaddy's undisputed lack of involvement in the selection and registration of the domain names, the *de minimus* revenue received by GoDaddy from the Accused Domains (approx. $107 in direct advertising revenue from a small subset of the Accused Domains and, as opined by GoDaddy's damages expert, an estimated $242 in apportioned revenues derived from banner advertisements for GoDaddy products and services), the minimal non-AMPAS affiliated traffic, and the numerous facts supporting a determination of good faith. GoDaddy will also introduce expert testimony as to (a) the accounting of revenues generated by GoDaddy related to the Accused Domains; (b) the calculation of a reasonable royalty for the alleged use of the Accused Domains by GoDaddy; and (c) the quantifiable amount of unjust enrichment resulting from GoDaddy's alleged unauthorized use of certain trademarks owned by AMPAS.

### B.   Summary of GoDaddy's Affirmative Defense of Good Faith [L.R. 16-4.1(d)]

The ACPA provides a safe harbor to any person who registers, uses, or traffics in domain names where that person "believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).  GoDaddy held an objective good faith belief that the

Ring Bender LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

1   practice of parking undeveloped domains on pages containing advertisements was a

2   fair or otherwise lawful use of the Accused Domains.

3      **C.     Elements Required to Establish GoDaddy's Affirmative Defense of**

4              **Good Faith [L.R. 16-4.1(e)]**

5      GoDaddy is not liable for a violation of the ACPA with respect to any of the

6   Accused Domains if GoDaddy can demonstrate by a preponderance of the evidence

7   that, at the time GoDaddy registered, used, or trafficked in the Accused Domain: (1)

8   GoDaddy had reasonable grounds to believe that the use of the Accused Domain

9   was a fair use or otherwise lawful; and (2) GoDaddy actually held this belief.

10      Source: 15 U.S.C. § 1125(d)(1)(B)(ii); ABA MODEL JURY INSTRUCTIONS

11   HANDBOOK ON COPYRIGHT, TRADEMARK AND TRADE DRESS LITIGATION, § 2.7.6 (1st

12   ed. 2008)

13      **D.     Brief Description of Key Evidence in Support of GoDaddy's**

14              **Affirmative Defense of Good Faith [L.R. 16-4.1(f)]**

15      GoDaddy incorporates by reference the entirety of the evidence described in

16   Section II., C., as support for its reasonable belief that any use of the Accused

17   Domains was a fair use or otherwise lawful. GoDaddy will introduce additional

18   testimony and documentary evidence regarding the reasonableness of its belief that

19   any use of the Accused Domains was lawful, including evidence of (a) the evolution

20   of GoDaddy's parked page program, (b) GoDaddy's reliance on the representations

21   of its registrants with respect to third-party intellectual property rights in deciding to

22   allow the placement of advertisements on parked pages; (c) relevant changes in the

23   nature of Google's AdSense for Domains program from 2009 to date as it pertains to

24   the Accused Domains; (d) the prevalence of domain name monetization services, as

25   well as the lack of any regulatory or statutory scheme preventing such a practice;

26   and (e) that GoDaddy's parked page programs and trademark enforcement policies

27   met or exceeded industry standards.

28   ///

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

17

**E.    Anticipated Evidentiary Issues [L.R. 16-4.1(h)]**

GoDaddy anticipates that AMPAS may object to the testimony of GoDaddy's Vice President of Policy, James Bladel on the topic of Mr. Bladel's (a) involvement with the Internet Corporation for Assigned Names and Numbers ("ICANN") on behalf of GoDaddy; and (b) the policies and procedures of domain registrars, including GoDaddy, as it relates to trademark dispute policies and procedures. Although not identified on GoDaddy's Rule 26 Disclosure, Mr. Bladel was otherwise made known to AMPAS during the discovery process.  Mr. Bladel was (a) identified in documents produced by GoDaddy and relied upon by AMPAS during the conduct of this litigation and (b) the subject of deposition questioning by AMPAS.

