**WILMER CUTLER PICKERING HALE AND DORR LLP**
Robert Galvin, California Bar No. 171508
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6017
E-mail:      robert.galvin@wilmerhale.com

William Lee, *pro hac vice*
60 State St.
Boston, MA 02109
Telephone: (617) 526-6000
Email: william.lee@wilmerhale.com

**RING BENDER  LLLP**
Aaron M. McKown, California Bar No. 208781
Paula L. Zecchini, California Bar No. 238731
2 Park Plaza, Suite 550
Irvine, California  92614
Telephone: (949) 202-5810
E-Mail:      amckown@ringbenderlaw.com
                 pzecchini@ringbenderlaw.com

Attorneys for Defendant
GODADDY.COM, LLC (f/k/a GoDaddy.com, Inc.)

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ACADEMY OF MOTION PICTURE ARTS AND SCIENCES, a California nonprofit corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>GODADDY.COM, INC., a Delaware corporation; THE GODADDY GROUP INC., a Delaware corporation; DOMAINS BY PROXY, INC., a Delaware Corporation; GREENDOMAINMARKET.COM, an unknown entity; BDS, an unknown entity; and XPDREAMTEAM LLC, a California limited liability corporation,<br><br>    Defendants. | Case No. CV10-3738 AB (CWx) [consolidated with Case No. CV13-08458-ABC (CW)<br><br>Assigned to Hon. André Birotte Jr.<br><br><br>**DEFENDANT GODADDY.COM, LLC'S TRIAL BRIEF**<br><br><br>Complaint Filed:    May 18, 2010<br>Trial Date:            August 4, 2015 |

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

# **TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................ 1

II.     AMPAS CANNOT PREVAIL ON ITS ACPA CLAIM AS TO ANY OF
        THE ACCUSED DOMAINS ........................................................................ 5

        A.    AMPAS Is Unable to Demonstrate Confusing Similarity As To 56
              Of The 293 Accused Domains ............................................................ 5

        B.    The Evidence In This Case Demonstrates That GoDaddy Did Not
              Act With A Bad Faith Intent To Profit From AMPAS' Marks .............. 7

              1.    The Nine Enumerated Factors Set Forth in the ACPA Favor
                    GoDaddy ................................................................................. 9

              2.    The Unique Circumstances in this Case Further Militate
                    Against a Finding of Bad Faith Intent to Profit ......................... 22

              3.    AMPAS' "Evidence" of GoDaddy's Bad Faith Intent to Profit
                    from AMPAS' Marks is Flawed ................................................. 32

              4.    The ACPA Safe Harbor Further Shields GoDaddy from
                    Liability ................................................................................. 38

        C.    If AMPAS Prevails On The Issue Of Bad Faith, The Statutory Damage
              Award Should Be Significantly Lower Than The $30 Million
              Requested By AMPAS ...................................................................... 42

        D.    AMPAS Is Not Entitled To An Award of Attorneys' Fees Under The
              ACPA ............................................................................................. 44

III.    CONCLUSION ........................................................................................ 47

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

DEFENDANT'S TRIAL BRIEF

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

# TABLE OF AUTHORITIES

## Cases

*Active Sports Lifestyle USA, LLC v. Old Navy, LLC*, 2014 WL 1246497
(C.D. Cal. 2014) ........................................................................................42

*Apple Inc. v. Samsung Electronics Co*., No. 11-CV-01846-LHK,
2014 WL 4145499 (N.D. Cal. Aug. 20, 2014)...............................45, 46

*Cartoon Network LP v. CSC Holdings, Inc.*, 536 F. 3d 121 (2d Cir. 2008) .............23

*CollegeSource, Inc. v. AcademyOne, Inc.*, No. 10-3542, 2012 WL 5269213
(E.D. Pa., Oct. 25, 2012) ...........................................................................40

*CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004) ..........................23

*CrossFit, Inc. v. Alvies,* No. 13-3771 SC, 2014 WL 251760
(N.D. Cal. Jan. 22, 2014)...........................................................................28

*Deckers Outdoor Corp. v. Ozwear Connection Pty Ltd*., 113 U.S.P.Q.2d 1197, 2014
WL 4679001 (C.D. Cal. 2014) .....................................................................6

*E&J Gallo Winery v. Spider Webs Ltd*., 286 F.3d 270 (5th Cir. 2002)..............18, 23

*Facebook, Inc. v. Banana Ads, LLC, et al.* No. 11-cv-03619,
2013 WL 1873289 (N.D. Cal. Apr. 30, 2013) ...........................................43

*General Steel Domestic Sales, LLC v. Chumley,* No. 10-cv-01398-PAB-KLM,
2013 WL 1900562 (D. Colo. May 7, 2013)...............................................40

*Gioconda Law Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424 (S.D.N.Y. 2013).......8, 22

*Government Employees Ins. Co. v. Google, Inc.*, No. 1:04-cv-507,
2005 WL 1903128 (E.D. Va. Aug. 8, 2005) ..............................................40

*Gracie v. Gracie*, 217 F.3d 1060 (9th Cir. 2000) .....................................................44

*Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214
(4th Cir. 2002) .....................................................................................10, 21

*Herb Reed Enters. v. Fla. Mgmt., Inc.*, 736 F.3d 1239 (9th Cir. 2013) ...................42

*Infostream Group Inc. v. Avid Life Media Inc.,* No. CV 12-09315 DDP,

2013 WL 6018030 (C.D. Cal. Nov. 12, 2013) ......................................................40

*Int'l Oddities v. Record*, No. CV 12-3934-CAS VBKX, 2013 WL 3864050

(C.D. Cal. July 22, 2013) ...............................................................................44

*Interstellar Starship Servs., Ltd. v. Epix, Inc.,* 304 F.3d 936 (9th Cir. 2002) ............7

*J.G. Wentworth, S.S.C. Ltd. P'ship v. Settlement Funding LLC,* No. 06-0597,

2007 WL 30115 (E.D. Pa., Jan. 4, 2007) .......................................................40

*Jurin v. Google*, *Inc.*, 695 F. Supp. 2d 1117 (E.D. Cal. 2010) .................................40

*Lewittes v. Cohen*, No. 03 Civ. 189, 2004 WL 1171261

(S.D.N.Y. May 26, 2004) .............................................................................5, 8

*Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949

(C.D. Cal. 1997) ...........................................................................................30

*Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806 (6th Cir. 2004) .....8, 10

*Mattel, Inc. v. Barbie-Club.com*, 310 F.3d 293 (2d Cir. 2002) ...............................19

*Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362 (D.N.J. 2004) .........7, 12, 17

*MDY Indus., LLC v. Blizzard Entm't, Inc.,* 629 F.3d 928 (9th Cir. 2010) ...............39

*Merck & Co. v. Mediplan Health Consulting*, 425 F. Supp. 2d 402

(S.D.N.Y. 2006) ...........................................................................................13

*Network Automation, Inc. v. Advanced System Concepts, Inc.*, 638 F.3d 1137

(9th Cir. 2011) .........................................................................................14, 40

*New Kids on the Block v. News Am. Pub., Inc.,* 971 F.2d 302 (9th Cir. 1992) .........13

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749,

188 L. Ed. 2d 816 (2014) .............................................................................45

*People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359

(4th Cir. 2001) ........................................................................................18, 45

*Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 737 F.3d 546

(9th Cir. 2013) ...............................................................................................1

*Porsche Cars North Am., Inc. v. Porsche.com*, 51 F. Supp. 2d 707

(E.D. Va. 1999) ...........................................................................................21

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

DEFENDANT'S TRIAL BRIEF

*Pro-Concepts, LLC v. Resh*, No. 2:12CV573, 2013 WL 5741542

(E.D. Va. Oct. 22, 2013) ...................................................................19

*Rearden LLC, et al. v. Rearden Commerce, Inc.*, 2010 WL 2650516

(N.D. Cal. July 1, 2010) ...........................................................11, 31

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004) ...............................39

*Rosetta Stone Ltd. v. Google, Inc.*, 730 F. Supp. 2d 531 (E.D. Va. 2010) ...............41

*S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235 (11th Cir. 2009) ....................9

*Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881 (9th Cir. 2005) ........................10

*Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279 (S.D.N.Y. 1997) .....46

*Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092 (C.D. Cal. 2009) .....20, 36

*Sporty's Farm LLC v. Sportsman's Market, Inc.,* 202 F.3d 489

(2d Cir. 2002) ...................................................................7, 18, 23

*Storey v. Cello Holdings*, L.L.C., 347 F.3d 370, 385 (2d Cir. 2003) ........................7

*SunEarth, Inc. v. Sun Earth Solar Power Co.*, 2013 WL 4528539

(N.D. Cal. Aug. 23, 2013) ...........................................................passim

*Texas Int'l Prop. Associates v. Hoerbiger Holding AG*, 624 F. Supp. 2d 582

(N.D. Tex. 2009) ...................................................................27

*Tiffany (NJ) v. eBay*, 600 F.3d 93 (2d Cir. 2010) ...........................................passim

*TMI, Inc. v. Maxwell*, 368 F.3d 433 (5th Cir. 2004) ..........................................8

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171

(9th Cir. Cal. 2010) ...........................................................14, 15, 16

*Trump Plaza of the Palm Beaches Condo. Ass'n v. Rosenthal*, 2009 U.S. Dist.

LEXIS 54450 (S.D. Fla. June 24, 2009) ............................................31

*Verizon California, Inc. v. Onlinenic, Inc.*, 647 F. Supp. 2d 1110

(N.D. Cal. 2009) ...................................................................43

*Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264

(4th Cir. 2001) ...........................................................7, 10, 19

*Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350 (9th Cir. 1969) .........15

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

DEFENDANT'S TRIAL BRIEF

## **Statutes**

15 U.S.C. § 1125 ...................................................................................... 4, 8, 41

## **Other Authorities**

S. Rep. 106-140 ...................................................................................... 1, 4, 11, 13, 20

H.R. Rep. 106-412 .................................................................................. 1, 4, 11, 13, 20

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

DEFENDANT'S TRIAL BRIEF

## I.     INTRODUCTION

In 1999, Congress enacted the Anticybersquatting Consumer Protection Act, codified at 15 U.S.C. § 1125(d) (the "ACPA"), to prevent a very specific harm: the third-party registration of a domain name associated with a protected trademark for the purpose of either "ransom[ing] the domain name to the mark holder or divert[ing] business from the mark holder." *Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 737 F.3d 546, 550 n. 3 (9th Cir. 2013).  In doing so, Congress sought to protect the interests of trademark owners in reserving a web address at www.trademark.com, while also ensuring that it "must not cast its net too broadly or impede the growth of technology, and [that] it must be careful to balance the legitimate interests of Internet users with the other interests sought to be protected." S. Rep. 106-140, 10.  To that end, Congress made clear that "[u]nder the [ACPA], the use of a domain name for purposes of comparative advertising . . . *even where done for profit*, would not alone satisfy the bad-faith intent requirement."  S. Rep. 106-140, 14; H.R. Rep. 106-412 (emphasis added).

Plaintiff Academy of Motion Picture Arts and Sciences ("AMPAS") does not allege that Defendant GoDaddy.com, LLC ("GoDaddy")—the world's largest domain name registrar—registered any of the domain names at issue, nor that GoDaddy attempted to ransom any of those domain names to AMPAS or sought to divert business from AMPAS.  Instead, AMPAS complains of GoDaddy's conduct in partnering with non-party Google, Inc. ("Google") to allow the placement of third-party advertisements on 293 domain names alleged to incorporate one of five AMPAS trademarks within the domain name string (the "Accused Domains").

The contrast between the wrongs intended to be addressed by the ACPA and the allegations underlying AMPAS' cybersquatting claim make clear that AMPAS is not seeking to hold GoDaddy liable for the type of conduct the ACPA was enacted to prevent.  Rather, AMPAS is attempting an end run around traditional trademark law by seeking to hold GoDaddy liable for alleged trademark

infringement by third-party advertisers participating in Google's AdSense for Domains program—a hypocritical position given that AMPAS was one of the very advertisers whose advertisements appeared on domain names at issue in this case. Endorsing the position advanced by AMPAS would amount to a radical expansion of the ACPA that finds support in neither precedent nor policy and that would, if adopted, dramatically expand AMPAS' rights in its trademarks while stifling the very technological and commercial progress Congress strove to protect.

AMPAS' effort fails not only for the lack of facts supporting an ACPA violation as to each of the Accused Domains, but also because the available evidence falls far short of establishing that GoDaddy had the requisite bad faith intent to profit from any of the five AMPAS trademarks at issue (the "AMPAS Marks"). A determination as to whether GoDaddy had a "bad faith intent to profit" from the AMPAS Marks requires a three-part analysis: (1) an examination of the nine non-exclusive and permissive statutory factors set forth in the ACPA; (2) application of the unique circumstances of this case; and (3) consideration of whether GoDaddy had reasonable grounds to believe that the use of the domain names was a fair use or otherwise lawful. The evidence impacting each of these queries belies any bad faith intent to profit from the AMPAS Marks.

The undisputed evidence relating to each of the nine factors weighs overwhelmingly in GoDaddy's favor. As an initial matter, not one of the Accused Domains was registered or selected by GoDaddy. Rather, they were all selected and registered by third-parties—a number of whom (a) hold trademark and/or personal identifier rights in the Accused Domains and/or (b) registered the Accused Domains for the purpose of offering bona fide goods and services to the public via the Internet. There is no evidence that GoDaddy (or any of the registrants) intended to divert consumers from AMPAS' own website either for commercial gain or for the purpose of tarnishing or disparaging the AMPAS Marks. The undisputed evidence also demonstrates that any use of the Accused Domains to trigger the display of

AMPAS-related advertisements on parked pages resolving from the Accused Domains was protected by the nominative fair use doctrine. AMPAS can hardly argue to the contrary given its admitted use of hundreds of third-party trademarks to trigger the display of its own advertisements on, among other things, domain names participating in one of GoDaddy's parked page programs.

The unique factors presented by the evidence in this case also compel a defense verdict at trial. GoDaddy is the largest domain name registrar in the world with approximately 59 million domain names under management. GoDaddy has registered more than 150 million domain names since becoming an ICANN-accredited registrar in 2000, averaging over 25,000 domain registrations per day. Each time a domain name is registered, GoDaddy requires the registrant to affirmatively represent that the registration of their selected domain name(s) does not infringe any third-party intellectual property rights. GoDaddy relies on this representation in allowing registrants to utilize its registration services and purchase its post-registration products.

To prevent being placed in the position of arbiter as to the legitimacy of a registrant's representations, GoDaddy created a robust trademark dispute resolution program to assist brand owners in resolving disputes over the alleged misuse of their intellectual property by third-party registrants. GoDaddy's decision to model its program on the "notice and takedown" procedures of the Digital Millennium Copyright Act has effectively provided brand owners like AMPAS with extrajudicial protections not otherwise afforded by current trademark law.

For example, prior to the initiation of the instant lawsuit, AMPAS availed itself of GoDaddy's trademark dispute resolution program to address both copyright and trademark issues on websites hosted by GoDaddy. Included among the issues presented by AMPAS was the appearance of pay-per-click advertisements on parked pages resolving from domain names that allegedly incorporated the AMPAS Marks in the domain strings (e.g., PETS-OSCAR.COM, OSCAR-CURROS.COM,

RING BENDER LLP
2 Park Plaza, Suite 550
Irvine, California 92614

DEFENDANT'S TRIAL BRIEF

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

HIGHPOINTACADEMYAWARDS.COM, and GEORGES-OSCAR.COM). In response, GoDaddy redirected each of the domain names at issue to non-monetized templates within, on average, 2.75 days.

