1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACADEMY OF MOTION PICTURE ARTS AND SCIENCES, a California nonprofit corporation,<br><br>        Plaintiff,<br><br>      v.<br><br>GODADDY.COM, INC., a Delaware corporation; THE GODADDY GROUP INC., a Delaware corporation; DOMAINS BY PROXY, INC., a Delaware Corporation; GREENDOMAINMARKET.COM, an unknown entity; BDS, an unknown entity; and XPDREAMTEAM LLC, a California limited liability corporation,<br><br>        Defendants. | Case No. CV 10-03738 AB (CWx) [consolidated with Case No. CV 13-08458-ABC (CW)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW (Fed. R. Civ. P. 52(a)(1))** |

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Following the bench trial of the above-captioned matter from August 4-7, 2015, the Court makes the following Findings of Fact and Conclusions of Law:

# I.   FINDINGS OF FACT

## A.   The Parties

1.   GoDaddy.com, Inc. was incorporated under the laws of Arizona on January 13, 1997.  On December 5, 2011, GoDaddy.com, Inc. changed its corporate form to become a limited liability company under the laws of Delaware.  Consistent with its change in corporate form, GoDaddy.com, Inc. changed its name to GoDaddy.com, LLC ("GoDaddy").   [Stipulated Fact ("SF") 10 (Dkt. No. 725, FPTCO at Appendix A).]

2.   GoDaddy is the largest domain name registrar in the world with approximately 60 million domain names under management.  GoDaddy has registered more than 150 million domain names since becoming an ICANN-accredited registrar in 2000, averaging over 25,000 domain registrations per day.  On average, GoDaddy registers a domain name every 0.7 seconds. [SF 11-14; Trial Transcript ("TT") at 256:25-257:8 (Hanyen); 346:16-20 (Nicks).]

3.   In addition to registering domain names, GoDaddy helps individuals and small businesses get online by hosting their websites as well as providing tools to design, build, and manage their online presence.   [TT at 259:15-22 (Hanyen); 345:1-7 (Nicks).]

4.   GoDaddy serves 13 million customers around the world using 40,000 servers in data centers worldwide.  On average, GoDaddy receives over 10 billion domain name service inquiries each day.   [TT at 259:23-25 (Hanyen); 346:12-15 (Nicks).]

5.   The Academy of Motion Picture Arts and Sciences ("AMPAS") is a non-profit founded for the purpose of advancing the motion pictures arts and sciences by promoting cultural, educational and technological achievements.   [SF

1.]

6.     Among its activities to promote motion picture arts and sciences, AMPAS organizes and presents an annual televised awards show, known as the "Oscars" or the "Academy Awards." [SF 3; *see also* SF 4-8.] The awards presented at this ceremony are known as an "Academy Award" or an "Oscar." [TT at 60:17-61:12; 61:23-63:5 (Davis).]

7.     AMPAS owns the following registered trademarks:  OSCARNIGHT, ACADEMY AWARD, OSCAR, OSCARS, and ACADEMY AWARDS (the "AMPAS Marks" or "AMPAS's Marks").  [SF 17.][1]

8.     Between 36.3 million and 43.7 million viewers watched the Academy Awards ceremony from 2009 to 2014.  [Joint Exhibit ("JTX") 222-244.]  It is the most-watched non-sports television event of the year in the United States.  [TT at 67:17-68:2 (Davis).]

9.     However, these figures do not reflect the untold number of additional Americans who do not watch the awards ceremony but are exposed to the marks through the undisputed media saturation AMPAS's marks receive.  [*See* JTX 245.] The ceremony is "an international press event" with thousands of news reporters covering the event each year.  [TT at 66:13-67:16.] The Academy Awards annual ceremony receives extensive media coverage each year, including in the most widely circulated newspapers and magazines in the United States.  [*See* JTX 222-245.]

10.     Because of the widespread interest in the annual awards ceremony, AMPAS licenses its trademarks for "significant amounts of money, tens of millions,

---

[1] The Court has taken "judicial notice that the U.S. Patent and Trademark Office ('USPTO') identifies AMPAS as the registered owner of the following marks: ACADEMY AWARD (USPTO Reg. No. 2,245,965), ACADEMY AWARDS (USPTO Reg. Nos. 1,103,895; 1,880,473; 1,956,313), OSCAR (USPTO Reg. Nos. 1,096,990; 1,118,751; 1,996,585; 2,021,582), OSCARS (USPTO Reg. No. 1,528,890), and OSCAR NIGHT (USPTO Reg. No. 2,029,445).  [Dkt. 655, p. 2 n.3; *see also* SF 18-19]

1  even hundreds of million dollar amounts."  [TT at 542:15-21 (Pampinella); *see also*
2  JTX 1, 3, and 4 (AMPAS's broadcast and other licenses).]

3        11.    Both "Oscar" and the "Academy Awards" have their own entries in the
4  Oxford English Dictionary, referring specifically to AMPAS's annual awards
5  ceremony, and the Encyclopedia Britannica includes an entry for the "Academy
6  Awards" referring to AMPAS's annual awards ceremony.  [SF 22-23; JTX 248-50.]

7        12.    AMPAS and GoDaddy are not competitors.  [SF 16.]

8        **B.**      **The Nature of GoDaddy's Registration Services and Parked Pages**

9        13.    GoDaddy provides low-cost domain name registration services,
10  typically allowing individuals to register domains for, on average, $10 to $12 per
11  domain name.  [TT at 345:22-346:2 (Nicks).]

12        14.    In order to facilitate such low-cost domain registration services,
13  GoDaddy primarily uses an automated process.  Requiring GoDaddy to subject each
14  domain registration to a costly, manual legal review is not commercially practical
15  and would dramatically increase GoDaddy's costs, which would in turn be passed
16  on to the consumer.  [TT at 314:5–315:5 (Hanyen); 346:8–11 (Nicks).]

17        15.    GoDaddy provides an automated registration process whereby domain
18  name registrants submit domain names for registration through GoDaddy's online
19  "dashboard."  [TT at 260:20-261:17 (Hanyen).]

20        16.    Once a registrant selects their domain name, he/she is presented with a
21  series of decisions to make, such as how long to register the domain name, whether
22  to add privacy service, whether to build a website with GoDaddy's assistance,
23  and/or the designation of the domain name server ("DNS") to which the domain
24  name will route.  [SF 58; TT at 261:18-269:16 (Hanyen).]

25        17.    Designation of a DNS allows the Internet Protocol (IP) address
26  corresponding to the domain name to be located and accessed online.  [SF 57; TT at
27  269:23-270:2 (Hanyen).]

28

18.    At all times relevant, registrants using GoDaddy's registration service could configure their DNS so that it routed to:

        a.     the registrant's website;

        b.     an existing website associated with another domain name;

        c.     a one-page website created and hosted by GoDaddy; or

        d.     GoDaddy's parked page servers.

[SF 56, 58, 59; TT at 269:9-19 (Hanyen).]

19.    In the event a registrant does not select a DNS at the time of registration, the DNS for GoDaddy's parked page servers is designated by default through GoDaddy's automated processes.    [SF 60; TT at 269:9-19 (Hanyen); 349:15-21 (Nicks).]

20.    GoDaddy's registration, routing, and parked page processes are automated.  [TT at 260:20-261:17, 270:18-271:10 (Hanyen).]

21.    At a large scale, ensuring that every domain name is associated with a DNS entry (even an entry directing the domain to one of GoDaddy's Parked Pages servers) is important because domain names that are not associated with a DNS entry present a technological problem.  When users navigate their web browsers to a domain name that is not associated with a DNS entry, those unresolved "DNS queries, which [are] looking for a number where there [is] no number, develop[] a sort of churn in [GoDaddy's] system."   While this modest slowing may not be problematic at a smaller scale, GoDaddy processes more than 10 billion DNS queries every day.  Slowing GoDaddy's systems can mean, for many people's day-to-day internet use, a slowing of the entire Internet.  [Jones Deposition Transcript ("DT") 33:8-34:10; TT at 346:14-15 (Nicks).]

22.    To solve this technological problem, GoDaddy began implementing a Parked Pages Program shortly after it began operating as a domain registrar in 2000.  [Jones DT at 32:5-25.]

23.    Beginning in 2000 or 2001, GoDaddy directed parked pages to non-monetized webpages displaying words like "Under Construction" or "Coming Soon."   [Merdinger 30(b)(6) DT Vol. I at 81:24-82:15.]   However in 2005, GoDaddy began to monetize its parked pages. [Merdinger 30(b)(6) DT Vol. I at 86:13-87:11.]

24.    The term "parking" refers to the circumstance in which a domain name is "parked" temporarily on the Internet in the event a third-party Internet user inserts the domain name into his or her web browser. [SF 62.]

25.    Unlike traditional websites, such as godaddy.com, GoDaddy's parked pages are "dynamic" – meaning a parked page does not exist unless and until an Internet user types a domain name into a web browser and presses enter. [SF 62; TT at 350:9-352:2 (Nicks).]

26.    A parked page then exists only for the duration that an Internet user keeps the page open on the computer.  [SF 6; TT at 350:23-25 (Nicks).]

27.    Once the Internet user closes the parked page, that particular parked page ceases to exist.  The next time the domain name is entered into a browser, a new parked page is generated. [SF 64.]

28.    GoDaddy was not the first company to develop parked pages.  Many companies in the industry have had and continue to have parked pages for domains that have not been associated with a website.  Displaying advertisements on parked pages is standard in the industry and many other companies have done so.  [Jones DT at 31:8-16, 40:17-41:1; TT at 348:2-349:10 (Nicks).]

29.    Although GoDaddy initially adopted parked pages GoDaddy to solve a technological problem, GoDaddy soon discovered that blank webpages posed a separate user-experience problem: a disorienting "dead end."   Directing a parked page to a blank Web page or one without any substantive content may solve the technological problem, but it can lead to a poor user experience because someone

can generally only find a parked page by navigating their Web browser directly to that domain.  Once a user has reached a parked page, the user is probably "looking for a Web site that doesn't exist."  By placing advertisements on that otherwise non-existent Web page, GoDaddy is able to "put[] something in front of" the user and "redirect [that user] to some other part of the Internet, a live Web site" that might be relevant to the user's experience.  [TT at 317:3-318:7 (Nicks).]

30.    GoDaddy began its attempts to solve this user experience problem by placing banner ads for GoDaddy products and services on certain parked pages to encourage users to design, build, or host their websites.  The purpose of those banner ads was to improve the customers' experience, and to encourage them to purchase GoDaddy's services to "use their domain names" and "build Web sites." Those banner advertisements benefitted GoDaddy with modest sales revenue.[2]  [SF 69; Jones DT at 33:8-34:10, 34:25-37:4; Rechterman DT at 63:12-64:1, 66:22-25; TT at 370:7-373:17, 392:14-22  (Nicks).]

31.    To continue to improve the customers' and Internet users' experience, to benefit brand owners, and to further monetize its Parked Pages Program, beginning in approximately 2005, GoDaddy entered into an agreement with Google wherein Google provided sponsored advertisements on certain parked pages through its AdSense for Domains program.   These Google advertisements continued to enhance user experience by giving users a list of other advertised websites that may be the Web site the user was actually looking for or related to it.  As with banner advertisements, Google advertisements on GoDaddy's parked pages also benefitted GoDaddy by offering GoDaddy modest revenues.[3]  [SF 61, 62, 67, 69, 72-77; JTX

---

[2] For example, GoDaddy's total revenues in 2011 were $894.3 million.  Just one year earlier, GoDaddy's total revenues from banner advertising in 2010 was roughly $6 million, or 0.6 percent of GoDaddy's total revenues in 2011 [JTX 648, 672, p. 84.]

[3] GoDaddy's total revenues from click-through advertisements and CashParking subscription fees combined in 2010 was roughly $6.7 million, or 0.7 percent of GoDaddy's total revenues in 2011. [JTX 648, 672 p. 84.]

33; Merdinger, 30(b)(6) DT Vol. I at 86:13-87:11; Jones DT at 59:16-60:3, 60:6-11; Rechterman DT at 113:2-114:1; TT 371:3-372:7.]

32.    GoDaddy now maintains two parked page programs—one called "Free Parking" (established in 2005) and one known as "CashParking" (established in 2006). [SF 61, 70; TT at 349:11-14 (Nicks); Merdinger 30(b)(6) DT Vol. I at 86:13-87:11, 91:1-12.]  In this action, these two programs have been collectively referred to as the Parked Page Programs.

33.    When a registrant registers a domain name with GoDaddy, if that registrant fails to select or configure a name server, GoDaddy will automatically default that domain name into its Free Parking Program.  [SF 59, 60.]

34.    Whether advertisements are displayed on a domain name with its DNS routed to GoDaddy's parked page servers depends on the template assigned to the domain name by GoDaddy's automated processes.  [TT at 350:17-353:11 (Nicks).]

35.    GoDaddy maintains different templates for its parked pages, some of which display advertisements and some of which do not.  [SF 65, 68; TT at 350:17-353:11 (Nicks); TT at 272:6-273:10 (Hanyen).]

36.    Those parked pages that display advertisements may contain GoDaddy banner advertisements, Google-provided pay-per-click advertisements, or some combination of both.  [SF 65-67.]

37.    GoDaddy's Free Parking Program monetizes domain names by creating and hosting dynamic websites with (i) contextual pay-per-click advertisements; (ii) pop-under advertisements; [4] and/or (iii) banner advertisements for GoDaddy's and its affiliates' products and services.  [SF 61, 62, 67, 69, 72-77.]

---

[4] GoDaddy previously contracted with Casale Media to use so-called "pop-under" advertisements in its Parked Pages Program.  GoDaddy also retained a portion of the revenues generated by pop-under advertising in both Free Parking and Cash Parking. However, GoDaddy discontinued their use because "[t]hey weren't bringing very much revenue in, and they were annoying."  [SF 72-75; TT at 358:4-15 (Nicks).]

1      38.     In the Free Parking Program, GoDaddy does not share any of the

2  advertising revenue with the domain name registrant.  [SF 76; TT at 391:15-17

3  (Nicks).]  Pay-per-click advertising revenue derived from the Free Parking Program

4  is shared only amongst GoDaddy and its advertising partner (here, Google).  [JTX

5  584; TT at 391:11-14 (Nicks); JTX 15 & 31.]   GoDaddy also retains revenue

6  derived from the banner advertisements in the Free Parking Program.  [SF 69; TT at

7  392:14-22 (Nicks).]

8      39.     The following screenshot represents a standard GoDaddy Free Parking

9  parked page template, which may include GoDaddy banner ads set out on the right-

10  hand side, and Google pay-per-click ads within the rectangular bracket under

11  "Sponsored Listings."



[JTX 2111.001; TT at 355:22-356:24 (Nicks).]

40. GoDaddy's Cash Parking Program is "an online domain monetization system" that provides "domains with pay-per-click ads and search engine-friendly articles." [JTX 2020.008, JTX 2020.004.] Under this sub-program of the Parked Pages Program, the registrant chooses to pay GoDaddy a monthly enrollment fee in exchange for a share of GoDaddy's pay-per-click and pop-under advertising revenue from the parked domain name. [JTX 2020; JTX 645; *see also* JTX 539 (GoDaddy added hundreds of templates to Cash Parking "all designed to help users increase traffic").]

41. Accordingly, GoDaddy's Cash Parking Program monetizes domain names by creating and hosting dynamic websites with contextual pay-per-click advertisements and pop-under advertising. [SF 74-77; TT at 355:14-358:11, 372:8-13 (Nicks); Jones DT at 34:13-17, 35:9-37:4, 71:5-8.] GoDaddy's Cash Parking Program also monetizes domain names by charging the domain names registrant a monthly fee in exchange for sharing a portion of the revenue generated from the pay-per-click advertisements appearing on the parked page. [SF 77.]

42. The following represents a generic GoDaddy CashParking template, which does not include GoDaddy advertising, but may include Google provided pay-per-click ads under "Sponsored Listings" and a statement at the bottom of the page indicating that the page is provided by GoDaddy.com.

///
///
///
///
///
///
///



[JTX 2221.001; TT at 356:25-357:20 (Nicks).]

43.     Some templates for parked pages do not contain advertisements, but may contain statements such as "Sorry, this site is not currently available!" or "Coming Soon."  Some templates for parked pages may not have any content at all (i.e., blank pages).  [SF 66; TT at 358:16-359:18 (Nicks).]  GoDaddy also uses some of the following non-ad templates as part of its Free Parking Program:

///

///

///

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11



12
13
14
15
16
17
18
19
20
21
22
23



24

25  [TT at 358:22-359:18 (Nicks).]

26      44.    Unless it is manually overridden, the template designation for a given

27  domain is entirely automated and may change at any moment based on the

28

registrant's right to control content resolving from the domain name at all times. [TT at 270:18-271:10 (Hanyen); 351:1-353:22, 329:22-33:1 (Nicks).]

45.     The fact that a domain name may resolve to a parked page with ads on one occasion does not mean that it will always do so.  [SF 68.]

46.     GoDaddy's automated processes consider a host of factors each time a domain name is visited, any one of which can make the difference between whether the domain name is assigned to a non-ad or ad-bearing template.  [TT at 350:17-353:11 (Nicks).]

47.     Parked pages hosted by GoDaddy are generally not indexed by search engines and, as such, will not show up in the search results provided by search engines such as Google.  [TT at 359:19-360:8 (Nicks).]

48.     With rare exception, the only way an Internet user could have landed on a GoDaddy parked page resolving from one of the domain names at issue was by typing the domain name into a web browser's address bar.  [SF 62; TT at 360:9-361:5 (Nicks).]

49.     GoDaddy does not place its own banner advertisements on websites resolving from domain names that utilize its CashParking service.  [SF 78; TT at 365:6-20 (Nicks).]

50.     Since at least October 2007, GoDaddy prohibited the use of certain third party trademarks, including "academy awards," as keywords[5] in its CashParking program.  [TT at 384:9-385:12; 385:18-22 (Nicks); JTX 404, 534; SF at 106, 107, 108.]

51.     Parked pages serve different purposes to different people/entities.   For example, with regard to those parked pages that serve third party advertisements, (a)

---

[5] Keywords are words that a CashParking registrant can associate with its domain that Google uses to help generate relevant advertising and search results.  For example, a user parking a domain name related to fashion might associate keywords like "shoes" or "runway," which Google's algorithm would use to add context and produce more relevant results.

the advertisers (such as AMPAS) benefit through exposure, (b) GoDaddy and the advertisement provider, such as Google, benefit through revenue share; and (c) Internet users benefit by not reaching dead ends or 404 errors, while also being presented with options to assist them in reaching desirable content.  Regardless of the placement of third-party advertisements on certain parked page templates, domain name registrants benefit from seeing content resolving from their domain name while also being presented with the tools they need to build their website.  [TT at 270:13-271:10 (Hanyen); 371:3-372:7, 372:14-373:17 (Nicks); Merdinger 30(b)(6) DT Vol. I at 37:2-38:21.]

52.    Before domain registrant is able to register a domain name through GoDaddy (a prerequisite to participating in Free Parking), the registrant must agree to GoDaddy's Domain Name Registration Agreement (the "DNRA").   In the DNRA, registrants agree to allow GoDaddy to direct domain names to its Free Parking program and to retain all revenue derived from the Free Parking Program, if they do not designate a DNS for their domain.  [SF 80-82.]

53.    Because GoDaddy obtains an independent license from registrants to place domains in Free Parking, "a registrant could register a domain without intent to monetize it, but yet it ends up in GoDaddy's free parking service."  [Merdinger Indiv. DT Vol. II at 129:14-18.]

54.    For example, Oscar Sagastume testified that he did not "really think about" whether GoDaddy would place his domain OSCARCOMEDY.COM (one of the Accused Domains in this action) in Free Parking.   [TT at 251:10-21.] Nonetheless, his domain participated in Free Parking and displayed three pay-per-click advertisements (out of 10) using one or more of AMPAS's marks.  [JTX 2111 (OSCARCOMEDY.COM parked page with advertisements stating, *inter alia*, "Oscar awards by year," "2010 Oscar Nominees," and "District 9 Oscar Nominees".]

C.     **GoDaddy's Participation in Google's AdSense for Domains**
         **Program**

55.    At all times relevant, third-party, pay-per-click advertisements were provided by Google's AdSense for Domains service, which enables registrars and domain name holders to potentially generate some revenue and offers a better user experience than traditional "Under Construction" pages.   [SF 83-84; TT 370:7-373:17 (Nicks).]

56.    In its AdSense agreements with Google, GoDaddy agreed: (i) that it would be solely responsible for the domain names and webpages in its Parked Pages Program; and (ii) that it would not violate others' rights, including trademark and intellectual property rights, and would not allow others to do so.   [JTX 12, 13, 15, 31, 33, 37.]

57.    At all times relevant, Google was wholly responsible for selecting the pay-per-click advertisements that appeared on GoDaddy parked pages and for placing those advertisements on a GoDaddy parked page.   [SF 87-89; JTX 31.010 at ¶ 3.18.]

58.    At no time during its relationship with Google has GoDaddy had the ability to choose or otherwise control which advertisements Google placed on a parked page.   [SF 84, 87-89; JTX 31.001 at ¶ 3.1; TT at 376:4-12; 378:18-24; 379:2-10 (Nicks).]

59.    Google maintains complete control and discretion over the selection and placement of advertisements appearing on each GoDaddy parked page.   [SF 87-89; JTX 31.001 at ¶¶ 1.1, 3.1; TT at 378:18-24 (Nicks).]

60.    GoDaddy is contractually prohibited from modifying or otherwise reviewing the advertisements selected by Google and must display the advertisements as delivered.   [SF 87-88; JTX 31.001 at ¶ 3.1, 33.005 at ¶ 3.1; TT at 376:4-12.]

61.   Google also prohibits GoDaddy from tracking data contained in any advertising results, including text or URLs.  [SF 89; JTX 31.001 at ¶ 3.1, 33.005 at ¶ 3.1.]

62.   Beginning in 2009, Google stopped providing GoDaddy with the advertisements to be displayed on parked pages; instead, the Google ads were transmitted directly by Google to the Internet user's web browser.  [TT at 378:9-20 (Nicks).]

63.   From 2009 to present, GoDaddy has had no ability to learn the content of the Google advertisements that were going to be displayed in an Internet user's browser when visiting a GoDaddy parked page.   [TT at 378:21-24 (Nicks).]

64.   From 2009 to present, GoDaddy has been unable to filter, either technologically or contractually, the content of Google advertisements appearing on parked pages.  [TT at 378:25-379:2 (Nicks); SF 87-88; JTX 31.001 at ¶ 3.1, 33.005 at ¶ 3.1; TT at 376:4-12 (Nicks).]

65.   Beginning in 2013, Google changed the manner in which its ads were displayed on GoDaddy parked pages.  Specifically, starting in 2013, a client browser would read the parked page as essentially two separate webpages – a webpage within a webpage.   In this mechanism, GoDaddy provides a master page that contains an internal web page, or "iFrame," directed to Google for its placement of pay-per-click advertisements.   This change further removed GoDaddy from the placement of Google ads on parked pages.  [TT at 379:12-381:25 (Nicks).]

66.   Google has implemented a comprehensive trademark protection policy for those domains participating in AdSense for Domains.  [SF 85; JTX 31.011 at ¶ 4.3.]

67.   Despite being aware of the protections afforded by Google's trademark policy, AMPAS chose not to avail itself of the policy in relation to any of the domain names at issue.  [Miller 30(b)(6) DT Vol. I at 99:14-99:17, 99:20-100:7,

1  101:02-101:12.]

2      68.   AMPAS never contacted Google to object to the use of the AMPAS

3  Marks in Google's AdSense program, nor has AMPAS complained to Google that

4  the use of the AdSense or AdWords programs infringe on the AMPAS Marks.

5  [Miller 30(b)(6) DT Vol. I at 98:01-99:04, 101:9-14, 108:17-108:24; Vol. II at

6  292:20-293:3.]

7      **D.**   **Circumstances in Which GoDaddy Earns Revenue from Parked**

8            **Pages**

9      69.   GoDaddy only earns revenue from a parked page if: (a) an Internet user

10  clicks on a GoDaddy banner and then purchases a product/service; or (b) an Internet

11  user clicks on one of the Google-provided, third-party pay-per-click advertisements.

12  [SF 69; TT at 391:4-22; 392:14-25 (Nicks); JTX 408, 697.]

13     70.   Prior to October 16, 2013, GoDaddy could also earn revenue from pop-

14  under advertisements triggered by the display of certain monetized templates in the

15  Free Parking Program.  [SF 73; JTX 408, 697.]

16     71.   Prior to January 28, 2015, GoDaddy could also earn revenue from pop-

17  under advertisements triggered by the display of certain monetized templates in the

18  Cash Parking Program.  [SF 75; JTX 408, 697.]

19     **E.**   **GoDaddy's Trademark Protection Practices**

20     72.   GoDaddy supports the protection of intellectual property, and has

21  developed policies and procedures to assist intellectual property right owners in the

22  protection of their brands.   [SF 52-24; JTX 28-30; TT at 275:4-278:4, 320:1-20

23  (Hanyen), 419:6-420:7 (Nicks); Ede DT at 160:3-161:11.]

24     73.   As part of its trademark protection practices, GoDaddy requires every

25  domain name owner utilizing its parked page services to represent and warrant that:

26  (1) the parked webpage does not "violate . . . any third party rights;" (2) the owner

27  has no knowledge of any "infring[ment] or conflict[] with the legal rights of a third

28

party or a third party's trademark or trade name;" and (3) that the registrant's website "conforms to all local, state, federal, and internal laws." GoDaddy relies on these representations. [SF 52-54; JTX 23.061 at ¶ 10, 24.006 at ¶ 10; TT at 268:1-7 (Hanyen).]

74.     For those customers who call into GoDaddy to register domain names, GoDaddy also trains its employees to counsel prospective domain name registrants against the registration of domain names incorporating famous trademarks. [TT at 299:24-301:6, 320:1-20 (Hanyen); Ede DT at 160:3-161:11; JTX 38.]

75.     In addition, GoDaddy organized and hosted an annual "Registrar's Summit" from 2008-2013, the purpose of which was to provide a forum for registrars to discuss issues facing registrars and to establish best practices in the industry, including best practices for trademark claims handling.  [TT at 301:7-302:1, 302:2-303:1, 303:24-304:2, 320:1-20 (Hanyen); Ede DT at 160:3-161:11.]

76.     GoDaddy also established a Domain Services department to handle, among other things, allegations of trademark infringement related to any of the 60 million domain names under its management and to streamline the submission of complaints, legal action, and court orders by trademark owners. [Ede DT at 160:3-161:11, 320:1-20.]

77.     GoDaddy receives thousands of infringement notices each year, often threatening litigation if it does not take (or refuses to take) the action requested by the complainant.  As an accredited registrar, the actions GoDaddy may take in response to cease and desist letters are generally dictated by the Internet Corporation for Assigned Names and Numbers ("ICANN"), the administrative body sanctioned by Congress to regulate the Internet.  [TT at 270:3-12, 281:7-11, 282:14-283:11, 325:14-18 (Hanyen); JTX 3044.]

78.     ICANN adopted the Uniform Domain Name Dispute Resolution Policy ("UDRP") as a means to resolve disputes arising from the registration of domain

names.  ICANN's website states:  "All registrars must follow the ["UDRP"].  Under the policy, most types of trademark-based domain-name disputes must be resolved by agreement, court action or arbitration before a registrar will cancel, suspend, or, transfer a domain name."  [TT at 270:3-12 (Hanyen).]