Mr. Bladel may be called as a trial witness by GoDaddy as a substitute for Tim Ruiz, the previous Vice President of Policy, who left GoDaddy's employ in August 2014.  Mr. Ruiz was deposed in his capacity as GoDaddy's Vice President of Policy in November 2011 and was included as a trial witness on GoDaddy's previous Local Rule 16-2.4 witness disclosure, exchanged with AMPAS in 2013. Prior to Mr. Ruiz's departure from GoDaddy, Mr. Bladel held the role of director of policy planning and acted as a subordinate to Mr. Ruiz.

Other than the above-identified issue, GoDaddy is unaware of any significant evidentiary issues outside of those commonplace evidentiary objections to be raised by the parties with respect to testimony and exhibits presented at trial.

**F.    <u>Identification of Issues of Law [L.R. 16-4.1(i)]</u>**

No pure issues of law remain for adjudication.  For the Court's convenience, however, the legal framework for the three factual issues to be adjudicated at trial is set forth or otherwise designated below.

**1.    Confusing Similarity under the ACPA**

The parties previously briefed the issue of confusing similarity in relation to their summary judgment filings.  *See* Parties' Briefs on Summary Judgment [Dkt.

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

1   Nos. 339, 349, 373, 381, 410, 419, 563, 565, 566].    The Court authored two

2   opinions setting forth the legal framework that it used for determining confusing

3   similarity.  *See* Orders dated June 21, 2013 and July 24, 2014 [Dkt. Nos. 493, 569]

4   (finding disputed facts as to whether a subset of the 57 remaining domain names

5   could be deemed confusingly similar under the ACPA).

### 2.    Bad Faith Intent to Profit under the ACPA

7        The parties have yet to brief the issue of bad faith intent to profit for the

8   Court.  Although GoDaddy intends to more fully discuss the issue in its trial brief, it

9   sets forth the following relevant case law and legislative history below.

10       Because the ACPA has the potential to encompass a broad array of online

11  conduct, courts are "reluctant to interpret the ACPA's liability provisions in an

12  overly aggressive manner." *Virtual Works, Inc. v. Volkswagen of Am., Inc*., 238 F.3d

13  264, 270 (4th Cir. 2001); *see also id*. ("The ACPA was not enacted to put an end to

14  the sale of all domain names.").  This is particularly true of the bad faith intent to

15  profit requirement as "the ACPA's congressional record consistently signals the

16  drafters' intention to target a narrow class of cyber-squatters consisting of those who

17  have the bad faith intent to profit, and not to tread on the rights of those with any

18  other motives."  H.R. Rep. 106-412, 10; S. Rep. 106-40, 13; *Ford Motor Co. v.*

19  *Greatdomains.com, Inc.,* 177 F.Supp.2d 635, 641 (E.D. Mich. 2001) ("[The] ACPA

20  was designed to target persons who commandeer a domain name for no reason other

21  than to profit by extortion, yet bypass persons with legitimate interests in the domain

22  name.").

23       Although courts have struggled to define the boundaries of "bad faith intent to

24  profit" given the express license to consider factors beyond the nine enumerated

25  indicia, a number of courts—including the Ninth Circuit—have departed from strict

26  adherence to the statutory factors and relied expressly on a more case-specific

27  approach to bad faith.  *See Interstellar Starship Servs., Ltd. v. Epix, Inc.,* 304 F.3d

28  936, 94647 (9th Cir. 2002); *Sporty's Farm LLC v. Sportsman's Market, Inc.,* 202

F.3d 489, 499 (2d Cir. 2002).  As part of that analysis, courts look to a defendant's whole course of conduct, including conduct during ACPA litigation, in order to reach a determination on the issue of bad faith.  *See, e.g.*, *Storey v. Cello Holdings*, L.L.C., 347 F.3d 370, 385 (2d Cir. 2003).