The safe harbor provision of the ACPA also militates against a finding of GoDaddy's bad faith intent to profit from AMPAS' Marks. The general provision of monetized parked pages does not run afoul of any regulation adopted by the Internet Corporation for Assigned Names and Numbers (the administrative body sanctioned by Congress to regulate the Internet) ("ICANN") and, to GoDaddy's knowledge, there are no reported decisions holding the provision of monetized parking services to be unlawful under any regulatory, statutory or common law scheme. In light of these facts, GoDaddy held an objective good faith belief that the automated practice of parking undeveloped domains on pages containing advertisements generated by Google was a lawful use of the Accused Domains. This belief was bolstered by (a) repeated court decisions setting forth the legality of Google's AdSense for Domains and AdWords products, as well as the practice of competitive keyword advertising and (b) Google's August 2010 decision (as implemented in January 2011) to generate advertisements for GoDaddy parked pages based on the personalized search history and/or preferences of each Internet user.

The legal and factual universe presented by this case supports a defense verdict at trial. Yet even assuming *arguendo*, the Court determines GoDaddy acted in bad faith by allowing the monetization of the Accused Domains, the multi-million dollar award sought by AMPAS is overreaching. Given GoDaddy's undisputed lack of involvement in the selection and registration of the domain names, the *de minimus* revenue received by GoDaddy from a small subset of the Accused Domains (approx. $108), the minimal non-AMPAS affiliated traffic, and the strength of countervailing facts supporting a determination of good faith, the Court should cap any award of statutory damages at $1,000 per domain name. The same

RING BENDER LLP
2 Park Plaza, Suite 550
Irvine, California 92614

facts precluding an award of maximum statutory damages also should preclude AMPAS' ability to recover attorneys' fees because this is not an exceptional case.

The progeny of cases applying the ACPA reflect the delicate balance sought to be achieved by Congress vis-à-vis the protection of intellectual property rights and the advancement of technology and commerce. While courts have steadfastly utilized the ACPA to punish the "traditional" cybersquatter, courts have just as regularly refused to find a violation where a defendant did not engage in any of "the core activities that threaten to result in the paradigmatic harm that the ACPA was enacted to eradicate." *Lewittes v. Cohen*, No. 03 Civ. 189, 2004 WL 1171261 at *8 (S.D.N.Y. May 26, 2004). In light of the undisputed evidence demonstrating that GoDaddy did not engage in any conduct proscribed by the ACPA, the result should be no different here.

## II. AMPAS CANNOT PREVAIL ON ITS ACPA CLAIM AS TO ANY OF THE ACCUSED DOMAINS

To state a viable claim under the ACPA, AMPAS must establish that (1) GoDaddy registered, trafficked in, or used each of the Accused Domains; (2) each of the Accused Domains is identical or confusingly similar to the AMPAS Marks; and (3) that GoDaddy had a bad faith intent to profit from the goodwill of the AMPAS' Marks. *See* 15 U.S.C. § 1125(d)(1)(A). Evidence sufficient to satisfy the above elements must be produced for each of the Accused Domains since liability under the ACPA is domain name specific. *Id.* AMPAS is unable to make such a showing.

### A. AMPAS Is Unable to Demonstrate Confusing Similarity as to 56 of the 293 Accused Domains

There are currently 293 domain names at issue. *See* Stipulated Fact ("SF") No. 25. Although the Court previously adjudicated the issue of confusing similarity as to 237 of the 293 domain names, the issue of whether each of the remaining 56 domain names is confusingly similar to one or more of the AMPAS Marks is set to

be adjudicated at trial.[1]  *See* Orders [Dkt. Nos. 508 and 568].  Each of the remaining 56 domain names incorporates the term "oscar" in the domain name string.  *See* Appendix A; GoDaddy's Proposed Findings [Dkt. No. 702] at ¶ 83.

The mere fact that each of the 56 domain names at issue incorporates the term "oscar" somewhere in the domain name string does not lead to a finding of confusing similarity.  *See, e.g.*, *Deckers Outdoor Corp. v. Ozwear Connection Pty Ltd.*, 113 U.S.P.Q.2d 1197, 2014 WL 4679001 (C.D. Cal. 2014) (concluding that the domain name "ozwearuggs.com" was *not* confusingly similar to the trademark "UGG," since the component "uggs" was generic and noting as a further example that "if the trademark was 'CHIP' plastics, the word 'chips' in a domain name would not necessarily be 'confusingly similar' to the trademark 'CHIP'").  This is especially true where AMPAS admits that the term "oscar" has at least 15 meanings in common usage other than those ascribed to AMPAS' trademarks, and that a number of those meanings predate the existence of AMPAS' trademark.  *See* SF Nos. 98-111.  The lack of confusing similarity between each of the 56 domains and the "OSCAR" mark is further supported by the Court's earlier inability to reach a determination as to these domain names, which weighs heavily in favor of a finding that they are indeed not "confusingly similar."  Dkt. Nos. 508 and 568.

In light of the undisputed evidence, the Court should deem each of these 56 domains not confusingly similar as a matter of law and reduce the total number of Accused Domains at issue to 237.  It is this number that should be at issue when the Court makes the lynchpin liability determination in this case: whether GoDaddy had the requisite bad faith intent to profit from AMPAS' Marks in relation to each of the Accused Domains.

---

[1]  During the course of the litigation, 53 domains accused by AMPAS were dismissed either voluntarily or because the Court held they were not confusingly similar as a matter of law.  *See* SF No. 27.

Ring Bender LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

DEFENDANT'S TRIAL BRIEF

**B.** **The Evidence in This Case Demonstrates that GoDaddy Did Not Act With a Bad Faith Intent to Profit from AMPAS' Marks**

Because the ACPA has the potential to encompass a broad array of online conduct, courts are "reluctant to interpret the ACPA's liability provisions in an overly aggressive manner." *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 270 (4th Cir. 2001); *see also id.* ("The ACPA was not enacted to put an end to the sale of all domain names."). This is particularly true of the bad faith intent to profit requirement. As one federal court noted in discussing the "bad faith intent to profit" prong in the context of a "cyber-griper" situation:

> The ACPA's congressional record consistently signals the drafters' intention to target a narrow class of cyber-squatters consisting of those who have the bad faith intent to profit, and not to tread on the rights of those with any other motives. H.R. Rep. 106-412, 10; S. Rep. 106-40, 13; *Ford Motor Co.*, 177 F. Supp.2d at 642 (the "ACPA was designed to target persons who commandeer a domain name for no reason other than to profit by extortion, yet bypass persons with legitimate interests in the domain name.").

*Mayflower Transit*, LLC v. Prince, 314 F. Supp. 2d 362, 370 (D.N.J. 2004).

Although courts have struggled to define the boundaries of "bad faith intent to profit" given the express license to consider factors beyond the nine enumerated indicia, a number of courts—including the Ninth Circuit—have departed from strict adherence to the statutory factors and relied expressly on a more case-specific approach to bad faith. *See Interstellar Starship Servs., Ltd. v. Epix, Inc.,* 304 F.3d 936, 946-947 (9th Cir. 2002); *Sporty's Farm LLC v. Sportsman's Market, Inc.,* 202 F.3d 489, 499 (2d Cir. 2002). As part of that analysis, courts look to a defendant's whole course of conduct, including conduct during ACPA litigation, to reach a determination on the issue of bad faith. *See, e.g., Storey v. Cello Holdings*, L.L.C., 347 F.3d 370, 385 (2d Cir. 2003).

Given the clear Congressional intent to "balance the property interests of trademark owners with the legitimate interests of Internet users and others who seek to make lawful uses of others' marks, including for purposes such as comparative

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

1    advertising, comment, criticism, parody, news reporting, fair use etc.," courts have

2    been reluctant to identify additional "unique circumstances" that reveal a bad faith

3    intent to profit.   H.R. Rep. 106-412, 10 (emphasis added); *Gioconda Law Grp.*

4    *PLLC v. Kenzie*, 941 F. Supp. 2d 424, 428 (S.D.N.Y. 2013).   Indeed, in cases that

5    vary too much from the specific evil contemplated by the ACPA, courts have looked

6    skeptically at claims of bad faith and refused to find an ACPA violation.   *See*

7    *Lewittes*, 2004 WL 1171261, at *8   ("[O]n the whole, the allegations set forth in the

8    Complaint do not even remotely suggest that defendants perpetrated the core

9    activities that threaten to result in the paradigmatic harm that the ACPA was enacted

10   to eradicate.").

11          As the Sixth Circuit noted in a 2004 decision:

12          The paradigmatic harm that the ACPA was enacted to eradicate—the
             practice of cybersquatters registering several hundred domain names
13          in an effort to sell them to the legitimate owners of the mark—is
             simply not present in any of [Defendant's] actions.   In its report on the
14          ACPA, the Senate Judiciary Committee distilled the crucial elements
             of bad faith to mean an "intent to trade on the goodwill of another's
15          mark."   S. Rep. No. 106–140, at 9. *See also Ford Motor Co. v.*
             *Catalanotte*, 342 F.3d 543, 549 (6th Cir. 2003) ("Registering a famous
16          trademark as a domain name and then offering it for sale to the
             trademark owner is exactly the wrong Congress intended to remedy
17          when it passed the ACPA.").   **There is no evidence that this was
             [Defendant's] intention when she registered the Lucas Nursery**
18          **domain name and created her web site. It would therefore stretch
             the ACPA beyond the letter of the law and Congress's intention to**
19          **declare anything to the contrary**.

20   *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 810 (6th Cir. 2004)

21   (emphasis added).

22          One year later, the Fifth Circuit adopted a similar approach while assessing an

23   ACPA claim aimed at a site designed to "inform potential customers about a

24   negative experience with [a] company."   *TMI, Inc. v. Maxwell*, 368 F.3d 433, 439

25   (5th Cir. 2004).   That court examined the nine statutory indicia of bad faith, then

26   added that "we particularly note that Maxwell's conduct **is not the kind of harm**

27   **that ACPA was designed to prevent**."   *Id*. at 440 (emphasis added); *see also id*.

28

1  (noting the absence of bad faith after "analyzing the statutory factors and ACPA's

2  purpose").

3      The Eleventh Circuit joined this line of precedent in 2009.  Emphasizing that

4  "'bad faith' is not enough" and that "[a] defendant is liable only where a plaintiff

5  can establish that the defendant had a 'bad faith intent to profit,'" the Eleventh

6  Circuit saw no bad faith intent to profit under the ACPA where a plaintiff accused

7  the defendant "not of a design to sell a domain name for profit but of a refusal to sell

8  one."  *S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1246–47 (11th Cir.

9  2009) (citations omitted) (emphasis in original).  As the court explained:

> The Senate Report accompanying the Anticybersquatting Consumer
> Protection Act bolsters our understanding that a "bad faith intent to
> profit" is the essence of the wrong that the Act seeks to combat.  That
> report defines cybersquatters as those who: (1) register well-known
> brand names as Internet domain names in order to extract payment
> from the rightful owners of the marks; (2) register well-known marks
> as domain names and warehouse those marks with the hope of selling
> them to the highest bidder; (3) register well-known marks to prey on
> consumer confusion by misusing the domain name to divert customers
> from the mark owner's site to the cybersquatter's own site; (4) target
> distinctive marks to defraud consumers, including to engage in
> counterfeiting activities.  The report says nothing about those who
> hold onto a domain name to prevent a competitor from using it.

17  *Id*. at 1246 (quotation marks and citations omitted) (emphasis in original).

18      It is within this legal framework that the Court must engage in a tripartite

19  analysis to determine whether GoDaddy acted with a bad faith intent to profit from

20  AMPAS' Marks.  As set forth below, the undisputed evidence demonstrates that

21  GoDaddy had no such intent.

22      **1.      The Nine Enumerated Factors Set Forth in the ACPA Favor**

23           **GoDaddy**

24      The nine "bad faith" factors set forth in the ACPA are difficult to apply in the

25  current context where (a) a domain name registrar who is admittedly not a

26  competitor of the trademark holder (b) hosts parked pages for domain names it did

27  not select for registration (c) as part a program containing more than 18 million

28  domain names through (d) an automated process in which no GoDaddy personnel

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

9

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

are involved.  Nonetheless, when applied to the facts of this case, the nine factors are either inapplicable, neutral, or weigh in favor of GoDaddy.[2]

a.  <u>Trademark or Intellectual Property Rights in the Accused Domains</u>

"This factor takes account of the fact that the same or similar marks can peacefully coexist in the marketplace without a likelihood of confusion when used in widely differing product or service lines or in remote geographic markets."  4 McCarthy on Trademarks and Unfair Competition § 25:78. "The language of Factor (I) does not speak in terms of United States trademark rights, but refers generally to 'intellectual property rights.' This encompasses intellectual property rights irrespective of their territorial origin." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 234 (4th Cir. 2002). *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 2013 WL 4528539 at *23 (N.D. Cal. Aug. 23, 2013) *amended in part*, 2013 WL 6157208 (N.D. Cal. Nov. 22, 2013).

The undisputed evidence demonstrates that many of the registrants of the Accused Domains have trademark and/or other intellectual property rights in their respective domain names.[3]  For example, Online Data Exchange, LLC, the registrant of E-OSCAR.COM, E-OSCARHOME.COM, E-OSCARONLINE.NET, OFFICALE-OSCAR.COM, and OFFICIALE-OSCARONLINE.COM owns a federally-registered trademark in e-OSCAR.  *See* Joint Exhibit ("JTX") No. 1222; GoDaddy's Proposed Findings [Dkt No. 702] at ¶ 90.  Similarly, the registrants for 16 other Accused Domains have common law trademark rights in their domain names.  *See* Appendix B; GoDaddy's Proposed Findings [Dkt No. 702] at ¶ 91; JTX

---

[2]  "The first four [factors] suggest circumstances that may tend to indicate an absence of bad-faith intent to profit from the goodwill of a mark, and the others suggest circumstances that may tend to indicate that such bad-faith intent exists." H.R. Rep. No. 106-412, 1999 WL 970519 at *10; *accord Virtual Works, Inc.*, 238 F.3d at 269; *Lucas Nursery*, 359 F.3d at 810.

[3]  The Court previously ruled that GoDaddy is the authorized licensee of the domain name registrants of the Accused Domains.  *See* Order [Dkt. No. 491] at 13:4-14:21.  Thus, whether GoDaddy has trademark or intellectual property rights in any of the Accused Domains depends on the trademark or intellectual property rights of each individual registrant; i.e., GoDaddy effectively "stands in the shoes" of the registrant.  *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 897 (9th Cir. 2005).

Nos. 373-386, 392.  As such, this factor weighs in GoDaddy's favor with respect to each of these 21 domain names.

As to the remaining Accused Domains, this factor is neutral in light of the lack of evidence relating to any trademark or other intellectual property rights held by those registrants when GoDaddy's alleged use occurred.  To meet its burden, AMPAS was required to present evidence demonstrating a lack of trademark rights on the part of the registrants of the Accused Domains.  AMPAS will not offer any such evidence at trial.

> b.  <u>The Extent to which Each Domain Name Consists of the Legal Name of the Registrant or a Name that is Otherwise Commonly Used to Identify the Registrant</u>

> "This factor recognizes that with the growing use of personal Web sites, a person should be permitted to register their legal name or widely recognized nickname as the domain name of their Web site." 4 McCarthy on Trademarks and Unfair Competition § 25:78.  However, this "factor is not intended to suggest that domain name registrants may evade the application of this act by merely adopting Exxon, Ford, Bugs Bunny or other well-known marks as their nicknames." H.R. Rep. No. 106-412, 10.