79.    The UDRP expressly prohibits GoDaddy from unilaterally cancelling the registration of a domain name without court order, arbitration process, or the agreement of the registrant.  [TT at 270:3-12 (Hanyen)].

80.    As early as 2004, GoDaddy voluntarily established a Trademark Infringement Policy ("TM Policy").  The TM Policy is a written policy by which brand owners and domain name registrants can resolve disputes over the alleged unauthorized use of trade names, trademarks or copyrights by domain name registrants without resort to the courts.   [SF 101; JTX 28; TT at 275:4-276:2 (Hanyen).]

81.    Pursuant to GoDaddy's TM Policy, a trademark owner can initiate a complaint by providing GoDaddy with, among other things, (1) a description of the manner in which its trademark or other protected material is being infringed; (2) sufficient evidence that the owner of the website is a GoDaddy customer; (3) information supporting the complaining party's rights in the trademark or other protected material; and (4) a good faith certification signed under oath.  [SF 101; JTX 28-30; TT at 276:15-277:2 (Hanyen).]

82.    The majority of trademark owners choose to initiate this process using a standardized form letter, usually on their attorney's letterhead and often threatening litigation if GoDaddy does not take a host of actions in response. Despite the wide-ranging requests made by trademark owners, some of which violate the UDRP, GoDaddy does its best to aid in the fair and complete resolution of disputes presented in compliance with its TM Policy.  [TT at 277:16-279:11, 280:16-281:6, 282:14-290:25 (Hanyen); JTX 30, 1243.18039-.18043, 3044, 3046.]

83.     The complainants often demand that GoDaddy take action that is expressly prohibited by the terms of the UDRP, including cancelling or transferring the disputed domain name without a court or arbitral order or which do not relate to the specific circumstances of a particular domain name.   AMPAS's standard demand that GoDaddy cancel a domain name's registration or to cease selling tickets to the Academy Awards are two such examples.  [TT at 282:14-285:4, 291:1-293:9, 293:24-297:5 (Hanyen); TT at 92:12-93:19 (Davis); JTX 1013, 1035, 1156, 3044.]

84.     Although it is often contractually or practically unable to comply with such demands, pursuant to GoDaddy's TM Policy, GoDaddy always attempts to facilitate communications between brand owners and third-party registrants in an effort to allow for a potential resolution of their dispute.  [TT at 277:16-279:11, 280:16-281:6 (Hanyen); JTX 30, 3044.]

85.     GoDaddy also offers a VIP program for brand owners who have repeat infringement concerns to further simplify and expedite the process.  [Jones DT at 114:16-20, 122:8-123:5; JTX 399.]

86.     Because of the repetitive nature of registrations involving certain well-known trademarks (e.g., Louis Vuitton, Rolex, and FedEx), the majority of brand owners, especially those participating in the VIP program, will include multiple domain names in a single form letter requesting GoDaddy's assistance in resolving disputes even though often the domain names at issue do not relate to a brand owner's mark.  [TT at 285:5-288:25 (Hanyen); JTX 399, 1243.18039-.18043, 3046.]

87.     Brand owners frequently perform this mark policing by using the services of brand protection companies like Mark Monitor, CSC, and other companies.   Among other services, such brand protection companies can obtain daily lists of all the domain names registered every day (at GoDaddy, 27,000 per day) and run computer searches for domain names involving their clients' marks

that mark holders can use to file takedown requests with service providers like GoDaddy. [TT at 443:21-444:12 (Nicks).][6]

88.     GoDaddy resolves thousands of trademark disputes each year through its TM Policy, often within one business day of the receipt of a complaint. Although GoDaddy resolves different types of complaints in varying manners, GoDaddy considers issues completely resolved when it does not receive a negative response from a trademark owner after the owner is advised of the action taken by GoDaddy.  [TT at 281:7-11, 281:20-282:5, 282:14-283:11, 290:12-25, 325:14-18 (Hanyen); JTX 3044.]

89.     Upon notice of infringement by a trademark owner, GoDaddy will manually override its automated systems to ensure that a domain name in one of the parked page programs always resolves to a page containing no ads pending resolution of the dispute, regardless of the perceived viability of the trademark owner's claim of infringement.  [SF 102; TT at 279:12-19, 288:2-25 (Hanyen).]

90.     The manual override ensures that a domain name of which GoDaddy has received notice of potential infringement will not be sent to Google with a request for advertisements to be displayed.  This is important to GoDaddy not only from the perspective of assisting trademark owners but also as it relates to GoDaddy's "quality score" with Google.   The amount of revenue earned by GoDaddy from Google's AdSense Program is negatively impacted by, among other things, alleged trademark infringement in the parked page programs, which results in lower quality scores being assigned by Google.  [Merdinger Indiv. DT Vol. I at 37:2-38:21, 52:21-54:17.]

**F.     AMPAS and GoDaddy's Pre-Litigation Relationship**

91.     AMPAS does not object to the registration of domain names containing

---

[6] The record is silent about whether AMPAS engaged similar services to police its own marks. However, GoDaddy's expert estimated that AMPAS spent $343,545 "in monitoring for infringing domains" over an unspecified period of time.  [TT at 539:8-13 (Pampinella)]

the AMPAS's Marks.   Rather, AMPAS objects to the *commercial use* of such domain names.  [Robertson DT at 79:1-80:16, 93:21-94:3, 96:13-97:12; TT at 79:9-81:9;  81:10-82:14;  105:2-24;  120:18-123:11  (Davis); JTX 219 at ¶¶ 7 & 8 (AMPAS's statement of regulations regarding unlicensed use of AMPAS's Marks providing the AMPAS Marks "may not be used in the title or subtitle of any . . . commercial web site.").]

92.    From 2007 to 2010, AMPAS availed itself of GoDaddy's TM Policy in policing its intellectual property on the Internet.  During that time, GoDaddy aided AMPAS in the resolution of several disputes related to alleged registrant misuse of the AMPAS Marks, as well as the Oscar statuette.  [JTX 1000; TT at 291:1-12 (Hanyen); Dkt. 716 at Appendix G.]

93.    For example, in 2007, GoDaddy aided AMPAS in the resolution of a dispute related to alleged registrant misuse of the OSCAR statuette on a hosted website.  Beginning in 2009, GoDaddy also assisted AMPAS in removing Google's pay-per-click advertisements from domain names alleged by AMPAS to contain one or more of its marks.  [JTX 1126, 1035.]

94.    On June 18, 2009, AMPAS sent correspondence to GoDaddy in accordance  with  GoDaddy's  TM  Policy,  in  which  AMPAS  referenced  specific domain  names  and  demanded,  for  the  first  time,  that  GoDaddy  "cease  all advertising" on certain parked pages containing domain names allegedly using or imitating AMPAS's trademarks.  [JTX 1035; TT at 293:20-296:14 (Hanyen).]

95.    In response to the June 18, 2009 correspondence from AMPAS, on June 22, 2009, GoDaddy advised AMPAS that it had requested the redirection of those domains that were hosted by GoDaddy to pages without advertising links.  No further demands or complaints were made by AMPAS relating to the domain names identified in the June 18, 2009 correspondence.  As such, GoDaddy considered this issue resolved.  [JTX 1013, 1256; TT at 297:6-21 (Hanyen).]

96.     Between June 19, 2009 and February 5, 2010, AMPAS sent approximately 30 additional letters to GoDaddy relating to the placement of advertising links on parked pages resolving from certain specified domains.  [TT at 291:1-12 (Hanyen); *see* JTX 1000 (chart summarizing exhibit numbers for AMPAS complaints and GoDaddy responses).]

97.     GoDaddy responded to each cease and desist letter related to GoDaddy's placement of advertising on parked pages resolving from domain names that AMPAS considered to be infringing by (a) manually overriding each domain name identified by AMPAS so that it would resolve to a non-ad parked page and (b) advising AMPAS of its action.  [TT at 291:13-18 (Hanyen); *see* JTX 1000.]

98.     AMPAS did not thereafter make any further demands or complaints about the domain names at issue in the cease and desist letters.  [TT at 297:22-298:8 (Hanyen).]

99.     On average, GoDaddy aided in resolving each of the pre-litigation issues presented by AMPAS within 2.75 days of the date identified on one of AMPAS's standardized form letters, often responding to AMPAS within one business day of receipt.  In fact, on one occasion GoDaddy responded within 17 minutes and in another it responded in an hour and fifteen minutes.  [TT at 91:8-92:7 (Davis); TT at 292:18-293:5, 296:17-297:5, 298:9-22 (Hanyen); JTX 1013, 1156, 1035; *see* JTX 1000.]

100.   At no time prior to May 18, 2010, did AMPAS further complain about the domain names identified in any of the pre-litigation correspondence nor did it notify GoDaddy that the immediate removal of the advertisements was an insufficient response to its demands.  Based on GoDaddy's experience with other brand owners, and its experience with AMPAS, GoDaddy believed that it had satisfactorily resolved all of AMPAS's concerns with respect to each of the letters its received.  [TT at 290:12-25, 297:4-6, 16-21; 298:1-8; 299:2-6 (Hanyen); JTX

1   1000, 1243.18039-.18043, 1013, 1035, 1156.]

2   101.   The last pre-lawsuit communication received from AMPAS by
3   GoDaddy was dated February 5, 2010.  [TT at 297:22-25; JTX 1000.]

4   102.   AMPAS originally asserted six (6) claims against six (6) defendants in
5   relation to 181 domain names.  AMPAS added another 166 domain names over the
6   course of the litigation.   During that same period, five (5) claims, five (5)
7   defendants, and 53 domain names were dismissed either by Court order, stipulation
8   of the parties, or voluntarily by AMPAS.  [Dkt. 1 (Complaint); Dkt. 20 (First
9   Amended Complaint); Dkt. 39 (Order of Dismissal); Dkt. 46 (Order of Dismissal);
10  Dkt. 51 (Order granting GoDaddy's motion to dismiss in part); Dkt. 170 (Second
11  Amended Complaint); Dkt. 360 (Order of Dismissal); Dkt. 491 (Order granting
12  GoDaddy's motion for summary judgment in part); Dkt. 569 (Order re confusingly
13  similar domain names); Dkt. 655 (Order granting in part GoDaddy's motion for
14  partial summary judgment); Dkt. 660 (Stipulation of Dismissal); Dkt 678 (Notice of
15  Voluntary Dismissal); Dkt. 1 in *AMPAS II* (Complaint); Dkt. 20 in *AMPAS II* (First
16  Amended Complaint); Dkt. 40 in *AMPAS II* (Order granting GoDaddy's motion to
17  dismiss in part); SF 27.]

18  103.   None of the 181 domains accused in the original complaint had been
19  identified by way of a cease and desist letter sent to GoDaddy prior to the filing of
20  the complaint in May 2010 even though AMPAS first became aware of more than
21  100 of them in February 2010.   [TT at 299:7-10 (Hanyen); *compare* Dkt. 1
22  (Complaint) *with* JTX 1000; JTX 400; TT 97:11-100:5 (Davis).]

23  **G.     The 293 Domain Names at Issue**

24  104.   There are 293 domain names at issue in this action (the "Accused
25  Domains").  The domain names are:

26  · 100OSCAR.COM

27  · 100OSCARS.COM

28

1      ·   100THOSCAR.COM

2      ·   2011OSCARS.COM

3      ·   2011THEOSCARS.COM

4      ·   2012ACADEMYAWARDS.COM

5      ·   2013ACADEMYAWARDS.COM

6      ·   2013OSCARS.COM

7      ·   2013OSCARS.NET

8      ·   24HOURSATOSCARS.COM

9      ·   24HOURSATTHEOSCARS.COM

10      ·   2OSCARS.NET

11      ·   3DOSCAR.COM

12      ·   411-ACADEMYAWARDS.COM

13      ·   ACADEMYAWARD100.COM

14      ·   ACADEMYAWARDBUZZ.COM

15      ·   ACADEMYAWARDEE.COM

16      ·   ACADEMYAWARDER.COM

17      ·   ACADEMYAWARDMOVIES.COM

18      ·   ACADEMY-AWARDS.INFO

19      ·   ACADEMYAWARDS.NET

20      ·   ACADEMY-AWARDS.ORG

21      ·   ACADEMYAWARDS2011LIVE.COM

22      ·   ACADEMYAWARDS2011WINNERS.COM

23      ·   ACADEMYAWARDS2012.NET

24      ·   ACADEMYAWARDS2012WINNERS.COM

25      ·   ACADEMYAWARDS2015.COM

26      ·   ACADEMYAWARDSDB.COM

27      ·   ACADEMYAWARDSINC.COM

28

1     ·  ACADEMYAWARDSLIVE.COM

2     ·  ACADEMYAWARDSMOVIES.COM

3     ·  ACADEMYAWARDSNOMINATION.COM

4     ·  ACADEMY-AWARDS-POOL.COM

5     ·  ACADEMYAWARDSPREVIEW.COM

6     ·  ACADEMYAWARDSWINNERSLIST.COM

7     ·  ACADEMYAWARDWINNINGFILMS.COM

8     ·  ACADEMYAWARDZ.COM

9     ·  AFRICANACADEMYAWARDS.COM

10    ·  ALLOSCAR.COM

11    ·  ALLOSCARWINNERS.COM

12    ·  ANDTHEOSCARGOESTOTHEHANGOVER.COM

13    ·  APP-OSCARS.COM

14    ·  APPSOSCARS.COM

15    ·  APPS-OSCARS.COM

16    ·  ATTHEOSCARS.COM

17    ·  AWARDSOSCAR.COM

18    ·  BESTOSCARPARTYINTOWN.COM

19    ·  BESTPICTUREOSCARNOMINATIONS.COM

20    ·  BETACADEMYAWARDS.COM

21    ·  BILLYCRYSTAL2012ACADEMYAWARDS.COM

22    ·  BILLYCRYSTAL2012OSCARS.COM

23    ·  BOLLYWOODOSCARSAWARDS.COM

24    ·  BOOTLEGOSCARS.COM

25    ·  BOOTLEGOSCARS.NET

26    ·  COLLEGIATEACADEMYAWARDS.COM

27    ·  COLLEGIATEACADEMYAWARDS.ORG

28

1       ·    COMEDYOSCARS.COM

2       ·    DJ-ACADEMY-AWARDS.COM

3       ·    DOGACADEMYAWARD.COM

4       ·    E-OSCAR.COM

5       ·    E-OSCARHOME.COM

6       ·    E-OSCARONLINE.NET

7       ·    FUTUREOSCARWINNER.NET

8       ·    GLOBEACADEMYAWARD.COM

9       ·    GLOBEACADEMYAWARDS.COM

10      ·    GLOBEACADEMYAWARDS.ORG

11      ·    GOTOSCAR.COM

12      ·    GREENOSCAR.COM

13      ·    GUIDE2OSCARSEVENTS.COM

14      ·    GUIDETOOSCARSEVENTS.COM

15      ·    HOLLYWOODOSCAR.COM

16      ·    HOMEMOVIEOSCARS.COM

17      ·    HOMEOSCARS.COM

18      ·    IAMANOSCARWINNER.COM

19      ·    IMAGEOSCAR.NET

20      ·    IMAGEOSCARS.COM

21      ·    INDIEACADEMYAWARDS.COM

22      ·    INTERNETOSCAR.COM

23      ·    INTERNET-OSCAR.COM

24      ·    JONSTEWARTOSCARS.COM

25      ·    LEEZAGIBBONSOSCARNIGHT2009.COM

26      ·    LEEZAGIBBONSOSCARNIGHT2011.COM

27      ·    LEEZAGIBBONSOSCARPARTY.COM

28

1     ·   LETSTALKOSCARS.COM

2     ·   LISTOFACADEMYAWARDWINNERS.COM

3     ·   LISTOSCAR.COM

4     ·   LOCATIONSOSCAR.COM

5     ·   MAKINGTHEROUNDSWITHOSCAR.NET

6     ·   METAVERSEACADEMYAWARDS.COM

7     ·   MILLIONAIREACADEMYAWARDS.COM

8     ·   MILLIONAIRESACADEMYAWARDS.COM

9     ·   MUSICACADEMYAWARD.COM

10     ·   MYOSCARCOLLECTION.COM

11     ·   MYOSCARCOLLECTION.NET

12     ·   MYOSCARCOLLECTIONNOW.COM

13     ·   MYOSCARCOLLECTIONONLINE.COM

14     ·   MYOSCARORNOT.COM

15     ·   MYOSCARSORNOT.COM

16     ·   MYOSCARSPEECH.COM

17     ·   NIGHTATOSCARS.COM

18     ·   NOMINATEDBYOSCAR.COM

19     ·   NOMINATEDBYOSCAR.NET

20     ·   NOMINATEDBYOSCAR.ORG

21     ·   OFFICEOSCARS.COM

22     ·   OFFICIALE-OSCAR.COM

23     ·   OFFICIALE-OSCARONLINE.COM

24     ·   ONACADEMYAWARDS.COM

25     ·   ONLINEOSCARS.COM

26     ·   OSCAR2.COM

27     ·   OSCAR2013LIVE.COM

28

1      ·   OSCAR2013LIVESTREAM.COM

2      ·   OSCAR2014LIVE.COM

3      ·   OSCAR360.COM

4      ·   OSCARACADEMYAWARD.COM

5      ·   OSCARACTOR.COM

6      ·   OSCARACTRESS.COM

7      ·   OSCARANDEMMY.COM

8      ·   OSCARAPP.COM

9      ·   OSCARARTPRODUCTION.COM

10      ·   OSCARATTHEMOVIES.COM

11      ·   OSCARAWARD2013LIVE.COM

12      ·   OSCARAWARDBOOKS.COM

13      ·   OSCARAWARDS2013.COM

14      ·   OSCAR-AWARDS-POOL.COM

15      ·   OSCARBET.COM

16      ·   OSCARBETS.COM

17      ·   OSCARBLOG.COM

18      ·   OSCARBLOGGER.COM

19      ·   OSCARBRIGHT.COM

20      ·   OSCARBRITE.COM

21      ·   OSCARBUZ.COM

22      ·   OSCARCAM.COM

23      ·   OSCARCHALLENGE.COM

24      ·   OSCARCHALLENGE.NET

25      ·   OSCARCINEMAS.COM

26      ·   OSCARCLAIM.COM

27      ·   OSCARCLAIM.NET

28

1  · OSCARCLAIMS.NET

2  · OSCARCOMEDY.COM

3  · OSCARCOMMUNITY.COM

4  · OSCARDOESITAGAIN.COM

5  · OSCARDVD.COM

6  · OSCARDVDS.COM

7  · OSCARELIGIBLE.COM

8  · OSCARELIGIBLE.NET

9  · OSCARENTERTAINMENT.COM

10 · OSCARFAQS.COM

11 · OSCARFILMSITESI.COM

12 · OSCARFORWOMEN.COM

13 · OSCARGOODIEBAGS.COM

14 · OSCARGOODIES.COM

15 · OSCARGURU.COM

16 · OSCARHOPE.COM

17 · OSCARHOSPITALITY.COM

18 · OSCARHOSTS.COM

19 · OSCARI.COM

20 · OSCARI.NET

21 · OSCARIMAGE.COM

22 · OSCARIMAGES.COM

23 · OSCAR-INT.COM

24 · OSCARKIDS.COM

25 · OSCARLIST.COM

26 · OSCARLIVE2013.COM

27 · OSCARLOCATIONS.COM

28

1      ·   OSCARMOMINEE.COM

2      ·   OSCARMOMINEES.COM

3      ·   OSCAR-MOVIE.COM

4      ·   OSCAR-MOVIE.INFO

5      ·   OSCARMOVIEMAKER.COM

6      ·   OSCARMOVIES.COM

7      ·   OSCAR-MOVIES.INFO

8      ·   OSCARMOVIES.NET

9      ·   OSCARNIGHTDRESSES.COM

10      ·   OSCARNOMINATEDFILMS.COM

11      ·   OSCARNOMINATEDMOVIES.COM

12      ·   OSCARNOMINATIONS2011.COM

13      ·   OSCARNOMINATIONS2013.COM

14      ·   OSCAR-O.COM

15      ·   OSCAR-O.INFO

16      ·   OSCARORNOT.COM

17      ·   OSCAR-PG.COM

18      ·   OSCARPICTURES.COM

19      ·   OSCARREDCARPET.COM

20      ·   OSCARRESPONSE.COM

21      ·   OSCARRESULTS.COM

22      ·   OSCARRESULTS.NET

23      ·   OSCARRUN.COM

24      ·   OSCARS-2011.COM

25      ·   OSCARS2011LIVE.COM

26      ·   OSCARS2013LIVE.COM

27      ·   OSCARS3D.COM

28

| | | |
|---|---|---|
| 1 | · | OSCARSARCHIVES.COM |
| 2 | · | OSCARSBALL.COM |
| 3 | · | OSCARSBLOG.COM |
| 4 | · | OSCARSDRESSREGISTRY.COM |
| 5 | · | OSCARSEASON.NET |
| 6 | · | OSCARSFANTASY.COM |
| 7 | · | OSCARSFASHION.COM |
| 8 | · | OSCARSFILM.COM |
| 9 | · | OSCARSGIFTINGSUITE.COM |
| 10 | · | OSCARSGOODIEBAGS.COM |
| 11 | · | OSCARSGOODIES.COM |
| 12 | · | OSCARSHOMEMOVIES.COM |
| 13 | · | OSCARSHOTELS.COM |
| 14 | · | OSCARSHOTELS.NET |
| 15 | · | OSCARSINAMINUTE.COM |
| 16 | · | OSCARSLIST.COM |
| 17 | · | OSCARSLIVEBLOGGING.COM |
| 18 | · | OSCARSLLC.COM |
| 19 | · | OSCARSMILE.COM |
| 20 | · | OSCARSNOBINATIONS.COM |
| 21 | · | OSCARSNUB.COM |
| 22 | · | OSCARSOASIS.COM |
| 23 | · | OSCARSONLINE.NET |
| 24 | · | OSCARSOPENHOUSE.COM |
| 25 | · | OSCARSORNOT.COM |
| 26 | · | OSCARSPICTURES.COM |
| 27 | · | OSCARSREDCARPET.COM |
| 28 | | |

1     ·   OSCARSRESULTS.COM

2     ·   OSCARSRESULTS.NET

3     ·   OSCARSROOM.COM

4     ·   OSCARSTWEET.COM

5     ·   OSCARSUNPLUGGED.COM

6     ·   OSCARSWIN.COM

7     ·   OSCARSWINNER.COM

8     ·   OSCARTHEATERS.COM

9     ·   OSCAR-THEMOVIE.INFO

10     ·   OSCARTRAILER.COM

11     ·   OSCARTWEETS.COM

12     ·   OSCARTWIST.COM

13     ·   OSCARUNIVERSE.COM

14     ·   OSCARVIEWINGPARTY.COM

15     ·   OSCAR-W.COM

16     ·   OSCARWAY.COM

17     ·   OSCARWEAR.NET

18     ·   OSCARWEEK.COM

19     ·   OSCARWINNERS.NET

20     ·   OSCARWINNERS2009.COM

21     ·   OSCARWINNERS2012.COM

22     ·   OSCARWINNERSCOMMUNITY.COM

23     ·   OSCARWINNINGFILMS.COM

24     ·   OSCARWINNINGMOVIES.COM

25     ·   OSCARWINNINGACTORS.COM

26     ·   OSCARWORTHYMANSION.COM

27     ·   PETACADEMYAWARDS.COM

28

1     ·   PETACADEMYAWARDS.INFO

2     ·   SAPPHIREACADEMYAWARDS.COM

3     ·   SOCIALMEDIAACADEMYAWARDS.COM

4     ·   TEXTILEOSCARS.COM

5     ·   TEXTILEOSCARS.NET

6     ·   THEFANTASYOSCARS.COM

7     ·   THEIMAGEOSCAR.COM

8     ·   THEIMAGEOSCARS.COM

9     ·   THEINTERNETACADEMYAWARDS.COM

10     ·   THELIQUIDOSCARS.COM

11     ·   THELOCATIONSOSCAR.COM

12     ·   THEMORMONOSCARS.COM

13     ·   THEOSCARBODY.COM

14     ·   THEOSCARCOPS.NET

15     ·   THEOSCARDOTCOM.COM

16     ·   THEOSCARGOES2.COM

17     ·   THEOSCARGURU.COM

18     ·   THEOSCARORNOT.COM

19     ·   THEOSCARS.CO

20     ·   THEOSCARS2011.COM

21     ·   THEOSCARSATLANTA.COM

22     ·   THEOSCARSORNOT.COM

23     ·   THEOSCARSTWEET.COM

24     ·   THEOSCARSTWEETS.COM

25     ·   THEOSCARSXXX.COM

26     ·   THEOSCARTEAM.COM

27     ·   THEOSCARTOUR.COM

28

1        ·   THINKOSCAR.COM

2        ·   THINKOSCAR.NET

3        ·   THINKQUICKOSCAR.COM

4        ·   TOGETHERACADEMYAWARDS.COM

5        ·   TRAVELOSCAR.COM

6        ·   TRAVELOSCARS.COM

7        ·   TRAVELOSCARS.NET

8        ·   TWOOSCARS.COM

9        ·   VIRTUALACADEMYAWARDS.COM

10        ·   VIRTUALWORLDACADEMYAWARDS.COM

11        ·   VOTEOSCARS.COM

12        ·   VOTEOSCARSADS.COM

13        ·   WATCHACADEMYAWARDS2012ONLINE.COM

14        ·   WATCHOSCAR2013ONLINE.COM

15        ·   WATCHOSCARAWARDS2012ONLINE.COM

16        ·   WEBACADEMYAWARDS.COM

17        ·   WILDABOUTTHEACADEMYAWARDS.COM

18        ·   WORMACADEMYAWARDS.ORG

19        ·   YOUTUBEOSCARS.COM

20        ·   ZBIGATTIACADEMYAWARDS.COM

21 [SF 26]

22     105.   The 293 Accused Domains names represent 0.0005% of the 60 million

23 domain registrations currently managed by GoDaddy.  [SF 14, 26.]

24     106.   Each of the 293 Accused Domains incorporates either "academyaward"

25 or "oscar" in the domain name string:  (a) 237 of the domains contain the string

26 "oscar," (b) 56 domains contain some variation on the string "academyawards," and

27 (c) 1 domain contains both.  [SF 26.]

28

107.  53 domain names initially accused by AMPAS in this consolidated action have been dismissed.  [SF 27.]

108.  GoDaddy is not, nor was it at any time, the domain name registrant for any of the Accused Domains nor did GoDaddy choose any of the Accused Domains for registration.  [SF 29.]

109.  GoDaddy's involvement, if any, with the registration of the Accused Domains was only as a domain name registrar.  [SF 29.]