Given the clear Congressional intent to "balance the property interests of trademark owners with the legitimate interests of Internet users and others who seek to make lawful uses of others' marks, including for purposes such as comparative advertising . . . fair use, etc.," courts have been reluctant to identify additional "unique circumstances" that reveal a bad faith intent to profit.  H.R. Rep. 106-412, 10 (emphasis added); *Gioconda Law Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 428 (S.D.N.Y. 2013).

In cases that vary too much from the specific evil contemplated by the ACPA, courts have looked skeptically at claims of bad faith and refused to find an ACPA violation.  *See Lewittes v. Cohen*, No. 03 Civ. 189, 2004 WL 1171261, at *8 (S.D.N.Y. May 26, 2004) ("[O]n the whole, the allegations set forth in the Complaint do not even remotely suggest that defendants perpetrated the core activities that threaten to result in the paradigmatic harm that the ACPA was enacted to eradicate."); *accord Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 810 (6th Cir. 2004); *TMI, Inc. v. Maxwell*, 368 F.3d 433, 439 (5th Cir. 2004); *S. Grouts & Mortars, Inc. v. 3M Co*., 575 F.3d 1235, 1246–47 (11th Cir. 2009).

## III.    BIFURCATION OF ISSUES [L.R. 16-4.3]

All issues are set to be tried to the Court in a single trial.

## IV.    JURY TRIAL [L.R. 16-4.4]

Although AMPAS originally requested trial by jury, the Court recently granted AMPAS' motion to strike its jury demand.  *See* Order dated April 10, 2015 [Dkt. No. 656].  As such, the entirety of this action will be tried to the Court.

///

///

20

## V.     ATTORNEYS' FEES [L.R. 16-4.5]

AMPAS claims an entitlement to attorneys' fees pursuant to 15 U.S.C. §1117(d), which authorizes the award of attorneys' fees for violations of the ACPA in "exceptional cases."   GoDaddy denies that AMPAS is entitled to an award of attorneys' fees.

## VI.    ABANDONMENT OF ISSUES [L.R. 16-4.6]

GoDaddy hereby abandons the following affirmative defenses:

·     Failure to State a Cause of Action (First Affirmative Defense)

·     Laches (Second Affirmative Defense)

·     Estoppel/Waiver (Third Affirmative Defense)

·     Unclean Hands (Fourth Affirmative Defense)

·     Trademark Abuse/Misuse (Sixth Affirmative Defense)

·     No Likelihood of Injury (Ninth Affirmative Defense)

·     Abandonment (Tenth Affirmative Defense)

·     No Harm (Eleventh Affirmative Defense)

·     No Secondary Meaning (Twelfth Affirmative Defense)

·     No Standing (Thirteenth Affirmative Defense)

·     Fault of Others (Fourteenth Affirmative Defense)

·     Reservation of Rights (Fifteenth Affirmative Defense)

GoDaddy also elects to abandon its affirmative defenses of Fair Use (Seventh Affirmative Defense) and Lack of Confusing Similarity (Eighth Affirmative Defense), except to the extent these affirmative defenses are otherwise incorporated as elements to be proved or negated in relation to AMPAS' ACPA claim.

///

///

///

///

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RING BENDER LLLP, 2 Park Plaza, Suite 550, Irvine, California 92614

Dated:  June 23, 2015

**RING BENDER LLLP**
Aaron M. McKown
Paula L. Zecchini

By:   *s/ Paula L. Zecchini*
        Paula L. Zecchini

**WILMER CUTLER PICKERING
HALE AND DORR LLP**
Robert Galvin, California Bar No. 171508
Jimmy Doan, California Bar No. 271448
950 Page Mill Road
Palo Alto, CA  94304
Telephone: (650)858-6017
E-mail:  robert.galvin@wilmerhale.com

William Lee, *pro hac vice*
60 State Street
Boston, MA  02109
Telephone: (617)526-6000
E-mail: William.lee@wilmerhale.com

Attorneys for Defendant
GODADDY.COM, LLC