*SunEarth*, 2013 WL 4528539 at *23.

The undisputed evidence shows that no less than 14 of the Accused Domains consist of the legal name of the registrant or a name commonly used to identify the registrant, the registrant's children or the registrant's business.  *See* Appendix C; GoDaddy's Proposed Findings [Dkt No. 702] at ¶ 92; JTX Nos. 373-380, 382-386, and 392.  Thus, the second factor weighs in GoDaddy's favor for each of these 14 domain names.  *See e.g., Rearden LLC, et al. v. Rearden Commerce, Inc.*, 2010 WL 2650516 at *1220 (N.D. Cal. July 1, 2010) ("[A] reasonable jury could weigh this particular factor even more heavily in favor of Appellants given the fact that [the domain name] is the exact legal name recently adopted by one of the Appellants.").

As for the remaining Accused Domains, this factor is neutral in light of AMPAS' failure to produce evidence at trial regarding whether any of the domain

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

names consist of the legal name of the registrant or a name that is otherwise commonly used to identify the registrant or the registrant's business.

### c. Prior Use of the Accused Domains in Bona Fide Offering of Goods or Services

"This factor is similar to Factor (I) and recognizes that the legitimate use of the domain name in commerce is a good indicator of a good faith intent." 4 McCarthy on Trademarks and Unfair Competition § 25:78. The reference to "prior use" means that this "good faith factor cannot be founded upon a purported good faith use of the domain name undertaken only after the dispute arose and motivated by a desire to fabricate a good faith defense." *Id.*

*SunEarth*, 2013 WL 4528539 at *23.

There is no evidence regarding whether any of the Accused Domains were previously used in connection with a bona fide offering of goods and services by any of the registrants. To that extent, this factor is neutral.

There is evidence, however, that at least 12 of the Accused Domains were registered for the purpose of providing a bona fide offering of goods and services in the future. *See* Appendix D; GoDaddy's Proposed Findings [Dkt No. 702] at ¶ 93; JTX Nos. 373-376, 378-379, 382-386, and 392. For each of these domain names, the factor weighs in favor of GoDaddy. With regard to the remaining domain names, this factor is, at the very least, neutral in the absence of evidence as to whether any registrant other than those for the additional 21 Accused Domains, identified *supra*, with trademark or other intellectual property right in their respective domain names when GoDaddy's alleged use occurred.

### d. Bona Fide Noncommercial or Fair Use of the Mark in a Site Accessible Under the Domain Name

The purpose of this element is to protect domain name registrations and users engaged in protected activities such as critical commentary [or, as relevant here, comparative advertising]. *Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*, 213 F. Supp. 2d 612, 624-25 (E.D. Va. 2002). This factor should be examined in tandem with the "safe harbor" in the ACPA which provides that bad faith

intent shall "not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).

*Mayflower Transit, LLC*, 314 F. Supp. 2d at 369.

It is undisputed that until January 22, 2011, advertisements displayed on GoDaddy's parked pages were generated by a Google algorithm that parsed domain names into keywords and then used those keywords to generate contextually relevant advertisements to be served on GoDaddy parked pages. *See* JTX No. 369. This is the conduct upon which AMPAS bases its ACPA claim against GoDaddy, arguing that the display of advertisements that were potentially triggered by one or more of the AMPAS Marks constitutes cybersquatting.[4]

As an initial matter, AMPAS has no evidence that any of the AMPAS Marks were used to generate advertisements displayed on the Accused Domains. However, the available evidence demonstrates that even if such a use did occur, Google (and, as such, GoDaddy and the registrants of the Accused Domains) would be protected from liability by the nominative fair use doctrine.

In the Ninth Circuit, the nominative fair use doctrine applies to "a class of cases where the use of [a] trademark does not attempt to capitalize on consumer confusion or to appropriate the cachet of one product for a different one." *New Kids on the Block v. News Am. Pub., Inc.,* 971 F.2d 302, 306 (9th Cir. 1992). A defendant can use a plaintiff's trademark as long as doing so does not cause "confusion about the source of [the] defendant's product or the mark-holder's sponsorship or affiliation." *Merck & Co. v. Mediplan Health Consulting*, 425 F. Supp. 2d 402, 413 (S.D.N.Y. 2006); *Tiffany (NJ) v. eBay*, 600 F.3d 93, 102-03 (2d

---

[4]   This conduct applies only to those domain names with screenshots taken prior to January 2011, at which time Google advised GoDaddy that the display of advertisements on GoDaddy parked pages would be done utilizing interest-based advertising—a fact that militates against a finding that GoDaddy violated the ACPA as to those 134 post-January 2011 domain names. *See* JTX No. 400; *see also*, GoDaddy's Proposed Findings [Dkt. No. 702] at ¶ 97.

Ring Bender LLP
2 Park Plaza, Suite 550
Irvine, California 92614

1    Cir. 2010). Indeed, the nominative fair use doctrine permits a "truthful use of a

2    mark, even if the speaker fails to expressly disavow association with the trademark

3    holder, so long as it's unlikely to cause confusion as to sponsorship or

4    endorsement." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1177 (9th

5    Cir. 2010) (citations omitted). It is the trademark holder who "bear[s] the burden of

6    establishing that the [defendant's] use of [its] mark was not nominative fair use."

7    *Id*. at 1182.

8    Although AMPAS claims that GoDaddy (either on its own, or in conjunction

9    with Google or the registrants of the Accused Domains) used the AMPAS Marks to

10   generate AMPAS-related advertisements to be displayed on parked pages resolving

11   from the Accused Domains, AMPAS is unable to present evidence that even a single

12   Internet user was confused by one or more of the limited AMPAS-related

13   advertisements appearing on the Accused Domains. To the contrary, AMPAS

14   admitted that it had no knowledge of any such confusion. *See* Depo. Testimony of

15   S. Miller at 155:18-156:10 (Vol. II of 30(b)(6) Deposition); Depo. Testimony of R.

16   Robertson at 119:7-21.

17   Moreover, a review of the screenshots produced by AMPAS shows the

18   tenuous nature of any claim of confusion. With the exception of those parked pages

19   that actually displayed AMPAS' own advertisements, Internet users landing on a

20   parked page resolving from one of the Accused Domains would be hard-pressed to

21   believe that either the parked page or the advertisements contained thereon

22   constituted AMPAS' official website or provided a link to a website sponsored by

23   AMPAS. Indeed, screenshots produced for 79 of the 293 domain names do not

24   contain advertisements displaying any of the AMPAS' Marks. *See* Appendix E;

25   GoDaddy's Proposed Findings [Dkt. No. 702] at ¶ 101.

26   The lack of a likelihood of confusion is especially true given that the "focus

27   must be on the reasonably prudent consumer in the marketplace. . . . The relevant

28   marketplace is online marketplace, and the relevant consumer is a reasonably

prudent consumer accustomed to shopping online. . . . Unreasonable, imprudent and inexperienced web-shoppers are not relevant." *Toyota Motor Sales*, 610 F.3d at 1176; *see also Network Automation*, 638 F.3d 1137 (noting that "internet consumers are accustomed to . . . exploration by trial and error. They skip from site to site, ready to hit the back button whenever they're not satisfied with a site's contents" and that "consumers don't form any firm expectations about the sponsorship of a website until they've seen the landing page – if then. This is sensible agnosticism, not consumer confusion.").

The Ninth Circuit's decision in *Toyota Motor Sales* is illustrative. In *Toyota Motor Sales*, the Ninth Circuit addressed whether the defendants' commercial use of the domain names—"buy-a-lexus.com" and "buyorleaselexus.com"—qualified as nominative fair use. When it evaluated the applicability of the nominative fair use doctrine, the court noted that the defendants previously included copyrighted photographs of the plaintiff's Lexus brand vehicles and one of plaintiff's design marks on their website. The court stated that these uses of the "stylized Lexus mark and 'Lexus L' logo was more use of the mark than necessary and suggested sponsorship or endorsement by Toyota," because the defendants "could adequately communicate their message without using the visual trappings of the Lexus brand." *Id*. at 1181. The court also stated that "those visual cues might lead some consumers to believe they were dealing with an authorized Toyota affiliate. Imagery, logos and other visual markers may be particularly significant in cyberspace, where anyone can convincingly recreate the look and feel of a . . . brand at minimal expense." *Id*.

However, because the defendants had changed the look and feel of their website at the time of trial, which included "prominent" disclaimers, in large font, the court concluded that "[r]easonable consumers would arrive at the [defendants'] site agnostic as to what they would find. Once there, they would immediately see the disclaimer and would promptly be disabused of any notion that the . . . website is

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

sponsored by" plaintiff.  *Id*. at 1182.  "Because there was no risk of confusion as to sponsorship or endorsement," the defendants' use of the plaintiff's Lexus mark was fair."  *Id*.; *see also Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350, 351–52 (9th Cir. 1969) (concluding that defendant's use of Volkswagen and VW did not infringe plaintiff's trademarks where defendant also used term "independent" and did not use plaintiff's distinctive logos or lettering to advertise his services).  The Court noted in contrast that "[i]t is the wholesale prohibition of nominative use in domain names that would be unfair. . . . The only winners would be companies like Toyota, which would acquire greater control over the markets for goods and service related to their trademark brands, to the detriment of competition and consumers."  *Toyota Motor Sales,* 610 F.3d at 1180.

The same reasoning compels a conclusion that any alleged use of keywords parsed from the Accused Domains to display AMPAS-related advertisements on GoDaddy parked pages constitutes nominative fair use under Ninth Circuit case law. At the very least, the practices approved in *Toyota Motor Sales* certainly weigh against a finding of bad faith here.  Namely, a review of the advertisements returned by Google demonstrates that any advertisement incorporating one or more of the AMPAS Marks (again, other than AMPAS' own advertisements): (a) used no more of an AMPAS Mark than necessary; and (b) did nothing to suggest sponsorship or endorsement of the advertisement or linked content by AMPAS.

Each of the free parking pages clearly indicates that the web page was "parked FREE courtesy of GoDaddy.com."  *See* SF Nos. 97-98.  The ads served by Google are under the heading "Sponsored Listings" and appear in a format familiar to most Internet users as third-party advertisements. *See id*.  This clear statement of source, as well as the visual cues contained on the parked pages, in no way intimated any sponsorship or endorsement of the parked page or the "Sponsored Listings" by AMPAS.  *See id.*  They clearly communicate the opposite, advising consumers that they have not reached the webpage for AMPAS or any site affiliated

with AMPAS. *See id.* The lack of evidence suggesting that even a single consumer expressed confusion regarding the parked pages or any advertisements displayed thereon supports this conclusion. *See, e.g., Tiffany (NJ) Inc.,* 600 F.3d at 103 (finding "eBay's use of Tiffany's mark on its website and in sponsored links was lawful. eBay used the mark to describe accurately the genuine Tiffany goods offered for sale on its website. And none of eBay's uses of the mark suggested that Tiffany affiliated itself with eBay or endorsed the sale of its products through eBay's website.").

To the extent Google, GoDaddy, or any of the registrants of the Accused Domains used one or more of the AMPAS Marks to trigger the placement of advertisements on a parked page, it was a nominative fair use. *Mayflower Transit*, 314 F. Supp. 2d at 369 (finding "that an analysis of the fourth factor under bad faith—whether Defendant had a 'bona fide noncommercial or fair use of the mark'—speaks to the ultimate disposition of this case, and demonstrates why Defendant cannot be held liable under the ACPA"). Indeed, any other finding would be incongruous not only with AMPAS' own admitted use of Google's AdSense for Domains program, but also Congressional intent in enacting the ACPA: "**Under the bill, the use of a domain name *for purposes of comparative advertising* . . . even where done for profit, would not alone satisfy the bad-faith intent requirement**." S. Rep. 106-140, 14; H.R. Rep. 106-412 (emphasis added). This factor weighs in favor of GoDaddy's good faith.

e.     <u>Intent to Divert Consumers either for Commercial Gain or</u><br><u>With an Intent to Tarnish or Disparage the AMPAS Marks</u>

"This factor embodies the traditional rule of trademark law that when there is proof that the junior user has done something to intentionally divert or confuse customers, the courts will use this, either via a presumption or as relevant evidence, that defendant was successful and that a likelihood of confusion exists." 4 McCarthy on Trademarks and Unfair Competition § 25:78.

*SunEarth*, 2013 WL 4528539 (N.D. Cal.) at *24.

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

It is undisputed that GoDaddy did not register any of the Accused Domains nor did it select any of the Accused Domains for registration. *See* SF No. 29. It is also undisputed that GoDaddy and AMPAS are not competitors and there is no evidence that any conduct by GoDaddy was done with the purpose of competing with AMPAS. *See* SF No. 16. No evidence exists to suggest, much less prove, that GoDaddy had any interest in diverting consumers from AMPAS' website to parked pages resolving from any of the Accused Domains or that it did so. *See* Depo. Testimony of S. Miller at 89:20-24 and 90:5-6 (Vol. 1 of 30(b)(6) Deposition).

Nor is there any evidence that GoDaddy intended to use any of the Accused Domains to divert consumers for a commercial gain, to tarnish AMPAS' marks, or to harm the goodwill of AMPAS' marks. *See id.* at 89:20-24, 90:5-6, 91:8-10, 91:17-92:3, and 92:6-7. Indeed, the position taken by AMPAS on this factor is puzzling given that its own advertisements showed up as "Sponsored Listings" on a number of the screenshots produced in this litigation. *See* SF No. 126; *see, e.g.*, JTX Nos. 2029, 2045. Contrary to AMPAS' contention, the appearance of its own advertisements on a number of the Accused Domains would have actually directed—rather than diverted—consumers to its webpage.

In considering this factor, courts also examine whether the defendant attempted to prevent the plaintiff from competing with the defendant (*see Sporty's Farm*, 202 F.3d at 499); launched a website at the domain that disparaged the owner and its business (*see E&J Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270, 276 (5th Cir. 2002)); or attempted to divert Internet users to a website that contained information antithetical to the owner's purpose and goodwill (*see PETA v. Doughney*, 263 F.3d 359, 369 (4th Cir. 2001)). There is no evidence that GoDaddy engaged in any such conduct. As such, this factor weighs strongly in GoDaddy's favor.

///

///

RING BENDER LLP
2 Park Plaza, Suite 550
Irvine, California 92614

1

### f. Offering to Sell the Accused Domains

2

> "This factor embodies the conduct of the prototypical
> cybersquatter who registers a domain name with no intent to use it
> and offers to sell it to the legitimate trademark owner." 4
> McCarthy on Trademarks and Unfair Competition § 25:78.

3

4

5

*SunEarth*, 2013 WL 4528539 at *24.