110.  Of the 181 domain names identified by AMPAS in the original complaint, thirty (30) have been dismissed.  Of the 293 Accused Domains, the following 151 were named in the original complaint:

- 2011OSCARS.COM
- 2013OSCARS.COM
- 2013OSCARS.NET
- 3DOASCAR.COM
- ACADEMYAWARDBUZZ.COM
- ACADEMYAWARDS.NET
- ACADEMYAWARDSINC.COM
- ACADEMYAWARDSPREVIEW.COM
- ACADEMYAWARDZ.COM
- ANDTHEOSCARGOESTOTHEHANGOVER.COM
- AWARDSOSCAR.COM
- BETACADEMYAWARDS.COM
- BOOTLEGOSCARS.COM
- BOOTLEGOSCARS.NET
- COLLEGIATEACADEMYAWARDS.COM
- COLLEGIATEACADEMYAWARDS.ORG
- DOGACADEMYAWARD.COM

1       ·    E-OSCAR.COM

2       ·    E-OSCARHOME.COM

3       ·    E-OSCARONLINE.NET

4       ·    FUTUREOSCARWINNER.NET

5       ·    GREENOSCAR.COM

6       ·    GUIDE2OSCARSEVENTS.COM

7       ·    GUIDETOOSCARSEVENTS.COM

8       ·    HOLLYWOODOSCAR.COM

9       ·    HOMEMOVIEOSCARS.COM

10      ·    HOMEOSCARS.COM

11      ·    IMAGEOSCAR.NET

12      ·    IMAGEOSCARS.COM

13      ·    INTERNETOSCAR.COM

14      ·    INTERNET-OSCAR.COM

15      ·    JONSTEWARTOSCARS.COM

16      ·    LEEZAGIBBONSOSCARNIGHT2009.COM

17      ·    LEEZAGIBBONSOSCARNIGHT2011.COM

18      ·    LEEZAGIBBONSOSCARPARTY.COM

19      ·    LISTOSCAR.COM

20      ·    LOCATIONSOSCAR.COM

21      ·    MAKINGTHEROUNDSWITHOSCAR.NET

22      ·    MYOSCARCOLLECTION.COM

23      ·    MYOSCARCOLLECTION.NET

24      ·    MYOSCARCOLLECTIONNOW.COM

25      ·    MYOSCARCOLLECTIONONLINE.COM

26      ·    MYOSCARSPEECH.COM

27      ·    OFFICEOSCARS.COM

28

| | | |
|---|---|---|
| 1 | · | OFFICIALE-OSCAR.COM |
| 2 | · | OFFICIALE-OSCARONLINE.COM |
| 3 | · | OSCAR2.COM |
| 4 | · | OSCAR360.COM |
| 5 | · | OSCARANDEMMY.COM |
| 6 | · | OSCARATTHEMOVIES.COM |
| 7 | · | OSCARAWARDBOOKS.COM |
| 8 | · | OSCARBET.COM |
| 9 | · | OSCARBETS.COM |
| 10 | · | OSCARBLOG.COM |
| 11 | · | OSCARBLOGGER.COM |
| 12 | · | OSCARCAM.COM |
| 13 | · | OSCARCINEMAS.COM |
| 14 | · | OSCARCLAIM.COM |
| 15 | · | OSCARCLAIM.NET |
| 16 | · | OSCARCLAIMS.NET |
| 17 | · | OSCARCOMEDY.COM |
| 18 | · | OSCARCOMMUNITY.COM |
| 19 | · | OSCARDOESITAGAIN.COM |
| 20 | · | OSCARDVDS.COM |
| 21 | · | OSCARELIGIBLE.COM |
| 22 | · | OSCARELIGIBLE.NET |
| 23 | · | OSCARENTERTAINMENT.COM |
| 24 | · | OSCARFAQS.COM |
| 25 | · | OSCARFORWOMEN.COM |
| 26 | · | OSCARGOODIES.COM |
| 27 | · | OSCARGURU.COM |
| 28 | | |

1     · OSCARHOPE.COM

2     · OSCARHOSPITALITY.COM

3     · OSCARI.COM

4     · OSCARI.NET

5     · OSCARIMAGE.COM

6     · OSCAR-INT.COM

7     · OSCARLIST.COM

8     · OSCARLOCATIONS.COM

9     · OSCARMOVIEMAKER.COM

10    · OSCARMOVIES.NET

11    · OSCARORNOT.COM

12    · OSCARRESPONSE.COM

13    · OSCARRESULTS.COM

14    · OSCARRESULTS.NET

15    · OSCARRUN.COM

16    · OSCARSARCHIVES.COM

17    · OSCARSBALL.COM

18    · OSCARSBLOG.COM

19    · OSCARSFANTASY.COM

20    · OSCARSFASHION.COM

21    · OSCARSGIFTINGSUITE.COM

22    · OSCARSGOODIEBAGS.COM

23    · OSCARSGOODIES.COM

24    · OSCARSHOMEMOVIES.COM

25    · OSCARSHOTELS.COM

26    · OSCARSHOTELS.NET

27    · OSCARSINAMINUTE.COM

28

| | | |
|---|---|---|
| 1 | · | OSCARSLIST.COM |
| 2 | · | OSCARSLIVEBLOGGING.COM |
| 3 | · | OSCARSLLC.COM |
| 4 | · | OSCARSMILE.COM |
| 5 | · | OSCARSNUB.COM |
| 6 | · | OSCARSONLINE.NET |
| 7 | · | OSCARSOPENHOUSE.COM |
| 8 | · | OSCARSORNOT.COM |
| 9 | · | OSCARSPICTURES.COM |
| 10 | · | OSCARSRESULTS.COM |
| 11 | · | OSCARSRESULTS.NET |
| 12 | · | OSCARSTWEET.COM |
| 13 | · | OSCARSUNPLUGGED.COM |
| 14 | · | OSCARSWIN.COM |
| 15 | · | OSCARTHEATERS.COM |
| 16 | · | OSCARTRAILER.COM |
| 17 | · | OSCARTWEETS.COM |
| 18 | · | OSCARTWIST.COM |
| 19 | · | OSCARUNIVERSE.COM |
| 20 | · | OSCARWEAR.NET |
| 21 | · | OSCARWINNERS.NET |
| 22 | · | OSCARWINNERSCOMMUNITY.COM |
| 23 | · | OSCARWINNINGFILMS.COM |
| 24 | · | OSCARWORTHYMANSION.COM |
| 25 | · | TEXTILEOSCARS.COM |
| 26 | · | TEXTILEOSCARS.NET |
| 27 | · | THEFANTASYOSCARS.COM |
| 28 | | |

1 · THEIMAGEOSCAR.COM

2 · THEIMAGEOSCARS.COM

3 · THEINTERNETACADEMYAWARDS.COM

4 · THELIQUIDOSCARS.COM

5 · THELOCATIONSOSCAR.COM

6 · THEMORMONOSCARS.COM

7 · THEOSCARCOPS.NET

8 · THEOSCARDOTCOM.COM

9 · THEOSCARGOES2.COM

10 · THEOSCARGURU.COM

11 · THEOSCARORNOT.COM

12 · THEOSCARSATLANTA.COM

13 · THEOSCARSORNOT.COM

14 · THEOSCARSTWEET.COM

15 · THEOSCARSTWEETS.COM

16 · THEOSCARSXXX.COM

17 · THEOSCARTEAM.COM

18 · THEOSCARTOUR.COM

19 · THINKOSCAR.COM

20 · THINKOSCAR.NET

21 · TRAVELOSCAR.COM

22 · TRAVELOSCARS.COM

23 · TRAVELOSCARS.NET

24 · VOTEOSCARS.COM

25 · VOTEOSCARSADS.COM

26 · WEBACADEMYAWARDS.COM

27 [SF 26-27; Dkt. 1 (Original Complaint).]

28

111.  Of the 293 Accused Domains, the Court has yet to make a determination on the issue of confusing similarity as to the following 56 domain names:

- GREENOSCAR.COM
- HOMEOSCARS.COM
- LISTOSCAR.COM
- LOCATIONSOSCAR.COM
- OSCAR4RE.COM
- OSCARCAM.COM
- OSCARCHALLENGE.COM
- OSCARCHALLENGE.NET
- OSCARCLAIM.COM
- OSCARCLAIM.NET
- OSCARCLAIMS.NET
- OSCARCOMMUNITY.COM
- OSCARELIGIBLE.COM
- OSCARELIGIBLE.NET
- OSCARHOPE.COM
- OSCARHOSPITALITY.COM
- OSCARI.COM
- OSCARI.NET
- OSCAR-INT.COM
- OSCARKIDS.COM
- OSCARLOCATIONS.COM
- OSCARRESPONSE.COM
- OSCARRUN.COM
- OSCARS3D.COM

1     ·     OSCARSHOTELS.COM

2     ·     OSCARSHOTELS.NET

3     ·     OSCARSINAMINUTE.COM

4     ·     OSCARSLLC.COM

5     ·     OSCARSMILE.COM

6     ·     OSCARSOPENHOUSE.COM

7     ·     OSCARSORNOT.COM

8     ·     OSCARSROOM.COM

9     ·     OSCARTWIST.COM

10     ·     OSCARUNIVERSE.COM

11     ·     OSCARWAY.COM

12     ·     OSCARWORTHYMANSION.COM

13     ·     TEXTILEOSCARS.COM

14     ·     TEXTILEOSCARS.NET

15     ·     THEMORMONOSCARS.COM

16     ·     THEOSCARBODY.COM

17     ·     THEOSCARCOPS.NET

18     ·     THEOSCARTEAM.COM

19     ·     THEOSCARTOUR.COM

20     ·     GOTOSCAR.COM

21     ·     MAKINGTHEROUNDSWITHOSCAR.COM

22     ·     OSCARBRIGHT.COM

23     ·     OSCARBRITE.COM

24     ·     OSCARDOESITAGAIN.COM

25     ·     OSCARRESULTS.NET

26     ·     OSCARSOASIS.COM

27     ·     THINKOSCAR.COM

28

1    ·   THINKOSCAR.NET

2    ·   THINKQUICKOSCAR.COM

3    ·   TRAVELOSCAR.COM

4    ·   TRAVELOSCARS.COM

5    ·   TRAVELOSCARS.NET

6    [Dkt. 710 at Appendix B (FPTCO).]

7        112.   Because the Court finds, as discussed more fully below, that AMPAS

8    has not met its burden of proving that GoDaddy acted with a bad faith intent to

9    profit off of AMPAS's marks, the Court does not determine whether any of the

10   remaining 56 domain names are confusingly similar to AMPAS's marks.

11       113.   The word "oscar" has at least fourteen (14) stipulated common

12   meanings and usages, including as the first or given name of a man, a type of

13   tropical fish, a steak preparation, a designation for the letter "O" in the NATO

14   alphabet, and as an acronym for various governmental and private programs and

15   projects.  [SF 112-125; JTX 114, 117, 135; Robertson DT at 83:3-11.]

16       114.   Oscar Hernandez is the registrant of theoscarteam.com.  As a realtor,

17   Mr. Hernandez selected his domain name in order to market his then-anticipated

18   realty team.  Mr. Hernandez did not have an intent to use any third party trademarks

19   in conjunction with the registration of his domain name. [TT at 237:9-15, 238:15-

20   21, 239:11-13 (Hernandez).]

21       115.   Oscar Sagastume is the registrant of oscarcomedy.com.  Mr. Sagastume

22   selected his domain name in order to secure a web address that referenced both his

23   first name and the fact that he is stand-up comedian.  Mr. Sagastume did not have an

24   intent to use any third party trademarks in conjunction with the registration of his

25   domain name.  [TT at 247:9-20, 248:1-6, 249:18-21 (Sagastume).]

26       116.   The US Patent & Trademark Office ("USPTO") has repeatedly

27   permitted the registration of the OSCAR mark by persons other than AMPAS.  [JTX

28

114 (temporary electrical power products), 117 (wines), and 135 (consumer credit industry services).]

117.   Online Data Exchange, LLC ("OLDE"), which registered five of the domain names at issue (E-OSCAR.COM, E-OSCARHOME.COM, E-OSCARONLINE.NET, OFFICALE-OSCAR.COM, OFFICIALE-OSCARONLINE.COM) is the owner one such federally registered trademark, e-OSCAR.  [JTX 135.]

118.   Although Google originally generated advertisements for GoDaddy's parked pages by parsing each domain name into keywords, Google implemented interest-based advertising for the Parked Page Programs in January 2011.  [TT at 382:1-383:9, 385:23-386:14 (Nicks).]

119.   Google's interest-based advertising method generates advertisements based on the types of sites an Internet user visits and the websites he/she has viewed in the past.  [JTX 364; TT at 385:23-386:14, 387:15-25 (Nicks).]

120.   At all times since January 2011, and continuing to the present, Google's interest-based advertising has been utilized to display Google-generated third-party, pay-per-click advertisements in the Parked Page Programs.   [TT at 387:11-14 (Nicks).]

121.   Screenshots produced by AMPAS or its agents for the following 130 domain names were taken in or after January 2011 and thus, the Google-generated advertising displayed may have been the result (at least in part) of the browsing history of AMPAS or its agents, not necessarily the domain name:

- ACADEMYAWARDMOVIES.COM
- OSCARWAY.COM
- 2OSCARS.NET
- THINKQUICKOSCAR.COM
- OSCARCHALLENGE.COM

| | | |
|---|---|---|
| 1 | · | OSCARCHALLENGE.NET |
| 2 | · | OSCARDVD.COM |
| 3 | · | OSCARNIGHTDRESSES.COM |
| 4 | · | OSCARS-2011.COM |
| 5 | · | OSCARS3D.COM |
| 6 | · | OSCARSREDCARPET.COM |
| 7 | · | YOUTUBEOSCARS.COM |
| 8 | · | ZBIGATTIACADEMYAWARDS.COM |
| 9 | · | ACADEMY-AWARDS.ORG |
| 10 | · | ACADEMYAWARDS2015.COM |
| 11 | · | AFRICANACADEMYAWARDS.COM |
| 12 | · | MILLIONAIREACADEMYAWARDS.COM |
| 13 | · | MILLIONAIRESACADEMYAWARDS.COM |
| 14 | · | NOMINATEDBYOSCAR.COM |
| 15 | · | NOMINATEDBYOSCAR.NET |
| 16 | · | NOMINATEDBYOSCAR.ORG |
| 17 | · | OSCARFILMSITESI.COM |
| 18 | · | OSCAR-MOVIE.COM |
| 19 | · | OSCAR-MOVIE.INFO |
| 20 | · | OSCAR-O.COM |
| 21 | · | OSCAR-O.INFO |
| 22 | · | OSCAR-THEMOVIE.INFO |
| 23 | · | OSCAR-W.COM |
| 24 | · | SAPPHIREACADEMYAWARDS.COM |
| 25 | · | TOGETHERACADEMYAWARDS.COM |
| 26 | · | 2012ACADEMYAWARDS.COM |
| 27 | · | 2013ACADEMYAWARDS.COM |
| 28 | | |

| | | |
|---|---|---|
| 1 | · | ACADEMYAWARDEE.COM |
| 2 | · | ACADEMYAWARDER.COM |
| 3 | · | ACADEMY-AWARDS.INFO |
| 4 | · | ACADEMYAWARDS2011WINNERS.COM |
| 5 | · | ACADEMYAWARDS2012WINNERS.COM |
| 6 | · | ACADEMYAWARDSDB.COM |
| 7 | · | ACADEMYAWARDSLIVE.COM |
| 8 | · | ACADEMYAWARDSNOMINATION.COM |
| 9 | · | ACADEMY-AWARDS-POOL.COM |
| 10 | · | ACADEMYAWARDSWINNERSLIST.COM |
| 11 | · | ACADEMYAWARDWINNINGFILMS.COM |
| 12 | · | APP-OSCARS.COM |
| 13 | · | APPSOSCARS.COM |
| 14 | · | APPS-OSCARS.COM |
| 15 | · | BILLYCRYSTAL2012ACADEMYAWARDS.COM |
| 16 | · | GLOBEACADEMYAWARD.COM |
| 17 | · | GLOBEACADEMYAWARDS.COM |
| 18 | · | GLOBEACADEMYAWARDS.ORG |
| 19 | · | INDIEACADEMYAWARDS.COM |
| 20 | · | LISTOFACADEMYAWARDWINNERS.COM |
| 21 | · | MUSICACADEMYAWARD.COM |
| 22 | · | ONACADEMYAWARDS.COM |
| 23 | · | ONLINEOSCARS.COM |
| 24 | · | OSCARACTOR.COM |
| 25 | · | OSCARACTRESS.COM |
| 26 | · | OSCAR-AWARDS-POOL.COM |
| 27 | · | OSCARMOVIES.COM |
| 28 | | |

1          ·    OSCAR-MOVIES.INFO

2          ·    OSCARNOMINATEDFILMS.COM

3          ·    OSCARNOMINATIONS2011.COM

4          ·    OSCARNOMINATIONS2013.COM

5          ·    OSCARS2011LIVE.COM

6          ·    OSCARSEASON.NET

7          ·    OSCARSFILM.COM

8          ·    OSCARSROOM.COM

9          ·    OSCARWINNINGACTORS.COM

10         ·    PETACADEMYAWARDS.COM

11         ·    PETACADEMYAWARDS.INFO

12         ·    THEOSCARBODY.COM

13         ·    THEOSCARS.CO

14         ·    WILDABOUTTHEACADEMYAWARDS.COM

15         ·    WORMACADEMYAWARDS.ORG

16         ·    100OSCAR.COM

17         ·    100OSCARS.COM

18         ·    100THOSCAR.COM

19         ·    2011THEOSCARS.COM

20         ·    24HOURSATOSCARS.COM

21         ·    24HOURSATTHEOSCARS.COM

22         ·    411-ACADEMYAWARDS.COM

23         ·    ACADEMYAWARD100.COM

24         ·    ACADEMYAWARDS2011LIVE.COM

25         ·    ACADEMYAWARDS2012.NET

26         ·    ALLOSCAR.COM

27         ·    ALLOSCARWINNERS.COM

28

1 · ATTHEOSCARS.COM
2 · BESTOSCARPARTYINTOWN.COM
3 · BESTPICTUREOSCARNOMINATIONS.COM
4 · BILLYCRYSTAL2012OSCARS.COM
5 · BOLLYWOODOSCARSAWARDS.COM
6 · COMEDYOSCARS.COM
7 · DJ-ACADEMY-AWARDS.COM
8 · GOTOSCAR.COM
9 · IAMANOSCARWINNER.COM
10 · LETSTALKOSCARS.COM
11 · METAVERSEACADEMYAWARDS.COM
12 · MYOSCARORNOT.COM
13 · MYOSCARSORNOT.COM
14 · OSCAR2013LIVE.COM
15 · OSCAR2013LIVESTREAM.COM
16 · OSCAR2014LIVE.COM
17 · OSCARACADEMYAWARD.COM
18 · OSCARAPP.COM
19 · OSCARAWARD2013LIVE.COM
20 · OSCARAWARDS2013.COM
21 · OSCARBUZ.COM
22 · OSCARGOODIEBAGS.COM
23 · OSCARHOSTS.COM
24 · OSCARIMAGES.COM
25 · OSCARLIVE2013.COM
26 · OSCARMOMINEE.COM
27 · OSCARMOMINEES.COM
28

1         ·    OSCARNOMINATEDMOVIES.COM

2         ·    OSCARPICTURES.COM

3         ·    OSCARREDCARPET.COM

4         ·    OSCARS2013LIVE.COM

5         ·    OSCARSNOBINATIONS.COM

6         ·    OSCARSWINNER.COM

7         ·    OSCARVIEWINGPARTY.COM

8         ·    OSCARWEEK.COM

9         ·    OSCARWINNERS2009.COM

10        ·    OSCARWINNERS2012.COM

11        ·    SOCIALMEDIAACADEMYAWARDS.COM

12        ·    THEOSCARS2011.COM

13        ·    VIRTUALACADEMYAWARDS.COM

14        ·    VIRTUALWORLDACADEMYAWARDS.COM

15        ·    WATCHOSCAR2013ONLINE.COM

16        ·    OSCARKIDS.COM

17        ·    OSCARARTPRODUCTION.COM

18 [JTX 400.]

19       122.   Each of the parked pages on which the Google-provided, third-party

20 pay-per-click advertisements appeared specifically identified those advertisements

21 as "Sponsored Listings" or "Ads."  [SF 97.]

22       123.   Each of the parked pages on which the Google-provided, third-party

23 pay-per-click advertisements appeared clearly stated that the website being visited

24 was actually a page parked by GoDaddy.com.  [SF 98.]

25       124.   GoDaddy banner advertisements do not incorporate any of the AMPAS

26 Marks.  [JTX 2006, 2020-2298, 2307-2321, 3001-3004, 3053-3055.]

27       125.   Screenshots produced by AMPAS or its agents for the following

28

seventy (70) domain names do not contain advertisements displaying any of AMPAS's trademarks:

- 2012ACADEMYAWARDS.COM
- 2013ACADEMYAWARDS.COM
- 411-ACADEMYAWARDS.COM
- ACADEMYAWARD100.COM
- ACADEMY-AWARDS.ORG
- ACADEMYAWARDS2011LIVE.COM
- ACADEMYAWARDS2012.NET
- ACADEMYAWARDS2012WINNERS.COM
- ACADEMYAWARDS2015.COM
- ACADEMYAWARDSLIVE.COM
- ACADEMYAWARDSMOVIES.COM
- ACADEMYAWARDSNOMINATION.COM
- ACADEMY-AWARDS-POOL.COM
- ACADEMYAWARDSWINNERSLIST.COM
- AFRICANACADEMYAWARDS.COM
- ALLOSCARWINNERS.COM
- ATTHEOSCARS.COM
- BILLYCRYSTAL2012ACADEMYAWARDS.COM
- BILLYCRYSTAL2012OSCARS.COM
- BOLLYWOODOSCARSAWARDS.COM
- COMEDYOSCARS.COM
- GLOBEACADEMYAWARDS.ORG
- IAMANOSCARWINNER.COM
- LEEZAGIBBONSOSCARNIGHT2011.COM
- LEEZAGIBBONSOSCARPARTY.COM

1     ·    LISTOFACADEMYAWARDWINNERS.COM

2     ·    MILLIONAIREACADEMYAWARDS.COM

3     ·    MUSICACADEMYAWARD.COM

4     ·    MYOSCARORNOT.COM

5     ·    MYOSCARSORNOT.COM

6     ·    MYOSCARSPEECH.COM

7     ·    NOMINATEDBYOSCAR.COM

8     ·    NOMINATEDBYOSCAR.NET

9     ·    NOMINATEDBYOSCAR.ORG

10    ·    ONACADEMYAWARDS.COM

11    ·    ONLINEOSCARS.COM

12    ·    OSCAR360.COM

13    ·    OSCARARTPRODUCTION.COM

14    ·    OSCARBODY.COM

15    ·    OSCAR2013LIVESTREAM.COM

16    ·    OSCAR2014LIVE.COM

17    ·    OSCARAWARD2013LIVE.COM

18    ·    OSCARAWARDS2013.COM

19    ·    OSCAR-AWARDS-POOL.COM

20    ·    OSCARBUZ.COM

21    ·    OSCARDVD.COM

22    ·    OSCARFILMSITESI.COM

23    ·    OSCARIMAGES.COM

24    ·    OSCARMOMINEE.COM

25    ·    OSCAR-MOVIE.COM

26    ·    OSCAR-MOVIES.INFO

27    ·    OSCARMOVIES.NET

28

1 · OSCARNOMINATEDMOVIES.COM

2 · OSCARNOMINATIONS2013.COM

3 · OSCAR-PG.COM

4 · OSCARPICTURES.COM

5 · OSCARREDCARPET.COM

6 · OSCARS-2011.COM

7 · OSCARS-EMPORIUM.COM

8 · OSCARSFILM.COM

9 · OSCARSMOVIES.COM

10 · OSCARSWINNER.COM

11 · OSCAR-THEMOVIE.INFO

12 · OSCARWEEK.COM

13 · OSCARWINNERS2009.COM

14 · OSCARWINNERS2012.COM

15 · OSCARWINNINGMOVIES.COM

16 · SAPPHIREACADEMYAWARDS.COM

17 · THEOSCARS2011.COM

18 · THEOSCARSXXX.COM

19 · TOGETHERACADEMYAWARDS.COM

20 · TWOOSCARS.COM

21 · VIRTUALWORLDACADEMYAWARDS.COM

22 · WATCHACADEMYAWARDS2012ONLINE.COM

23 · WATCHOSCAR2013ONLINE.COM

24 · WATCHOSCARAWARDS2012ONLINE.COM

25 · WILDABOUTTHEACADEMYAWARDS.COM

26 · WORMACADEMYAWARDS.ORG

27 · ZBIGATTIACADEMYAWARDS.COM

28

[JTX 3053.]

126.   Screenshots produced by AMPAS or its agents for the following three (3) domain names do not contain any Google-provided, third-party pay-per-click advertising links:

·   OSCARMOMINEES.COM

·   BESTPICTUREOSCARNOMINATIONS.COM

·   BETACADEMYAWARDS.COM

[SF 45, JTX 3054.]

127.   The screenshots produced by AMPAS for OSCAR-MOVIES.INFO is not a screenshot of a GoDaddy parked page.  [JTX 1200.005, 1201, 3002, 3053.]

128.   AMPAS failed to present evidence that OSCAR-MOVIES.INFO ever resolved to a GoDaddy parked page.  [JTX 1200.005, 1201.]

**H.     AMPAS's Own Advertisements Appear on GoDaddy Parked Pages**

129.   Oscars.com is a domain name owned by or affiliated with AMPAS.  [SF 9.]

130.   Oscars.com auto-forwards to Oscars.go.com, a revenue generating website that is co-produced by AMPAS and ABC.  [SF 109.]

131.   AMPAS utilized Google's AdWords program to drive traffic to Oscars.go.com in 2009, 2010 and 2011.  [SF 110; Weiss 30(b)(6) DT Vol. III at 401:04-401:23.]

132.   AMPAS also utilized Google's AdWords Program to drive traffic to its YouTube page in 2008, 2009, and 2010.  [SF 111; Weiss 30(b)(6) DT Vol. III at 404:14-405:09.]

133.   Google's AdWords program is an online advertising service that enables advertisers to compete to display brief advertising copy to Internet users, often with links to a different website, based in part on keywords that are predefined by the advertisers.  [Miller 30(b)(6) DT Vol. II at 275:21-276:03, 276:10-277:01.]

134.   Between 2008 and 2010, AMPAS purchased hundreds of third party trademarks as keywords, which would, in turn, be used to trigger the display of an AMPAS advertisement designed to drive traffic to the OSCARS.COM site and AMPAS's YouTube page.   For example, AMPAS purchased the following trademarks as keywords:  The Beatles, Gladiator, Alien, Blade Runner, Tom Cruise, Titanic, Grease, Richard Pryor, and X-Men.  [Weiss 30(b)(6) DT Vol. III at 401:04-401:23, 404:14-405:9, 429:17-22, 438:16-440:03; JTX 315.001-.018.]

135.   Advertisements purchased through Google's AdWords program may be displayed on parked domains participating in Google's AdSense for Domains program, including GoDaddy's Parked Page Programs.  [Miller 30(b)(6) DT Vol. II at 276:13-277:01.]

136.   The screenshots for the following four (4) domain names contain advertisements directing an Internet user to AMPAS's own revenue-generating website, oscars.go.com:

- · THEOSCARS.CO
- · THEWORLDACADEMYAWARD.COM
- · THEWORLDACADEMYAWARD.ORG
- · ACADEMYAWARDWINNINGFILMS.COM

[SF 126; JTX 3055.]

**I.     GoDaddy's Relationship to the Accused Domains**

137.   GoDaddy never offered to sell any of the domain names at issue to AMPAS.  [Miller 30(b)(6) DT Vol. II at 158:06-20.]