6

It is undisputed that GoDaddy never offered to sell any of the Accused

7

Domains to AMPAS.[5]  *See* Depo. Testimony of S. Miller at 158:6-20 (Vol II of

8

30(b)(6) deposition).  It is also undisputed that GoDaddy never claimed any

9

ownership interest in the Accused Domains. *See id.* To the contrary, GoDaddy has

10

repeatedly disavowed any interest in the Accused Domains by first lodging them

11

with the Court at the outset of this litigation and again after AMPAS identified

12

additional domain names. *See* SF No. 28; *see also Mattel, Inc. v. Barbie-Club.com*,

13

310 F.3d 293, 296 (2d Cir. 2002) (citing 15 U.S.C. § 1125(d)(2)(D) ("Depositing

14

such documentation with the district court serves to signify . . . the registrar's

15

disinterested surrender of the disputed property to the adjudicative authority of the

16

court.").  In light of the above, this factor strongly favors GoDaddy. *See SunEarth*,

17

2013 WL 4528539 at *24 (finding this factor to favor defendant where "[n]o

18

evidence was offered that Defendants have attempted to sell, transfer or assign the

19

domain names to anyone for financial gain [and] Plaintiffs acknowledge that

20

Defendants have made no offer to sell the domain names to them.")

21

[5]     AMPAS may argue that to the extent certain parked pages include an automatically generated banner ad inquiring as to whether the Internet user is interested in purchasing the third-party-owned domain, the existence of such a banner ad constituted an offer to sell the domain under the ACPA. This argument falls flat. The cited banner merely advertised a service that GoDaddy generally offered to help facilitate the sale of expiring domains (or in some instances, the registrant's desire to offer a domain for sale via a parked page). Because it is undisputed that GoDaddy did not own any of the Accused Domains, the appearance of any such banner could not constitute an offer to sell by GoDaddy. Moreover, "a mere offer to sell a domain name is not itself evidence" of bad faith intent in the absence of evidence of the offer being exorbitant, i.e., not simply for reimbursement. *See Virtual Works, Inc.*, 238 F.3d at 270 (citing H.R. Conf. Rep. No. 106-464, at 111 (1999); *see also, Pro-Concepts, LLC v. Resh*, No. 2:12CV573, 2013 WL 5741542 at *15 (E.D. Va. Oct. 22, 2013) (offer to sell a domain for cost of reimbursement counters against finding of bad faith as to this factor).

22

23

24

25

26

27

28

g.     Misleading False Contact Information When Applying for

the Accused Domains

> The "provision of false contact information to a registrar is a hallmark of the cybersquatter, who wants to profit without being easily identifiable and served with process." 4 McCarthy on Trademarks and Unfair Competition § 25:78. However, a "mere honest mistake in identification has no such import." *Id*.

*SunEarth*, 2013 WL 4528539 at *24.

GoDaddy did not register any of the Accused Domains nor did GoDaddy provide any misleading or false contact information on behalf of the registrants as part of the registration process. *See* SF Nos. 29 and 30.  Moreover, it is undisputed that GoDaddy disclosed the identities of the registrants of the Accused Domains either in response to a letter from AMPAS' counsel or as part of this litigation. *See* SF No. 30.  This conduct is indicative of GoDaddy's good faith and, as such, this factor strongly favors GoDaddy.

h.     Registration of Multiple Domain Names that are Identical

or Confusingly Similar to Distinctive or Famous Marks of

Others, or Dilutive of Other Famous Marks

> In this factor, Congress intended to address an "increasingly common cyberpiracy practice known as 'warehousing', in which a cyberpirate registers multiple domain names—sometimes hundreds, even thousands—that mirror the trademarks of others." H.R. Rep. No. 106–412, 13.

*SunEarth*, 2013 WL 4528539 at *25.

Again, GoDaddy did not register any of the Accused Domains.  *See* SF No 29.  Nor is there any evidence that GoDaddy registered any domain names on behalf of itself that were identical or confusingly similar to the AMPAS Marks.  As such, this factor strongly favors GoDaddy.[6]

---

[6]     To the extent AMPAS seeks to rely on evidence that one or more of the registrants for the Accused Domains registered multiple domain names, "the ACPA 'does not suggest that the mere registration of multiple domain names is an indication of bad faith.'" *Harrods*, 302 F.3d at 234–35 (quoting H.R. Rep. No. 106–412 at 13). "This is presumably because many companies legitimately register

1

i.     The Extent to Which the Marks in the Domain Name Are

2          Not Distinctive or Famous

3

> [T]he ninth factor requires the Court to consider the extent to which the mark incorporated in the domain name is distinctive or famous under the ACPA. A mark is "distinctive and famous" if it is "widely recognized by the general consuming public of the United States as a designation of [sic] source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A).

*Pro-Concepts, LLC v. Resh*, No. 2:12CV573, 2013 WL 5741542, at *16

(E.D. Va. Oct. 22, 2013)

For the purposes of this factor, GoDaddy concedes that ACADEMY AWARD trademark is distinctive. With regard to the OSCAR trademark, however, GoDaddy disputes that the trademark has acquired the distinctiveness claimed by AMPAS given the substantial evidence that the term "oscar" is in common use both in everyday parlance and as a term trademarked to entities and individuals other than AMPAS. *See* SF Nos. 98-111; JTX Nos. 113-132, 135, 142-145; *see also* Depo. Testimony of R. Robertson at 83:3-11.

For example, the US Patent & Trademark Office has repeatedly permitted the registration of the OSCAR mark by persons other than AMPAS and at least one dictionary now defines the lower case term "oscar," as it would appear in a domain name, as a general award of excellence unrelated to AMPAS. *See* JTX Nos. 113-132, 135, 142-145, and 395. Even AMPAS admits that the term "OSCAR" has an array of meanings wholly unrelated to its awards ceremony. *See* SF Nos. 98-111. As a result, the OSCAR mark, especially as used in the context of domains names, is

---

many, even hundreds, of domain names consisting of various permutations of their own trademarks in combination with other words." *Id.* "Just as they can have several telephone numbers, companies can register multiple domain names in order to maximize the chances that customers will find their web site." *Id.* (quoting *Porsche Cars North Am., Inc. v. Porsche.com*, 51 F. Supp. 2d 707, 709 (E.D. Va. 1999)).

DEFENDANT'S TRIAL BRIEF

a weak mark in the context of the Accused Domains. Accordingly, this factor weighs strongly in GoDaddy's favor.

As set forth above, eight of the nine enumerated ACPA factors weigh in GoDaddy's favor or are neutral. The facts supporting the single factor in AMPAS' favor are exceptionally weak given the lack of evidence demonstrating that anyone other than AMPAS, its counsel, or its hired consultant visited the Accused Domains. *See* Depo. Testimony of S. Miller at 60:2-15 (Vol I of 30(b)(6) deposition). Moreover, the factors that most directly relate to bad faith all heavily weigh in GoDaddy's favor:

· GoDaddy did not attempt to divert customers from AMPAS;

· GoDaddy never offered to sell the domain names to AMPAS or any other person;

· GoDaddy did not try to hide its identity or provide misleading information relative to any of the Accused Domains; and

· GoDaddy has not registered any of the Accused Domains let alone registered other infringing domains.

The single factor arguably weighing in AMPAS' favor—whether the domains were used for the bona fide provision of goods and services—is insufficient to establish that GoDaddy possessed a bad faith intent to profit from any of the AMPAS Marks. *See Gioconda Law Group PLLC*, 941 F. Supp. 2d at 463 (where "only two of the nine [factors] weigh in favor of bad faith. That is not enough.").

## 2. The Unique Circumstances in this Case Further Militate Against a Finding of Bad Faith Intent to Profit

As set forth above, the most important evaluation in reaching a determination on the issue of bad faith is that undertaken in relation to the unique circumstances of the case. *See Sporty's Farm*, 202 F.3d at 289. In this case, the unique circumstances, all of which are undisputed, compel a finding that GoDaddy did not possess the requisite bad faith intent to profit from the AMPAS Marks.

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

DEFENDANT'S TRIAL BRIEF

a. <u>The Routing of the Accused Domains to GoDaddy's Parked Page Servers, and the Subsequent Display of Advertisements, Occurred By Way of Automated Processes</u>

The ACPA's intentional conduct requirement must be supported by proof of a volitional act by the defendant. *See*, *e.g.*, *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F. 3d 121, 131--32 (2d Cir. 2008) (person who uses automated system supplies requisite volitional conduct, not provider of system); *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 551 (4th Cir. 2004) (volitional conduct required for infringement claim not satisfied by providing automated system that responds indiscriminately to user requests); *E&J Gallo Winery*, 286 F.3d at 278 (utilizing interpretations of the Copyright Act to inform decision in ACPA matter).

Yet despite nearly five years of discovery, there is no evidence—not a single email, not a single document, and not a single line of testimony—demonstrating any intent by GoDaddy to profit specifically from the AMPAS Marks, let alone that GoDaddy had a bad faith intent to do so. The undisputed evidence supports a finding that GoDaddy did not engage in any volitional conduct specific to AMPAS or its marks:

· GoDaddy's registration, routing, and parked page processes are entirely automated;

· GoDaddy's automated system allows a registrant to select his or her desired domain name and to select where to route the domain name, including the ability to select GoDaddy's parked page servers, without having to interact with any GoDaddy personnel;

· In the event a registrant fails to designate a name server or otherwise identify where to route his or her domain name at the time of registration, GoDaddy's automated system will select its parked page servers as the DNS for that domain name;

· GoDaddy did not target or otherwise specifically select any of the Accused Domains for placement in its parked page programs;

· GoDaddy did not force any domain name to stay in its parked page program or create any barriers that would have made it difficult for a domain name to change its DNS. Rather, a

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

Ring Bender LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

registrant was free at all times to change his or her DNS through GoDaddy's automated systems;

·  When an Internet user enters that domain name into their URL, GoDaddy's automated systems create a template, which is then supplied through an automated process to Google, whose own automated systems determine and place advertisements on the parked page; and

·  GoDaddy did not select the third-party advertisements that appear on a GoDaddy parked page.

*See* SF Nos. 29, 59, 60, 83-84, 87-89 102, and 106; GoDaddy's Proposed Findings [Dkt. No. 702] at ¶¶ 8-19, 25, 31-33, and 39-43.

Given the entirely automated nature of GoDaddy's parked page system, GoDaddy lacked the volitional conduct necessary to support a finding that it had any intent to profit from the AMPAS Marks, let alone a bad faith intent to do so with respect to any of the Accused Domains. Any inadvertent use by GoDaddy of domain names that are confusingly similar or identical to the AMPAS Marks via its automated processes was unintentional and not indicative of the volitional conduct required for liability under the ACPA.

> b.  GoDaddy Made No Effort to Promote or Otherwise Drive Traffic to the Accused Domains, Nor Did GoDaddy Promote the Display of AMPAS-related Advertisements

It is undisputed that there are only two ways in which GoDaddy profits from parked pages: (1) an Internet user clicks on a GoDaddy banner and then purchases a product/service; or (2) an Internet user clicks on one of the Google-generated Sponsored Listings. *See* SF No. 69. Such conduct, however, presupposes that an Internet user actually lands upon a parked page; yet another reality that AMPAS conveniently chooses to ignore.

The undisputed evidence demonstrates that only a handful of Accused Domains were visited by anyone other than AMPAS, its counsel and/or its hired consultant. This evidence is not surprising—parked pages are inherently difficult for a general Internet user to stumble upon absent some attempt to promote them.

RING BENDER LLP
2 Park Plaza, Suite 550
Irvine, California 92614

*See e.g.*, JTX No. 911. So much so, apparently, that in order to manufacture this lawsuit, AMPAS hired a litigation consultant to create a software program to locate and trigger the Accused Domains. *See* SF Nos. 46, 47; JTX No. 2062.

Regardless, GoDaddy made no attempt to promote or otherwise drive traffic to any of the Accused Domains. *See id.* GoDaddy did not advertise the Accused Domains nor did it provide third parties with links to the Accused Domains. *See id.* Despite having an entire department dedicated to search engine optimization, GoDaddy did not engage in efforts to optimize any of the Accused Domains or otherwise promote their appearance in search engine results. *See id.*

Nor did GoDaddy make any effort to direct the placement of AMPAS-related advertisements on the domain names at issue. GoDaddy did not choose or otherwise have the ability to control the advertisements placed on the parked pages resolving from the Accused Domains. *See* SF Nos. 84, 87-89. At all times relevant, Google has maintained wholesale control and discretion over the selection and placement of advertisements appearing on each GoDaddy parked page. *See* SF Nos. 87-89. Moreover, since at least 2007, GoDaddy prevented registrants utilizing its Cash Parking service from identifying the term "academy award" as a keyword to generate advertisements. *See* SF No. 106, 107; JTX Nos. 404 and 534.

GoDaddy's refusal to promote and/or optimize the Accused Domains—even when provided with the opportunity to do so—is further evidenced by the fact that 221 of the 293 Accused Domains generated no revenue at all. *See* JTX Nos. 686, 902, 908, and 910. The remaining 72 Accused Domains generated total revenue of a mere $108. *See id.* If GoDaddy intended to profit from any of the AMPAS Marks contained in the Accused Domains, GoDaddy would have made specific efforts to drive relevant traffic to each of them. It did not do so.

///

///

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

c. After January 2011, Google Utilized Interest-based Advertising to Generate Advertisements for Domain Names in the Parked Page Programs

One additional factor weighs against a finding of bad faith as to 134 of the 293 Accused Domains: Google's January 2011 decision to change the advertising format for GoDaddy parked pages to "interest-based advertising," which displays advertisements based on factors unique to the Internet user who triggered a parked page. *See* JTX No. 369.

In August 2010, shortly after the filing of this lawsuit, Google advised GoDaddy that it would soon be utilizing "interest-based advertising" in the AdSense for Domains program. *See* JTX No. 364. As described by Google, "with interest-based advertising for AdSense for Domains, advertisers will be able to reach users on the basis of their previous interactions with them, such as visits to the advertiser's website, as well as reach users on the basis of their interest (such as 'sports enthusiasts' or 'travel enthusiasts')." *Id.* The ads returned with Google's interest-based advertising "associate categories of interest—say sports, gardening, cars, pets—with [an internet user's] browser, based on the types of sites [the individual] visit[s] and the pages [he/she] view[s]," which are then used by Google to "show [] more relevant text and display ads." *See* (http://googleblog.blogspot.com/2009/03/making-ads-more-interesting.html); *see also*, JTX No. 364.

After GoDaddy performed the required technical and privacy updates to its Google-monetized parked page templates, Google turned interest-based advertising on for all such templates on January 22, 2011. *See* JTX Nos. 368 and 369. Because advertisements displayed in the "interest-based advertising" context are triggered by factors unique to the Internet user, GoDaddy can only presume that the appearance of any AMPAS-related advertisements on the 134 screenshots taken after January 2011 resulted from the browser history and cookie files of the computers used by

RING BENDER LLP
2 Park Plaza, Suite 550
Irvine, California 92614

1  AMPAS, its counsel, and its hired consultant to trigger those parked pages.  *See*

2  Appendix F; GoDaddy's Proposed Findings [Dkt No. 702] at ¶ 97.

3      As far as GoDaddy was advised by Google, as of January 21, 2011, third-

4  party advertisements served on GoDaddy parked pages were generated through the

5  use of interest-based advertising (i.e., the search history and/or preferences of the

6  internet user).  AMPAS has produced no evidence to the contrary with respect to

7  these 134 domain names, let alone evidence that GoDaddy engaged in the conduct

8  of which AMPAS complains with respect to these 134 post-January 2011 domain

9  names: the intentional display of advertisements that "promote goods and services

10  obviously relating to the Academy Awards® and the OSCARS®."[7]  *See* JTX No.

11  833 at ¶¶ 37-59.