138.   GoDaddy never claimed any ownership interest in any of the domain names at issue.  Rather, GoDaddy lodged each of the domain names at issue with the Court by way of a Registrar's Certificate. [SF 28.]

139.   GoDaddy did not provide any misleading or false contact information on behalf of the registrants as part of the registration process for any of the domain

names at issue.  [SF 29, 30.]

140.  GoDaddy disclosed the identities of each of the registrants of the domain names at issue as part of this litigation.  [SF 30.]

141.  GoDaddy did not target or otherwise specifically select any of the domain names at issue for placement in its Parked Page Programs.  [SF 58-60; TT at 349:22-350:4 (Nicks).]

142.  GoDaddy did not force any domain name to stay in one of its parked page programs or create any barriers that would have made it difficult for a domain name to change its DNS.  Rather, each registrant was free at all times to change his or her DNS.  Indeed, GoDaddy encourages registrants to build out their domain names.  [TT at 261:22-262:4, 262:25-263:23, 264:2-19, 329:22-330:1 (Hanyen).]

143.  GoDaddy did not engage in efforts to optimize any of the domain names at issue or otherwise promote their appearance in search engine results, despite having the knowledge and ability to do so.  [TT at 359:19-360:8 (Nicks).]

144.  GoDaddy did not make any effort to direct the placement of AMPAS-related advertisements on the domain names at issue, despite having the ability to provide Google with AMPAS-related keywords for each of the domain names at issue.  [Nicks 30(b)(6) DT Vol. I at 83:7-19, 78:11-80:22.]

145.  With the exception of those domains participating in GoDaddy's CashParking program, there is no evidence to show the manner in which the DNS for each of the domain names at issue came to be designated to the parked page servers (i.e., registrant selection or automated default).

146.  For those domains participating in GoDaddy's CashParking program, the DNS was affirmatively directed to GoDaddy's parked page servers by the respective registrants, not GoDaddy.  [TT at 349:22-350:4 (Nicks).]

147.  GoDaddy does not have any intent to profit from the trademarks of third parties in the absence of a valid license to do so. [TT at 430:22-25, 431:8-10

(Nicks).]

148.   GoDaddy did not have any intent for Google to serve ads containing AMPAS marks on parked pages.  [TT at 432:11-15 (Nicks).]

149.   Prior to the filing of this lawsuit, GoDaddy was under the belief that it had processes and practices in place (i.e., acting quickly to suspend hosting and take action upon receipt of a trademark complaint) that other registrars did not have in place.  AMPAS failed to present any evidence to the contrary.  [TT at 302:15-19, 303:24-304:2 (Hanyen).]

## J.   Financial Impact of the 293 Accused Domains

150.   GoDaddy received approximately $107 in total revenue from pop-under and Google-provided, third-party pay-per-click advertisements on seventy-two (72) of the 293 domain names at issue.  The pop-under revenue accounted for less than $1 of the total revenue.  [TT at 421:4-19, 422:4-426:11 (Nicks); TT at 523:4-23 (Pampinella); JTX 400, 686, 902, 908, 910, 3019, 3021.]

151.   Of the 293 domain names at issue, 221 domain names generated no revenue from Google-provided, third-party pay-per-click advertisements.  The most revenue generated by any domain was $13.67.  [TT at 400, 421:4-19, 422:4-426:11 (Nicks); TT at 523:4-23 (Pampinella); JTX 686, 908, 910, 3019, 302, 3043.]

152.   The total page impressions recorded from 2005 to 2014 for the 293 accused domains was 48,763: (a) 60 accused domains had less than or equal to 10 impressions, (b) 244 accused domains had less than 100 impressions.  Some of the recorded impressions were made by AMPAS's counsel and consultants.  The 48,763 recorded impressions on the accused domains represent 0.00044% of all impressions (10,997,067,487) on all domain names participating in one of GoDaddy's Parked Page programs.  [TT at 426:12-22 (Nicks); TT at 523:25-525:20 (Pampinella); JTX 908-909, 3020, 3043, 3052.]

153.   The impression count is not indicative of the number of times a domain

name resolved to a monetized GoDaddy parked page.  [TT at 426:23-430:9 (Nicks), 528:1-18 (Pampinella); JTX 3020, 3052.]

154.   For example, one domain – "oscar2013live.com" accounted for 19,748 (41% of all impressions recorded for the accused domains).   At least 19,590 of which were made at a time when the domain name was, as admitted by AMPAS, not in either of GoDaddy's Parked Page Programs but rather was pointed to an invalid WHOIS template, which does not contain advertisements.   [TT at 272:6-273:10 (Hanyen); 426:23-430:9 (Nicks); 528:1-18 (Pampinella); JTX 3020, 3052; SF 48-51.]

155.   "oscar2013live.com" generated $0 in Google advertising revenue for the period of time in which it resolved to a monetized template in GoDaddy's Free Parking Program.  [TT at 430:19-21 (Nicks); JTX 400, 3021.]

**K.**     **No Evidence of Injury to AMPAS**

156.   AMPAS has no knowledge of any instance of actual confusion related to its marks resulting from the domain names at issue.  [SF 25; Robertson DT at 119:07-21; Miller 30(b)(6) DT Vol. II 155:18-156:16.]

157.   AMPAS has not lost any profits as a result of the domain names at issue.  [SF 31; Miller 30(b)(6) DT Vol. I at 89:07-89:10, 89:13-19.]

158.   AMPAS has no knowledge of any traffic being diverted from any of its own websites as a result of any Accused Domain.  [Miller 30(b)(6) DT Vol. I at 89:20-90:6.]

159.   AMPAS has no knowledge of its marks being tarnished resulting from any of the Accused Domain.  [Miller 30(b)(6) DT Vol. I at 91:08-92:07.]

160.   AMPAS has no knowledge of any harm to its marks resulting from any of the Accused Domain.  [Miller 30(b)(6) DT Vol. I at 93:24-94:14.]

**L.**     **GoDaddy's Implementation of Various Trademark Filters**

161.   GoDaddy "became aware of trademark concerns in parked systems in

1  early 2006."  [Merdinger 30(b)(6) DT Vol. I at 36:14-22; *see also* SF 130; JTX
2  1252, 1253, and 1254.]

3       162.  Indeed, in 2007, GoDaddy's Senior Director of Domain Registration,
4  Richard Merdinger, filed a patent with the USPTO for an invention entitled
5  "Systems and Methods for Filtering Online Advertisements Containing Third-Party
6  Trademarks."  [SF 103; JTX 42 (the "Patent Application).]

7       163.  In the Patent Application, Merdinger stated that he had "noticed that
8  domain name registrants often post advertisements on web pages that resolve from
9  their domain names" which "[o]ften…relate in some way to the registrant's domain
10  name and include trademarks to which the registrant has no rights."  Merdinger
11  further stated that "there is a need for systems and methods for filtering online
12  advertisements containing third-party trademarks."  [JTX 42 at ¶0007.]

13      164.  Merdinger's Patent Application specifically identified that "[w]hile the
14  domain name is 'parked,' the domain name registrant may participate in a program
15  that allows domain name registrants, registrars, and advertisers to jointly monetize
16  the parked webpage by providing advertisements for the webpage."  [JTX 42 at
17  ¶0030.]

18      165.  The Patent Application went on to explain that "an unscrupulous
19  domain name registrant may attempt to financially gain from using [a] trademarked
20  domain name," particularly because "often the trademark owner is unaware of the
21  potentially infringing domain name."  [JTX 42, ¶¶0032, 0033.]

22      166.  To solve this problem, Merdinger attempted to describe and patent a
23  process "for filtering online advertisements containing third-party trademarks" from
24  such systems.  [JTX 42, ¶ 0008.]

25      167.  However, as recently as 2011, GoDaddy had not attempted to develop a
26  system based on the patent.  Though Merdinger's patent application describes a
27  relatively straightforward in concept, GoDaddy had not yet identified a method for

28

1 "practical implementation." [Merdinger 30(b)(6) DT Vol. I at 47:11-14, 66:3-9.]

2     168. The Patent Application described a process of using software to parse

3 domain name into keywords and then check those keywords against a database of

4 known trademarks like the USPTO trademark database. [JTX 42.] However,

5 making such a system practical proved vexing because it is "extremely difficult to

6 do an adequate and competent job of making a semantical relationship between a

7 keyword and other elements." Because the meaning of many trademarks is

8 contextual (particularly trademarks composed of common words or names like the

9 AMPAS Marks) "[i]t is a nontrivial exercise to…make the semantical connection

10 between a keyword and anything, including a trademark. [Merdinger 30(b)(6) DT

11 Vol. I at 69:3-70:11.]

12     169. For example, a machine filter may parse the domain

13 OSCARCOMEDY.COM into the keywords OSCAR and COMEDY. However, it is

14 a different thing altogether to determine whether, in context, the keyword OSCAR is

15 a use of AMPAS's OSCAR mark, any of the other multiple registered "OSCAR"

16 marks, someone's proper name, or something else entirely. That is, without a

17 sophisticated algorithm that can put those keywords in a larger context, such a

18 filtering system runs a significant risk of "mistakenly associat[ing] a keyword with

19 trademarks when it is not within the context" of the mark. While it is

20 technologically feasible to develop such an algorithm, such technology is the

21 province of search engine companies (like Google). [Merdinger 30(b)(6) DT Vol. I

22 at 72:12-73:8, 74:9-75:17.] Indeed, companies like Google likely spend fortunes to

23 develop and implement such contextual algorithms as the foundation of an entirely

24 separate (and lucrative) search and advertising business.

25     170. Despite those technological challenges, in early 2013, GoDaddy began

26 to develop a software filter to screen domain names for potential trademark issues

27 against the USPTO database of trademark terms. [TT at 403:3-22 (Nicks).]

28

171.   On July 22, 2013, in response to the Court's order dated June 21, 2013, which found that GoDaddy could not avail itself of the registrar safe harbor provision of the ACPA, GoDaddy implemented a filter to prevent the placement of advertisements on any domain name incorporating one or more of the AMPAS's Marks.  [TT at 406:21-407:22, 409:5-11 (Nicks); JTX 399, 401-402; SF 99-100.]

172.   Prior to July 22, 2013, the majority of domains identified by AMPAS over the course of this lawsuit were manually overridden to resolve to non-ad bearing parked pages within days of receiving notice of AMPAS's complaints.  For example, 126 of the 151 remaining accused domains identified in AMPAS's original complaint were manually re-directed to non-ad bearing pages within 3 days of service of the complaint; 17 of the 151 had expired prior to GoDaddy receiving notice of the domain names, and one was not hosted by GoDaddy.  [TT at 398:25-403:2 (Nicks); JTX 398, 400.]

173.   As of July 22, 2013, any domain name incorporating one or more of the AMPAS Marks would have been processed through the AMPAS filter and marked for a no-ad template.  Any such domain name would also have been barred from participation in GoDaddy's CashParking Program.  [TT at 407:23-408:24 (Nicks).]

174.   Since activation of the AMPAS-specific filter on July 22, 2013, AMPAS has not identified any new domain names registered through GoDaddy that contain AMPAS keywords and display Google-provided, third-party pay-per-click advertisements.  [SF 99-100.]

175.   Contemporaneous with the implementation of the AMPAS Filter, GoDaddy continued work on creating a trademark filter reliant on trademarks contained in the USPTO trademark database.  GoDaddy's efforts included the acquisition of a competing company that claimed to have created and implemented a similar filter utilizing regular downloads from the USPTO database.  [TT at 409:12-21 (Nicks); Nicks 30(b)(6) DT Vol. III at 28:10-29:7; JTX 399, 401-402.]

176.  Although the claims of the acquired entity proved to be overstated, GoDaddy persisted in its attempts to create and implement a trademark filter that utilized the entire USPTO database—a technological possibility conceived by GoDaddy employee Richard Merdinger in relation to a patent application placed at issue by AMPAS.  [TT at 409:12-412:18 (Nicks); Nicks 30(b)(6) DT Vol. III at 53:6-53:25; JTX 44.]

177.  Despite dedicating significant capital and employee time to the development of a USPTO-based trademark filter over the course of a year and a half, GoDaddy was ultimately unable to implement such a filter due to commercial impracticalities created by, in part, the sheer volume of registered trademarks (over 250 gigabytes of data to be updated daily) consisting of (a) one- and two-letters terms and (b) common suffixes, e.g., -ion and -ing.  When GoDaddy attempted a trial-run of its USPTO-based trademark filter, the sheer scope and variety of the words found in the USPTO trademark database returned flags on 99.4 percent of all domains, with a significant proportion of false positives.  [TT at 409:12-418:13 (Nicks); Nicks 30(b)(6) DT Vol. III at 53:6-53:25; JTX 141-142.]

178.  After significant time and expense, GoDaddy implemented its comprehensive trademark filter in December 2014 which, among other things, prevents the display of any advertisements on any parked domain that contains one of nearly 1400 registered trademarks in the domain name string.  [TT at 412:19-21, 413:4-14, 415:12-18, 469:10-470:7 (Nicks); Nicks 30(b)(6) DT Vol. III at 54:20-55:21; JTX 401.]

179.  Out of an abundance of caution, GoDaddy also voluntarily blacklists specific domain names flagged by its trademark filter, meaning that those domains will never resolve to a GoDaddy parked page bearing any form of monetized ads, even if the domain name expires and is subsequently re-registered.  [JTX 402; Nicks 30(b)(6) DT Vol. III at 49:16-50:19.]

180.   The addition of registered trademarks to GoDaddy's trademark filter is performed on an ongoing and continuous basis.   [TT at 413:15-19, 418:14-21 (Nicks).]

181.   GoDaddy has run its filter against approximately 50 million domain names under its management regardless of whether those domain names were in one of GoDaddy's Parked Page Programs.   Of the approximately 50 million domain names run against GoDaddy's filter, approximately ten percent (10%), or approximately five (5) million, were flagged for manual review.   The preliminary results of the manual review indicated that approximately forty percent (40%) are not potentially infringing.   Regardless, no Google pay-per-click advertisements or GoDaddy banner ads will ever appear on any of the flagged domain names unless and until each flagged domain name (1) clears the manual review process and (2) the domain name enters one of the Parked Page Programs.   [TT at 435:22-436:8, 436:20-438:18, 469:10-470:7 (Nicks).]

## II.   CONCLUSIONS OF LAW

1.   The ACPA, which Congress incorporated into the Lanham Act in 1999, sets forth the elements of a cybersquatting claim.   To prevail, AMPAS must prove four elements by a preponderance of evidence that: (1) GoDaddy registered, trafficked in, or used one of the Accused Domains; (2) the Accused Domain is identical or confusingly similar to one or more of the AMPAS Marks;[7] (3) the relevant AMPAS Mark was "distinctive at the time of registration"; and (4) that GoDaddy registered, trafficked in, or used the domain with a "bad faith intent to profit from that mark."   15 U.S.C. § 1125(d)(1)(A)(i)-(ii); *accord* 5 McCarthy on Trademarks and Unfair Competition § 25A:50 (4th ed. 2015).

---

[7] In the case of a famous mark, an ACPA plaintiff may establish liability by showing that the domain is "dilutive of" the mark, a less stringent standard than the "confusingly similar" standard for distinctive marks.   However, as part of the parties' pre-trial conferences, AMPAS waived its claim that each the Accused Domains were "dilutive of" AMPAS's Marks.   [*See* SF 32.]   Accordingly, the Court does not address the ACPA's alternative standard for dilutive domains.

2.     Pursuant to the Court's prior orders on summary judgment and the parties' stipulations, the Court has already held that: (1) AMPAS owns the AMPAS Marks; (2) AMPAS's Marks are distinctive; (3) 237 of the 293 domains are "confusingly similar" to the AMPAS Marks; (4) GoDaddy used or trafficked in the Accused Domains when it enrolled them in the parked pages program as the registrant's licensee; and (5) GoDaddy did not register any of the Accused Domains. [*See* Dkt. Nos. 51, 491, & 508; SF 29.]

3.     Accordingly, the only issues remaining before the Court for the purpose of determining liability are: (1) whether AMPAS used or trafficked in the 293 Accused Domains with bad faith intent to profit from AMPAS's Marks; and (2) whether the remaining 56 domains are "confusingly similar" to AMPAS's marks.

4.     As discussed below, the Court finds that AMPAS has failed to prove by a preponderance of the evidence that GoDaddy acted with a bad faith intent to profit off of AMPAS's Marks.  The Court relatedly finds that GoDaddy has met its burden on its affirmative good faith safe harbor defense, which is a complete defense to liability.  Accordingly, the Court does not separately determine whether any of the remaining 56 domain names are "confusingly similar" to the AMPAS Marks.  *See Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 947 (9th Cir. 2002) ("Without a finding of bad faith, [plaintiff's] cybersquatting claim necessarily fails.")

**A.     The Evidence Presented at Trial Does Not Support a Finding That GoDaddy had a Bad Faith Intent to Use AMPAS's Marks in Relation to the Accused Domains**

5.     The only remaining issue for adjudication at trial on AMPAS's affirmative claim is whether GoDaddy had the requisite bad faith intent to profit from any of the AMPAS Marks when such marks were used in connection with each of the Accused Domains.    "A finding of 'bad faith' is an essential prerequisite to

finding an ACPA violation." *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, *supra*, 304 F.3d at 946.

6.      Because the ACPA has the potential to encompass a broad array of online conduct, courts are "reluctant to interpret the ACPA's liability provisions in an overly aggressive manner." *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 270 (4th Cir. 2001); *see also id.* ("The ACPA was not enacted to put an end to the sale of all domain names."), cited with approval in *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, *supra*, 304 F.3d at 946-47.  This is particularly true of the bad faith intent to profit requirement.  As one federal court noted in discussing the "bad faith intent to profit" prong in the context of a "cyber-griper" situation:

> The ACPA's congressional record consistently signals the drafters' intention to target a narrow class of cyber-squatters consisting of those who have the bad faith intent to profit, and not to tread on the rights of those with any other motives.  H.R. Rep. 106-412, 10; S. Rep. 106-40, 13; *Ford Motor Co.*, 177 F. Supp. 2d at 642 (the "ACPA was designed to target persons who commandeer a domain name for no reason other than to profit by extortion, yet bypass persons with legitimate interests in the domain name.").

*Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 370 (D.N.J. 2004).

7.      The ACPA's bad faith requirement is a significant departure from the common law of trademarks where "[n]o analogous requirement exists," serving as a clear "limitation[] on who can be liable for cybersquatting in in what circumstances…."  *Petroliam Nasional Berhad v. GoDaddy.com, Inc.* ("*Petroliam Nasional II*"), 737 F.3d 546, 553-54 (9th Cir. 2013).

8.      Of particular relevance here, the ACPA's bad faith limitation requires that a plaintiff prove the defendant acted with "*subjective bad faith*…."  *Petroliam Nasional II*, *supra*, 737 F. 3d at 553-555 (emphasis added).  That is, the plaintiff must prove a defendant *subjectively* intended to profit from of the *specific mark* at issue *in bad faith*.  *Id.*; 15 U.S.C. §1125(d)(1)(A)(i) (providing liability under the ACPA where the defendant "has a bad faith intent to profit *from that mark*")

(emphasis added).  This subjective bad faith requirement "spares neutral service providers from having to divine the intent of their customers" who may register infringing domains.  *Petroliam Nasional II*, 737 F.3d at 554 (emphasis added).

9.  Although courts have struggled to define the boundaries of "bad faith intent to profit" given the express license to consider factors beyond the nine enumerated indicia, a number of courts—including the Ninth Circuit—have departed from strict adherence to the statutory factors and relied expressly on a more case-specific approach to bad faith.  *See Interstellar Starship Servs., Ltd. v. Epix, Inc.*, *supra*, 304 F. 3d at 946-947; *Sporty's Farm LLC v. Sportsman's Market, Inc.*, 202 F. 3d 489, 499 (2d Cir. 2002).  Courts "need not… march through the nine factors seriatim because the ACPA itself notes that use of the listed criteria is permissive."  *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202 (9th Cir. 2009), quoting *Virtual Works v. Volkswagen of Am., Inc.*, *supra*, 238 F.3d at 269.  As part of that analysis, courts look to a defendant's whole course of conduct, including conduct during ACPA litigation, to reach a determination on the issue of bad faith. *Lahoti v. VeriCheck, Inc.*, 586 F.3d at 1202, citing *Storey v. Cello Holdings,* L.L.C., 347 F. 3d 370, 385 (2d Cir. 2003).

10.  Given the clear Congressional intent to "balance the property interests of trademark owners with the legitimate interests of Internet users and others who seek to make lawful uses of others' marks, including for purposes such as comparative advertising, comment, criticism, parody, news reporting, fair use etc.," courts have been reluctant to identify additional "unique circumstances" that reveal a bad faith intent to profit.  *Gioconda Law Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 428 (S.D.N.Y. 2013), quoting H.R. Rep. 106-412, 10.

11.  Mindful of this careful balance Congress struck in the ACPA, courts guide their inquiry into bad faith "by an assessment of how close a defendant's conduct falls to the ACPA's heartland." *Gioconda Law Grp. PLLC v. Kenzie*, *supra*,

941 F. Supp. 2d at 430; *see also Lewittes v. Cohen*, No. 03 Civ. 189, 2004 WL 1171261, at *8 (S.D.N.Y. May 26, 2004) ("[O]n the whole, the allegations set forth in the Complaint do not even remotely suggest that defendants perpetrated the core activities that threaten to result in the paradigmatic harm that the ACPA was enacted to eradicate.").  This sort of quintessential harm under the ACPA "occurs when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder." *Bosley Medical Institute, Inc. v. Kremer*, 403 F.3d 672, 680 (9th Cir. 2005), quoting *DaimlerChrysler v. The Net Inc.,* 388 F.3d 201, 204 (6th Cir.2004).

12.    As the Sixth Circuit noted in a 2004 decision:

> The paradigmatic harm that the ACPA was enacted to eradicate— the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark—is simply not present in any of [Defendant's] actions.  In its report on the ACPA, the Senate Judiciary Committee distilled the crucial elements of bad faith to mean an "intent to trade on the goodwill of another's mark."  S.Rep. No. 106–140, at 9. *See also Ford Motor Co. v. Catalanotte*, 342 F. 3d 543, 549 (6th Cir. 2003) ("Registering a famous trademark as a domain name and then offering it for sale to the trademark owner is exactly the wrong Congress intended to remedy when it passed the ACPA.").  **There is no evidence that this was [Defendant's] intention when she registered the Lucas Nursery domain name and created her web site. It would therefore stretch the ACPA beyond the letter of the law and Congress's intention to declare anything to the contrary**.

*Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F. 3d 806, 810 (6th Cir. 2004) (emphasis added).

13.    One year later, the Fifth Circuit adopted a similar approach while assessing an ACPA claim aimed at a site designed to "inform potential customers about a negative experience with [a] company." *TMI, Inc. v. Maxwell*, 368 F. 3d 433, 439 (5th Cir. 2004).  That court examined the nine statutory indicia of bad

faith, then added that "we particularly note that Maxwell's conduct **is not the kind of harm that ACPA was designed to prevent**." *Id.* at 440 (emphasis added); *see also id.* (noting the absence of bad faith after "analyzing the statutory factors and ACPA's purpose").

14. The Eleventh Circuit joined this line of precedent in 2009. Emphasizing that "'bad faith' is not enough" and that "[a] defendant is liable only where a plaintiff can establish that the defendant had a 'bad faith intent to profit,'" the Eleventh Circuit saw no bad faith intent to profit under the ACPA where a plaintiff accused the defendant "not of a design to sell a domain name for profit but of a refusal to sell one." *S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F. 3d 1235, 1246–47 (11th Cir. 2009) (citations omitted) (emphasis in original). As the court explained:

> The Senate Report accompanying the Anticybersquatting Consumer Protection Act bolsters our understanding that a "bad faith intent to profit" is the essence of the wrong that the Act seeks to combat. That report defines cybersquatters as those who: (1) register well-known brand names as Internet domain names in order to extract payment from the rightful owners of the marks; (2) register well-known marks as domain names and warehouse those marks with the hope of selling them to the highest bidder; (3) register well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site; (4) target distinctive marks to defraud consumers, including to engage in counterfeiting activities. The report says nothing about those who hold onto a domain name to prevent a competitor from using it.

*Id.* at 1246 (quotation marks and citations omitted) (emphasis in original).

15. As the Senate Report associated with the ACPA noted, "in seeking to curb [cybersquatting], Congress must not cast its net too broadly or impede the growth of technology, and it must be careful to balance the legitimate interests of Internet users with the other interests sought to be protected." S. Rep. 106-140 at 8.

16. While the ACPA "is written more broadly than what may have been the political catalyst that got it passed," *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1219

(9th Cir. 2010), courts applying the ACPA's bad faith requirement should be wary of finding bad faith under the ACPA where the unique circumstances of the case place the defendant's conduct well outside the ACPA's heartland of ransoming a domain name or diverting Web traffic from the mark-holder's legitimate website. "The ACPA is not an all-purpose tool designed to allow the holders of distinctive marks the opportunity to acquire any domain name confusingly similar to their marks. [Citation]  **The requirement of bad faith intent to profit imposes an important limit that cabin's the statute's scope and…leaves untouched conduct that might annoy or frustrate mark holders**, but that Congress shielded from liability by enumerating indicia of the sort of bad faith it had in mind." *Gioconda Law Grp. PLLC v. Kenzie*, *supra*, 941 F. Supp. 2d at 437 (internal citations omitted) (emphasis added).

17.    It is within this legal framework that the Court must engage in a tripartite analysis to determine whether GoDaddy acted with a bad faith intent to profit from AMPAS's Marks.    As set forth below, the undisputed evidence demonstrates that GoDaddy had no such intent.

18.    The ACPA enumerates nine nonexclusive factors for courts to consider in determining whether bad faith exists.  *See* 15 U.S.C. § 1125(d)(1)(B)(i).[8]  The use

---

[8]    These criteria are:

(i) the trademark or other intellectual property rights of the person, if any, in the domain name;

(ii) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(iii) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(iv) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(v) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation,

of the listed criteria is permissive, *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F. 3d 264, 269 (4th Cir. 2001), and "**the most important grounds for finding bad faith are the unique circumstances of the case**." *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, *supra*, 304 F. 3d at 946-947 (emphasis added); *Sporty's Farm LLC v. Sportsman's Market, Inc.*, *supra*, 202 F. 3d at 499.

19. The ultimate inquiry for the Court under the ACPA is whether AMPAS has shown by a preponderance of evidence that GoDaddy had a subjective bad faith intent to profit from the AMPAS Marks. It is not sufficient under the ACPA for AMPAS to prove that GoDaddy had an intent to profit from its Parked Page Programs. Nor is it sufficient for AMPAS to prove that infringing domains were sometimes registered by GoDaddy's customers and automatically enrolled by GoDaddy in the Parked Page Programs if no DNS was entered by the registrant for their domain name at the time of registration. Congress did not enact strict liability or a negligence standard in the ACPA. It required proof that a defendant registered, used, or trafficked in a domain name with the specific, subjective intent to profit in bad faith off a person's trademark. *Petroliam Nasional II*, 737 F.3d at 553-55; 15

---

or endorsement of the site;

(vi) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(vii) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(vii) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(ix) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

U.S.C. § 1125(d)(1)(A)(i).  Unless AMPAS can meet this requirement, the Court must enter judgment in favor of GoDaddy.