12          d.    GoDaddy Took Immediate Action in Response to

13              AMPAS' Complaints of Infringement Both Pre-and Post-

14              Litigation

15      In or about 2002, GoDaddy voluntarily established a Trademark and

16  Copyright Infringement Policy ("TM Policy").  The TM Policy is a written policy

17  by which brand owners and domain name registrants can resolve disputes over the

18  alleged unauthorized use of trade names, trademarks or copyrights by domain name

19  registrants without resort to the courts.  *See* JTX Nos. 28-30; *see also*, SF No. 10.

20      Pursuant to the TM Policy, a trademark owner can initiate a complaint by

21  providing GoDaddy with, among other things, (1) a description of the manner in

22

---

23  [7]    Though AMPAS may now argue for a more expansive view of its ACPA
claim (i.e., GoDaddy exhibited a bad faith intent to profit based solely on the

24  general monetization of the Accused Domains), at least one federal court has stated
that the use of domain names to provide advertising links unrelated to a trademark

25  contained in a domain name is more likely to be indicative of good faith.  *See Texas
Int'l Prop. Associates v. Hoerbiger Holding AG*, 624 F. Supp. 2d 582, 590 (N.D.

26  Tex. 2009) ("If TIPA had been using the domain name to provide links unrelated to
automation and compression, its activities would more easily comport with good

27  faith.").  Here, there was a demonstrable lack of intent on GoDaddy's part to
provide advertising links related to a trademark in relation to the Accused Domains

28  after January 2011.

which its trademark or other protected material is being infringed; (2) sufficient evidence that the owner of the website is a GoDaddy customer; (3) information supporting the complaining party's rights in the trademark or other protected material; and (4) a good faith certification signed under oath. *See id.* In establishing its TM Policy, GoDaddy borrowed heavily from "notice and takedown" procedures proscribed by the Digital Millennium Copyright Act ("DMCA"), codified at 17 U.S.C. § 512, which provides for the extrajudicial enforcement of copyrights on the Internet. *See* JTX Nos. 28-30; *see also*, SF No. 10.

Although trademark infringement is just as common of a problem as copyright infringement in cyberspace, Congress has yet to dictate a procedure by which trademark holders can enforce their rights absent the commencement of legal action. *See CrossFit, Inc. v. Alvies,* No. 13-3771 SC, 2014 WL 251760, at *2 (N.D. Cal. Jan. 22, 2014). By adopting a DMCA-style notice and takedown procedure to help address alleged instances of trademark infringement, GoDaddy filled the gap left by Congress, managing to streamline enforcement efforts for tens of thousands of claims by trademark holders and to simplify the process for the removal of problematic material upon notice. *See, e.g.*, *Tiffany (NJ) Inc.*, 600 F.3d at 99 (approving of eBay's DMCA-styled "notice-and-takedown" system as a means to allow owners of intellectual property rights, to "report to eBay any listing offering potentially infringing items, so that eBay could remove such reported listings.").

From 2007 to 2010, AMPAS availed itself of GoDaddy's trademark dispute resolution process to police its intellectual property on the Internet. *See* Appendix G. For example, in 2007, GoDaddy aided AMPAS in the resolution of a dispute related to alleged registrant misuse of the OSCAR statuette on a hosted website. *See* JTX No. 1126. Beginning in 2009, GoDaddy also assisted AMPAS in removing Google's pay-per-click advertisements from domain names alleged by AMPAS to contain one or more of its marks. *See e.g.*, JTX No. 1130.

RING BENDER LLP
2 Park Plaza, Suite 550
Irvine, California 92614

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

On June 18, 2009, AMPAS demanded for the first time that GoDaddy "*cease all advertising*" on websites whose domain names included some variation of "oscar" or "academyaward" in the domain name string. *See* JTX No. 1130. The June 18, 2009 letters were the first to mention the placement of advertising on websites resolving from domain names that AMPAS considered to be infringing. *See id.*; *cf. See* JTX No. 1126. In response to the June 18, 2009, AMPAS letters, GoDaddy immediately removed the advertisements from those domain names and advised AMPAS of its actions. *See* JTX No. 1131.

Thereafter, GoDaddy routinely responded to each AMPAS cease and desist letter related to GoDaddy's placement of advertising on websites resolving from domain names that AMPAS considered to be infringing by removing all advertisements from the domain names; on average, GoDaddy responded to each letter with 2.75 days. *See* Appendix G. GoDaddy took this action even on domain names that clearly had no relation to AMPAS or its marks—another benefit afforded to AMPAS by virtue of GoDaddy's adoption of a DMCA-type notice and takedown procedure for trademarks. *See id*. At no time prior to May 18, 2010, did AMPAS further complain about the domain names identified in any of the pre-litigation correspondence nor did it notify GoDaddy that the immediate removal of the advertisements was an insufficient response to its demands.[8] *See id.*

Despite being named in the instant lawsuit in May 2010, GoDaddy continued to assist AMPAS in policing its trademarks. There is no dispute that upon receiving notice of a specific domain name during the pendency of this action, GoDaddy manually overrode its automated systems to ensure that no advertisements would resolve from any of the Accused Domains. Moreover, to ensure that (a) AMPAS could recover each of the Accused Domains if ordered by the Court and (b) the

---

[8] It should be noted that a number of the cease and desist letters sent to GoDaddy by AMPAS from June 2009 to date related to domain names that were not hosted by GoDaddy. *See e.g.*, JTX No. 1013. Rather than ignore AMPAS' correspondence, GoDaddy promptly responded to these letters as well. *See id.*

DEFENDANT'S TRIAL BRIEF

Court had jurisdiction over the Accused Domains, GoDaddy locked all of the Accused Domains and lodged each with the Court.[9] *See* JTX No. 28.

In an attempt to avoid the clear evidence that GoDaddy takes great strides to prevent trademark infringement in its parked page programs, AMPAS argues that the continuation of the parked page programs in the face of third-party complaints received between 2007 and 2011 suffices to demonstrate GoDaddy's bad faith intent to profit from AMPAS' marks and, as such, its liability for cybersquatting. *See* AMPAS' Memo of Contentions [Dkt. No. 688] at 6:13-14. Generalized knowledge, however, has been expressly disapproved as a theory of liability in similar contexts.

For example, in *Tiffany v. eBay*, the Second Circuit upheld a district court's decision that eBay could not be held contributorily liable for trademark infringement on the basis of general knowledge of infringement, even where (a) a large percentage of the listings on a site were for counterfeit products, (b) eBay removed listings whenever it had notice of them and (c) it terminated repeat infringers in appropriate circumstances. *See Tiffany (NJ) Inc.*, 600 F.3d at 106-108. Similarly, in *Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949, 963-64 (C.D. Cal. 1997), *aff'd on other grounds*, 194 F.3d 980 (9th Cir. 1999), the court concluded that a "trademark owner's demand letter is insufficient to resolve th[e] inherent uncertainty" in questions of infringement, and stating that "[t]he mere assertion by a trademark owner [of infringement] . . . is not sufficient to impute knowledge of infringement." Both courts made clear that the law does not "impose . . . an affirmative duty to seek out potentially infringing uses" by third-parties. *Lockheed Martin Corp.*, 985 F. Supp. At 951; *Tiffany (NJ) Inc.*, 600 F.3d at 107

---

[9] During the pendency of this litigation, there were a few occasions on which the failings of counsel delayed the redirection of domains identified during the course of litigation. *See* JTX No. 400. The record is clear, however, that when AMPAS' complaints were made through the proper channels (i.e., from AMPAS or its counsel to GoDaddy's Domain Services department), the domains were redirected to non-monetized ad templates within an average of 2.75 days.

DEFENDANT'S TRIAL BRIEF

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

1    (agreeing with the district court that generalized knowledge of the sale of counterfeit

2    goods did not impose upon eBay an affirmative duty to remedy the problem).

3    Although the legal claims in *Tiffany* and *Lockheed* differed from those

4    presented here, the logic underlying the decisions is equally applicable. As in

5    *Tiffany* and *Lockheed*, the uncontested evidence regarding GoDaddy's

6    responsiveness to AMPAS' notices of claimed infringing domains as well as

7    GoDaddy's extensive proactive measures aimed at minimizing instances of

8    infringement by its registrants, proves GoDaddy's conduct to be the antithesis of

9    willful blindness.

10   GoDaddy's near-immediate cessation of any alleged use of a domain name in

11   its parked page program, whether pre- or post-litigation, also negates a finding that

12   it intended to profit from AMPAS' marks. *See Trump Plaza of the Palm Beaches*

13   *Condo. Ass'n v. Rosenthal*, 2009 U.S. Dist. LEXIS 54450 (S.D. Fla. June 24, 2009)

14   (transferring of a domain name upon receipt of a complaint by the trademark owner

15   "defeats the allegation that Rosenthal had a 'bad faith intent to profit from' use of

16   the 'Trump Plaza of the Palm Beaches' mark in a domain name as required to state a

17   claim under the [ACPA]"); *Rearden*, 2010 WL 2650516 at *14 (immediate

18   cessation of objectionable use demonstrates good faith).

19   The same can be said of GoDaddy's decision to filter AMPAS-related domain

20   names immediately after the Court determined that GoDaddy used and/or trafficked

21   in the Accused Domains. Despite GoDaddy's continued good faith belief in the

22   lawfulness of the conduct at issue, within weeks of the Court's entry of an order

23   finding that GoDaddy "used" and/or "trafficked in" a number of the Accused

24   Domains, GoDaddy created and implemented a filter to prevent the display of

25   advertisements on any domain name containing one or more of the AMPAS Marks

26   in the domain string. *See* JTX Nos. 99-100. The filter prevents thousands of

27   registrants from monetizing their domain names, even where those domain names

28   bear no conceivable relation to AMPAS (e.g., www.doscarlos.net).

RING BENDER LLP
2 Park Plaza, Suite 550
Irvine, California 92614

1  Contemporaneous with the implementation of the AMPAS Filter, GoDaddy
2  also began work on a more wide-ranging trademark filter.  *See* JTX Nos. 388, 389.
3  After significant time and expense—including the acquisition of a competing entity
4  that claimed to have created and implemented a similar filter utilizing regular
5  downloads from the USPTO database—GoDaddy implemented its comprehensive
6  trademark filter in December 2014.[10]  GoDaddy's Trademark Filter prevents the
7  display of advertisements on any parked domain that contains one of nearly 1400
8  registered trademarks in the domain name string.  *See* JTX No. 401.  In an
9  abundance of caution, GoDaddy has also voluntarily blacklisted specific domain
10 names flagged by its trademark filter, meaning that those domains will never resolve
11 to a GoDaddy parked page bearing any form of advertisement.  *See* JTX No. 402.

12  **3.  AMPAS' "Evidence" of GoDaddy's Bad Faith Intent to**
13  **Profit from AMPAS' Marks is Flawed**

14  In its Memorandum of Contentions of Law and Fact, AMPAS relies heavily
15 on evidence that not only fails to support a finding of bad faith intent to profit but
16 affirmatively establishes GoDaddy's good faith.  *See* AMPAS' Memo of
17 Contentions [Dkt. No. 688].  Specifically, AMPAS' arguments relating to (a) the
18 Merdinger patent application, (b) the volume of third-party complaints processed by
19 GoDaddy, (c) the provision of privacy services by a dismissed defendant, and (d)
20 the long-defunct practices of non-party Standard Tactics LLC, ignore the weight of
21 evidence adduced throughout the course of this litigation.  The Court should reject
22 these arguments out of hand.

23  _____
    [10]  Although the claims of the acquired entity proved to be overstated, GoDaddy
24 persisted in its attempts to create and implement a trademark filter that utilized the
    entire USPTO database—a technological possibility conceived by GoDaddy
25 employee Richard Merdinger in relation to a patent application placed at issue by
    AMPAS. Despite dedicating significant capital and employee time to the
26 development of a USPTO-based trademark filter over the course of a year and a
    half, GoDaddy was ultimately unable to implement such a filter due to commercial
27 impracticalities created by, in part, the sheer volume of registered trademarks (over
    a terabyte of data) consisting of (a) one and two-letter terms and (b) common
28 suffixes, e.g., -ion.

DEFENDANT'S TRIAL BRIEF

Since the inception of this lawsuit, AMPAS has repeatedly cited an October 2007 patent application entitled "Systems and Methods for Filtering Online Advertisements Containing Third-Party Trademarks" filed by a GoDaddy employee, Richard Merdinger, as evidence of GoDaddy's bad faith operation of the parked page program. *See* Complaint [Dkt. No. 1]; JTX 42. AMPAS argues that because the Merdinger patent application identifies an industry-wide problem—the fact that "unscrupulous domain name registrant[s]" sometimes register domain names that incorporate a third-party's trademark with the intent to use "parked pages" to serve advertisements related to that trademark owner's products or services—GoDaddy, and by extension, every company providing parked page services, necessarily acted in bad faith by continuing to allow advertisements to be placed on parked pages. *See* AMPAS' Memo of Contentions [Dkt. No. 688] at 7:5-7; AMPAS' Proposed Findings of Fact [Dkt. No. 709] at ¶¶ 71-77. AMPAS's argument, however, is fatally flawed.

GoDaddy does not deny that it was aware of this potential problem. Indeed, it was the existence of this industry-wide threat to third-party intellectual property rights that compelled GoDaddy to (a) to require registrants to certify their domain names were not infringing third-party intellectual property rights and (b) establish an expedited process within its Domain Services group to remove advertisements on parked pages as soon as any colorable claim of trademark infringement was received. *See* SF Nos. 52-54, 101-102. This was also the very reason GoDaddy encouraged (and continues to encourage) its engineers to explore probable technical solutions like those proposed in the Merdinger patent application.

Contrary to AMPAS' attempt to paint GoDaddy as an entity bent on profiting from the intellectual property of others at all costs, the evidence clearly

demonstrates that GoDaddy was working hard to limit such activity, not encourage it, even in the face of significant and ongoing technical, commercial, and contractual challenges that limit GoDaddy's ability to filter third-party advertisements or accurately identify domain names containing trademarked terms.

The Merdinger patent application simply does not demonstrate that GoDaddy had the requisite bad faith intent to profit from the AMPAS Marks. If anything, it provides further evidence of GoDaddy's good faith, discussed *infra*, in exploring a variety of approaches to limit potential infringement of third-party intellectual property rights by registrants—unscrupulous, unwitting or otherwise. AMPAS' attempt to turn these good faith efforts into evidence of bad faith intent is misguided.

    b.   Third-Party Trademark Complaints Relating to GoDaddy
         Parked Pages Do Not Support a Finding of Bad Faith
         Intent to Profit from the AMPAS Marks

During the course of this litigation, GoDaddy produced over 1000 pieces of correspondence received between January 2007 and October 2011 from third-party trademark owners in relation to its parked page programs. *See* JTX 1232. The correspondence was sent by third-party trademark owners in accordance with GoDaddy's TM Policy and/or the operation of its VIP Program—a program offered to those brand-owners with frequent and recurring infringement concerns (e.g., FedEx, Louis Vuitton, JP Morgan Chase, and Ugg), which was designed to expedite the redirection of potentially-infringing domain names to non-monetized templates (no ads) in GoDaddy's parked page program.[11] *See* JTX 714. While AMPAS plainly intends to parade these third-party trademark complaints as evidence of GoDaddy's bad faith operation of its parked page programs, the evidence simply

---

[11]     At the outset of this litigation, Go Daddy offered to place AMPAS in its VIP program; AMPAS declined GoDaddy's invitation. *See* Depo. Testimony of C. Jones at 126:15-127:9.

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

RING BENDER LLP
2 Park Plaza, Suite 550
Irvine, California 92614

1  does not support AMPAS' claim.  *See* AMPAS' Memo of Contentions [Dkt. No.