**B.**   **The Unique Circumstances Presented by This Case Negate a Finding that GoDaddy Has at Any Time Held a Bad Faith Intent to Profit from the AMPAS Marks**

20.   As set forth above, the most important evaluation in reaching a determination on the issue of bad faith is that undertaken in relation to the unique circumstances of the case.  *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, *supra*, 304 F.3d at 946-47; *Sporty's Farm L.L.C. v. Sportsman's Market Inc.*, *supra*, 202 F. 3d at 495.  In this case, the unique circumstances compel a finding that GoDaddy did not possess the requisite bad faith intent to profit from the AMPAS Marks.

21.   **Unique Circumstance No. 1:**   GoDaddy reasonably relied in good faith on the representations made by the registrants of the Accused Domains stating that the registration of those domains did not violate any third party trademark rights.   As a result, GoDaddy could not have used or trafficked in any of the Accused Domains with a subjective bad faith intent to profit from the AMPAS Marks until such time as GoDaddy received notice by a third party of a potential issue.

22.   GoDaddy submitted evidence that every domain name registrant who registers a domain name through it, including the registrants for each of the Accused Domains, represents that (1) his or her domain name does not "violate . . . any third party rights;" (2) the owner has no knowledge of any "infring[ment] or conflict[] with the legal rights of a third party or a third party's trademark or trade name;" and (3) that the registrant's website "conforms to all local, state, federal, and internal laws."  [SF 52-54; JTX 23.061 at ¶ 10, 24.006 at ¶ 10; TT at 268:1-7 (Hanyen).] GoDaddy also submitted evidence that it relied upon these representations in

1 forming its belief that there were no trademark issues with respect to any specific

2 domain name until GoDaddy was notified by a trademark owner of a potential issue.

3 [*See* SF 52-54; JTX 28, 30; TT at 275:4-278:4, 320:1-20 (Hanyen), 419:6-420:7

4 (Nicks); DT at 160:3-161:11 (Ede).]

5     23.    The Court finds that GoDaddy's reliance on these representations in

6 allowing the Accused Domains to participate in one of GoDaddy's Parked Page

7 Programs was reasonable and belies a finding of bad faith.  As described by Ms.

8 Hanyen, GoDaddy's Universal Terms of Service ("UTOS") and DNRA are online

9 contracts whose terms are agreed to by the registrant affirmatively clicking on a box

10 stating his or her acceptance of their terms; as such, they constitute standard "click-

11 through" or "click-wrap" agreements.  [*See* TT at 265:12-268:20 (Hanyen).]  The

12 law is well established that such agreements are generally enforceable.  *See, e.g.*,

13 *Specht v. Netscape Communications Corp.*, 150 F. Supp. 2d 585 (S.D.N.Y.

14 2001), *aff'd*, 306 F. 3d 17 (2d. Cir. 2002); *Hotmail Corp. v. Van$ Money Pie*, No.

15 98-20064, 1998 WL 388389 (N.D. Cal. Apr. 16, 1998).  As a result, the Court finds

16 that it was reasonable for GoDaddy (1) to believe that the representations made by

17 its registrants were true and correct at the time of registration; and (2) to rely upon

18 those representations in good faith in allowing the placement of advertisements on

19 parked pages resolving from those domain names by its advertising partners.[9]  *See*

20 *MDY Indus., LLC v. Blizzard Entm't, Inc.,* 629 F. 3d 928, 955 (9th Cir. 2010) ("[A]

21 valid contractual relationship exists between Blizzard and its customers based on the

22 operative [agreements]."); *see also Register.com, Inc. v. Verio, Inc.*, 356 F. 3d 393,

23 403 (2d Cir. 2004) ("While new commerce on the Internet has exposed courts to

24 many new situations, it has not fundamentally changed the principles of contract.").

25

---

26 [9]    The reasonableness of GoDaddy's belief is further supported by the testimony of Oscar

27 Hernandez and Oscar Sagastume, both of whom confirmed that the registration of their domain names was consistent with their representations that the registration was neither unlawful nor violative of any third party trademark rights.  [*See* TT at 238:15-23, 239:20-240:6 (Hernandez); TT at 247:24-248:6, 249:18-250:5 (Sagastume).]

28

24.     The reasonableness of GoDaddy's reliance on the registrant's certification that the registrant had the right to use each of the Accused Domain names is all the more obvious when contrasted with AMPAS's theory of liability. According to AMPAS, GoDaddy was legally obligated to implement a filter that would automatically block any domain name from its Parked Pages Program simply because that domain shared a string of characters with a famous or distinctive mark, even if that mark was unregistered.  [TT at 568:7-13 (AMPAS Closing Argument)] As Paul Nicks pointed out in his testimony, however, this would include any domain name that included the common English suffixes "ING," which is a registered trademark.  [TT at 406:12-20, 411:1-21 (Nicks); JTX 141, 142.]

25.     Indeed, the USPTO database includes over 2.5 million individual registered trademarks.  [TT at 410:18-20]  As registered marks, the vast majority of those 2.5 million marks are presumptively "distinct."  *Lahoti v. VeriCheck, Inc.*, *supra*, 586 F.3d at 1199; *see also* 15 U.S.C. 1115(a).  In addition to "ING," the Court takes judicial notice that many other common English suffixes double as registered trademarks, including "TION," "TIC," and "ISH."  USPTO Reg. No. 4,496,934 (registered mark "TION"); USPTO Reg. No. 4,785,839 (registered mark "TIC"); USPTO Reg. Nos. 4,769,620, 4,627,523, 4,187,852, 4,253,375 (registered marks for "ISH")  By AMPAS's logic, GoDaddy had an affirmative legal obligation to *disbelieve a registrant's certification* that the registrant had the lawful right to use, for example, the domain F**ISH**.NET or **OSCAR**DELAHOYA.COM,[10] and keep those domains out of the Parked Pages Program, unless and until GoDaddy independently assured itself that the registrant was telling the truth.[11]

---

[10] FISH.NET contains the character string "ISH" and OSCARDELAHOYA.COM contains the character string "OSCAR," both of which are registered marks.

[11] Even then, it is unclear whether GoDaddy would be absolved under AMPAS's theory of liability.  Despite the undisputed evidence that Google has exclusive control over the content of the pay-per-click advertisements, AMPAS's Chief Operating Officer Richard Robertson suggested that a domain that was not itself infringing – like the hypothetical "OSCARSCARWASH.COM," – could still subject *GoDaddy* to liability if *Google* served an advertisement relating to AMPAS's

26.     Unsurprisingly, AMPAS cites no authority to suggest that GoDaddy was anything but permitted to rely upon the representations of its registrants.  To the contrary, in concluding that the ACPA does not permit claims of contributory infringement, the Ninth Circuit has expressly warned against constructions of the statute that would "force[] [GoDaddy] to inject [itself] into trademark and domain name disputes" by "analyz[ing] its customers subjective intent with respect to each domain name…."  *Petroliam Nasional II*, *supra*, 737 F.3d at 553.

27.     Armed with the registrant's certification that the domain did not infringe on any third-party marks, the fact that GoDaddy may have intended to profit by enrolling that domain in the Parked Pages Program is entirely unsurprising.  AMPAS itself has argued, and as the Court held on summary judgment, that GoDaddy became the registrant's licensee upon execution of the DNRA.  [Dkt. No. 491, pp. 13-14; *see also* Jones DT at 77:21-25.)]  Having been assured by the registrant that the registrant was authorized to use the domain name, and having obtained a license from that registrant to use the domain name for the purpose of advertising in the Parked Pages Program, GoDaddy would have had every reason to believe that its use of the domain name to generate advertising revenue was lawful.

28.     Consider, for example, a scenario in which Apple registered the domain name NEWAPPLEPRODUCT.COM in anticipation of an upcoming gadget the technology company intended to release.  Because Apple wanted to keep the upcoming product release a secret, suppose further that Apple registered the domain name through a mid-level employee.  However, because Apple did not want to launch the website yet, it allowed GoDaddy to enroll the domain in its Free Parking Program where the domain was unlikely to ever get noticed.  In accepting the terms of GoDaddy's DNRA, Apple would have expressly authorized GoDaddy to place

marks.  [*See* Robertson DT at 93:21-94:3.]

advertising on the Parked Page, and GoDaddy's use of that domain for that purpose would be entirely lawful and surely in good faith.

29.     At first blush, this example may seem unique.  Yet it is describes the precise circumstance in which GoDaddy found itself every time a registrant agreed to the legally binding DNRA (including with each of the 293 Accused Domains): with GoDaddy as the licensee of a registrant who GoDaddy reasonably believed to be the rightful owner of a domain name that did not violate any third-party trademark rights.  To the extent GoDaddy intended to profit off of any such domain (or the marks contained therein) by enrolling the domain in the Parked Pages Program, GoDaddy did so *in good faith*.  The evidence is undisputed that once AMPAS or any other trademark-holder called GoDaddy's good faith belief into question by filing a takedown request, GoDaddy always responded by immediately (sometimes within a matter of minutes) reassigning the domain to an advertisement-free template.

30.     **Unique Circumstance No. 2:**  The automated nature of the registration by third-party registrants and the routing and parked page processes for the Accused Domains refutes a finding of bad faith intent to profit from the AMPAS Marks.

31.     As noted above, the ACPA's stringent bad faith requirement demands proof that the defendant with a subjective bad faith to profit off of the specific marks at issue.  *Petroliam Nasional II*, *supra*, 737 F. 3d at 553-555; 15 U.S.C. §1125(d)(1)(A)(i).

32.     However, the undisputed evidence establishes that GoDaddy did not engage in any volitional conduct[12] specific to AMPAS or its marks:

---

[12] The plain language of the ACPA imposes this requirement on its own.  A person cannot subjectively intend something *involuntarily*. Nevertheless, the Court cases interpreting the somewhat analogous Digital Millennium Copyright are also instructive.  *See Cartoon Network LP v. CSC Holdings, Inc*., 536 F.3d 121, 131-32 (2d Cir. 2008) (person who uses automated system supplies requisite volitional conduct for liability under the Copyright Act, not provider of system) and *CoStar Grp., Inc. v. LoopNet, Inc*., 373 F. 3d 544, 551 (4th Cir. 2004) (volitional conduct required for copyright infringement claim not satisfied by providing automated system that responds indiscriminately to user requests); *see also GoPets Ltd. v. Hise*, 657 F.3d 1024, 1034 (9th

- GoDaddy's registration, routing, and parked page processes are automated;

- GoDaddy's automated system allows a registrant to select his or her desired domain name and to select where to route the domain name, including the ability to select GoDaddy's parked page servers, without having to interact with any GoDaddy personnel;

- In the event a registrant fails to designate a name server or otherwise identify where to route his or her domain name at the time of registration, GoDaddy's automated system will select its parked page servers as the DNS for that domain name;

- GoDaddy did not target or otherwise specifically select any of the Accused Domains for placement in its parked page programs;

- GoDaddy did not force any domain name to stay in its parked page program or create any barriers that would have made it difficult for a domain name to change its DNS.   Rather, a registrant was free at all times to change his or her DNS through GoDaddy's automated systems;

- When an Internet user enters that domain name into their browser, GoDaddy's automated systems return a template to the Internet user, which then retrieves ads from Google, whose own automated systems determine and place advertisements on the parked page; and

- GoDaddy did not select the third-party advertisements that appear on a GoDaddy parked page.

[*See* SF 29, 56-60, 87-88 (FPTCO at Appendix A); TT at 269:17-22 (Hanyen); TT at 376:4-12, 378:9-20, 378:21-24, 378:25-379:2, 379:12-381:25, 432:11-15 (Nicks); Nicks 30(b)(6) DT Vol. I at 83:7-19, 78:11-80:22; JTX 31.001 at ¶ 3.1, 33.005 at ¶ 3.1.]

33.     Given the entirely automated nature of GoDaddy's parked page system, GoDaddy lacked the subjective intent necessary to support a finding that it had any intent to profit from the specific AMPAS Marks at issue in this litigation, let alone a bad faith intent to do so with respect to any of the Accused Domains.   Any inadvertent use by GoDaddy of domain names that are confusingly similar or identical to the AMPAS Marks via its automated processes was unintentional and

Cir. 2011) (utilizing interpretations of the Copyright Act to inform decision in ACPA matter) *E&J Gallo Winery v. Spider Webs, Ltd.*, 286 F. 3d 270 (5th Cir. 2002) (same).

not indicative of the specific intent required for liability under the ACPA. Moreover, since GoDaddy did not select the domain names containing character strings corresponding to the AMPAS Marks and did not select the third-party advertisements from Google containing AMPAS Marks, AMPAS has failed to prove that GoDaddy had the required specific bad faith intent to profit *from the AMPAS Marks*.

34.   **Unique Circumstance No. 3:** Further evidence weighing against a finding of bad faith intent to profit is found in GoDaddy's efforts to assist brand owners, including AMPAS, in protecting their intellectual property rights; the industry-leading nature of GoDaddy's trademark dispute resolution procedure; the speed and efficiency of its notification and override processes; and general brand owner satisfaction with the operation of GoDaddy's trademark dispute resolution process.

35.   As early as 2004, GoDaddy voluntarily established a Trademark & Copyright Infringement Policy ("TM Policy").  The TM Policy is a written policy by which brand owners and domain name registrants can resolve disputes over the alleged unauthorized use of trade names, trademarks or copyrights by domain name registrants without resort to the courts.  [*See* JTX 28-30; *see also*, SF No. 10.]

36.   Pursuant to the TM Policy, a trademark owner can initiate a complaint by providing GoDaddy with, among other things, (1) a description of the manner in which its trademark or other protected material is being infringed; (2) sufficient evidence that the owner of the website is a GoDaddy customer; (3) information supporting the complaining party's rights in the trademark or other protected material; and (4) a good faith certification signed under oath.  *See id.*  In establishing its TM Policy, GoDaddy borrowed heavily from "notice and takedown" procedures proscribed by the Digital Millennium Copyright Act ("DMCA"), codified at 17 U.S.C. § 512, which provides for the extrajudicial enforcement of copyrights on the

1  Internet.  [*See* JTX 28-30; SF 11.]

2      37.    Although trademark infringement is just as common of a problem as

3  copyright infringement in cyberspace, Congress has yet to dictate a procedure by

4  which trademark holders can enforce their rights absent the commencement of a

5  legal action.  By adopting a DMCA-style notice and takedown procedure to help

6  address alleged instances of trademark infringement, GoDaddy filled the gap left by

7  Congress, managing to streamline enforcement efforts for tens of thousands of

8  claims by trademark holders and to simplify the process for the removal of

9  problematic material upon notice.  *Cf., e.g.*, *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F. 3d

10  93, 99 (2d Cir. 2010) (approving of eBay's DMCA-styled "notice-and-takedown"

11  system as a means to allow trademark holders to "report to eBay any listing offering

12  potentially infringing items, so that eBay could remove such reported listings.").  If

13  anything, GoDaddy's notice and take-down process invites abuse *from trademark*

14  *holders* by "incentiviz[ing] 'false positives,' in which the lawful use of a domain

15  name is restricted by a risk-averse third party service provider that receives a

16  seemingly valid take-down request."  *Petroliam Nasional II*, 737 F.3d at 553.[13]

17      38.    From 2007 to 2010, AMPAS availed itself of GoDaddy's trademark

18  dispute resolution process to police its intellectual property on the Internet.  [*See*

19  JTX 1126, 1130.]  On June 18, 2009, AMPAS demanded for the first time that

20  GoDaddy "*cease all advertising*" on specific websites whose domain names

21  AMPAS identified as including some variation of "oscar" or "academyaward" in the

22  domain name string.  [*See* JTX 1130.]  The June 18, 2009 letters were the first to

23  mention the placement of advertising on websites resolving from domain names that

24  AMPAS considered to be infringing.  [*See id.*; *cf.* JTX 1126.]  In response to the

---

[13] Indeed, the Court saw evidence of just such abuse in the testimony of Oscar Sagastume and Oscar Hernandez, both of whom had common-law trademark rights in their names and saw their non-infringing domains OSCARCOMEDY.COM and THEOSCARTEAM.COM blocked as a result of AMPAS's takedown requests and this litigation.  [TT at 238:15-239:2 (Hernandez); 247:9-248:6; JTX 28.]

1   June 18, 2009 AMPAS letters, GoDaddy immediately removed the advertisements
2   from those domain names and advised AMPAS of its actions. [*See* JTX 1131.]

3       39.   Thereafter, GoDaddy routinely responded to each AMPAS cease and
4   desist letter related to GoDaddy's placement of advertising on websites resolving
5   from domain names that AMPAS considered to be infringing by removing all
6   advertisements from the domain names, often on the same day GoDaddy received a
7   complaint and sometimes as quickly as minutes after receiving the request. [*See* TT
8   at 292:18-293:5, 296:21-297:5, 298:9-22 (Hanyen); JTX 1013, 1035; JTX 1000.]
9   GoDaddy took this action even on domain names that clearly had no relation to
10  AMPAS or its marks—another benefit afforded to AMPAS by virtue of GoDaddy's
11  adoption of a DMCA-type notice and takedown procedure for trademarks. [*See,
12  e.g.*, JTX 1035.]  At no time prior to May 18, 2010 did AMPAS further complain
13  about the domain names identified in any of the pre-litigation correspondence nor
14  did it notify GoDaddy that the immediate removal of the advertisements was an
15  insufficient response to its demands. [*See id.*]  Indeed, none of the pre-litigation
16  domain names identified by AMPAS were named in this action thereby evidencing
17  AMPAS's satisfaction with GoDaddy's takedown and notice procedure.

18      40.   Despite being named in the instant lawsuit in May 2010, GoDaddy
19  continued to assist AMPAS in policing its trademarks.  There is no dispute that upon
20  receiving notice of a specific domain name during the pendency of this action,
21  GoDaddy manually overrode its automated systems to ensure that no advertisements
22  would resolve from any of the Accused Domains.  Moreover, to ensure that (a)
23  AMPAS could recover any Accused Domain if ordered by the Court and (b) the
24  Court had jurisdiction over the Accused Domains, GoDaddy locked all of the
25  Accused Domains and lodged each with the Court. [*See* JTX 28.]

26      41.   In an attempt to avoid the clear evidence that GoDaddy takes great
27  strides to prevent trademark infringement in its parked page programs, AMPAS

28

argues that the continuation of the parked page programs in the face of third-party complaints received between 2007 and 2010 suffices to demonstrate GoDaddy's bad faith intent to profit from the AMPAS Marks and, as such, its liability for cybersquatting.  Generalized knowledge, however, has been expressly disapproved as a theory of liability in similar contexts.

42.   The case of *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F. 3d 93 (*Tiffany II*) is instructive here and bears close scrutiny.  *Tiffany II* was decided on appeal from a trial court ruling in *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463 (S.D.N.Y. 2008) (*Tiffany I*), in which the court found eBay was not liable to Tiffany for the sale of counterfeit Tiffany merchandise on eBay.  The appellate court described eBay as "an Internet-based marketplace that allows those who register with it to purchase goods from and sell goods to one another.  It 'connect[s] buyers and sellers and [ ] enable[s] transactions, which are carried out directly between eBay members.' [Citation.] In its auction and listing services, it 'provides the venue for the sale [of goods] and support for the transaction[s], [but] it does not itself sell the items' listed for sale on the site, [citation], nor does it ever take physical possession of them, [citation]." *Tiffany II*, 600 F. 3d at 96–97, fn. omitted, quoting from *Tiffany I*, 576 F. Supp. 2d at 475.  The court noted that "eBay generates revenue by charging sellers to use its listing services." *Tiffany II*, 600 F. 3d at 97.  It "also generates revenue through a company named PayPal, which it owns and which allows users to process their purchases." *Id.*

43.   Tiffany became aware that counterfeit Tiffany merchandise was being sold on eBay. It bought various items and learned that a "'significant portion'" of the Tiffany merchandise offered on eBay was counterfeit. *Tiffany II*, 600 F. 3d at 97–98 (quoting *Tiffany I*, 576 F. Supp. 2d at 486).

44.   eBay knew that a portion of the Tiffany merchandise offered on its website was counterfeit. *Tiffany II*, 600 F. 3d at 98.  Because eBay received revenue

1  from each transaction, it profited from the sale of counterfeit Tiffany merchandise.

2  *Id*.   Nevertheless, eBay had "'an interest in eliminating counterfeit Tiffany

3  merchandise from eBay . . . to preserve the reputation of its website as a safe place

4  to do business.'"   *Id*. (quoting *Tiffany I*, 576 F. Supp. 2d at 469).   Customers had

5  already complained to eBay about purchasing Tiffany items on the website only to

6  discover they were counterfeit. *Tiffany II*, 600 F. 3d at 98.

7      45.   eBay's ability to identify counterfeit items was limited, in that it

8  "'never saw or inspected the merchandise in the listings.'"   *Tiffany II*, 600 F. 3d at

9  98 (quoting *Tiffany I*, 576 F. Supp. 2d at 477-78).   Additionally, even if it was able

10  to inspect the items, it may not have had the expertise necessary to determine

11  whether they were counterfeit. *Tiffany II*, 600 F. 3d at 98.

12      46.   Nevertheless, eBay set up a buyer protection program to reimburse

13  customers who purchased counterfeit items.   *Tiffany II*, 600 F. 3d at 98.   It

14  "established a 'Trust and Safety' department" and hired employees to "'focus

15  exclusively on combating infringement.'"   *Id*. (quoting *Tiffany I*, 576 F. Supp. 2d at

16  476).   It also "implemented a 'fraud engine,' 'which is principally dedicated to

17  ferreting out illegal listings, including counterfeit listings.' . . . In addition to general

18  filters,   the   fraud   engine   incorporates   'Tiffany-specific   filters,'   including

19  'approximately   90   different   keywords'   designed   to   help   distinguish   between

20  genuine and counterfeit Tiffany goods." *Tiffany II*, 600 F. 3dat 98-99 (quoting from

21  *Tiffany I*, 576 F. Supp. 2d at 477, 491).

22      47.   It also set up a program for the owners of intellectual property rights to

23  send a Notice of Copyright Infringement ("NOCI") to eBay, after which eBay

24  would remove the listing for the infringing item.   Most listings were removed within

25  12 hours, with the rest removed within 24 hours. *Tiffany II*, 600 F. 3d at 99.   During

26  the time period relevant to the litigation, "eBay 'never refused to remove a reported

27  Tiffany listing, acted in good faith in responding to Tiffany's NOCIs, and always

28

provided Tiffany with the seller's contact information.'" *Id.* (quoting *Tiffany I*, 576 F. Supp. 2d at 488).

48.     While eBay took these and other steps to prevent the sale of counterfeit merchandise on its site, it also "actively sought to promote sales of premium and branded jewelry, including Tiffany merchandise, on its site." *Tiffany II*, 600 F. 3d at 100-01).   It "'advised its sellers to take advantage of the demand for Tiffany merchandise as part of a broader effort to grow the Jewelry & Watches category'" of its website.   *Id.* at 101 (quoting *Tiffany I*, 576 F. Supp. 2d at 479).   eBay also advertised the availability of Tiffany merchandise at low prices on its website and even by purchasing "sponsored links" on Google and Yahoo! advertising eBay listings that offer Tiffany jewelry for sale. *Tiffany II*, 600 F. 3d at 101.

49.     Tiffany sued eBay, alleging that eBay was liable for "'direct trademark infringement'" under section 32 of the Lanham Act.  *Tiffany II*, 600 F. 3d at 101-02 (quoting *Tiffany I*, 576 F. Supp. 2d at 493).  This provides: "Any person who shall, without consent of the registrant— [¶] (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided."  15 U.S.C. § 1114(1)(a).

50.     Tiffany argued in the trial court "that eBay had directly infringed its mark by using it on eBay's website and by purchasing sponsored links containing the mark on Google and Yahoo! [Citation.] Tiffany also argued that eBay and the sellers of the counterfeit goods using its site were jointly and severally liable. [Citation.] The district court rejected these arguments on the ground that eBay's use of Tiffany's mark was protected by the doctrine of nominative fair use. [Citation.]" *Tiffany II*, 600 F. 3d at 102; *Tiffany I*, 576 F. Supp. 2d at 494-95.   Under this

doctrine, a defendant may use the plaintiff's trademark to identify the plaintiff's goods "'so long as there is no likelihood of confusion about the source of [the] defendant's product or the mark-holder's sponsorship or affiliation.' [Citation.]" *Tiffany II*, 600 F. 3d at 102.

51.    The circuit court itself had "recognized that a defendant may lawfully use a plaintiff's trademark where doing so is necessary to describe the plaintiff's product and does not imply a false affiliation or endorsement by the plaintiff of the defendant. 'While a trademark conveys an exclusive right to the use of a mark in commerce in the area reserved, that right generally does not prevent one who trades a branded product from accurately describing it by its brand name, so long as the trader does not create confusion by implying an affiliation with the owner of the product.' [Citations.]" *Tiffany II*, 600 F. 3d at 102-03.

52.    On that basis, the circuit court "agree[d] with the district court that eBay's use of Tiffany's mark on its website and in sponsored links was lawful. eBay used the mark to describe accurately the genuine Tiffany goods offered for sale on its website.  And none of eBay's uses of the mark suggested that Tiffany affiliated itself with eBay or endorsed the sale of its products through eBay's website." *Tiffany II*, 600 F. 3d at 103.

53.    The court also rejected Tiffany's argument that eBay was liable for infringement because it knew of the problem with counterfeit Tiffany merchandise being sold on its website.  *Tiffany II*, 600 F. 3d at 103.  The court explained that eBay's knowledge of the problem was "relevant to the issue of whether eBay contributed to the direct infringement of Tiffany's mark by the counterfeiting vendors themselves, or whether eBay bears liability for false advertising.  But it is not a basis for a claim of direct trademark infringement against eBay, especially inasmuch as it is undisputed that eBay promptly removed all listings that Tiffany challenged as counterfeit and took affirmative steps to identify and remove

1   illegitimate Tiffany goods.  To impose liability because eBay cannot guarantee the
2   genuineness of all of the purported Tiffany products offered on its website would
3   unduly inhibit the lawful resale of genuine Tiffany goods." *Id.*

4        54.    The court then turned to the more difficult question of whether eBay
5   could be held liable for contributory trademark infringement "for culpably
6   facilitating the infringing conduct of the counterfeiting vendors." *Tiffany II*, 600 F.
7   3d at 103.  The court "[a]cknowledg[ed] the paucity of case law" on the issue, but
8   concluded that the district court correctly ruled in eBay's favor on the issue. *Id.*

9        55.    The court noted that "[c]ontributory trademark infringement is a
10  judicially created doctrine that derives from the common law of torts. [Citations.]"
11  *Tiffany II*, 600 F. 3d at 103-04.  It originally imposed liability on " 'a manufacturer
12  or distributor [who] intentionally induces another to infringe a trademark, . . . or
13  continues to supply its product to one whom it knows or has reason to know is
14  engaging in trademark infringement." *Id.* at 104.  It was extended to service
15  providers when the owner of a swap meet was held liable for the sale of infringing
16  products by vendors at the swap meet. *Id.*

17       56.    Citing the Ninth Circuit, the Second Circuit in *Tiffany II* held that the
18  doctrine "applies to a service provider if he or she exercises sufficient control over
19  the infringing conduct." *Tiffany II*, 600 F. 3d at 104.  In *Lockheed Martin Corp. v.*
20  *Network Solutions, Inc.*, 194 F. 3d 980, 984 (9th Cir. 1999), the court held
21  contributory trademark infringement may be applied where a service provider
22  exercises "'[d]irect control and monitoring of the instrumentality used by a third
23  party to infringe the plaintiff's mark.'" *Tiffany II*, 600 F. 3d at 105.