2  688 at 6:13-14, 27-28.

3      It is critical to appreciate the relatively small scale of the complaints received

4  by GoDaddy in relation to its parked page program as compared to the magnitude of

5  GoDaddy's domain registration and hosting activities.  Since beginning operations

6  as a domain registrar in 2000, GoDaddy has processed over 150 million domain

7  registrations, averaging more than 25,000 per day.  *See* SF No. 11.  Whether

8  examining the 293 accused domains at issue in this case or the over 1000 third-party

9  parked page complaints received between 2007 and 2011, AMPAS cannot avoid the

10 fact that these numbers are but a fraction of the approximately 18 million parked

11 pages hosted by GoDaddy.  *See* SF No. 14.  Although AMPAS desperately wishes

12 to convince this Court otherwise, the evidence is clear that trademark complaints

13 relating to GoDaddy's parked pages are a very small exception at GoDaddy, not the

14 general rule.

15     Moreover, the evidence relied upon by AMPAS actually demonstrates that

16 GoDaddy took affirmative steps to develop a prompt and efficient process for

17 responding to third-party complaints related to parked pages and devoted substantial

18 resources to those efforts.  *See* JTX Nos. 1243, 1252.  In accordance with its

19 established procedures, as soon as a claim of trademark infringement relating to a

20 parked page was received, GoDaddy redirected the domain name to a non-

21 monetized template.  *See id.*  The evidence at trial will show that other trademark

22 owners are satisfied with GoDaddy's DMCA-modeled complaint process, as well as

23 its prompt redirection and response time.  *See id.*  To be sure, none have attempted

24 to pursue any ACPA claims against GoDaddy.  Again, AMPAS' key "evidence" of

25 bad faith serves only to demonstrate GoDaddy's good faith efforts to protect third-

26 party intellectual property rights.

27

28

c.   The Provision of "Indisputably Legal" Proxy Services by a
Dismissed Defendant Has No Bearing on GoDaddy's
Alleged Bad Faith Intent to Profit

AMPAS appears poised to argue that the provision of privacy services by dismissed defendant Domains By Proxy to a number of the registrants of the Accused Domains should be considered as affirmative conduct on the part of GoDaddy to mislead AMPAS as to the identity of the registrants. *See* AMPAS' Memo of Contentions [Dkt. No. 688] at ¶¶ 8:26-28, 10:5-7, and 16:5-8. As an initial matter, AMPAS cannot present any legal basis for such an extension of vicarious liability.

More problematic, however, is the fact that AMPAS was forced to dismiss Domains By Proxy from the instant lawsuit nearly three years ago precisely because the provision of privacy services is "indisputably legal." *Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1109-10 (C.D. Cal. 2009); *see also*, *id.* at 1096 (noting the importance of proxy service providers given "[t]he fact that every person who wants to register a domain name either consents to put some sort of publicly accessible contact information on line, or is unable to register the domain name has drawn criticism from privacy and free speech advocates" and that as a result, "there has been a growth in companies that will register domain names for individuals and act as a proxy by using the company's contact information. Such services allow domain registrants concerned with maintaining their privacy to remain anonymous.") The fact that some domain registrants do not wish to expose their personal email addresses or phone numbers to the public at large is more a reflection of good judgment than any specific intent to mislead AMPAS.

AMPAS also ignores the fact that privacy services like Domains By Proxy provide mechanisms for third-parties to contact domain registrants; indeed, although irrelevant, AMPAS included as trial exhibits correspondence that specifically sets forth how this process works in application. *See*, *e.g.*, JTX No. 3037. Regardless,

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

1   as relevant here, it is undisputed that GoDaddy disclosed the identities of each of the

2   registrants of the Accused Domains either in response to a letter from AMPAS'

3   counsel or as part of this litigation.  *See* SF No. 29.  As such, AMPAS' tangential

4   theory of liability involving privacy services purchased from (and provided by)

5   dismissed defendant Domains By Proxy misses the mark.

d.      Evidence Related to Standard Tactics LLC is Irrelevant to

the Pending Action

8   AMPAS also seeks to rely on the actions of non-party Standard Tactics LLC,

9   an entity formed to mimic the perspective of a customer with a large domain profile

10  for the purpose of providing feedback when testing proposed customer experience

11  enhancements.  *See* AMPAS' Memo of Contentions [Dkt. No. 688] at 6:3-7, 8:26-

12  28, 10:13-15; Depo. Testimony of C. Jones at 147:10-148:11, 149:5-10.  To that end,

13  in certain circumstances, Standard Tactics would take over the remaining

14  registration period for domain names that had been procured by third-party

15  registrants using fraudulent payment information (but for which the registration fee

16  had already been paid to the registry by GoDaddy and, as such, was unable to be

17  recouped).  The testing performed by Standard Tactics was relatively short-lived,

18  ending in 2010.

19  Despite AMPAS' claims to the contrary, evidence related to Standard Tactics

20  is irrelevant to the present action.  The undisputed evidence demonstrates that none

21  of the Accused Domains were registered by Standard Tactics.  *See* SF No. 26.

22  Moreover, AMPAS fails to present the Court with any evidence demonstrating that

23  the conduct of non-party Standard Tactics was either violative of the ACPA or

24  otherwise improper.  It bears noting that Standard Tactics was never found to have

25  engaged in cybersquatting with regard to the domain names that it controlled.  As

26  such, the Court should decline to consider any evidence related to Standard Tactics

27  in reaching a determination on the issue of bad faith.

28

DEFENDANT'S TRIAL BRIEF

RING BENDER LLP
2 Park Plaza, Suite 550
Irvine, California 92614

### 4. The ACPA Safe Harbor Further Shields GoDaddy from Liability

The ACPA provides a safe harbor to any person who registers, uses, or traffics in domain names where that person "believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). This provision is applied narrowly and bars those who act even partially in bad faith. *See Lahoti v. Vericheck*, 586 F. 3d 1190, 1203 (9th Cir. 2009). The logic is that "all but the most blatant cybersquatters will be able to put forth at least some lawful motives for their behavior." *Id.* Despite this limitation, the undisputed evidence demonstrates GoDaddy's reasonable belief that the placement of advertisements on the Accused Domains—whether those advertising GoDaddy's services or those placed by Google offering either domain name-related or interest-based advertisements—was a fair use or otherwise lawful.

Although AMPAS has repeatedly attempted to equate the provision of domain monetization services with intentional trademark infringement, there is simply no evidence to support such a position. Nor is GoDaddy the only provider of parked page services; indeed, at the time GoDaddy became an ICANN-accredited registrar in 2000, registrars were already directing domain names to parked pages. *See* Depo. Testimony of C. Jones at 31:8-16; SF No. 12. These companies provide the same basic parked page monetization programs offered by GoDaddy, often in conjunction with Google's AdSense for Domains program (or a similar program operated by Yahoo!, Inc.). *See e.g.*, Depo. Testimony of C. Jones at 40:17-40:1.

The provision of these parking services does not run afoul of any regulation adopted by ICANN and there are no known decisions holding the provision of monetized parking services to be unlawful under any regulatory, statutory or common law scheme. *See, e.g.*, Depo. Testimony of T. Ruiz at 34:13-20, 66:16-67:8. In light of the widespread prevalence of domain name monetization services, as well as the lack of any regulatory or statutory scheme preventing such a practice,

GoDaddy held an objective good faith belief that the practice of generally parking undeveloped domains on pages containing advertisements was a lawful use (if any) of the Accused Domains.

More specifically, GoDaddy had a reasonable belief that its placement of advertisements on each of the Accused Domains was a lawful use of the domain. As set forth above, GoDaddy requires all registrants to certify that they are not violating any state or federal laws in registering their selected domain names and that their registration does not infringe third-party intellectual property rights. *See* SF No. 54. GoDaddy relied on these affirmative representations in its decision to allow the placement of advertisements on parked pages. *See MDY Indus., LLC v. Blizzard Entm't, Inc.,* 629 F.3d 928, 955 (9th Cir. 2010) ("[A] valid contractual relationship exists between Blizzard and its customers based on the operative [agreements]."); *see also Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract.").

AMPAS may argue that GoDaddy could not have held a reasonable belief that the placement of advertisements on parked pages was lawful where those advertisements contained third-party trademarks. However, this argument fails not only for a lack of evidentiary support, but also in view of GoDaddy's prior arguments on the issue of nominative fair use and the evolving state of law related to competitive keyword advertising and Google's AdWords and AdSense for Domains products.

Since it began offering these products, Google has been plagued by lawsuits related to its sale and display of advertisements triggered by the third-party purchase of trademarked keywords, whether those advertisements were displayed on a Google search results page or a third-party parked page. Google, however, has never definitively lost any of these cases and there has been a rising trend in case

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

DEFENDANT'S TRIAL BRIEF

law holding that keyword advertising does not violate the Lanham Act.[12]  *See, e.g.,* *Government Employees Ins. Co. v. Google, Inc.*, No. 1:04-cv-507, 2005 WL 1903128 (E.D. Va. Aug. 8, 2005) (granting summary judgment because "Plaintiff has failed to establish a likelihood of confusion stemming from Google's use of [Plaintiff's] trademark as a keyword and has not produced sufficient evidence to proceed on the question of whether the Sponsored Links that do not reference [Plaintiff's] marks in their headings or text create a sufficient likelihood of confusion to violate ... the Lanham Act."); *Jurin v. Google, Inc.*, 695 F. Supp. 2d 1117, 1123 (E.D. Cal. 2010) (granting dismissal where "[t]o the extent Plaintiff may contend that Defendant [Google] has helped "facilitate" confusion of the product with others, such is a highly attenuated argument. Even if . . . a "Sponsored link" might confuse a consumer, it is hardly likely that with several different sponsored links appearing on a page that a consumer might believe each one is the true producer or "origin" of the . . . product."); *General Steel Domestic Sales, LLC v. Chumley,* No. 10-cv-01398-PAB-KLM, 2013 WL 1900562 (D. Colo. May 7, 2013) (holding no likelihood of confusion where defendant used plaintiff's trademark in the ad copy of its Google AdWords advertisement and where defendant purchased

---

[12]    Those purchasing trademarked keywords for the purpose of competitive keyword advertising have achieved similar results.  *See, e.g., Network Automation, Inc.*, 638 F.3d 1137 (finding no likelihood of confusion after applying factor test, focusing most heavily on the strength of plaintiff's mark, lack of evidence of actual confusion, type of goods and degree of care likely to be exercised by the purchaser, and the labeling and appearance of advertisements and the surrounding context on the screen displaying the results page); *Infostream Group Inc. v. Avid Life Media Inc.*, No. CV 12-09315 DDP, 2013 WL 6018030 (C.D. Cal. Nov. 12, 2013) (granting defendant's motion to dismiss plaintiff's trademark infringement claim, holding that defendant's purchase of plaintiff's trademark as a keyword ad trigger does not lead to customer confusion); *CollegeSource, Inc. v. AcademyOne, Inc.,* No. 10-3542, 2012 WL 5269213 (E.D. Pa., Oct. 25, 2012) (finding no likelihood of confusion where the surrounding ad context, including separation of sponsored ad links and labeling of sponsored links, decreased any potential likelihood of confusion); *J.G. Wentworth, S.S.C. Ltd. P'ship v. Settlement Funding LLC,* No. 06-0597, 2007 WL 30115 (E.D. Pa., Jan. 4, 2007) (finding defendant's purchase of plaintiff's trademarks as keyword ad triggers for Google's AdWords program did not result in any actionable likelihood of confusion because of the separate and distinct nature of the links created on the search results page).

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

RING BENDER LLP
2 Park Plaza, Suite 550
Irvine, California 92614

1 plaintiff's trademark as a keyword ad trigger for sponsored links); *accord*,

2 *Parts.com, LLC v. Yahoo! Inc.*, 996 F. Supp. 2d 933, 938 (S.D. Cal. 2013) ("[T]he

3 mere fact that Yahoo displays an array of links when a user enters "Parts.com" as a

4 search term is not enough to suggest that Yahoo is affiliated with Parts.com.").

5     Indeed, though ultimately overturned on appeal two years into the pendency

6 of this lawsuit, judgment was entered in favor of Google in August 2010 in *Rosetta*

7 *Stone Ltd. v. Google, Inc*., 730 F. Supp. 2d 531, 535 (E.D. Va. 2010) *aff'd in part,*

8 *vacated in part, remanded*, 676 F.3d 144 (4th Cir. 2012).[13]  In granting summary

9 judgment in Google's favor, the trial court found Google was not liable on any

10 theory of trademark infringement or dilution arising from the selling of keywords to

11 competitors for display in online advertisements.  *See id.* at 540-51.  The decision in

12 *Rosetta Stone* bolstered GoDaddy's legitimate belief in its good faith conduct in the

13 operation of the parked page programs, as well as the fair use (if any) of AMPAS'

14 trademarks.  *See id.; accord Tiffany (NJ) Inc.,* 600 F.3d at 107–09 (generalized

15 knowledge of infringement of a seller's trademark on its website was insufficient to

16 impose upon eBay an affirmative duty to remedy the problem, even where eBay

17 received thousands of Notice Of Claimed Infringement Forms—online forms that

18 allow intellectual property right owners to report to eBay when they have good faith

19 belief that a listed item infringed on a copyright or trademark).

20     These legal successes provided GoDaddy with added security in its good faith

21 belief that the automated placement of Google-generated advertisements on each of

22 the Accused Domains was lawful.  Indeed, the liability sought to be imposed on

23 Google in each of these scenarios was no different from that sought to be imposed

24 by AMPAS—liability for the display of advertisements purchased by third parties

25

26

27 [13]     By the time *Rosetta Stone* was overturned on appeal in 2012, interest-based
advertising had been in use in GoDaddy's parked page program for over a year.  *See*

28 JTX No. 369.

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

1 where those advertisements were displayed based on the presence of a trademarked

2 keyword in a search term.[14]

3    In light of the above facts, as well as the robust enforcement actions taken by

4 GoDaddy in assisting AMPAS and other trademark holders in policing their marks,

5 GoDaddy reasonably believed that the placement of Google's advertisements on

6 parked pages was lawful.  Indeed, AMPAS' continued use of the TM Policy to

7 address the monetized parked pages led GoDaddy to believe that it was not only

8 satisfied with GoDaddy's response but that any threat of litigation was over the

9 parked page program was resolved.  *See, e.g., Parts.com v. Google Inc.* 3:13-cv-

10 01074-JLS-WMC (S.D. Cal. Dec. 4, 2013).  GoDaddy should be afforded immunity

11 under the ACPA's safe harbor provision.