24       57.    The Second Circuit adopted the reasoning of *Lockheed Martin* to
25  conclude that contributory trademark infringement "applies to a service provider
26  who exercises sufficient control over the means of the infringing conduct." *Tiffany*
27  *II*, 600 F. 3d at 105.  It applied to eBay "in light of the 'significant control' eBay

28

retained over the transactions and listings facilitated by and conducted through its website." *Id.*; *Tiffany I*, 576 F. Supp. 2d at 505-07.

58.   The question then was whether eBay was liable based on the nature of the services it provided to the infringing vendors. *Tiffany II*, 600 F. 3d at 106. Tiffany claimed it was, in that it "continued to supply its services to the sellers of counterfeit Tiffany goods while knowing or having reason to know that such sellers were infringing Tiffany's mark."[14]  *Id.*   The district court rejected the claim, first because once eBay received a NOCI giving eBay reason to know a listing was for counterfeit goods, it promptly removed the challenged listing. *Id.*

59.   The district court's second basis for rejecting Tiffany's claim was that eBay lacked sufficient knowledge of trademark infringement by sellers whose listings were not removed to provide a basis for imposing liability. *Tiffany II*, 600 F. 3d at 106.  Tiffany challenged this conclusion, arguing that eBay "knew, or at least had reason to know, that counterfeit Tiffany goods were being sold ubiquitously on its website," as evidenced by the thousands of NOCIs Tiffany filed with eBay and the many complaints of customers who purchased counterfeit Tiffany products on eBay.  *Id.*  Tiffany argued that eBay should "be held contributorily liable on the basis that despite that knowledge, it continued to make its services available to infringing sellers." *Id.*

60.   The Second Circuit agreed with the district court's rejection of Tiffany's argument, holding that "[f]or contributory trademark infringement liability to lie, a service provider must have more than a general knowledge or reason to know that its service is being used to sell counterfeit goods.  Some contemporary

---

[14]     The Ninth Circuit has concluded that, unlike trademark infringement, there is no contributory infringement claim under the ACPA in part because of the heightened mental state requirement for a violation of the ACPA.  *See Petroliam Nasional II*, 737 F. 3d 546. Nevertheless, the Court finds the analysis in *Tiffany II* useful by analogy because it addresses the challenge of a service provider like GoDaddy or eBay policing the actions of its customers that implicate the trademarks of others.

knowledge of which particular listings are infringing or will infringe in the future is necessary." *Tiffany II*, 600 F. 3d at 107.  The court noted that where "the NOCIs and buyer complaints gave eBay reason to know that certain sellers had been selling counterfeits, those sellers' listings were removed and repeat offenders were suspended from the eBay site.  Thus, Tiffany failed to demonstrate that eBay was supplying its service to individuals who it knew or had reason to know were selling counterfeit Tiffany goods." *Id*. at 109.

61.   Tiffany also expressed concern "that if eBay is not held liable except when specific counterfeit listings are brought to its attention, eBay will have no incentive to root out such listings from its website." *Tiffany II*, 600 F. 3d at 109.  This would "require Tiffany and similarly situated retailers to police eBay's website—and many others like it—'24 hours a day, and 365 days a year,'" "a burden that most mark holders cannot afford to bear." *Id*.

62.   While acknowledging Tiffany's concern, the court pointed out that it was "interpreting the law and applying it to the facts of this case.  [The court] could not, even if [it] thought it wise, revise the existing law in order to better serve one party's interests at the expense of the other's." *Tiffany II*, 600 F. 3d at 109.  In addition, the court was "disposed to think, and the record suggests, that private market forces give eBay and those operating similar businesses a strong incentive to minimize the counterfeit goods sold on their websites. eBay received many complaints from users claiming to have been duped into buying counterfeit Tiffany products sold on eBay.  [Citation.]  The risk of alienating these users gives eBay a reason to identify and remove counterfeit listings.  Indeed, it has spent millions of dollars in that effort." *Id*., fn. omitted.

63.   The circuit court also "agree[d] with the district court that if eBay had reason to suspect that counterfeit goods were being sold through its website, and intentionally shielded itself from discovering the offending listings or the identity of

the sellers behind them, eBay might very well have been charged with knowledge of those sales sufficient to satisfy" the "'knows or has reason to know' " test. *Tiffany II*, 600 F. 3d at 109. "A service provider is not . . . permitted willful blindness. When it has reason to suspect that users of its service are infringing a protected mark, it may not shield itself from learning of the particular infringing transactions by looking the other way. [Citations.] In the words of the Seventh Circuit, 'willful blindness is equivalent to actual knowledge for purposes of the Lanham Act.' [Citation.]" *Id*. at 109–10, fns. omitted.

64.   However, eBay's general knowledge that its website was being used to sell counterfeit Tiffany products was, "[w]ithout more, . . . insufficient to trigger liability" for contributory trademark infringement. *Tiffany II*, 600 F. 3d at 110. Since it "did not ignore the information it was given about counterfeit sales on its website," it was not willfully blind to the problem. *Id*.

65.   Although the legal claims in *Tiffany* differed from those presented here, the logic underlying the decisions is equally applicable.

66.   The parallels between the evidence presented in the instance action and that in *Tiffany* are hard to avoid: (a) GoDaddy generates revenue by way of its provision of parked page services; (b) GoDaddy was aware that "unscrupulous domain name registrants" may register domain names containing third party trademarks with an intent to profit from those trademarks; (c) GoDaddy has an interest in eliminating any possibility of trademark infringement, not only to preserve its relationships with trademark owners but also to ensure its quality score with Google was not negatively affected; (d) GoDaddy's ability to identify potentially infringing domain names was limited due to the inherent difficulties in ascertaining a registrant's intent in registering a domain name, especially in those circumstances where the domain name contained a trademark that is also a common name, such as Oscar Hernandez or Oscar Sagastume; (e) despite this fact, GoDaddy

1  established a robust Trademark Protection Policy, which included a VIP program for
2  brandowners with frequent concerns of potential infringement; and (f) during the
3  time period relevant to the litigation, GoDaddy never refused to redirect a domain
4  name identified by AMPAS and acted in good faith in responding to AMPAS's
5  complaints, often responding to AMPAS' complaint within one business day.

6        67.    A similar result was reached in *Lockheed Martin Corp. v. Network*
7  *Solutions, Inc.*, 985 F. Supp. 949, 963-64 (C.D. Cal. 1997), *aff'd on other grounds*,
8  194 F. 3d 980 (9th Cir. 1999).[15]  In *Lockheed*, the court concluded that a "trademark
9  owner's demand letter is insufficient to resolve th[e] inherent uncertainty" in
10 questions of infringement, and held that "[t]he mere assertion by a trademark owner
11 [of infringement] . . . is not sufficient to impute knowledge of infringement."  Both
12 courts made clear that the law does not "impose . . . an affirmative duty to seek out
13 potentially infringing uses" by third-parties.  *Lockheed Martin Corp. v. Network*
14 *Solutions, Inc.*, 985 F. Supp. 949, 951; *see Tiffany II*, 600 F. 3d at 107 (agreeing
15 with the district court that generalized knowledge of the sale of counterfeit goods
16 did not impose upon eBay an affirmative duty to remedy the problem).

17       68.    The conclusion in *Tiffany II* and *Lockheed* under the Lanham Act is all
18 the more appropriate under the ACPA, which imposes the subjective bad faith
19 requirement as an *additional limitation* on traditional trademark infringement.
20 *Petroliam Nasional II*, 737 F.3d at 553-54.  Indeed, the proposition that a
21 generalized knowledge of potential infringement is insufficient to satisfy the
22 ACPA's bad faith requirement is expressly set out in the text of the statute itself,
23 which only imposes liability on a defendant who "has a bad faith intent to profit
24 from *that* mark" at issue in the litigation.  15 U.S.C. 1125(d)(1)(A)(i).  The statute,
25 which courts interpret narrowly, does not speak of a bad faith intent to profit from

26 ───────────────────────
27 [15]   *Lockheed Martin* involved a claim for trademark infringement against a domain registrar based on the registration of a domain name.  It did not involve a claim under the ACPA because the ACPA had not yet been passed into law.
28

trademarks generally; it speaks of a bad faith intent to profit from specific trademarks. *Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092 (C.D. Cal. 2009) ("The bad faith required to support a cybersquatting claim is not general bad faith, but 'a bad faith intent to profit *from the mark,*'") (emphasis in original), *overruled on other grounds in Petroliam Nasional II*, *supra*, 737 F.3d at 551. The ACPA is a specific intent statute, not a negligence statute. *Id* ("the defendant must intend to profit specifically from the goodwill associated with another's trademark"). Plaintiff has failed to adduce any evidence that GoDaddy had any intent to profit from AMPAS's Marks specifically. *Petroliam Nasional Berhad v. GoDaddy.Com, Inc.* ("*Petroliam Nasional I*"), 897 F. Supp. 2d 856, 866 (N.D. Cal. 2012) (finding "there is no evidence that Go Daddy had a bad faith intent to profit from [the plaintiff's] mark" under the ACPA because the plaintiff did "not show intent to profit specifically from [the plaintiff's] mark"). Instead, the Court finds that GoDaddy's industry-leading efforts to protect third-party trademarks (including AMPAS's Marks) from abuse is strong evidence of GoDaddy's good faith intent to protect (not profit from) third-party trademarks generally and AMPAS's Marks specifically in response to appropriate take-down requests.[16]

69.    As in *Tiffany II* and *Lockheed*, the uncontested evidence regarding GoDaddy's responsiveness to AMPAS's notices of claimed infringing domains as well as GoDaddy's extensive proactive measures aimed at minimizing instances of infringement by its registrants, proves GoDaddy's conduct to be the antithesis of willful blindness or bad faith. The record at trial showed that GoDaddy quickly responded to specific complaints brought by trademark owners, ensuring that any advertisements on challenged domain names in the Parked Page Programs were promptly removed upon receipt of any complaint from a trademark owner even if

---

[16] *See Petroliam Nasional II*, *supra*, 737 F. 3d at 553-54 (implicitly approving of GoDaddy's takedown process under the ACPA, and cautioning that imposing contributory liability under the ACPA would incentivize abuse of that takedown system).

1  the domain name did not relate to a brand owner's mark.  [*See, e.g.*, TT at 288:14-20

2  (Hanyen); JTX 1243.18039-.18043.]

3      70.  **Unique Circumstance No. 4:**  Google's control over any third-party,

4  pay-per-click advertisements displayed on the Accused Domains that reference or

5  contain the AMPAS Marks further supports a finding that GoDaddy did not have a

6  subjective bad faith intent to profit from the AMPAS Marks.

7      71.  AMPAS could not allege a violation of the ACPA based merely on

8  GoDaddy's registration of the Accused Domains because GoDaddy's actions as a

9  registrar are shielded from liability by a safe harbor provision in the ACPA for such

10  activity.  *See* 15 U.S.C. § 1114(2)(D)(iii).  Rather, AMPAS's theory at trial was that

11  GoDaddy's use of the Accused Domains in the Parked Page Programs violated the

12  ACPA.  While AMPAS's counsel at times appeared to contend that any advertising

13  on any of the Accused Domains would constitute a violation of the ACPA, the

14  AMPAS witnesses admitted that AMPAS did not object to advertising on domain

15  names containing the term "oscar" if the advertising was unrelated to the AMPAS'

16  Marks.  For example, Bruce Davis, AMPAS' former Executive Director, testified

17  that AMPAS "had very cordial relations with Mr. M[a]yer and Mr. De La Renta,"

18  referring to the well-known brands associated with Oscar Mayer and Oscar De La

19  Renta.  [TT at 101:22-102:4 (Davis).]  He further testified that AMPAS had no

20  objection to Oscar Mayer advertising "baloney or hot dogs," even though the name

21  "Oscar Mayer" contains the word "oscar."  [TT at 103:13-15 (Davis).]  Similarly,

22  AMPAS's witness, Richard Robertson, the former executive administrator, testified

23  that AMPAS did not have a problem with a car wash named "oscarscarwash.com" if

24  it did not refer to the AMPAS Marks.  [*See* Robertson DT at 93:21-94:3.]

25      72.  This admission reflects one of the unique circumstances of this case.

26  AMPAS does not own all rights to use the word "oscar," [TT 101:20-22 (Davis)],

27  particularly given the fact it is a common name and is the subject of multiple,

28

competing trademarks.  [*See* SF 112-125; JTX 114, 117, 135; Robertson DT at 83:3-11.]  If the Court were to rule that it was a violation of the ACPA for GoDaddy to allow the posting of *any* advertisement on a domain name containing the word "oscar," then GoDaddy would be liable if it hosted the websites for "oscarmayer.com," "oscardelarenta.com," or "oscarscarwash.com."   Such an overbroad reading the ACPA must be rejected.

73.    The Court therefore must consider the content of the advertising that appeared on the Parked Pages for the Accused Domains in assessing whether GoDaddy acted with bad faith intent to profit.

74.    With respect to the GoDaddy banner ads that appeared on the Free Parking Parked Pages, the Court notes that none of the GoDaddy ads in evidence contained the AMPAS Marks or referenced in any way, directly or indirectly, the AMPAS Marks.   Thus, standing alone, the GoDaddy banner ads, like ads on "oscarmayer.com" or the hypothetical "oscarscarwash.com" do not invoke the AMPAS Marks or create any confusion with the AMPAS Marks.  It is difficult to see how AMPAS could complain or be harmed if a visitor to domains like "oscar360.com,"         "oscarcomedy.com,"         "theoscarteam.com,"         or "makingtheroundswithoscar.com" visited a web page that displayed only GoDaddy banner ads and contained no reference to the AMPAS Marks.  At a minimum, the display of the GoDaddy banner ads alone does not support a finding of bad faith intent to profit.

75.    Many of the screenshots for the Accused Domains contain no advertisements with the AMPAS Marks.  *See supra* ¶ 113.  [JTX3053.]   For example, screenshots for 70 of the Accused Domains do not display any ads with the AMPAS Marks.  *See id.*  At least one federal court has found that displaying advertisings unrelated to a brand owner is evidence of good faith.  *See Texas Int'l Prop. Associates v. Hoerbiger Holding AG*, 624 F. Supp. 2d 582, 590 (N.D. Tex.

2009) ("If TIPA had been using the domain name to provide links unrelated to automation and compression, its activities would more easily comport with good faith."). The Court finds that with respect to these 70 Accused Domains [*see* JTX 3053], GoDaddy did not have a bad faith intent to profit from the AMPAS Marks because none of the advertisements relate to AMPAS or its marks.

76. Some of the screenshots for the Accused Domains do, however, display third-party ads provided from Google that reference, either directly or indirectly, the AMPAS Marks along with other ads that do not reference the AMPAS Marks. But as the Court has found above, while GoDaddy contracted with Google to provide ads to its Parked Page Programs, GoDaddy did not control the content of those Google ads, did not receive the Google ads (after 2009), did not publish the Google ads (after 2009), did not know the content of the Google ads before they were sent by Google to Internet users visiting the sites, and GoDaddy could not predict which ads would be served by Google on the Accused Domains. Under these circumstances, the Court concludes that GoDaddy could not have intended for particular ads referencing AMPAS Marks to be sent by Google to Internet users visiting GoDaddy's Parked Pages. While GoDaddy may have intended that Google provide ads to visitors to GoDaddy's Parked Pages, there is ***no evidence*** that GoDaddy subjectively intended for Google to provide ***ads relating to the AMPAS Marks***. The manner of operation of the Google-provided ads combined with the lack of evidence that GoDaddy intended for particular ads relating to the AMPAS Marks to be provided by Google supports a finding of no bad faith intent to profit from the AMPAS Marks. To the extent that AMPAS objects to Google providing ads that reference the AMPAS Marks, it would seem that AMPAS's complaint should be directed at Google, not GoDaddy.

77. **<u>Unique Circumstance No. 5:</u>** The testimony of GoDaddy witnesses Jessica Hanyen and Paul Nicks, both of whom presented as credible witnesses, also

compels a finding of no subjective bad faith intent to profit from the AMPAS Marks.  AMPAS conceded the credibility of these witnesses.  [*See* TT at 570:12-15 (Singer).]

78.    Based on their testimony, the Court finds that GoDaddy did not have a bad faith intent to make *an unlicensed* profit[17] from the trademarks of third parties by way of its parked page programs, including AMPAS, and did not have any intent to serve advertisements containing the AMPAS Marks on parked pages.  [*See* TT at 430:22-25, 431:8-10, 432:11-15 (Nicks).]

79.    This finding of a lack of subjective bad faith is further supported by the testimony demonstrating that although GoDaddy was not the first registrar to park pages with advertisements, prior to the filing of this lawsuit, GoDaddy had processes and practices in place (i.e., acting quickly to suspend hosting and take action upon receipt of a trademark complaint) that other registrars did not have.  The fact that GoDaddy's policies for responding to trademark complaints in domain names exceeded other registrars weighs in GoDaddy's favor.  [*See* TT at 302:15-19, 303:24-304:2 (Hanyen).]

80.    **Unique Circumstance No. 6:**  GoDaddy's near-immediate cessation of any alleged use of a domain name in its Parked Page Programs, whether pre- or post-litigation [*see* JTX 1000, 1013, 1035, 1156], also weighs against a finding that it intended to profit from the AMPAS Marks.  *See Trump Plaza of the Palm Beaches Condo. Ass'n v. Rosenthal*, No. 08-80408-CIV, 2009 WL 1812743, at *11 (S.D. Fla. June 24, 2009) (transferring of a domain name upon receipt of a complaint by the trademark owner "defeats the allegation that Rosenthal had a 'bad faith intent to

---

[17]  Again, GoDaddy may well have intended to profit from domains enrolled in its parked pages program, but that is not the operative question.  The evidence showed that GoDaddy only placed ads on a parked page *after* it had obtained: (1) the registrant's certification of rights to use the domain name; and (2) the registrant's license to place advertisements on the parked page.  Under those circumstances, any intent to profit would have been grounded in what GoDaddy reasonably believed to be a valid license. While that may reflect an intent to profit, it is not a *bad faith* intent to profit, let alone a specific bad faith intent to profit off of AMPAS's Marks.

1  profit from' use of the 'Trump Plaza of the Palm Beaches' mark in a domain name
2  as required to state a claim under the [ACPA]"); *24 Hour Fitness USA, Inc. v. 24/7*
3  *Tribeca Fitness, LLC*, 447 F. Supp. 266, 289 (S.D. NY. 2006) ("given that
4  [defendant] has taken down its website, and the lack of evidence of bad faith, the
5  Court finds that [plaintiff] is not entitled to relief on its claim for cybersquatting")
6  *compare Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1221 (9th Cir.
7  2012) (though cessation of allegedly infringing use did not "conclusively
8  demonstrate" good faith, trier of fact could consider it in determining good or bad
9  faith).

10     81.   **Unique Circumstance No. 7:**  The same can be said of GoDaddy's
11  decision to filter AMPAS-related domain names immediately after the Court
12  determined that GoDaddy used and/or trafficked in the Accused Domains.  Despite
13  GoDaddy's continued good faith belief in the lawfulness of the conduct at issue,
14  within weeks of the Court's entry of an order finding that GoDaddy "used" and/or
15  "trafficked in" a number of the Accused Domains, GoDaddy created and
16  implemented an almost-certainly-overbroad filter to prevent the display of
17  advertisements on any domain name containing one or more of the AMPAS Marks
18  in the domain string.   [*See* JTX 100.]   The filter prevents registrants from
19  monetizing their domain names, even where those domain names bear no
20  conceivable relation to AMPAS (*e.g.*, www.doscarlos.net), and even where it would
21  lawful to do so.

22     82.   Contemporaneous with the implementation of the AMPAS Filter,
23  GoDaddy also continued work on a more wide-ranging trademark filter.  [*See* TT at
24  409:12-21 (Nicks); Nicks 30(b)(6) DT Vol. III at 28:10-29:7; JTX 399, 401-402.]
25  After significant time and expense—including the acquisition of a competing
26  company that claimed to have created and implemented a similar filter utilizing
27  regular downloads from the USPTO database—GoDaddy implemented its broader
28

trademark filter in December 2014.[18]  GoDaddy's Trademark Filter prevents the display of advertisements on any parked domain that contains one of nearly 1400 registered trademarks in the domain name string.  [*See* JTX 401.]  In an abundance of caution, GoDaddy has also voluntarily blacklisted specific domain names flagged by its trademark filter, meaning that those domains will never resolve to a GoDaddy parked page bearing any form of advertisement.  [*See* JTX 402; TT at 435:22-436:8, 436:20-438:18, 469:10-470:7 (Nicks).]

83.    In light of the fact that courts look to a defendant's whole course of conduct, including conduct during ACPA litigation, to reach a determination on the issue of bad faith, this factor weighs in favor of GoDaddy and against a finding of bad faith.  *See, e.g.*, *Storey v. Cello Holdings*, L.L.C., 347 F. 3d 370, 385 (2d Cir. 2003).

84.    **Unique Factor No. 8:**  The lack of a bad faith intent to profit from the AMPAS Marks is further demonstrated by evidence that GoDaddy did not promote or otherwise drive traffic to the Accused Domains.  It is undisputed that there are only two ways in which GoDaddy profits from parked pages: (1) an Internet user clicks on a GoDaddy banner and then purchases a product/service; or (b) an Internet user clicks on one of the Google-generated Sponsored Listings.  [*See* SF 69.]  Such conduct, however, presupposes that an Internet user actually lands upon a parked page.

85.    The undisputed evidence demonstrates that only a handful of Accused Domains were visited by anyone other than AMPAS, its counsel, and/or its hired

---

[18]    Although the claims of the acquired entity proved to be overstated, GoDaddy persisted in its attempts to create and implement a trademark filter that utilized the entire USPTO database—a technological possibility conceived by GoDaddy employee Richard Merdinger in relation to a patent application placed at issue by AMPAS. Despite dedicating significant capital and employee time to the development of a USPTO-based trademark filter over the course of a year and a half, GoDaddy was ultimately unable to implement such a filter due to commercial impracticalities created by, in part, the sheer volume of registered trademarks (over a terabyte of data) consisting of (a) one and two-letter terms and (b) common suffixes, e.g., -ion and -ing.  [*See* TT at 411:15-412:21, 415:12-18, 416:2-418:13, 432:2-10 (Nicks); JTX 141-142.]

consultant.  This evidence is not surprising—parked pages are inherently difficult for a general Internet user to stumble upon absent some attempt to promote them. [*See, e.g.*, TT at 359:19-361:5.]

86.  GoDaddy's refusal to promote and/or optimize the Accused Domains—even when provided with the opportunity to do so—is further evidenced by the fact that 221 of the 293 Accused Domains generated no Google click-through ad revenue at all.  [*See* JTX 686, 908, and 910.]  The remaining 72 Accused Domains generated total revenue of a mere $108 from Google click-through ads.  [*See id*.]  Even accounting for banner advertising revenue and CashParking subscription fees, GoDaddy earned less than $400 in revenue from any of the Accused Domains.  [TT at 520:11-521:9.]  If GoDaddy intended to profit from any of the AMPAS Marks contained in the Accused Domains, GoDaddy would have made specific efforts to drive relevant traffic to each of them.  It did not do so.

87.  **Unique Circumstance No. 9:**  Another factor that weighs against a finding of bad faith as to 130 of the 293 Accused Domains is Google's January 2011 decision to change the advertising format for GoDaddy parked pages to "interest-based advertising," which displays advertisements based on factors unique to the Internet user who triggered a parked page.  [*See* TT at 385:23-386:11 (Nicks).] After GoDaddy performed the required technical and privacy updates to its Google-monetized parked page templates, Google turned interest-based advertising on for all such templates in January 2011.  [*See* TT at 386:12-14 (Nicks).]

88.  As far as the evidence shows, as of January 2011 and continuing to present, third-party advertisements served on GoDaddy parked pages were generated through the use of interest-based advertising (i.e., the search history and/or preferences of the internet user).  AMPAS produced no evidence to the contrary with respect to these 130 domain names, nor did it produce evidence that GoDaddy engaged in the conduct of which AMPAS complains with respect to these

1  130 post-January 2011 domain names:  the intentional display of advertisements that

2  promote goods and services obviously relating to the AMPAS Marks.  [TT at 96:4-

3  16, 102:8-105:22 (Davis); Robertson DT at 96:13-97:12.]

4      89.    The use of domain names to provide advertising links unrelated to a

5  trademark contained in a domain name is more likely to be indicative of good faith.

6  *See Texas Int'l Prop. Associates v. Hoerbiger Holding AG*, *supra*, 624 F. Supp. 2d

7  at 590 ("If TIPA had been using the domain name to provide links unrelated to

8  automation and compression, its activities would more easily comport with good

9  faith.").  Here, the evidence supports a finding that GoDaddy lacked a bad faith

10  intent to provide advertising links, through Google, related to the AMPAS Marks for

11  130 Accused Domains as a result of Google's implementation of interest-based

12  advertising.

13  **D.**    **The Evidence Presented at Trial Fails to Support a Finding of**

14          **Subjective Bad Faith as it Relates to the Nine Bad Faith Factors**

15          **Enumerated in the ACPA**

16      90.    The nine "bad faith" factors set forth in the ACPA are difficult to apply

17  in the current context where (a) a domain name registrar who is admittedly not a

18  competitor of the trademark holder (b) hosts parked pages for domain names it did

19  not select for registration (c) as part a program containing more than 18 million

20  domain names through (d) an automated process in which no GoDaddy personnel

21  are directly involved.  Nonetheless, when applied to the facts of this case, the nine

22  factors are either inapplicable, neutral, or weigh in favor of GoDaddy.

23      91.    Factor 1: *Trademarks or Other Intellectual Property Rights in the*

24  *Domains*:

25      "This factor takes account of the fact that the same or similar marks
       can peacefully coexist in the marketplace without a likelihood of
26      confusion when used in widely differing product or service lines or in
       remote geographic markets."  4 McCarthy on Trademarks and Unfair
27      Competition § 25:78.  "The language of Factor (I) does not speak in
       terms of United States trademark rights, but refers generally to

28

'intellectual property rights.' This encompasses intellectual property rights irrespective of their territorial origin." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F. 3d 214, 234 (4th Cir. 2002).

*SunEarth, Inc. v. Sun Earth Solar Power Co.* ("*SunEarth*"), 2013 WL 4528539 at *23 (N.D. Cal. Aug. 23, 2013) amended in part, 2013 WL 6157208 (N.D. Cal. Nov. 22, 2013).

(a)    The undisputed evidence demonstrates that many of the registrants of the Accused Domains have trademark and/or other intellectual property rights in their respective domain names.   For example, Online Data Exchange, LLC, the registrant of E-OSCAR.COM, E-OSCARHOME.COM, E-OSCARONLINE.NET, OFFICALE-OSCAR.COM, and OFFICIALE-OSCARONLINE.COM owns a federally-registered trademark in e-OSCAR. [See JTX 135.]  There are other registered trademarks to the term "oscar" that are not owned or controlled by AMPAS.   [*See* JTX 114 and 117.]   In addition, there are well-known trademarks like Oscar Mayer and Oscar De La Renta that contain the word "oscar."   Given these other trademarks with respect to the term "oscar," AMPAS has failed to show that all of the Accused Domains do not reference other trademarks or intellectual property rights.  Since GoDaddy was not the registrant, in the face of these potential competing claims to the right to use the term "oscar," it would have been difficult and commercially impractical for GoDaddy to know or assess each registrant's potential intellectual property rights prior to receipt of a domain-specific complaint from AMPAS.