12 **C.**    **If AMPAS Prevails on the Issue of Bad Faith, the Statutory**

13       **Damage Award Should be Significantly Lower Than the $30**

14       **Million Requested by AMPAS**

15    In the event the Court finds in favor of AMPAS, the available evidence does

16 not support a recovery anywhere near the $100,000 per domain name statutory

17 damage award that AMPAS seeks.[15]  This is not simply argument or posturing, but

18 rather a reasoned analysis after a survey of relevant ACPA decisions across the

19 country over the past decade.  Though AMPAS will likely point to the significant

20 ───────────────

[14]    AMPAS engaged in the very conduct it now complains of when it purchased

21 trademarked keywords from Google as part of Google's AdWords program to
increase traffic to its Internet sites without considering whether it had the permission

22 to use those trademarks. *See* Depo. Testimony of J. Weiss at 404:14-405:9, 426:23-
427:22, 427:24-428:6, 449:3-7, 449:10-12.  Indeed, AMPAS expressly approved

23 Google's placement of AMPAS advertisements on GoDaddy parked pages from
2008-2010 as part of its participation in Google's AdWords program. *See id.*

24 [15]    To the extent AMPAS also seeks a permanent injunction under the ACPA it

25 will be barred from obtaining such given the undisputed lack of evidence
demonstrating irreparable harm.  AMPAS admits there is no evidence of lost profits,

26 no evidence of loss of goodwill, and no evidence of actual dilution and thus, cannot
obtain a permanent injunction as a matter of law. *See Herb Reed Enters. v. Fla.*

27 *Mgmt., Inc.*, 736 F.3d 1239 (9th Cir. 2013); *Active Sports Lifestyle USA, LLC v. Old*
*Navy, LLC*, 2014 WL 1246497 (C.D. Cal. 2014).

28

per domain name awards reached in *Verizon California, Inc. v. Onlinenic, Inc.*, 647 F. Supp. 2d 1110, 1120 (N.D. Cal. 2009) and *Facebook, Inc. v. Banana Ads, LLC, et al.* No. 11-cv-03619, 2013 WL 1873289 (N.D. Cal. Apr. 30, 2013), the facts in each of those cases serve only to bolster GoDaddy's position.

In *Verizon*, the court awarded the plaintiff $50,000 per domain name and entered a $33 million *default judgment* against a serial cybersquatter who concealed its identity to avoid liability for its conduct. *Verizon*, 647 F. Supp. 2d at 1114. As alleged by the plaintiff in that action, the registrar defendant actively selected and registered—as the actual registrant—14,700 domain names alleged to infringe 28 trademarks. *See id.* at 1115. The registrar defendant used seven (7) different entities to evade detection and subsequently engaged in a concerted effort to evade service of process while also failing to comply with court orders. *See id.* Unlike the registrar defendant in *Verizon*, GoDaddy (1) was not involved in selecting or registering the confusing domain names; (2) did not act as the actual registrant in registering any of the domain names at issue; (3) does not have a history of acting as a serial cybersquatter; (4) had no pattern of concealment; and (5) did not engage in any other identifiable misconduct.

The circumstances presented in *Facebook, Inc. v. Banana Ads LLC* present a similarly stark contrast between the acts of the defendants and the conduct engaged in by GoDaddy. In *Banana Ads*, the court entered a $2.8 million *default judgment* against multiple "typosquatters," with the awards ranging from $5,000 to $25,000 per domain name. *See Banana Ads*, 2013 WL 1873289 at * 14. As with the defendant in *Verizon,* each of the defendants in *Banana Ads* acted as the actual registrant in selecting and registering the infringing domain names. Several of the defendants intentionally diverted traffic to their own business and some intentionally concealed their identities. *See id.* at **6-13. Unlike the circumstances presented by this action, not one of the ACPA bad faith factors favored the defendants and neither

DEFENDANT'S TRIAL BRIEF

the unique circumstances of the case nor the ACPA safe harbor protected their conduct.

As opposed to the egregious circumstances in *Verizon* and *Banana Ads,* the decision in *Int'l Oddities v. Record*, No. CV 12-3934-CAS VBKX, 2013 WL 3864050 at *14 (C.D. Cal. July 22, 2013) is more indicative of any potential statutory damage award. In *Int'l Oddities*, despite finding bad faith, the court awarded minimal damages ($1,000 per violation) based on the defendant's failed attempt to successfully monetize the disputed website, the website's brief existence, and the need to avoid an unwarranted windfall to the plaintiff:

> [B]ased on the evidence in the record thus far, the Court is not convinced that plaintiff is entitled to the substantial statutory damages that it seeks under the ACPA. As best as can be discerned, defendant's website was only active for a limited amount of time, and defendant did not achieve even a modicum of commercial success, legitimate or otherwise. And while defendant has not participated in this action in good faith at all times, awarding plaintiff the statutory damages that it seeks would amount to a substantial windfall, based on the evidence before the Court. Accordingly, the Court finds that the appropriate amount of statutory damages for plaintiff's ACPA claims is $1,000 per violation, the statutory minimum.

*Id.*; *accord Adobe Systems, Inc. v. Tilley*, No. C 09-1085 PJH, 2010 WL 309249 at *5-6 (N.D. Cal. Jan. 19, 2010) (noting that statutory damages in trademark cases are not meant to provide a windfall to a plaintiff).

As in *Int'l Oddities*, GoDaddy's undisputed lack of involvement in the selection and registration of the domain names, the *de minimus* revenue received by GoDaddy from a small subset of the Accused Domains (approx. $108), the minimal non-AMPAS affiliated traffic to the bulk of the domain names, and the strength of facts supporting a determination of good faith, dictate an award of statutory damages of no more than $1,000 per domain name.

**D.    AMPAS Is Not Entitled To an Award of Attorneys' Fees under the ACPA**

Under the ACPA, attorneys' fees are only available in "exceptional" cases, i.e., those cases in which where a prevailing party can present evidence of

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

malicious, fraudulent, deliberate, or willful conduct. *See Gracie v. Gracie*, 217 F.3d 1060, 1068 (9th Cir. 2000). Although AMPAS seeks an award of attorneys' fees in this action, it claims entitlement to such fees based on the misguided belief that a finding of "bad faith intent to profit" will *ipso facto* deem the case exceptional. It will not.[16] *See People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 370 (4th Cir. 2001) ("The district court was within its discretion to find that, even though Doughney violated the ACPA (and, thus, acted in bad faith), he did not act with the level of malicious, fraudulent, willful or deliberate behavior necessary for an award of attorney fees.").

The Ninth Circuit's general rule is that "[w]hile a jury finding of willful infringement is relevant to the question of whether a case is exceptional, it is insufficient on its own to support an award of fees in the absence of some aggravating circumstance or heightened level of culpability." *Apple Inc. v. Samsung Electronics Co*., No. 11-CV-01846-LHK, 2014 WL 4145499, at *7 (N.D. Cal. Aug. 20, 2014). AMPAS is unable to present evidence of any such aggravating circumstance or heightened level of culpability.

Any attempt by AMPAS to recover its attorneys' fees will also be dogged by the Court's prior decisions in this action; most notably, its denial of both parties' motions for summary judgment on the famousness of the AMPAS Marks and the dismissal of five of AMPAS' six claims, as well as four of the originally named defendants. *See Octane Fitness, LLC v. ICON Health & Fitness, Inc*., 134 S. Ct. 1749, 1751, 188 L. Ed. 2d 816 (2014) (nothing that "an 'exceptional' case, then, is simply one that stands out from others with respect to the substantive strength of a

---

[16]     The current state of Ninth Circuit law also suggests that AMPAS' request for attorneys' fees is barred by its election of statutory damages pursuant to 15 U.S.C. § 1117(d). *See, e.g., K and N Eng'g, Inc. v. Bulat*, 510 F.3d 1079 (9th Cir. 2007); *Avnet, Inc. v. Avana Techs., Inc*., 2014 U.S. Dist. LEXIS 177423 at *26-28 (D. Nev. Dec. 23, 2014), adopted by *Avnet, Inc. v. Avana Techs., Inc*., 2014 U.S. Dist. LEXIS 177423 (D. Nev. Dec. 23, 2014); *but cf., Bittorrent, Inc. v. Bittorrent Mktg. GMBH*, No. 12-CV-02525-BLF, 2014 WL 5773197, at *14 (N.D. Cal. Nov. 5, 2014).

1  party's litigating position (considering both the governing law and the facts of the

2  case) or the unreasonable manner in which the case was litigated.").

3      The recent decision in *Apple v. Samsung*, in which Apple unsuccessfully

4  sought to deem the case "exceptional" and recover attorneys' fees under the Lanham

5  Act, is instructive:

> The fact that the Court found the famousness of Apple's trade dresses
> to be "a close question" is, by itself, sufficient for the Court to deny
> Apple's motion for attorneys' fees. "[T]he substantive strength of
> [Samsung's] litigating position" does not "stand[ ] out from others"
> given that the Court previously called the issue "a close question."
> *Octane Fitness*, 134 S.Ct. at 1756. In the pre-*Octane Fitness* patent
> law jurisprudence, "a lawsuit which survives a motion for summary
> judgment is not objectively baseless." *Synthes USA, LLC v. Spinal
> Kinetics, Inc.*, No. 09–cv–01201 RMW, 2012 WL 4483158, at *13
> (N.D. Cal. Sept. 27, 2012) aff'd, 734 F.3d 1332, 1345 (Fed. Cir. 2013)
> (citing *Medtronic Navigation, Inc. v. BrainLAB Medizinische
> ComputerSysteme GmbH*, 603 F.3d 943, 954 (Fed. Cir. 2010)
> (reversing exceptional case finding where the "district court's
> characterization of Medtronic's claims as frivolous is undermined by
> the fact that the court denied BrainLAB's motions for summary
> judgment and denied each of its motions for JMOL filed during the
> trial")). While the standard for awarding attorneys' fees is no longer
> objective baselessness, Apple narrowly avoided summary judgment
> against its trade dress claims based on Samsung's famousness
> defense. This fact strongly suggests that this is not an "exceptional"
> case as contemplated by 15 U.S.C. § 1117(a). Therefore, if a jury
> might have reasonably thought that Apple's trade dresses had not
> achieved the requisite fame, Samsung might also have reasonably
> thought that Apple's trade dresses had not achieved the fame required
> for Apple's trade dresses to be protectable. Lack of fame thus
> constitutes a reasonable defense to Apple's trade dress dilution claims.
> Accordingly, Samsung's litigation position was not so weak as to
> render this case "exceptional." See 15 U.S.C. § 1117(a).

21  *Apple Inc.*, 2014 WL 4145499, at *9.

22      AMPAS' struggle to present evidence sufficient to satisfy even the bad faith

23  element, combined with the rulings compelling this case to trial, hamstrings any

24  attempt to secure attorneys' fees. Rather, this case presents the type of "close and

25  contested issues" that render "the outcome [] by no means a foregone conclusion"

26  and bar designation of the case as "exceptional" under the Lanham Act. *Simon &

27  Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 302 (S.D.N.Y. 1997).

28  ///

RING BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

## III.  CONCLUSION

This case presents a classic example of opportunistic counsel pressing a claim in the hopes of achieving a windfall judgment for themselves.  AMPAS admits that it has not suffered any actual harm—no lost profits, no diverted customers, no dilution of its marks, and no loss of goodwill.  While GoDaddy acknowledges that it generated $108 in revenue from a small subset of the Accused Domains, the undisputed evidence demonstrates that GoDaddy did not have a bad faith intent to profit from the AMPAS Marks.  To the extent GoDaddy's alleged use was not protected by the nominative fair use doctrine, it was inadvertent, at most.  It does not constitute the type of bad faith conduct required for a finding of liability under the ACPA and certainly does not serve as a basis upon which to deem this case "exceptional" for purposes of awarding attorneys' fees.

Dated:  July 28, 2015

**RING BENDER LLLP**

Aaron M. McKown

Paula L. Zecchini

By:  *s/ Paula L. Zecchini*
      Paula L. Zecchini

**WILMER CUTLER PICKERING HALE AND DORR LLP**

Robert Galvin, California Bar No. 171508

Jimmy Doan, California Bar No. 271448

950 Page Mill Road

Palo Alto, CA  94304

Telephone: (650)858-6017

E-mail:  robert.galvin@wilmerhale.com
      jimmy.doan@wilmerhale.com

William Lee, *pro hac vice*

60 State Street

Boston, MA  02109

Telephone: (617)526-6000

E-mail: William.lee@wilmerhale.com

Attorneys for Defendant

GODADDY.COM, LLC (fka

GODADDY.COM, INC.)

**Ring Bender LLLP**
2 Park Plaza, Suite 550
Irvine, California 92614

**APPENDIX A**

## <u>Domain Names Yet to be Adjudicated on the Issue of Confusing Similarity</u>

1. GREENOSCAR.COM
2. HOMEOSCARS.COM
3. LISTOSCAR.COM
4. LOCATIONSOSCAR.COM
5. OSCAR4RE.COM
6. OSCARCAM.COM
7. OSCARCHALLENGE.COM
8. OSCARCHALLENGE.NET
9. OSCARCLAIM.COM
10. OSCARCLAIM.NET
11. OSCARCLAIMS.NET
12. OSCARCOMMUNITY.COM
13. OSCARELIGIBLE.COM
14. OSCARELIGIBLE.NET
15. OSCARHOPE.COM
16. OSCARHOSPITALITY.COM
17. OSCARI.COM
18. OSCARI.NET
19. OSCAR-INT.COM
20. OSCARKIDS.COM
21. OSCARLOCATIONS.COM
22. OSCARRESPONSE.COM
23. OSCARRUN.COM
24. OSCARS3D.COM

25. OSCARSHOTELS.COM

26. OSCARSHOTELS.NET

27. OSCARSINAMINUTE.COM

28. OSCARSLLC.COM

29. OSCARSMILE.COM

30. OSCARSOPENHOUSE.COM

31. OSCARSORNOT.COM

32. OSCARSROOM.COM

33. OSCARTWIST.COM

34. OSCARUNIVERSE.COM

35. OSCARWAY.COM

36. OSCARWORTHYMANSION.COM

37. TEXTILEOSCARS.COM

38. TEXTILEOSCARS.NET

39. THEMORMONOSCARS.COM

40. THEOSCARBODY.COM

41. THEOSCARCOPS.NET

42. THEOSCARTEAM.COM

43. THEOSCARTOUR.COM

44. GOTOSCAR.COM

45. MAKINGTHEROUNDSWITHOSCAR.COM

46. OSCARBRIGHT.COM

47. OSCARBRITE.COM

48. OSCARDOESITAGAIN.COM

49. OSCARRESULTS.NET

50. OSCARSOASIS.COM

51. THINKOSCAR.COM

52.    THINKOSCAR.NET

53.    THINKQUICKOSCAR.COM

54.    TRAVELOSCAR.COM

55.    TRAVELOSCARS.COM

56.    TRAVELOSCARS.NET

**APPENDIX B**

# Registrants with Common Law Trademark Rights in
# Their Domain Names

1.  OSCARORNOT.COM
2.  OSCARSORNOT.COM
3.  THEOSCARSORNOT.COM
4.  OSCARHOSPITALITY.COM
5.  OSCARSOASIS.COM
6.  OSCARSROOM.COM
7.  THEOSCARS.CO
8.  THEOSCARTEAM.COM
9.  OSCAR360.COM
10. OSCARCOMEDY.COM
11. OSCARSKIDS.COM
12. OSCARWAY.COM
13. OSCARCLAIM.COM
14. OSCARCLAIM.NET
15. OSCARCLAIMS.NET
16. OSCARHOPE.COM

**APPENDIX C**

## Domain Names Consisting of the Legal Name of the Registrant or a Name Commonly Used to Identify the Registrant or its Business

1. OSCARORNOT.COM
2. OSCARSORNOT.COM
3. THEOSCARSORNOT.COM
4. OSCARHOSPITALITY.COM
5. OSCARSOASIS.COM
6. THEOSCARS.CO
7. THEOSCARTEAM.COM
8. OSCAR360.COM
9. OSCARCOMEDY.COM
10. OSCARWAY.COM
11. OSCARCLAIM.COM
12. OSCARCLAIM.NET
13. OSCARCLAIMS.NET
14. OSCARIMAGES.COM