(b)    It may be that GoDaddy does not have any trademark rights in any of AMPAS's Marks, but that is not the question.  The first ACPA factor speaks of the defendant's rights "if any, *in the domain name*."  15 U.S.C. § 1125(d)(1)(B)(i) (emphasis added).  Here, the evidence at trial showed that GoDaddy only "used" or "trafficked in" any of the Accused Domains with

the reasonable belief that the registrant had rights to the domain name and that GoDaddy was the registrant's authorized licensee.   [SF 52-54; JTX 23.061 at ¶ 10, 24.006 at ¶ 10; TT at 268:1-7 (Hanyen); Jones DT at 77:21-25.]

(c)     As the testimony of Oscar Hernandez and Oscar Sagastume (and the evidence relating to the Online Data Exchange) made clear, many of those registrants *did* have trademark rights in many of the Accused Domains, which rights those registrants licensed to GoDaddy.

(d)     Consequently, this factor weighs in GoDaddy's favor, and does not support a finding of bad faith intent to profit.

92.     <u>Factor 2</u>:  *Extent to Which Accused Domains Consist of the Legal Name of the Registrants or Names Otherwise Commonly Used to Identify the Registrants*:

> "This factor recognizes that with the growing use of personal Web sites, a person should be permitted to register their legal name or widely recognized nickname as the domain name of their Web site." 4 McCarthy on Trademarks and Unfair Competition § 25:78.  However, this "factor is not intended to suggest that domain name registrants may evade the application of this act by merely adopting Exxon, Ford, Bugs Bunny or other well-known marks as their nicknames." H.R. Rep. No. 106-412, 10.

*SunEarth*, *supra*, 2013 WL 4528539 at *23.

(a)     At trial, GoDaddy presented two witnesses, Oscar Sagastume and Oscar Hernandez, who testified that the Accused Domains that they registered referred to their personal names.   [*See* TT at 238:15-23 (Hernandez); TT at 247:24-248:6 (Sagastume).]  Given the time constraints at trial, GoDaddy could not be expected to present every witness at trial whose name or the name of their child or business was referenced in one of the Accused Domains.   Regardless, the fact that "oscar" is a common name illustrates the difficulty that GoDaddy would have in assessing, in advance of

a complaint by AMPAS, whether the registrant's domain name was referring to their legal name.  AMPAS presented no evidence on this point.  Certainly as to the Accused Domains where the domain name referred to the registrant's own name, such as theoscarteam.com and oscarcomedy.com, this factor favors GoDaddy (as their licensee).  Even with respect to other Accused Domains containing the term "oscar," the factor either favors GoDaddy or is at least neutral because it would have been difficult if not commercially impractical for GoDaddy to make this determination before placing domains in its Parked Page Programs.

(b)     As such, this factor does not support a finding of bad faith intent to profit.

93.     <u>Factor 3</u>: *Prior Use of the Accused Domains in Bona Fide Offering of Goods or Services*:

> "This factor is similar to Factor (I) and recognizes that the legitimate use of the domain name in commerce is a good indicator of a good faith intent." 4 McCarthy on Trademarks and Unfair Competition § 25:78.  The reference to "prior use" means that this "good faith factor cannot be founded upon a purported good faith use of the domain name undertaken only after the dispute arose and motivated by a desire to fabricate a good faith defense." *Id*.

*SunEarth*, *supra*, 2013 WL 4528539 at *23.

(a)     There is no evidence one way or the other regarding whether any of the Accused Domains were previously used in connection with a bona fide offering of goods and services by any of the registrants.  To that extent, this factor is neutral.

(b)     However, this factor also highlights the difficulty in limiting the Court's analysis to the ACPA's nine, non-exclusive factors in this case.  To the extent any of the Accused Domains were previously used for the bona fide offering of goods and services, it almost certainly was not GoDaddy who used them for that purpose – that is not what domain registrars do.  Nor would

GoDaddy have any way of knowing one way or the other whether the registrant (or a past registrant) had ever used the domains for the bona fide offering of goods and services.

(c)     Put simply, this third factor presumes a level of individualized intervention or knowledge by GoDaddy that is simply inconsistent with the sort of automated systems at issue here.  This factor is inapplicable in this case and is, therefore, neutral.

94.     <u>Factor 4</u>: *Bona Fide Noncommercial or Fair Use of the Mark in a Site Accessible Under the Domain Name*:

> The purpose of this element is to protect domain name registrations and users engaged in protected activities such as critical commentary [or, as relevant here, comparative advertising].  *Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*, 213 F. Supp. 2d 612, 624-25 (E.D. Va. 2002).  This factor should be examined in tandem with the "safe harbor" in the ACPA which provides that bad faith intent shall "not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).

*Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 369 (D.N.J. 2004).

(a)     It is undisputed that until January 2011, advertisements displayed on GoDaddy's parked pages were generated by a Google algorithm that parsed domain names into keywords and then used those keywords to generate contextually relevant advertisements to be served on GoDaddy parked pages.  [*See* TT at 374:1-386:14 (Nicks).]  This is the conduct upon which AMPAS bases its ACPA claim against GoDaddy, arguing that the display of advertisements that were potentially triggered by one or more of the AMPAS Marks constitutes cybersquatting.

(b)     As an initial matter, AMPAS has presented no evidence that any of the AMPAS Marks were used to generate advertisements displayed on the Accused Domains.  However, the available evidence demonstrates that even if such as use did occur, Google (and, as such, GoDaddy and the registrants

of the Accused Domains) would be protected from liability by the nominative fair use doctrine.

(c)    The nominative fair use doctrine permits a "truthful use of a mark, even if the speaker fails to expressly disavow association with the trademark holder, so long as it's unlikely to cause confusion as to sponsorship or endorsement." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F. 3d 1171, 1177 (9th Cir. 2010) (citations omitted); *see also New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 306 (9th Cir. 1992) (nominative fair use is "a class of cases where the use of [a] trademark does not attempt to capitalize on consumer confusion or to appropriate the cachet of one product for a different one.");

(d)    A defendant can use a plaintiff's trademark as long as doing so does not cause "confusion about the source of [the] defendant's product or the mark-holder's sponsorship or affiliation." *Merck & Co. v. Mediplan Health Consulting*, 425 F. Supp. 2d 402, 413 (S.D.N.Y. 2006); *see, e.g.*, *Toyota Motor Sales*, 610 F. 3d at 1180 (finding registration and use of domain names "buy-a-lexus.com" and "buyorleaselexus.com" by non-trademark holders qualified as nominative fair use "because there was no risk of confusion as to sponsorship or endorsement"); *Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350, 351-52 (9th Cir. 1969).

(e)    It is the trademark holder who "bear[s] the burden of establishing that the [defendant's] use of [its] mark was not nominative fair use." *Toyota Motor Sales*, 610 F. 3d at 1182.

(f)    A review of the screenshots produced by AMPAS shows the tenuous nature of any claim of confusion. With the exception of those parked pages that actually displayed AMPAS's own advertisements, Internet users landing on a parked page resolving from one of the Accused Domains would

be hard-pressed to believe that either the parked page or the advertisements contained thereon constituted AMPAS's official website or provided a link to a website sponsored by AMPAS.

(g)   The advertisements returned by Google to those Accused Domains displaying Google-placed, third-party, pay-per-click advertisements incorporating one or more of the AMPAS Marks:  (a) used no more of an AMPAS Mark than necessary; and (b) did nothing to suggest sponsorship or endorsement of the advertisement or linked content by AMPAS.  Each of the parked pages on which the advertisements at issue appeared expressly identified the advertisements as "Sponsored Listings" and clearly stated that the website being visited was actually a page parked by GoDaddy.com.[19]

(h)   AMPAS also failed to present evidence that even a single Internet user was confused by one or more of the AMPAS-related advertisements appearing on the Accused Domains.   Rather, AMPAS admitted that it had no knowledge of any such confusion.  [*See* Miller 30(b)(6) DT Vol. II at 155:18-156:10; Robertson DT at 119:7-21.]

(i)   The lack of a likelihood of confusion is especially true given that the "focus must be on the reasonably prudent consumer in the marketplace…. The relevant marketplace is online marketplace, and the relevant consumer is a reasonably prudent consumer accustomed to shopping online. . . . Unreasonable, imprudent and inexperienced web-shoppers are not relevant."

---

[19] Three Accused Domains (ACADEMY-AWARDS.INFO, ACADEMYAWARDS.NET, and ACADEMY-AWARDS.ORG) appear to be "domain name[s] consist[ing] *only* of the trademark followed by .com, or some other suffix like .org or .net."  *Toyota Motor Sales*, 610 F.3d at 1177.  While such use of a mark in a domain name "will typically suggest sponsorship or endorsement by the trademark holder," *Id.*, this is not a typical case.  First, any "reasonably prudent" Internet user (*Id.* at 1176) visiting one of those Parked Pages would instantly recognize that they had not arrived at one of AMPAS's official websites.  None of the parked pages displayed any substantive content at all, let alone substantive content relating to AMPAS or any of its marks or events.  Moreover, the Parked Pages all expressly disclaimed any relationship to AMPAS, stating that any links were "Sponsored Listings" and noting that the website was a GoDaddy Parked Page, not an official AMPAS website.

*Toyota Motor Sales*, 610 F. 3d at 1176; *see also Network Automation*, 638 F. 3d 1137 (noting that "internet consumers are accustomed to . . . exploration by trial and error.  They skip from site to site, ready to hit the back button whenever they're not satisfied with a site's contents" and that "consumers don't form any firm expectations about the sponsorship of a website until they've seen the landing page – if then.  This is sensible agnosticism, not consumer confusion.").

(j)     Furthermore, the nominative fair use of the terms "Oscar" and "Academy Awards" is well-established.  Newspapers are filled with ads for "Academy Award Nominated" Films.  Actors and actresses are regularly referred to as "Academy Award Winners."  Just like the Boston Marathon or the New Kids on the Block, certain products or services are "not readily identifiable without use of the trademark."  The Oscars and the Academy Awards are clearly examples of products or services that are not readily identifiable without use of the trademarks.  If AMPAS were able to exclusively reference its marks on a website or in a domain name, "the language would be depleted in much the same way as if generic words were protectable."  *New Kids*, 971 F.2d at 306.  As the Ninth Circuit has noted, "sometimes there is no descriptive substitute . . . when many goods or services are effectively identifiable only by their trademarks."  *Id.*; *accord J.K. Harris & Co., LLC v. Kassel*, 253 F. Supp. 2d 1120 (N.D. Cal. 2003) ("This referential use of Plaintiff's trade mark is exactly what the nominative fair use doctrine is designed to allow.").  To the extent any of the Accused Domains included Google-provided click-through advertisements referencing AMPAS's Marks, the evidence before the Court demonstrates (a) the product or service was not readily identifiable without use of the mark, (b) the advertisement did not use more of the mark than necessary, and (c) neither

the registrant, Google, nor GoDaddy suggested they were sponsored or endorsed by AMPAS, this factor does not support a finding of bad faith intent to profit. *See, e.g.*, academyawardmovies.com; academyawards2011winners.com; academyawardwinningfilms.com; bestpictureoscarnominations.com; guidetooscarevents.com.

(k)      AMPAS's reliance on *Haas Automation, Inc. v. Denny*, No. 2:12-CV-04779 (CBM) (PLAx), 2013 WL 6502876 (C.D. Cal. Dec. 4, 2013) for the proposition that nominative fair use in not applicable in ACPA cases is misplaced.  In reviewing that opinion, it appears that the court in *Haas* accidentally conflated the fourth statutory bad faith factor.  Specifically, rather than determining whether there was a bona fide non-commercial use **or** a fair use with respect to the domain name, the court in *Haas* found that there was no "bona fide non-commercial fair use" in concluding that nominative fair use doctrine did not apply to ACPA claims. *See Haas*, 2013 WL 6502876 at *4.  To the extent that the *Haas* court relied on this conflated factor, the Court respectfully declines to follow it in light of the ACPA's disjunctive language.

(l)      To the extent Google used one or more of the AMPAS Marks to trigger the placement of advertisements on a parked page, it was a nominative fair use. *Mayflower Transit*, 314 F. Supp. 2d at 369 (finding "that an analysis of the fourth factor under bad faith—whether Defendant had a 'bona fide noncommercial or fair use of the mark'—speaks to the ultimate disposition of this case, and demonstrates why Defendant cannot be held liable under the ACPA").  This finding comports with Congressional intent in enacting the ACPA:  "**Under the bill, the use of a domain name *for purposes of comparative advertising* . . . even where done for profit, would not alone satisfy the bad-faith intent requirement**." *Id.* at 371 (emphasis

added), quoting. Rep. 106-140, 14; H.R. Rep. 106-412.  At a minimum, given Google's widespread use of the AMPAS Marks (and others' trademarks) and its preeminent position in the world of internet advertising, GoDaddy could have reasonably believed that Google's use was a nominative fair use, since no court has prevented Google from using the trademarks of others in this manner.

(m)     As such, this factor does not support a finding of bad faith intent to profit.

95.     <u>Factor 5</u>:  *Intent to Divert Consumers either for Commercial Gain or With an Intent to Tarnish or Disparage the AMPAS Marks*:

> "This factor embodies the traditional rule of trademark law that when there is proof that the junior user has done something to intentionally divert or confuse customers, the courts will use this, either via a presumption or as relevant evidence, that defendant was successful and that a likelihood of confusion exists."  4 McCarthy on Trademarks and Unfair Competition § 25:78.

*SunEarth*, *supra* 2013 WL 4528539 (N.D. Cal.) at *24.

(a)     It is undisputed that GoDaddy did not register any of the Accused Domains nor did it select any of the Accused Domains for registration.  [*See* SF 29.]  It is also undisputed that GoDaddy and AMPAS are not competitors and there is no evidence that any conduct by GoDaddy was done with the purpose of competing with AMPAS.  [*See* SF 16.]  No evidence exists to suggest, much less prove, that GoDaddy had any interest in diverting consumers from AMPAS's website to parked pages resolving from any of the Accused Domains or that it did so.  [*See* Miller 30(b)(6) DT Vol. I at 89:20-24, 90:5-6.]

(b)     There is no evidence that any consumers hoping to find one of AMPAS's websites were actually diverted to one of the Accused Domains.

(c)     Nor did AMPAS present evidence that GoDaddy intended to use any of the Accused Domains to divert consumers for a commercial gain, to

tarnish any of the AMPAS Marks, or to harm the goodwill of any of the AMPAS Marks.  [*See* Miller 30(b)(6) DT Vol. I at 89:20-24, 90:5-6, 91:8-10, 91:17-92:3, and 92:6-7.]

(d)   In fact, AMPAS participated as an advertiser in Google's AdSense for Domains program, resulting in the display of AMPAS own advertisements on parked pages resolving from domain names incorporating both generic terms and third-party trademarks.  As a result, AMPAS's own advertisements appeared as "Sponsored Listings" and/or "Ads" on at least four of parked pages resolving from the Accused Domains.

(e)   GoDaddy could form no specific intent with respect to each of the Accused Domains prior to at least the receipt of notice of AMPAS's complaints regarding each domain given the volume of its automated process for registering domains selected by registrants.  Indeed, there is no evidence that anyone at GoDaddy subjectively knew that any of the Accused Domains existed at all until AMPAS complained about them.

(f)   In considering this factor, courts also examine whether the defendant attempted to prevent the plaintiff from competing with the defendant (*see Sporty's Farm*, *supra* 202 F. 3d at 499); launched a website at the domain that disparaged the owner and its business (*see E&J Gallo Winery v. Spider Webs, Ltd.*, *supra*, 286 F. 3d at 276; or attempted to divert Internet users to a website that contained information antithetical to the owner's purpose and goodwill (*see PETA v. Doughney*, 263 F. 3d 359, 369 (4th Cir. 2001)).  There is no evidence that GoDaddy engaged in any such conduct.

(g)   As such, this factor does not support a finding of bad faith intent to profit.

96.   <u>Factor 6</u>: *Offering to Sell the Accused Domains*

"This    factor    embodies    the    conduct    of    the    prototypical

cybersquatter who registers a domain name with no intent to use it and offers to sell it to the legitimate trademark owner." 4 McCarthy on Trademarks and Unfair Competition § 25:78.

*SunEarth*, *supra*, 2013 WL 4528539 at *24.

(a)     It is undisputed that GoDaddy never offered to sell any of the Accused Domains to AMPAS nor claimed any ownership interest in the Accused Domains.

(b)     To the extent certain parked pages include an automatically generated banner ad inquiring as to whether the Internet user is interested in purchasing the third-party-owned domain, the existence of such a banner ad did not constitute an offer to sell the domain under the ACPA. Because it is undisputed that GoDaddy did not own any of the Accused Domains, the appearance of any such banner could not constitute an offer to sell by GoDaddy. Moreover, "a mere offer to sell a domain name is not itself evidence" of bad faith intent in the absence of evidence of the offer being exorbitant, i.e., not simply for reimbursement. *See Virtual Works, Inc.*, 238 F. 3d at 270 (citing H.R. Conf. Rep. No. 106-464, at 111 (1999); *see also Pro-Concepts, LLC v. Resh*, No. 2:12CV573, 2013 WL 5741542, at *15 (E.D. Va. Oct. 22, 2013) (offer to sell a domain for cost of reimbursement counters against finding of bad faith as to this factor); *Healix Infusion Therapy, Inc. v. Murphy*, No. H-08-0337, 2008 WL 4155459, at *15 (defendant's generalized offer of a domain name "for sale to the public" not evidence of bad faith absent evidence that the defendant targeted its offer to the owner of the mark).

(c)     GoDaddy also lodged each of the Accused Domains by way of three (3) "Registrar's Certificates" filed with the Court over the course of this litigation. [*See* SF 28.] *See also Mattel, Inc. v. Barbie-Club.com*, 310 F. 3d 293, 296 (2d Cir. 2002) (citing 15 U.S.C. § 1125(d)(2)(D) ("Depositing such documentation with the district court serves to signify . . . the registrar's disinterested surrender of the disputed property to the adjudicative authority

of the court.").

(d)     As such, this factor does not favor a finding of bad faith intent to profit.  *See SunEarth*, *supra*, 2013 WL 4528539 at *24 (finding this factor to favor defendant where "[n]o evidence was offered that Defendants have attempted to sell, transfer or assign the domain names to anyone for financial gain [and] Plaintiffs acknowledge that Defendants have made no offer to sell the domain names to them").

97.     Factor 7:  *Misleading False Contact Information When Applying for the Accused Domains*:

> The "provision of false contact information to a registrar is a hallmark of the cybersquatter, who wants to profit without being easily identifiable and served with process." 4 McCarthy on Trademarks and Unfair Competition § 25:78. However, a "mere honest mistake in identification has no such import." *Id.*

*SunEarth*, *supra*, 2013 WL 4528539 at *24.

(a)     GoDaddy did not register any of the Accused Domains nor did GoDaddy provide any misleading or false contact information on behalf of the registrants as part of the registration process.  [*See* SF 29 and 30.]

(b)     Moreover, it is undisputed that GoDaddy disclosed the identities of the registrants of the Accused Domains either in response to a letter from AMPAS's counsel or as part of this litigation.  [*See* SF 30.]

(c)     To the extent AMPAS claims that dismissed defendant Domains By Proxy's provision of privacy services to a number of the registrants of the Accused Domains meets this factor, this cannot be considered as affirmative conduct on the part of GoDaddy to mislead AMPAS as to the identity of the registrants.  AMPAS failed to present any legal basis for such an extension of vicarious liability, especially where, as here, the provision of privacy services is "indisputably legal."  *Solid Host, NL v. Namecheap, Inc.*, *supra*, 652 F. Supp. 2d at 1109-10; *id.* at 1096 (noting the importance of proxy service

providers given "[t]he fact that every person who wants to register a domain name either consents to put some sort of publicly accessible contact information on line, or is unable to register the domain name has drawn criticism from privacy and free speech advocates" and that as a result, "there has been a growth in companies that will register domain names for individuals and act as a proxy by using the company's contact information. Such services allow domain registrants concerned with maintaining their privacy to remain anonymous").

(d)     The evidence submitted at trial further supports a finding that the services provided by Domains By Proxy are lawful and, to the extent used by GoDaddy's customers, do not support a finding of bad faith intent either by GoDaddy or any registrant.  For example, Ms. Hanyen identified several legitimate purposes for Domains By Proxy's services, including allowing for the expression of controversial political views, avoiding spam, preventing domain name hijacking, and allowing abused women to disclose the details of their abuse without repercussions for their abusers.  [*See* TT at 262:7-21 (Hanyen).]  Similarly, as Mr. Sagastume testified, Domains By Proxy allowed him to avoid publicly disclosing his personal contact information so that he could avoid his "crazy ex stalker girlfriend."  [TT at 249:6-17 (Sagastume).]

(e)     Accordingly, this factor favors GoDaddy.

98.     Factor 8:  *Registration of Multiple Domain Names that are Identical, Confusingly Similar, or, in the Case of Famous Marks, Dilutive of the Marks of Others*

In this factor, Congress intended to address an "increasingly common cyberpiracy practice known as 'warehousing', in which a cyberpirate registers multiple domain names—sometimes hundreds, even thousands—that mirror the trademarks of others." H.R. Rep. No. 106-412, 13.

*SunEarth*, *supra*, 2013 WL 4528539 at *25.

(a)     This factor again highlights why the unique, case-specific considerations discussed above are better gauges of bad faith in this action than a mere sum of the nine, non-exclusive statutory factors.  This factor speaks of a defendant's "registration or acquisition of" domain names, (15 U.S.C. § 1125(d)(1)(B)(viii)), but GoDaddy did not register any of the Accused Domains.  [SF No 29.]   Nor is there any evidence that GoDaddy registered any other domain names (i.e., domain names not at issue in this case) on behalf of itself that were identical or confusingly similar to the AMPAS Marks.   Likewise, there is no evidence that GoDaddy ever "acquired" any of the Accused Domains or any other domains that were identical or confusingly similar to the AMPAS Marks.

(b)     To the extent one or more of the registrants for the Accused Domains registered multiple domain names, "the ACPA 'does not suggest that the mere registration of multiple domain names is an indication of bad faith.'"  *Harrods*, 302 F. 3d at 234-35 (quoting H.R. Rep. No. 106–412, at 13).   "This is presumably because many companies legitimately register many, even hundreds, of domain names consisting of various permutations of their own trademarks in combination with other words." *Id.*  "'Just as they can have several telephone numbers, companies can register multiple domain names in order to maximize the chances that customers will find their web site.'"  *Id.* (quoting *Porsche Cars North Am., Inc. v. Porsche.com*, 51 F. Supp. 2d 707, 709 (E.D. Va. 1999)).

(c)     In any event, even if the registrant's registration of multiple domain names offered some evidence of the registrant's bad faith, AMPAS cannot attribute the registrant's bad faith to GoDaddy. *Petroliam Nasional II*, *supra*, 737 F. 3d at 553-55.  GoDaddy, "with clients holding over 50 million domain names," cannot be required to "analyze its customer's

subjective intent with respect to each domain name." *Id*. at 553.  The Court

cannot and does not charge GoDaddy with that "impossible task…." *Id*.

(d)     As such, this factor strongly favors GoDaddy.

99.     <u>Factor 9</u>:  *Extent to Which the Marks in the Domain Name Are Not Distinctive or Famous*

> [T]he ninth factor requires the Court to consider the extent to which the mark incorporated in the domain name is distinctive or famous under the ACPA.  A mark is "distinctive and famous" if it is "widely recognized by the general consuming public of the United States as a designation of [sic] source of the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A).

*Pro-Concepts, LLC v. Resh*, No. 2:12CV573, 2013 WL 5741542, at *16 (E.D. Va. Oct. 22, 2013)

(a)     As registered marks, the AMPAS Marks are all presumptively

distinctive, and GoDaddy has not offered any evidence to refute that fact.

Even absent AMPAS's specific evidence that the OSCAR, OSCARS,

ACADEMY AWARD, and ACADEMY AWARDS have become sufficiently

"household names" to qualify as famous mark, *Thane Int'l v. Trek Bicycle*

*Corp*, 305 F.3d 894, 911-912 (9th Cir. 2002) (superseded by statute on other

grounds as stated in *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778

F.3d 1059, 1069 (9th Cir. 2015), the Court would likely take judicial notice of

their fame.  *See I.P. Lund trading ApS v. Kohler Co.*, 136 F.3d 27, 47 (Fed.

Cir. 1998) ("some marks…may be so famous as to be judicially noticed").[20]

(b)     Again, however, the extent to which this factor is material in

light of the unique circumstances of this case is questionable at best.

AMPAS's Marks, though all distinct and mostly famous, are all composed of

common words in the English language.    The fact that ACADEMY

---

[20] However, AMPAS has not offered any evidence to support a finding that its OSCAR NIGHT mark is itself famous independent from the distinct OSCAR mark.

AWARDS is a famous mark might be relevant in the context of a defendant who registered a domain using that mark (ACADEMY-AWARDS.INFO, for example). Under those circumstances, the registrant would have had to actively choose to register the domain name, and it would be difficult for the registrant to argue he was unaware that the domain included one of AMPAS's Marks. Moreover, he would surely know whether he had obtained the rights from AMPAS to register or otherwise use the mark in that context before he registered the domain containing the famous mark.

(c) The situation is quite different for GoDaddy. Given the (necessarily) automated nature of GoDaddy's registration process and Parked Pages Program, GoDaddy had no part in selecting any of the Accused Domains for registration and could not possibly have *independent* knowledge (apart from the registrant's certification) of whether AMPAS had authorized the registrant to register the domain name containing AMPAS's famous (or, in the case of OSCAR NIGHT, distinctive) marks. Perhaps most importantly, unlike the registrant for whom the domain name has independent meaning, from GoDaddy's automated perspective, the Accused Domains were little more than strings of characters. Most Americans would look at the domain ACADEMY-AWARDS.INFO and see a reference to AMPAS's annual awards ceremony. It is in this obvious point that this final statutory factor finds its value. But, in the absence of a sophisticated algorithm, computers are not so discerning – particularly where, as here, the marks consist of other common English words.

(d) To the extent this factor might weigh in AMPAS's favor, then, it only does so minimally under the unique circumstances of this case. However, given the nature of AMPAS's theory of liability, the strength of its marks is a double-edged sword. Famous (and strongly distinctive) marks are

valuable commodities.  As the holder of those marks, AMPAS would have both the legal obligation and the economic incentive to diligently police their use, even at considerable expense.  Indeed, the evidence adduced at trial showed that third-party companies like Mark Monitor and CSC offer such policing services, including daily monitoring of newly registered domains. Yet AMPAS would hold GoDaddy liable for failing to do the policing work that AMPAS was required (and in the better position) to do itself.  *Saul Zaentz Co. v. Woznizk Travel, Inc.*, 627 F. Supp. 2d 1096, 1010 (N.D. Cal. 2008) (holding trademark law "imposes on a trademark owner the duty to police its rights against potential infringers"); 2 McCarthy on Trademarks and Unfair Competition § 11:91 (4th ed. 2015) ("The law imposes on trademark owners the duty to be pro-active and to police the relevant market for infringers."); *accord Grupo Gigante SA De CV v. Dallo & Co., Inc.*, 391 F.3d 1088, 1102 ("Companies expecting judicial enforcement of their marks must conduct an effective policing effort.") (internal quotes omitted).