**APPENDIX D**

## Domain Names Registered for the Purpose of Creating Websites for the Bona Fide Offering of Goods and Services

1. OSCARORNOT.COM
2. OSCARSORNOT.COM
3. THEOSCARSORNOT.COM
4. OSCARHOSPITALITY.COM
5. OSCARSOASIS.COM
6. THEOSCARTEAM.COM
7. OSCARCOMEDY.COM
8. OSCARWAY.COM
9. OSCARCLAIM.COM
10. OSCARCLAIM.NET
11. OSCARCLAIMS.NET
12. OSCARIMAGES.COM

**APPENDIX E**

**Screenshots Relied Upon by AMPAS that Do Not Contain Advertisements Displaying Any of AMPAS' Trademarks**

1. 2012ACADEMYAWARDS.COM
2. 2013ACADEMYAWARDS.COM
3. 411-ACADEMYAWARDS.COM
4. ACADEMYAWARD100.COM
5. ACADEMY-AWARDS.ORG
6. ACADEMYAWARDS2011LIVE.COM
7. ACADEMYAWARDS2012.NET
8. ACADEMYAWARDS2012WINNERS.COM
9. ACADEMYAWARDS2015.COM
10. ACADEMYAWARDSLIVE.COM
11. ACADEMYAWARDSMOVIES.COM
12. ACADEMYAWARDSNOMINATION.COM
13. ACADEMY-AWARDS-POOL.COM
14. ACADEMYAWARDSWINNERSLIST.COM
15. AFRICANACADEMYAWARDS.COM
16. ALLOSCARWINNERS.COM
17. ATTHEOSCARS.COM
18. BILLYCRYSTAL2012ACADEMYAWARDS.COM
19. BILLYCRYSTAL2012OSCARS.COM
20. BOLLYWOODOSCARSAWARDS.COM
21. COMEDYOSCARS.COM
22. GLOBEACADEMYAWARDS.ORG
23. IAMANOSCARWINNER.COM
24. LEEZAGIBBONSOSCARNIGHT2011.COM

25. LEEZAGIBBONSOSCARPARTY.COM

26. LISTOFACADEMYAWARDWINNERS.COM

27. MILLIONAIREACADEMYAWARDS.COM

28. MUSICACADEMYAWARD.COM

29. MYOSCARORNOT.COM

30. MYOSCARSORNOT.COM

31. MYOSCARSPEECH.COM

32. NOMINATEDBYOSCAR.COM

33. NOMINATEDBYOSCAR.NET

34. NOMINATEDBYOSCAR.ORG

35. ONACADEMYAWARDS.COM

36. ONLINEOSCARS.COM

37. OSCAR360.COM

38. OSCARARTPRODUCTION.COM

39. OSCARBODY.COM

40. OSCAR2013LIVESTREAM.COM

41. OSCAR2014LIVE.COM

42. OSCARAWARD2013LIVE.COM

43. OSCARAWARDS2013.COM

44. OSCAR-AWARDS-POOL.COM

45. OSCARBUZ.COM

46. OSCARDVD.COM

47. OSCARFILMSITESI.COM

48. OSCARIMAGES.COM

49. OSCARMOMINEE.COM

50. OSCAR-MOVIE.COM

51. OSCAR-MOVIES.INFO

52. OSCARMOVIES.NET
53. OSCARNOMINATEDMOVIES.COM
54. OSCARNOMINATIONS2013.COM
55. OSCAR-PG.COM
56. OSCARPICTURES.COM
57. OSCARREDCARPET.COM
58. OSCARS-2011.COM
59. OSCARS-EMPORIUM.COM
60. OSCARSFILM.COM
61. OSCARSMOVIES.COM
62. OSCARSWINNER.COM
63. OSCAR-THEMOVIE.INFO
64. OSCARWEEK.COM
65. OSCARWINNERS2009.COM
66. OSCARWINNERS2012.COM
67. OSCARWINNINGMOVIES.COM
68. SAPPHIREACADEMYAWARDS.COM
69. THEOSCARS2011.COM
70. THEOSCARSXXX.COM
71. TOGETHERACADEMYAWARDS.COM
72. TWOOSCARS.COM
73. VIRTUALWORLDACADEMYAWARDS.COM
74. WATCHACADEMYAWARDS2012ONLINE.COM
75. WATCHOSCAR2013ONLINE.COM
76. WATCHOSCARAWARDS2012ONLINE.COM
77. WILDABOUTTHEACADEMYAWARDS.COM
78. WORMACADEMYAWARDS.ORG

79. ZBIGATTIACADEMYAWARDS.COM

**APPENDIX F**

**Screenshots Relied Upon by AMPAS That Were Taken after January 2011**

1. ACADEMYAWARDMOVIES.COM
2. OSCARWAY.COM
3. 2OSCARS.NET
4. THINKQUICKOSCAR.COM
5. OSCARCHALLENGE.COM
6. OSCARCHALLENGE.NET
7. OSCARDVD.COM
8. OSCARNIGHTDRESSES.COM
9. OSCARS-2011.COM
10. OSCARS3D.COM
11. OSCARSREDCARPET.COM
12. YOUTUBEOSCARS.COM
13. ZBIGATTIACADEMYAWARDS.COM
14. ACADEMY-AWARDS.ORG
15. ACADEMYAWARDS2015.COM
16. AFRICANACADEMYAWARDS.COM
17. MILLIONAIREACADEMYAWARDS.COM
18. MILLIONAIRESACADEMYAWARDS.COM
19. NOMINATEDBYOSCAR.COM
20. NOMINATEDBYOSCAR.NET
21. NOMINATEDBYOSCAR.ORG
22. OSCARFILMSITESI.COM
23. OSCAR-MOVIE.COM
24. OSCAR-MOVIE.INFO
25. OSCAR-O.COM

26. OSCAR-O.INFO
27. OSCAR-THEMOVIE.INFO
28. OSCAR-W.COM
29. SAPPHIREACADEMYAYAWARDS.COM
30. TOGETHERACADEMYAWARDS.COM
31. 2012ACADEMYAWARDS.COM
32. 2013ACADEMYAWARDS.COM
33. ACADEMYAWARDEE.COM
34. ACADEMYAWARDER.COM
35. ACADEMY-AWARDS.INFO
36. ACADEMYAWARDS2011WINNERS.COM
37. ACADEMYAWARDS2012WINNERS.COM
38. ACADEMYAWARDSDB.COM
39. ACADEMYAWARDSLIVE.COM
40. ACADEMYAWARDSNOMINATION.COM
41. ACADEMY-AWARDS-POOL.COM
42. ACADEMYAWARDSWINNERSLIST.COM
43. ACADEMYAWARDWINNINGFILMS.COM
44. APP-OSCARS.COM
45. APPSOSCARS.COM
46. APPS-OSCARS.COM
47. BILLYCRYSTAL2012ACADEMYAWARDS.COM
48. GLOBEACADEMYAWARD.COM
49. GLOBEACADEMYAWARDS.COM
50. GLOBEACADEMYAWARDS.ORG
51. INDIEACADEMYAWARDS.COM
52. LISTOFACADEMYAWARDWINNERS.COM

53. MUSICACADEMYAWARD.COM

54. ONACADEMYAWARDS.COM

55. ONLINEOSCARS.COM

56. OSCARACTOR.COM

57. OSCARACTRESS.COM

58. OSCAR-AWARDS-POOL.COM

59. OSCAR-MIKE.COM

60. OSCARMOVIES.COM

61. OSCAR-MOVIES.INFO

62. OSCARNOMINATEDFILMS.COM

63. OSCARNOMINATIONS2011.COM

64. OSCARNOMINATIONS2013.COM

65. OSCARS2011LIVE.COM

66. OSCARSEASON.NET

67. OSCARSFILM.COM

68. OSCARSROOM.COM

69. OSCARWINNINGACTORS.COM

70. PETACADEMYAWARDS.COM

71. PETACADEMYAWARDS.INFO

72. THEOSCARBODY.COM

73. THEOSCARS.CO

74. WILDABOUTTHEACADEMYAWARDS.COM

75. WORMACADEMYAWARDS.ORG

76. 100OSCAR.COM

77. 100OSCARS.COM

78. 100THOSCAR.COM

79. 2011THEOSCARS.COM

80. 24HOURSATOSCARS.COM

81. 24HOURSATTHEOSCARS.COM

82. 411-ACADEMYAWARDS.COM

83. ACADEMYAWARD100.COM

84. ACADEMYAWARDS2011LIVE.COM

85. ACADEMYAWARDS2012.NET

86. ACADEMYAWARDSMOVIES.COM

87. ALLOSCAR.COM

88. ALLOSCARWINNERS.COM

89. ATTHEOSCARS.COM

90. BESTOSCARPARTYINTOWN.COM

91. BESTPICTUREOSCARNOMINATIONS.COM

92. BILLYCRYSTAL2012OSCARS.COM

93. BOLLYWOODOSCARSAWARDS.COM

94. COMEDYOSCARS.COM

95. DJ-ACADEMY-AWARDS.COM

96. GOTOSCAR.COM

97. IAMANOSCARWINNER.COM

98. LETSTALKOSCARS.COM

99. METAVERSEACADEMYAWARDS.COM

100. MYOSCARORNOT.COM

101. MYOSCARSORNOT.COM

102. OSCAR2013LIVE.COM

103. OSCAR2013LIVESTREAM.COM

104. OSCAR2014LIVE.COM

105. OSCARACADEMYAWARD.COM

106. OSCARAPP.COM

107. OSCARAWARD2013LIVE.COM
108. OSCARAWARDS2013.COM
109. OSCARBUZ.COM
110. OSCARGOODIEBAGS.COM
111. OSCARHOSTS.COM
112. OSCARIMAGES.COM
113. OSCARLIVE2013.COM
114. OSCARMOMINEE.COM
115. OSCARMOMINEES.COM
116. OSCARNOMINATEDMOVIES.COM
117. OSCARPICTURES.COM
118. OSCARREDCARPET.COM
119. OSCARS2013LIVE.COM
120. OSCARSNOBINATIONS.COM
121. OSCARSWINNER.COM
122. OSCARVIEWINGPARTY.COM
123. OSCARWEEK.COM
124. OSCARWINNERS2009.COM
125. OSCARWINNERS2012.COM
126. SOCIALMEDIAACADEMYAWARDS.COM
127. THEOSCARS2011.COM
128. VIRTUALACADEMYAWARDS.COM
129. VIRTUALWORLDACADEMYAWARDS.COM
130. WATCHOSCAR2013ONLINE.COM
131. OSCARKIDS.COM
132. WATCHACADEMYAWARDS2012ONLINE.COM
133. WATCHOSCARAWARDS2012ONLINE.COM

134. OSCARARTPRODUCTION.COM

**APPENDIX G**

## Pre-Litigation Correspondence between AMPAS and GoDaddy

| Date | Domain Name at Issue | JTX No. Ref. |
|------|----------------------|--------------|
| 2007-02-16 | OSCARNIGHTDC.COM | C&D – JTX-1126 |
| 2009-06-18 | ACADEMY-AWARD.INFO | C&D – JTX-1013<br><br>Response<br>– JTX-1256 |
| 2009-06-18 | ACADEMYAWARDS.INFO | C&D – JTX-1130<br><br>Response<br>– JTX-1131 |
| 2009-06-18 | ACADEMYAWARDSFORUM.COM;<br>ACADEMYAWARDSFORUMS.COM | C&D – JTX-1015<br><br>Response<br>– JTX-1132 |
| 2009-06-18 | ACADEMYAWARDSNOMINATIONS.COM | C&D – JTX-1016<br><br>Response<br>– JTX-1133 |
| 2009-06-18 | THEACADEMYAWARDSEDWARDDELUXE.COM | C&D – JTX-1014<br><br>Response<br>– JTX-1134 |
| 2009-06-29 | ACADEMYAWARD.US | C&D – JTX-1018<br><br>Response<br>– JTX-1257, 1138 |

| | | |
|---|---|---|
| 2009-06-29 | ACADEMYAWARDS2010.COM | C&D – JTX-1019<br><br>Response<br>– JTX-1138 |
| 2009-06-29 | NRIACADEMYAWARDS.COM;<br>NRIACADEMICAWARDS.COM | C&D – JTX-1139<br><br>Response<br>– JTX-1138 |
| 2009-06-29 | PETS-OSCAR.COM | C&D – JTX-1111<br><br>Response<br>– JTX-1137 |
| 2009-06-29 | YOUTUBEACADEMYAWARDS.COM | C&D – JTX-1020<br><br>Response<br>– JTX-1138 |
| 2009-07-06 | ACADEMYAWARDSMOVIES.COM | C&D – JTX-1079<br><br>Response<br>– JTX-1141, 1147 |
| 2009-07-06 | ACADEMYAWARDSDOCUMENTARY.COM | C&D – JTX-1024<br><br>Response<br>– JTX-1146, 1147 |
| 2009-07-06 | ACADEMYAWARDSDVD.COM | C&D – JTX-1022<br><br>Response<br>– JTX-1140, 1147 |
| 2009-07-06 | ACADEMYAWARDSSHOW.COM | C&D – JTX-1142<br><br>Response<br>– JTX-1143, 1147 |

| 2009-07-06 | ACADEMYAWARDSVIDEO.COM | C&D – JTX-1028 Response – JTX-1144, 1147 |
|---|---|---|
| 2009-07-06 | ACADEMYAWARDSWINNERS.COM | C&D – JTX-1027 Response – JTX-1145, 1147 |
| 2009-07-06 | INSHADACADEMYAWARDS.COM, INSHADACADEMYAWARDS.INFO, INSHADACADEMYAWARDS.NET, INSHADACADEMYAWARDS.ORG | C&D – JTX-1026 Response – JTX-1147 |
| 2009-07-22 | ACADEMYAWARD-WINNERS.COM | C&D – JTX-1151 Response – JTX-1152 |
| 2009-08-06 | ACADEMYAWARDWINNERS.COM | C&D – JTX-1031 Response – JTX-1153 |
| 2009-08-14 | ACADEMYAWARDBOOKS.COM | C&D – JTX-1033 Response – JTX-1154 |
| 2009-08-20 | ACADEMYAWARDNOMINATIONS.COM | C&D – JTX-1034 Response – JTX-1155 |
| 2009-08-20 | HIGHPOINTACADEMYAWARDS.COM | C&D – JTX-1035 Response – JTX-1156 |

| | | |
|---|---|---|
| 2009-09-24 | ACADEMYAWARDSVOTING.COM; ACADEMYAWARDSVOTING.ORG | C&D – JTX-1038<br><br>Response – JTX-1157 |
| 2009-10-08 | WATCH-OSCAR-ONLINE.INFO | C&D – JTX-1039<br><br>Response – JTX-1158 |
| 2010-01-08 | OSCAR-CURROS.INFO, OSCAR-CURROS.COM, OSCAR-CURROS.NET | C&D – JTX-1029<br><br>Response – JTX-3036 |
| 2010-02-02 | ACADEMYAWARDTRAILERS.COM | C&D – JTX-1161<br><br>Response – JTX-1162 |
| 2010-02-02 | GEORGES-OSCAR.COM | C&D – JTX-1163<br><br>Response – JTX-1164 |
| 2010-02-05 | ACADEMYAWARDS.MOBI | C&D – JTX-1117<br><br>Response – JTX-1166 |
| 2010-02-05 | ACADEMYAWARDSRENTAL.COM | C&D – JTX-1030<br><br>Response – JTX-1165 |