(e)     The law does not recognize any such duty where, as here, there is no liability for secondary infringement and there is no evidence that GoDaddy was willfully blind to any specific evidence of infringement.  *MDT Corp. v. New York Stock Exch., Inc.*, 858 F. Supp.  1028, 1033-34 (C.D. Cal. 1994) (defendant "appears to interpret [the case law] to impose an affirmative duty on innocent third party users of a mark to police the mark for its owner.  No such duty exists"); *see also Petroliam Nasional II*, *supra*, 737 F.3d at 553-554 (concluding that the ACPA does not support claims for secondary liability); *Tiffany II*, *supra*, 600 F.3d at 109-110 (describing willful blindness standard for service provider in context of trademark infringement as when the service provider both (1) "has reason to suspect that users of its service are infringing a protected mark" *and* (2) the service provider "shield[s] itself from learning

1   of the particular infringing transactions by looking the other way").

2       (f)    At best, the nature of GoDaddy's automated process makes this

3   factor neutral.  However, in light of the unique circumstances of this case and

4   the added duty and incentive AMPAS would have to vigorously protect its

5   marks, the Court thinks it reasonable for GoDaddy to have relied on AMPAS

6   to perform that policing function on its own without costly and overbroad

7   interventions by GoDaddy.  Accordingly, the Court finds this factor also

8   weighs in favor of GoDaddy.

9      100.  As set forth above, eight of the nine enumerated ACPA factors weigh

10   in GoDaddy's while the remaining factor is neutral.  The single neutral factor—

11   whether the domains were used for the bona fide provision of goods and services—

12   is insufficient to establish that GoDaddy possessed a bad faith intent to profit from

13   any of the AMPAS Marks.  *See Gioconda Law Grp. PLLC v. Kenzie*, *supra*, 941 F.

14   Supp.2d at 463 (where "only two of the nine [factors] weigh in favor of bad faith.

15   That is not enough.").

16      101.  In any event, the factors that most directly relate to bad faith all heavily

17   weigh in GoDaddy's favor:

18      (a) GoDaddy did not attempt to divert customers from AMPAS;

19      (b) GoDaddy never offered to sell the domain names to AMPAS or
20           any other person;

21      (c) GoDaddy did not try to hide its identity or provide misleading
            information relative to any of the Accused Domains; and

22      (d) GoDaddy has not registered any of the Accused Domains let alone
23           registered other infringing domains.

24      102.  Based on an analysis of the evidence presented at trial in relation to

25   nine-enumerated factors contained in the ACPA, as well as the unique

26   circumstances presented by this case, AMPAS failed to meet its burden to

27   demonstrate that any conduct engaged in by GoDaddy was done with a bad faith

28   intent to profit from the AMPAS Marks.  AMPAS having failed to meet its

1  affirmative burden of proof on the sole question of liability, the Court must find in

2  GoDaddy's favor.

3        **E.      The ACPA Safe Harbor Further Shields GoDaddy from Liability**

4        103.   Although the Court finds that AMPAS has failed to meet its affirmative

5  burden of proof on the dispositive question of GoDaddy's bad faith intent to profit,

6  the Court also finds in the alternative that GoDaddy has met its burden of proof on

7  its related affirmative defense that it acted with a good faith belief that its use of the

8  domain was a fair use or otherwise lawful.

9        104.   The ACPA provides a safe harbor to any person who registers, uses, or

10  traffics in domain names where that person "believed and had reasonable grounds to

11  believe that the use of the domain name was a fair use or otherwise lawful." *Id.*

12  (quoting 15 U.S.C. § 1125(d)(1)(B)(ii)).  This provision is applied narrowly and bars

13  those who act even partially in bad faith. *See Lahoti*, 586 F. 3d at 1203.  The logic

14  is that "all but the most blatant cybersquatters will be able to put forth at least some

15  lawful motives for their behavior." *Id*.  Despite this limitation, the undisputed

16  evidence demonstrates GoDaddy's reasonable belief that the placement of

17  advertisements on the Accused Domains—whether those advertising GoDaddy's

18  services or those placed by Google offering either domain name-related or interest-

19  based advertisements—was a fair use or otherwise lawful.

20        105.   Although AMPAS has repeatedly attempted to equate the provision of

21  domain monetization services with intentional trademark infringement, there is no

22  evidence to support such a position.  Nor is GoDaddy the only provider of parked

23  page services; indeed, at the time GoDaddy became an ICANN-accredited registrar

24  in 2000, registrars were already directing domain names to parked pages.  [*See*

25  Jones DT at 31:8-16; SF 12.]  These companies provide the same basic parked page

26  monetization programs offered by GoDaddy, often in conjunction with Google's

27  AdSense for Domains program.  [*See, e.g.*, Jones DT at 40:17-41:1.]

28

1        106.   In light of the widespread prevalence of domain name monetization

2   services, as well as the lack of any regulatory or statutory scheme preventing such a

3   practice, GoDaddy held an objective good faith belief that the practice of generally

4   parking undeveloped domains on pages containing advertisements was a lawful use

5   (if any) of the Accused Domains.

6        107.   More specifically, GoDaddy had a reasonable belief that its placement

7   of advertisements on each of the Accused Domains was a lawful use of the domain.

8   As set forth above, GoDaddy requires all registrants to certify that they are not

9   violating any state or federal laws in registering their selected domain names and

10  that their registration does not infringe upon any third-party intellectual property

11  rights.   [*See* SF 54.]   GoDaddy relied on these affirmative representations in its

12  decision to allow the placement of advertisements on parked pages.  *See MDY*

13  *Indus., LLC v. Blizzard Entm't, Inc.*, *supra*, 629 F. 3d at 955 ("[A] valid contractual

14  relationship exists between Blizzard and its customers based on the operative

15  [agreements]."); *see also Register.com, Inc. v. Verio, Inc.*, *supra*,  356 F. 3d at 403

16  ("While new commerce on the Internet has exposed courts to many new situations,

17  it has not fundamentally changed the principles of contract.").

18       108.   As the registrant's licensee, GoDaddy would have had every reason to

19  believe its use of the Accused Domains for the purpose set forth in the license

20  (allowing GoDaddy to generate advertising revenue from those domains so long as

21  their DNS was directed to a Parked Page server) was perfectly lawful.   AMPAS

22  offers no evidence to suggest that GoDaddy was aware of any red flags related to

23  any individual registrant that would undermine GoDaddy's reasonable reliance on

24  the registrant's certification until AMPAS brought the domain to GoDaddy's

25  attention through either GoDaddy's take-down process or these consolidated

26  lawsuits.   But the evidence is undisputed that GoDaddy acted immediately to

27  redirect those pages to non-monetized parked pages as soon as GoDaddy gained that

28

knowledge.

109.  AMPAS may argue that GoDaddy could not have held a reasonable belief that the placement of advertisements on parked pages was lawful where those advertisements contained third-party trademarks.  However, this argument fails not only for a lack of evidentiary support (i.e., there is no evidence that GoDaddy ever had any knowledge of or control over the specific advertisements Google provided), but also in view of GoDaddy's prior arguments on the issue of nominative fair use and the evolving state of law related to competitive keyword advertising and Google's AdWords and AdSense for Domains products.

110.  There is a growing consensus in the case authorities that keyword advertising does not violate the Lanham Act.  *See, e.g.*, *Government Employees Ins. Co. v. Google, Inc.*, No. 1:04-cv-507, 2005 WL 1903128 (E.D. Va. Aug. 8, 2005) (granting summary judgment because "Plaintiff has failed to establish a likelihood of confusion stemming from Google's use of [Plaintiff's] trademark as a keyword and has not produced sufficient evidence to proceed on the question of whether the Sponsored Links that do not reference [Plaintiff's] marks in their headings or text create a sufficient likelihood of confusion to violate . . .  the Lanham Act."); *Jurin v. Google*, *Inc.*, 695 F. Supp. 2d 1117, 1123 (E.D. Cal. 2010) (granting dismissal where "[t]o the extent Plaintiff may contend that Defendant [Google] has helped "facilitate" confusion of the product with others, such is a highly attenuated argument.  Even if . . . a "Sponsored link" might confuse a consumer, it is hardly likely that with several different sponsored links appearing on a page that a consumer might believe each one is the true producer or "origin" of the . . . product."); *General Steel Domestic Sales, LLC v. Chumley*, No. 10-cv-01398-PAB-KLM, 2013 WL 1900562 (D. Colo. May 7, 2013) (holding no likelihood of confusion where defendant used plaintiff's trademark in the ad copy of its Google AdWords advertisement and where defendant purchased plaintiff's trademark as a

keyword ad trigger for sponsored links); *accord*, *Parts.com, LLC v. Yahoo! Inc.*, 996 F. Supp. 2d 933, 938 (S.D. Cal. 2013) ("[T]he mere fact that Yahoo displays an array of links when a user enters "Parts.com" as a search term is not enough to suggest that Yahoo is affiliated with Parts.com.").

111. Those purchasing trademarked keywords for the purpose of competitive keyword advertising have achieved similar results. *See, e.g.*, *Network Automation, Inc. v. Advanced System Concepts, Inc*., 638 F. 3d 1137 (9th Cir. 2011) (finding no likelihood of confusion after applying factor test, focusing most heavily on the strength of plaintiff's mark, lack of evidence of actual confusion, type of goods and degree of care likely to be exercised by the purchaser, and the labeling and appearance of advertisements and the surrounding context on the screen displaying the results page); *Infostream Group Inc. v. Avid Life Media Inc.*, No. CV 12-09315 DDP, 2013 WL 6018030 (C.D. Cal. Nov. 12, 2013) (granting defendant's motion to dismiss plaintiff's trademark infringement claim, holding that defendant's purchase of plaintiff's trademark as a keyword ad trigger does not lead to customer confusion); *CollegeSource, Inc. v. AcademyOne, Inc.*, No. 10-3542, 2012 WL 5269213 (E.D. Pa., Oct. 25, 2012) (finding no likelihood of confusion where the surrounding ad context, including separation of sponsored ad links and labeling of sponsored links, decreased any potential likelihood of confusion); *J.G. Wentworth, S.S.C. Ltd. P'ship v. Settlement Funding LLC*, No. 06-0597, 2007 WL 30115 (E.D. Pa., Jan. 4, 2007) (finding defendant's purchase of plaintiff's trademarks as keyword ad triggers for Google's AdWords program did not result in any actionable likelihood of confusion because of the separate and distinct nature of the links created on the search results page).

112. These legal successes provided GoDaddy with added security in its good faith belief that the automated placement of Google-generated advertisements on each of the Accused Domains was lawful. Indeed, the liability sought to be

imposed on Google in each of these scenarios was no different from that sought to be imposed by AMPAS—liability for the display of advertisements purchased by third parties where those advertisements were displayed based on the presence of a trademarked keyword in a search term.

113.   AMPAS engaged in the very conduct it now complains of when it purchased trademarked keywords from Google as part of Google's AdWords program to increase traffic to its Internet sites without considering whether it had the permission to use those trademarks.   [Weiss DT at 404:14-405:9, 426:23-427:22, 427:24-428:6, 449:3-7, 449:10-12.]   Indeed, AMPAS expressly approved Google's placement of AMPAS advertisements on GoDaddy parked pages from 2008-2010 as part of its participation in Google's AdWords program.   [*See id.*]

114.   In light of the above facts, as well as the robust enforcement actions taken by GoDaddy in assisting AMPAS and other trademark holders in policing their marks, GoDaddy reasonably believed that the placement of Google's advertisements on parked pages was lawful.   Indeed, AMPAS's continued use of the TM Policy to address the monetized parked pages led GoDaddy to believe that it was satisfied with GoDaddy's response and that litigation would not be forthcoming.   *See Parts.com v. Google Inc.*, 3:13-cv-01074-JLS-WMC (S.D. Cal. Dec. 4, 2013).   GoDaddy should be afforded immunity under the ACPA's safe harbor provision.

## III.   <u>CONCLUSION AND SUMMARY OF DECISION</u>

The storied procedural history of these two consolidated lawsuits belies their simplicity.   Despite five years of vigorous litigation, a docket approaching 800 entries, multiple rounds of summary judgment, thousands of exhibits, and a week of testimony, AMPAS's sole claim against GoDaddy for violation of the ACPA fails for two straightforward reasons.   <u>First</u>, AMPAS conflates a generalized intent to profit with the ACPA's *bad faith* intent to profit off of AMPAS's *specific marks*.

After years of discovery, AMPAS has failed to produce any evidence that GoDaddy possessed a subjective bad faith intent to profit off of the AMPAS Marks when GoDaddy's automated process enrolled the Accused Domains in the Parked Pages Program and then automatically created individual Parked Page impressions with advertisements generated using Google's proprietary algorithm. *Petroliam Nasional I*, 897 F. Supp. 2d at 866 (no ACPA liability where plaintiff failed to show "intent to profit specifically from [the plaintiff's] mark"). There is no question that GoDaddy intended, at least in part,[21] to profit from its Parked Pages Program. That is to be expected, as GoDaddy is a for-profit corporation. But intending to profit is not an act of bad faith – it is the bedrock upon which every economy has sat since the dawn of agriculture.

Nor is it enough to say that GoDaddy intended to profit with the generalized knowledge that its Parked Pages Program would sometimes capture domains containing third-party trademarks. The ACPA does not support claims for contributory or vicarious liability, and, again, there is nothing inappropriate or unlawful in profiting off of another's trademark if one obtains the license to do so. *See Ford Motor Co. v. Greatdomains.com, Inc.*, 177 F. Supp. 2d 635, 642 (E.D. Mich. 2001) ("the ACPA was designed to target persons who commandeer a domain name for no reason other than to profit by extortion, yet bypass persons with legitimate interests in the domain name—even if they do incidentally profit from the domain name's status as a trademark"), *declined to follow other grounds in Petroliam Nasional II*, *supra*, 737 F.3d at 551. It is for this very reason that, before enrolling any domain (including the 293 Accused Domains) in its Parked Pages Program, GoDaddy required the registrant to: (1) certify his or her right to use the

---

[21] GoDaddy offered persuasive testimony that it *also* developed a monetized parked pages program to solve significant technological and user experience issues. But as GoDaddy's Senior Executive Vice President, Barbara Jo Rechterman testified, one reason GoDaddy chose to use a monetized parked pages program was "because it's monetized." [Rechterman DT at 113:9-12.]

domain without infringing any third-party marks or violating any state or federal law; and (2) grant GoDaddy a license to use that domain for the purpose of advertising. Absent some independent information that would have put GoDaddy on notice that the registrant misrepresented his or her rights in the domain name, GoDaddy is entitled to rely on its registrants' certifications and the accompanying licenses to use the domains for the purpose of advertising.

It is also true that AMPAS offered evidence that GoDaddy was generally aware that some level of trademark infringement was inevitable in its Parked Pages Program. But as the Second Circuit noted in an analogous context "a service provider must have more than a general knowledge or reason to know that its service is being used to" infringe on another's mark. *Tiffany II*, *supra*, 600 F.3d at 107. "Some contemporary knowledge of which particular [domains] are infringing or will infringe in the future is necessary." *Id*.[22] However, the evidence clearly establishes that GoDaddy never had any control over or subjective knowledge of the ad results generated by Google's proprietary search algorithm. Even if it wanted to, GoDaddy had no way of knowing whether sending one of the Accused Domain names to Google would result in an advertisement related to any of AMPAS's Marks. As soon as GoDaddy received information of a specific act of a potentially infringing domain with objectionable advertisements, GoDaddy immediately acted

---

[22] It is true that *Tiffany II* involved claims of contributory liability for traditional trademark infringement. But this only strengthens the force of the *Tiffany II* rationale. The ACPA's subjective bad faith requirement is a limitation on liability above and beyond the intent necessary to prove traditional trademark infringement. *Petroliam Nasional II*, *supra*, 737 F.3d at 553. Additionally, the claim for contributory trademark infringement at issue in *Tiffany II* did not require a finding of intent at all, only knowledge or constructive knowledge. *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 943 (9th Cir. 2011). That is, the ACPA's specific, subjective bad faith requirement is narrower and *significantly more difficult to prove* than the less-exacting knowledge requirement for the contributory trademark infringement at issue in *Tiffany II*. *See Petroliam Nasional II*, 737 F.3d at 553 (holding "[t]he ACPA is a 'carefully and narrowly tailored' attempt to fix [a] specific problem" and declining to "expand the scope of the Act and seriously undermine" the ACPA's limiting provisions by imposing secondary liability). For this reason, it is not even clear whether the sort of willful blindness that can give rise to traditional contributory liability is sufficient to satisfy the ACPA's subjective bad faith requirement. But even assuming willful blindness is enough, AMPAS has not shown it.

1   to move that domain to an advertisement-free template.

2       Which brings the Court to the second fundamental problem with AMPAS's

3   theory of liability – it confuses *GoDaddy's technical capacity* to filter all trademarks

4   with *AMPAS's legal duty* to police its own trademarks.   At its core, AMPAS's

5   ACPA claim would impose upon GoDaddy (and presumably any other company

6   offering parking, hosting, or other basic internet services) the unprecedented duty to

7   act as the internet's trademark police.   The ACPA did not impose such sweeping

8   obligations.   AMPAS devoted much of its evidence and argument to proving that it

9   was technologically possible for GoDaddy to eliminate its monetized parking

10  program (or implement a filter that would have effectively accomplished the same

11  result) since at least 2007.   What AMPAS failed to do, however, is offer any

12  authority that GoDaddy was legally obligated to do so.[23] *Compare Lockheed Martin*

13  *Corp. v. Network Solutions, Inc.*, *supra*, 985 F. Supp. at 966 ("a domain name

14  registrar, has no affirmative duty to police the Internet in search of potentially

15  infringing uses of domain names"); *MDT Corp. v. New York Stock Exchange, Inc.,*

16  858 F. Supp. at 1034 (the law does not "impose an affirmative duty on innocent

17  third party users of a mark to police the mark for its owner"); *see also Hard Rock*

18  *Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1149 (7th Cir.

19  1992) (flea market operator could not be liable for "failing to take reasonable

20  precautions" against risk of trademark infringement because operator had "no

21  affirmative duty to take precautions against the sale of counterfeits"), *cited with*

22  *approval in Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 265 (9th Cir. 1996).

23      Like GoDaddy, AMPAS had the ability to police the AMPAS Marks,

24  including by engaging the services of brand protection companies like Mark

25  _____

26  [23] AMPAS's evidence regarding the terms of GoDaddy's AdSense contract with Google is a red herring.   Whatever that bilateral contract provided regarding GoDaddy's obligation to help protect Google from liability, AMPAS offered no evidence to suggest it was a third-party beneficiary of

27  the agreement.   If Google believes GoDaddy has violated the terms of the agreement, Google is free to sue.

28

Monitor or CSC that would regularly monitor existing and new domain names for possible infringement.   Unlike GoDaddy, however, AMPAS also had the legal obligation to pro-actively police its valuable marks.   *Saul Zaentz Co. v. Wozniak Travel, Inc.*, *supra*, 627 F. Supp. 2d at 1110; *See also* 2 McCarthy on Trademarks and Unfair Competition § 11:91 (4th ed. 2015).   It is for this reason that AMPAS's evidence of GoDaddy's efforts to block any use of domains containing GoDaddy's marks is so unexceptional – that is what the law expects mark holders to do for their own marks.   The manner in which GoDaddy polices its own marks is also a useful contrast to its obligations to other mark-holders for two additional reasons: GoDaddy knows which marks it owns, and it knows who has the right to use them. When a registrant attempts to register a domain name using one of GoDaddy's marks, GoDaddy knows whether the registrant has the right to do so.   This is vastly different than circumstances here, where a registrant registers a domain name containing all or part of a *third-party's* marks.   Under the latter scenario, it would be an "impossible task" for GoDaddy to discern whether every individual registrant had the right to use the domain name, and therefore license it to GoDaddy for the purpose of advertising.   *See Petroliam Nasional II*, *supra*, 737 F.3d at 553; *accord Lockheed Martin Corp. v. Network Solutions, Inc.*, *supra*, 985 F. Supp. At 967 ("because of the inherent uncertainty of trademark protection in domain names…[e]ven after receiving [mark holder's] demand letters [a service provider] would not have reason to know" whether *other* domains with similar character strings to the mark were infringing where the trademark at issue ("SKUNK WORKS") consisted of common English words).

Despite the law's general proscription that mark-holders, not service providers, are responsible for protecting their marks, and despite the obvious epistemological limitations on GoDaddy's ability to discern an infringing use from a properly licensed use, the evidence also shows that GoDaddy took many pro-active

steps to protect third-party marks (like the AMPAS Marks) from abuse.  GoDaddy
filled the gaps left in the ACPA with its TM Policy that allowed mark holders like
AMPAS to report any suspected cybersquatting to GoDaddy, at which point
GoDaddy would immediately remove any advertising from the domain.[24]  GoDaddy
also organized a number of industry conferences to discuss best practices for
protecting third-party intellectual property, including trademarks, where GoDaddy
consistently found itself to be at the vanguard of industry standards.  And over the
years, GoDaddy repeatedly experimented with keyword and domain name filtering
platforms that could reasonably balance questions of: (a) protecting third-party
marks; (b) concerns of over breadth; and (c) GoDaddy's ability to practically
implement the filter.  Indeed, GoDaddy now operates a more limited trademark filter
that (with the help of human review) appears to strike an appropriate balance of
those three considerations.

At bottom, AMPAS's theory of liability says that GoDaddy's industry-
leading efforts to protect third-party marks was not enough because it was
technically feasible for GoDaddy to do more for *some* mark-holders (like AMPAS)
at the expense of other mark-holders and end-users.[25]  But GoDaddy's "failure" to

---

[24] GoDaddy did so despite the fact that the ACPA does not expressly require any such notice and
take-down process.  Unlike the Digital Millennium Copyright Act, in which Congress placed an
affirmative burden on service providers to implement such a process, Congress omitted a similar
obligation a year later when it passed the ACPA.  That is, the evidence before the Court is that
GoDaddy went above and beyond what Congress required when it passed the ACPA.

[25] Consider the famous boxer Oscar De La Hoya.  Despite his obvious trademark rights in his
well-known name, AMPAS would force GoDaddy to prohibit Mr. De La Hoya from participating
in CashParking simply because he shares his first name with AMPAS's gilded statuette.  But
AMPAS offers nothing to suggest that it would be unlawful for Mr. De La Hoya to profit off his
own name by enrolling his domain name in CashParking, or for GoDaddy (as his hypothetical
licensee) to do so by enrolling the domain in Free Parking.  Nor does AMPAS offer any cogent
reason to conclude that the lawfulness of *Mr. De La Hoya's* (or GoDaddy's) decision to profit off
of his own name could somehow be contingent upon *Google's* choice of advertisements served
through its AdSense program.  This is particularly so given that Google's choice of advertisements
is itself determined, in part, by other's (including AMPAS's) decision to purchase certain
keywords, by the end-user's browsing history, and any other number of unknown proprietary
variables in Google's algorithm.

1  implement an overbroad trademark filter in 2007 simply because it was technically

2  possible to do so does not translate to bad faith, let alone a subjective bad faith to

3  profit from AMPAS's marks specifically.  What is possible, what is practical, and

4  what the law requires are three very different things.  As the testimony made clear,

5  the nature of any such filter would inevitably lead to a large amount of "'false

6  positives,' in which the lawful use of a domain name is restricted by a risk-averse

7  third party service provider" – an outcome the Ninth Circuit has expressly cautioned

8  against under the ACPA.  *Petroliam Nasional II*, *supra*, 737 F.3d at 553.

9         In essence, the evidence adduced at trial showed that the sort of filter AMPAS

10  contends GoDaddy is legally obligated to implement (one that incorporates most if

11  not all of the USPTO database) would effectively shut down GoDaddy's monetized

12  Parked Pages Program altogether.  Looking at this specific case, one might be

13  tempted to ask "so what?"  GoDaddy's Parked Pages Program does not significantly

14  impact GoDaddy's overall revenues and it only offers advertisements.  But as the

15  testimony at trial emphasized, those advertisements offer considerable value to

16  Internet users who accidentally stumble upon a Parked Page.  More importantly,

17  though, AMPAS's theory of liability has far greater implications than GoDaddy's

18  Parked Pages Program:  it would essentially forbid GoDaddy from pursuing an

19  otherwise lawful business simply because that business also carried the potential for

20  trademark abuse.  That has never been the law.  Were it otherwise, it is difficult to

21  imagine how the Internet could function.

22         Ultimately, whether GoDaddy acted with a bad faith intent to profit off of

23  AMPAS's marks is a question of fact.  *Rearden LLC v. Rearden Commerce, Inc.*,

24  *supra*, 683 F.3d at 1219-21 (reversing summary judgment on ACPA claim because

25  there were genuine issues of fact for fact-finder on issue of bad faith); *accord Coca-*

26  *Cola Co. v. Purdy*, 382 F.3d 774, 784 (8th Cir. 2004); *Goldfaden v. Miss World*

27  *(Jersey) Ltd.*, No. CIV.A. 02-712 (JAG), 2005 WL 1703207, at *17 (D.N.J. July 20,

28

2005).  After considering the nine enumerated factors and the multitude of unique factors going to the question of bad faith in this case, and after weighing all the evidence presented at trial, the Court finds that AMPAS has not met its burden of proving that GoDaddy registered, trafficked in or used any of the Accused Domains with a bad faith intent to profit from the AMPAS Marks.   15 U.S.C. § 1125(d)(1)(a)(i).  Quite the opposite.  In addition to its reasonable belief that the display of advertisements containing AMPAS's Marks constituted a nominative fair use,[26] the Court finds GoDaddy reasonably believed in good faith that its use of the Accused Domains in its Free and Cash Parking programs was "otherwise lawful" in light of: (1) each registrant's certification that the domain name did not infringe on any third-party marks and was otherwise lawful; and (2) the license that each registrant gave GoDaddy to use the domain for the purpose of advertising in the Parked Pages Program.  That alone precludes a finding that GoDaddy acted with a bad faith intent to profit off of the AMPAS Marks.  15 U.S.C. § 1125(d)(1)(B)(ii).

AMPAS having failed to meet its burden of proving that GoDaddy acted with a bad faith intent to profit from any of the AMPAS Marks, and GoDaddy having affirmatively defeated any such finding, the Court must enter judgment in GoDaddy's favor.  *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, *supra*, 304 F.3d at 946.  Accordingly, the Court need not consider whether any of the remaining 56 Accused Domains are confusingly similar to the AMPAS Marks or determine the appropriate measure of statutory damages.

///

///

///

///

---

[26] Again, it was AMPAS's affirmative burden to prove that GoDaddy's use of the AMPAS Marks was not a nominative fair use.  *Toyota Motor Sales*, 610 F. 3d at 1182.  AMPAS failed to do so.

1   GoDaddy shall submit a proposed judgment **no later than September 18,**
2   **2015**.  AMPAS shall file any objections to GoDaddy's proposed judgment **no later**
3   **than September 25, 2015**.

4

5   **IT IS SO ORDERED**.

6

7   Dated:  September 10, 2015   _____

8   HONORABLE ANDRÉ BIROTTE JR.
    UNITED STATES DISTRICT COURT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28